Page 3

```
1              UNITED STATES DISTRICT COURT
2            FOR THE DISTRICT OF COLUMBIA
3
4    - - - - - - - - - - - - - - - - x
5    D. MICHAEL BEARD,                :
6              Plaintiff,            :
7    vs.                    : Case No. 1:0GCV00756
8    ALPHONSO R. JACKSON,            :
9    SECRETARY OF HOUSING AND        :
10   URBAN DEVELOPMENT,              :
11             Defendant.            :
12   - - - - - - - - - - - - - - - - x
13                        Washington, D.C.
14                        Friday, January 19, 2007
15
16
17
18   Deposition of:
19             MICHAEL BEARD,
20   the Plaintiff, called for examination by counsel for
21   Defendant, pursuant to notice and agreement as to time and
22   place, at 501 Third Street, N.W., Washington, D.C., before
23   Deborah Rinaldo, a Notary Public in and for the District of
24   Columbia.
25
```

```
                                        I N D E X

                               EXAMINATION:          PAGE:
3    MICHAEL BEARD      Direct - Ms. Melnik          4
4                       Cross - Ms. Buie            98
5                       Redirect - Ms. Melnik       128
6                       Recross - Ms. Buie          133
7
8                         E X H I B I T S
9    BEARD EXHIBITS:        DESCRIPTION:             PAGE:
10   No. 1                Complaint                  14
11   No. 2                Relationship of Affiants
12                        chart                      23
13   No. 3                10/01 e-mail               26
14   No. 4                10/15/01 memorandum        32
15   No. 5                Informal EEO complaint     41
16   No. 6                3/4/02 memorandum          42
17   No. 7                6/15/04 e-mail             63
18   No. 8                6/16/04 e-mail             65
19   No. 9                Springfield Family Medicine
20                        report                     94
21   No. 10               2/16/01 e-mail             128
22   No. 11               3/3/01 e-mail              128
23
24
25
```

Page 2

```
1    APPEARANCES:
2              On Behalf of the Plaintiff:
3              MOLLY E. BUIE, ESQUIRE
4              Robert C. Seldon & Associates, P.C.
5              1319 F Street, N.W.
6              Suite 305
7              Washington, D.C.  20004
8              (202) 955-6968
9
10             On Behalf of the Defendant:
11             KAREN L. MELNIK, ESQUIRE
12             Assistant United States Attorney's Office
13             555 Fourth Street, N.W.
14             Tenth floor
15             Washington, D C  20001
16             (202) 307-0338
17
18             RICHARD K. JOHNSON, ESQUIRE
19             TIFFANIE R. SMITH, Attorney advisor
20             Office of Inspector General
21             451 7th Street, S.W.
22             Room 8260
23             Washington, D.C.  20410
24             (202) 708-1613
25
```

Page 4

# PROCEEDINGS

(10:10 a.m.)

3 (Whereupon,

4          MICHAEL BEARD,

5 was called as a witness and after having been first duly

6 sworn, was examined and testified as follows:)

7          DIRECT EXAMINATION

8     BY MS. MELNIK:

9     Q. Sir, can you please state and spell your full name.

10    A. Dana Michael Beard. D-A-N-A, Michael,

11 M-I-C-H-A-E-L, Beard, B-E-A-R-D.

12    Q. And what I would like to do first is review some of

13 the rules of how we'll conduct this deposition.  First thing

14 you'll notice, obviously, is the court reporter is taking down

15 everything that is being said to create a record and

16 eventually a transcript of this deposition will be made.  It's

17 very important that you give audible, clear and verbal

18 answers.  Do you understand?

19    A. Yes.

20    Q. It's also very important for you to wait until I've

21 finished a question before you start responding.  This is

22 important for two reasons.  First, the court reporter cannot

23 record both of us at the same time because she's obligated to

24 take down everything that is said.  So it will be less

25 confusing for her and create a more clear record if we are

## Page 5

1 able to wait for each other. Do you understand?
2  A. Yes.
3  Q. The second reason is that you may anticipate
4 incorrectly what I'm going to ask you. I may start asking you
5 about something, and you may start to interpret it a certain
6 way before I have a chance to finish. So again, it will make
7 for a more accurate record when the response comes out after I
8 finish my question. Do you understand?
9  A. Yes.
10  Q. You will have an opportunity to review and make
11 changes to the transcript that you deem necessary after we
12 complete the deposition. But you should bear in mind that if
13 those changes are material changes, I would be allowed to
14 comment on your changes at trial. What I mean by material, I
15 just mean a change that affects a significant aspect of your
16 testimony. Do you understand?
17  A. Yes.
18  Q. Perhaps most importantly, the court reporter
19 administered an oath to you just as we got started. From that
20 point on you are under oath, under penalty of perjury, just as
21 if you were testifying in court. Do you understand that?
22  A. Yes.
23  Q. If I ask a question and you don't understand it,
24 feel free to ask me to rephrase it because, for the record, I
25 will assume that you understand the question if you answer.

## Page 6

1 Do you understand that?
2  A. Yes.
3  Q. With the exception of an objection from your lawyer
4 based upon a privilege, you are obligated to answer all of my
5 questions. Do you understand?
6  A. Yes.
7  Q. If you feel like you need to take a break, just ask.
8 However, I would ask that if a question is pending, that you
9 answer the question before we go on to a break. Do you
10 understand that?
11  A. Yes.
12  Q. Have you had any drugs or alcohol in the last 24
13 hours?
14  A. I had wine with dinner last night.
15  Q. Any reason why that glass of wine would affect your
16 ability to provide truthful and accurate testimony here today?
17  A. None.
18  Q. Did you review any documents in preparation for your
19 testimony?
20  A. Yes.
21  Q. What documents are those?
22  A. The plaintiff's and the defendant's interrogatory
23 responses.
24  Q. And did you meet with your attorney in preparation
25 for your deposition today?

## Page 7

1  A. Yes, I did.
2  Q. How many times did you meet with your lawyer?
3  A. Yesterday.
4  Q. Other than your lawyer, did you discuss your
5 deposition testimony with anyone else?
6  A. My wife.
7  Q. And what's her name?
8  A. Dorothy.
9  Q. Dorothy Beard?
10  A. Yeah.
11  Q. How long have you been married?
12  A. 35 years.
13  Q. What is your date of birth?
14  A. November 28, 1949.
15  Q. And that makes you how old?
16  A. 57.
17  Q. Do you have any children?
18  A. Yes.
19  Q. How many?
20  A. One.
21  Q. What's his or her name?
22  A. Jennifer.
23  Q. Jennifer Beard?
24  A. Wells, W-E-L-L-S.
25  Q. And how old is she?

## Page 8

1  A. 34.
2  Q. For whom do you currently work?
3  A. Office of Inspector General, United States
4 Department of Housing and Urban Development.
5  Q. And the acronym we often say HUD OIG?
6  A. Yes.
7  Q. And I'll refer to the Office of Inspector General
8 for Housing and Urban Development as HUD OIG, for the record.
9  A. OIG.
10  Q. How long have you worked for HUD OIG?
11  A. I believe I started with the HUD OIG in 1988.
12  Q. What's the position you currently hold?
13  A. Special assistant to the deputy assistant inspector
14 general for audit.
15  Q. When did you start in that position as special
16 assistant?
17  A. March of 2005.
18  Q. What was your position prior to becoming a special
19 assistant?
20  A. I was the regional inspector general for Region VI
21 in Fort Worth, Texas.
22  Q. Is that regional inspector general for audit?
23  A. Yes, regional inspector general for audit.
24  Q. Again, in terms of an acronym, is that often
25 referred to as RIGA, R-1-G-A?

Page 9

1    A. Yes.
2    Q. For how long did you hold the position of regional
3  inspector general for audit, or RIGA, in Fort Worth?
4    A. I was appointed to that position in October of 1992.
5  So 13 years.
6    Q. Prior to being RIGA in Fort Worth, what position did
7  you hold prior to that?
8    A. I was the assistant regional inspector general for
9  audit in Atlanta, Georgia.
10    Q. For how long were you the assistant regional
11  inspector general for audit in Region IV?
12    A. Four years.
13    Q. So 1988 to 1992?
14    A. Right.
15    Q. Prior to being the assistant RIGA in Region IV, were
16  you still with HUD prior to that?
17    A. No.
18    Q. Where were you prior to that?
19    A. I was with the Office of Inspector General for the
20  Environmental Protection Agency.
21    Q. From what year to 1988 were you with OIG at --
22    A. 1987 to 1988.
23    Q. You are familiar with an administrative complaint, a
24  discrimination complaint that's entitled Tighe, T-I-G-H-E, v.
25  Cuomo, are you not?

Page 10

1    A. Yes.
2    Q. And what was your role, if any, in that
3  administrative discrimination lawsuit or complaint?
4    A. I provided an affidavit to the EEO investigator
5  sometime in 1999, and I was deposed by Mr. Tighe's attorney in
6  July of 2001.
7    Q. And what was Mr. Tighe's -- it's Robert Tighe,
8  correct?
9    A. Yes.
10    Q. What was Robert Tighe's position at the time?
11    A. He was a special agent with the Office of Inspector
12  General in Fort Worth, Texas.
13    Q. Now, is that office, is that the same as your office
14  or was he doing something else?
15    A. There are two offices, one of audit and one of
16  investigations. So he was in a separate investigative office.
17    Q. What was your understanding of his -- or why he
18  filed the complaint? What were his complaints? What was his
19  complaint based on?
20    A. I think he was filing for race or age.
21    Q. And do you know against who he was alleging was the
22  discriminating official or officials?
23    A. He was alleging Larry Chapman as the discriminating
24  official. And I don't know if he alleged anyone else.
25    Q. Who is Larry Chapman?

Page 11

1    A. Larry Chapman is the special agent in charge of the
2  office of investigations in Fort Worth, Texas.
3    Q. And special agent in charge often referred to as
4  SAC, S-A-C?
5    A. Yes.
6    Q. And what's the working or professional relationship
7  between your office and the Office of Inspector General
8  Investigations?
9      What's the -- I don't mean you personally and
10  Mr. Chapman personally, but what's the -- organizationally
11  what's the relationship between those two?
12    A. They complement one other in that as the auditors
13  find indications of fraud or a crime, they would refer that to
14  the investigators. And when the investigators needed help in
15  areas where audit expertise would help them, they would ask
16  the office of audit to do so.
17    Q. And what was your relationship like with Mr. Chapman
18  personally?
19    A. It was cordially professional. And we had been
20  friends, but it had gotten strained over the years.
21    Q. As far as you are concerned, what was the cause of
22  that straining of the relationship?
23    A. He was having an extramarital affair, and I
24  confronted him on that. He and his spouse and my spouse, the
25  four of us, were frequent double-daters to events.

Page 12

1    Q. Was there anything else or was it just that?
2    A. It was just that as far as I'm concerned.
3    Q. Now, wasn't Mr. Tighe's complaint, weren't you
4  also -- strike that.
5      Did he allege that you were a discriminating
6  official in some capacity in that lawsuit?
7    A. Not that I'm aware of.
8    Q. How about Mr. Phelps or Mr. Heist?
9    A. No.
10    Q. Or Ms. Susan Gaffney?
11    A. He may have been alleging against Ms. Susan Gaffney.
12  I do not know if he was or he was not.
13    Q. At the time of the lawsuit or the administrative
14  complaint, the discrimination complaint, 1999, who was the
15  inspector general at the time?
16    A. Susan Gaffney, G-A-F-F-N-E-Y.
17    Q. Who was Mr. Stephens?
18    A. Mr. Michael Stephens? He is the current deputy
19  inspector general for the OIG.
20    Q. And was he working at HUD OIG in 1999?
21    A. No, he was not.
22    Q. Were Mr. -- who is Mr. Phelps?
23    A. Mr. Phelps is -- or was the deputy assistant
24  inspector general for audit.
25    Q. Who was Mr. Heist, H-E-I-S-T?

## Page 13

1    A. He is the deputy assistant inspector general for

2  audit. No. Excuse me. He is the assistant inspector general

3  for audit.

4    Q. And were Mr. Stephens -- I'm sorry. Were Mr. Phelps

5  and Mr. Heist working for HUD OIG in 1999?

6    A. Yes, they were.

7    Q. And what was the nature of your deposition testimony

8  in that case, Cuomo -- Tighe v. Cuomo?

9    A. In the deposition in July of 2000 I was asked

10  general questions about the atmosphere at HUD towards adhering

11  to EEO requirements and regulations.

12    Q. How did you respond those questions?

13    A. I pointed out that the senior management at the HUD

14  OIG were taking actions -- they were not adhering to the EEO

15  regulations. They were attempting to hire people of minority

16  or female class without adhering to the EEO regulations.

17    Q. Now, is that something you were told or it was your

18  perception at the time? What did you base that information on

19  at the time?

20    A. We were -- at that time our annual appraisals

21  included a section for EEO hiring, and if we did not improve

22  the status in our particular regions, then we would be rated

23  low on that. There was a lot of pressure to hire or not hire

24  or select or not select coming from the headquarters.

25    Q. Were you critical -- in your deposition testimony in

## Page 14

1  Tighe v. Cuomo, were you critical of specific individuals or

2  was it as you just said, sort of management in general,

3  headquarters in general or did you name names such as it were?

4    A. I believe I did name some names, which would have

5  been -- I probably would have mentioned specifically Kathy

6  Kuhl-Inclan, who at that time was the assistant inspector

7  general for audit, and Susan Gaffney, the inspector general.

8  I may have mentioned others. I don't recall.

9    (Beard Deposition Exhibit Number 1 was marked for

10  identification.)

11    BY MS. MELNIK:

12    Q. Mr. Beard, do you recognize Exhibit 1?

13    A. Yes, I do.

14    Q. And what's Exhibit 1?

15    A. It's my complaint.

16    Q. If you turn to paragraph 22 --

17    A. Yes.

18    Q. -- you say that your testimony in that Tighe v.

19  Cuomo case was the subject of discussions between former

20  inspector general Gaffney and members of her senior staff.

21    A. Yes.

22    Q. Were you present for those conversations of which

23  you are referring?

24    A. No, I was not.

25    Q. Do you know who exactly the discussions were between

## Page 15

1  or among?

2    A. Yes.

3    Q. How did you learn about those discussions -- first

4  of all, who were they between or among?

5    A. Kathy Kuhl-Inclan, Susan Gaffney, Bryan Saddler, who

6  was counsel to the IG, John Connors, deputy inspector general.

7  I think Phillip Kesaris, who would have been the assistant

8  inspector general for investigations.

9    Q. Can you spell that last name you mentioned?

10    A. My best guess is K-E-S-A-R-I-S.

11    MS. BUIE: I think that's right.

12    BY MS. MELNIK:

13    Q. And how did you learn that there were discussions

14  regarding your testimony in Tighe v. Cuomo among or between

15  those individuals that you just named?

16    A. My supervisor, Kathy Kuhl-Inclan, called and told me

17  of the discussions.

18    Q. Well, didn't Kathy Inclan leave HUD OIG in 2000?

19    A. Yes.

20    Q. And wasn't your testimony in Tighe v. Cuomo in July

21  of 2001?

22    A. Yes.

23    Q. So are you saying that Kathy Inclan called from

24  another office to discuss it with you?

25    A. No. The call took place in 1999 and it was in

## Page 16

1  reference to the affidavit that I gave in Tighe v. Cuomo.

2    Q. Not your testimony?

3    A. Not the testimony.

4    Q. Do you recall the general substance of your

5  affidavit? Was it the same as your deposition or was it

6  something different?

7    A. The affidavit dealt specifically with the actions of

8  Mr. Chapman in the selection of people for the housing fraud

9  initiative.

10    Q. Now, with respect to the Tighe v. Cuomo case, are

11  you aware that the EEOC affirmed the administrative judge's

12  ultimate finding that unlawful employment discrimination was

13  not proven by a preponderance of the evidence?

14    A. No.

15    Q. Were you aware that Mr. Tighe made a request for a

16  reconsideration of that finding and it was also denied?

17    A. I was aware he had appealed.

18    Q. Were you aware that it was denied?

19    A. Yes.

20    Q. Now, I think we just mentioned or you confirmed that

21  Susan Gaffney left HUD OIG in 2001?

22    A. Yes.

23    Q. Who replaced her as inspector general?

24    A. Immediately Mr. Heist became the acting deputy

25  inspector general. As that he would have been the inspector

Page 17

1 general, but not -- he can't be an acting inspector general.
2 That was for a short time. And then Mr. Dave Williams was put
3 in place as the acting inspector general until the position
4 was filled.
5     Q. By whom?
6     A. Mr. Kenneth Donohue.
7     Q. How would you describe your -- first your working
8 relationship with Ms. Gaffney?
9     A. I'm sorry?
10     Q. How would you describe your working relationship
11 with Susan Gaffney?
12     A. Well, it was a fairly good relationship.
13     Q. What made it good?
14     A. I think she looked to me to produce the kind of
15 audits that she wanted for making impacts on HUD programs.
16     Q. And in doing that, were you given a significant
17 amount of autonomy to run Region VI the way you saw fit?
18     A. Yes.
19     Q. And in doing that -- when I refer to autonomy -- let
20 me ask you. When you acknowledged that you had a certain or
21 good amount of autonomy to run Region VI as you saw fit, what
22 does that mean to you? What were you permitted to do on your
23 own sort of decision-making ability?
24     A. What she had essentially done was move the authority
25 to publish reports to the field, particularly for external

Page 18

1 audits, and so that the field was publishing those reports in
2 a much more open manner or easier manner than what had been in
3 the past.
4         The internal reports, which are reports issued to
5 HUD, were still cleared by headquarters.
6     Q. And with respect to the outside audits, does that
7 mean the region got to decide which audits it wanted to
8 pursue?
9     A. Pretty much. There would be meetings normally
10 around three times a year to discuss what types of audits were
11 going to be done, what subject areas were going to be done.
12 And then the regions were left to conduct those.
13     Q. And it's fair to say that you were -- that was a
14 working relationship that was something that you thought was
15 positive? That was a good thing?
16     A. Yes.
17     Q. So under Ms. Gaffney, you didn't have to run every
18 single audit decision or whom to audit by headquarters?
19     A. That's correct.
20     Q. Did there come a time when that changed?
21     A. Yes.
22     Q. And when did that change?
23     A. Sometime in 2002 a new directorate was created
24 called Technical Oversight and Planning. And all audit
25 decisions were sent to TOP, which is what it was called, and

Page 19

1 approved or disapproved on their recommendation by Mr. Heist.
2     Q. When did Mr. Donohue, Kenneth Donohue, become the
3 inspector general? What year?
4     A. 2002.
5     Q. Was the creation of the technical oversight and
6 planning or TOP, T-O-P, was that a creation of his or his in
7 conjunction with other headquarters officials? Do you know
8 how TOP came about or whose idea that was?
9     A. No. I mean, specifically, no, I don't know that.
10     Q. But you know it was something that was created by
11 headquarters?
12     A. Yes.
13     Q. And with the creation of TOP whereby all audit
14 decisions had to be vetted, so to speak, through them and
15 approved by or through Mr. Heist, that took away some of the
16 autonomy that you previously enjoyed under Ms. Gaffney?
17         MS. BUIE: Objection to form.
18         THE WITNESS: It changed how we did business.
19         BY MS. MELNIK:
20     Q. And in doing so because now you could not decide
21 which audits on your own to bring with respect to outside
22 audits, that decreased your level of autonomy?
23         MS. BUIE: Objection to form. These are all
24 incredibly leading questions.
25         MS. MELNIK: I get to ask leading questions.

Page 20

1         MS. BUIE: No, you don't.
2         BY MS. MELNIK:
3     Q. You can still answer the question.
4     A. It changed how we did business.
5     Q. Let me ask you this, prior to the creation of TOP
6 with respect to outside audits, you made the decisions with
7 respect to whom to audit, correct?
8     A. Generally speaking, yes. But at these planning
9 meetings we were told the subject areas that were of interest.
10 So we were steered into certain subject areas.
11     Q. But with respect to bringing specific audits against
12 specific entities, you got to make that call, correct?
13     A. Yes, we did.
14     Q. And then once the creation of TOP, that changed?
15     A. Yes.
16     Q. Prior to Mr. Heist -- I'm sorry, what's the position
17 he holds now? Mr. Heist?
18     A. Assistant inspector general for audit.
19         MR. JOHNSON: We generally say AIGA.
20         BY MS. MELNIK:
21     Q. Who was the AIGA before Mr. Heist?
22     A. Kathy Kuhl-Inclan.
23         MS. BUIE: I don't think we've spelled that one.
24         THE WITNESS: K-U-H-L, hyphen, I-N-C-L-A-N.
25         BY MS. MELNIK:

Page 21

1  Q. How was your working relationship with
2 Ms. Kuhl-Inclan? How was your relationship with her?
3  A. Professional and cordial.
4  Q. How would you describe your professional
5 relationship with Mr. Heist?
6  A. The same, professional and cordial.
7  Q. Now, the tension that you describe between yourself
8 and Mr. Larry Chapman, were you ever spoken to or counseled by
9 headquarters regarding your professional interaction and/or
10 even personal interaction with Mr. Chapman?
11  A. Counseled? I think that there was a meeting in
12 sometime in 2002 where Mr. Haban, the assistant inspector
13 general for investigations, met with myself and Mr. Chapman
14 and Mr. Heist, and at that time counseled us to get along.
15  And in, I think, May of 2002, there was a conference
16 in Tampa, Florida, where Mr. Michael Stephens, the deputy
17 inspector general, asked Mr. Chapman and I to get along.
18  Q. So the tension or stress of which you referred to
19 between yourself and Mr. Chapman was such that it was known by
20 headquarters?
21  A. Someone had told Mr. --
22  Q. First answer that. Is that yes or no?
23  A. Someone had told Mr. Stephens there was a problem.
24  Q. And Mr. Stephens, at that time, and still is not
25 your first-line supervisor, correct?

Page 22

1  A. Correct.
2  Q. At that time Mr. Phelps was your first-line
3 supervisor?
4  A. At the time of the counseling, yes.
5  Q. And Mr. Heist is Mr. Phelps' supervisor?
6  A. Yes.
7  Q. And Mr. Stephens is above Mr. Heist and Mr. Phelps
8 and yourself?
9  A. Yes.
10  Q. Just in terms of chain of command, was there a point
11 in time when Mr. Heist changed the chain of command as to who
12 reported to whom?
13  A. Yes.
14  Q. Can you describe that for me?
15  A. Sometime in 2001 he made Mr. Phelps the first-line
16 supervisor for the regional inspectors general.
17  Q. Mr. Heist made Mr. Phelps; is that correct?
18  A. Yes.
19  Q. Mr. Phelps made him -- Mr. Heist made Mr. Phelps,
20 what?
21  A. First-line supervisor for the regional inspectors
22 general.
23  Q. And you were a regional inspector general?
24  A. Yes.
25  Q. How many regions are there?

Page 23

1  A. Ten.
2  (Beard Deposition Exhibit Number 2 was marked for
3 identification.)
4  BY MS. MELNIK:
5  Q. Mr. Beard, do you recognize what Exhibit 2 shows?
6  A. Yes.
7  Q. And what does it show?
8  A. Relationship of Affiants Chart. It shows a chain of
9 command type relationship.
10  Q. And prior to Mr. Phelps retiring -- do you know when
11 he retired, by the way?
12  A. January 2006. Somewhere in that neighborhood.
13  Q. So prior to his retirement, does Exhibit 2
14 accurately demonstrate the chain of command -- or your chain
15 of command?
16  A. Yes.
17  Q. In terms of comparison between Ms. Gaffney and
18 Mr. Donohue, the newer inspector general, in addition to
19 creating -- or TOP being created, what other management
20 differences were there between the two, if any, that you
21 recall?
22  A. He instructed us to adhere to the chain of command,
23 and he announced that empowerment was over.
24  Q. And when you say -- I'm sorry, what was the last
25 thing?

Page 24

1  A. He announced that empowerment was over.
2  Q. What do you believe he meant by empowerment was
3 over?
4  A. That the regional inspectors general and the special
5 agents in charge were going to have more of their actions
6 approved in headquarters.
7  Q. How did you learn of that change of sort of
8 management style or directive?
9  A. At a manager's conference in Tampa, Florida,
10 Mr. Donohue announced it.
11  Q. What was your reaction? Immediate reaction? How
12 did you feel about that change?
13  A. That we were going to centralize rather than
14 decentralize.
15  Q. That was a fact. That was happening, correct?
16  A. Yes.
17  Q. My question is, how did you feel about that?
18  A. It was just going to be a different way to operate.
19 I had done that before. So we were just going to be a
20 centralized organization rather than decentralized.
21  Q. So you had no feeling about it one way or another?
22 Positive? Negative? Nothing? You felt nothing about it?
23  A. If I were to have my preference, I prefer
24 decentralized, but I have worked under both.
25  Q. When was the last time that, in your mind, things

Page 25

1  were more centralized? When had they been centralized? You
2  said you worked under that before. When are you referring to?
3      A. The Air Force audit agency that I worked for in the
4  '80s -- '70s and '80s, is a very centralized organization.
5  The Environmental Protection Agency was a centralized
6  organization. The HUD IG has been more decentralized until
7  Mr. Donohue changed it.
8      Q. So your experience with HUD starting from 1988 all
9  the way through to 2005 -- or well, I'll take that back, to
10  2002, was one that was more decentralized?
11      A. Yes.
12      Q. Why was that something you preferred?
13      A. It's easier to motivate people when they have more
14  input into the products they are working with. And it's more
15  efficient.
16      MS. BUIE: Do you think we could go off the record
17  for just a second before you go on to the next area.
18      (A recess was taken.)
19      (Beard Deposition Exhibit Number 3 was marked for
20  identification.)
21      BY MS. MELNIK:
22      Q. Mr. Beard, since this is a few pages long, why don't
23  you take a minute just to look through it.
24      A. (Reviewing document.)
25      Q. Do you recognize Exhibit 3?

Page 26

1      A. Yes.
2      Q. Directing your attention first to the first page of
3  Exhibit 3, you'll agree with me that it's an e-mail that was
4  sent to you from Mr. William Nixon? At least the body of the
5  text on the first page was from Mr. William Nixon to yourself?
6      A. Yes.
7      Q. Who is William Nixon?
8      A. He is an assistant regional inspector general at
9  Fort Worth.
10      Q. And did he have that position while you were the
11  RIGA of Fort Worth?
12      A. Yes.
13      Q. During your tenure as RIGA at Fort Worth, how long
14  was Mr. Nixon the assistant RIGA? In other words, how long
15  did you two work together in those two positions?
16      A. I would guess that he became the ARIGA in maybe
17  1996.
18      Q. So approximately nine or so years?
19      A. Yes.
20      Q. And this is the e-mail that Mr. Nixon sent to you,
21  you sent to Stanley McLeod, correct?
22      A. Yes.
23      Q. And at the time you sent it, who was Stanley McLeod
24  or what was his position?
25      A. In October of 2001 I think he is the director for

Page 27

1  planning -- I don't recall the name of the predecessor to TOP.
2  But he would have been the director for that.
3      Q. The predecessor to TOP?
4      A. Yes.
5      Q. Did Mr. McLeod subsequently become the director or
6  chief or leader of TOP?
7      A. Yes.
8      Q. Now, the e-mail that Mr. Nixon sent to you was in
9  response to a memoranda from headquarters; is that right?
10      A. We had been asked to comment on the ASB.
11      Q. And what's the ASB?
12      A. Audit staff bulletin.
13      Q. Was the subject of this audit staff bulletin
14  regarding the trend or transformation from decentralized to
15  centralized operations with respect to audits?
16      MS. BUIE: Object to the form.
17      THE WITNESS: I don't know.
18      BY MS. MELNIK:
19      Q. Well, if you read or scan the text of Exhibit 3, you
20  may be able to answer.
21      A. These are apparently changes to -- or proposed
22  changes to the audit preparations manual, I think, going by
23  the headlines that are in here. And we had been asked to
24  comment on those proposed changes.
25      Q. Had there always been ASBs and were there ASBs under

Page 28

1  Gaffney?
2      A. Yes. Well, ASBs are issued by the audit. Not
3  Ms. Gaffney.
4      Q. Had they existed previously?
5      A. Yes.
6      Q. Now, how would you describe Mr. Nixon's response to
7  this particular ASB?
8      A. He did not like what the ASB was saying. So his
9  response is negative.
10      Q. Now, Mr. Nixon is a subordinate of yours, correct?
11      A. Yes.
12      Q. So rather than listening or -- listening to his
13  comments, Mr. Nixon's comments, and communicating them in your
14  own words to headquarters, you chose to simply forward his
15  e-mail to you up to Mr. McLeod?
16      MS. BUIE: Object to the form. Not only is it
17  leading, it's also a compound question.
18      BY MS. MELNIK:
19      Q. You didn't take Mr. Nixon's comments and pass them
20  to headquarters in your own words, correct?
21      A. I forwarded this e-mail from Nixon to Mr. McLeod. I
22  don't recall if I deleted anything from it.
23      Q. If you look on page -- let me ask you this, as
24  Mr. Nixon is your subordinate, your -- strike that.
25      You are responsible for the work product that comes

Page 29

1 out of Region VI, correct?

2  A. Yes.

3  Q. And you are responsible for the professionalism of
4 your staff at Region VI, correct?

5  A. What do you mean by professionalism?

6  Q. You are essentially the manager of all of Region
7 VI -- or you were?

8  A. Yes.

9  Q. And as a manager, you are responsible for managing
10 your staff?

11  A. Yes.

12  Q. And that includes making sure that they act in a
13 professional manner.

14  A. Okay.

15  Q. Is that right?

16  A. Yes.

17  Q. Professional manner between themselves, correct?

18  A. Yes.

19  Q. And a professional manner with outside agencies?

20  A. Yes.

21  Q. Folks -- auditees that they audit, right?

22  A. Yes.

23  Q. And as well as supervisors, yourself included?

24  A. Yes.

25  Q. Going up to folks, supervisors above yourself,

Page 30

1 correct?

2  A. Yes.

3  Q. Now, on page 3, if you would go to page 3 of
4 Exhibit 3, in the middle is the second bullet. Mr. Nixon
5 writes in the middle of the second bullet, "The IGs that go
6 along with management, (clients) or have been agreeable should
7 be terminated."

8   Do you agree with me that that's what it says?

9  A. That's what it says.

10  Q. Now, it was your decision to forward this e-mail up
11 the chain, correct?

12  A. Yes.

13  Q. And do you think that's a professional comment that
14 Mr. Nixon made?

15  A. I think it's demonstrating what Mr. Nixon feels.

16  Q. That's not what I asked. I asked if you think that
17 was a professional comment to make?

18  A. I do not think it's unprofessional.

19  Q. Well, that's a double negative. Do you think it was
20 professional or do you think it was not professional?

21  A. I think it was professional.

22  Q. In forwarding Mr. Nixon's e-mail up the chain of
23 command, I take it to mean that you agreed with what he said
24 in substance?

25  A. I'm forwarding it to Mr. McLeod, who is the director

Page 31

1 of planning at the time. So I'm not sure of the statement
2 "chain of command." But I am forwarding it to Mr. McLeod.

3  Q. And in doing so, as the RIGA of Region VI, you are
4 essentially -- or aren't you essentially putting your
5 imprimatur on the comments that were made?

6  A. You have to define imprimatur for me.

7  Q. Well, you sent it to Mr. McLeod, so you knew about
8 the comments obviously, correct?

9  A. Yes.

10  Q. And --

11   MS. BUIE: Condone.

12   MR. JOHNSON: Endorse.

13   BY MS. MELNIK:

14  Q. I'm sorry. I'm sitting here trying to find a word.
15 Exactly. By sending them up, you endorse, condone or are in
16 agreement in principle with Mr. Nixon's view of the ASB?

17  A. Agreement in principle, yes.

18   (Beard Deposition Exhibit Number 4 was marked for
19 identification.)

20   BY MS. MELNIK:

21  Q. And do you recognize Exhibit 4 as a series of
22 memoranda back in October of 2001 between yourself and
23 Mr. James Heist?

24  A. Yes.

25  Q. And on the one on October 15, 2001, which is the

Page 32

1 first page of Exhibit 4, in the last paragraph on that page,
2 he tells you -- and this is second sentence, last paragraph on
3 the page. "The tone of Mr. Nixon's comments was
4 inappropriate. Moreover, you should have exercised some
5 discretion and edited the comments rather than simply passing
6 them along.

7   "Therefore, I direct you to counsel Mr. Nixon,
8 verbally and in writing, on the roles and responsibilities of
9 the headquarters staff and the need to communicate in a
10 professional manner. I also direct you to advise me of the
11 results of this counseling session and provide me with your
12 assurance that Mr. Nixon understands the importance of
13 communicating in a professional and respectful manner."

14   Do you recall receiving this memorandum?

15  A. Yes, I do.

16  Q. So based on your answer to my previous question
17 before showing you this exhibit, you disagree with Mr. Heist
18 in terms of the professionalism of Mr. Nixon and his comments?

19   MS. BUIE: Object to the form.

20   THE WITNESS: I, when I forwarded the message to
21 Mr. McLeod, did not consider it to be any error or anything
22 wrong.

23   BY MS. MELNIK:

24  Q. So you disagree with Mr. Heist in terms of his
25 assessment of whether or not it was professional or

Page 33

1 unprofessional?
2    A. Yes.
3    Q. Is it fair to say, Mr. Beard, that the tone of
4 Mr. Nixon's e-mail was anger?
5    A. Yes.
6    Q. And although you couldn't recall when I asked you
7 previously about whether or not you made any changes, if you
8 look on the second memoranda dated October 23, 2001, which is
9 from yourself to Mr. Heist, starting on the last line of the
10 first page.
11        "I chose not to sanitize or edit his comments and
12 forwarded them to Mr. McLeod. I could have sanitized those
13 comments, but I felt it important for Mr. McLeod to receive
14 the full impact the draft had on the field staff. If I had
15 sanitized the comments, Mr. McLeod would never know the real
16 field reaction."
17        Do you recall writing this memoranda?
18    A. Yes.
19    Q. So you didn't sanitize or edit the e-mail?
20    A. Apparently not.
21    Q. And then in the last paragraph you state, "In light
22 of the foregoing, I would ask that you reconsider your
23 instruction to me regarding written counseling."
24        So despite Mr. Heist's instruction to counsel
25 Mr. Nixon with respect to his professionalism, your response

Page 34

1 was not to say yes, I will, but rather to ask him to
2 reconsider?
3    MS. BUIE: Object to the form.
4    BY MS. MELNIK:
5    Q. Do you understand my question?
6    A. No. What's the question?
7    Q. Sure. Mr. Heist had instructed you to counsel
8 Mr. Nixon, correct?
9    A. Yes.
10    Q. And your response to that was not to counsel
11 Mr. Nixon, but rather to ask Mr. Heist if he would reconsider?
12    A. I asked Mr. Heist to reconsider because I considered
13 the incident my fault. Not Mr. Nixon's. Mr. Nixon, when he
14 wrote the e-mail, was writing to me. So it was my error. And
15 I said it would not happen again, and it has not happened
16 since.
17        I said in that --
18    Q. Wait. There is not a question pending. If you turn
19 to the November 2, 2001, memoranda from yourself to Mr. Heist,
20 you yourself express anger, do you not, with respect to the
21 bulletin? You call aspects either insulting or condescending,
22 correct?
23    MS. BUIE: I'm just going to object because it's a
24 compound question.
25    BY MS. MELNIK:

Page 35

1    Q. You yourself were angry about some aspects of the
2 bulletin, correct?
3    A. Mr. Heist --
4    Q. Is that a yes or no, Mr. Beard? Were you upset?
5    A. I thought they were insulting and condescending.
6    Q. In fact, you say -- and this is on the last
7 sentence, "The bulletins, taken as a whole, are degrading and
8 cause field staff to be resentful."
9        Correct, you wrote that?
10    A. Yes.
11    Q. And these bulletins to which you refer, they would
12 be applicable to all the regions. Not just yours, correct?
13    A. That's correct.
14    Q. The line before that last line you state, "The
15 bulletins are overkill, indicating headquarters personnel do
16 not trust us to perform audits in accordance with GAGAS."
17        And just for clarification, what is GAGAS?
18    A. Generally accepted government audit standards.
19    Q. So essentially, you are telling your boss that you
20 feel like headquarters doesn't trust you to perform your job?
21    MS. BUIE: Object to the form.
22    THE WITNESS: He had asked that I give him specific
23 examples where I thought the bulletins were insulting and
24 condescending. And I responded to his inquiry.
25    BY MS. MELNIK:

Page 36

1    Q. And in doing so, it was your belief that
2 headquarters did not trust you or your staff to perform audits
3 in accordance with GAGAS, correct?
4    A. That's the tone in the bulletins. That's the
5 inference being drawn by the auditors.
6    Q. That's the inference that you drew, correct?
7    A. No. Mr. Nixon and the other people who responded to
8 those were drawing.
9    Q. So are you saying that all your staff felt this way
10 in terms of being insulting and that they don't trust you,
11 that only related to your staff? You didn't feel that way
12 personally at all?
13    A. This was the way the bulletins were coming across.
14    Q. I'm not asking how the bulletins were coming across.
15 I'm asking about the reaction. And you've said that Mr. Nixon
16 and the auditors felt this way. Are you saying you did not
17 feel that way as well?
18    A. I thought that message was being inferred correctly
19 from the bulletins.
20    Q. By whom?
21    A. By those that were being asked to comment on them.
22    Q. And you are one of those people that were asked to
23 be commenting, correct?
24    A. Yes.
25    Q. I just want to turn to the last page of Exhibit 4.

Page 37

1 At the top you state, "I was insulted by the following." The
2 bullet point is, "The Director of Planning and Research is
3 responsible for evaluating and processing referrals submitted
4 to OIG Headquarters for signature.
5     "The report issuer should provide the Director, or a
6 designee, electronic files of the referral memorandum and
7 referral summary. The Office of Planning and Research is
8 responsible for monitoring the audit follow-up process and may
9 request additional information from OIG counsel or the report
10 issuer before submitting the referral to the Assistant
11 Inspector General for Audit."
12     Mr. Beard, what did you find insulting about that?
13     A. Actually, I don't remember now what point I was
14 trying to make.
15     (A recess was taken.)
16     BY MS. MELNIK:
17     Q. Mr. Beard, in February of 2002, were you
18 reprimanded?
19     A. Yes.
20     Q. What was the reprimand for?
21     A. For not referring potential criminal matters to the
22 office of investigations.
23     Q. Had you not done that? You had not referred a
24 potential criminal matter to the office of investigations?
25     A. I disagreed with that.

Page 38

1     Q. So you disagreed with the reprimand in that you had
2 not done that?
3     A. Yes.
4     Q. So what did you do since you disagreed?
5     A. I filed an EEO complaint and asked that a hostile
6 work environment and in particular that culminated in that
7 reprimand be -- I think I asked for the reprimand to be
8 removed.
9     Q. Now, on or about the same period of time, February
10 of 2002, you received a performance appraisal, correct?
11     A. Yes.
12     Q. Did you have a problem with Mr. Michael Phelps'
13 evaluation of you or some aspect of it?
14     A. Not in February of 2002.
15     Q. Do you recall filing a grievance with respect to
16 comments that were made with respect to your 2002 performance
17 appraisal?
18     A. I filed an informal agreement [sic] with Mr. Phelps
19 when I received a copy of an appraisal that was different than
20 the one I received in February.
21     Q. What about that was different?
22     A. There was a document attached that was not attached
23 to the original appraisal.
24     Q. What was the substance of the document that was
25 attached that you had a problem with?

Page 39

1     A. What I objected to was the fact that it was
2 attached. It was not in the appraisal I was given in February
3 of 2002.
4     Q. Wasn't there things in the attachment that were
5 critical of your performance?
6     A. Without actually looking at it, I'm not sure what it
7 said.
8     Q. Mr. Beard, do you recall a memoranda that you sent
9 to Sandra Scott, an equal employment opportunity specialist,
10 where you complained that when you came to headquarters on
11 February 20, 2002, for your annual rating, that Mr. Phelps
12 berated and told you you were difficult to manage? Do you
13 recall that?
14     First let me ask you, do you recall writing that?
15     A. Sandra Scott? What time period is this?
16     Q. This is March 20, 2002.
17     A. I would have contacted Sandra Scott to start the
18 proceedings for an EEO complaint.
19     Q. And then do you recall the event to which you are
20 referring to, to Ms. Scott about Mr. Phelps, you say, berating
21 or at least letting you know that you were difficult to
22 manage? Do you recall him telling you that?
23     A. Yes, I do recall Mr. Phelps telling me I was
24 difficult to manage.
25     Q. When did he tell you that in relation to this

Page 40

1 evaluation -- you receiving your evaluation?
2     A. I don't remember that.
3     Q. Do you recall why he told you you were difficult to
4 manage?
5     A. I think actually I'm recalling what he said in his
6 affidavit, that he told Mr. Stephens I was difficult to
7 manage.
8     (Beard Deposition Exhibit Number 5 was marked for
9 identification.)
10     MS. BUIE: Karen, what page is it that you are
11 referring to?
12     MS. MELNIK: It's either the second or the third at
13 the bottom.
14     BY MS. MELNIK:
15     Q. Just for clarification of the record, what is
16 Exhibit 5?
17     A. Informal EEO complaint for reprisal.
18     Q. Is that your informal EEO complaint for reprisal
19 that you submitted in March of --
20     A. March 20, 2002.
21     Q. And then now going to the third page at the
22 bottom --
23     A. Yes.
24     Q. -- having had a chance to read that paragraph, do
25 you now recollect the event of when Mr. Phelps had a

Page 41

1 conversation with you about the difficulty in managing you?

2    A. It would have been at the meeting on February 20,

3 2002.

4    Q. Do you recall why he believed you were difficult to

5 manage?

6    A. Well, according to what I've written here, he said I

7 frequently failed to follow HUD policy, and then he cited some

8 examples.

9    Q. Just backtracking just for half a second, when you

10 received your reprimand back on February 20, 2002, was

11 Mr. Stephens working at HUD OIG?

12    A. He came in 2002, and I'm not sure when the date is.

13    (Beard Deposition Exhibit Number 6 was marked for

14 identification.)

15    BY MS. MELNIK:

16    Q. Do you recognize the series of memoranda which makes

17 up Exhibit Number 5 [sic]?

18    A. Yes.

19    Q. I think there is a total of five memoranda?

20    A. Yes.

21    Q. What's going on between you and Mr. Phelps in these

22 memoranda?  What's causing this back and forth between you and

23 Mr. Phelps?

24    A. My testimony in the Tighe case.

25    Q. Is that mentioned in any of your memoranda?  Can you

Page 42

1 show me?

2    A. On the second page of the March 15th memoranda.

3    MS. BUIE: Can you point it out?

4    THE WITNESS: second paragraph, "Because of its tone

5 and timing."

6    BY MS. MELNIK:

7    Q. So you say -- and this is again on the March 15th

8 memoranda, second page, "Because of its tone and timing, I

9 consider your memo another example of your continuing

10 harassment and retaliation."

11    And you are saying that -- you are referring to what

12 when you say that?

13    A. The memo of March 4, 2002, from Mr. Phelps to me.

14    Q. I guess you are misunderstanding me.  I'm asking you

15 with respect to the substance of these memos, what's that

16 about?  Not what you think might be causing the memos from

17 Mr. Phelps, but what's the substance of the memos?

18    A. That is the substance of these memos.  These memos

19 would not have occurred elsewhere.

20    Q. Well, that's, again, not my question, Mr. Beard.  I

21 understand that you think these were caused because of your

22 testimony back in 2001 about Mr. Tighe, but I'm asking you the

23 substance.

24    In the substance of these memos, correct me if I'm

25 wrong, is there a discussion of your testimony in Tighe v.

Page 43

1 Cuomo?

2    A. No, there is not.

3    Q. So what is the substance of these memos about?

4    A. It's harassment.

5    Q. You are still not answering my question, Mr. Beard.

6 I'm asking about the substance of the memos.  I understand

7 that you think the memos are a form of harassment, but that's

8 not what I'm asking.  Okay?  Do you understand my question?

9    A. Yes.

10    Q. My question is, what was this about?

11    A. The subject matter on Mr. Phelps' memo was

12 performance rating for Will Nixon period ending January 31,

13 2002.

14    Q. And that's the subject on your memo to him on March

15 15, 2002?

16    A. Yes.

17    Q. As it is for all the memos in Exhibit 5, correct?

18    A. Correct.

19    Q. Okay.  So what was the problem with respect to the

20 performance rating for Will Nixon for the period ending March

21 31, 2002?

22    A. Nothing.

23    Q. If you turn to the March 15, 2002, memoranda that

24 you sent to Mr. Phelps, do you see that?

25    A. Yes.

Page 44

1    Q. On that page on the, I guess, third paragraph,

2 explain to me, you say in that third paragraph, "To avoid

3 problems in the future, I have discussed the new political

4 atmosphere."

5    First, what did you mean by the new political

6 atmosphere?

7    A. Well, in that memo I note that I passed on the

8 admonitions that Mr. Phelps had given me, that the days of

9 Susan Gaffney were over, and we were no longer allowed to piss

10 off the politicals.

11    Q. So what's the new political atmosphere?

12    A. That we're not allowed to piss off the politicals.

13    Q. Was that a change?  How was that a change?

14    A. I have no idea what Mr. Phelps is getting at when he

15 said the days of Susan Gaffney were over and we're no longer

16 allowed to piss off the politicals.

17    Q. I understand that.  But I'm not asking you what you

18 say Mr. Phelps said.  I'm asking you what you said.

19    "I have discussed the new political atmosphere and

20 counseled him."  I assume Mr. Nixon is who the "him" is; is

21 that correct?

22    A. Yes.  "Counseled him" is Mr. Nixon.

23    Q. So you acknowledge that there was a new political

24 atmosphere.  Is that right or wrong?

25    A. Yes.

## Page 45

1     Q. And for you, what was new about it? What was new
2 about the atmosphere?
3     A. To me that meant that if we were going to be issuing
4 internal audits at HUD, we could not piss off the politicals, I
5 couldn't make them mad.
6     Q. Are you saying that it was okay to make them mad
7 previously?
8     A. We had issued several reports that upset a lot of
9 people under the days of Susan Gaffney.
10     Q. If you look to the March 28, 2002, memo, which is
11 from Mr. Phelps to you, in the first paragraph Mr. Phelps
12 writes, "I explained to you the way the negative and
13 derogatory tone and implications in your reports on GPRA and
14 HANO had been received by the senior members of the new
15 administration."
16       Do you recall getting this memo?
17     A. Yes.
18     Q. Did you agree with that in terms of the tone and
19 implication of your reports?
20     A. I did not agree that the tone was -- what he's
21 saying is the implications in our reports were not received by
22 the members of the new administration. Okay. I'm not privy
23 to that.
24     Q. Well, did you agree that the tone was derogatory?
25     A. No.

## Page 46

1     Q. Did the fact that he was -- Mr. Phelps was
2 admonishing you with respect to that have any impact on you?
3     A. Yes, it did.
4     Q. What impact did it have on you?
5     A. I avoided doing audits that would put me in a
6 position of pissing off the politicals.
7     Q. Well, in this memoranda, is he referring to audits
8 that you choose to do or the tone of the audits that you have
9 done?
10     A. He is referring to the tone of GPRA and HANO audits.
11     Q. So audits that already exist?
12     A. They existed.
13     Q. Do you see now, referring down to the last sentence
14 of that first page, March 28th 2002, "My concern is that you
15 are espousing this philosophy to your staff and poisoning
16 their views of the organization."
17       He goes on to say, "Espousing your views to HQ,
18 senior management is okay. However, espousing this view in
19 Mr. Nixon's performance appraisal is not only ill placed but
20 unacceptable."
21       Did you agree with Mr. Phelps' assessment in terms
22 of what you put in Mr. Nixon's performance appraisal?
23     A. No. What is he referring to? Or what are you
24 referring to?
25     Q. Well, the series of memoranda are all about Mr. Will

## Page 47

1 Nixon's performance appraisal, correct?
2     A. Yes.
3     Q. So my question is, do you agree with Mr. Phelps'
4 assessment with respect to the -- your choice to criticize
5 headquarters through Will Nixon's performance appraisal?
6     A. I don't believe I had. I don't criticize
7 headquarters through Nixon's appraisal.
8     Q. Now, in May of 2002 you filed a formal EEO
9 complaint; is that correct?
10     A. Sounds right.
11     Q. And do you recall what you alleged in terms of what
12 form of discrimination or -- broad strokes, what did you
13 allege?
14     A. I said that there was a hostile work environment
15 that culminated in the reprimand.
16     Q. Do you remember against whom specifically you made
17 allegations against?
18     A. Mr. Heist, Mr. Saddler and Mr. Phelps.
19     Q. And again, was Mr. Stephens working for HUD OIG at
20 that time?
21     A. This is May 2002?
22     Q. Correct.
23     A. Yes, I believe he was.
24     Q. Did you make any allegations against him?
25     A. No.

## Page 48

1     Q. And then in November of 2002 --
2     A. Let's step back. I think he's mentioned in it as
3 part of the hostile work environment, now that I think about
4 it.
5     Q. Mr. Beard, I'm showing you, essentially, your
6 complaint back from May of 2002.
7     A. Yes.
8     Q. And I just want you just to read that through just
9 to refresh your recollection with respect to...
10     A. Okay.
11     Q. Does it refresh your memory?
12     A. Yes.
13     Q. Did you make allegations against Mr. Stephens as
14 well?
15     A. What I was recalling is in paragraph 14 on page 6.
16     Q. And I understand that paragraph 14 refers back to
17 that earlier counseling that you talked about regarding
18 Mr. Stephens counseling you and Mr. Chapman together?
19     A. Yes.
20     Q. And Mr. Stephens counseled both you and Mr. Chapman,
21 correct?
22     A. Yes.
23     Q. On the first page of the formal EEO complaint for
24 reprisal the respondents listed are Bryan Saddler, James Heist
25 and Michael Phelps, correct?

Page 49

1    A. Yes.
2    Q. Now, with respect to that EEO complaint, you ended
3  up signing a settlement agreement, correct?
4    A. Yes.
5    Q. I want to refer back to Exhibit Number 1, which is
6  the complaint.
7       MS. BUIE: The complaint in this case, right?
8       MS. MELNIK: Exactly, the complaint in this case.
9    BY MS. MELNIK:
10    Q. Specifically paragraph 32. Mr. Beard, you allege in
11  paragraph 32 of your complaint that after entering the
12  settlement agreement, that you were subjected to repeated and
13  unwarranted action by HUD OIG. Do you see that?
14    A. Yes.
15    Q. And specifically you say one of the things is to
16  discredit your superior performance.
17    A. Yes.
18    Q. What are you referring to?
19    A. All the items that I'm referring to are listed in
20  the complaint that I filed, and there is a list of them in
21  that complaint.
22       MS. BUIE: Are you talking about the administrative
23  complaint?
24       Let's get it straight. When we say "complaint"
25  we're either talking about District Court complaint or

Page 50

1  administrative complaint.
2       THE WITNESS: They are listed in the EEO complaint
3  that I filed in May of 2002.
4    BY MS. MELNIK:
5    Q. And I'm asking you now for you to describe for me
6  what exactly you are talking about, in your own words,
7  discredit your superior performance.
8       And plus, paragraph 32 refers to events that
9  happened after the settlement. So they couldn't be in your
10  EEO complaint because you are referring to things after the
11  settlement.
12    A. Okay. I'm not referring to the complaint filed in
13  May 2002. I'm referring to the complaint filed in 2005. They
14  are enumerated in that complaint.
15    Q. Well, I'm asking you now to describe for me what you
16  meant by discredit your superior performance.
17       Maybe start with who. Who tried to discredit your
18  superior performance?
19    A. Specifically Mr. Heist.
20    Q. How?
21    A. Well, in addition to what I've listed in that
22  complaint and in the EEO complaint and in this complaint,
23  calling to memory, he would make accusations about what I was
24  doing or belittle me or belittle my staff or --
25    Q. When --

Page 51

1    A. Pardon me?
2    Q. I didn't mean to interrupt.
3    A. Well, for example, I think one of the items that are
4  listed talks about a manager's conference in 2004 where
5  Mr. Heist accused me of sneaking a return on investment in
6  one of the audit reports that I published that year.
7    Q. And this was in what year?
8    A. That was 2004.
9    Q. Do you recall when?
10    A. It was at the Chicago manager's conference. I think
11  in the EEO complaint I actually give a date of when that took
12  place.
13    Q. Do you claim that there was any kind of discrediting
14  to your superior performance in all of 2003?
15    A. I list incidents that occurred in 2003, 2004, when I
16  prepared that EEO complaint.
17    Q. Did you go to an EEO counselor in 2003?
18    A. I went to an EEO counselor in 2005.
19    Q. So that is a no, you did not go to an EEO counselor
20  in 2003?
21    A. No, I did not.
22    Q. Did you go to an EEO counselor in 2004?
23    A. No, I did not.
24    Q. You also say you were subjected to unwarranted
25  action by HUD OIG in the sense or that they undermined your

Page 52

1  managerial authority. Who undermined your managerial
2  authority?
3    A. Mr. Heist.
4    Q. Anyone else?
5    A. Mr. Phelps.
6    Q. Is that it?
7    A. Mr. Saddler. I think in those filings that I made
8  in 2005, I think I listed incidents that mention the three of
9  those individuals.
10    Q. What exactly did they do?
11    A. They discredited my managerial authority.
12    Q. Okay. Can you give me any examples?
13    A. One example with Mr. Saddler, we had been working
14  for a number of years on a case called Heritage Village. And
15  we had been working with the assistant United States Attorney
16  in Fort Worth, Texas, and the region counsel in Fort Worth,
17  Texas.
18       Mr. Saddler settled that case or took action in that
19  case that the AUSA had abandoned it without consulting the
20  region personnel, myself, Mr. Thomas, who was working on it,
21  or with the region counsel.
22       And region counsel blamed that on me and was very
23  upset with us because they had invested a tremendous amount of
24  time in that case. I believe that's enumerated in that
25  complaint.

Page 53

1  Q. Do you recall what year it was in?
2  A. That would have occurred in either 2003 or 2004.
3  Q. With respect to that example that you just
4  explained, did you go to see an EEO counselor in 2003?
5  A. No.
6  Q. Did you go to see an EEO counselor in 2004?
7  A. No.
8  Q. Are you alleging that the folks that you mentioned,
9  Heist, Phelps, Saddler -- what do you believe their motivation
10  was for trying to undermine your managerial authority? Why
11  were they doing that, do you think?
12  A. It was in retaliation for my testimony and the fact
13  that I had filed an EEO complaint against them.
14  Q. Is that the same -- I'm going back just one example.
15  Going back to discredit your superior performance by Heist,
16  what's your reason for or why do you believe Heist was acting
17  as he was with respect to discrediting your superior
18  performance?
19  A. I think that he was acting in retaliation for my
20  filing an EEO complaint against him.
21  Q. You also allege that they interfered with Region
22  VI's execution of its audit functions. Who was interfering
23  with Region VI's execution of its audit functions?
24  A. Mr. Heist, Mr. Phelps, Mr. Saddler.
25  Q. Why do you think they were interfering with Region

Page 54

1  VI's execution of audit functions?
2  A. They were doing that as a retaliatory act and to
3  keep Region VI from meeting its goals.
4  Q. With respect to that interference or that alleged
5  interference with Region VI's execution of its audit
6  functions, in retaliation for your prior EEO activity, did you
7  go see an EEO counselor in 2003?
8  MS. BUIE: Objection. You've already asked this
9  twice now.
10  BY MS. MELNIK:
11  Q. You can answer. Did you go see an EEO counselor
12  with respect to that allegation?
13  A. No.
14  Q. Did you see an EEO counselor in 2004 with respect to
15  that allegation?
16  A. No.
17  Q. Lastly, you say that they undermined your authority
18  over and relationship with subordinates. Who was doing that?
19  A. Mr. Heist, Mr. Phelps, Mr. Saddler.
20  Q. How were they doing that?
21  A. I had enumerated examples of that also in the EEO
22  complaint that I filed in 2005 and in this particular case
23  that I filed here. And are you referring also to the one that
24  was earlier in 2002?
25  Q. No. I'm referring to the post-settlement -- this

Page 55

1  whole paragraph 32 is post settlement.
2  A. Okay.
3  Q. So can you recall any examples?
4  A. Well, in addition to what I've just mentioned, an
5  example would be, I was supposed to attend the memorial
6  ceremonies at Oklahoma City in memory of the Oklahoma City
7  bombing. And I had set up for my wife and myself to attend
8  and had gotten tickets for Mr. Donohue to attend. And he was
9  bringing -- he was bringing someone else at the time. I've
10  forgotten who it was.
11  On the Friday before -- it was going to occur on a
12  Monday. On the Friday before that Monday, Mr. Heist sent an
13  e-mail instructing me not to attend, that he was going to
14  attend the function and that I was disinvited.
15  So that all the folks in Oklahoma City office HUD
16  and in the IG's office, it was pretty well known that
17  obviously I'm not too well liked by my headquarters staff
18  because they have told me not to attend.
19  Q. When was that? What year?
20  A. Either 2003 or 2004.
21  Q. With respect to that and the other examples that are
22  enumerated in your 2005 complaint with respect to undermining
23  your authority over and relationship with subordinates, why do
24  you think Mr. Heist, Phelps and/or Saddler were behaving that
25  way towards you or treating you that way?

Page 56

1  A. Because I had filed an EEO complaint in 2002 against
2  the three of them.
3  Q. And you saw this as retaliation for that?
4  A. Yes.
5  Q. With respect to those allegations, did you see an
6  EEO counselor in 2003?
7  A. No.
8  Q. Did you see an EEO counselor in 2004?
9  A. No.
10  Q. Do you recall the date that you did see an EEO
11  counselor with respect to all these allegations?
12  A. Sometime between January 10th of 2005 and the date
13  it was filed.
14  (Whereupon, at 12:32 p.m., a lunch recess was
15  taken.)
16
17
18
19
20
21
22
23
24
25

Page 57

1    AFTERNOON SESSION
2    (1:14 p.m.)
3    BY MS. MELNIK:
4    Q. Mr. Beard, what was CPD?
5    A. Community planning and development. It's a program
6 office of HUD.
7    Q. Were you responsible for an audit of CPD?
8    A. I've done several audits of CPD.
9    Q. I'm referring to 2004, a CPD audit in 2004.
10    A. I'm assuming you are referring to what we call the
11 CPD capacity audit?
12    Q. Yes. So Region VI was responsible for --
13    A. Auditing that particular --
14    Q. Do you recall approximately when you sent up the
15 draft?
16    A. October, I think, of 2003.
17    Q. What was headquarters' reaction to that draft audit?
18    A. Mr. Heist wanted us to restructure the report. I
19 forget whether he wanted us to break out a finding or combine
20 a finding. But we restructured the report based on his
21 instructions.
22    Q. What was your initial reaction to his instruction?
23    A. It's what he wanted. So that's what we did.
24    Q. So you are saying you were in complete agreement
25 with it from the beginning?

Page 58

1    A. Yeah. I mean, there was no reason not to agree.
2 Whatever it was he wanted, we did, on that first draft.
3    Q. So Mr. Beard, did you combine the findings? Or what
4 did you do in response to headquarters' direction?
5    A. We're talking about the first draft that was sent up
6 in October. Heist had specific comments on how he wanted to
7 report the structure. And we did that and then we sent it
8 back up.
9    Q. And then what happened?
10    A. There were two exit conferences held, and I was
11 unable to attend those. So Heist attended in my stead. And
12 they would have been November/December time frame.
13    Q. Wasn't an independent review requested or brought --
14 sorry. The last thing you said was Mr. Heist went in your
15 stead to --
16    A. To the exit conferences.
17    Q. What happened thereafter?
18    A. We restructured and reworded and then eventually had
19 a draft that was approved by TOP and approved by Mr. Heist for
20 issuance, and we issued it to CPD for comments.
21    Q. So after you submitted it to TOP for comment, what
22 was TOP's response?
23    A. They approved the report.
24    Q. What was the specific criticism of headquarters with
25 respect to the audit? What was CPD's response to the draft?

Page 59

1    A. They didn't, which was the problem. The individual
2 that was supposed to respond in writing, Mr. Eargle, wouldn't
3 give us his comments and kept putting us off. So Mr. Heist
4 instructed me to issue the report without the comments.
5    Q. All right. Did you eventually get the comments,
6 Mr. Beard, from CPD?
7    A. Yes, we eventually did.
8    Q. Were those comments favorable or unfavorable?
9    A. They were unfavorable.
10    Q. In response to that, what happened next? And since
11 they were unfavorable, how were they critical of the draft?
12    A. When I had approval to issue the report, I was about
13 to issue the report -- as a matter of fact, I had signed it
14 and it was in the Xerox machine. Mr. Donohue contacted
15 Mr. Heist, according to Mr. Heist, and ordered the process
16 stopped. Then we got CPD comments. So we were about to issue
17 the report as it was until we were asked to stop it.
18    Q. My question was, what was CPD -- what were they
19 critical about with respect to your audit?
20    A. I think Mr. Eargle's contention was that it was
21 fraught with errors or whatever.
22    Q. And when you say "fraught with errors," what are you
23 referring to?
24    A. He sent back a response that said the report
25 contained errors.

Page 60

1    Q. Did you agree with that?
2    A. No.
3    Q. In response to CPD's critique of your region's
4 audit, what did headquarters do?
5    A. They initially told us to just stop the audit
6 entirely. And then Mr. Heist got permission for us to respond
7 in detail to Mr. Eargle's comments, which we did. Then we
8 sent that forward.
9    Q. At that point, in terms of your responding to the
10 criticism, what was Mr. Heist's position on that in terms of
11 you being able to respond to the criticisms?
12    A. Insofar as responding to Mr. Eargle's criticisms, I
13 think Mr. Heist was satisfied.
14    Q. Is it fair to say that Mr. Heist was supportive in
15 that respect?
16    A. Yes.
17    Q. But nonetheless, what did Mr. Donohue order? Or
18 what happened?
19    A. He ordered a complete review of the audit. At that
20 point in time I suggested to Mr. Heist the audit be withdrawn
21 since it was obvious there was political interference with the
22 audit.
23    Q. Well --
24    A. In other words, it was unprecedented.
25    Q. What are you saying was unprecedented?

Page 61

1    A. According to Mr. Heist, Mr. Donohue was stopping the
2  audit at the request of Mr. Bernardi, a political appointee.
3  That immediately tainted the independence of the audit.
4  That's why I asked Mr. Heist to allow me to withdraw it.
5    Q. What happened in terms of Mr. Donohue's request?
6  What did happen?
7    A. Mr. Heist and Mr. Stephens met with a gentleman by
8  the name of John Bowen, he is the assistant regional inspector
9  general in Chicago, and assigned him and another individual
10  the task of reviewing the audit.
11    Q. So is it fair to say that outside auditors were
12  brought in to review the work that Region VI had performed?
13    A. Yes.
14    Q. How did that make you feel?
15    A. We thought that was totally inappropriate, that the
16  audit could be issued as it stood.
17    Q. Did you communicate that position to someone above
18  you?
19    A. I communicated that to Mr. Phelps -- excuse me, to
20  Mr. Stephens and to Mr. Heist.
21    Q. Once the independent auditors did their review,
22  what's the next thing that happened?
23    A. I presented another -- well, I had asked him not to
24  issue the report early on. When they completed their review,
25  I put it to him in writing --

Page 62

1    Q. Who is "him"?
2    A. Mr. Heist. Detailing out areas that I thought were
3  independence problems and why we should not issue that report.
4  He instructed me to issue it. So I did.
5    (Beard Deposition Exhibit Number 7 was marked for
6  identification.)
7    BY MS. MELNIK:
8    Q. And is this Exhibit Number 7, what you recognize
9  it to be?
10    A. This is an e-mail from me to Stan McLeod and
11  Mr. Heist, and it's responding to an e-mail that Mr. McLeod
12  had sent me.
13    Q. Mr. McLeod's e-mail to you that was on June 15th of
14  '04 --
15    A. Yes.
16    Q. -- when had this process, the CPD started? When did
17  you initiate first given that draft?
18    A. October of 2003.
19    Q. It's not quite a year; is that right?
20    A. No.
21    Q. In his e-mail to you, he's telling you that he had a
22  discussion with Heist; is that right?
23    A. Yes.
24    Q. And that he doesn't want to have any further
25  discussions about the CPD audit?

Page 63

1    A. No. He doesn't want any further discussions on
2  Finding 3.
3    Q. On Finding 3; is that right?
4    A. Yes.
5    Q. What was the problem with Finding 3 as -- did
6  headquarters have a problem with Finding 3?
7    A. They never discussed it with us.
8    Q. So they never discussed it with you ever? You had
9  no idea?
10    A. That's the first thing I say in my e-mail. We never
11  had any discussions on Finding 3.
12    Q. Was it fair to say that you subsequently learned
13  there was a problem with Finding 3? At some point you learned
14  this?
15    A. We never knew what the problem was with Finding 3.
16    Q. To this day do you not know what the --
17    A. To this day we do not know what the problem was with
18  Finding 3.
19    Q. Mr. Beard, are you saying as you sit here today,
20  2007, you don't know what headquarters wanted to do with
21  respect to Finding 3 in the CPD audit?
22    A. They asked us -- well, actually, they deleted it
23  from the report and we were never involved in the discussions
24  of why it was deleted. So we issued the report without it.
25  We were told they were going to do a separate audit in that

Page 64

1  area later.
2    Q. Did you agree with their position?
3    A. No. But we did what we were told.
4    Q. I understand. Who is Laura Nixon?
5    A. Laura Nixon is a senior auditor in the Fort Worth
6  office. She was the in-charge auditor on this CPD audit.
7    Q. And she is subordinate to you at that time?
8    A. Yes.
9    (Beard Deposition Exhibit Number 8 was marked for
10  identification.)
11    BY MS. MELNIK:
12    Q. Do you recognize Exhibit 8?
13    A. Yes.
14    Q. What do you recognize Exhibit 8 to be?
15    A. It's an e-mail from Mr. Heist to Mr. Phelps
16  commenting on an e-mail that Laura Nixon sent Mr. Heist.
17    Q. What's the date that Laura Nixon sent it?
18    A. June 16, 2004.
19    Q. That would be the day after you sent your e-mail to
20  Mr. McLeod and Mr. Heist and cc'd Laura Nixon?
21    A. Yes.
22    MS. BUIE: That's Exhibit 7?
23    MS. MELNIK: Right. Exhibit 7 is what I'm referring
24  to, that previous e-mail.
25    BY MS. MELNIK:

Page 65

1    Q. Were you aware that she sent this e-mail up to your
2 boss?
3    A. Not at the time she sent it.
4    Q. When did you learn?
5    A. Within a day or two of her sending it.
6    Q. What is the subject matter of her e-mail to
7 Mr. Heist?
8    A. CPD audit.
9    Q. Specifically what with respect to the CPD audit?
10    A. Well, that's what it says. The subject matter just
11 says "CPD Audit."
12    Q. If you look at the second paragraph of her e-mail --
13    A. "I do not understand why Finding 3 is being removed
14 at this late date."
15    Q. Did you agree with Ms. Nixon with respect to her
16 position in terms of disagreeing about Finding 3 being removed
17 at this late date?
18        MS. BUIE: I'm going to object to that because I
19 don't think -- that's not what we read anyway.
20        BY MS. MELNIK:
21    Q. The e-mail says, Laura states -- Ms. Nixon states,
22 "I do not understand why Finding 3 is being removed at this
23 late date. Of the three findings, it was the least
24 controversial."
25        Do you concur in Ms. Nixon's assessment?

Page 66

1    A. I did not understand why Finding 3 was being
2 removed. And, yes, it was, of the three findings, the least
3 controversial.
4    Q. Do you recall, Mr. Beard, Region VI -- this is now
5 in 2004 -- the CVR audit?
6    A. Yes.
7    Q. When did you first submit that audit for review?
8    A. September of 2004.
9    Q. And that's considered an outside audit, correct?
10    A. Yes. Well, that has taints of both because at the
11 time HANO was being run by HUD?
12    Q. HANO, H-A-N-O?
13    A. Yes.
14    Q. When you say HANO, what are you talking about?
15    A. Housing Authority of New Orleans.
16    Q. What was headquarters' reaction to the CVR audit?
17    A. They sent us an e-mail accusing the auditors of
18 being biased and basing their findings on opinion or
19 subjective or some such words.
20    Q. When you say "the auditors," are you referring to
21 your auditors in Region VI?
22    A. Yes.
23    Q. In addition to that, what about with respect to the
24 criteria that was being used? Did they have a problem with
25 that?

Page 67

1    A. I don't recall that they had a problem with that.
2    Q. Was there a request for a legal opinion regarding
3 the criteria that was used?
4    A. I recall that Mr. Heist and/or Mr. McLeod sent the
5 report or the draft report to legal with some questions.
6    Q. So the answer is yes, there was a legal opinion that
7 was sought with respect to the criteria?
8    A. I don't know if they asked for a legal opinion for
9 the criteria. They didn't include me in that process.
10    Q. Did you subsequently learn, though, that they had
11 sought a legal opinion with respect to the criteria?
12    A. We invited the attorney working on it to come down
13 and work with the auditors at Fort Worth. And he spent a day
14 with them.
15    Q. So answer my question. Did you subsequently learn
16 that legal was brought in with respect to getting an opinion
17 as to the criteria that was used in the CVR audit? That's a
18 yes or no question, Mr. Beard.
19    A. Well, I don't know that they were asked that. I
20 never saw any request to legal -- what was asked. I do know
21 that legal pointed out to us we were using the wrong criteria.
22    Q. "Us," you mean who?
23    A. "Us" being Will Nixon and Danita Wade and Lynelle
24 Kunst. They are the auditors involved in doing the CVR
25 report.

Page 68

1    Q. Auditors that worked for you?
2    A. Yes.
3    Q. How did you respond to that criticism or finding?
4    A. We put the reference that Mr. Baker suggested into
5 the report.
6    Q. Did you remove the other one that they said should
7 be removed?
8    A. We weren't asked to remove it.
9        MS. BUIE: Is there a name for these criteria? I'm
10 just afraid it's not going to be clear on the record.
11        MS. MELNIK: A-87 versus FAR.
12        MS. BUIE: That's the name of the criteria?
13        BY MS. MELNIK:
14    Q. Mr. Beard, what's A-87?
15    A. That's an OMB circular for cost principles for state
16 and local governments, I think. And the FAR is the
17 procurement regulations in the Federal Acquisition
18 Regulations.
19    Q. Now, did the auditors -- Mr. Beard, you are
20 responsible for the drafts that come out of your region,
21 correct?
22    A. Yes.
23    Q. Do you review them before they come out?
24    A. Yes.
25    Q. Did you review the CVR audit before it left your

Page 69

1 region?
2     A. Yes, I did.
3     Q. So you knew that your auditors had used A-87,
4 correct?
5     A. Yes, I was.
6     Q. And you agreed with that?
7     A. Yes, I did.
8     Q. Headquarters disagreed with you, correct?
9     A. Mr. Baker said we needed to put in the FAR reference
10 for CVR. The contractor was subject to the FAR. The housing
11 authority was subject to the circular.
12     Q. So using A-87 was incorrect?
13     A. For the contractor, CVR, yes.
14     Q. Did legal find a conflict of interest?
15     A. I've got no idea what the context of that is. The
16 report had a conflict of interest finding.
17     Q. Okay. Did legal agree with that?
18     A. As I recall they did.
19     Q. Was the CVR audit ever issued?
20     A. No.
21     Q. Before you submit a draft to headquarters, do you
22 have access to legal to get their opinion?
23     A. Yes.
24     Q. And in CPD, did you utilize the resources of legal
25 to get an opinion before you submitted the draft?

Page 70

1     A. In CPD?
2     Q. Yes.
3     A. The only contact I remember is during the -- when we
4 were responding -- creating the response to CPD's response, we
5 were asking Bryan some questions in that particular area.
6     Q. So prior to submitting the draft to headquarters,
7 the initial draft, did you consult legal first?
8     A. I don't recall consulting legal on CPD.
9     Q. With respect to CVR, did you consult legal before
10 submitting the draft?
11     A. Yes.
12     Q. Are you saying that you asked -- you submitted CVR,
13 the audit, to legal for an opinion before you submitted the
14 draft to headquarters?
15     A. For an opinion on what?
16     Q. On anything.
17     A. I sent the initial draft to Mr. Saddler because I
18 had a specific question for him, and he answered that specific
19 question.
20         Earlier in the audit we had asked an opinion on a
21 contract we were looking at to see whether or not we could
22 pursue something, and he sent us an opinion on that.
23     Q. If you could now refer back to Exhibit 1, which is
24 the complaint in this case, starting on page 14.
25     A. Okay.

Page 71

1     Q. And count I in your complaint, Retaliation-Title
2 VII, who are you specifically alleging retaliated against you?
3     A. Mr. Heist, Mr. Phelps, Mr. Saddler, Mr. Stephens,
4 Mr. Donohue.
5     Q. And with respect to your Title VII retaliation
6 count, what prior EEO activity are you referring to in terms
7 of your claim of retaliation?
8     A. Did I miss something? The first question -- the way
9 you phrased that question, you said in your Title VII. Did I
10 miss something from the first question or was that also the
11 Title VII thing?
12     Q. Right now I'm just focusing on count I. So you only
13 need to focus on count I right now. It's Retaliation-Title
14 VII. Later on in your complaint you have Title VII -- later
15 on in your complaint you have retaliation under ADEA. And
16 count IV, Retaliation-Title VII, another count retaliation
17 under the ADEA.
18         So I'm going to break it down and go through each
19 count. Right now I'm just on count I, Retaliation-Title VII.
20 I'm asking you what prior EEO activity are you claiming as the
21 basis for your retaliation by those individuals that you just
22 named?
23     A. The affidavit I filed in 1999. The testimony I gave
24 in July 2001. The EEO complaint that I filed in 2002. The
25 ADR that I took part in November of 2002. I think this is all

Page 72

1 spelled out in the initial EEO complaint that I filed in 2005.
2     Q. Did you engage in any EEO-related activity, and by
3 that I mean giving affidavits, testifying -- you've already
4 said you hadn't visited a counselor, but I'm covering the full
5 range. So did you participate in any EEO activity in 2003 and
6 2004?
7     A. No.
8     Q. The ADR that you are referring to in 2002, what are
9 you referring to there?
10     A. In November of 2002 I agreed to go through
11 alternative dispute resolution with Mr. Michael Stephens,
12 deputy inspector general, and two ADR technicians or
13 volunteers from another agency.
14     Q. And was this eventually the settlement between you
15 and --
16     A. We signed a settlement agreement at the end of that
17 day.
18     Q. And that settled all the claims that you had up to
19 that point?
20     A. It was supposed to settle everything to that point
21 and we were to start over.
22     Q. And did Mr. Stephens communicate that to you with
23 respect to him settling that complaint, to sort of start over,
24 start anew?
25     A. Yes.

Page 73

1    Q. Now, specifically, again, as to count I, the
2 retaliation in that count refers to your directed reassignment
3 from Fort Worth to D.C., correct?
4    A. The paragraph itself talks about the directed
5 reassignment and assigning me to a position that lacked
6 specific duties commensurate with my background, limiting my
7 exposure and -- in other words, it says more than just the
8 directed reassignment.
9    Q. I guess I'm only contrasting it to later in your
10 complaint where it has to do with specific counts regarding a
11 negative reference given to another agency. I'm
12 distinguishing those two things.
13    So I'm asking you if count I sort of refers to the
14 directed reassignment from Fort Worth, Texas to Washington,
15 encompassing all things related to that move?
16    A. Let me read count I.
17    MS. BUIE: Can I just make one suggestion. You can
18 do this however you want to, but the way that we have it set
19 up in the complaint is, for the most part, a legal
20 construction for reasons having to do with the statutes.
21    It might be easier, Mr. Beard might understand the
22 question better if you just asked him what claims are at issue
23 and what the basis of those claims is. I mean, I just think
24 referencing the complaint is making it confusing.
25    MS. MELNIK: I understand.

Page 74

1 BY MS. MELNIK:
2    Q. Well, first let me make clear what you are not
3 alleging. In count I you don't allege a hostile work
4 environment, correct?
5    A. Well --
6    Q. I'm asking if those words appear --
7    A. The word hostile work environment does not appear.
8    Q. Okay. With respect to your directed reassignment
9 from Fort Worth to Washington, what's the basis or evidence
10 that you have that that was done in retaliation for a 1999
11 affidavit?
12    A. Everything that is listed in the complaints that I
13 filed in the formal grievance, the informal and formal
14 grievances twice, the EEO complaint in 2002, the EEO complaint
15 now. It is a cumulative history of activity taken against me
16 since I testified or took action to participate in EEO
17 activity and filed a grievance against Heist, Phelps and
18 Saddler.
19    Q. I don't think you are answering my question. Let's
20 just break it down, then. With respect to Mr. Phelps, what's
21 your -- the evidence you have that there is some sort of
22 connection between an affidavit in 1999 and the action that
23 was taken by headquarters with respect to your directed
24 reassignment in 2005? I don't want to know what you said
25 previously --

Page 75

1    A. I had --
2    Q. I know you've answered several questions with it's
3 all spelled out and this, that and the other. This is the
4 time where it's your turn to actually explain it all firsthand
5 to me. So I want to hear from you. What's your basis for
6 claiming that the action of moving you in 2005 is connected to
7 a 1999 affidavit in a case from an audit of investigation?
8    MS. BUIE: Let me just interject something.
9 Mr. Beard has every right to put on the record that he wants
10 to incorporate his previous sworn statements into his response
11 today. So, you know, I understand that you are asking him
12 something beyond what he has previously put down in writing,
13 and I don't have any problem with that. But you can't limit
14 his ability to put that on the record, that he is
15 incorporating those statements.
16    MS. MELNIK: I understand he's incorporating.
17    MS. BUIE: Okay.
18    THE WITNESS: Region VI, in my opinion, was and is
19 the best region of the ten. And that is reflected in all of
20 my appraisals from 2003, 2004, and 2005.
21    In 2005 alone in accordance with Mr. Donohue's
22 instructions to make the return on investment our primary
23 goal, which was in our strategic plan, Region VI did $109
24 million worth of questioned costs and funds put to better use
25 in the reports issued. That's reflected in my appraisal of

Page 76

1 January 2005.
2    My region is known for productivity. My region has
3 never had any EEO complaints. I have turned that region into
4 a place where people like to work. They brag about that when
5 people come from outside and do MAR reviews. They talk to MAR
6 reviewers then.
7    And I was assured by Mr. Stephens in front of my
8 staff that I was running that region correctly and he told my
9 staff I could stay there as long as I wanted.
10 BY MS. MELNIK:
11    Q. What year was that?
12    A. That was in 2003.
13    Q. Do you remember what month?
14    A. He came down for a MAR review exit conference in
15 which the MAR report said that Region VI was complying with
16 all policies and procedures of the OIG. And he sat through
17 that exit conference. And that probably would have been
18 January of 2003.
19    And the auditors that conducted that, which were
20 from Denver and Massachusetts, told him that the staff at Fort
21 Worth were worried that Heist and Phelps and Saddler were out
22 to get me and were going to try to fire me.
23    And he told them in response to that question I was
24 running that region well and I could stay there as long as I
25 want.

## Page 77

1    Q. And he had been there -- Mr. Stephens had been at
2  HUD OIG in that position for approximately how long when he
3  made those comments?
4    A. Probably close to a year.
5    Q. And that was before or after CPD and CVR?
6    A. It would be before CPD and CVR.
7    Q. What's your basis or evidence for stating that your
8  directed reassignment from Fort Worth to Washington, D.C. was
9  based on the EEO complaint that was ultimately settled in
10 November of 2002? What's the connection?
11   A. I'm going to go through the exercise of repeating
12 that it's all detailed in everything that I have filed up to
13 this point.
14        And in addition to that, I don't think that Heist,
15 Phelps and Saddler were too pleased that they had to sign that
16 settlement agreement. I don't think Stephens was pleased he
17 had to sign that. But I had an excellent case showing that
18 whole thing was a sham. That's why they settled it. That's
19 why they paid my attorney's fees.
20   Q. Anything else?
21   A. Everything is detailed in all those things that I
22 filed.
23   Q. If you could turn to page 15, count II, you'll agree
24 with me that in count II you are alleging age discrimination?
25   A. I haven't gotten there yet. (Reviewing document.)

## Page 78

1        Yes, age discrimination.
2    Q. And who specifically are you alleging discriminated
3  against you because of your age?
4    A. Mr. Saddler, Mr. Heist, Mr. Phelps, Mr. Donohue and
5  Mr. Stephens.
6    Q. Is Mr. Stephens older or younger than you?
7    A. I don't want to insult him, but I assume he's older.
8  I wouldn't know that for a fact.
9    Q. And with respect to Mr. Heist, do you know if he's
10 in his 40s, 50s, 60s?
11   A. I just know he's younger than me.
12   Q. How old are you again?
13   A. Today I'm 57.
14   Q. And Mr. Phelps, the one who recently retired, do you
15 know what decade in terms of age? Is he in his 40s or 50s --
16   A. I think he's 60 because that's why he retired.
17   Q. Is Mr. Saddler still at HUD OIG?
18   A. Yes.
19   Q. Do you know what decade in terms of how old he is?
20   A. No, I do not.
21   Q. How about Mr. Donohue?
22   A. I do not know his age.
23   Q. Who became the new RIGA in Region VI after you came
24 to D.C.?
25   A. Frances Baca, B-A-C-A.

## Page 79

1    Q. Were you aware that he was also born in 1949 like
2  yourself?
3    A. Yes. He and I are friends.
4    Q. What is your basis or evidence that these men
5  discriminated against you because of your age?
6    A. What they did on January 5th to an individual that's
7  being screened annually to see if a cancer is going to recur
8  is order him on a Wednesday to report on a Monday, take away
9  his life --
10        (A recess was taken.)
11        THE WITNESS: Their obvious intent was to get me to
12 retire, to leave a career that I had built.
13        BY MS. MELNIK:
14   Q. What's your basis for believing that that directed
15 reassignment was based on your age?
16   A. I was eligible to retire.
17   Q. Anything else?
18   A. Yes. Their desire to get rid of me.
19   Q. If you can turn to page 16, count III, and this is
20 now Retaliation Under the Age Discrimination and Employment
21 Act, ADEA.
22   A. Okay.
23   Q. And I guess my only question here is, are you
24 alleging any different facts from those that you've explained
25 with respect to count I, Retaliation, and count II, ADEA? Is

## Page 80

1  there any different set of facts upon which you are relying on
2  to make that claim, count III?
3        MS. BUIE: Can I just ask a clarification. You are
4  asking whether there is any difference in the factual basis
5  for his allegations under count II and count III or I and III?
6  Because I think you just said I and III.
7        MS. MELNIK: What I meant to say is we've gone
8  through count I, Retaliation under Title VII based upon -- I
9  think it's a legal issue because he --
10        MS. BUIE: You are asking whether it's the same
11 actions at issue under count I and count III?
12        MS. MELNIK: I/II versus count III. Count III is
13 retaliation under the ADEA. I'm wondering if there is any
14 different set of facts that he's relying on to demonstrate
15 count III that's any different from count I or II.
16        BY MS. MELNIK:
17   Q. Is there anything different or additional?
18   A. I don't understand the legal distinction between
19 these counts. So I'm having a hard time understanding and
20 answering the question.
21   Q. Let me ask you this, then, with respect to -- forget
22 the counts for a minute. With respect to why you believe you
23 were retaliated against, you've mentioned because of the 1999
24 affidavit, the 2001 testimony in Tighe v. Cuomo. That's
25 actually -- okay. And you've mentioned your own prior EEO

Page 81

1 activity with respect to your own case. Are there any other
2 bases for your claim generally of retaliation?
3     A. Yes. I mean, I'm one of their better managers. I
4 consider myself their best manager. And that is reflected in
5 all the appraisals they gave me. And nowhere during this time
6 period did I have any of them sit down and tell me that I was
7 doing something that was going to take away my job.
8         And in fact, I had been told precisely the opposite.
9 I thought I was safe on the assurance of Mr. Stephens.
10 Mr. Stephens told me that if something arose, to contact him.
11 They retaliated.
12     Q. If you'll turn to page 18, which is count IV, just
13 let me know when you finish reviewing that.
14     A. (Reviewing document.)
15     Q. And this count relates to when you tried to or
16 applied for the position of deputy assistant inspector general
17 for audit of the OIG for the Department of Defense; is that
18 correct?
19     A. That's correct.
20     Q. Who do you allege retaliated against you for giving
21 what -- whoever it was to be an accurate reference?
22     A. Obviously Mr. Phelps, because he is the one that
23 spoke to Mr. Reardon. And I'm fairly certain he did that with
24 the knowledge and complicity of Mr. Stephens and Mr. Heist.
25     Q. What is your basis for making that last statement?

Page 82

1     A. Mr. Stephens had told me -- and I had a meeting with
2 him, I believe, January 25th of 2005. He offered to help find
3 me a job. And I said, no, I have several things in -- irons
4 in the fire. And I asked him if they would just not interfere
5 with my getting a job. And he assured me no one would
6 interfere with my getting a job. And I took that assurance at
7 face value.
8     Q. And in your mind, not interfering meant what?
9     A. Not interfering.
10     Q. Even if that meant not giving what Mr. Phelps
11 believed to be an honest assessment?
12     MS. BUIE: Objection. Lack of foundation.
13     BY MS. MELNIK:
14     Q. Let me ask you this, you believe Phelps retaliated
15 against you?
16     A. Yes.
17     Q. How do you believe that he retaliated against you
18 with respect to your application to the Department of Defense?
19     A. It's obvious that in the conversation that he had
20 with Mr. Reardon he said things that had never been said to me
21 or included in any of my appraisals. If he had simply read
22 the appraisal he gave me for 2005, I would have gotten that
23 job.
24     Q. Had Mr. Phelps ever said anything to you directly
25 about your 1999 affidavit in the Tighe v. Cuomo case?

Page 83

1     A. I think he has. I don't recall -- it would have
2 been in conversations about these retaliatory actions.
3     Q. Well, I guess what I'm trying to get at is, what
4 causes you to believe that he was -- Mr. Phelps was
5 retaliating against you for your prior EEO activity when he
6 gave a reference to Mr. Reardon?
7         What's your basis for saying that was -- whatever he
8 said was motivated by a retaliation for prior EEO activity?
9     A. It's just a continuation of his retaliatory attitude
10 towards me and his animus towards me. He's not going to let
11 me get a promotion to get out of there. He's going to keep me
12 where I am.
13     Q. So the act itself, whatever reference he gave to
14 Mr. Reardon, that act itself, that's it?
15     A. If he had told Mr. Reardon what he told me about my
16 performance, it wouldn't have been a problem. If he had
17 complied with what I assume were instructions from
18 Mr. Stephens, there wouldn't have been a problem. He had
19 assured me that I was moved to Washington, D.C. on matters
20 other than performance.
21     Q. Who is the "he"?
22     A. Mr. Phelps and Mr. Heist.
23     Q. Can you recall any conversations with respect to
24 Mr. Phelps and your prior EEO activity? Can you recall any of
25 the conversations, what, if any, you might have had with

Page 84

1 respect to that?
2     A. For instance, one of the exhibits that we've had
3 here when he was sending me complaints on Mr. Nixon's
4 appraisal, we were discussing that testimony because I'm
5 saying, You are doing this because I did that.
6     Q. I understand that you suggested that that's what was
7 going on. I'm asking you if Mr. Phelps ever initiated or
8 himself said anything with respect to those prior -- the prior
9 EEO activity?
10     A. I don't recall anything like that. You are asking
11 me did he say to me, I'm retaliating against you?
12     Q. Well, no, I wouldn't expect him to come out and say
13 anything like that. Other than you bringing it up as a basis
14 for what you perceived was happening to you as a result of
15 that prior EEO activity, did Mr. Phelps, or even, for that
16 matter, Mr. Heist or Mr. Stephens ever make references to it
17 themselves, comment to you about it, express disappointment
18 about it, dissatisfaction about anything to you directly about
19 what you had done with respect to the EEO activity two years
20 before the move from Fort Worth to -- when I say "before," I
21 meant before the move from Fort Worth to D.C.
22     A. So what time period are you speaking of?
23     Q. 2003, 2004.
24     A. Other than Mr. Stephens' assurance that I could stay
25 in Fort Worth as long as I wanted, I think that's pretty much

Page 85

1 a direct reference to that whole mess.
2     Q. Other than that?
3     A. I can't think of anything off the top of my head.
4     Q. If you can turn to now page 19, count V, entitled
5 Retaliation Under the ADEA. If you can just read that
6 through.
7     A. Okay.
8     Q. And you'll agree with me that this is still relating
9 to your application to DOD?
10     A. Yes.
11     Q. Are there any different or additional facts that you
12 are basing this allegation upon that's different from the last
13 that we've just described in terms of your belief for
14 retaliation by Mr. Phelps?
15     A. Can you be specific as to what it is you are looking
16 for?
17     Q. You just finished explaining that you believe
18 Mr. Phelps retaliated against you with respect to what turned
19 out to be perhaps a negative reference to DOD; is that
20 correct?
21     A. Yes.
22     Q. And you also explained that you are basing that
23 upon -- or that his motivation is demonstrated by a continuing
24 activity or behavior that demonstrated to you that Mr. Phelps
25 was retaliating?

Page 86

1     A. Yes.
2     Q. So my question is, is there anything else different,
3 additional --
4     A. Yes.
5     Q. -- with respect to that now -- respect to count V?
6     A. Yeah, there is.
7     Q. What's that?
8     A. I've now arrived in D.C. I think there was a big
9 disappointment that I came up here, that I did not retire.
10 I'm stuck out in a cubicle. I'm not given any
11 responsibilities. I'm just twiddling my thumbs doing charts
12 and graphs.
13         I now have an opportunity to get out and be
14 productive again in an area that I would really benefit.
15 Mr. Phelps wants to make sure I retire. So he adds to the
16 stress and the pressure that I'm under to try to get me to
17 leave. He could have gotten rid of me just by being neutral.
18 I would have been gone.
19         (A recess was taken.)
20         (Mr. Johnson not present.)
21     BY MS. MELNIK:
22     Q. Mr. Beard, don't turn to it yet in the complaint,
23 which is Exhibit 1. I'm going to be referencing paragraphs
24 60, 66, 72, 80 and 88. They all say the same thing. It's
25 your damages paragraph. So why don't you turn to 60, 66, 72,

Page 87

1 88, any one of those.
2     A. They all say the same thing?
3     Q. Yeah.
4     A. Okay.
5     Q. You allege that because of defendant's alleged
6 violation of plaintiff's civil rights caused him, meaning you,
7 to suffer emotional pain. What are you referring to with
8 respect to emotional pain?
9     A. It really hurts to lose what I've lost. I can never
10 regain it. And it took a long time to build it.
11     Q. It meaning?
12     A. My career, my self-esteem, my ego, my standing in
13 the community, my credentials, my life. I mean, it's a lot.
14     Q. Did you seek psychiatric care?
15     A. No.
16     Q. And this might be the same -- might have the same
17 answer. You also mentioned embarrassment and then next
18 humiliation. Are you referring to the same things you just
19 referred to or something different?
20     A. Well, I have a peer group. I was at that particular
21 point in time, I was the elected federal representative on the
22 board of Southwest Intergovernmental Audit Forum. So I
23 personally knew the state auditor for all the states that I
24 was in, the other regional inspector generals from all the
25 other IGs, the folks in the GAO, a number of state/city

Page 88

1 auditors. I had been a very prominent member of that
2 organization.
3         And I was -- had just been elected and yet I had to
4 withdraw from that and explain to all those people that I had
5 lost my position and was being reassigned to Washington, D.C.
6         I was also an officer in several civic
7 organizations, and I had to do the same thing there.
8     Q. Did you seek any mental health care or assistance
9 with respect to that?
10     A. No.
11     Q. You also mention mental anguish. Again, is that
12 something different from emotional pain or is that the same
13 thing?
14     A. No. I would say it's not. I mean, mental anguish,
15 you sit there and you run a B movie in your mind all the time.
16 What's going on? What's happened to me? What's going to
17 happen to me at the deposition? What's going to happen at the
18 trial? It's constant. It doesn't go away.
19     Q. With respect to that, have you sought any mental
20 health professional help or psychiatric care?
21     A. No.
22     Q. You mentioned inconvenience. What are you referring
23 to when you say inconvenience?
24     A. My lifestyle was completely and abruptly changed and
25 threw me into territories that I had never been before in,

## Page 89

1  having to rearrange my entire life around used to be living in
2  Fort Worth, now I'm coming to Washington, D.C. It was a great
3  inconvenience.
4      Q. You also mentioned anxiety and depression. Could
5  you elaborate on that a little bit.
6      A. I had been, over the past two years, living in
7  constant fear that these guys would suddenly give me a
8  termination letter and I would be out in the street.
9      Q. When was this?
10     A. Since I have been up here in January 2005. I didn't
11 think they were through with me. Still don't. I do
12 everything as if I'm being watched. It's not a comfortable
13 way to live.
14     Q. Have you, again, seen a mental health professional
15 with respect to anxiety or depression?
16     A. No.
17     Q. Are you taking any medication to treat depression?
18     A. No.
19     Q. Or anxiety?
20     A. No.
21     Q. You also lastly mentioned a loss of enjoyment of
22 life. What were you referring to, if this is anything
23 different than you've already described?
24     A. Yes. I had a life where a number of people enjoyed
25 my company and that we did things together, particularly the

## Page 90

1  Sons of Union Veterans of the Civil War. And I belonged to
2  the North Texas Reenactment Society, and we went off on
3  weekend trips, did things together.
4      My wife and I were prominent in the Arlington
5  community. She was actually on the mayor's committee for
6  planning. And that's a city of 300,000 people. She was an
7  officer in three garden clubs, president of the oldest garden
8  club in the state of Texas.
9      We really were enjoying life. And it took us a
10 decade to build that. And then we came here where we lived in
11 an apartment and knew nobody.
12     Q. Have either you or your wife made any effort to
13 become a part of this community?
14     A. Yes.
15     Q. In what way?
16     A. I joined the Sons of Union Veterans here in
17 Washington, D.C. I continued my membership with the Knights
18 of Columbus, which is a catholic fraternal men's organization.
19 I arrange for the Sons of Union Veterans to appear in the
20 second annual Memorial Day parade down here in Washington,
21 D.C. So I'm trying to cope, get along, move on.
22     Q. And how long have you and your wife -- I think you
23 already told me.
24     A. 35 years.
25     Q. And has that been a stable relationship for you?

## Page 91

1      A. Yes.
2      Q. That still remains strong?
3      A. Yes.
4      Q. How was your relationship with your -- was it
5  daughter?
6      A. Yes, daughter.
7      Q. Where does she live?
8      A. Roswell, Georgia.
9      Q. Was that a good relationship prior to your move to
10 Washington, D.C.?
11     A. Yes.
12     Q. Is it still a good relationship?
13     A. Yes.
14     (A recess was taken.)
15     BY MS. MELNIK:
16     Q. Mr. Beard, I think I covered this going through each
17 of the damages inquiry that I just did, but just so I'm clear,
18 with respect to the things we've talked about, emotional pain,
19 mental anguish, inconvenience, anxiety, depression, loss of
20 enjoyment of life, have you seen a health professional as a
21 result of those things?
22     A. I've seen a doctor, but not a -- you were asking
23 earlier about a mental health professional. And the answer to
24 that is no, I have not seen a mental health professional. I
25 have seen a doctor.

## Page 92

1      Q. What doctor have you seen for that?
2      A. Let me cheat --
3      MS. BUIE: You have to ask.
4      THE WITNESS: Can I look in my wallet and see if
5  I've got his card?
6      BY MS. MELNIK:
7      Q. Sure.
8      A. It's the Springfield Family Practice. That much I
9  remember.
10     MS. BUIE: I think we probably listed it in the --
11     BY MS. MELNIK:
12     Q. Springfield Family Medicine?
13     A. Dr. Brideau.
14     Q. And do you recall seeing him on February 15, 2006?
15     A. I would have seen him in 2006. The specific date,
16 that's okay with me.
17     (Beard Deposition Exhibit Number 9 was marked for
18 identification.)
19     BY MS. MELNIK:
20     Q. Did you have a chance to review it?
21     A. Um-hum.
22     Q. Is that a yes?
23     A. Yes.
24     Q. Exhibit 9 is a report from Springfield Family
25 Medicine from a Donald Brideau, B-R-I-D-E-A-U, M.D.?

Page 93

1  A. Yes.
2  Q. And is that the doctor that you saw?
3  A. Yes, it is.
4  Q. Is there anything that you are claiming was a
5  medical problem as a result of your move from Fort Worth to
6  Washington?
7  A. In the sessions that I had with Mr. Brideau, the
8  blood pressure and the references to diabetes were new. I
9  hadn't had those problems before.
10  Q. Did you see a doctor routinely when you were in
11  Texas?
12  A. Yes.
13  Q. Do you recall who that was?
14  A. No, I can't think of his name.
15  Q. Or the practice or the location?
16  A. I'm about to say Dr. Patel, but I may be confusing
17  him with somebody else. But I did have that in the -- because
18  I looked it up.
19  Q. How often were you seen by the doctor in Texas, if
20  you can recall?
21  A. After -- I had been seeing Dr. Sagalowski
22  (phonetic). He was my doctor in charge of my cancer case.
23  And then he referred me back to my family practitioner, who
24  was that doctor, and I had been referred back to him late in
25  2004, I think.

Page 94

1  Q. You are saying the diabetes type II and --
2  A. And the blood pressure.
3  Q. The blood pressure, that was new -- a new diagnosis?
4  A. Yes.
5  Q. What, if any, course of treatment were you given
6  with respect to the diabetes, if any?
7  A. Diet and exercise.
8  Q. Are you complying with that directive from the
9  doctor?
10  A. Exercise, yes. Diet, no.
11  Q. And with respect to the high blood pressure, what,
12  if any, course of treatment was prescribed?
13  A. He did not prescribe a treatment for that.
14  Q. So you are not taking any -- no prescription
15  medication was prescribed with respect to the high blood
16  pressure?
17  A. That's correct.
18  Q. Do you know or did the doctor say that the diet and
19  exercise would also be beneficial with respect to your blood
20  pressure issue?
21  A. Yes.
22  Q. Any other medical issues other than the diabetes and
23  the high blood pressure with respect to your alleging -- with
24  respect to your move from Fort Worth to D.C.?
25  A. I would say depression and lack of sleep. I

Page 95

1  consider all of those to be physically debilitating and taking
2  their toll.
3  Q. Have you been diagnosed by a physician with having
4  depression?
5  A. No.
6  Q. With respect to your salary, was it impacted from
7  the move from Fort Worth to Washington? Were you paid the
8  same or paid something different?
9  A. I was paid something different because the locality
10  pay is different.
11  Q. Which is greater?
12  A. I think D.C. is greater.
13  Q. Benefits, medical, the benefits that a federal
14  employee receives, any different in terms of your benefits,
15  Fort Worth and D.C.?
16  A. Benefits offered by the federal government. No,
17  they are the same.
18  Q. Retirement benefits, any change between Fort Worth
19  and D.C.?
20  A. My prospect for retirement changed. But the benefit
21  itself is not.
22  Q. In going to Springfield Family Medicine, did you go
23  there because you needed to have a new local doctor as opposed
24  to flying back to Fort Worth, Texas every time? Or was there
25  some special reason you went or --

Page 96

1  A. To be scanned for the cancer. I'm required to have
2  an annual scan.
3  Q. And as a part of that, they also did a complete
4  physical?
5  A. Well --
6  Q. Or you asked for it?
7  A. No. You walk into a doctor's office, they are not
8  going to do anything for you unless they know personally what
9  your situation is.
10  MS. MELNIK: I think that's all I have.
11  MS. BUIE: I have some follow-up, but if I could
12  have like five to ten minutes.
13  (A recess was taken.)
14  (Mr. Johnson enters the room.)
15  CROSS-EXAMINATION
16  BY MS. BUIE:
17  Q. All right. We're back on the record now.
18  Mr. Beard, I would like to go back and talk just a little bit
19  about the testimony that you gave. I believe you said that it
20  was in July of 2001 with respect to Tighe versus Cuomo, and
21  that was a deposition testimony, correct?
22  A. That's correct.
23  Q. Did your testimony that you gave at that deposition
24  or in your affidavit that you also gave in connection with
25  that case in any way implicate Mr. Heist or Mr. Phelps?

Page 97

1    A. Certainly not in the 1999. And not to Mr. Heist
2  because he would not have been in the senior management at the
3  time. I did not mention Mr. Phelps by name, but he would have
4  been included in my general references to senior management.
5    Q. What comments did you make about senior management?
6    A. That they would interject in the selection process
7  for people being promoted or hired.
8    Q. Interject in an inappropriate way?
9    A. In an inappropriate way. One specific example that
10 I gave involved a panel that I was participating on in which
11 there were probably four panel members, and we came up with a
12 selection roster of individuals. And then afterwards I was
13 approached by the chair of that panel and he said that Susan
14 Gaffney wanted us to change the selections, and I refused to
15 do so. That was one of the examples I gave in the deposition.
16   Q. Okay. And where were these senior managers that you
17 referred to as a group? Where were they located, if you know?
18   A. Headquarters OIG in Washington.
19   Q. And is that where Mr. Phelps was located at that
20 time?
21   A. Yes.
22   Q. You also discussed at one point, I guess, that there
23 had been a shift in the audit process from, I believe you
24 called it, an empowered situation where the regions were more
25 autonomous to a more centralized process out of the

Page 98

1  headquarters office in Washington, D.C. Is that an accurate
2  characterization?
3    A. Yes.
4    Q. And that shift happened primarily with Mr. Stephens
5  in 2002? Is that what you said?
6    A. That's correct.
7    Q. Did you have the occasion to speak with other
8  regional inspectors general for audit about that shift in
9  management style?
10   A. Yes, I did.
11   Q. Did you specifically talk to them about their
12 preferences between centralized or decentralized audit
13 processes?
14   A. Yes, I did.
15   Q. To your knowledge, did any of the other regional
16 inspectors general for audit dislike the centralized audit
17 process?
18   A. Yes. And in fact, at a manager's meeting, Mr. Heist
19 raised some objections to it.
20   Q. Which manager's meeting was this, if you can give a
21 general time frame?
22   A. It would have been in 2002. We usually go down to
23 Florida. So somewhere in Florida. He said that Mr. Stephens
24 was pushing for he, Mr. Heist, to sign all reports and that he
25 was attempting to resist that and leave that authority in the

Page 99

1  field.
2    Q. Okay. What about other regional inspectors general
3  for audit? That's the same position you were in at that time,
4  correct?
5    A. Yes.
6    Q. What about feedback that you heard from any of those
7  RIGAs?
8    A. They were as concerned as I was that this was going
9  to layer in a bureaucratic review function that would serve to
10 slow down the audit process while we were attempting to speed
11 it up. So there was an expression of professional opinions
12 that if we layer in this other group, it's going to slow down
13 our process.
14   Q. Okay. After this shift happened, did you ever hear
15 feedback from your peers one way or another about whether that
16 had actually come about?
17   A. Yes.
18   Q. What was the consensus?
19   A. The consensus that it was complicating the audit
20 process, we were being required to produce the audits from
21 start of survey to draft time in 240 days. And the review
22 function was slowing that down and making it difficult.
23   Q. Do you recall any particular regional inspectors
24 general for audit who had this sort of complaint?
25   A. Yes. Nancy Cooper from Atlanta, Sandy Elion from

Page 100

1  the CAP district. Dan Temme from Philadelphia. Barry Savill
2  from Boston, Amy Lee from California, Roger Niesen from Kansas
3  City.
4    Q. Did you ever have the occasion to discuss with the
5  people that you named or other regional inspectors general for
6  audit their process of having audits or draft audits reviewed
7  by TOP, T-O-P?
8    A. Yes.
9    Q. Did you have an understanding one way or another
10 whether they routinely agreed or disagreed with TOP's feedback
11 or comments on their draft reports?
12   A. I think -- I'm trying to remember who said it. It
13 may have been Barry Savill of Boston, said it in a group of
14 us, that reports would no longer be issued. They'd escape, is
15 the way he put it.
16   Q. What was your interpretation of that comment?
17   A. Anything that was significant was going to be pretty
18 much watered down or taken out in the review process. And
19 that's what we were complaining about. This was amongst
20 ourselves.
21   Q. Okay. Did you ever hear any of your peers -- and
22 when I say peer, I'm referring to other regional inspectors
23 general for audit. Did you ever hear any of them say that
24 they would have disagreements with TOP over TOP's
25 recommendations on draft audits?

1   A. Yes.

2   Q. Did you have an understanding one way or another

3   whether that was an unusual or usual occurrence?

4   A. I would say it was a usual occurrence.

5   Q. Was there a process by which you understood that

6   regions and TOP were to agree or disagree on the final draft

7   of an audit report?

8       MS. MELNIK: Objection as to form.

9       BY MS. BUIE:

10  Q. Go ahead and answer.

11  A. The process that was in place, if there was a

12  disagreement between TOP and the region, Mr. Heist was to

13  settle the disagreement and approve or disapprove what TOP

14  wanted to do or what the region wanted to do.

15  Q. Okay. To your understanding, was it usual or

16  unusual for TOP to issue its findings or suggestions on

17  revisions of an audit and then for a regional inspector

18  general to take issue with some of those findings or

19  suggestions?

20  A. That was the normal deliberative process.

21  Q. Can you expand on that?

22  A. We would send in a draft report, TOP would review

23  it, they would send us comments, and then we would respond to

24  those comments. And then they would come back to us and that

25  was when we were usually getting down to what we were going to

Page 102

1   do in the final.

2       And there may have been more discussions. If

3   something were formally contested or we didn't want to do

4   something or they wanted to do something, we would go to

5   Heist.

6   Q. To your understanding, if you disagreed with a

7   finding or suggestion that was made by TOP, was that a

8   negative thing?

9   A. No. That was the deliberative process. The goal

10  was to get an audit report that was the highest quality that

11  we could get that was error free and was going to stand up to

12  any pressure it got from outside organizations. So it's an

13  internal process to make sure we know what we're saying and

14  can support what we're saying when the final report goes out.

15  Q. Okay. I believe that we discussed somewhat a

16  meeting that you had with Mr. Haban and Larry Chapman at some

17  point. And can you explain for us what was the purpose, if

18  you know, of that meeting?

19  A. Mr. Donohue was visiting Region VI with Mr. Heist

20  and Mr. Haban. As part of that visit I had auditors put on

21  briefings to Mr. Donohue as to what we were doing.

22      During one of those briefings, one of my auditors

23  from Oklahoma showed him things she had prepared for grand

24  jury testimony in Oklahoma and stated how pleased the U.S.

25  Attorney and the FBI were with our work on that particular

Page 103

1   case.

2       He seemed quite pleased with that. Later during the

3   day, outside of my presence, he asked Mr. Chapman if he knew

4   the auditor was testifying up at the grand jury. And he said

5   he did not. And that upset Mr. Donohue. He thought that the

6   office of audit was doing something in a criminal arena

7   without the knowledge and agreement of the special agent in

8   charge.

9       And Mr. Donohue, he went off the deep end. I wasn't

10  there when it happened, but he stormed out of the building, he

11  was never seen again, and he really laid into Haban big time.

12      So Mr. Haban came over to my office with Mr. Heist

13  and Mr. Chapman and sat us down and was saying that Donohue

14  was furious, that I shouldn't be doing that sort of thing

15  without Mr. Chapman's knowledge.

16      That's what the counseling was about. And in fact,

17  both Mr. Chapman and Mr. Heist knew that I had cleared

18  everything with the office of investigations, and neither one

19  of them said it at that meeting.

20  Q. Okay. Can you explain? What do you mean you

21  cleared it with --

22  A. We had been requested by the office of

23  investigations to participate in that particular endeavor, by

24  the assistant, the ASAC. His name was James Moore and he

25  reports direct to Mr. Chapman.

Page 104

1       We had been working on that case for some months.

2   And we meet monthly and we give Mr. Chapman our briefing

3   papers every month to tell him what we're doing with his

4   people. And I'm sure that Mr. Malloy was writing

5   investigative reports every so often saying what we were

6   doing. So this had been well coordinated.

7   Q. Did this problem or alleged problem with

8   communication between you and Mr. Chapman have anything to do

9   with the strain in your personal relationship with Mr. Chapman

10  that you referenced earlier in your testimony?

11  A. I think that Mr. Chapman was trying to sabotage me

12  with Mr. Donohue at that particular point in time. The

13  briefings that we had gave that morning really impressed

14  Mr. Donohue and he was very up on what we were doing. And I

15  think that Chapman saw an opportunity to destroy that and he

16  did.

17  Q. But to your understanding, Mr. Chapman or at least

18  someone under Mr. Chapman's authority had been aware of the

19  participation of this auditor in the grand jury testimony?

20  A. Yes. And it is also my understanding that Mr. Haban

21  was instructed to verify that. And he did.

22  Q. All right. Let's take a look back at Exhibit 3 that

23  was marked earlier, Nixon e-mail. Let's just take a minute.

24  Explain for me what this ASB thing is that is included in this

25  e-mail starting at page 2 of Exhibit 3. What is this ASB

Page 105

1  about?
2     A. (Reviewing document.)
3     Q. I'm not looking for specifics. Just in general.
4     A. Just in general they were rewriting the audit
5  operations manual, and they do that through the ASBs.
6        The ASB is issued by the office of audit under
7  Mr. Heist's signature, and it makes changes to the audit
8  operations manual. Over time those ASBs get incorporated into
9  the audit operations manual. The practice had been to send
10 the suggested changes out to the field and ask for comment.
11    Q. When you say "the field," to whom are you referring?
12    A. To regional inspectors general.
13    Q. What about the people under the regional inspectors
14 general, the auditors themselves?
15    A. The auditors themselves, that would depend upon the
16 region and the practice of the regional inspector general. I
17 would say that the majority were at least read by all of the
18 assistant regional inspectors general.
19    Q. That's what Mr. Nixon was at this time?
20    A. Yes, that's correct.
21    Q. So what was your understanding about your role in
22 terms of responding or not responding to this ASB?
23    A. When they sent these requests out, I took them
24 seriously, that they wanted to know what we thought about
25 them, they wanted us to review it for accuracy or how it was

Page 106

1  going to work in the field, and that they were looking for our
2  input. And these particular ones that were coming out were
3  causing consternation. This particular e-mail said it well.
4     Q. What type of consternation?
5     A. The auditors felt as though they were not being
6  trusted by headquarters to do simple tasks that they had been
7  doing for years. They were being asked to certify documents
8  or submit things for approval that were routine in nature and
9  that minutia was being elevated to vast areas of importance.
10    Q. So why did you end up forwarding Mr. Nixon's e-mail
11 back to Mr. McLeod?
12    A. Up until this particular incident, that was my
13 normal practice, was to take e-mails from my ARIGAS and
14 forward them on to Mr. McLeod.
15    Q. Okay. And did that practice change at some point?
16    A. After this particular incident, I no longer did
17 that. If we were going to have a comment on anything that
18 came out, I sent it personally from me to Mr. McLeod and it
19 was just what I said in the e-mail.
20    Q. All right. Was there any particular reason you
21 wanted Mr. McLeod to see Mr. Nixon's comments directly?
22    A. I didn't think that Stanley understood just how
23 irritated the ARIGAs in the field were by what was coming out
24 of Washington.
25        And I didn't know how involved he was in writing

Page 107

1  these things, but I suspected he was not. So I was hoping he
2  would take a look at some of this stuff.
3     Q. We discussed a phrase earlier in the testimony that
4  was used in one of the exhibits. I can't remember which one,
5  but it's the phrase "piss off the politicals." What does that
6  phrase mean to you?
7     A. My understanding of it was we were not going to
8  issue audit reports that the senior management at HUD would
9  express displeasure with. And to me that meant we were no
10 longer independent.
11    Q. So by politicals, you are referring to the senior
12 management at HUD?
13    A. I'm referring to the people that are politically
14 appointed by the White House to fill the political positions
15 at HUD. And that's who Phelps was referring to, the political
16 appointees.
17    Q. Okay. Do you have any understanding of why
18 something written by Region VI or any other audit division
19 would make politicals angry?
20    A. Yes.
21    Q. Why?
22    A. The one that comes to mind is I issued a report on
23 community builders in 1999 that was the subject of senate
24 hearings, and it essentially accused Mr. Cuomo, then secretary
25 of HUD, of prohibited personnel practices. That pissed him

Page 108

1  off.
2     Q. Did you have any understanding one way or another
3  whether that was a factor that should be taken into
4  consideration in your issuing of an audit or decision to begin
5  an audit?
6     A. Yes. When I received that instruction from
7  Mr. Phelps, I interpreted that to mean, and I took it
8  literally, to stay away from audits or audit subjects that
9  would result in reports that were critical of HUD.
10    Q. Okay. In your opinion, did that affect the function
11 of the audit department in some way?
12    A. It's a violation of the generally accepted
13 government auditing standards in that the standard requires
14 independence from the entity being audited. If a political
15 appointee can influence the audit, you are no longer
16 independent.
17    Q. Regardless of your personal feelings that you've
18 just stated, did you carry out what you understood to be
19 Mr. Phelps' direction not to piss off the politicals?
20    A. Yes. I intentionally stayed away from audits that
21 would do that and I took great care to make sure that when I
22 was writing reports or selecting things to be audited, that I
23 would not go down that path or I was going to be
24 confrontational with Mr. Phelps or Mr. Heist.
25    Q. I believe in that same -- I should probably just

Page 109

1  find which exhibit it is. I'm referring to Exhibit 6. Within
2  that exhibit there is a memorandum dated March 28, 2002. And
3  I believe we've established it's from Mr. Phelps to you.
4      A. Yes.
5      Q. Okay. And within this memorandum Mr. Phelps says,
6  "I explained to you the way the negative and derogatory tone
7  and implications in your report on GPRA and HANO had been
8  received by the senior members of the new administration."
9          Did you agree with Mr. Phelps that those two reports
10 had negative or derogatory tone?
11     A. I did not believe they had negative or derogatory
12 tone.
13     Q. Had Mr. Phelps reviewed those reports before you
14 issued them or before they came to the attention of the senior
15 members?
16     A. He specifically reviewed the HANO report. And
17 Mr. Heist specifically reviewed the GPRA and the HANO report.
18     Q. When they reviewed those reports, did they give you
19 any feedback to indicate that they thought there was a
20 negative or derogatory tone?
21     A. No.
22     Q. Did they suggest to you that you change any words in
23 the report?
24     A. Certainly.
25     Q. To change --

Page 110

1      A. They were always making suggestions to make changes
2  in the reports.
3      Q. But changes to correct any sort of negative or
4  derogatory tone?
5      A. No.
6      Q. When was the first time you heard that there was
7  supposedly a negative or derogatory tone in these reports?
8      A. When I went to Washington on February 20th, I think,
9  2002, to get my appraisal.
10     Q. Let's discuss what we were referring to as the CPD
11 audit. I think that refers to community planning and
12 development?
13     A. That's right.
14     Q. Was that an internal or external audit?
15     A. That was an internal audit.
16     Q. Who was the target of that audit? Or the subject?
17 I don't know what terminology you use.
18     A. The nonprofit grantees that received money from HUD
19 and whether or not HUD had appropriate controls over those
20 grantees and how they spent their money.
21     Q. Was it a part of the process normally for the
22 subject of an audit, like in this case CPD, was it a normal
23 part of the process for them to review an audit report before
24 it was issued?
25     A. We would give them the draft for comment, and they

Page 111

1  would provide their comments to us. So that was normal.
2      Q. Was it unusual for an agency or a division of the
3  agency that was being audited to be frustrated with the
4  findings of an audit?
5      A. Yes -- excuse me. It was not unusual. It was
6  commonplace. It was frequent but not always. Sometimes they
7  received the reports very well because they would have things
8  in there that they wanted us to say and they wanted to have
9  pointed out to people above them. And then sometimes they
10 didn't like the report at all.
11     Q. What was your understanding of why a division of the
12 agency or portion of the agency would not like an audit
13 report?
14     A. If they were not going to like an audit report, we
15 would be making recommendations saying that they had been
16 doing something wrong in the past and they had to fix it. And
17 if it was particularly strong recommendations, people that had
18 been working there could be held accountable for things we
19 were saying was wrong.
20     Q. Was that the situation with CPD, to your
21 recollection?
22     A. Yes.
23     Q. What is the typical role of the inspector general
24 for HUD OIG with respect to reviewing an audit report before
25 it's issued?

Page 112

1      A. Inspector generals -- I've only got at HUD three to
2  draw from. If they were involved in looking at a draft audit
3  report, it was extremely rare.
4      Q. Okay. I believe you testified Mr. Donohue did
5  review the CPD report in this -- this specific one we're
6  talking about here, correct?
7      A. Yes. Well, what I said was Mr. Donohue stopped the
8  process. I don't know that he ever reviewed the report or
9  read it.
10     Q. Had you been involved in an audit report where an
11 inspector general had stopped the process before?
12     A. In my 30 years of auditing, an incident like that
13 had never happened.
14     Q. On what basis did you feel -- I believe that you
15 testified earlier that you felt that Mr. Donohue's
16 independence had been compromised. Is that an accurate
17 reflection of your statement?
18     A. Yes, that's correct.
19     Q. Why did you feel that that was the case?
20     A. Because I had been told that the reason it was being
21 stopped was because Mr. Bernardi, a political appointee, and
22 then the assistant secretary of CPD, had asked Mr. Donohue to
23 stop the report.
24     Q. And that was permissible? Impermissible?
25     A. At that particular stage in the audit, to me, it was

Page 113

1 impermissible.
2    Q. I believe when we were discussing this report, this
3 is the one where, correct me if I'm wrong, but there had been
4 some review by auditors from Chicago? Something like that; is
5 that right?
6    A. Yes.
7    Q. And then I believe that we established earlier that
8 from the time you submitted the draft report, which was in
9 October, to the time it was issued was nearly a year. Is that
10 accurate, to your understanding?
11    A. I think June is when it's issued. So it's close.
12    Q. Okay. Was Region VI responsible for the length of
13 time it took to get that report issued?
14    A. Yes. And Mr. Phelps made a point of saying that at
15 the next manager's meeting, that Region VI had taken an
16 inordinate amount of time to get the report out.
17    Q. Why was that the case?
18    A. It sat in -- we clocked the time that it's approved
19 by TOP, and that would have been sometime in November until
20 the time the report is released, which was June. And that
21 time frame is blamed on the region.
22    Q. But did you feel that it was the region's -- that
23 the region bore that responsibility?
24    A. No. We would have issued the report, I think, in
25 January is when we had it set to issue.

Page 114

1    Q. Why was it not issued in January?
2    A. Because Mr. Heist said Mr. Donohue told him not to
3 issue it.
4    Q. So from your point of view, was Region VI
5 responsible for the report not being issued until June of that
6 year?
7    A. No. And the report had been approved by TOP and
8 Mr. Heist.
9    Q. In what time period?
10    A. Before January.
11    Q. All right. We also discussed a legal opinion that
12 was, I believe we established, was obtained -- and I think
13 that this had to do with the CVR report; is that correct?
14    A. Yes.
15    Q. And there was some discussion about criteria that
16 was involved in that audit report. Do you remember that?
17    A. Okay. Um-hum.
18    Q. And I think that we -- the two criteria we were
19 discussing, there was A-87?
20    A. Yes.
21    Q. And then there was the FAR. Have I got that right?
22    A. Yes.
23    Q. Which criteria did the auditors from Region VI apply
24 in the draft audit report?
25    A. We applied the circular.

Page 115

1    Q. That's A-87?
2    A. A-87.
3    Q. Why did you apply that criteria at that time?
4    A. The auditors that were doing the audit had used that
5 as the criteria for their findings having to do with
6 expenditures of funds. So that was the criteria they assumed
7 was in play.
8    Q. And then at some point did your region obtain or was
9 a legal opinion obtained that suggested that there needed to
10 be some modification to that?
11    A. Yes. It was pointed out to us, rightfully so, that
12 the CVR contractor itself was not subject to the circular,
13 because it's not a state or local government, and that we had
14 to be citing the FAR when referring to CVR and the circular,
15 when we were talking about the housing authority of New
16 Orleans. So we added the FAR to our list of criteria.
17    Q. So to your understanding, did this legal opinion say
18 that you should not use the A-87 circular at all?
19    A. No. I did not have that impression nor do I recall
20 that. I recall being told I needed the FAR, and I agreed with
21 that. I needed the FAR.
22    Q. Did you include the FAR as a criteria in the
23 ultimate audit report?
24    A. In the next draft that we sent up, we included the
25 FAR.

Page 116

1    Q. And was that draft approved by somebody?
2    A. No.
3    Q. That was the final draft?
4    A. We never heard back from TOP.
5    Q. Okay. Right. I remember now. Changing gears a
6 little bit, I believe that we talked some about an alternative
7 dispute resolution process that you participated in sometime
8 in 2002?
9    A. Yes.
10    Q. And was there a management official from HUD who
11 participated in that process with you?
12    A. Mr. Stephens.
13    Q. What did Mr. Stephens communicate to you as far
14 as -- or did he communicate anything to you as far as what the
15 outcome of the ADR process would be?
16    A. That we were going to put all of that behind us and
17 start over.
18    Q. What all of that? What did he mean, to your
19 understanding?
20    A. My understanding was that he agreed to stop the
21 reprimand, they would stop harassing me, that from that point
22 onward, I should have had a normal relationship as regional
23 inspector general within the office of inspector general and
24 would just move forward from there.
25    Q. So in other words, it was just going to wipe the

Page 117

1 slate clean. Is that fair to say?
2    A. Yes.
3    Q. Is this actually what happened in practice?
4    A. No.
5    Q. What did happen?
6    A. They continued in a harassing pattern to make Region
7 VI look bad and to negatively impact on the morale of the
8 Region VI auditors.
9    Q. When you say "they," who are you talking about?
10   A. Heist, Phelps and Saddler.
11   Q. And in what ways did they do these things that you
12 are saying?
13   A. They would question the auditors' judgments. They
14 would insult them. They would stop audits from going that had
15 been planned and worked on. They would say things in public
16 forums that were negative to the region. They marked down the
17 region's performance -- the entire region's performance in the
18 goals assessments. Those were the type of things that they
19 were doing.
20   Q. And was it your belief that those actions were
21 motivated by some legitimate reason?
22   A. No. I didn't think they were motivated by any
23 legitimate reason.
24   Q. What did you believe was the motivation for the
25 actions that you've just named?

Page 118

1    A. I think that Mr. Heist, Mr. Saddler and Mr. Phelps
2 still wanted me to depart. And they wanted to undo the fact
3 that I had signed that settlement agreement.
4    Q. So to your observation or in your opinion, did these
5 actions have any correlation to the EEO complaint that you had
6 settled in 2002?
7    A. Yes, I believe they did.
8    Q. What time period were these actions occurring that
9 you were just talking about?
10   A. 2003, 2004.
11   Q. Okay. Did there come a point in time when they
12 escalated or that there was some turning point?
13   A. The CVR report, I could see, was an escalation. And
14 I had decided to take Mr. Stephens up on his offer and go in
15 and present my case to him that we were still having troubles.
16   Q. Okay. Did that happen?
17   A. When I went up on January 5, 2005, to do that, when
18 I thought we were going to be discussing the CVR report,
19 that's the day I was given the directed reassignment. I still
20 went by and gave that referral to Mr. Stephens.
21   Q. When you say "gave that referral to Mr. Stephens,"
22 what are you talking about?
23   A. I was alleging in that referral that Mr. Heist and
24 Mr. Phelps, in their actions on CVR, were trying to interfere
25 in the audit process and get a result that was not supported

Page 119

1 by the audit work, which is a violation of our conduct of --
2 or standards of conduct. And I was giving that to him as a
3 supervisor of Mr. Heist and Mr. Phelps.
4    Q. Okay. We also discussed, there was some discussion
5 about this recommendation that Mr. Phelps provided to, I
6 believe his name is, Mr. Reardon at the Department of Defense?
7    A. Yes.
8    Q. And that was in connection with an application that
9 you had made to work for Mr. Reardon?
10   A. Yes.
11   Q. What is your understanding of what Mr. Phelps said
12 to Mr. Reardon?
13   A. Essentially I was not a team player and had not gone
14 along with changes that management had instituted.
15   Q. Where did you gain that understanding?
16   A. That's what Mr. Phelps told me when I asked him.
17 Within a month of the interview having taken place, when he
18 gave me my 2005 appraisal, I said, How can you say this, that
19 I'm so good in this 2005 appraisal and yet have told
20 Mr. Reardon something different?
21   Q. Did Mr. Reardon ever communicate to you that
22 Mr. Phelps had said anything negative about you?
23   A. Yes, he did.
24   Q. What did he say?
25   A. When I went into the interview, he informed me that

Page 120

1 I was the sole surviving candidate for the position, and --
2       MS. MELNIK: Objection as to hearsay.
3       BY MS. BUIE:
4    Q. Go ahead, please.
5    A. He told me that he had talked to Mr. Phelps and that
6 Mr. Phelps had given me a bad recommendation.
7    Q. Okay. Mr. Reardon said Mr. Phelps had given you a
8 bad recommendation?
9    A. Yes.
10   Q. Was this --
11      MS. BUIE: It's not hearsay because it doesn't go to
12 the truth of the matter asserted. It goes to whether
13 Mr. Reardon told this to Mr. Beard --
14      MS. MELNIK: I'm not saying he can't answer. I'm
15 just making an objection for the record.
16      MS. BUIE: It's not hearsay. Let's continue.
17      BY MS. BUIE:
18   Q. Was Mr. Phelps' recommendation in line with his
19 appraisal of your performance in your annual evaluations?
20   A. No, it was not. My annual appraisal for the year
21 2005 mentioned what a great region I had and how well managed
22 it was.
23      Specifically mentioned the $109 million that I did
24 in the return on investments statistics, and specifically
25 mentioned my extracurricular activities in coming up with a

Page 121

1  new rating system for the office of audit. And in fact, he
2  maybe mentioned that I had gotten a special achievement award
3  for that.
4     Q. Who gave you that special achievement award?
5     A. Mr. Phelps.
6     Q. When did that happen?
7     A. Sometime in 2004. Probably around July.
8     Q. Did Mr. Phelps ever make any comments to you in the
9  time period around this recommendation that you were not being
10 a team player?
11    A. I'm sorry?
12    Q. Around the time period that Mr. Phelps gave this
13 recommendation to Mr. Reardon, I'm saying other than in your
14 official performance evaluations, had he ever made an
15 unofficial comment to you that he felt you were not being a
16 team player?
17    A. No. That was the first time I had heard him use
18 that phrase.
19    Q. All right.
20    A. He had in 2004 told me the region was well run.
21    Q. Did this disparity between Mr. Phelps' written
22 evaluation of your appraisal and what he told Mr. Reardon, did
23 that disparity in any way affect your belief that the
24 reference was based on prohibited animus?
25    A. Yes.

Page 122

1     Q. How so?
2     A. If he had stuck to what he was telling me and what
3  was reflected in my appraisals and what was reflected in the
4  special achievement award of that year, it would have been a
5  positive referral.
6     MS. BUIE: Okay. My last few questions have to do
7  with damages. It doesn't really have anything to do with
8  nitty-gritty details about health care. You can stay or go.
9     MR. JOHNSON: Thank you.
10    BY MS. BUIE:
11    Q. So we went over with Ms. Melnik some of the claims
12 for damages that you made in your complaint to the District
13 Court, correct?
14    A. Yes.
15    Q. We discussed various emotional and health issues
16 that were listed in that complaint?
17    A. That's correct.
18    Q. And I believe you testified that apart from a change
19 in the locality pay, your salary wasn't changed between Fort
20 Worth and Washington, D.C.; is that right?
21    A. That's correct.
22    Q. Was there an impact on your finances as a result of
23 the directed reassignment from Fort Worth to D.C.?
24    A. There was a huge impact on my net pay in that it
25 went down significantly.

Page 123

1     Q. How is that?
2     A. The state of Virginia is one of those states that
3  taxes people a lot. The state of Texas is one that does not.
4  So the first effect was I was paying $7,000 or so in state
5  income tax that I was not paying in Texas.
6     I went from a housing market in Fort Worth where the
7  median market was around 150, 160,000 to one up here where the
8  median in the Alexandria/Arlington area was somewhere in
9  excess of 600,000.
10    I was not able to afford the kind of house that I
11 had in Texas, 14 miles away from my office, and kept going out
12 until I finally did locate one in Fredericksburg, Virginia.
13 And I'm in a house of lesser quality than the one in Texas at
14 about triple the cost.
15    Q. And just for the record, how far away is
16 Fredericksburg from where you report to duty every day?
17    A. 50 miles.
18    Q. What about any change in costs to commute to work?
19    A. The cost to commute to work is reimbursed by the
20 federal government pretty much.
21    Q. Any other impact on your finances as a result of the
22 directed reassignment?
23    A. The expenses that I've had to pay to pursue these
24 legal actions.
25    Q. Apart from that. What about, you owned a house in

Page 124

1  Arlington, was it, Texas?
2     A. Yes, Arlington, Texas.
3     Q. Did you have to sell that house at some point?
4     A. I sold that house to come to Washington, D.C.
5     Q. Had you planned on selling that house if you had
6  remained in Arlington?
7     A. No. If I would have stayed in Arlington, I would
8  have stayed in that house.
9     Q. What about, did the directed reassignment -- I know
10 we've talked about various doctors that you have been to and
11 so forth, but did the directed reassignment have any impact on
12 your access to health care?
13    A. Yes. The particular real carcinoma that I had is
14 extremely rare, less than one percent of the population.
15 That's why I got the doctor that I got. He is a professor at
16 the University of Texas.
17    He was interested in me because of the rarity of
18 this disease. So because of that, I was getting one of the
19 best men in the country. And now I have been separated from
20 him. Should there be a recurrence shown up on the scans, I'm
21 going to have to fly down to Texas or find someone here.
22    Q. I think you mentioned just briefly that you had --
23 that you receive annual scans or something. Can you just
24 explain what that's all about?
25    A. I have to go to one of those big donut machines,

Page 125

1 hook up to an iodine IV, take several blood samples and I'm
2 scanned from my neck to my thighs for what they call
3 blossoming, which is a recurrence of the cancer.
4    Q. And how often do you get those scans?
5    A. I now do that once a year.
6    (Discussion off the record.)
7    MS. BUIE: I think that's it for me.
8        REDIRECT EXAMINATION
9    BY MS. MELNIK:
10   Q. I have just a few follow-ups. Mr. Beard, you just
11 testified that you were not aware about the problem in terms
12 of inflammatory or problems in the language in the HANO audit
13 until you came for your review, I think you said, in 2002?
14   A. That's correct.
15   (Beard Deposition Exhibit Numbers 10 and 11 were
16 marked for identification.)
17   BY MS. MELNIK:
18   Q. These are e-mails that are either directly or cc'd
19 to you, correct?
20   A. Yes, I'm cc'd.
21   Q. And it has to do with -- parts of those e-mails have
22 to do with language in the HANO audit?
23   A. Yes.
24   Q. And that was before 2002, these e-mails were sent?
25   A. Yes.

Page 126

1    Q. In Exhibit Number 10, the e-mail from Mr. Nixon in
2 which you were -- actually, it was to you. You weren't cc'd.
3 You, Mr. Heist and Mr. Phelps, where he says he's going to
4 take out a lot of the inflammatory language; is that right?
5 Does he not say that in the e-mail back in '01? 2001?
6    A. Yes.
7    Q. Is that right?
8    A. You would have to meet Mr. Nixon to realize none of
9 these words were in that draft. He's being facetious.
10 Delusional is not in there. Holding residents hostage. I
11 don't believe that stuff is in the report.
12   Q. So he was just kidding when he sent this to the
13 higher-ups?
14   A. Well, I think it would be best to ask him.
15   Q. Well, for now I'm asking you since you were cc'd on
16 it --
17   A. I took this as a joke at the time. Mr. Nixon has
18 that kind of personality where he says things that, taken in a
19 context like this, looks as though it's horrible. But at the
20 time when he was doing it amongst the people, he was being
21 facetious. When I saw this in the discovery documents, that's
22 the way I interpreted this.
23   Q. How about your e-mail to and from Ms. Gaffney, the
24 inspector general? Was that also a joke?
25   A. What?

Page 127

1    Q. With respect to language that she -- a sentence that
2 she wanted addressed?
3    A. She had asked -- let's see what she says here. I
4 know I'm outside the audit process, but I'll ask whether you
5 might not consider dropping the sentence that says in our
6 opinion Secretary Cisneros entered into this agreement to
7 placate the mayor of New Orleans.
8    Q. Was your exchange with her, was that facetious and a
9 joke too?
10   A. No, this is not. She's asking us to consider taking
11 that language out.
12   Q. That was in 2001?
13   A. Yes.
14   Q. You listed a bunch of -- and I didn't write them all
15 down, I'm afraid, in response to Ms. Buie's questions about
16 things that headquarters did that had a negative impact, you
17 believed, on your region and its auditors. I wrote down
18 interfered with the audits, something about the goals. Do you
19 recall what you were discussing with Ms. Buie --
20   A. Yes.
21   Q. -- with respect to the things that headquarters was
22 doing that had this negative effect on Region VI and yourself?
23   A. Right.
24   Q. How did that make you feel?
25   A. Nervous. It made me feel nervous.

Page 128

1    Q. Nervous?
2    A. I wasn't sure what the relationship was leading
3 towards. So I was nervous. But at the same time I'm getting
4 appraisals that are telling me everything is okay.
5    Q. Well, it's fair to say you were well liked by your
6 folks at Region VI, your auditors, correct?
7    A. Yes.
8    Q. And you felt responsible for them professionally?
9    A. Yes.
10   Q. You tried to look out for them?
11   A. Yes.
12   Q. And are you saying that you felt nothing with
13 respect to them vis-a-vis headquarters? You only felt nervous
14 for yourself, but you felt nothing with respect to your region
15 as a whole vis-a-vis headquarters and that relationship?
16   A. I don't believe I said that.
17   Q. Well, then I'm asking.
18   A. I did feel for those. It was hurting their morale.
19   Q. And the fact that it was hurting your people's
20 morale, how did that make you feel?
21   A. I would say nervous and threatened. The region's
22 production could be affected by the morale.
23   Q. Did you appreciate the way headquarters was treating
24 your people?
25   A. I did not appreciate the way headquarters was

Page 129

1  treating my people.
2      Q. And with respect to -- switching gears. With
3  respect to your dealings with Mr. Reardon, are you saying that
4  he called you for an interview only to tell you that he got a
5  negative recommendation and he wasn't hiring you? He told you
6  that at the interview for your job?
7      A. No.
8      Q. Okay. Can you explain to me, then, what you meant
9  by you had this conversation with Reardon? You said you went
10  into the interview with Reardon and he had talked to Phelps,
11  given me a bad recommendation. So I assumed you were talking
12  about the interview you had with him?
13      A. Yes.
14      Q. With --
15      A. With Reardon.
16      Q. So he told you at the interview --
17      A. Yes, that he had talked to Mr. Phelps.
18      Q. And that you got a bad recommendation?
19      A. Right.
20      Q. He told you that during the interview?
21      A. During the interview.
22      Q. When you were talking -- now we're going back
23  switching subjects again -- about senior management
24  interjecting themselves in the selection process. Do you
25  remember discussion about that?

Page 130

1      A. Yes.
2      Q. Do you have a specific instance when Mr. Phelps
3  interjected into a selection process?
4      A. I do, but I did not mention that in the deposition.
5      Q. Which deposition?
6      A. 2001 in Tighe v. Cuomo.
7      Q. With respect to the -- again, switching gears again.
8  The CPD audit, is it your belief that you upset the politicals
9  with respect to that audit?
10      A. The CPD audit -- I don't know about what was in
11  Finding 3 that they deleted. I felt as though we were
12  delaying that so that it would come out after Mr. Bernardi had
13  his confirmation hearings. That was just a delaying tactic.
14  And I specifically mentioned that in writing to Mr. Heist.
15      MS. BUIE: I have a couple. It's like three
16  questions. Sorry Charlie. You introduced two new exhibits.
17      RECROSS EXAMINATION
18      BY MS. BUIE:
19      Q. Okay. Let's take a look at Exhibit 10. Let's just
20  assume for purposes of argument that Mr. Nixon wasn't being
21  facetious here in this e-mail. Let's assume he really did
22  take out some what he's classifying as inflammatory language.
23  Would that have been a normal part of his job duties?
24      A. Yes. The primary author of the report was Michelle
25  Nuss in New Orleans. He would have been dealing with Heist

Page 131

1  and he says in this memo here, John C, that's John Connors,
2  deputy inspector general, and Jim, Mr. Heist. He's dealing
3  with them.
4      The only reason I say it's facetious is this thing
5  where he says that he hopes I'm still on medication. He's
6  making a lame joke.
7      Q. But let's just assume that he's not being facetious
8  here. Was Ms. Nuss under Mr. Nixon's supervision?
9      A. Yes.
10      Q. So as her supervisor, would it have been his job to
11  make corrections or changes to her draft report?
12      A. Yes, it would.
13      Q. So this inflammatory language, let's just say it was
14  in the report, would you have put it in the report?
15      A. No.
16      Q. Would Mr. Nixon have put it in the report?
17      A. No.
18      Q. But Mr. Nixon was making sure that it was taken out
19  of the report before it was published, correct?
20      A. Yes.
21      Q. Was it unusual for somebody, either Mr. Heist or
22  somebody else in headquarters, TOP, to make a request to
23  change some words or some language in a draft audit report?
24      A. No, it was not unusual.
25      Q. Was it unusual for that to happen with Region VI

Page 132

1  draft audit reports?
2      A. No.
3      Q. Was it unusual for that to happen with other
4  regions' draft audit reports, if you know?
5      A. No. That's common -- it's the deliberative process.
6      Q. What about, just to clarify the record, because now
7  I'm confused, what is the sequence of events that happened in
8  terms of your discussions with Mr. Reardon about the job at
9  DOD?
10      A. I went to an interview with a selection panel.
11  There were a half a dozen senior executives from the
12  Department of Defense. That selection panel interviewed, I
13  don't know how many folks. They referred me to Mr. Reardon.
14  So I went back for an interview with Mr. Reardon. He told me
15  I was the sole individual referred by --
16      MS. MELNIK: Object for hearsay.
17      BY MS. BUIE:
18      Q. I'm just asking for the sequence of events.
19      A. Then he said to me that he had talked to Mr. Phelps
20  and Mr. Phelps had given me a bad recommendation.
21      Q. So this conversation about Mr. Phelps or
22  recommendation or whatever, this happened in the second
23  interview you had in the process?
24      A. In the process.
25      Q. In the selection process?

Page 133

1   A. That's correct.
2   Q. But this was the first interview you had had with
3 Mr. Reardon?
4   A. Mr. Reardon.
5      MS. BUIE: I don't have any further questions.
6      (Reading and signature not waived.)
7      (Whereupon, at 4:25 p.m. on Friday, January 19,
8 2007, the deposition was adjourned.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 134

1              CERTIFICATE
2      I, Deborah Rinaldo, a Shorthand Reporter and a Notary
3 Public, do hereby certify that the foregoing witness,
4 MICHAEL BEARD, was duly sworn on the date indicated, and that
5 the foregoing is a true and accurate transcription of my
6 stenographic notes and is a true record of the testimony given
7 by the foregoing witness.
8      I further certify that I am not employed by or related to
9 any party to this action by blood or marriage and that I am in
10 no way interested in the outcome of this matter.
11     In witness whereof, I have hereunto set my hand this
12 8th day of February, 2007.
13
14
15      _____/s/_____
16      Deborah Rinaldo
17      Notary Public in and for the
18      District of Columbia
19
20
21 My commission expires:
22 January 14, 2011
23
24
25