MGB Reporting, Inc.

Page 1

1      UNITED STATES DISTRICT COURT

2      FOR THE DISTRICT OF COLUMBIA

3

4

5

6   - - - - - - - - - - - - - -x

7   D. MICHAEL BEARD,           :

8        Plaintiff,             :   Civil Action Number

9   vs.                         :   06-0756 (GK)

10  ALPHONSO R. JACKSON,        :

11  Secretary Of Housing And    :

12  Urban Development,          :

13       Defendant.             :

14  - - - - - - - - - - - - - -x

15              DEPOSITION OF MICHAEL R. PHELPS

16

17                              Washington, DC

18                              Tuesday, March 13, 2007

19

20

21  REPORTED BY:

22     DAVID L. HOFFMAN

**EXHIBIT 2**

9805 Korman Court, Potomac, MD 20854
301-983-9315 ~ www.mgbreporting.com

MGB Reporting, Inc.

2 (Pages 2 to 5)

Page 2

Deposition of MICHAEL R. PHELPS, called for examination pursuant to notice of deposition, on Tuesday, March 13, 2007, in Washington, DC, at the law offices of Robert Seldon & Associates, 1319 F Street, N.W., Suite 305, at 2:10 p.m., before DAVID L. HOFFMAN, a Notary Public within and for the District of Columbia, when were present on behalf of the respective parties:

ROBERT C. SELDON, ESQ.
Robert Seldon & Associates
1319 F Street, N.W.,
Suite 305
Washington, D.C. 20004
202-955-6968
On behalf of Plaintiff

-- continued --

Page 3

APPEARANCES (Continued):
KAREN L. MELNIK, ESQ.
Assistant United States Attorney
U.S. Department of Justice
555 4th Street, N.W., Room E-4112
Washington, D.C. 20530
202-307-0338
RICHARD K. JOHNSON, ESQ.
U.S. Department of HUD
Office of Inspector General
451 7th Street, SW, Room 8260
Washington, D.C. 20410
202-708-1613
and
TIFFANIE R. SMITH, ESQ.
U.S. Department of HUD
Office of General Counsel
451 7th Street, SW, Room 10170
Washington, D.C. 20410
202-708-3087x5061
On behalf of Defendant
ALSO PRESENT: D. Michael Beard

Page 4

PROCEEDINGS
(2:10 p.m.)
Whereupon,
MICHAEL RICHARD PHELPS,
a witness, having been called for examination, and, having been first duly sworn, was examined and testified as follows:

EXAMINATION
BY MR. SELDON:

Q  Mr. Phelps, good afternoon, sir.
A  Hello, Mr. Seldon.
Q  I take it you are dug out from the ice now?
A  Yes, yes.
Q  For the record, give us your full name, please.
A  Michael Richard Phelps.
Q  Mr. Phelps, seeing as how we've been through this before, I'll give you the same choice as last time. I won't ask for your home address, if you will agree that the Assistant United States Attorney assigned to the case, can accept service of a

Page 5

subpoena, in the event we have to go to trial.
A  Yes, she can.
Q  Okay. I'm going to give you a very abbreviated set of ground rules, because we've done this before in the not-too-distant past, and if you want further explanation, I'll be glad to give it to you, but I'd like to spare us all that, especially because your attorney was so tardy.
(Laughter.)
THE WITNESS: And I've got to leave by 4:30.
(Laughter and discussion off the record.)
BY MR. SELDON:
Q  We're here, as you know, to take your deposition in the case that Michael Beard has brought against the Department of Housing and Urban Development, claiming discrimination and retaliation in connection with his reassignment and at least one other employment action.
We are here to take your deposition under oath. We need questions to be answered thoroughly, completely, accurately, candidly, under oath and

Page 6

1  under penalty of perjury.
2      If I put a question to you and you don't
3  know the answer, tell me, and I'll rephrase it for
4  you. If you don't know a word, tell me, and I'll
5  rephrase it for you.
6      What we need you to do and what we require
7  you to do when you're asked, is to give your answers
8  the best you possibly can, to the extent of your
9  knowledge, information, and belief, unless and until
10 it calls for a guess or speculation.
11     I'll spare you the rest of the ground
12 rules, unless you'd like to hear them again. Ready?
13     A   Ready.
14     Q   Mr. Beard was involved in a mediation
15 process that resulted a settlement agreement in 2002.
16 I take it, you're aware of that?
17     A   I'm not sure exactly which one you're
18 referring to.
19     Q   How many were there?
20     A   I don't know.
21     Q   It's going to take longer than 4:30, if
22 I've got to go through your deposition each time --

Page 7

1  I'm sorry, your statement.
2      As I look at the statement that you gave
3  to Mr. Williams, the EEO Investigator, I will give
4  you this and you may look at page 5.
5      (Handing document to witness.)
6      BY MR. SELDON:
7      Q   I think this is it. Do you see where it
8  says, on page 5 -- this is your statement, right?
9      A   Yeah, this is the --
10     Q   "He, thereafter, filed and EEO Complaint,
11 based on the Letter of Reprimand. As part of the EEO
12 process, he requested ADR, which he conducted with
13 the Deputy Inspector General. The Deputy Inspector
14 General resolved the EEO Complaint by..." et cetera,
15 et cetera.
16     A   Okay, yes.
17     Q   Okay? That's the one we're talking about.
18     A   I understand that's what you're talking
19 about.
20     Q   Okay, now, that was done in connection
21 with Mr. -- and I assume this is right -- Mr. Beard's
22 previous EEO Complaint?

Page 8

1      A   Yes.
2      Q   What had you -- how did you come to know
3  anything about that ADR?
4      (Pause.)
5      It's not a trick question.
6      A   No, I'm just trying to think. You know,
7  it was a long time ago. I'm trying to think back.
8      Q   Let's start with this question. Let's
9  make it simpler for you.
10     A   Okay.
11     Q   Did you learn about it before,
12 simultaneously, or after, to the best of your
13 recollection?
14     A   After.
15     Q   How did you learn about it?
16     A   I don't --
17     Q   Let's put it -- let's break it down again.
18 Do you recall who you learned it from?
19     A   No, I don't; I don't recall who told me
20 that it had been resolved.
21     Q   Do you recall how you learned that there
22 was an ADR and a settlement, agreement, which I will

Page 9

1  show you, because we attached --
2      A   Someone told me that there had been an ADR
3  and that it was settled.
4      Q   Okay.
5      A   I don't remember whether it was Mr. Heist
6  or Mr. Stephens.
7      Q   This would have been the Heist Deposition
8  Exhibit 6. I just want to make sure this is the same
9  Mediation and Settlement Agreement we're all involved
10 with, all talking about.
11     A   Okay.
12     Q   Okay, is it?
13     A   I don't know. I've never seen this.
14     (Pause.)
15     Q   Okay, I believe you've given testimony
16 here, so what I want to know, is, what, exactly, did
17 Mr. Stephens, if anything, tell you about that
18 complaint being -- what the terms were, resolving
19 that complaint?
20     MS. MELNIK: I'm going to object, lack of
21 foundation. He just said he didn't know --
22     MR. SELDON: He can answer that "none."

MGB Reporting, Inc.

Page 10

1  I've been teaching that question to the Department of
2  Justice for many years.
3       THE WITNESS: I do not recall whether Mr.
4  Stephens or Mr. Heist had this discussion with me.
5       BY MR. SELDON:
6  Q  Let's start with, how do you know? You
7  said you hadn't seen the Mediation Agreement, Heist
8  Exhibit 6.
9  A  That's right. I do not recall having seen
10 that.
11 Q  How do you know what the terms of it were?
12 A  Because I was told.
13 Q  By?
14 A  I don't know whether it was Mr. Heist or
15 Mr. Stephens.
16 Q  What did they tell you?
17 A  That they had reached a settlement. And I
18 don't know what the terms were. I mean, here's my
19 recollection:
20      That a settlement had been reached; that
21 Mr. Beard -- they wanted to try to start anew with
22 Mr. Beard, and they thought that if we all tried

Page 11

1  hard, we could work together and turn things around,
2  turn the past around, and, therefore, that's what we
3  were going to try to do. That's my recollection of
4  it.
5  Q  But you don't recall who said it?
6  A  I don't recall who told me.
7  Q  Do you recall if it was either of them?
8  A  Oh, yes, it would have been either of
9  them; I mean, it would have been one of the two.
10 Q  Do you know anything that went on in the
11 ADR?
12 A  I do not.
13 Q  Do you know how ADR came to be scheduled?
14 A  No.
15 Q  Do you recall whether you were asked for
16 your concurrence or non-concurrence in conducting it?
17 A  I don't recall having a discussion about
18 the fact that it was going to happen.
19 Q  So your statement that the Deputy
20 Inspector General resolved the EEO Complaint by
21 allowing the Complainant another chance to see if he
22 could become a team player, I guess you don't know

Page 12

1  what's in the agreement, because you've never seen
2  that, but at least at the time -- you can look with
3  me, if you want --
4       (Handing document to witness.)
5       BY MR. SELDON:
6  Q  I don't see any reference in there, that
7  it was resolved to see if Mr. Beard could become team
8  player. I'm wondering if you do.
9  A  Do you want me to read the whole thing?
10      MS. MELNIK: I'm going to object, just
11 because the document will speak for itself.
12      BY MR. SELDON:
13 Q  Go ahead.
14      (Pause.)
15      MS. MELNIK: It also mischaracterizes the
16 testimony.
17      MR. SELDON: In what way?
18      MS. MELNIK: It isn't that the agreement
19 --
20      MR. SELDON: Don't tell him the answer.
21      THE WITNESS: Now I know what you're
22 saying. I'll have an answer, anyway.

Page 13

1       (Pause.)
2       I don't see any reference.
3       BY MR. SELDON:
4  Q  Then, in preparing your statement for Mr.
5  Williams at the EEO level, at the Investigator level,
6  what, if anything, did you do to recall that the
7  agreement was designed to see if Mr. Beard could
8  become a team player?
9       MS. MELNIK: Same objection to the form.
10      THE WITNESS: I didn't do anything.
11      BY MR. SELDON:
12 Q  Do you remember that, spontaneously,
13 yourself?
14 A  Yes.
15 Q  Did you talk to Mr. Heist about it?
16 A  Who?
17 Q  Did you talk to Mr. Heist about it?
18 A  When?
19 Q  In the EEO Complaint process.
20      (Pause.)
21 A  I think I probably had a discussion with
22 him after I had submitted my affidavit. I don't

MGB Reporting, Inc.

5 (Pages 14 to 17)

Page 14

1  recall whether there were other discussions.
2      Q   What did you say to him and what did he
3  say to you?
4      A   It was a general conversation.
5      Q   About what?
6      A   The type of questions I was asked.
7      Q   And you told him?
8      A   The type of questions I was asked.
9      Q   What did he say to you?
10     A   I don't recall.
11     Q   Did you get any information before you
12 gave your statement?  If it did not come directly
13 from Mr. Phelps, nonetheless conveyed information to
14 you about Mr. Phelps's view of that settlement
15 agreement?
16         MS. MELNIK:  He is Mr. Phelps.
17         MR. SELDON:  Sorry.  Mr. Heist.  I'll
18 rephrase.
19         BY MR. SELDON:
20     Q   If you don't recall any direct
21 communication with Mr. Heist about his recollection
22 of what the settlement agreement was all about, did

Page 15

1  you get any communication from anyone else, which
2  conveyed Mr. Heist's understanding of that matter?
3      A   My only recollection is that I was told
4  that a settlement had been reached and that we were
5  going to work better together.
6      Q   What about in preparing your statement as
7  part of the Report of Investigation, the one I just
8  showed to you?
9      A   I do not recall having any discussions
10 prior to the time I met with the EEO Investigator.
11     Q   Mr. Beard reported to you, I take it,
12 reported in January 10th, 2005, reported to
13 headquarters?
14     A   Sounds like the right date.
15     Q   And he reported in as your deputy, I take
16 it — sorry, as a special assistant to you?
17     A   Yes, he did.
18     Q   What assignment did you have ready for him
19 to work on, on that day?
20     A   I don't recall.
21     Q   What assignments did you have him ready to
22 work on in the coming months?

Page 16

1      A   He worked on core competencies.
2      Q   How much time?
3      A   I don't recall.
4      Q   Is that an assignment that, to your view,
5  is commensurate with some duties and experience, as
6  an experienced Grade 15 auditor?
7      A   Absolutely.
8      Q   What else did you have him work on in
9  that first month after he was there?
10     A   I don't recall.
11     Q   Wasn't he working on the core
12 competencies, that project before Mr. Beard reported
13 to Washington, D.C.?
14     A   He was working on some portions of it.
15     Q   Was there any reason that he needed to be
16 in Washington, D.C. to work on that?
17         (Pause.)
18     A   Probably not.
19     Q   What did you have, if you can recall
20 anything, Mr. Beard working on in the second month
21 after he reported, and as your special assistant?
22     A   I don't recall.

Page 17

1      Q   What if anything can you recall that Mr.
2  Beard worked on in the third month after he reported
3  and as your special assistant?
4      A   I don't recall.
5      Q   What is the first assignment you recall
6  giving to Mr. Beard?
7      A   Core competencies.
8      Q   What is the second?
9      A   I don't recall.
10     Q   As I look in your EEO statement at page 6,
11 which you are free to look at or not, depending on
12 what you want to do -- and I want to also say you can
13 review as much or as little of it as you like.
14         But I'm focusing in on the job reference,
15 if you will.  What I'm going to do --
16         MR. SELDON:  I'm going to ask the Reporter
17 to mark that as Exhibit 1.
18         (Phelps Deposition Exhibit Number 1 was
19         marked for identification.)
20         BY MR. SELDON:
21     Q   I'm going to focus on the part that's on
22 the bottom half of page 6 of your statement.  You can

MGB Reporting, Inc.

Page 18

1  read that or not; you can read as much of your
2  statement as you like. It's entirely up to you.
3      Whenever you're ready to go --
4  A   Go ahead.
5  Q   How did this contact get initiated from
6  Mr. Reardon at the Department of Defense, with you?
7  A   He called me.
8  Q   What did he say?
9  A   I believe he said he had interviewed Mr.
10 Beard for a position with DOD, and asked me for my
11 impressions of Mr. Beard.
12 Q   Then it says in here, "I told Mr. Reardon
13 a lot of positive things about the Complainant."
14     What, exactly, did you tell him?
15     (Pause.)
16     MR. SELDON: The record ought to reflect
17 there's a pause by the witness.
18     (Pause.)
19     THE WITNESS: Can we put it on the record
20 that this was a couple of years ago?
21     BY MR. SELDON:
22 Q   Sure.

Page 19

1  A   Thank you. To the best of my
2  recollection, I told him that Mr. Beard was a bright
3  individual; that he was well-credentialed; that he
4  had a staff when he was in Ft. Worth, that worked
5  well with him, that seemed to get along well with
6  him; he had good rapport with his staff.
7  Q   Anything else.
8  A   I don't really recall anything else.
9  Q   Do you remember any of Mr. Beard's awards
10 being mentioned by you?
11 A   No, I do not.
12 Q   Do you remember anything about the
13 rankings in Mr. Beard's region, while he was there?
14 A   No.
15 Q   Do you recall mentioning anything about
16 Mr. Beard having testified before Congress?
17 A   I do not. I don't know; I don't recall
18 whether I did or not.
19 Q   Any reason why you didn't mention to Mr.
20 Reardon, the award that you, yourself, put Mr. Beard
21 in for?
22 A   No, I don't know why.

Page 20

1  Q   What did you tell Mr. Reardon that was not
2  positive about Mr. Beard?
3  A   Mr. Reardon asked me why Mr. Beard came to
4  Washington.
5  Q   Okay.
6  A   I told him that we had gone through a
7  change in administration within the OIG at HUD, and
8  things changed as far as the way we did business. It
9  used to be that the field managers were empowered to
10 work entirely independently and make their own
11 decisions and issue their own reports and do whatever
12 it was they wanted to do.
13     We now had a new Inspector General, and we
14 were going in a different direction, as far as the
15 way we conducted our business. We were very much
16 control-oriented regarding what was going on in the
17 field and what managers were doing, and that Mr.
18 Beard had trouble getting -- making that transition
19 to that method of operation.
20 Q   Did you state or imply that the source of
21 performance problems was on Mr. Beard's part?
22 A   I did not.

Page 21

1  Q   Did you state or imply that this was a
2  conduct problem on Mr. Beard's part?
3  A   I don't think I characterized it.
4  Q   Did you intend that it be taken that way?
5  A   No. I intended it to be that it was what
6  it was, just that he didn't get along and wasn't
7  operating the way we expected him to operate, and we
8  made a change.
9  Q   You told Mr. Reardon, if I understand it,
10 that there was a new IG in HUD OIG, and that Mr.
11 Beard hadn't worked in the new program; is that
12 right?
13 A   The new program being the way we were
14 running the organization.
15 Q   That's essentially what you're telling me?
16 A   Right.
17 Q   When did you tell him the new IG had come
18 onboard?
19 A   I don't know that I did.
20 Q   Did you make it sound like Mr. Donohue was
21 a new IG?
22 A   I don't know how I made it sound.

MGB Reporting, Inc.

7 (Pages 22 to 25)

Page 22

1  Q  Did you say he was a new IG? Your
2  statement, I think, said, "A new IG took us in a new
3  direction." Do you see that?
4  A  We had a previous administration. The new
5  IG -- yes, that's right.
6  Q  Mr. Donohue had been there three and a
7  half years by that time, hadn't he?
8  A  If you say.
9  Q  Donohue came in 2002; didn't he?
10  A  Right, but I don't know when I talked to
11  Mr. Reardon, but --
12  Q  Why did you describe Mr. Donohue as a new
13  IG, in the conversation with Mr. Reardon?
14  A  Because I was describing a change from the
15  old administration to the new administration. This
16  is not something that happened overnight; this is
17  something that had been going on.
18  Q  You didn't say that to Mr. Reardon, did
19  you?
20  A  No.
21  Q  I don't know if I asked you this or not,
22  but when you said this change by the new IG, to Mr.

Page 23

1  Reardon, did you say or indicate to him that Mr.
2  Donohue had become the new IG?
3  A  I do not think I did.
4  Q  Did you tell Mr. Reardon, who was
5  responsible for reassigning Mr. Beard?
6  A  I do not recall.
7  Q  Let me ask you a question: Did you view
8  the information you were giving to Mr. Reardon, as
9  part of an official request for Information or a
10  personal one about Mr. Beard?
11  A  Official.
12  Q  Do you have any information at all or any
13  knowledge, one way or the other, about what's
14  permissible to give in an official reference, as
15  opposed to an unofficial one?
16  A  No, I don't.
17  Q  Never had any information about that from
18  your HR Department of BPD, Bureau of Public Debt?
19  A  I couldn't say, one way or the other,
20  whether I had. I don't recall it.
21  Q  The information that you gave Mr. Reardon,
22  that Mr. Beard had trouble making the transition to a

Page 24

1  new system under the new Inspector General, was that
2  ever reflected in any of Mr. Beard's performance
3  appraisals, at least the ones that you gave him,
4  initially?
5  A  Yes, I think it probably was.
6  Q  In the performance appraisals? Do you
7  think so?
8  A  I do not recall whether it was in writing,
9  or whether it was in discussions with him.
10  Q  Did you view yourself at liberty to give
11  information that was not positive about Mr. Beard, to
12  Mr. Reardon, that hadn't been included in a
13  performance appraisal?
14  A  Yes.
15  Q  Why was that?
16  A  Because what we were talking about, was
17  not something I considered to be a performance issue
18  that would be dealt with in a performance appraisal.
19  Q  But you were dealing with the reason why
20  Mr. Beard was reassigned, or am I wrong?
21  A  Right, I was.
22  Q  But this, you were saying, was not an

Page 25

1  issue for a performance appraisal?
2  A  Correct.
3  Q  And that was because? Why?
4  A  Because I didn't characterize it as a
5  performance issue.
6  Q  That information that we just talked
7  about, that you conveyed to Mr. Reardon, did you
8  believe that would help or hinder or have no effect
9  on Mr. Beard's application for that position with
10  DOD?
11  A  I didn't really think about it, one way or
12  the other, where it was going to go. Could I add
13  that I also told Mr. Reardon that I thought that Mr.
14  Beard was someone that could probably perform very
15  well in the new environment where he knew, going in,
16  what was expected of him, the way it was going to be,
17  as opposed to the situation we had, where he was
18  allowed to operate one way and then that got changed
19  subsequently.
20     Whether that was positive information I
21  was giving Mr. Reardon, or not, I don't know.
22  Q  I think if I go back to your statement,

MGB Reporting, Inc.

8 (Pages 26 to 29)

Page 26

1  I'm looking on page 5: Issues dealing with the
2  Complainant as the Regional Manager date back prior
3  to 2000. How much prior?
4      MS. MELNIK: 2001?
5      MR. SELDON: Sorry, yes.
6      THE WITNESS: I don't know. I can't be
7  specific as to when.
8      BY MR. SELDON:
9  Q   Does anything come to mind?
10 A   Dates don't even come to mind.
11 Q   In the year 2001 -- I'm sorry -- so what
12 you're saying, is, when the new Deputy Inspector
13 General came on -- and I think Mr. Stephens has
14 testified in a few cases, that it was 2002, the first
15 months, is that right?
16     MR. JOHNSON: Stephens came in, in March,
17 January or March.
18     THE WITNESS: Stephens was January;
19 Donohue was March.
20     MR. JOHNSON: That's right.
21     BY MR. SELDON:
22 Q   What you said was, you, if I take it --

Page 27

1  you and Mr. Heist had discussions with the new Deputy
2  Inspector General about moving Mr. Beard out of his
3  position, when he came onboard. That was January of
4  02, so what did you talk about with Mr. Stephens
5  then? What did you tell him about Mr. Beard?
6      (Pause.)
7  A   I don't recall specifics. I mean, the
8  conversation was along the lines of, is Mr. Beard
9  managing that office the way you expect it to be
10 managed?
11     Why doesn't the two managers down there,
12 Mr. Beard and the head of Investigations, get along?
13 Do we need to do something to try to remedy the
14 situation?
15     I just don't recall specific things that
16 were discussed.
17 Q   I think we'll give you a book mark and a
18 reference, that on July 16, 2001, Mr. Beard gave
19 deposition testimony in Tighe vs. Cuomo.
20     I guess what I'd like to ask you, is, how
21 much of 2001, was Mr. Beard out for treatment for
22 cancer?

Page 28

1  A   I have no idea.
2  Q   I want to give you as much time as you
3  want to think about it.
4  A   I have no idea.
5  Q   But you do definitely recollect speaking
6  with Mr. Stephens about moving Mr. Beard out of his
7  position in 2002, I take it?
8  A   Yes. I mean, I remember.
9  Q   Then it says in here that you and Mr.
10 Heist had those discussions with the Deputy IG. What
11 do you recall Mr. Heist having contributed to this
12 discussion, if anything?
13 A   I don't recall. The only thing that
14 sticks in my mind about that whole conversation, was
15 that Mr. Heist and I both agreed that we didn't want
16 to make such a move; that we wanted to try to turn
17 this thing around.
18 Q   So, is it your recollection, then, that
19 Mr. Heist, at that point, had a poor impression of
20 Mr. Beard; is that right or wrong?
21 A   That would be correct.
22 Q   Do you recall any response that Mr.

Page 29

1  Stephens made at that point in time?
2  A   No, I don't.
3  Q   The decision to reassign Mr. Beard, which
4  was made, I guess, in 2004, and then effected in the
5  early part of 2005, what role, if any, did you have
6  in that decisional process?
7      (Pause.)
8  A   I wouldn't classify it as being a role. I
9  had discussions with Mr. Heist about the fact that
10 things had gotten to the point that we no longer
11 cared to deal with it.
12     It made our job too difficult to try and
13 manage an operation. We felt that he was having a
14 detrimental effect on the staff down there, by the
15 way he was operating and not getting along with us
16 and not following direction that was being given.
17     And it reached the point that we just
18 didn't care to deal with it anymore. Therefore, it
19 was time to make a move.
20     (Pause.)
21 Q   I'm going to put this in whatever words --
22 characterize it whatever way you like -- we know and

Page 30

1 I can show it to you, that the directed reassignment
2 of Mr. Beard, was signed by Mr. Heist -- I'll just
3 spread it out in the broadest terms -- sometime in
4 the Federal Government where I was in for 12 years, a
5 subordinate individual will have to give a document
6 to a superior to sign, even though it is his
7 decision, because someone higher has to sign off on
8 it. Sometimes a person just imparts his thinking.
9 I'm going to wipe the slate clean now. I'm just
10 saying, any universe you want, how will you describe
11 your role in the decision to reassign Mr. Beard?
12     MS. MELNIK: Asked and answered.
13     MR. SELDON: I think what he said, was, he
14 didn't have a role. He had discussions.
15     All right, I'll go back. I'll tell you
16 what --
17     BY MR. SELDON:
18 Q   Did you view yourself as the one who
19 started those discussions that led to Mr. Beard's
20 reassignment?
21 A   No.
22 Q   Who, to your knowledge, started them?

Page 31

1 A   I don't know.
2 Q   Did you hear about this initially from Mr.
3 Heist, or did you initially tell someone, or was it
4 anything at all?
5 A   My recollection was, I heard it from Mr.
6 Heist.
7 Q   What do you recall Mr. Heist telling you
8 then?
9 A   That he had had discussions with Mr.
10 Stephens; that things had reached a point where the
11 problems we were having, we just weren't going to
12 deal with anymore, and that Mr. Beard was going to be
13 reassigned.
14 Q   And these discussions you had with Mr.
15 Heist, I take it, were before Mr. Beard was
16 reassigned? In other words, you didn't learn about
17 it after the fact?
18 A   No, it was before.
19 Q   How was it decided, if you know, that Mr.
20 Beard would be your special assistant?
21 A   Mr. Heist told me.
22 Q   Is it fair -- and correct me if I'm wrong

Page 32

1 -- but that wasn't a decision that you made or
2 recommended?
3 A   No.
4 Q   Was the position Mr. Beard was in,
5 incumbered before he came to it?
6 A   No.
7 Q   Did it exist before he came to it?
8 A   Did that specific position exist?
9 Q   Yes.
10 A   No.
11 Q   Was there some generic PD position
12 description somewhere that was used?
13 A   Yes.
14 Q   But it had never been used for anyone in
15 that particular position before, I take it?
16 A   That's not true.
17 Q   Please correct me, then.
18 A   I had had a special assistant before.
19 There had been a special assistant within the Office
20 of Audit at different times over the years.
21 Q   That was Mr. Groom?
22 A   Mr. Groom was the one that actually was my

Page 33

1 special assistant.
2 Q   Other than Mr. Groom, have you ever had
3 one?
4 A   No.
5 Q   Were there other special assistants in the
6 Office of Audit, proper, other than Mr. Groom and Mr.
7 Beard?
8 A   Yes.
9 Q   Who were they?
10 A   Sandra Elion.
11 Q   Was there ever another special assistant
12 during your tenure in the Office of Audit proper?
13 A   Yes.
14 Q   Who was that?
15 A   I can't remember his name. His first name
16 was John. I can't remember his last name. This goes
17 back 15 years.
18 Q   Anyone else?
19 A   Nobody I can recall.
20 Q   Beard was your special assistant, Groom
21 was your special assistant, also?
22 A   Yes.

MGB Reporting, Inc.

10 (Pages 34 to 37)

Page 34

1  Q    And Ms. Elion was Heist's special
2  assistant?
3  A    Yes.
4  Q    And John, whatever-his-name-was, was?
5  A    He was the AIG's special assistant.
6  Q    The counterpart to Mr. Heist, whoever that
7  would have been at the time?
8  A    Right.
9  Q    Were the statements that you gave to Mr.
10 Reardon, in DOD about Mr. Beard, accurate?
11 A    Yes.
12 Q    What involvement, if any -- I'm sorry,
13 strike that.
14      Were you involved at all in Mimi Lee's
15 reassignment?
16 A    To the same extent that I was involved in
17 Mr. Beard's.
18 Q    In other words, you participated in
19 discussions?
20 A    Discussions with Jim about her work.
21 Q    Then he's the one who made the decision?
22 A    Yes.

Page 35

1  Q    What was your role in Sandra Elion's
2  reassignment, if any?
3  A    It would be the same. The decision was
4  Mr. Heist's.
5  Q    Donna Hawkins?
6       (Pause.)
7  A    It would be the same.
8  Q    Ed Boyles?
9  A    That was my decision.
10 Q    The servicing Personnel Office when you
11 were Deputy Assistant Inspector General for Audit,
12 was that the Bureau of Public Debt?
13 A    Correct.
14 Q    What would you typically consult with them
15 about?
16 A    Anything dealing with personnel. It would
17 be a wide range, from what step can we bring this
18 person in at, to what steps do I have to take to
19 remove a person?
20 Q    In other words, all the significant
21 aspects about employee or personnel relations?
22 A    Correct.

Page 36

1  Q    Is that the function that they serve
2  throughout the Office of Audit?
3  A    I would say so.
4  Q    Operationally, what, if anything, was the
5  division of responsibility between you and Mr. Heist
6  for running the Office of Audit?
7  A    I guess probably the easiest way to say
8  it, is, I handled the administrative side of things;
9  Mr. Heist handled the technical side of things,
10 technical audit issue things.
11 Q    What I'll ask you to do, is just to start
12 by explaining to us, more of what the administrative
13 side meant in the Office of Audit.
14 A    Budgets, staffing levels, approvals for
15 hiring people.
16 Q    Personnel changes, or not?
17 A    Personnel changes in terms of hiring
18 staff.
19 Q    When you say that Mr. Heist was primarily
20 -- I don't know if he was primarily -- he was
21 responsible for the technical audit issues. What did
22 you mean by that?

Page 37

1  A    Mr. Heist was responsible for everything.
2  He's the AIG.
3  Q    Exactly right.
4  A    I work for him.
5  Q    My question previously -- I should have
6  been clearer -- was, in a practical way --
7  A    When I say "technical," what I mean, is
8  the nuts and bolts of what that audit is all about,
9  what that audit report is all about, what the
10 findings are all about, in technical terms, about.
11      Do we do an audit? Do we not do an audit?
12 Is there something that we want to put into an audit
13 report or not; the approval process of doing the
14 audit, issuing the report.
15 Q    Were you responsible, in the first
16 instance, for giving the performance appraisals for
17 Regional Inspectors General for Audit and office
18 heads in headquarters in the Audit Division?
19 A    When?
20 Q    When you were a deputy.
21 A    Part of the time, not all the time.
22 Q    Do you recall when you were?

Page 38

1   A   I was, well, the entire time -- not the
2   entire time. There was a period of time when Mr.
3   Heist's predecessor left in September of 2000, I
4   think.
5   Q   Kuhl-Inclan?
6   A   Yes, she was there four years. She was
7   the rating official. She was Field Manager.
8       After that, I was. Before that, I was
9   going back -- and I don't know how long, because I
10  became a deputy in '89, but at that time, there was
11  another deputy; there was two of us.
12      The other deputy had that responsibility
13  until he left. I was the only deputy, and then I had
14  that responsibility, so, except for that four-year
15  period, I had that responsibility.
16  Q   So when Mr. Heist was Assistant Inspector
17  General for Audit, you were the rating official for
18  regional AIGs for Audit and Headquarters Audit
19  Director, right?
20  A   Yes.
21  Q   In connection with that, I take it that
22  you had become familiar with the process and

Page 39

1   requirements for being a rating official for
2   performance appraisals?
3   A   Yes.
4   Q   Can you define for us, in your own
5   understanding, what is a critical element?
6   A   No.
7   Q   Do you have an understanding of what
8   unacceptable performance is?
9       (Pause.)
10  A   Under what kind of system?
11  Q   In the performance appraisal system?
12  A   A pass/fail system like we were under?
13  Q   Yes.
14  A   Unacceptable would be when you fail.
15  Q   What, if anything, do you understand are
16  the consequences of an employee failing some or all
17  of his or her performance appraisals?
18  A   They would generally go under a
19  performance improvement plan.
20  Q   Can you tell me why they wouldn't?
21  A   Why they wouldn't go on a performance
22  improvement plan?

Page 40

1   Q   You said they generally would go under a
2   performance improvement plan.
3   A   Let me change that, then. If they were
4   failing, they would go under a performance
5   improvement plan.
6   Q   Okay.
7       I'm going to show you Heist Exhibit 9,
8   which is a performance appraisal that you were the
9   rating official of, for Mr. Beard, for the period
10  beginning in March of 04 and continuing through 05.
11      MR. SELDON: I've just got the one copy
12  and I can make more, if you need it.
13      (Handing document to witness.)
14      BY MR. SELDON:
15  Q   I'll let you look at that as much as you
16  like.
17      (Pause.)
18  A   Okay.
19  Q   You signed this as the rating official,
20  right?
21  A   Yes.
22  Q   Would it be fair to say, as we look on

Page 41

1   page 3, that Mr. Beard is rated under No. 2, that you
2   rated him, under the Business Practices, which
3   include management of his region?
4   A   Yes.
5   Q   Now let's assume -- does No. 1 relate to
6   how audits are conducted under his supervision and
7   whether they comply with OIG requirements and
8   standards?
9   A   Yes.
10  Q   Is there anyplace in the listing of
11  standards, that concerns in any manner, shape, or
12  form, how Mr. Beard or his region related or was to
13  relate to the TOP Division, Technical Oversight and
14  Planning?
15      (Pause.)
16  A   There's a lot of places that it comes into
17  play, probably none in Element 2 in the Business
18  Practices. Program mission objectives, selects
19  and/or manages audits in a productive and efficient
20  manner in support of goals and objectives.
21      TOP, they knew what our goals and
22  objectives were. They were approving whether or not

MGB Reporting, Inc.

12 (Pages 42 to 45)

Page 42

1  audits got started or not and whether or not they
2  were in line with that.
3       He would interact with them on that.
4  Establishes work plans, milestones.
5     Q    Okay. Do you remember giving Mr. Beard or
6  being responsible for him receiving a Special
7  Achievement Award for the HANO audit?
8     A    I do not remember, even when that was, but
9  sitting here thinking about it, it was probably when
10 Kathy Kuhl-Inclan was here.
11    Q    You don't know for sure?
12    A    I don't know for sure.
13    Q    As you were the rating official, did you
14 have an understanding of what it meant to give an
15 employee's performance you were appraising, a fully-
16 satisfactory rating?
17    A    Sure.
18    Q    I'm sorry, a successful rating. I didn't
19 mean fully-satisfactory; I meant successful.
20         MS. MELNIK: What was the question? I'm
21 sorry.
22         MR. SELDON: In his service as a rating

Page 43

1  official, what understanding did he have that giving
2  an employee a successful rating, meant.
3          THE WITNESS: Is that the terminology in
4  our rating sheets? I don't recall.
5          (Handing document to witness.)
6          BY MR. SELDON:
7     Q    I'll give you Heist Exhibit 9 and let you
8  look.
9     A    We called it successful, pass/fail. Oh,
10 okay, "successful" meant that you were doing the job
11 in an acceptable manner.
12    Q    Did you have the occasion at all to
13 participate in the reassignment of a Regional
14 Inspector General for Audit or an Office Director in
15 the Office of Audit? Here's the important part:
16 Whose office was not abolished? Who had received one
17 or more successful performance ratings?
18    A    Was I involved?
19    Q    Yes.
20    A    I would have been involved in Mimi Lee's.
21    Q    Her office was moved, though, was it not?
22    A    That's right, the regional office was

Page 44

1  moved. I can't think of any.
2          Ask me that question again.
3     Q    Were you involved as the decisional
4  person, in the reassignment, the directed
5  reassignment of either a Regional Inspector General
6  for Audit, or an Office Director in the Office of
7  Audit, when that person's office continued in
8  existence?
9     A    Austin Groom.
10    Q    Anyone else?
11         (Pause.)
12    A    I don't think so.
13    Q    Do you remember whether that was before or
14 after Mr. Groom filed an EEO Complaint?
15    A    I'm pretty sure it was before.
16    Q    Were you aware of any audit that Mr. Beard
17 -- that Region VI issued under Mr. Beard's
18 supervision, that did not meet OIG Office of Audit
19 standards?
20    A    Issued?
21    Q    Yes.
22    A    And there was a signed report that went

Page 45

1  out?
2     Q    Correct.
3     A    I cannot recall any.
4     Q    Do you remember any that were not issued
5  because they did not -- and for the reason that they
6  did not meet OIG Office of Audit standards?
7     A    Yes.
8     Q    Which one or ones?
9     A    CRV.
10    Q    That was the one in the Fall of 2004?
11    A    Yes.
12    Q    Any others?
13    A    Can't remember.
14    Q    Are you aware of anywhere in the Office of
15 Inspector General Manual that permits a manager to
16 make directed reassignments when a person's office is
17 not closed?
18    A    Is it the manual, the OIG Manual?
19    Q    Yes, that says you can make reassignments.
20    A    Not that I can recollect.
21    Q    What was your understanding of what
22 guidelines or policies govern a managerial decision

9805 Korman Court, Potomac, MD 20854
301-983-9315 ~ www.mgbreporting.com

MGB Reporting, Inc.

Page 46

1  to make a directed reassignment when that person's
2  office doesn't close?
3    A    That would be the Federal Personnel
4  Guidelines, I guess you would call it.
5    Q    Right. What do you understand them to
6  provide?
7    A    That you can do it.
8    Q    Tell me, in what circumstances.
9    A    If the person is not doing the job the way
10 management expects it to be done.
11       MR. SELDON: Let's take a few minutes. I
12 can guarantee you'll be out of here by 4:30.
13       (Recess.)
14       MR. SELDON: Let's go back on the record.
15       BY MR. SELDON:
16   Q    Mr. Phelps, did you go and visit Region IV
17 -- I'm sorry, Region VI, with Mr. Stephens in 2004?
18   A    I went and visited Region VI with Mr.
19 Stephens. I don't remember when.
20   Q    Any recollection of when that was?
21   A    I really don't.
22   Q    Then I wanted to go back to the decisional

Page 47

1  process that was made to reassign Mr. Beard. Would
2  it be fair to say -- and, if not, put it in your own
3  words -- that that was a consensus decision reached
4  by -- I'll just start with you and Mr. Heist, whether
5  anybody else was involved, is that fair to say?
6    A    No.
7    Q    Why not?
8    A    Because I think the decision was made when
9  Mr. Heist talked to me about it. I think there was
10 kind of a discussion, that we've got all these
11 issues.
12   Q    He is the one who had to sign it; is that
13 it?
14   A    Yes.
15   Q    Did you have knowledge, one way or
16 another, about whether that was a product of a
17 consensus decision involving Mr. Heist and Mr.
18 Stephens?
19   A    I know that he had had discussions with
20 Mr. Stephens, prior to talking to me.
21   Q    Do you know what those were, one way or
22 another?

Page 48

1    A    That he was going to be reassigned.
2    Q    That's the extent of what you know?
3    A    Yes.
4    Q    Do you know, one way or the other, whether
5  Mr. Heist had had any discussions with Mr. Donohue?
6    A    I do not know.
7    Q    Do you know whether Mr. Stephens and Mr.
8  Donohue discussed this?
9    A    I do not know.
10       MR. SELDON: That's it. Karen?
11          EXAMINATION
12       BY MS. MELNIK:
13   Q    Mr. Phelps, with respect to Mr. Beard's
14 reassignment to Washington, did you consult -- with
15 whom did you consult in terms of HR, if at all, Human
16 Resources?
17   A    I talked with our inhouse HR people, which
18 would have been the Director of HR, and probably
19 somebody else on her staff. I don't recall exactly.
20   Q    Why did you do that?
21   A    Because I would never make such a move
22 without vetting it with HR. I also talked to HR in

Page 49

1  the Bureau of Public Debt, who was our servicer, for
2  the same reason.
3        To put this into place, you want to make
4  sure that things are being done officially. To put
5  this into place, you want to make sure that things
6  are being done officially.
7    Q    Based on your conversations with your
8  folks in your inhouse HR, based on what they told
9  you, what's your understanding about whether or not
10 what you were trying to accomplish in terms of the
11 directed reassignment --
12       MR. SELDON: Object to the form of the
13 question.
14       BY MS. MELNIK:
15   Q    -- was against the rules, by the rules?
16 I mean --
17   A    That it was well within the rules.
18   Q    How about with respect to your
19 conversations with the folks at the Bureau of Public
20 Debt?
21   A    Same answer. All parties that I talked
22 with, said what we were doing, was within the rules

MGB Reporting, Inc.

14 (Pages 50 to 53)

Page 50

1  and here's the way we had to go about doing it, in
2  terms a letter and all that.
3      Q    So, the letter -- you recall that Mr.
4  Beard received a letter informing him of the directed
5  reassignment?
6      A    Yes.
7           (Pause.)
8      Q    You might have just answered this, but in
9  terms of what was put in the letter, who was
10 consulted or what entities were consulted with
11 respect to what belonged in a letter like that?
12     A    Our inhouse HR and BPD.
13     Q    Do you recall being asked several
14 questions about Mr. Beard's performance appraisals;
15 do you recall being asked questions about that,
16 within the last hour?
17     A    Yes.
18     Q    Why didn't Mr. Beard receive a failing
19 grade in one or more of the rating categories or
20 elements that are a part of his performance
21 appraisal?
22     A    Because, from the time that the ADR was

Page 51

1  done, in the original EEO Complaint, and a decision
2  was made that we were going to try to work together
3  and get things done, I was never in the mode of
4  operation of documenting a performance case.
5           I was not building a file for performance
6  purposes, to show how each of the elements and sub-
7  elements was being violated, continually hoping that
8  things were going to work themselves out, but
9  ultimately reaching the point where the reality was
10 that it wasn't going to work itself out and something
11 needed to be done.
12          At that point, it was not -- we did not
13 want to start documenting a performance case and go
14 down that path in a performance-based action. We had
15 a situation where things were getting worse, the
16 conflict between the headquarters staff and the field
17 staff -- and the field staff being influenced by Mr.
18 Beard in a way that we didn't feel was good for the
19 organization -- so, something had to be done then,
20 rather than go down the performance-issue path.
21     Q    Maybe you explained this, but just so it's
22 clear, you said you continually hoped that things

Page 52

1  would work themselves out. What are you referring
2  to, when you say "things"?
3      A    The issues with Mr. Beard not being
4  willing to work with headquarters, and going along
5  with the way we wanted, we, headquarters, wanted
6  things done, wanted operations carried out.
7           (Pause.)
8           MS. MELNIK:  If I could have this marked?
9              (Phelps Deposition Exhibit
10                Number 2 was marked for
11                identification.)
12          BY MS. MELNIK:
13     Q    Mr. Phelps, you're looking at Deposition
14 Exhibit Number 2. Do you recognize it?
15     A    Yes, I do.
16     Q    What is it?
17     A    This was some talking points, when we were
18 planning to bring Mr. Beard in, to give him his
19 letter. I said this to Mr. Heist, some of the issues
20 that I thought that were pertinent to talk about.
21     Q    Without explaining each of the 15 of the
22 items listed, what do they all relate to?

Page 53

1      A    Not following OIG policy directives.
2      Q    Who is not following OIG policy
3  directives?
4      A    Mr. Beard.
5      Q    Mr. Phelps, what's your date of birth?
6      A    November 4, 1945.
7      Q    Which makes you how old?
8      A    Sixty-one.
9      Q    Did Mr. Beard's age have anything to do or
10 influence your role or participation or discussions
11 with respect to his directed reassignment to
12 Washington?
13     A    No.
14     Q    Did Mr. Beard's prior EEO activity,
15 whether it be his testimony from Tighe v. Cuomo or
16 any other prior EEO activity, did that influence or
17 affect your role or discussion in Mr. Beard's
18 directed reassignment to Washington?
19     A    No.
20     Q    Did Mr. Beard's age influence of affect or
21 have any role whatsoever in your appraisal or
22 discussion with Mr. Reardon of DOD?

MGB Reporting, Inc.

Page 54

1  A   No.
2  Q   Did Mr. Beard's prior EEO activity or
3  participation, influence, affect, or have any role in
4  your conversations with Mr. Reardon?
5  A   No.
6      MR. SELDON: I've just got a few
7  followups.
8          FURTHER EXAMINATION
9  BY MR. SELDON:
10 Q   I understood you to say that you learned
11 about Mr. Beard's reassignment from Mr. Heist, after
12 the decision was made; is that right?
13 A   Right.
14 Q   When you said, in response to AUSA
15 Melnik's questions, that you talked about it,
16 consulted about Mr. Beard's reassignment with Human
17 Resources and the Bureau of Public Debt, I take it,
18 then, that was after the decision was made to
19 reassign Mr. Beard?
20 A   Yes.
21 Q   When you said you would never make such a
22 move without talking to HR or the Bureau of Public

Page 55

1  Debt, I don't understand what that meant.
2  A   Because, at the point that I became aware
3  of what was going on, I felt that I needed to talk to
4  the experts and make sure that the path we were going
5  down, was one that was defensible, and that everybody
6  was onboard, that we were, in fact, within our
7  authority to do such a thing and that we were doing
8  it the appropriate way.
9  Q   Who did you speak with in HR, to start?
10 A   The Director. Can't think of her name.
11 Q   Nancy Hughes?
12 A   Nancy Hughes. I seem to think there was
13 somebody else from her office in the meeting, but I
14 don't know that to be a fact.
15 Q   Did you have a question, before you talked
16 to HR and BPD, about whether were any limitations on
17 Mr. Heist's ability to give a directed reassignment
18 to an employee under your supervision?
19 A   Say that again.
20 Q   What question, if any, did you have on the
21 limits of Mr. Heist's authority to give an employee a
22 directed reassignment, before you went to talk to HR,

Page 56

1  BPD?
2  A   I didn't think it was a problem. I just -
3  - my sense was, it could be done. I was just making
4  sure that I talked to all the appropriate people;
5  that what we were doing, could be done, and what
6  steps did we have to go through, in terms of
7  notifying him and so forth.
8  Q   So you got the form of the memo, I take
9  it, and what was required in there, from HR, BPD?
10 A   You know, I can't recall exactly how that
11 happened, whether I talked to them and they drafted
12 it, or whether Jim talked to them and they drafted
13 it, subsequent to me having discussions with him and
14 getting back to him and telling him what we talked
15 about.
16     I just don't remember when the memo came.
17 I mean, it could have happened either way. I could
18 have said, draft it up for me, or Jim could have
19 called and said, okay, draft a memo.
20 Q   This Exhibit 2, this e-mail from you to
21 Mr. Heist, was that or was that not an e-mail sent
22 after the decision was made to reassign Mr. Beard?

Page 57

1  A   That was after.
2  Q   I heard you testify about -- correct me if
3  I'm wrong -- that you were never in the mode of
4  documenting a performance case against Mr. Beard,
5  right?
6      And I think you said you tried to work it
7  out, until something needed to be done; is that the
8  idea?
9  A   Right.
10 Q   Help me here with this one, because I
11 understood that you were not involved in the decision
12 to reassign Mr. Beard.
13     How would documenting it or not
14 documenting it, have something to do with the
15 decision to reassign him?
16 A   I'm not sure I understood the question.
17 Q   I understand why you might not have
18 documented a performance case, if you were going to
19 be making the decision. At least I understand what
20 your testimony is, if you were going to be making the
21 decision on whether or not to reassign Mr. Beard.
22     But as I understood it, the process to

9805 Korman Court, Potomac, MD 20854
301-983-9315 ~ www.mgbreporting.com

MGB Reporting, Inc.

16 (Pages 58 to 61)

Page 58

1  reassign Mr. Beard, was something you were not
2  involved with, so I don't understand what your
3  documenting or not documenting -- and maybe you could
4  explain it, why documenting it or not documenting it,
5  had anything to do with the process of reassigning
6  Mr. Beard.
7      A    Documented or not documented, had nothing
8  to do with the decision to reassign. The decision
9  was made, based on where we were at a point in time,
10 and the problems we were having.
11           What I was trying to say, was, the types
12 of things that led up to where we ended up, had at
13 some point in time, had I said I'm going to start
14 documenting a case here, because we've got
15 performance issues here that I don't feel are
16 acceptable and are not meeting our standards, and I'm
17 going to start documenting and building a case for a
18 performance-based action.
19           I never got to that point. I never did
20 that, so when the decision was made that we were
21 going to do this, we didn't have this whole body of
22 following the performance issue to support --

Page 59

1      Q    The body, for example, as is reflected in
2  Exhibit 2, was it correct that it was all created
3  after the decision was made to reassign Mr. Beard?
4      A    This list?
5      Q    The body that you just referred to.
6      A    This list was created afterwards. All of
7  the things in there, were things that had happened
8  over time, some of which I was directly involved in,
9  some of which I was not directly involved in, but I
10 had knowledge that they were problematic issues.
11     Q    The Houston Home and the marathon phone
12 conversation, what's that?
13     A    There was an audit that was being done of
14 the Home Program run by the City of Houston. There
15 were problems with that audit and the report, and we
16 had, like, a two- or three-hour phone conversation,
17 that I sat down with Mr. Heist.
18           I know there were some people from TOP
19 there. Who was there, whether it was McCloud or
20 whoever. I just recall sitting in on that
21 conversation with discussions back and forth about
22 problems with that job.

Page 60

1      Q    What year did that happen in?
2      A    I don't know. I don't recall.
3      Q    Did you believe that Mr. Beard's
4  performance in that audit, and/or the marathon phone
5  conversation, was unacceptable?
6      A    Yes.
7      Q    Why didn't you document that in the
8  performance appraisal?
9      A    Because I was not in that mode of
10 documenting.
11     Q    Were you following the Office of Inspector
12 General Manual provisions involving -- the relevant
13 provisions, when you gave Mr. Beard his annual
14 performance appraisals?
15     A    I believe I was.
16     Q    The nonprofit audits, what does that refer
17 to -- well, let's put it this way: I mean, what
18 training were you given by HR or advice in how to go
19 about giving employees performance appraisals?
20     A    You know, I don't specifically recall, Mr.
21 Seldon, what training I had. I know that I had a
22 number of training courses over the years on what's

Page 61

1  expected in doing performance appraisals, how to
2  communicate the results, what's got to be in writing,
3  and that sort of question.
4      Q    The ultimate aim being to follow the
5  Office of Inspector General Manual?
6      A    Pardon?
7      Q    The ultimate aim being to follow the
8  Office of Inspector General Manual?
9      A    Yes.
10     Q    When you consult with, let's say, BPD,
11 about a personnel action, is it you or they that have
12 the final substantive decision on what to do?
13     A    I think it's OIG management that has the
14 ultimate decision on what to do. They're advisors to
15 us; they're advisors on what the rules and
16 regulations are.
17          We have resources available to us, besides
18 BPD, to help them with their decisions.
19          (Pause.)
20          MR. SELDON: I have no more questions.
21          MS. MELNIK: I actually have some
22 followup. Sorry.

Page 62

1  MR. SELDON: It's okay with me; I've got
2  the afternoon blocked out.
3      FURTHER EXAMINATION
4  BY MS. MELNIK:
5      Q  You just testified that with respect to
6  No. 2, the Houston Home and the marathon phone
7  conversation. Was Mr. Beard a part of this marathon
8  phone conversation?
9      A  Yes, he was.
10     Q  What about it made it -- I forget the word
11 Mr. Seldon used -- what about it, was unacceptable?
12     A  The tone of the entire meeting, being very
13 argumentative, not really Mr. Mr. Beard, about his
14 staff, whom he was responsible for. He was very
15 argumentative and condescending towards headquarters
16 staff and the way they were conducting themselves.
17     Q  Wait. Let me ask you this: Mr. Beard,
18 how many folks did he have as a part of this marathon
19 phone conversation?
20     A  I don't know. I seem to recall there were
21 several people there. I'm pretty sure that Will
22 Nixon, who was one of his Assistant Inspectors

Page 63

1  General, was there. Beyond that, I don't know.
2      Q  With respect to No. 8, demeaning the role
3  of TOP, when I was at the Ft. Worth conference-Mays,
4  do you have a story? No, TOP took it out.
5      What are you talking about there?
6      A  I believe it was 2004, sometime, probably
7  late summertime, when I attended the staff conference
8  that Mr. Beard had in his region, a couple-day
9  conference.
10     A large part of that time issues kept
11 coming up, that staff members -- they were
12 derogatory. a lot of derogatory comments about, their
13 feelings about the way they felt about the people in
14 TOP and their abilities; whether they were capable,
15 qualified, knew what they were doing.
16     And they were sort of demeaning to the
17 people.
18     Q  What, if anything, upon hearing the
19 comments that you just described, the types of
20 comments you just described, coming from Mr. Beard's
21 staff, what impression did you leave with, with
22 respect to Mr. Beard and the influence his attitude

Page 64

1  was having on his staff?
2      A  That that staff was not acting
3  professionally, the way they addressed headquarters,
4  TOP staff; the way they characterized those people,
5  the way they accepted what the responsibilities of
6  those people were, and that this was something that
7  Mr. Beard should have been able to get a handle on
8  with these people, and find a way to voice legitimate
9  concerns without doing it in a demeaning, derogatory
10 manner.
11     And I didn't see that happening. I just
12 felt this was something that he allowed to continue
13 to go on and fester.
14     Q  Is that something that -- that experience,
15 was that something that you communicated to Mr.
16 Heist?
17     A  Yes.
18     Q  Since Mr. Beard's directed reassignment in
19 2005, what, if any, of the preexisting or existing
20 issues regarding his staff, that you've just
21 described, have continued since his departure?
22     How have things changed, if at all, since

Page 65

1  his departure from that region?
2      A  Remember, I've been gone for over a year
3  now, but I was there for a year, after Mr. Beard came
4  to headquarters. A new manager that took over down
5  there, I think he made a drastic turnaround with that
6  staff.
7      They got onboard with the fact that we
8  don't have to agree with what headquarters says or
9  the direction they're going in, and we can voice
10 legitimate concerns in a professional manner, but,
11 having done that, let's get on with it, you know,
12 let's move and do what headquarters wants us to do.
13     And I think the person that took over down
14 there, was able to do that, and, certainly, the year
15 before I retired, I'm not aware of any problems with
16 any of the staff members down there.
17     I know, in talking to that manager --
18     Q  Let me ask you, when did you retire?
19     A  January 3rd, 06.
20     MR. SELDON: We can do this all we want,
21 but we're going to have to change the rules on
22 admissibility.

Page 66

1    MS. MELNIK: I didn't hear anything you
2 just said.
3    MR. SELDON: We can do this as long as you
4 want, but you'll have to change the rules on
5 admissibility, before you can use it for anything.
6    MS. MELNIK: I just wanted him to
7 explain --
8    MR. SELDON: I have no problem with it.
9    MS. MELNIK: We're done.
10    (Whereupon, at 3:55 p.m., the taking of
11 the deposition ceased.)

Page 67

1    I HEREBY CERTIFY that I have read this
2 transcript of my deposition and that this transcript
3 accurately states the testimony given by me, with the
4 changes or corrections, if any, as noted.

7    X_____

11 Subscribed and sworn to before me this ___ day of
12    20 .

16    X_____
17    Notary Public

19 My commission expires:

Page 68

1    CERTIFICATE OF NOTARY PUBLIC & REPORTER

3    I, DAVID L. HOFFMAN, the officer before
4 whom the foregoing deposition was taken, do hereby
5 certify that the witness whose testimony appears in
6 the foregoing deposition was duly sworn; that the
7 testimony of said witness was taken in shorthand and
8 thereafter reduced to typewriting by me or under my
9 direction; that said deposition is a true record of
10 the testimony given by said witness; that I am
11 neither counsel for; related to, nor employed by any
12 of the parties to the action in which this deposition
13 was taken; and, further, that I am not a relative or
14 employee of any attorney or counsel employed by the
15 parties hereto, nor financially or otherwise
16 interested in the outcome of this action.

18    _____
19    Notary Public in and for the
20    District of Columbia

22 My Commission Expires   JULY 14, 2010

Page 69

CONTENTS

WITNESS                    EXAMINATION
MICHAEL R. PHELPS
  by Mr. Seldon                4
  by Ms. Melnik                48
  by Mr. Seldon                54
  by Ms. Melnik                62

EXHIBITS
DEPOSITION EXHIBIT                      IDENTIFIED
Phelps Exhibit 1 - Affidavit                17
Phelps Exhibit 2 - Email to James Heist   52