MGB Reporting, Inc.

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

D. MICHAEL BEARD,          :
17 Rubins Walk
Fredericksburg, VA  22405,  :

                           :
          Plaintiff        : C.A. No. 06-0756 (GK)
                           :
        v.                 :
                           :
ALPHONSO R. JACKSON,       :
Secretary of Housing and   :
Urban Development,
451 Seventh Street, S.W.    :
Washington, D.C.  20410,   :
                           :
          Defendant        :

Friday, January 5, 2007

The discovery deposition of STANLEY J. McLEOD, a witness

called for examination by counsel for the plaintiff, at

the Offices of Robert C. Seldon & Associates, 1319 F

Street NW, Washington, DC, before Tracy E. Barksdale,

Certified Shorthand Reporter and notary public in and for

the District of Columbia, commencing at 9:42 a.m., when

were present on behalf of the respective parties:



EXHIBIT
3

2 (Pages 2 to 5)

Page 2

```
 1   APPEARANCES:
 2   On behalf of Plaintiff:
 3     ROBERT C. SELDON, ESQ.
        Robert C. Seldon & Associates
 4     1319 F Street NW
        Washington, DC 20004
 5     (202) 783-3608
 6   On behalf of Defendant:
        KAREN L. MELNIK, ESQ.
        Assistant United States Attorney
 8     U.S. Department of Justice
        501 - 3rd Street NW
 9     Washington, DC 20530
        (202) 307-0338
10
        RICHARD K. JOHNSON, ESQ.
11     Deputy Counsel to the Inspector General
        U.S. Department of Housing and Urban Development
12     Office of Inspector General
        451 - 7th Street NW, Room 8250
13     Washington, DC 20410-4500
        (202) 708-1613
14
        TIFFANIE R. SMITH, ESQ.
15     Attorney Advisor
        U.S. Department of Housing and Urban Development
16     Office of General Counsel
        451 - 7th Street SW, Room 10170
17     Washington, DC 20410
        (202) 708-5097
18
        Also Present:
19
        D. MICHAEL BEARD
20
21
22
```

Page 3

```
 1                    I-N-D-E-X
 2   WITNESS
 3     STANLEY J. McLEOD
 4   Examination By:                      PAGE
 5     Counsel for Plaintiff Mr. Seldon         4
       Counsel for Defendant Ms. Melnik        60
 6     Counsel for Plaintiff Mr. Seldon        74
 7
 8   Deposition Exhibits                  PAGE
 9     1   Affidavit                      18
10     2   Word list                     36
11     3   Discussion draft dated 10-27-04   40
12     4   Memorandum dated August 16, 2004, from
           Bryan P. Saddler to William W. Nixon    44
13
14     5   Various e-mails                44
15     6   Memorandum dated September 22, 2004,
           from Richard Johnson to Stanley McLeod   46
16     7   Memorandum dated October 13, 2004,
           from Richard Johnson to Stanley McLeod   47
17
18     8   Memorandum dated December 13, 2004, from
           James A. Heist to D. Michael Beard    49
19     9   Memorandum dated October 29, 2004, from
           D. Michael Beard to James A. Heist    53
20
21   (*Exhibits attached to transcript)
22
```

Page 4

```
 1        P R O C E E D I N G S
 2           STANLEY J. McLEOD,
 3   the witness, called for examination by counsel for the
 4   plaintiff, and, after having been sworn by the notary,
 5   was examined and testified as follows:
 6        EXAMINATION BY COUNSEL FOR THE PLAINTIFF
 7   BY MR. SELDON:
 8     Q   Mr. McLeod, how are you?
 9     A   Good.
10     Q   For the record, will you please give us your
11   full name.
12     A   Stanley Joseph McLeod.
13     Q   Your present home address?
14     A   11015 Kenilworth Avenue, Garrett Park, Maryland,
15   20896.
16     Q   And your home phone number?
17     A   (301) 949-3205.
18     Q   Mr. McLeod, before we begin, let me just tell
19   you one thing. It's possible as this case goes on that
20   your appearance or participation would be needed later.
21   Basically two ways this can be done, or actually any
22   number of them. One is that a process server can come to
```

Page 5

```
 1   your home or a agreed-upon place and serve process on
 2   you, subpoena. The second is, it's up to you, and
 3   I will say that every other witness ever offered this
 4   chance agrees, that the United States Attorney's Office
 5   could accept service of a subpoena for you. They would
 6   not be responsible for producing you. That would still
 7   be solely your responsibility. They could accept service
 8   of a subpoena, if you would agree, until the litigation
 9   is done, if that's acceptable to you.
10        Which way would you rather have us do it? Home
11   or through home?
12     A   Home's fine.
13     Q   Okay. Mr. McLeod, I take it you are presently
14   resigned from the federal government?
15     A   Retired, yes.
16     Q   Sorry. How long has that been, sir?
17     A   Been retired for two years.
18     Q   You've been employed since then?
19     A   No.
20     Q   Your last position, I take it, was with the
21   Department of Housing and Urban Development?
22     A   Correct.
```

Case 1:06-cv-00756-GK     Document 13-6     Filed 04/23/2007     Page 3 of 21
MGB Reporting, Inc.

3 (Pages 6 to 9)

Page 6

1    Q   Have you had any business dealings with the
2  Department of Housing and Urban Development since your
3  retirement?
4    A   No, I haven't.
5    Q   What I'm going to do now, is -- and your last
6  position with HUD was what, now?
7    A   Director Technical Operations and Planning
8  Division.
9    Q   Which is part of what?
10   A   Part of the Office of Audit.
11   Q   Of the Office of Inspector General?
12   A   Correct.
13   Q   What was the date, approximately, that you left
14  that position?
15   A   When I retired in January '05, I believe.
16   Q   I'm going to give you the ground rules of --
17   A   '04, I believe -- no, '05. I'm sorry.
18   Q   Okay. I'll give you the first ground rule, it
19  happens during the deposition. There will be times that
20  you will give an answer and remember that it was
21  incorrect or remember that you need to supplement or
22  whatever. I'm going to give you the chance today

Page 7

1  whenever you want to let us know that. What we need you
2  to do, and what we insist that you do when you leave here
3  today, is to have given the best answers you possibly
4  can, candid, accurately, honestly, your oath under
5  penalty of perjury.
6        Now I'm going to go back and explain the
7  introductory ground rules to you. Rick has promised he
8  will not recite them verbatim while I do so.
9        We represent the plaintiff in this action,
10  Michael Beard. Mr. Beard was and still is employed by
11  the Office of Audit of OIG, which is what we'll probably
12  call the Office of Inspector General.
13        We are in the part of the process which is known
14  as discovery. During the discovery process, each side
15  has the opportunity to ask the other side for documents,
16  information, whatever else is relevant that they believe
17  may help or support their case. Each side has the
18  obligation when asked to provide documents, information,
19  and whatever else is asked for, whether it helps or hurts
20  the case.
21        When I say "side," you're not a party to this,
22  but whether for parties or not parties, what I call is a

Page 8

1  side. If we ask you something today, or if we ask other
2  people of the HUD Office of Inspector General, if we ask
3  you information, whether it hurts or helps HUD's case,
4  one of the procedures we use is deposition on oral
5  examination. That's what we're doing here today. For
6  the most part, it's going to be me putting questions to
7  you, although AUSA Melnik, who represents the government,
8  has the right to put questions to you as well. For the
9  purposes of my explaining what's going on, we're just
10  going to assume it's me.
11        When I put a question to you, I need you to
12  answer honestly, candidly, accurately, under oath, under
13  penalty of perjury, to the best of your knowledge,
14  information, or belief. If I put a question to you, and
15  you don't understand it, feel free to say so, and I'll
16  explain it, rephrase it, ask another question. If
17  there's a word in the question you don't understand, say
18  so, and I'll either explain it to you, pick another one,
19  or go on to another question.
20        When you give an answer, it needs to be
21  complete, candid, accurate, and honest, and by the same
22  token, as I explained before, if at any point during the

Page 9

1  deposition you feel the need to change an answer, explain
2  it, whatever, I'll give you the chance before you leave
3  today to give us the best answer you can under penalty of
4  perjury.
5        You're required to answer questions to the best
6  of your knowledge, information, and belief. We tend to
7  use the following examples. If I say to you, Mr. McLeod,
8  how many people are here in this room, you can look
9  around and count and say, I know there are seven. If I
10  show you a memorandum, and you recognize it because of
11  the form or the format that it was in when you were the
12  director of technical --
13   A   We called it the TOP.
14   Q   That is the acronym, Technical Operations and
15  Planning?
16   A   Correct.
17        MR. JOHNSON: I thought it was Technical
18  Oversight?
19        THE WITNESS: I'm sorry. Yes. That is correct.
20  BY MR. SELDON:
21   Q   If you recognize a memo because of the form, you
22  can say, I recognize the format, this is a memorandum to

Case 1:06-cv-00756-GK    Document 13-6    Filed 04/23/2007    Page 4 of 21
MGB Reporting, Inc.

4 (Pages 10 to 13)

Page 10

1  so and so, maybe me from so and so. If I say to you, do
2  you recognize this document, again, if it's something
3  based on your experience, okay, you need to give that
4  answer. If I say to you, though, Mr. -- if I say to you,
5  Mr. McLeod, what's the weather like outside, you can say,
6  well, we can't see outside, but I was outside ten minutes
7  ago; it was a warm, rainy day in January, probably still
8  is, but if I say to you, Mr. McLeod, how many cars are
9  there in front of this building, you would say, that
10  would be a guess. That is where you would stop. If it's
11  a guess or speculation, you don't give us the answer, you
12  should feel free to say so. That's the only place you
13  draw the line. No place else.
14       During the course of the deposition you may hear
15  AUSA Melnik make objection. For the most part, your
16  testimony is going to be taken over those objections. If
17  you hear her make an objection, give us a minute or two
18  to try to work it out, because it makes for a much better
19  proceeding and transcript. That's different from a
20  situation if it comes where she instructs you not to
21  answer. If she instructs you not to answer, don't answer
22  unless and until she tells you it's okay to answer.

Page 11

1       There are probably going to be other ground
2  rules that I'll remember as we go along. One I've
3  remembered now, this is not being videotaped. When you
4  give an answer, you need to say yes or no; nodding your
5  head or shaking your head, it's okay now, as we're
6  just -- you're just nodding along with me and showing you
7  know what's up, but when it comes time to give an answer,
8  you can't do it that way. You've got to say whatever
9  your answer is.
10       Do you understand the ground rules?
11  A  I understand.
12       MR. SELDON: Karen, do you have anything you'd
13  like to add?
14       MS. MELNIK: No. Just reminders of one voice at
15  a time. That's all.
16       MR. SELDON: Sorry. I grew up in New York.
17  It's not a possible rule for me to honor.
18       MS. MELNIK: Hopefully you can do better than
19  someone else I know.
20  BY MR. SELDON:
21  Q  Mr. McLeod, in your last position with HUD OIG,
22  and for the record today I'm going to say, unless I

Page 12

1  specify to the contrary for you, HUD, Department of
2  Housing and Urban Development, OIG, HUD OIG, Office of
3  Inspector General, all refers to the HUD Office of
4  Inspector General, unless I tell you to the contrary.
5       In your last position as director of TOP, what
6  were your duties and responsibilities?
7  A  We were responsible for overseeing the work of
8  ten regional offices, reviewing drafts, reports,
9  providing comments on those reports, those comments were
10  provided to the inspector, Assistant Inspector General
11  for Audit Jim Heist, who passed the comments on to the
12  district offices, as we called them. That was one of the
13  functions.
14       I had several staff that reviewed reports and
15  provided comments to me. I reviewed those comments,
16  passed them along to Jim Heist, who passed them along to
17  the district offices. We also were responsible for the
18  semi-annual report to Congress, the Office of Audit plan,
19  and Office of Audit policies and procedures.
20  Q  Let's take some of these from the top. You
21  mentioned the oversight function of ten regional
22  offices. There are in addition, I know, in addition to

Page 13

1  the ten regional offices of HUD OIG, there are also
2  several more office and headquarters Office of Audit.
3  Did you perform the same functions with regard to their
4  work as well?
5  A  Yes, we did.
6  Q  And how many of -- there were how many offices
7  in Washington, DC?
8  A  There would have been the Headquarters Office
9  Audit and there would have been the Financial Audit, and
10  those were the only two, I believe, in Washington.
11  Q  Was there also an Information System Office,
12  Systems Office or not?
13  A  Yes, there was. That was the third office.
14  Q  Did that also --
15  A  That was also part of our --
16  Q  Charter?
17  A  Correct.
18  Q  How long were you in this position as director
19  of TOP?
20  A  From the early 1990's. I'm not sure of the
21  specific date. My best guess would be about '94.
22  Q  That's an estimate?

Page 14

1   A   Yes.
2   Q   How long were you the director?
3   A   I was the director -- let me back up.
4   Q   When you joined TOP, I take it there was a
5   predecessor?
6   A   The predecessor, the Office of Planning
7   Development and Research -- I mean Planning and Research
8   Division. When I first came to headquarters, I was in
9   the Planning and Research Division. I worked for Jim
10  Martin. Jim Martin moved on. I took his position, and
11  we later changed to Planning and Research Division after
12  the new IG came aboard:
13  Q   Mr. Donahue?
14  A   Mr. Donahue, because it was more technical
15  oversight, and we changed the division's name to TOP.
16  That was probably in the mid '90s.
17  Q   As opposed to sometime -- Mr. Donahue didn't
18  come until 2002-2003, somewhere in there?
19  A   Was it --
20  Q   Susan Gaffney was IG until sometime in 2002,
21  May. If you don't remember, that's okay.
22  A   Right. It's been a couple years.

Page 15

1   Q   And you tried to forget.
2   A   And I tried to forget.
3   Q   That's fair enough.
4       Would it be fair to say that you were, until
5   your retirement, you were director of TOP and continually
6   had been the first director of TOP?
7   A   First director of TOP, yes.
8   Q   And you remained its director continuously until
9   you retired?
10  A   Correct.
11  Q   You were succeeded by who, if you know?
12  A   Give me a moment. Can't recall.
13  Q   Okay. Robert Guinn, does that ring a bell?
14  A   Before that, when I left, one of my -- he just
15  retired. I can't recall.
16  Q   The report you mentioned --
17  A   Roger Niesen.
18  Q   The report to Congress, I take it, was the
19  semi-annual report?
20  A   Yes.
21  Q   Your office was responsible for the report to --
22  A   That's correct.

Page 16

1   Q   That would have been the semi-annual report
2   required under the IGA?
3   A   That's correct.
4   Q   The office --
5   A   Put an annual audit plan together, and we also
6   conducted, tried to conduct planning meetings three times
7   a year with the regional office. I say region,
8   district. I don't know what the terminology is.
9   Q   We'll just call it regional. We understand
10  today you're not pinning yourself down, and we're not
11  pinning you down to that being the meaning -- it's truly
12  anything in the field?
13  A   Yes.
14  Q   Fair enough. Office of Audit policies and
15  procedures, what are those?
16  A   Policies on audit report writing, how we were
17  to -- how reports are to be written, how we are to report
18  cost savings, various policies to make the Office of
19  Audit consistent throughout the regions.
20  Q   Do you, sitting here today, have any
21  recollection in which Region 6, while it was under the
22  supervision of Mr. Beard, issued a final audit report

Page 17

1   that was not written in accordance with the policies of
2   the -- I'm sorry, the policies of the Office Audit, final
3   audit report issued?
4   A   I don't recall any.
5   Q   I think you said they were policies and
6   procedures. Do you recall any report that was finally
7   issued by Region 6 when it was under Mr. Beard's
8   supervision that was issued, other than in accordance
9   with the procedures proscribed by the policies of the
10  Office of Audit?
11  A   I don't recall.
12  Q   None come to mind?
13  A   No.
14  Q   What I'm going to do, I'm going to give you a
15  copy of the affidavit you executed in connection with the
16  investigation of Mr. Beard's formal administration
17  complaints, and what I'm going to do first is explain to
18  you first how this works. I'm going to give one to the
19  reporter to mark as McLeod Exhibit 1 in this case.
20  That's the copy you're going to be working from. I'm
21  going to give a courtesy copy to attorney Melnik. We're
22  going to wait until you both have copies.

Page 18

1    (Thereafter Exhibit 1 was marked for
2    identification).
3  BY MR. SELDON:
4    Q   Mr. McLeod, first and foremost, do you recognize
5  this document?
6    A   Yes, I do.
7    Q   What is it, to your knowledge?
8    A   I was asked to voluntarily put an affidavit
9  together about my recollection of our interaction with
10  Michael's district, Mr. Beard's district.
11    Q   Would it be fair to say you put this together
12  from questions that were given to you by the investigator
13  in Mr. Beard's case, if you recall?
14    A   I don't believe there was any questions. I
15  think I was told there was a complaint, and I was asked
16  if I would put an affidavit together about my
17  recollection of the interaction we had with Mr. Beard's
18  region.
19    Q   Let's look at paragraph No. 4 on page 1. Says,
20  my organization was required to work with the various
21  regional offices to assure that the audit reports issued
22  by the regions for headquarters were in full compliance

Page 19

1  with auditing standards.
2    Do you recall at any time when Mr. Beard was the
3  head of HUD OIG Audit Region 6, any time that a final
4  audit report was issued by Region 6 under his supervision
5  that was not in full compliance with OIG auditing
6  standards?
7    A   I don't recall any, no.
8    Q   Nothing comes to mind?
9    A   No.
10    Q   Now, as we go down in this paragraph, it says,
11  the slightest change in their reports, meaning, I believe
12  it means Mr. Beard's regional office reports --
13    A   Yes.
14    Q   -- were taken by the complainant's staff as a
15  personal affront on their credibility.
16    What I'd like you to do, elaborate for me,
17  sitting here today, who you meant by the complainant's
18  staff.
19    A   William Nixon comes to mind.
20    Q   Anyone else?
21    A   No.
22    Q   I see in the sentence that you did not refer to,

Page 20

1  and this is just a predicate, because if I'm wrong, just
2  so you understand, my predicate as to questions are not
3  what counts. It's your testimony that counts. If my
4  predicate's wrong, you can say so.
5    I don't see in this sentence or elsewhere in
6  your affidavit you stating that the slightest change in
7  Region 6 reports were taken by Mr. Beard as a personal
8  affront. Did you believe that Mr. Beard did take it as a
9  personal affront? And by that we meant the slightest
10  change in his office's audit reports.
11    A   Did he see it as a personal affront, I don't
12  believe so.
13    Q   That's the discussion -- strike that.
14    For example, if the complainant's region used
15  opinionated terms in their audit reports, and we asked
16  them to remove the language so it could read more
17  neutral, they would needlessly argue for hours about how
18  the language should remain in the reports.
19    First question, did Mr. Beard personally do
20  that?
21    MS. MELNIK:  With respect to whom?
22    MR. SELDON:  Himself.

Page 21

1    THE WITNESS:  Did he personally do the arguing?
2  BY MR. SELDON:
3    Q   Yes. Needlessly argue for hours about how
4  language should remain in the reports.
5    MS. MELNIK:  Specifically about Mr. McLeod or --
6    MR. SELDON:  No, I'm sorry.
7    Q   Let's go back. The game is to get a good
8  transcript. This is an example of the lawyers working it
9  out.
10    It says here, for example, if the complainant's
11  region used opinionated terms in their audit report, and
12  we asked them to remove the language so the report could
13  read more neutrally, what I mean is, is the "they,"
14  does that include Mr. Beard?
15    A   Yes. He would typically be in those meetings
16  with his subordinates where we would have several
17  contacts.
18    Q   And so you're saying, correct me if I'm wrong,
19  that Mr. Beard himself would needlessly argue for
20  hours on how the language should remain?
21    A   He certainly was supporting his assistant
22  regional inspector generals.

Page 22

1    Q    My first question, though, is, did Mr. Beard
2    needlessly argue for hours about how language should
3    remain in the reports?
4    A    I don't recall.
5    Q    You don't recall him ever doing that, I take it?
6    A    No.
7    Q    Who did you mean to include when you said, "they
8    would needlessly argue for hours"?
9    A    They would be the folks that worked on the audit
10   report, because many of these reports we would have
11   conversations, and his whole staff were in the room to
12   discuss the audit.
13   Q    Did Mr. Nixon needlessly argue for hours over
14   language in a report?
15   A    He was a predominant one, yes.
16   Q    Can you give me an example of when Mr. Nixon
17   needlessly argued for hours over language in a draft
18   report.
19   A    Well, one example would be the CVR report.
20   Q    And you definitely recall Mr. Nixon arguing for
21   hours, as you put it in your affidavit, about language in
22   the report?

Page 23

1    A    I can't recollect these meetings that took place
2    two and a half years ago.
3    Q    Okay. But I guess what I'm saying is there's a
4    statement here that he argued for hours. That's -- I'm
5    talking about an argument lasting for hours.
6    A    Many of the meetings we had would be -- would
7    last for hours.
8    Q    Right. Not exactly my question.
9        The question here, as you put it here in your
10   affidavit, was that there would be arguments if the
11   complainant's region used opinionated terms and asked it
12   be removed.
13       In other words, I understand you to be talking
14   here about the removal of opinionated terms.
15   A    Correct.
16   Q    And the question is, they, which you said
17   included Mr. Nixon, when asked to remove the language,
18   would needlessly argue for hours.
19       Do you recall Mr. Nixon needlessly arguing for
20   hours over particular terms in a report?
21   A    This might have been many reports at many
22   different times, but the arguments might have taken

Page 24

1    hours, yes.
2    Q    Anyone other than Mr. Nixon come to mind? Let
3    me state the question, needlessly argued for hours over
4    terms in these reports?
5    A    There were others on the staff that argued over,
6    whether it is for hours, I don't recollect.
7    Q    No one comes to mind?
8    A    No.
9    Q    This is one of those times, does anyone else
10   come to mind other than Mr. Nixon?
11   A    No.
12   Q    Let's go to the next page. I guess I'll ask you
13   first, because you've talked about the time this has
14   been. You gave a signature under oath at the end of
15   this, if you want to look. No, I'm sorry, affirmation.
16   I take it you did affirm this at the time?
17   A    Uh-huh.
18   Q    You need to say yes or no.
19   A    Yes, I'm sorry.
20   Q    Do you recall how this affidavit came to be
21   prepared?
22   A    No, I don't.

Page 25

1    Q    Who else, if anyone, was involved with you in
2    providing this information?
3    A    No one else was involved in providing this
4    information.
5    Q    Page 2, the end of paragraph 4, page 2.
6    A    Correct.
7    Q    Whenever you're ready. You should always feel
8    free, if I direct you somewhere to read, to read as much
9    or as little as you like.
10       You said Mr. Heist was very aware of the
11   resistance in my organization, meaning TOP, was receiving
12   from the complainant's office in our attempts to do our
13   job.
14       Now, first of all, did you at any point tell
15   Mr. Heist that Mr. Beard was personally --
16   A    No, did not.
17   Q    -- resistant?
18       Who did you tell Mr. Heist, if anyone, was
19   resistant to your organization?
20   A    I don't necessarily recall giving any names. I
21   really talked about it in terms of resistance in getting
22   reports issued.

Case 1:06-cv-00756-GK   Document 13-6   Filed 04/23/2007   Page 8 of 21
MGB Reporting, Inc.

8 (Pages 26 to 29)

Page 26

1    Q   Do you recall telling him that there were one or
2  more people in Mr. Beard's region, Region 6, that argued
3  needlessly for hours over terms in a report? Him being
4  Mr. Heist.
5    A   Mr. Heist often sat in those meetings where we
6  discussed reports.
7    Q   You mean in meetings with the Region 6 staff?
8    A   Correct.
9    Q   Did you ever hear him in any of those meetings
10 say to Mr. Beard, your subordinate is arguing too long?
11   A   Not to my knowledge.
12   Q   Did you ever hear Mr. Heist say to Mr. Nixon,
13 this has gone on long enough, we need to move on?
14   A   I don't recall.
15   Q   Did you ever hear Mr. Heist say anything like
16 that in sub or substance to any other of Mr. Beard's
17 subordinates?
18   A   Not to my recollection.
19   Q   Was there any final audit report, to your
20 knowledge, that TOP had agreed should be issued that
21 Mr. Beard, Mr. Beard or his office, did not issue?
22   A   Rephrase that.

Page 27

1    Q   Yes. I think you talked a moment ago about, on
2  a different subject, audit reports that were issued by
3  the regional offices after review by TOP. Just framing
4  it for you, that's not a question.
5    A   Correct.
6    Q   Do you have any recollection in any instance in
7  which Mr. Beard's region, which would include him, did
8  not issue an audit report that TOP had wanted issued?
9  Let's say --
10   A   I don't understand.
11   Q   Let's strike it and start again.
12      Is it correct to say, sir, that TOP had approved
13 audit reports for issuance or not?
14   A   That's incorrect.
15   Q   How would we make that correct, if you can do
16 so?
17   A   We provided comments to Mr. Heist.
18   Q   Then it was up to him to approve audits for
19 issuance; is that correct?
20   A   That's correct.
21   Q   Are you aware of any circumstance in which
22 Mr. Beard's region, which would include him, did not

Page 28

1  issue an audit report that was approved for issuance by
2  Mr. Heist?
3    A   That I can recall.
4    Q   Do you recall any instance in which Mr. Beard's
5  region, including Mr. Beard, issued an audit report that
6  Mr. Heist did not approve for issuance?
7    A   Not that I can recall.
8    Q   Can you recall any instance in which Mr. Beard's
9  region, including him, took any official action on behalf
10 of the Department of Housing and Urban Development that
11 was not approved by Mr. Heist?
12   A   Not to my knowledge.
13   Q   And I guess probably what Mr. Johnson would like
14 me to be clear about, this is all to the extent of your
15 knowledge, I take it, as opposed to the ultimate universe
16 of actions?
17   A   That's correct.
18   Q   Do you know of any circumstance in which
19 Mr. Beard's region, including Mr. Beard, issued some
20 action or on behalf of the Department of Housing and
21 Urban Development that was not approved by Mr. Heist?
22   A   I think you already asked that question.

Page 29

1    Q   I think I said -- I asked first, did you know of
2  any official action they did not take. Now I'm asking
3  did they take any action that had not been approved by
4  Mr. Heist? First one was did they fail to take any
5  official action, and this one is did they take any
6  official action without Mr. Heist's approval, where it
7  was required?
8    A   Not to my knowledge.
9    Q   Now we'll go back and talk about the issuance or
10 nonissuance of reports.
11      Were you aware in the ordinary course of
12 business of all the audit reports that were issued by
13 regions?
14   A   Yes, I was.
15   Q   Were you aware of the -- let's leave it that.
16 Too long a question.
17      Paragraph 5, the problem as I saw it, you begin,
18 what problem were you talking about? Again, for the
19 record this is in your affidavit.
20   A   The problem in getting audit report comments
21 resolved.
22   Q   Were there other problems you were referring to?

Case 1:06-cv-00756-GK    Document 13-6    Filed 04/23/2007    Page 9 of 21
MGB Reporting, Inc.

9 (Pages 30 to 33)

Page 30

1    A    These are problems with the audit report.
2    Q    I'm saying the problem with getting the audit
3    reports. I may have misunderstood.
4         The problem, tell me in your own words what you
5    were referring to as the problem.
6    A    We would get reports from the region.
7    Q    Presumably in draft form?
8    A    Draft form that would have comments on those,
9    and there would be arguments that we were wrong, and they
10   wanted to issue the report, although we felt that some of
11   the audits did not meet our audit policies.
12   Q    Anything else you were describing as the
13   problem?
14   A    The problem was only in relation to audit
15   reports and the comments.
16   Q    And you said that they did not meet audit
17   policies, is that it?
18   A    Standards.
19   Q    Were there any times, to your knowledge, any
20   audit reports issued by Region 6?
21        MS. MELNIK: Do you mean final or draft?
22        MR. SELDON: No. Issued can only mean final

Page 31

1    ones.
2         MS. MELNIK: Okay.
3    BY MR. SELDON:
4    Q    Let's try it again.
5         Are you aware of any audit reports, meaning
6    final ones, issued by Region 6 that were issued that did
7    not meet OIG audit standards?
8    A    Not to my knowledge.
9    Q    And do you recall any circumstance in which they
10   were directed to issue an audit that did not meet audit
11   standards?
12   A    I don't understand the question.
13   Q    Well, someone could have said, I'm not saying
14   they did, this is an example, someone could have said,
15   well, it doesn't meet our standards, but let's get it out
16   of here anyway. Anything --
17   A    No.
18   Q    Okay. Which audits, if any, did Mr. Beard, was
19   Mr. Beard not as knowledgeable of all the facts of --
20   strike that.
21        Which audits, if any, was Mr. Beard not as
22   knowledgeable about the facts of audits? Strike that.

Page 32

1    Let's try again.
2         Which audits, if any, was Mr. Beard not
3    knowledgeable in terms of the facts?
4    A    I'm not sure. I don't know that I can answer
5    this question two and a half, two years later.
6    Q    Any come to mind?
7    A    There was a few audits that were outstanding
8    when I left, one being CVR. There were problems on other
9    audits, but I don't recall all the details.
10   Q    What did you do in terms of getting ready for
11   your deposition today?
12   A    I met with Ms. Melnik and --
13   Q    Don't tell me what was exchanged between you --
14   A    Nothing was exchanged.
15   Q    No. I meant what was discussed. But it is all
16   right to say that you met with somebody. Did you meet
17   with anybody else?
18   A    No.
19   Q    To your knowledge, when Region 6 was under
20   Mr. Beard's supervision, were there any audits that were
21   not supported by the facts?
22   A    Not to my knowledge.

Page 33

1    Q    Were there any that they were -- strike that.
2         When, if ever, did you bring to Mr. Heist's
3    attention that Mr. Beard was not knowledgeable about
4    facts of audits?
5    A    I don't recall.
6    Q    Nothing comes to mind?
7    A    No.
8    Q    Do you recall Mr. Heist ever commenting that to
9    you?
10   A    No.
11   Q    Do you recall ever being in a meeting with
12   Mr. Heist in which, and by this I mean and with the staff
13   that he commented, not to you, that Mr. Beard was not
14   knowledgeable about the facts of audits?
15   A    No.
16   Q    Do you recall being in any such meeting with
17   Region 6 staff in which Mr. Heist stated that
18   complainant's staff was not knowledgeable about audits?
19   A    No.
20   Q    We need to go back for a minute.
21        These meetings that Mr. Heist was in, other than
22   and you Mr. Heist and the Region 6 staff, who else, if

MGB Reporting, Inc.

10 (Pages 34 to 37)

Page 34

1  anyone, would be in those meetings?
2     A    The technical expert on my staff that would have
3  reviewed the audit.
4     Q    Anyone else?
5     A    Typically be, that's all there would be, myself,
6  that person, and Mr. Heist.
7     Q    Not Mr. Phelps?
8     A    No.
9     Q    Now let's go back a little bit.
10       Do you recall in any of these meetings, as
11  you've described them, technical expert on your staff
12  saying that Mr. Beard was not knowledgeable about the
13  facts of an audit?
14     A    I don't recall.
15     Q    You don't recall that happening?
16     A    I don't recall.
17     Q    That's one of those tricky answers that a
18  transcription doesn't come out right. You don't recall
19  that happening, I guess?
20     A    I can't remember. I can't remember.
21     Q    You can't remember an example, I take it?
22     A    No.

Page 35

1     Q    Do you recall a technical expert on your staff
2  ever saying in one of these meetings to Mr. Beard that
3  your staff needs to move on and should not be so
4  argumentative?
5     A    Don't recall.
6     Q    You don't recall any instances?
7     A    No. I don't recall.
8        MS. MELNIK: I just want to be clear. Maybe
9  everyone is except me. If you could ask him if he
10  doesn't recall because none happened or because he just
11  can't recall an instance as he sits here today, but he
12  knows it happened. I don't know which is the answer to
13  that question.
14        MR. SELDON: Well, I think I did in my own 100
15  yards, but if he can clear it up, he can. I asked him if
16  he recalled any instances, whether it's because he's
17  sitting here today or whether it's because it didn't
18  happen. You can ask to your satisfaction.
19        MS. MELNIK: Okay.
20  BY MR. SELDON:
21     Q    Do you recall there being an issue coming up in
22  connection with the Housing Authority of New Orleans or

Page 36

1  the HANO audit about there being certain language in that
2  draft report by Region 6?
3        MR. JOHNSON: I think you're going to have to
4  clarify the audit by sharing it. Because HANO, there's
5  dozens of audits.
6  BY MR. SELDON:
7     Q    I'm going to give you a copy, it's so
8  voluminous, but I'm going to give to you the audit. It
9  is a draft dated October XX, 2004. You can use this for
10  recollection.
11       Do you have any recollection either way of there
12  being an issue about the use of certain words? Do you
13  understand?
14     A    Yes, I do.
15     Q    And did you at some point either have someone on
16  your staff, or did someone on your staff come up with a
17  list of questionable words that were in the audit?
18     A    Yes, that did happen.
19     Q    Show you Exhibit 2 and ask if you can identify
20  this.
21       (Thereafter Exhibit 2 was marked for
22       identification).

Page 37

1  BY MR. SELDON:
2     Q    Do you recognize this list?
3     A    Yes, I do.
4     Q    What is it?
5     A    We received the draft report of CVR Associates.
6     Q    That's the HANO audit?
7     A    That's one of the many HANO.
8     Q    No. We called it the HANO in the record, so
9  when you say CVR, it's the same.
10     A    Okay.
11     Q    Go ahead.
12     A    We received the draft earlier, and provided
13  comments on that, our audit policy requires that audit
14  reports be neutral, and the draft came back for the
15  second time, and it contained what we thought were many
16  biased words or phrases. The region, Mr. Beard's staff
17  felt that that was not the case, so we made a list.
18     Q    Okay. And that list is Exhibit 2?
19     A    Correct.
20     Q    Prior to the time that Exhibit 2 was compiled,
21  how many of these biased words or phrases, if you recall
22  any, were brought to the attention of Mr. Beard or his

MGB Reporting, Inc.

11 (Pages 38 to 41)

Page 38

1  staff?

2     A   I don't recall that we gave them specifics.  We

3  did let them know that the report was full of biased

4  words and phrases.

5     Q   Was this list prepared, if you recall, at the

6  request of Mr. Beard?

7     A   No, it was not.

8     Q   How did it get --

9     A   Let me correct that.  I don't recall.

10    Q   Do you recall either way whether this list was

11  ever given to Mr. Beard?

12    A   I would have to look at the e-mails to see

13  whether this was transmitted to them.  I do not know.

14    Q   What was the purpose of this list?

15    A   So the region could understand that there was

16  bias in the way the report was written that violated our

17  policy that reports be written in a neutral tone.

18    Q   In other words, this list was a list of specific

19  examples?

20    A   Correct.

21    Q   This was, as you understood it, to be given to

22  the region?

Page 39

1     A   Correct.

2     Q   Who, if you know, was responsible for preparing

3  this list?

4     A   Who was responsible on my staff?

5     Q   Yes.

6     A   I don't recall.

7     Q   Okay.  Let's take a look on the right hand

8  toward the bottom, and you've got the audit in front of

9  you, if you want to refer to it; unfortunately, they

10  charged me by the page for copies.

11    A   Right.

12    Q   Got a reference in here that there's a biased

13  term, "Ms. Hill's boyfriend," page 52 and 53 twice.

14    A   Right.

15    Q   Why is that a biased term?

16    A   I don't know that, if you have a boyfriend or

17  girlfriend, that's only your decision as to whether you

18  have a boyfriend or girlfriend.  Who is to say that that

19  was the case?  That was supposition.

20    Q   Do you have any way of knowing one way or the

21  other whether Ms. Hill described this person as her

22  boyfriend?

Page 40

1     A   I don't know.

2     Q   Let's go on.

3     A   It adds nothing to the report.  That's one of

4  the reasons we commented.

5     Q   Let's put Exhibit 2 aside.  It's a good idea to

6  give the official copies back to the reporter.  This is

7  Exhibit 1.

8     A   Okay.

9     Q   That will come to me.  That's your courtesy

10  copy.  Exhibit 2.

11        Who is Mr. John Grygrowski?

12    A   He's one of my staff.

13    Q   That would be one of your technical experts?

14    A   Correct.

15    Q   Was he working on the HANO audit that we've just

16  been talking about?

17    A   Yes, I believe he did.

18    Q   I'm going to show you a copy of the document,

19  which I'll ask to have marked as McLeod Exhibit 3.

20        (Thereafter Exhibit 3 was marked for

21        identification).

22  BY MR. SELDON:

Page 41

1     Q   Is this a document that you recognize?

2     A   Specifically no.  I don't recognize this

3  document.  This is the way the process would work, that

4  they would send these comments forward to me in this

5  manner.

6     Q   So let's just define a few other terms.  I'd

7  appreciate it.  Is this in the form on the top of this

8  document in which e-mail was sent within HUD OIG,

9  specifically your organization?

10    A   Correct.

11    Q   And your name is then one that appears in the

12  two assigned to this e-mail?

13    A   Correct.

14    Q   Now, what is the function of a document such as

15  this?

16    A   This is a document that I would receive and

17  review and pass these comments forward to Jim Heist to

18  pass to the region.

19    Q   So this is, I take it, this is a document that

20  you would review and then transmit forward to Mr. Heist?

21    A   Correct.

22    Q   What is the purpose of such a document or what

Case 1:06-cv-00756-GK    Document 13-6    Filed 04/23/2007    Page 12 of 21
MGB Reporting, Inc.

12 (Pages 42 to 45)

Page 42

1  are the purposes?
2      A  To point out changes required in the report in
3  order for it to meet our audit policies and procedures so
4  it can be issued.
5      Q  Are reports -- not reports, are documents such
6  as these, McLeod Exhibit 2, as a matter of business
7  practice --
8          MS. MELNIK: 3.
9  BY MR. SELDON:
10     Q  3, Exhibit 3; shared with regions whose reports
11  are being considered your organization?
12     A  Generally it would be the case, but I don't know
13  specifically on this matter.
14     Q  Would it be fair to say that the standard
15  business practice would be to provide copies of such
16  discussion papers to the region whose reports, draft
17  reports were being considered?
18     A  That generally was the case. My staff worked
19  directly with the folks in the field to discuss the audit
20  report in putting these comments together.
21     Q  Was that the standard business practice?
22     A  That was, yes.

Page 43

1      Q  Here we have a general comment, TOP supports
2  actions recommended in the report. Or they're clearly
3  supported by criteria, et cetera, et cetera.
4          Do you recall, did you understand this to mean
5  that your organization recommended issuing a report, a
6  draft audit report with findings or no?
7      A  As I read this statement, if the recommendations
8  are made in the report, they should be supported by
9  policies, procedures, and laws that have been violated.
10     Q  That's fair.
11         The next paragraph says, as requested, a copy of
12  Brian Saddler's legal opinion on questions concerning the
13  report is included.
14         What's that all about?
15     A  At times when there's legal matters in the audit
16  reports, we would ask our counsel to opine as to whether
17  the criteria that's being used is proper or anything that
18  they could help us in improving the quality of the audit
19  report.
20     Q  Were there any lawyers on your staff?
21     A  No.
22     Q  Was it out of the ordinary, when legal questions

Page 44

1  arose, to seek an opinion, I mean that in no particular
2  sense, from the office counsel?
3      A  We often use the office of counsel.
4      Q  To your recollection, was there anything unusual
5  or out of the ordinary about seeking an opinion from the
6  office of counsel in the AOR?
7      A  Unusual, no.
8      Q  Hold on to that for a second. We may need it.
9  I don't know that you will, but you might.
10     A  Okay.
11     Q  I'll give you a document, we'll call it McLeod
12  Exhibit 4.
13         (Thereafter Exhibit 4 was marked for
14         identification).
15  BY MR. SELDON:
16     Q  Is this a document that you recognize, sir?
17         (Whereupon a discussion was held off
18         the record).
19         (Thereafter Exhibit 5 was marked for
20         identification).
21  BY MR. SELDON:
22     Q  Mr. McLeod, do you recognize this document?

Page 45

1      A  No.
2      Q  Do you recognize it by the form, though, or by
3  reading the contents?
4      A  I don't know that I've seen this document.
5      Q  Let's give Mr. McLeod the document that is
6  now -- no, the --
7          THE REPORTER: The one that was marked 4 and now
8  5?
9          MR. SELDON: Yes.
10     Q  Is there a document that you recognize either in
11  substance or in form?
12     A  I wasn't involved in this document. I can only
13  surmise what it is.
14     Q  You are on the circulation list?
15     A  Yes.
16     Q  There's a reference here, I believe this comes
17  from the note that's actually written by Mr. Beard,
18  talking about there had been some contact with GSA about
19  applicability of circular A-126 to the HANO audit.
20         I'm not asking if you know about that. I'm just
21  asking if you see --
22         MR. JOHNSON: No.

Page 46

1    MR. SELDON: Wrong one?
2    MR. JOHNSON: Yeah. This isn't HANO.
3    MR. SELDON: Pertaining to the aircraft.
4    Q    Anything ring a bell?
5    A    It would be a guess. It happened several years
6    ago.
7    Q    You don't need to guess. Let's go on. You can
8    put that down.
9    (Whereupon a discussion was held off
10    the record).
11    MR. SELDON: Let's have this marked as Exhibit
12    6.
13    (Thereafter Exhibit 6 was marked for
14    identification).
15    THE WITNESS: I remember the document.
16    BY MR. SELDON:
17    Q    What is it?
18    A    This is a document where there was some legal
19    issues in the audit of the San Antonio Housing Authority,
20    and we felt that there was some legal issues that needed
21    to be resolved, and we asked OGC, our general counsel
22    staff to look at it.

Page 47

1    Q    This was an audit that was prepared originally
2    or drafted by Region 6?
3    A    Correct.
4    Q    Under Mr. Beard's supervision?
5    A    Correct.
6    Q    Anything out of the ordinary in asking for this
7    opinion from the IG's office of legal counsel?
8    A    No.
9    Q    Okay. Put that aside. Let's have this marked
10    as Exhibit 7.
11    (Thereafter Exhibit 7 was marked for
12    identification).
13    BY MR. SELDON:
14    Q    Do you recall this document, sir?
15    A    After we received the original comments from
16    Mr. Johnson, we passed it along to the region. We asked
17    the region to give us a second draft, and they did, and
18    we asked Rick to look at those, and then he provided this
19    document.
20    Q    So let's look at the last page, which is
21    unnumbered, so what I'm going to do is start, I'm going
22    to ask you, because we have it in the record, the lower

Page 48

1    right-hand corner of each page, just write the page
2    number and circle, so we may be on the same wave length.
3    A    (Marks on exhibit).
4    Q    So the last page is what?
5    A    6.
6    Q    Let's look at page 6.
7    In conclusion, part of it, it says, after
8    reviewing the audit and the relevant audit work papers,
9    we have changed our earlier opinion.
10    Now, the "we" there is the office of legal
11    counsel, I take it?
12    A    I believe so.
13    Q    So what's -- what is this talking about, after
14    reviewing the audit and the relevant audit work papers,
15    we have changed our opinion? Tell me what that means.
16    A    I can only presume what it means.
17    Q    You make that presumption based -- can you make
18    that presumption based upon your understanding of
19    business practices at OIG?
20    MS. MELNIK: Object. That calls for
21    speculation. Documents speaks for itself.
22    MR. SELDON: That's why I'm asking if he has any

Page 49

1    reason, other than reading this.
2    THE WITNESS: It would mean between this draft
3    and this draft they provided additional information.
4    BY MR. SELDON:
5    Q    Let's stop right there. Who do you mean by they
6    provided?
7    A    The region.
8    Q    Is that unusual in the audit review process?
9    A    No.
10    Q    Okay. Now let's mark as Exhibit 8.
11    (Thereafter Exhibit 8 was marked for
12    identification).
13    BY MR. SELDON:
14    Q    Do you know what this document's all about?
15    A    This is an audit resolution document.
16    Q    What does that mean? First of all, let's start,
17    this is once again about the same San Antonio Housing
18    Authority that we talked about in Exhibit 6 and 7?
19    A    Correct.
20    Q    You say an audit resolution document. What is
21    an audit resolution document?
22    A    Audit resolution document is when the auditee

Case 1:06-cv-00756-GK    Document 13-6    Filed 04/23/2007    Page 14 of 21
MGB Reporting, Inc.

14 (Pages 50 to 53)

Page 50

1  responds to the recommendation, they either accept them
2  or reject them --
3     Q   Auditee being the person or entity being
4  audited?
5     A   Correct. There's various documents that float
6  back and forth and discussion of those recommendations
7  and resolution of those problems.
8     Q   Now, with this document, McLeod Exhibit 8, first
9  of all, this is something Mr. Heist issued, although it's
10  signed by Mr. Phelps as deputy?
11    A   It was probably the way that they --
12    Q   Do you recognize Mr. Phelps' signature?
13    A   That's his signature, yes.
14    Q   It says, after further review and discussion
15  with program staff, we've decided to accept Public &
16  Indian Housing's position, et cetera, et cetera.
17        First of all, I take it Public & Indian Housing
18  or PIH is one of the program offices within the
19  department?
20    A   Correct.
21    Q   Okay. So how does this get to be discussed and
22  reviewed with the Public & Indian Housing, just if you

Page 51

1  could explain the process.
2     A   In order for those funds to be recovered from
3  the Housing Authority headquarters, Public & Indian
4  Housing would have to take action.
5     Q   I see. The programming office would have to
6  recover the money, is that the idea?
7     A   Yes.
8     Q   What does this refer to, if you could put that
9  into context?
10    A   That they provided adequate documentation to us
11  that we would accept those costs as being reasonable,
12  allowable is the word.
13    Q   Because it would be up to them to collect?
14    A   Correct. That those costs were allowable.
15    Q   Now, at the bottom on from Mr. Heist, it says,
16  we agree with the basic premise of your referral.
17        What does that mean and refer to?
18    A   That would mean that they're referring these
19  recommendations to the next level in the audit resolution
20  process. They referred it to, basically referred it to
21  the assistant secretary for resolution.
22    Q   And this being we agree with the basic premise

Page 52

1  of your referral?
2     A   Correct.
3     Q   Does that mean, to your understanding of
4  standard business practices in that office, Mr. Heist's
5  office agreed with the premise of Region 6, Mr. Beard's
6  region --
7     A   We agree with the premise of spending
8  development dollars for projects.
9     Q   Or there was essentially no way to proceed? If
10  I'm wrong, just say so.
11    A   This document is saying that you haven't made
12  the case that funds were spent when they knew of the
13  problems with the project, the site, problems with the
14  project site.
15    Q   Is that because it was impossible to determine?
16    A   It was impossible to determine what was in their
17  minds at the time they approved this project.
18    Q   Now, this process, and you can look back if you
19  like, as far as you like, but if we're looking just as
20  Exhibits 6, 7, and 8, these particular phases of it, this
21  review process went on for three months?
22    A   Uh-huh.

Page 53

1     Q   You need to say yes or no.
2     A   Yes.
3     Q   Is there anything unusual about that?
4     A   I'm not sure what you're asking. Audit
5  resolution processes can take six months or more.
6     Q   Why is that so?
7     A   At the field level they have 120 days to take
8  action on the recommendations, and that would be referred
9  in to here at that point in time --
10    Q   Here meaning in town?
11    A   Here in headquarters for further resolution, and
12  I believe they were required to get concurrence on the
13  recommendations, at least by -- I don't recall the time
14  frame, but there was a certain time frame that the
15  recommendations were to be resolved, or they would be
16  reported in the semi-annual report to Congress.
17    Q   Now let's have you take a look at, this is one I
18  forgot or neglected to do, now to McLeod Exhibit 9.
19        (Thereafter Exhibit 9 was marked for
20        identification.)
21  BY MR. SELDON:
22    Q   Do you recognize this document?

MGB Reporting, Inc.

Page 54

1    A    Yes.

2    Q    What is it?

3    A    This is Mr. Beard's response to one of these --

4    Q    Exhibit 7?

5    A    The exhibits that --

6    Q    Just take a look and see if it's in response to

7    Exhibit 7, the second legal opinion, or did it come into

8    the process after Exhibit 7, the second legal opinion.

9    A    Without reviewing these documents in detail, I

10    can't say for a fact. It's likely a response to earlier

11    comments.

12    Q    Okay. So we're talking in the first paragraph

13    here, this memo from Mr. Beard, that there was a legal

14    opinion that was obtained in response to the original

15    reference to headquarters on August 24th, 2004.

16    A    Correct.

17    Q    It was then a legal opinion, the first one by

18    counsel's office, and then it says, Region 6 disagreed

19    with the conclusions of that.

20        Do you see that there?

21    A    Correct.

22    Q    Anything improper, wrong, or inappropriate by

Page 55

1    Mr. Beard, his region, or his region doing that?

2    A    No. Nothing wrong with that.

3    Q    Then it says, counsel was provided a second

4    opinion that changed the first one.

5        Do you see that?

6    A    Uh-huh.

7    Q    You need to say --

8    A    Yes.

9    Q    Would it be fair to say that this was part and

10    parcel of the review process that went on at TOP for

11    audits drafted in the region, in regions?

12    A    It was unusual that it would get to a legal

13    opinion, but yes, it was normal to have that discussion.

14    Q    Now let's go back to McLeod Exhibit 1. Once

15    again we're referring to, it's called an affidavit that

16    you affirmed in connection with the investigation in

17    Mr. Beard's complaint, administrative complaint?

18        Now, if we look at the one, two, three, four,

19    fifth, and six lines down from the top, you affirmed,

20    solemnly swore that this statement, your statement may be

21    used in evidence. With me so far?

22    A    Yes.

Page 56

1    Q    When you prepared this statement, let's talk

2    about, for example, what was up in paragraph 4, various

3    allegations in paragraph 4, do you recall whether you had

4    available to you at that time and relied upon notes of

5    particular or other recordations of particular meetings

6    or conferences or audits?

7    A    What was your question again?

8    Q    Yes. Do you recall in preparing this affidavit,

9    in particular paragraph 4, if you had available to you

10    and relied upon notes, recordations, or anything

11    involving particular audits?

12    A    This was written in November.

13    Q    Yes.

14    A    And at that time we were involved in several

15    outstanding audit issues with the region. I don't recall

16    the particulars, but that's what caused me to write what

17    I said here in the affidavit.

18    Q    Let's look at page 2 of, last line paragraph 4.

19    My organization did not receive this same kind of

20    resistance.

21        In other words, from Region 6, from the other

22    regional offices?

Page 57

1    A    Correct.

2    Q    What review, if any, of actions of other

3    regional offices did you conduct in preparing this

4    affidavit?

5    A    This affidavit was prepared based on my opinions

6    as of that date and time.

7    Q    Did you or did you not go back and review

8    particular draft audits from other regions?

9    A    I review all drafts from all regions at all

10    times.

11    Q    No. My question was did you go back and review

12    them again in preparing and signing this affidavit?

13    A    No.

14    Q    Now, one thing that I'm going to try and work

15    with you here for a minute, is this affidavit was signed

16    November of 2005, just over a year ago.

17    A    Two years. Two years and two months.

18    Q    No. I'm not an auditor, but I feel relatively

19    confident this was one year and two months ago.

20    A    I've been retired for two years. This was

21    written when I was working here. You're right. It does

22    say '05. I don't know who wrote that.

Case 1:06-cv-00756-GK    Document 13-6    Filed 04/23/2007    Page 16 of 21
MGB Reporting, Inc.

16 (Pages 58 to 61)

Page 58

1    Q   Is that your handwriting in '05 below your
2    signature?  Let's put it this way, that is your signature
3    on page 2, or is it not?
4    A   This?
5    Q   Is that your signature on page 2?
6    A   Page 2 of what?
7    Q   I'm sorry.  Page 3.
8    A   This being page 3?
9    Q   Yes.
10   A   No, it isn't.  I believe these documents are for
11   the wrong --
12   Q   Let's go through what we've got.  The first two
13   pages are statements that you gave?
14   MR. JOHNSON:  I think it did happen in '05,
15   because he didn't file until March '05.
16   MR. SELDON:  Let's just go off the record.
17   (Whereupon a discussion was held off
18   the record).
19   BY MR. SELDON:
20   Q   Take a look at the third page again.  Is that
21   your signature?
22   A   No, it's not my signature.  Well, whose

Page 59

1    signature is that?  Looks like an L.  No.  This is not my
2    signature.
3    MR. JOHNSON:  Did you send this by e-mail to
4    someone?
5    MR. SELDON:  But he's initialed the first two
6    pages, unless that's a J. McLeod.  It's something
7    J. McLeod.
8    MR. JOHNSON:  Do you remember writing this?
9    THE WITNESS:  I remember writing this, and it
10   might be something that somebody asked me to write.
11   BY MR. SELDON:
12   Q   Mr. McLeod, is it correct that on the first two
13   pages the initials in the lower right-hand corner are
14   yours?
15   A   I don't think they're my initials.  It's SJM,
16   but --
17   Q   To the best of your recollection, are these
18   first two pages your statement?
19   A   It is my statement.
20   Q   Okay.  So now let's look at the fourth page.
21   it's the signature, seems to say S.J. McLeod; is that
22   your signature?

Page 60

1    A   No.  It's not my signature.
2    Q   But at least there's no doubt that the first two
3    pages are your statement?
4    A   Correct.
5    MR. SELDON:  Let's go off the record.
6    (Whereupon a discussion was held off
7    the record).
8    (Pause in proceedings).
9    MR. SELDON:  Karen, go ahead.
10   MS. MELNIK:  Okay.
11   EXAMINATION BY COUNSEL FOR DEFENDANT
12   BY MS. MELNIK:
13   Q   Mr. McLeod, do you recall Mr. Seldon asked you a
14   lot of questions about whether or not Region 6 ever
15   issued a final audit report that was not in line with
16   procedures and policies, et cetera.  Do you recall him
17   asking you a lot of questions about that?
18   A   Yes, he did.
19   Q   Briefly, what's the process with respect to what
20   the region would first submit to headquarters with
21   respect to an audit, say a draft audit?  Describe that
22   process for me, if you can.

Page 61

1    A   The process is they would submit a draft report
2    that had been thoroughly reviewed by the regional
3    manager, and that would be their first draft, which we
4    would review, and generally we would provide comments,
5    and for the most part things were not substantial
6    comments for most reports, and they would be asked to go
7    ahead and issue the first draft.  They would issue that
8    first draft, get comments back from the auditee, and then
9    we would review that, and they would issue the final.
10   Q   Now, what, if any, in that process, what if
11   any -- what were your concerns with respect to Region 6
12   in terms of that process that you just described?  What,
13   if any, problems or issues were there with respect to
14   Region 6?
15   A   There were a few reports where we received
16   drafts, and we had serious problems with the draft that
17   may have made reference to a wrong OMB circular, or there
18   may have been commentary on there that was not neutral, a
19   number of issues, which we would send back to them, say,
20   you need to take care of these issues, and it would
21   become an arduous process of going back and forth and
22   trying to resolve those issues, because there was a

Case 1:06-cv-00756-GK     Document 13-6     Filed 04/23/2007     Page 17 of 21
MGB Reporting, Inc.

17 (Pages 62 to 65)

Page 62

1 reluctancy to make any changes.
2   Q   Let me ask you this. Once TOP made comments on
3 a draft audit, would it be appropriate for the region to
4 have an opportunity to respond to those comments?
5   A   Yes, it would.
6   Q   And once they made those comments or response,
7 perhaps in defense of their position?
8   A   Correct.
9   Q   And then TOP or headquarters came back with sort
10 of their response to the region's response, what is
11 supposed to happen?
12   A   That would go to Jim Heist, who would make the
13 final call as to whether there's an issue there that
14 needs to be researched further. He might go back and
15 tell them to make these changes and send us back another
16 draft, or he might say that this looks pretty close,
17 make these couple of changes, and go ahead and issue the
18 report.
19   Q   What was different with respect to Region 6 as
20 opposed to the other regions with respect to this process
21 that you're describing?
22   A   Often the reports -- let me take that back.

Page 63

1   Many of the reports were problematic from the
2 get go, and making the comments on the reports and
3 sending them to Jim required the reports to come back
4 once or twice or three times. There was a general
5 reluctancy to make changes on the audit report.
6   Q   And was that true of all the regions or Region
7 6?
8   A   Region 6 was more problematic than others, but
9 they were a large region.
10   Q   In your affidavit on the second page, paragraph
11 5, in the first sentence, you say that the problem, as I
12 saw it, was that the complainant, you're referring to
13 Mr. Beard?
14   A   Correct.
15   Q   Was not as knowledgeable of all of the facts of
16 the audits, and appeared to rely primarily on the
17 opinions and positions of his audit managers.
18   What caused you or forms the basis of you making
19 that statement? Describe instances, if you can, that
20 caused you to make that comment.
21   A   He was one of the few audit or regional managers
22 that when I called to ask specifics about audits, he

Page 64

1 would get back to me with the staff being around
2 surrounding him in order to answer the questions, the
3 specific questions on the report. He was not as familiar
4 with reports as maybe some of the other regional
5 inspector generals were.
6   Q   You were asked some questions about obtaining,
7 and then the questions that were asked by Mr. Seldon it
8 was TOP or headquarters that would ask for legal
9 opinions. Do you recall being asked some questions about
10 that?
11   A   Yes, I was.
12   Q   Let me just follow up with that.
13   With respect to getting an opinion from legal,
14 the office of general counsel, what's the preferred or
15 more typical way or in terms of timing when legal is
16 brought in to offer an opinion?
17   A   Typically the regions in the course of their
18 audits, if there's a legal issue, would ask that legal
19 issue directly to the OGC staff. OIG, OGC staff. Those
20 issues would be resolved before the draft reports were
21 ever sent to TOP.
22   Q   I see. So whatever legal issues surrounded

Page 65

1 whether or not an auditee was, you know, whether or not
2 an auditee was doing something in compliance with the law
3 or whether the criteria that was used by the region was
4 accurate, and correct me if I'm wrong, was the
5 responsibility of the region to consult legal --
6   A   The region was required to give a draft report
7 to us that was fully documented and reviewed,
8 cross-referenced to whatever applicable criteria there
9 was, and there were some voids in some of these audits
10 that were sent from that region.
11   Q   When you say that region, what --
12   A   Region 6. Where there were legal issues that
13 weren't fully vetted, and so in some of these cases we
14 had to take our staff and go and deal with the legal
15 staff in trying to determine what was the right criteria
16 to use.
17   Q   And because it was -- what kind of workload did
18 your staff have with respect to all these audits coming
19 in from all these regions? How heavy was the load?
20   A   There was, I'm guessing, maybe 30 audits going
21 on at any point in time, and we might be involved in
22 draft reports, final reports, we also -- I did not

Case 1:06-cv-00756-GK    Document 13-6    Filed 04/23/2007    Page 18 of 21
MGB Reporting, Inc.

18 (Pages 66 to 69)

Page 66

1 mention, another function of our office which I did not
2 mention was reviewing legislation and directives that
3 were issued by the department, so that took up a big part
4 of our workload also. But yes, we were heavily
5 burdened. We were asked to provide comments on reports
6 within seven days, and sometimes that was an easy task,
7 and sometimes it was problematic.
8     Q   And in terms of the impact on your -- you and
9 your staff's ability to complete its work in a timely
10 fashion, did the fact that it fell on your -- you and
11 your staff to get legal opinions and have the -- let me
12 break it down.
13        The fact your office or your staff had to get
14 legal opinions, in terms of your ability to complete your
15 work, was that a positive impact or negative impact?
16    A   It was a negative impact. Took additional time
17 and resources of our staff to deal with the issues, talk
18 to the OGC staff, talk to the regions, in trying to
19 resolve the matter at hand.
20    Q   And with respect to Region 6, their reluctance
21 to, after say the initial sort of back once and forth,
22 after their initial opportunity to respond to your

Page 67

1 comments, the fact that it continued on from there, did
2 that positively or negatively effect, you know, the
3 management and resources of your staff?
4    A   Yes, it did, and there was times --
5    Q   Well, was it positive or negative?
6    A   It was negative impact on our staff.
7    Q   Why?
8    A   We would needlessly argue points that were
9 irrelevant, in my estimation, arguing terminology where
10 it really didn't have any real matter. The audits should
11 speak for themselves, there's no reason to throw in
12 needless adjectives, so having to comment on issues in
13 terms of report writing, we found was not productive for
14 our group.
15    Q   Who is ultimately responsible for the work
16 product that comes out of the each region?
17    A   The Regional Inspector General for Audit is
18 responsible for everything that comes out of the region.
19 When the TOP organization was initially developed, we
20 were receiving reports from regions that had not been
21 fully vetted with Regional Inspector General for Audit,
22 and I think a memo was sent by Jim Heist early in the

Page 68

1 process that when everything is sent to headquarters, we
2 want everything to be reviewed and the document that the
3 Regional Inspector General for Audit in the region would
4 put his imprimatur on that.
5    Q   The Region Inspector General for Region 6 is who
6 or was who?
7    A   Was Mr. Beard.
8    Q   And who was responsible for the, ultimately
9 responsible for the professional conduct of Region 6,
10 vis-a-vis TOP and headquarters?
11    A   Mr. Beard would be responsible for all of his
12 staff in making sure that they're in full compliance with
13 all policies and procedures.
14    Q   There were several questions that Mr. Seldon
15 asked you where your response was "I don't recall," and
16 if memory serves me, he was asking you about some
17 specific instances -- strike that. Give me one moment.
18        (Whereupon a discussion was held off
19        the record).
20 BY MS. MELNIK:
21    Q   Mr. McLeod, do you recall in response to many of
22 Mr. Seldon's questions your response was "I don't

Page 69

1 recall." Do you recall now giving that response earlier?
2    A   Yes, I do.
3    Q   Okay. In trying to -- what did you mean with
4 respect to when he asked you about some specific
5 instances involving Mr. Beard or Mr. Beard's staff in
6 Region 6? Did you mean that the instances that
7 Mr. Seldon was referring to did not happen at all or that
8 as you sit here today, that they did in fact happen,
9 you're just not able to recall specifically who or the
10 specific conversations?
11        MR. SELDON: Objection. Asked and answered.
12 BY MS. MELNIK:
13    Q   You can answer.
14    A   Okay. There were, in terms of the specific
15 reports and dealings that we had with the regions, I do
16 recall that Region 6 was a large part of our work. There
17 was many, many audit reports that were controversial in
18 nature. They're a large part of our workload, and when
19 Mr. Seldon asked questions about do I recall instances,
20 there were many, many problems, but in terms of
21 specifics, it would take time and effort for me to go
22 back and look at what happened two and a half, three

Case 1:06-cv-00756-GK    Document 13-6    Filed 04/23/2007    Page 19 of 21
MGB Reporting, Inc.

19 (Pages 70 to 73)

Page 70

1  years ago, which I don't have the recollection of at the
2  present time.
3      Q   I believe you were asked a question about
4  whether or not there were instances in which you recall
5  Mr. Beard, whether or not he was told or his staff was
6  told, all right, this process is taking too long, we need
7  to speed it up, we need to just kind of get to it.
8          Do you recall sort of that line of questioning?
9  Do you remember being asked about, that whether or not
10  you recall Mr. Heist or specific instances where that
11  conversation might have occurred?  Do you recall being
12  asked about that?
13     A   Yes.
14     Q   Okay.  Do you, you weren't necessarily privy to
15  every single e-mail and every single conversation that
16  was had between Mr. Heist and Mr. Beard?
17     A   I certainly was not privy to all those
18  discussions.
19     Q   How about e-mails?
20     A   E-mails, probably not.
21     Q   You were also asked toward the end of
22  Mr. Seldon's questions about whether or not when you

Page 71

1  drafted the affidavit Exhibit 1, did you review other
2  regions' audits, and you said you did not?
3      A   Correct.
4      Q   Did you feel you needed to review other regions'
5  audits to draw the distinction or differences in problems
6  with respect to Region 6 and other regions?
7      A   I didn't believe I needed to look back at the
8  details.  I think one was correct, this affidavit was
9  probably written after I was retired, someone asked me to
10  put it together.  I didn't have the documents in front of
11  me, but I certainly recalled what had gone on in the TOP
12  division in the last five years, what our workload was,
13  and how Region 6 impacted on our workload.
14     Q   When you say impacted, perhaps you might be
15  repeating yourself, but you've said Region 6 is a big
16  region.
17     A   Correct.
18     Q   Because of that, would there be more audits
19  coming out of their region?
20     A   Correct.
21     Q   Because of the problems with respect to that
22  region that we've discussed, are you referring to sort

Page 72

1  of, above and beyond it being your largest region, the
2  impact the problems of Region 6 had on your staff?
3      A   Correct.  Because many things that regions
4  would not argue over when somebody violated our policy is
5  when we tried to maintain neutrality there, would be
6  arguments about how important it was to leave adjectives
7  in that didn't serve any purpose.  We told them, take
8  these things out, we'd have to argue with them about
9  taking certain words out, or if we had a problem with
10  what the criteria was used in the audit, we would do
11  research, we would talk to headquarters office or our
12  general office, they would give us advice.  I would
13  typically rely on that advice.  The region would often
14  argue there was problems, and we were wrong, the OGC is
15  wrong, they're right, and they would fight it to the end.
16     Q   And you mentioned about using the wrong
17  criteria.  What's the significance of that?  What is
18  criteria, how does that play a role in any audit?  Why is
19  that important?
20     A   Criteria is important if you're going to make a
21  recommendation, you have to have a cause and what the
22  cause was and what was violated.  If I have a contract

Page 73

1  that says, I will do X, Y, and Z, and I didn't perform,
2  then we can make recommendations that those funds be
3  recovered.  If there is no contract, and we go by some
4  other criteria that has no relevance to the audit, such
5  as in the case of, I believe it was in the CVR report,
6  there was reference to OMB circular that didn't apply,
7  that applied only to government contracts, not to this
8  type of contract.  We had that argument with the regions,
9  we asked OGC for opinion on that.  They agreed the wrong
10  criteria was being used, but we continued to have to
11  fight the battle that the criteria was wrong, and there
12  was nothing you could do about it.
13     Q   And when you say we had to fight the battle, who
14  ultimately are you fighting with?
15     A   We're fighting with ourselves.
16     Q   Well, who's responsible, again, for the product
17  coming out of that region?
18     A   The Regional Inspector General is responsible
19  for that product that's coming out of the region.  When
20  we have an argument or not an argument, there's a problem
21  between what they say and what we feel is the right
22  criteria, we would usually vet that, have discussions,

Page 74

1  telephone discussions, review the criteria, et cetera,
2  and most Regional Inspector Generals would accept the
3  word of Jim Heist, who was their boss, as far as this is
4  the way it will go. But often in Region 6 it was not the
5  case. Even if Jim Heist said it was wrong, it would
6  still be argued.
7      (Whereupon a discussion was held off
8      the record).
9  BY MS. MELNIK:
10     Q   If I could ask, Mr. McLeod, what's your date of
11 birth?
12     A   10-15-48.
13     MS. MELNIK: That's all I have.
14     EXAMINATION BY COUNSEL FOR PLAINTIFF
15 BY MR. SELDON:
16     Q   Mr. McLeod, these alleged arguments with
17 Mr. Beard's region, were they causing you or your office
18 to neglect work for other work for other regions?
19     A   It would have required us to spend less time
20 looking at other reports, less review time. In terms of
21 neglecting audits, we would have a turn around time where
22 we tried to review the reports in five days. If there's

Page 75

1  additional problematic reports with the region, it might
2  delay the work on other audits, getting comments back to
3  the regions and other regions, yes.
4      Q   Anything come to mind that you recall?
5      A   No. Specifics I don't have.
6      Q   Did your office -- when did it become TOP?
7  2002, something like that?
8      A   I'm not sure of the specific date. Before it
9  even became TOP, we were doing that type of review work
10 with the regions before it was officially designated as
11 TOP.
12     Q   Would it be fair to say for the last few years,
13 however it was designated, Mr. Beard was always the head
14 of Region 6 involved in this process?
15     A   Correct.
16     Q   Did he or his staff become more or less
17 argumentative over the time?
18     A   There were times when he got very argumentative,
19 and if we set a policy through our policy, and they would
20 provide comments that our staff, that my staff was not
21 properly trained, they should have done some audit work
22 in the field. They find the policies being issued as

Page 76

1  insulting.
2      Q   My exact question is, did they get more
3  argumentative over time?
4      A   I would say yes.
5      Q   Did the workload in TOP change, let's say over
6  the last few years you were there?
7      A   In terms of audit report reviews, no.
8      Q   Any other work change in the -- workload change
9  in the last few years?
10     A   Not to my knowledge.
11     Q   And now I take it you left in January of '05?
12     A   January of '05, yes.
13     Q   And Mr. Beard was reassigned in January of '05?
14     A   Yes.
15     Q   I take it, just to wrap this up, for that reason
16 you wouldn't have any personal knowledge of how the
17 workload changed in terms of TOP's workload vis-a-vis
18 Region 6?
19     A   No.
20     MR. SELDON: Okay.
21     (Whereupon the deposition concluded at
22     11:51 a.m., the witness having not

Page 77

1      waived signature).
2      -o0o-

MGB Reporting, Inc.

21 (Pages 78 to 80)

Page 78

## CERTIFICATE OF COURT REPORTER

1
2       I, TRACY E. BARKSDALE, the court reporter before
3   whom the foregoing deposition was taken, do hereby
4   certify that the witness whose testimony appears in the
5   foregoing deposition was duly sworn by me; that the
6   foregoing testimony is a complete, true, and correct
7   transcription of the stenographic notes as taken by me in
8   said manner on said date; that I am neither counsel for,
9   related to, nor employed by any of the parties to the
10  action in which this deposition was taken; and, further,
11  that I am not a relative or employee of any counsel or
12  attorney employed by the parties hereto, nor financially
13  or otherwise interested in the outcome of this action.
14       DATED_____
15
16

17                    _____
                     TRACY E. BARKSDALE, RPR
                     Notary Public for the
18                   District of Columbia
                     My commission expires
19                   November 14, 2011
20
21
22

Page 79

## AFFIDAVIT OF DEPONENT

1
2       I have read the foregoing deposition, which
3   contains a correct transcription of the answers given by
4   me to the questions therein recorded, except as to errors
5   which may be indicated on any attached errata sheet.
6
7                    _____
                     STANLEY J. McLEOD
8
9       Subscribed and sworn to before me this
10  ____ day of _____, 2007, in _____
11
12
13                   _____
                     Notary Public
14
15  My Commission Expires:

16                   _____, 20___
17
18
19
20
21
22

Page 80

1   ERRATA SHEET
2   Case Name: Beard v. Jackson (HUD)
3   Witness Name: STANLEY J. McLEOD
4   Deposition Date: January 5, 2007
5   Page No.  Line No.    Change
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____