Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
D. MICHAEL BEARD,            :
17 Rubins Walk              :
Fredericksburg, VA  22405,   :
                             :
              Plaintiff      : C.A. No. 06-0756 (GK)
                             :
        v.                   :
                             :
ALPHONSO R. JACKSON,         :
Secretary of Housing and     :
Urban Development,           :
451 Seventh Street, S.W.     :
Washington, D.C.  20410,     :
                             :
              Defendant      :
```

Friday, January 5, 2007

The discovery deposition of MICHAEL P. STEPHENS, a

witness called for examination by counsel for the

plaintiff, at the Offices of Robert C. Seldon &

Associates, 1319 F Street NW, Washington, DC, before

Tracy E. Barksdale, Certified Shorthand Reporter and

notary public in and for the District of Columbia,

commencing at 12:04 p.m., when were present on behalf of

the respective parties:

EXHIBIT
tabbies
5

Case 1:06-cv-00756-GK   Document 13-8   Filed 04/23/2007   Page 2 of 12
MGB Reporting, Inc.

2 (Pages 2 to 5)

Page 2

```
 1  APPEARANCES:
 2  On behalf of Plaintiff:
 3    ROBERT C. SELDON, ESQ.
      Robert C. Seldon & Associates
 4    1319 F Street NW
      Washington, DC 20004
 5    (202) 783-3608
 6  On behalf of Defendant:
 7    KAREN L. MELNIK, ESQ.
      Assistant United States Attorney
 8    U.S. Department of Justice
      501 - 3rd Street NW
 9    Washington, DC 20530
      (202) 307-0338
10
      RICHARD K. JOHNSON, ESQ.
11    Deputy Counsel to the Inspector General
      U.S. Department of Housing and Urban Development
12    Office of Inspector General
      451 - 7th Street NW, Room 8260
13    Washington, DC 20410-4500
      (202) 708-1613
14
      TIFFANIE R. SMITH, ESQ.
15    Attorney Advisor
      U.S. Department of Housing and Urban Development
16    Office of General Counsel
      451 - 7th Street SW, Room 10170
17    Washington, DC 20410
      (202) 708-3087
18
    Also Present:
19
      D. MICHAEL BEARD
20
21
22
```

Page 3

```
 1          CONTENTS
 2  EXAMINATION BY:                          PAGE
 3    Counsel For Plaintiff Mr. Seldon         4
      Counsel For Defendant Ms. Melnik         30
 4    Counsel For Plaintiff Mr. Seldon         39
 5
 6  STEPHENS DEPOSITION EXHIBITS *          PAGE
 7    1  Mediation Settlement Agreement Formal
         Complaint                            6
 8
      2  Affidavit                           12
 9
      3  Memo dated January 5, 2005, from James A.
10       Heist to D. Michael Beard           20
11    4  Memo dated February 20, 2002, from
         Michael Phelps to D. Michael Beard  27
12
13  (*Exhibits attached to transcript)
14
15
16
17
18
19
20
21
22
```

Page 4

```
 1         PROCEEDINGS
 2  WHEREUPON,
 3         MICHAEL P. STEPHENS
 4  the witness, called for examination by counsel for the
 5  plaintiff, and, after having been sworn by the notary,
 6  was examined and testified as follows:
 7       EXAMINATION BY COUNSEL FOR PLAINTIFF
 8  BY MR. SELDON:
 9    Q  Good afternoon, Mr. Stephens.
10    A  Good afternoon.
11    Q  For the record, please give us your full name.
12    A  Sure. Michael P. Stephens, S-t-e-p-h-e-n-s.
13    Q  And you are the Deputy Inspector General of the
14  Office Inspector General for the Department of Housing &
15  Urban Development?
16    A  I am.
17    Q  Mr. Stephens, you know from another case that we
18  don't ask law enforcement officers for their home
19  addresses. If you will agree that, even if you're no
20  longer with the federal government, the U.S. Attorney's
21  Office could accept service of a subpoena for you, is
22  that still okay?
```

Page 5

```
 1    A  Sure.
 2    Q  I'm going to try and save some time for you here
 3  again, because it wasn't that long ago that we spent five
 4  minutes going over the ground rules for these.
 5       If you remember them, or if you don't want me to
 6  go over them, I'd be glad to pass on that.
 7    A  Okay.
 8    Q  And let's save some more time. I think we've
 9  gone over your career history, at least for the most
10  part, in a recent deposition. Anything change?
11    A  No, sir.
12    Q  Any reason to bother to go over it again?
13    A  Not on my account.
14    Q  Okay. Save about ten minutes.
15       What this case concerns, just so we have it on
16  the record, as I'm sure you know, is Michael Beard's
17  complaint that's presently pending in federal court and
18  the administrative process that preceded it.
19       What I'm going to do first is give you a copy of
20  a document which we'll ask to have marked as Stephens
21  Exhibit 1, and if you recall, the reporter will mark it,
22  give you the official one, and I'll provide counsel a
```

Case 1:06-cv-00756-GK    Document 13-8    Filed 04/23/2007    Page 3 of 12
MGB Reporting, Inc.

3 (Pages 6 to 9)

Page 6

1  courtesy copy.
2    (Thereafter Exhibit 1 was marked for
3    identification).
4  BY MR. SELDON:
5    Q   Mr. Stephens, do you recognize this document?
6    A   I do.
7    Q   And just for the record, what is it?
8    A   It looks like a mediation agreement on a EEO
9  case that was filed by Michael Beard against Secretary
10 Mel Martinez.
11   Q   Your signature appears on the final page, I take
12 it, page 4?
13   A   Yes.
14   Q   How did you come to be involved in this matter?
15   A   Well, in issues of mediation, EEO cases, I am
16 generally asked to be involved regarding what position
17 the OIG wants to take regarding mediation and settlement,
18 and as I recall, that was the case in this one.
19   Q   Do you recall going into this mediation your
20 being briefed by Mr. -- I use briefed in the loosest
21 sense of the word -- being briefed by Mr. Phelps or
22 Mr. Heist what their issues were with Mr. Beard?

Page 7

1    A   Well, I would like to clarify something.
2    Q   Sure. Please do.
3    A   I'm not sure I was involved in the mediation. I
4  don't recall whether there was a --
5    Q   Let me rephrase --
6    A   -- mediation meeting.
7    Q   Let me rephrase.
8        Whether or not there was a meeting is not really
9  the focus of my question. Let's strike that and start
10 again.
11       Do you recall, before you executed this
12 settlement agreement, what issues Mr. Phelps and/or
13 Mr. Heist had with Mr. Beard?
14   A   In relation to this complaint?
15   Q   Yes. Well, actually, let's just say this.
16   A   No, I don't.
17   Q   I believe this agreement resolved more than just
18 an EEO complaint. It also resolved any potential
19 grievance or any other action he might have?
20       Let's try again. Let's say without regard to
21 the complaint or without regard to the grievance, do you
22 recall any agreement by Mr. Heist or Mr. Phelps about

Page 8

1  their issue about Mr. Beard at any time before you
2  executed the settlement agreement?
3    A   Not really, no. I don't.
4    Q   Do you recall learning about them during the
5  course of the mediation process?
6    A   No, I don't.
7    Q   It talks about on page 2 here under paragraph
8  4th, the department, I assume for this case, OIG, agrees
9  to remove a letter of reprimand issued to Mr. Beard.
10       Do you recall anything about that letter of
11 reprimand at all?
12   A   It's vague. I believe it had something to do
13 with Mr. Will Nixon, but no, sir, I don't have the
14 specifics in mind. I'm sorry.
15   Q   And can you tell us in your own words what
16 removing the letter of reprimand issued to Mr. Beard,
17 what that was to accomplish, in your own words.
18   A   Well, at the date, let me see, seems fairly soon
19 after I came on the job, I believe I came in January of
20 '02, so not quite right after I came on the job, but I
21 thought it was important to try to clear the air, move
22 on. Sometimes in the decision process for a new manager

Page 9

1  of an organization to look at it and say, well, we could
2  go on and on with this, or we can make a decision to move
3  forward, and as I recall, that was my motivation.
4    Q   Okay. Would it be fair to say then that the aim
5  was, whatever was in that letter of reprimand, that the
6  letter of reprimand as well as the substance of it in the
7  past, that that was the purpose of this agreement, as you
8  understood it?
9    A   I don't understand the question.
10   Q   Sure. Let's take it one by one.
11       I think we can see from here that the agreement
12 was to remove the letter of reprimand?
13   A   Oh, I think Mr. Beard had a real problem having
14 a letter of reprimand.
15   Q   Right. And then the second question I'm asking,
16 was it also the aim of putting the substance of the
17 letter of reprimand to bed?
18   A   No.
19   Q   No? Okay. So what did you think then was
20 surviving about the substance?
21   A   I don't recall what the substance of the letter
22 of reprimand was. Do you have it? Might be helpful if I

Case 1:06-cv-00756-GK    Document 13-8    Filed 04/23/2007    Page 4 of 12
MGB Reporting, Inc.

4 (Pages 10 to 13)

Page 10

1  saw it.
2      Q   Could probably find it.
3      A   So it would be difficult for me to determine.
4      Q   Okay. So you -- we may have to, but I'd rather
5  not take a break if I could avoid it, for your sake.
6      The aim was to remove the letter of reprimand
7  from his file?
8      A   That's what it says here in the agreement.
9  agrees to remove.
10     Q   But are you saying that there was no
11  understanding on your part that the substance of the
12  letter of reprimand would be --
13     MR. JOHNSON: I think it's been asked and
14  answered.
15     MR. SELDON: I'm just making sure he's right.
16     THE WITNESS: I can't say without looking at the
17  letter of reprimand. I may need it to refresh my memory.
18  BY MR. SELDON:
19     Q   Okay. The third paragraph, department agrees to
20  include the complainant's write-up of his accomplishments
21  in the annual appraisal.
22     Do you recall what that's all about? Sorry, not

Page 11

1  the third paragraph, the third section of the fourth
2  paragraph.
3      A   I don't recall what that was all about.
4      Q   Paragraph 4, do you recall what that's all
5  about?
6      A   No. Only what I can derive from the sentence,
7  but I don't recall what that's all about.
8      Q   All right. I'll probably find the letter of
9  reprimand.
10     Do you know one way or the other whether, before
11  this agreement was executed by you, whether Mr. Beard was
12  counseled in performance or conduct by Mr. Phelps or
13  Mr. Heist?
14     A   No, I do not.
15     (Pause in proceedings).
16  BY MR. SELDON:
17     Q   On the second page, fourth paragraph, paragraph
18  4, destroying the normal chain of command relationship.
19     Do you know, have any recollection what that's
20  all about?
21     A   No, I don't, other than what I can surmise from
22  this. I don't know what that really referred to. Back

Page 12

1  then I probably would have, but not now.
2      Q   And then I think we went on, I think we did ask
3  you if you knew before this was entered into, this
4  agreement, if Mr. Heist or Mr. Phelps had counseled
5  Mr. Beard about his performance or conduct, and your
6  answer was?
7      A   I don't know.
8      Q   Okay. No recollection?
9      A   (Shakes head).
10     Q   Just to establish in this particular case, I
11  take it that the Office of Audit is also under your
12  supervision as Deputy Inspector General?
13     A   Correct.
14     Q   Let's put in second, I'll give the reporter one
15  to mark and to give to you.
16     (Thereafter Exhibit 2 was marked for
17     identification).
18  BY MR. SELDON:
19     Q   Ask you to identify this document for us,
20  please.
21     A   This is an affidavit that I signed dated
22  10-5-05.

Page 13

1      Q   In connection with Mr. Beard's administrative
2  complaint?
3      A   Yes. To the EEO investigator.
4      Q   This is going to seem like a very funny
5  question, but would you look at page 2, please. Is that
6  your signature?
7      A   Yes.
8      Q   Okay. So far you're the first person to answer
9  that question in the affirmative.
10     A   Well, that's a facsimile of my signature, it's a
11  copy of my signature.
12     Q   What I'd like to do is look to the second
13  paragraph on the first page, the last line, they, meaning
14  Mr. Heist and Mr. Phelps, had kept you, quote, informed
15  about their concerns about the complainant's managerial
16  abilities for years. Just that part of it.
17     What I'd like to do, first of all, if you --
18  what period of time are you referring to when you said
19  they kept you informed about their concerns of the
20  complainant's managerial duties for years?
21     A   I don't know what that would refer to. I think
22  most people would say years is a plural, which would

Case 1:06-cv-00756-GK    Document 13-8    Filed 04/23/2007    Page 5 of 12
MGB Reporting, Inc.

5 (Pages 14 to 17)

Page 14

1  probably mean two. Other than that --
2     Q    But nothing comes to mind?
3     A    No.
4     Q    Two or more is the idea?
5     A    I would think.
6     Q    But nothing comes to mind, specifically, I take
7  it?
8     A    No. Like the date that they started and the
9  date they ended.
10    Q    And when you said they had informed you about
11 their concerns about complainant's managerial duties for
12 years, what complaints about Mr. Beard's managerial
13 duties do you recall?
14    A    Demeanor, attitude in fighting with
15 headquarters, disagreeable, borderline insubordinate,
16 poisoning the well of the atmosphere of the Fort Worth
17 office against headquarters' directions, argumentative,
18 uncooperative.
19    Q    Anything else?
20    A    Refusing to take orders.
21    Q    Anything else come to mind?
22    A    I think that summarizes it.

Page 15

1     Q    And in the previous sentence it says that
2  Mr. Heist and Mr. Phelps had informed you that, quote,
3  they had lost confidence in the complainant's ability to
4  manage his region, end quote.
5        Is that anything different from what you just
6  talked about?
7     A    Well, no, because when you are the manager of a
8  region, you set the tone, and you're the example for your
9  employees under you. So I don't think it makes much
10 difference.
11    Q    Do you definitely recall them saying to you in
12 sum or substance that Mr. Beard refused to take orders?
13    A    Perhaps not in -- I don't recall those exact
14 terms, but they did use the terms he was told to do A, B,
15 and C, and he ended up doing C, D, and F. In any
16 headquarters/field relationship, we expect a reasonable
17 openness for dialogue, discussion, disagreement, but they
18 have a right to voice their opinions, but when it's
19 finally decided on at the headquarters level, this is the
20 way it will be, they're expected to understand that the
21 decision's been made.
22    Q    Do you recall Mr. Heist or Phelps telling you in

Page 16

1  sum or substance that Mr. Beard had not followed a final
2  decision that was made by headquarters?
3     A    I believe on several occasions, but I don't have
4  the specifics what those were.
5     Q    You do recall or not recall that they did in sum
6  or substance, whether you can remember the examples, that
7  is what they told you?
8     A    Yes.
9     Q    Do you recall them ever telling you that at any
10 point Mr. Beard had refused to issue an audit that he was
11 directed not to -- I'm sorry. Let's go back.
12       Do you recall in sum or substance Mr. Heist or
13 Mr. Phelps telling you that Mr. Beard refused to issue an
14 audit that he was told to issue?
15    A    It wasn't an audit. It was a report in which
16 they determined whether they should an audit or not.
17 It's called scoping. I recall, I don't have the name of
18 the entity, but I recall they said they wanted a report
19 which they use to determine whether to do an audit or not.
20    Q    And do you recall --
21    A    And I believe it never came.
22    Q    In other words, you believe that they told you

Page 17

1  that Mr. Beard had not followed that direction?
2     A    Those are your words, not my words.
3     Q    I'm asking you if you recall it that way.
4     A    Say it again.
5     Q    Do you remember, recall that they told you that
6  they had directed Mr. Beard —
7     A    I think I just told you as clear as a bell.
8     Q    I'm just trying to understand. I can go back
9  and have it read back.
10       Maybe we should do that. We should read
11 Mr. Stephens' answer back.
12       (Thereafter the requested material was
13       read by the court reporter).
14 BY MR. SELDON:
15    Q    Okay. And is it your recollection that the
16 reason it never came was because of some failure to act
17 on Mr. Beard's part?
18    A    It never came. That was Mr. Beard's
19 responsibility. That's as to my recollection.
20    Q    That's fine. I think you mentioned you had been
21 informed by Mr. Phelps and/or Mr. Heist that Mr. Beard
22 had poisoned the atmosphere in Region 6?

Page 18

1   A   I don't think those were my words.
2   Q   I mean I wrote that down.
3   A   Mr. Phelps or I said so.
4   Q   I thought you had given me this in response to
5   my question, which was what did they tell you about his
6   abilities over the years?
7   A   That was, I don't know if that was their exact
8   words or part of my interpretation.
9   Q   Okay.
10  A   So I don't know whether that was a direct quote
11  from them or not.
12  Q   Oh, I wasn't suggesting it was.
13      Do you recall what they informed you about that
14  led you to that conclusion or that belief?
15  A   Just, you know, an accumulation of many
16  discussions. I know that Mr. Will Nixon, who is a
17  supervisor down there, was involved and seemed like in
18  general debate with headquarters and had authored some
19  e-mails in which they were caustic, unprofessional in
20  tone, and then I believe Mike supported that when they
21  asked him to counsel Mr. Nixon. I believe he supported
22  Mr. Nixon and his tone and demeanor.

Page 19

1       I had another opportunity to hold a conference
2   call on an audit with Mr. Nixon's wife. I don't recall
3   her first name, who was also an auditor there, about a
4   particular audit, and she was very upset and caustic and,
5   I thought, unprofessional.
6       On my visits to Fort Worth on occasion, I can't
7   tell you how many times I went down there. I don't know,
8   three or four perhaps, I traveled around the country to
9   meet with employees and managers and give them an
10  opportunity to ask me questions that they might have.
11  Perhaps we can clear some things up on a headquarters
12  level, and after leaving Fort Worth, I felt that the tone
13  of the employees were a bit combative. I compare that to
14  other places that I've been, and one seeks to find the
15  answer to that type of climate, and I believe that
16  Mr. Heist and Mr. Phelps, who ran the day-to-day
17  operations of the Office of Audit, felt that that climate
18  was instilled by the manager, Mr. Beard, and promoted by
19  him and was allowed, they felt confident.
20  Q   And is that then what you relied on their
21  explanation -- strike that.
22      Let's take a look at, let's mark as Exhibit 3.

Page 20

1       (Thereafter Exhibit 3 was marked for
2       identification).
3   BY MR. SELDON:
4   Q   This is a document which I'll represent to you
5   is the memorandum that was given to Mr. Beard by
6   Mr. Heist, effecting his reassignment.
7       Was this document reviewed by you?
8   A   It was not.
9   Q   Just so it's clear, third page is a memo that
10  allows Mr. Beard to accept or decline the reassignment.
11      I take it that -- let's go back to your EEO
12  statement, you talked about concurring in the decision to
13  reassign Mr. Beard. Was it presented to you that the
14  decision for you to concur in was specifically to
15  reassign Mr. Beard?
16  A   Yes.
17  Q   And was it presented to you to reassign
18  Mr. Beard to Washington, DC?
19  A   Yes.
20  Q   Was that presented to you on the basis of
21  performance and/or conduct or which?
22  A   Well, I think a multitude of things. One, a

Page 21

1   decision had been made by the Office of Audit that they
2   had no confidence in him continuing as the boss in
3   Fort Worth and that they had a position that they needed
4   him in Washington, DC.
5   Q   What position did they explain to you that they
6   needed Mr. Beard to do? They being Mr. Heist and/or
7   Mr. Phelps.
8   A   I believe it's called special assistant to
9   Mr. Heist.
10  Q   Mr. Heist being --
11  A   The Inspector General Audit.
12  Q   Did they tell you, either one, what Mr. Beard
13  would be doing?
14  A   Not specifically.
15  Q   Do you recall generally?
16  A   Special projects, things that Mr. Heist needed.
17  Q   Did they give you any indication what those
18  projects would be?
19  A   No.
20  Q   Was this position encumbered before Mr. Beard
21  was placed into it?
22  A   I don't know. What do you mean by the word

Case 1:06-cv-00756-GK    Document 13-8    Filed 04/23/2007    Page 7 of 12
MGB Reporting, Inc.

7 (Pages 22 to 25)

Page 22

1  encumbered?
2    Q   Let's put it this way. Was someone in that
3  position before Mr. Beard?
4    A   Well, there is another special assistant;
5  Mr. Heist has, I believe, one or two. I'm not sure. I
6  don't think the position that he took someone had it
7  before.
8    Q   Did Mr. Heist or Mr. Phelps explain to you why
9  they needed another special assistant?
10   A   No.
11   Q   Did you intend that the Regional Inspector
12  General position Mr. Beard would be vacating would be
13  filled permanently?
14   A   Yes.
15   Q   Did you have any concern about whether this
16  would essentially be using FTE for Mr. Beard to do a job
17  that, to your recollection, had previously not been
18  performed?
19   A   Not at all.
20   Q   Did it bother you, concern you in any way that
21  there were any shortages in audit staff that couldn't be
22  filled by doing this?

Page 23

1    A   Not at all. I have great confidence in
2  Mr. Heist, and if he felt he said he had a position which
3  he needed Mr. Beard in headquarters, I felt confident
4  that was accurate.
5    Q   Did you feel in any way, one way or the other,
6  you were told that by reassigning Mr. Beard, there would
7  need to be another auditor hired to replace him?
8    A   No. I don't think that's what occurred.
9    Q   Would the selection of a Regional Inspector
10  General be something that would ultimately come to you to
11  approve?
12   A   Yes.
13   Q   Did there come a point in time where you were
14  asked to approve, by that I mean in the broadest sense,
15  you might have interviewed or just concurred to approve
16  the selection of a Regional Inspector General for
17  Region 6 after Mr. Beard was relieved of that
18  responsibility?
19   A   Yes.
20   Q   When was that?
21   A   A while ago.
22   Q   Do you recall whose selection you were asked to

Page 24

1  approve?
2    A   Frank Baca, B-a-c-a, I believe is the spelling.
3    Q   Was that something you actively participated in,
4  or was that something you concurred in when presented to
5  you?
6    A   Concurred when presented.
7    Q   Had Mr. Baca previously been with your
8  organization?
9    A   Yes, he had.
10   Q   In what capacity?
11   A   He was the Regional Inspector General for Audit
12  in Seattle, Washington.
13   Q   Did it come to you then to have some involvement
14  in the selection for permanent replacement then for
15  Mr. Baca?
16   A   He wasn't replaced.
17   Q   That's what I was about to ask you next.
18  Seattle was merged with something else?
19   A   Yes.
20   Q   What office was that again? I'm not sure.
21   A   Los Angeles, I think.
22   Q   Did Mr. Phelps and/or Mr. Heist ever seek your

Page 25

1  concurrence for approving a direct reassignment for any
2  other head of an audit division or region, other than
3  Mr. Beard?
4    MR. JOHNSON:  Could you repeat that? I just
5  missed your words.
6    MR. SELDON:  Make it easier. Just pretend I
7  didn't ask that question at all.
8    Q   Did Mr. Heist or Mr. Phelps seek your
9  concurrence for directing the reassignment of the head of
10  an audit division or region other than Mr. Beard?
11   A   Yes.
12   Q   Who was that?
13   A   I believe it's Mimi Lee. I think that's the
14  correct name.
15   Q   And I assume Sandra Ileon as well or no?
16   A   That's correct.
17   Q   Ms. Lee, do you recall the circumstances that
18  led up to her being given a director reassignment?
19   A   I don't. I really don't. That goes back, I
20  think, early on. I think she was in San Francisco, and I
21  couldn't even tell you where they were going to reassign
22  her. I just don't recollect.

Case 1:06-cv-00756-GK    Document 13-8    Filed 04/23/2007    Page 8 of 12
MGB Reporting, Inc.

8 (Pages 26 to 29)

Page 26

1    Q    Does it stimulate your recollection one way or
2    the other that the Office of Audit was being moved from
3    San Francisco to Los Angeles?
4    A    That helps. I think what occurred there was a
5    realignment or redivision of offices and what states they
6    covered. It's vague.
7    Q    Okay. I'll just ask, is there anything else?
8    Again, if you don't remember, it's fine. Do you recall
9    anything about Ms. Lee's office being moved from
10   San Francisco to Los Angeles as being what triggered a
11   reassignment?
12   A    I did not.
13   Q    Okay. Part of this case involves information
14   that was imparted to outside, one or more outside
15   agencies that Mr. Beard applied to for jobs. Is that
16   anything you have any knowledge of one way or the other?
17   A    I was told --
18       MS. MELNIK: I'm going to just object if he was
19   told. In conferences with lawyers --
20   BY MR. SELDON:
21   Q    Yes.
22   A    I have no personal knowledge.

Page 27

1    Q    And no personal involvement in that?
2    A    No.
3        MR. SELDON: Why don't we take five.
4        (Pause in proceedings).
5        MR. SELDON: Let's mark this as Exhibit 4.
6        (Thereafter Exhibit 4 was marked for
7        identification).
8    BY MR. SELDON:
9    Q    Mr. Stephens, do you recognize this document?
10   A    I do not.
11   Q    Okay. Let's just leave that in as Exhibit 4,
12   and we'll go on.
13       There's a concept called return on investment in
14   the Inspector General's Office; is that right?
15   A    Yes.
16   Q    Could you explain what that is, please. And I'm
17   talking about in terms of the performance of either the
18   Inspector General's Office or divisions of it.
19   A    Well, return on investment is one term that's
20   used in the Inspector General's community to talk about
21   performance and ability to recover funds that were
22   misused in some way.

Page 28

1    Q    How does that relate to the concept of return on
2    investment?
3    A    I'm not --
4    Q    You had said that there is an ability to recover
5    funds that were misused. So is there something more than
6    gross amount of funds recovered, or am I wrong?
7    A    Return on investment is normally equated on this
8    form, and it is really an equation out of Government
9    Accounting Office, and that is whatever an agency is
10   budgeted, an IG shop, versus what they're able to
11   recover, and then come up with a numerical equation of
12   costs, this much money to do business as an IG shop, and
13   this is what you recovered, and so it's a way to judge
14   the value, one of the tools.
15   Q    Is it an important way of judging the value of
16   what's going on in an IG shop?
17   A    It's one of the tools.
18   Q    Do you know, can you think of any, sitting here,
19   that are more important?
20   A    Sure.
21   Q    If you could just identify what they are, by
22   name, that would be fine.

Page 29

1    A    Audit findings, criminal indictments,
2    recommendations to the department or other entities to
3    change their manner of operation.
4    Q    Okay. Would that be the list of tools that are
5    of equal or greater importance than return on investment,
6    or are there any others?
7    A    Let me hear the question again.
8    Q    I think you had referred to return on investment
9    as a way of -- I have to go in my words -- of, correct me
10   if I'm wrong, measuring the performance of an IG officer,
11   or is that wrong?
12   A    It is a -- one of the tools that are used.
13   Q    To measure performance?
14   A    Yes.
15   Q    And then I asked you were there any others of
16   equal or greater importance, and I think you mentioned
17   audit findings, indictments returned, recommendations to
18   change program operations, and what I was saying only
19   was, were there any others that came to mind?
20   A    Proposed legislation relationships with the
21   department and Congress. There are probably others.
22       MR. SELDON: Okay. I don't have any more

Case 1:06-cv-00756-GK    Document 13-8    Filed 04/23/2007    Page 9 of 12
MGB Reporting, Inc.

9 (Pages 30 to 33)

Page 30

1  questions.
2      EXAMINATION BY COUNSEL FOR DEFENDANT
3  BY MS. MELNIK:
4      Q  Mr. Stephens, towards the beginning of
5  Mr. Seldon's questions he was asking about poisoning,
6  about the poisoning of the atmosphere at Region 6, and
7  one of the examples you gave was Mr. Will Nixon's, this
8  continuous debate that he had with headquarters and that
9  he authored some caustic, unprofessional e-mail.
10      Do you recall talking about that?
11      A  I do.
12      Q  To whom were these e-mails sent? I mean, what
13  entity? If you remember individuals, that's fine, but if
14  you don't, generally who were these e-mails from
15  Mr. Nixon sent to?
16      A  Headquarters in Audits, which I believe would
17  have been TOP, the agency that oversees the -- which is a
18  quality control unit for audit work. Specifically I
19  don't know.
20      Q  And you said that Mr. Nixon's behavior was being
21  supported. Supported by whom, and what did you mean by
22  that?

Page 31

1      A  Well, with -- Mr. Nixon is a manager in
2  Fort Worth. His boss was Mike Beard, who had overall
3  responsibility of everything that was occurring in that
4  region, and I believe that that environment was fostered
5  not only with Mr. Nixon but others that headquarters
6  doesn't know what they're doing and that I will fight
7  them for you.
8      Q  When you say I will fight them --
9      A  Mr. Beard will take the torch and fight
10  headquarters for you. I will support you in your battles
11  with headquarters.
12      Q  You mentioned how you actually went to
13  Fort Worth and noticed or felt that the tone of the
14  employees was combative compared to other places you had
15  visited.
16      What other places were you talking about?
17      A  I probably have been in the last five years to
18  every region in the country, some of them two or three
19  different times, visiting investigations and audit
20  offices, and my involvement was the same, to meet with
21  the employees. And compared to those experiences, my
22  overall feeling was, when I left Fort Worth, is that

Page 32

1  there was a climate of, let's take them on, of
2  disgruntled, disgruntled people.
3      Q  Why would the -- that kind of attitude or
4  climate at the region, why is that problematic to your
5  organization?
6      A  Well, it's problematic, I think, to any
7  organization.
8      Q  I want to know specifically why it's problematic
9  to yours.
10      A  Well, the issue is that you expect your managers
11  to understand that the direction has to come from
12  headquarters. Mr. Donahue and I and the senior staff set
13  the tone and the priorities and the policies, and we
14  expect the managers in the field to implement those and
15  to support those, and when you have a region in which you
16  feel that is working against you, and that it's fairly
17  open and vocal about their disagreements and demeanor of
18  headquarters, it becomes a contagious thing, and that's a
19  concern to us, it becomes incumbent upon us to try to evaluate
20  what the reasons are for that, and after a significant
21  period of time, we determined part of the major reason
22  was because of Mr. Beard's attitude towards headquarters,

Page 33

1  and his employees felt comfortable joining in.
2      Q  You were asked a lot of questions with respect
3  to what you learned about the problems with Mr. Beard and
4  his management and audits from Mr. Heist and Mr. Phelps.
5  What, if any, firsthand interaction, whether it be via
6  e-mail, telephone call, memoranda, where you've learned
7  for yourself firsthand about the things that you had been
8  learning from Mr. Heist and Mr. Phelps?
9      A  What comes to mind, there was an audit on CPD,
10  which is Community Planning & Development, that's a
11  division with HUD headquarters, in which a draft was
12  presented to HUD headquarters.
13      Q  From whom?
14      A  By whom?
15      Q  From or by whom?
16      A  By Mr. Beard, and there was great concerns by
17  the auditee and others that there were significant
18  inaccuracies in that report. Mr. Donahue asked me
19  personally to get involved in my position and resolve it.
20      Q  What's Mr. Donahue's position?
21      A  Mr. Kenneth Donahue, D-o-n-a-h-u-e, is the
22  Inspector General.

Case 1:06-cv-00756-GK    Document 13-8    Filed 04/23/2007    Page 10 of 12
MGB Reporting, Inc.

10 (Pages 34 to 37)

Page 34

1   Q   What did Mr. Donahue request of you?
2   A   He asked me to get involved and resolve it.
3   Q   Had he ever asked you to personally get involved
4 in a draft audit for one of your regions before that?
5   A   No.
6   Q   Has he ever since?
7   A   No.
8   Q   As a result of Mr. Donahue asking you personally
9 to intervene in the CPD audit, what kind of steps had to
10 be taken, impact on the organization because of that?
11   A   Well, I met with Mr. Heist and Mr. Phelps, and I
12 asked them what would be the best way to resolve this.
13 We decided collectively to bring in other auditors from
14 other regions, and we did so at considerable cost and
15 time, took away from their current assignments. I think
16 it took them probably 60 or 90 days to resolve the
17 issues, and we finally were able to publish the audit.
18   Q   I know, understand that sitting here, you
19 probably are unable to recount each and every instance or
20 every e-mail or communication that you had with respect
21 to Mr. Beard and the reasons which ultimately brought
22 Mr. Beard to Washington, but if you could describe as

Page 35

1 best you're able the reasons why as an organization you
2 believed it necessary to remove him from a supervisory
3 position.
4   A   I rely heavily on my senior staff, Mr. Phelps
5 and Mr. Heist ran the daily operations of the Office
6 Audit. Other members of the senior staff talked to me,
7 talked to me about personnel issues in every region,
8 Mr. Phelps and Mr. Heist, the frequency in relation to
9 Mr. Beard's demeanor, his relationship with headquarters,
10 the issues, the technical issues that were found in his
11 audit work --
12   Q   Technical issues meaning what?
13   A   Meaning there was trouble with the technical
14 side with his audit work. In other words, conclusions
15 were made in his audit that were not supported by the
16 evidence. And it was an accumulation over a period of
17 time, and I think with the CVR on it, I believe it was --
18 it was clear that there was no other alternative but to
19 remove him. That in combination to his combative style
20 and his constant disagreements with headquarters was a
21 great concern to us as well as the effect it was having
22 on the employees in that region.

Page 36

1   Q   Mr. Stephens, what's your date of birth?
2   A   12-5-47. 59.
3   Q   Years old? And the person who replaced
4 Mr. Beard out of Region 6, Mr. Baca, do you know how old
5 he is, 40's, 50's, what decade?
6   A   50's.
7   Q   Not the decade he was born, just how old he is.
8   A   He's in his 50's.
9   Q   And since Mr. Baca took over as the regional
10 auditor, regional director out at Region 6, what, if any,
11 problems have you had with Region 6?
12   A   I've had no problems with Region 6. I've not
13 heard from Mr. Phelps -- well, Mr. Phelps has retired,
14 from Mr. Guinn, who took over Mr. Phelps' position, and
15 Mr. Heist of any issues regarding Frank Baca, and I have
16 reviewed some of the audit work that they've done, and it
17 is very good.
18   Q   Did Mr. Beard's age play any role in either your
19 decision or concurrence in the decision to have him moved
20 out of his supervisory position in Region 6 to
21 headquarters?
22   A   No, it did not.

Page 37

1   Q   Did your knowledge of his prior -- let me ask
2 you this. One moment.
3      (Whereupon a discussion was held off
4      the record.)
5 BY MS. MELNIK:
6   Q   Strike that. Let me ask you this question.
7      Did your knowledge of his prior EEO activity,
8 which eventually led to that settlement that you entered
9 into during the first year of your tenure, did that play
10 any role or have any impact at all in your decision to
11 move Mr. Beard from Region 6 to headquarters?
12   A   No, it did not.
13      (Whereupon a discussion was held off
14      the record).
15 BY MS. MELNIK:
16   Q   Let me just ask you, going back to the
17 settlement agreement you entered into back in, I think it
18 was November of '02, and approved on December 4th, '02,
19 by director of EEO. What was your attitude, your
20 thinking about resolving this EEO matter with Mr. Beard?
21      MR. SELDON: Objection. Asked and answered
22 several times.

Page 38

BY MS. MELNIK:

Q    But you can answer.

A    Well, I do think that there were times that you have to put things behind you and move forward, with hopes of making progress as far as relationships, as far as let's get down to we can concentrate on the audit work. That was clearly the motive behind that.

Q    Are you aware of any other, besides the settlement agreement that you signed with respect to that reprimand, you didn't have, you didn't recognize that document as the reprimand, but the settlement that you signed was in connection with having a reprimand removed from Mr. Beard's file, you're aware of that through reading the settlement itself; is that correct?

A    Right.

Q    Are you aware of any other EEO activity of Mr. Beard, as you sit here?

A    Just this one here.

Q    Okay. Meaning the case at issue?

A    The case at issue.

MS. MELNIK: I think that's all.

MR. SELDON: I just have a couple other

Page 39

questions.

EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. SELDON:

Q    The Community Planning & Development or CPD audit that you discussed a moment ago with AUSA Melnik, Mr. Stephens, how did you learn about that audit having been given to CPD first?

Let me rephrase that question. How did you first learn of that audit being given to CPD?

MS. MELNIK: Object to the form.

MR. SELDON: I'll rephrase it if you tell me how.

MR. JOHNSON: I'm not sure of the question.

MR. SELDON: He had said there was an audit given to CPD.

MR. JOHNSON: Right.

MR. SELDON: I just said how did he first learn of it.

THE WITNESS: I don't recall. It was a draft audit.

BY MR. SELDON:

Q    Do you recall how you first learned of that

Page 40

being given to CPD?

A    I just answered that.

Q    Well, when you changed to draft audit, I just wanted to make sure it didn't change your answer.

A    I don't recall.

Q    Do you recall whether it was first, second, or whatever order it was in at some point learning more about this draft audit being given to CPD by Mr. Heist or Mr. Phelps?

A    I have no recollection of who told me.

Q    Do you recall anything that either of them -- do you have any recollection of either of them telling you anything about this draft audit and its dissemination to CPD?

A    Well, that's a two-part question.

Q    Trying to make it quicker.

A    I do recall that the recipients of the draft audit were not happy with the proof offered for the conclusions.

The second part about the dissemination, I have no clue. I don't know.

Q    Just to be clear, the focus of my question was,

Page 41

maybe you've answered it; if so, we'll move on.

The focus of my question was do you remember Heist or Phelps telling you anything, and you said that you remember the recipients of the draft audit not being happy with the proof. Is that something you recall Heist or Phelps telling you?

A    I don't remember which one, but one of the two.

MR. SELDON: I think we've got it.

(Whereupon the deposition concluded at 1:42 p.m., the witness having not waived signature).

-o0o-

6

6