UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

D. MICHAEL BEARD,
17 Rubins Walk
Fredericksburg, VA 22405,

Plaintiff : C.A. No. 06-0756 (GK)

v.

ALPHONSO R. JACKSON,
Secretary of Housing and
Urban Development,
451 Seventh Street, S.W.
Washington, D.C. 20410,

Defendant

CONDENSED

Wednesday, February 14, 2007

The discovery deposition of JAMES ALAN HEIST, a witness called for examination by counsel for the plaintiff, at the Offices of Robert C. Seldon & Associates, 1319 F Street NW, Washington, DC, before Tracy E. Barksdale, Certified Shorthand Reporter and notary public in and for the District of Columbia, commencing at 9:30 a.m., when were present on behalf of the respective parties:

EXHIBIT 6

APPEARANCES:
On behalf of Plaintiff:
ROBERT C. SELDON, ESQ.
Robert C. Seldon & Associates
1319 F Street NW
Washington, DC 20004
(202) 783-3608
On behalf of Defendant:
KAREN L. MELNIK, ESQ.
Assistant United States Attorney
U.S. Department of Justice
501 - 3rd Street NW
Washington, DC 20530
(202) 307-0338

RICHARD K. JOHNSON, ESQ.
Deputy Counsel to the Inspector General
U.S. Department of Housing and Urban Development
Office of Inspector General
451 - 7th Street NW, Room 8260
Washington, DC 20410-4500
(202) 708-1613

Also Present:

D. MICHAEL BEARD

I-N-D-E-X

WITNESS
JAMES ALAN HEIST
Examination By: PAGE
Counsel for Plaintiff Mr. Seldon 4
Counsel for Defendant Ms. Melnik 111
Counsel for Plaintiff Mr. Seldon 119

Deposition Exhibits PAGE
1 Management Assistance Review Report on Region 6 46
2 Regional Ranking for fiscal year 2005 47
3 Office Ranking FY 2004 goals 48
4 Page from Excel spreadsheet 48
5 Manual chapter 1430.1 entitled Performance Appraisal Program 50
6 Document 53
7 Affidavit 59
8 Memorandum 69
9 Performance Appraisal form 92
10 Talking points 107
11 Award recommendation for performance and incentive award 122
(*Exhibits attached to transcript)

P R O C E E D I N G S

JAMES ALAN HEIST,

the witness, called for examination by counsel for the plaintiff, and, after having been sworn by the notary, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE PLAINTIFF

BY MR. SELDON:

**Q Mr. Heist, good morning.**
A Good morning.
**Q For the record, please give us your full name.**
A James Allen Heist.
**Q And I take it you're employed by the Department of Housing & Urban Development?**
A Yes.
**Q Office of OIG?**
A Yes. Assistant inspector general for audits.
**Q Mr. Heist, I'm going to do, first of all, what we've done before. We've either got to ask you for your home address now in case we need to serve you a subpoena, or you can agree that whether or not you are still employed with the government, if a subpoena is needed for your appearance at trial or a deposition in lieu of**

**trial, the Assistant United States Attorney then assigned to defend the case could accept service of process for you.**
**Which way would you prefer to go? You're not -- she's not responsible for producing you; she would simply accept the subpoena.**
A That would be my preference.
**Q Fine. We don't need your home address.**
**Here are the ground rules. I know we've gone over it before, but we'll do it again so we have it all in once place.**
**We, as you know, represent the plaintiff in this action, Mr. Beard is an employee in the same office of the Office of Inspector General at the Office for Audit. Mr. Beard presently has a suit in United States District Court for the District of Columbia, claiming a couple things, which my recollection is, among other matters, is reassignment from his position heading the audit function in OIG region 6, as well as what he alleges as interference with his ability to get another job, and I believe the claim sounded discrimination and retaliation.**
**We, as you know, represent Mr. Beard in this**

Page 6

action. We're in the part of the case known as discovery, and discovery, each side has the opportunity to ask the other side, and I use that loosely, you're on HUD as you said, but you, of course, are not individually responsible. Each side has the opportunity to ask the other side for information or documents that would support its case. Just as important, each side that is asked for documents and information has the very serious responsibility to turn those documents and information over, whether it helps or whether it hurts their case. It's a very important part of the process, everyone takes their responsibilities, especially the U.S. Attorney's Office, very, very seriously.

What we're doing today is conducting your deposition on oral examination; it's one of the discovery procedures. You've been placed under oath. What's going to happen from here on in, for the most part, it will be me, but it could be AUSA Melnik, asking you questions today. I'm going to be giving you instruction as though I'm the only one asking you questions; anything I say applies the same to AUSA attorney Melnik.

When I say honestly, candidly, accurately, under

Page 7

oath, and under penalty of perjury, to the best of your knowledge, ability, and belief, number of examples, and a number of elaborations to this. When I put a question to you, when we're talking about honestly, candidly, and accurately, we're talking about as good as you possibly can remember, sitting here today, racking your brains if you need to, using your memory and talking about things you know. If we're talking about, for example, I could say to you, Mr. Heist, how many people are here in the room today, and you can count and see that there are six of us. If I show you a document, and you recognize it because you signed it, or it's in a form from HUD OIG, and you recognize it, you should say, I recognize this from the standard business practice and I'm giving you an answer based on that, or I recognize the signature of so and so, and I'm giving testimony on that. You need to do that, if you know something and have reason to know or if you know it. The place you draw the line, and the only place you draw a line is at a guess or speculation. If your answer would call for that, feel free to say that, and I'll either rephrase the question, get something you need more information about, or we'll move on.

Page 8

If I put a question to you, and you do not understand, feel free to say so, and I will do my best to rephrase or explain the question. If I use in a question a word that you do not understand, feel fee to say so, and I'll do my best to explain it or pick another word.

If, during the course of the deposition, you realize an answer you've given is inaccurate in any way or incomplete, feel free to say so, or let me break in, and say whatever else you need to say. What we need you to do, and what we insist you do is, when you leave here today, the answers you give are the best answers you can give, under oath, penalty of perjury, best of your knowledge, ability, and belief.

During the questions, you may have – AUSA Melnik may make an objection. For the most part, your testimony today would be taken over any objection, but if you hear her make one, give us a chance to try and work it out. Makes things a lot smoother. That's different from a circumstance that she might instruct you not to answer. If she does that, don't answer unless and until AUSA Melnik tells you that it's okay to answer.

During the course of the deposition, we often

Page 9

remember or have reason to see examples for the need for other rules and ground rules, but at the moment it's about all I can recall.

Karen, anything you'd like to add?

MS. MELNIK: No.

BY MR. SELDON:

Q Mr. Heist, do you understand what I've told you?

A Yes.

Q Ready to go?

A Yes.

Q How long have you been assistant inspector general for audit?

A I've been in that position since March of 2001.

Q Can you briefly summarize your – not briefly. Can you summarize your duties and responsibilities in that position.

A I'm responsible for all the audit activity carried out by the office of inspector general, with the exception of forensic audit activities that are under the office of investigation. They have auditor positions that don't report to me.

Q Right.

A Responsible for carrying out a program of internal and external audits, of HUD programming and activities.

**Q Anything else?**

A I'm responsible for an organization that consists of three headquarters divisions.

**Q What are they?**

A Financial audits division, information systems audit division, technical oversight and planning division.

**Q Right. Are those --**

A And within headquarters, there's an immediate office audit.

**Q OIG headquarters or --**

A HUD OIG headquarters, HUD OIG office audit headquarters is what I'm speaking about.

**Q Is there another office other than the three you mentioned?**

A It's the immediate office audit.

**Q You meaning your office?**

A Correct.

**Q Who is in that office? By that I mean title or position.**

A There are two deputy assistant inspectors general for audit.

**Q Do they divide their responsibilities?**

A One's for headquarters operations. The second for field and disaster recovery operations.

**Q Right.**

A Then there are two special assistant.

**Q Special assistant to whom?**

A Special assistant to me and special assistant to Robert Gwin, who is the deputy assistant inspector general for field operations, field and disaster recovery operations.

**Q Sorry. There's one special assistant to you?**

A Correct.

**Q Then you and Mr. Gwin?**

A Yes.

**Q So to you the special assistant is Mr. Beard?**

A No. Elion, E-l-i-o-n, Saundra; Gwin has a special assistant, Michael Beard.

**Q Was there a time Mr. Beard -- oh, I'm sorry. He reports to a deputy?**

A Right.

**Q Assistant inspector general for audit?**

**How long have you had two deputy inspector generals for audit?**

A That was a recent change effective last month.

**Q And since someone is going to be reading the transcript here, last month would be January 2007, right?**

A Correct.

**Q And prior to that time, how many deputy assistant inspector generals for audit did you have?**

A One.

**Q Who is your immediate supervisor by title?**

A Michael Stephens.

**Q Deputy inspector general?**

A Yes.

**Q Who's your second?**

A Kenneth Donahue.

**Q Are you subject to a performance rating system in any way?**

A Yes.

**Q You are a member of the senior executive service, I take it?**

A Yes, I am.

**Q Is it fair to say, just to sort of shorten this, do you get annual appraisals from one or both of these gentlemen?**

A Yes, Mr. Stephens is my rating official. Mr. Donahue is the reviewing official.

**Q And do you have critical elements in your job that you handle?**

A Yes.

**Q What are they?**

A They're aligned to -- there are five elements.

**Q And these would be, would it be fair to say, the critical functions of your position?**

A Yes.

**Q It's fair to say, if you failed in any of those elements, there would be some sort of performance-based action taken against you?**

A Yes.

**Q That could be either putting you in an opportunity-to-improve period; isn't that right?**

A Not sure if I know how the process works for SAS employees.

**Q Is that similar to the way it works for GS**

**employees?**

A Yes.

**Q Are the performance appraisals, to your understanding -- I guess in this initial instance, Mr. Stephens is the rating official?**

A Yes.

**Q Donahue is reviewing?**

A Yes.

**Q Is this done in accordance to the provision of one or more of the office of inspector general manuals?**

A Yes.

**Q Which one?**

A I don't know which one, specifically.

**Q Other than the place you just mentioned, opportunity periods, are you also familiar -- are you in any way responsible for performance appraisals of subordinate professional personnel in the office audit?**

A Yes.

**Q In what capacity or capacities?**

A I'm the reviewing official for most of the GS-15 auditor positions in the organization.

**Q That would mean -- I'm sorry. Go ahead.**

A And I'm the rating official for Saundra Elion.

**Q Because you're her immediate supervisor?**

A Correct.

**Q Let's leave out January of '07. Would it be fair to say that, other than Ms. Elion, she was the only GS-15 direct report to you?**

A That's correct.

**Q And all the others would be reporting to the deputy assistant inspector general for audit; is that right?**

A Correct.

**Q That person, let's say --**

A Not all 15's, I'm sorry.

**Q Okay.**

A There are assistant directors.

**Q I'm sorry. Let me rephrase that. Is it fair to say that all office head and individuals at equivalent levels at office audit would be reporting directly in the first instance to the deputy assistant inspector general for audit?**

A By that you mean regional inspector generals for audits?

**Q They're all the same?**

A Correct.

**Q You would then be the reviewing official for those people?**

A Correct.

**Q Do you know of any way in which your ratings as members of the senior executive service division process is any different from those used to rate GS employees?**

A Well, the process for rating, a performance-based rating system, and pay-for-work performance system.

**Q In your case or in the GS case?**

A In my case.

**Q Okay. Any other differences that you know of?**

A The critical elements are stated differently.

**Q Stated differently. It's the same concept?**

A Similar concept.

**Q How does it differ?**

A The SAS rating process incorporates performance-based measurements.

**Q Okay.**

A That are used in part to establish pay levels.

**Q Right. Any other ways you know they're different?**

A Not that I can think of off the top of my head.

**Q You are given a rating annually or any other standard?**

A Annually, yes.

**Q And these are designed to measure your performance as deputy assistant inspector general?**

A As assistant inspector general.

**Q Sorry. That's the idea?**

A Yes.

**Q Is it also true that your immediate and second line subordinate employees also get annual performance appraisals?**

A Yes.

**Q And in your case the aim is that your performance appraisals would be accurate?**

A Yes.

**Q And is it also fair to say that your subordinates and second line subordinates in whose ratings you're involved are also designed to be accurate --**

Page 18

A When you say accurate --
**Q When you do the process?**
A Right. The process has a basis for conclusions reached, yes.
**Q And those conclusions are to measure the performance on an annual basis; is that right?**
A Yes.
**Q Do you have any other way of measuring, that you know of, in the office inspector general for yourself, subordinate employees in which performance of -- either in your case or a subordinate to you, first or second line, is measured annually?**
A We do establish annual performance goals for our managers.
**Q Let's list them all and again go back. Performance goal is one. What's another?**
A Well, I mean that's a broad category of goals that we reach. Organizational component.
**Q Meaning, for example, each --**
A Each region and each headquarters director.
**Q Okay. And what else is done to measure performance of your first or second line subordinates on an annual basis?**

Page 19

A Typically there's an assessment of accomplishments in relation to the other elements that aren't directly tied to our system of performance measurements.
**Q This is done systematically on an annual basis?**
A It's done as part of the rating process.
**Q Okay. That's fair enough. Anything else?**
A No.
**Q How about, and this may carry over to performance, what about regional ranks?**
A Currently we don't have a mechanism to rank regions.
**Q Let's focus on the period when you became AIGI in 2001.**
A A; I'm GA.
**Q Sorry. Two cases of investigation. March of 2001, until let's say the end of 2006. Was there a ranking process then?**
A Mr. Phelps had developed a ranking process that he used as part of his decision process in determining ranks.

Page 20

**Q What else? We're talking about regular and periodic measurements of performance of regional heads and their equivalents and the regions or the regions and their equivalent units.**
A I believe I've stated what comes to mind.
**Q Okay. Your performance appraisals, are they designed to be accurate?**
A Yes.
**Q And those of your first and second line subordinates, are they to be accurate as well?**
A They're to be based on a justifiable evaluation of the accomplishments of the manager in line with the stated performance standards.
**Q Okay. When you are given a performance appraisal, is it your experience that time and attention and care has been paid to it?**
A Yes.
**Q Is it also your understanding that when your first and second line subordinates are given a performance appraisal, requisite time and care and attention has been given to them?**

Page 21

A That's the speculation.
**Q Any time you know there's been a deviation from the time you became AIGA in March of 2001 until say 2006?**
A I'm not sure I understand the question.
**Q Sure. You said the appraisals of your first and second line subordinates are designed to have the appropriate time and attention going into their preparation. I want to know if there's any way you know there's been a deviation from that?**
A When you say a deviation, of the process?
**Q Start with the process.**
A As far as process is concerned, one circumstance that comes to mind is there is a requirement, there is a part of the process that is during the mid term, at the mi.. point of the rating there's a discussion held with the employee.
**Q Okay.**
A I can recall --
**Q Getting delayed periodically?**
A It's has been delayed. I know it was delayed with Mr. Beard.
**Q What about the annual process? Any ways in**

Page 22

**which you know that the annual process with your first or second line subordinates rating their performance has not been carried out the way it's supposed to be carried out?**

A Not that I'm aware of. I can't say for certainty one way or the other whether there were ones that were delayed or not.

**Q Any ones, no delays would be the problem. I was asking you about the substance. Maybe I wasn't. I was asking about the process. I'm sorry. Go ahead.**

**I said go ahead. Anything more to add?**

A No.

**Q Is there any way that you know of that the substance -- and I assume these performance appraisals of your first -- of your second line subordinates were up to the period we're talking about, up to the time Mr. Phelps prepared the ratings?**

A Up through January of last year. Up to the point in time when Mr. Phelps retired.

**Q January of '06. And you expected him to do that, conduct a performance appraisal process thoroughly, so far as ratings are concerned? Would that be fair?**

A Yes.

Page 23

**Q Fairly, is that right?**

A Yes.

**Q Accurately?**

A Certainly there needs to be a documented rationale for the rating that ultimately is decided. There's judgment involved, I think, in any rating process.

**Q Do you know of any way in which Mr. Phelps didn't have some ratings for your second line subordinates documented accurately?**

A Again, documented in accordance with the process that would, require that any rating be supported and reasons for the rating be documented.

**Q And is there any way that you know of that Mr. Phelps, in rating your second line subordinates, didn't rate any of them accurately, in substance?**

A Rating my second line?

**Q He was rating your second line subordinates, I assume?**

A Right.

**Q Any way in which you know that in substance Mr. Phelps didn't do it accurately?**

Page 24

A Not that I'm aware of.

**Q Did you have oversight, or did you ever rate or appraise Mr. Phelps in which one or more factors included how he rated your second line subordinates?**

MS. MELNIK: I'm sorry. What was the question?

MR. SELDON: Did he have a way in his performance ratings of Mr. Phelps, did Mr. Heist in -- was one of the -- strike it.

I think we've established that Mr. Heist was responsible in the first instance for the performance rating on Mr. Phelps.

BY MR. SELDON:

**Q Is that correct?**

A Correct.

**Q In one or more matters, did any of that performance rating turn on how and -- or how the process -- on the process and/or substance of the ratings that Mr. Phelps gave to his direct subordinates?**

A I can't recall any specific elements of his rating that speaks to that directly.

**Q Okay. Do recall ever counseling or advising Mr. Phelps on the way in which he had carried out**

Page 25

**performance ratings for his immediate subordinates inaccurately or improperly?**

A No.

**Q Any way in which they weren't thorough?**

A No.

**Q Any way in which they weren't complete?**

A No.

**Q Any way, to your knowledge, in which he deviated from the OIG procedures for doing that, for rating subordinates?**

A This gets back to have I counseled him to that effect?

**Q Informally or informally, I guess, take it broadly, rated his performance badly?**

A No.

**Q Criticized him in that respect orally or in writing?**

A Not that I can recall.

**Q Okay. And then the performance ratings of, let's say, second line subordinates, are there other ways in which their performance as opposed to the performance of the regions or units under their direction was rated?**

Page 26

A You'll have to repeat that.
**Q Yeah. We talked about the performance appraisal process being a way in which the performance of your second line supervisors, second line subordinates, was rated annually. Okay. With me so far?**
A Uh-huh.
**Q You need to say yes or no for the reporter.**
A Yes, I'm sorry.
**Q Was there any other way in which the performance of those individuals as opposed to the regions or offices under their supervision was rated annually or periodically? I mean, there's separate processes to measure a region's performance against the performance goals.**
A Right.
**Q Right. Before we go to the regions, which we will in a moment, I just wanted to focus on the managers themselves, then we'll go to the regions.**
A Well, that's what I was trying to get to. I mean, how well the manager -- how well the region performed in the context of his performance goals, is considered, when arriving at the rating for the particular manager that was responsible for that organization.

Page 27

**Q That's fair. Now I understand.**
**So one of the things I think you talked about was performance goals, and that would be for a region or sub office; is that correct?**
A Correct.
**Q Regional rankings was another you mentioned?**
A In response to one of the questions, yes.
**Q I'm just trying to get a list to start.**
A I mean, that was, regional rankings was something that we had tried for a couple years. We did not do it for the last rating cycle.
**Q The last rating cycle would have been for the year 2006?**
A Correct.
**Q In this context, can you tell us, are you familiar with the term GPRA, Government Performance & Results Act?**
A GPRA.
**Q In the context of the rankings of organizational units under your second line supervision, what is that, how is that involved?**

Page 28

A Well, I mean, GPRA refers to a statute that broadly, mostly relates to agencies' performance. We use the term loosely. And in the same concept, the starting point for the GPRA process is for an organization to lay out a strategic plan that sets forth its priorities, and then going the step below that, lay out a set of performance goals that will direct the organization towards meeting that strategic, those strategic plan goals, and then as part of that, we put forth some goals for offices, to the extent applicable that we expect, performance goals for the organization to meet, and simply they're just that, they're goals.
**Q So if we say there were performance goals for the entire office of audit and others, is that what you meant to say?**
A Well, it's set forth as goals for the office audit and then corresponding goals for each of the region.
**Q That's what I was getting at.**
A In many instances they're one and the same.
**Q Right. And so what other --**

Page 29

A I'm sorry. I should say the goals are stated the same.
**Q Okay.**
A In many instances.
**Q You mentioned a number of ways of periodically measuring the performance of, let's say the regional and sub office in the office audit, what else is there, if anything, that you haven't mentioned?**
A Well, apart from the performance rating process of the managers?
**Q Correct.**
A Really the performance goals, that's what comes to mind.
**Q Anything else come to mind? What are management assistance reviews?**
A Management assistance reviews are carried out by the office of management and policy.
**Q And let's talk about here first and foremost. What is the function of that office, insofar as management assistance reviews are concerned? Actually, let's start with what are management assistance reviews?**
A Management assistance reviews are --

MS. MELNIK: I'm sorry. Is it assistant? Assistance?
MR. SELDON: Assistance, c-e.
MS. MELNIK: Oh, thank you.
THE WITNESS: It's a program whereby individual offices in both the office of audit and office of investigation are reviewed on a cycle.
BY MR. SELDON:
**Q Periodically as opposed to every year?**
A I think the idea is -- well, the idea is to do -- the goal, if you will, is to do those every three years. I don't know that the organization keeps to that cycle or not. I'm not the one who would answer to that. They are done periodically, is the main point.
**Q In order to what, evaluate offices' performance?**
A From the perspective of the office audit, it's to measure that office's audit work against audit policies and procedures against government auditing standards, and it's in part to fulfill a requirement within government auditing standards that all office audits have a quality control with respect to the audit products that are produced, the audit work that's done in

accordance with government auditing standards.
**Q Is your standard, that OMAP, is that system -- or that's the system of measuring the office quality? I didn't understand.**
A It's an element of the overall system of quality control for ensuring that auditing work adheres to auditing standards.
**Q Okay. Anything else that periodically and regularly measures the performance of the regions and other subordinate offices that are under your jurisdiction, other than what you mentioned?**
A Not the regions, per se, but there is every three years a peer review done.
**Q By?**
A Of HUD OIG, HUD OIG's audit component by another office of inspector general from another agency.
**Q When was, to your knowledge, that last one performed for the office audit of HUD OIG?**
A It was three years ago was the last review that was completed.
**Q Is there a name for that audit?**
A We refer to it as the peer review. I think

official name is external quality review. Most people refer to it as a peer review.
**Q Does this review, this audit peer review, is it a review of the individual regional offices or the overall office audit?**
A It's the overall office audit.
**Q Does it -- I'm sorry, go ahead.**
A It's part of their review. They typically review a selection of audits done by the regions.
**Q Is that done on any systematic basis?**
A There's a guide that's published by the president's counsel on integrity and efficiency.
**Q I guess, is there a systematic basis for selecting the audits they do?**
A I mean, that's the general guidelines, PCIE guide, president's counsel on integrity and efficiency.
**Q Right. And what I'm saying, do you know of any way in which -- of whether or not those outside reviews by PCIE of the office of audit systematically checks individual audits prepared by regions and other subordinate offices?**
A The review typically does review individual

audits.
**Q My question really went to the selection of which audits.**
A I mean, that's a matter for the team from the other OIG to decide how that selection is made.
**Q I take it, though, it's a selection of audits, is that right, as opposed to all audits?**
A Correct.
**Q Do you remember when the last one of these peer reviews, PCIE, was conducted in the office, for the office audits?**
A The review is not conducted by the PCIE.
**Q The review is conducted by?**
A Another part of OIG.
**Q That's part of?**
A The last review that was completed was performed by Department of Health & Human Services.
**Q When was that?**
A That report was issued December '03.
**Q That was while you were the DAI?**
A No. I was the AIG.
**Q I'm sorry. Was the office audit given an**

**unsatisfactory, unsuccessful, for failing evaluation in any respect by the OIG of the Department of Health & Human Services?**

A No.

**Q Was any region, to your recollection?**

A No.

**Q Now, I think we've talked about these various measures of the individual regions and subordinate offices of yours. Any others come to mind?**

A Well, there's an ongoing process to review individual work products, draft reports.

**Q Yes. I guess what I'm asking, and I'll get to that in a minute, I'm trying to find out -- I guess what I'm trying to find out are ways of regular prescribed evaluation methods. Because what I've got down so far are performance goals, regional ranking, GPRA measures, management assistance reviews, and the peer reviews by other members of the inspector general community.**

**These are done periodically and regularly, I take it?**

A Yes.

**Q Are there any others?**

A Well, maybe I need to get a -- get your -- get a better understanding when you say evaluation methods.

**Q Okay. Performance goals for regional offices and others that are subordinate to you, are these done, these performed with predefined -- in other words, when I say predefined, some sort of criteria that are set up in advance of performance?**

A Yes.

**Q Are these quantifiable?**

A Yes.

**Q Are they objective?**

A Yes.

**Q Are they performed on a regular prescribed periodic basis?**

A When you say they're performed, I mean, they're calculated monthly.

**Q Okay.**

A And so throughout the year we can see where the region is in relation to those goals.

**Q Are they designed to measure performance accurately?**

A They're designed to be accurate as far as, you

know, where mathematically a given region is in relation to that goal.

**Q Okay. What are those goals? Just so we have a reference for the future, performance goals. What are these goals? Let me give you some examples. It's your testimony that counts. Could be the amount of money that's recovered, could be the amount of audits done. None of that counts. I'm just suggesting the direction of my question.**

A Are you looking for examples?

**Q Yes. What are the performance goals?**

A Other, for example, is under the Inspector General Act, all inspectors general are required to report various monetary outcomes from their audit work.

**Q Okay.**

A And/or it's both -- the whole office of inspector general has a goal that for their audit investigative work it's the goal that those audits and investigations report an eight to one, what we call return on investment, meaning that the dollars reported in the investigations will be eight times the amount of resources that went into accomplishing those monetary

results.

**Q When you say "dollars reported," that would mean monies or funds recovered by the Office Inspector General as a result of the audit?**

A That's one category.

**Q I just want to get it defined.**

A It questions costs, disallowed and ineligible cost, unsupported cost, and there's another category called funds put to better use, which is laid out in the Inspector General Act.

**Q Right. What else do these performance goals measure?**

A There are goals for -- we have, for example, a goal that from the start of an audit to the submission of the draft audit report to headquarters technical oversight and planning division for review, that that take no more than 240 calendar days. So part of the measurement will be as audits are completed, yes or no, did they meet the 240 goal? And then that's tabulated and on a monthly basis.

**Q Okay.**

A Another goal is the number of staff hours taken

Page 38

to produce or complete an external audit is 2,000 staff hours for external reports and 3,000 hours for internal -- 2,000 for external, 3,000 for internal audits. There's another goal, for example, that -- for internal reports it's 80 days, for external reports it's 60 days to -- once you have an approved, once you have a draft report returned to the region, it would take that long of a period to issue the final report. Again, the measurement is did a particular audit meet that goal or not meet that goal, and then the measurement is the percentage of audits produced by the region or the headquarters office that did or did not meet that goal.

**Q Okay. Other performance goals come to mind?**

A We have, with -- after the report is issued, there's an audit resolution process. There's a department-wide goal, again, once the audit's issued, we work with the department to resolve that report, reach what we call a management decision. The department goal is that that be accomplished within 120 days. Our goal is that a certain percentage of that, of audits, of audit recommendations meet that 120-day goal.

**Q Other performance goals come to mind?**

Page 39

A Let me think what I did not mention. I'm thinking there might be something else, but drawing a blank right now.

**Q Regional rankings, what is that?**

A That was a process that Mr. Phelps had developed a few years ago to attempt to take each office's accomplishments against a certain set of goals and then come up with a ranking.

**Q Comparative rankings, is that what the idea was?**

A Yes.

**Q This was, again -- this was upon quantifiable criteria; is that correct?**

A Yes.

**Q Were they objective, this criteria?**

A I mean, the measurement was objective against, you know, quantifiable factors. At the end of the day the evaluation of what that meant was not objective. It was subjective.

**Q Fair enough.**

**Were these regional rankings, this was a process that was set up, I take it, in advance of actually ranking regions comparatively; is that right?**

Page 40

A I don't remember. Again, that was something that was developed by Mr. Phelps.

**Q Was it done on a regular basis?**

A It was done for a couple of years, and I can't remember exactly what year we made some changes to it and then decided, I decided to discontinue.

**Q Till then, though, was it conducted regularly?**

A I don't remember how often Mr. Phelps did the calculation.

**Q Did you see the results?**

A At some point I did, yes.

**Q Were awards given out based on regional rankings?**

A Not that I'm aware of.

**Q Were awards ever planned to be given out according to regional rankings?**

A I believe there were some discussions about doing that.

**Q With whom?**

A Senior staff.

**Q Who would be?**

A Mr. Donahue, Mr. Stephens.

Page 41

**Q Not just the senior staff, the inspector general and deputy inspector general, I take it?**

A Yes.

**Q Yourself too?**

A Yes.

**Q This was under consideration at some point, I take it, or no?**

A It was under consideration, yes.

**Q GPRA, why don't you tell us exactly not so much what it stands for but what it measures. There's GPRA statistics, or am I wrong?**

A I mean, GPRA is the Government Performance and Results Act.

**Q Okay.**

A Which very broadly requires agencies to put forth the strategic plan and set forth performance measurements.

**Q Yes. What are those performance measurements?**

A There's nothing prescribed in GPRA itself.

**Q Yes. But in the sense of administered by office of audit, was their performance measured?**

A I think one of the things I described to you --

Page 42

**Q This was part of the performance --**

A -- the other --

**Q Wait. Do you mean to say that these performance measurements were part of the performance goals we talked about previously, or do I have that wrong?**

A Well, you set out goals, and then you measure accomplishments against those goals.

**Q Okay. What I'm saying is you described those particular aspects as part of performance goals and measurement. Is GPRA something different?**

A Well, I mean, to me, it is, yes. I mean, GPRA is the general requirement that agencies have strategic plans and performance goals. I would, as a way of footnoting that, requirements are directed towards the agencies. There's no specific legislative requirement that that apply separately to IG's, OIG's. We, as a matter of policy, have incorporated or have accepted some of those policies, some of those concepts.

**Q Let me try to refine --**

A We refer to --

**Q You go ahead. I didn't want to cut you off. You go ahead.**

Page 43

A No. That's what GPRA means to me.

**Q Okay. So what I'm trying to clarify for the record is we've talked about performance goals. I asked you for examples, one example was questioned costs or dollars recovered. What I'm trying to say is, were there -- you talked about GPRA and strategic plans and planning. What I'm trying to find out, were there different measurements for performance goals that were established by the office audit pursuant to GPRA that are different than the ones you've testified about already?**

A I had indicated that there were some that I hadn't thought of, individual analysis that now have come to mind.

**Q What would that be?**

A One of our -- tied to our strategic goals is as a priority area, for example, audits of single family lenders, FHA lenders.

**Q FHA single family lenders?**

A So we have a goal that the office audit will accomplish X number of single family audits. Another priority area in our strategic plan is audits of the section 8 program.

Page 44

**Q Publicly assisted housing?**

A We've set out goals for the number of audits of -- audits of public housing agencies administration of the section 8 program, again, external audits, if you will.

**Q Okay.**

A The last two years we've established goals for community planning and development audits.

**Q Okay. Anything else?**

A That's what comes to mind at this point.

**Q So these would be additional performance goals?**

A They're all part of the same set of performance goals.

**Q Okay. And then my question, I just want to see, is there a -- is that the one set of performance goals, or is there another set that's set up under GPRA?**

A There's one set that's set up under the GPRA concept.

**Q Thanks. Management assistance reviews, did we define that previously?**

A I believe we did.

**Q How about just a quick one so I don't have to**

Page 45

**guess.**

A It's a program of periodically reviewing offices for adherence to search for policies and procedures.

**Q Right. And periodic management reviews, are they done according to predefined criteria?**

A Yes.

**Q Are the criteria subject to quantifiable measurement?**

A My answer, to elaborate on my answer, there's a guide that's set forth how these reviews are being conducted.

**Q But to your knowledge, are they according to predefined criteria?**

A Predefined in the sense that the manual chapter lays out how they're to be performed.

**Q I guess what I'm trying to find out, are the studies or measurements of evaluations in MAR reports predefined as to what they would be?**

A I'm not aware that there's -- that the way the reports lay out the results are proscripted.

**Q Are they designed to be accurate?**

A I don't -- they're not performed by my office,

Page 46

so I wouldn't be the best one to speak to how they're designed.

**Q Are they given to you, MAR's, after they're prepared?**

A I get a copy of the report, yes.

**Q Have you reviewed them in practice?**

A In practice, yes.

**Q Have you found any to be inaccurate?**

A Not that I can recall.

(Whereupon a discussion was held off the record).

(Thereafter Exhibit 1 was marked for identification).

BY MR. SELDON:

**Q Mr. Heist, can you either by knowledge or form or review identify what this document is. You could read as much or as little as you'd like.**

**Do you know what this is, sir?**

A It appears to be a management assistance review report on region 6.

**Q And can you tell what year or years it covers?**

A No, I can't.

Page 47

**Q Look at page 9.**

A Okay. I was looking for a date on this.

**Q Right. But does this tell you on page 9 what period it covers?**

A It says it covers April 1st, 2001, through September 30th, 2002.

**Q In the ordinary practice, that would mean that that was the last three semi-annual reporting periods?**

A That's what the document says.

**Q Any reason to think this isn't that?**

A No reason to think that, no.

**Q This would be the three semi-annual reporting periods?**

A That's correct.

**Q I'll show you a document that's going to be marked as Heist 2 and ask you to identify this.**

**(Thereafter Exhibit 2 was marked for identification).**

**BY MR. SELDON:**

**Q Can you identify this?**

A This was the regional ranking that was done for fiscal year 2005.

Page 48

**Q As we talked about before?**

A Yes. This was the year that we attempted to refine what Mr. Phelps had developed.

**Q I will ask you to identify, I'll give you Heist Exhibit 3.**

**(Thereafter Exhibit 3 was marked for identification).**

**BY MR. SELDON:**

**Q Can you identify this document for us, please.**

A The heading indicates that it's office ranking FY 2004 goals.

**Q Do you recognize this document?**

A This appears to be the results of the previous ranking method that Mr. Phelps had developed.

**Q Ask this to be marked Heist Exhibit 4, see if you can tell us what this is.**

**(Thereafter Exhibit 4 was marked for identification).**

THE WITNESS: This appears to be a page from an Excel spreadsheet.

BY MR. SELDON:

**Q Prepared by?**

Page 49

A It was either prepared by Mr. Phelps or someone at the direction of Mr. Phelps on a biweekly basis. This is the report as of December 5th, 2004, comparing office ceilings with the actual on-board staff.

**Q And on a regional basis, correct me if I'm wrong, but was the aim to have ceilings -- I mean, for the on-board and pending to be as close to ceiling as possible?**

A The amount of on-board staff compared to ceiling fluctuates at any point in time.

**Q I mean is the aim for on-board plus or minus to be close to the ceiling?**

A Not necessarily.

**Q Why wouldn't it?**

A Depends overall where our budget situation is, and hypothetically, for example, we could be in a position where at any given point in time we might want to be over our established ceiling.

**Q Do you recall wanting to be over the ceiling as of 12-5-2004?**

A No. I can't recall where -- whether we were in that situation at that point in time or not.

MR. SELDON: Okay. Let's take a break here.
(Pause in proceedings).
BY MR. SELDON:
**Q Let's go back on the record.**
**Mr. Heist, I think you said you were responsible either as the rating or reviewing official for subordinates, right?**
A Yes.
**Q Okay. And was that done pursuant to a particular publication of the office of the inspector general?**
A A manual chapter, yes.
**Q And there were also, I take it -- strike that.**
**Did that manual chapter also govern how Mr. Phelps was supposed to rate his direct reports?**
A Yes, to my knowledge.
**Q Do you have any reason to believe that he did not on any occasion?**
A No.
**Q Let me ask you to identify Heist Exhibit 5.**
**(Thereafter Exhibit 5 was marked for identification).**

**BY MR. SELDON:**
**Q Do you recognize this document, sir?**
A It is manual chapter 1430.1 entitled performance appraisal program.
**Q Was this then the section --**
MS. MELNIK: I'm sorry. Did he answer the question? Was it does he recognize it or not?
THE WITNESS: Yes.
BY MR. SELDON:
**Q Do you recognize this, sir?**
MS. MELNIK: It's a yes or no.
THE WITNESS: I did say yes.
BY MR. SELDON:
**Q Were subordinates in your office at the -- your director subordinate reports -- by that I mean first or second line reports -- eligible for any sort of performance awards?**
A Yes.
**Q The ones that could be given by you or authorized by you as opposed to on one of the more senior officials at OIG, was there a range of amounts they could be done in?**

A Yes.
**Q What was the range?**
A Are you speaking to my --
**Q You or Mr. -- in other words, your direct reports or the ones that were your second line reports that they reported to Mr. Phelps.**
A To the extent there was a dollar limit, yes.
**Q What was the dollar limit?**
A Back in -- you're speaking back at what point in time?
**Q Depends what you recall.**
A I don't recall. I don't recall the specifics, because it may have varied.
**Q Do you recall anything about it, before we move on?**
A My current -- I do know that my current approval authority is $5,000.
**Q Okay. That's good. One of the issues in this case centers on one or more of the issues on ADR session and a settlement agreement that was reached as a result of that. I take it November or December, depending on what date you apply, of 2002 -- I left my copy in my**

**office.**
**(Pause in proceedings).**
**BY MR. SELDON:**
**Q Let's mark this as No. 6.**
**(Thereafter Exhibit 6 was marked for identification).**
**BY MR. SELDON:**
**Q Do you recognize this document, sir?**
A No.
**Q Okay. Your affidavit in this administrative process, which I can let you look at, you were aware that the complainant was involved in the EEO hearing versus Robert Tighe Cuomo?**
A Yes.
**Q Actually, you can refer to this one.**
**What do you know about that?**
A Only that there was a matter and that Mr. Beard was involved.
**Q An EEO complaint being the matter?**
A And I was advised that he gave a deposition.
**Q The matter being an EEO complaint, I take it?**
A Yes.

Page 54

**Q When did you first learn of that?**
A I believe it was, would have been at the time when I was acting deputy IG.
**Q When, let's start with when were you acting deputy IG.**
A That would have been June 2001, part of July 2001.
**Q And I don't remember my question. I did say when did you learn of the EEO complaint, or when did you learn of Mr. Beard's deposition?**
A That was when I learned that there was an EEO complaint and that Mr. Beard gave a deposition. Some point around that time frame.
**Q Did you know that at some subsequent point Mr. Beard filed either a formal or informal complaint of discrimination -- sorry, of retaliation, which related to -- strike that.**
**Did you know one way or the other after that that Mr. Beard initiated the agency complaints process concerning his participation in that case?**
A Repeat that question again.
MS. MELNIK: If you're able.

Page 55

BY MR. SELDON:
**Q I'll do it this way. The second line that is in your statement that I didn't read, in the bottom paragraph is, my only knowledge of the complainant's involvement was that he gave a deposition in this case, meaning Tighe versus Cuomo.**
**Okay? When did you gain knowledge that Mr. -- I'm sorry. You talked about the involvement in his complaint, of the deposition. Now what I'd like to know is when, if at all, did you understand that Mr. Beard had filed an EEO complaint that -- let's say at any time before the present one?**
A I don't recall when.
**Q Do you believe that you recall it -- I'm sorry, do you believe you learned it when you were deputy inspector general on an acting basis?**
MS. MELNIK: As to which thing? As to the depo or as to the EEO complaints?
MR. SELDON: He's already talked about the deposition. I'm talking about the administrative process.
MS. MELNIK: I'm sorry.

Page 56

MR. SELDON: No problem. I do that all the time.
THE WITNESS: I don't recall any specific knowledge about the administrative process.
BY MR. SELDON:
**Q What about less than specific?**
MS. MELNIK: Objection. Vague.
MR. SELDON: He said he had no specific knowledge.
BY MR. SELDON:
**Q Want to go ahead and answer.**
A All I recall was that it was stated to me by Mr. Saddler, our counsel, that there was a matter, an EEO matter, and that Mr. Beard was giving a deposition.
**Q Okay. And then move on to the second point was when, if at all, did you learn that Mr. Beard was involved in the EEO agency complaints process before this, prior to this case?**
A There was a prior EEO complaint, and I know, I recall that part of the issue was his testimony in the Robby Tighe EEO complaint.
**Q Okay. What else can you recall of that?**

Page 57

A Nothing else.
**Q Do you recall whether his testimony was favorable to Mr. Tighe?**
A I had no knowledge of that, one way or another.
**Q When, to the best you can pin it down for us, did you first learn of Mr. Beard's prior EEO complaint?**
A I don't remember.
**Q Do you recall was it before Mr. Beard initiated the process for the second time? In other words, in this case.**
A Yes, I believe it was, to my recollection, yes.
**Q Do you recall ever speaking with Mr. Phelps about Mr. Beard's prior EEO complaint?**
A No.
**Q Do you ever recall --**
A I'm sorry. When you say -- repeat that again.
**Q Do you recall ever speaking to Mr. Phelps about Mr. Beard's prior EEO complaint?**
A No.
MS. MELNIK: Objection. Vague. Which one?
MR. SELDON: The prior complaint, meaning the one that gave -- before the one that gave rise to this

suit.
MS. MELNIK: Okay.
THE WITNESS: I don't recall any specific discussions.
BY MR. SELDON:
**Q Do you recall anything general, generally?**
A As to the content, no, I don't recall.
**Q Do you recall having one or more discussions, any discussions on this subject matter with Mr. Stephens?**
A No.
**Q Do you recall knowing whether there was -- or do you recall at any point learning whether there was any alternative dispute resolution in that case?**
A I don't recall whether there was an ADR session or not.
**Q Do you have knowledge one way -- do you recall one way or the other whether there were any issues on Mr. Phelps' part or your part with Mr. Beard's performance? Strike that.**
**Take a look for me at Heist Exhibit 6. That's not it. It's that settlement, mediation settlement agreement, okay?**

MS. MELNIK: He's never seen that before.
MR. SELDON: Just for reference.
BY MR. SELDON:
**Q If you look for me at page 2. Under 4 it says, 1, the department agrees to remove the letter of reprimand issued to the complainant on February 20th, 2002.**
**Do you know what letter of reprimand is being referred to there?**
A Generally, yes.
**Q What do you recall of it or know?**
A I don't recall the dates, but Mr. Phelps had proposed a letter of reprimand to Mr. Beard.
**Q February 20th, 2002, seem about right?**
A I can't say with certainty.
**Q Okay.**
A I remember the letter of reprimand. I just don't remember this event.
**Q Okay. Let's do this. Let's just mark your affidavit as Heist Exhibit 7.**
**(Thereafter Exhibit 7 was marked for identification).**

**BY MR. SELDON:**
**Q Okay. Let's put that aside for one moment. We'll get back to it. Actually, we won't.**
**When, if ever, did you first discuss with Mr. Stephens or Mr. Donahue about the possibility of reassigning Mr. Beard out of his position as regional inspector general for region 6?**
A What was the -- when did I first remember?
**Q When do you remember first discussing with Mr. Stephens or Mr. Donahue?**
A I don't remember.
**Q Was it before you directed his reassignment in January of '05?**
A Yes.
**Q Do you recall, was it much prior to that?**
MR. SELDON: Don't tell him to answer.
MS. MELNIK: We're just discussing.
MR. SELDON: I'm asking because he -- what's the best that he can do to recall when he discussed reassigning Mr. Beard from his position as regional inspector general in region 6 with Mr. Stephens or Mr. Donahue.

THE WITNESS: All I can -- best recollection was that it was sometime prior to January 2005.
BY MR. SELDON:
**Q Right. Do you think -- I think you can do -- I'm going to ask you a slightly more --**
MR. JOHNSON: The reason I had a question is I'm trying to figure are you talking about the specific reassignment that occurred or just general reassignments?
MR. SELDON: I was going to ask him depending on his answer.
MR. JOHNSON: Oh, okay.
BY MR. SELDON:
**Q So was it longer than a couple of months before January of '05?**
A I don't recall.
**Q Well, you believe, have reason to believe one way or the other that it was, let's say, more than two years before January '05?**
A I don't recall any conversations going back that far, that specifically spoke to his being reassigned.
**Q Do you recall when, if ever, you first had discussions with Mr. Phelps on the subject of reassigning**

Page 62

**Mr. Beard?**
A I don't recall when. I don't recall when, no.
**Q Do you recall either way, let's say more than a year before January of '05?**
A No, I don't recall.
**Q Do you recall Mr. Phelps giving you -- strike that.**
**Mr. Beard was reassigned to a special assistant position?**
A Correct.
**Q And was that to you or Mr. Phelps?**
A That was to Mr. Phelps.
**Q The decision to reassign Mr. Beard, that was made by whom?**
A It was a consensus decision that was reached at some time in December in talking with Mr. Stephens and Mr. Phelps.
**Q All right. When you say consensus, each person participated in the discussions that led to it, decision to reassign Mr. Beard?**
A Yes.
**Q Ultimately is it correct that Mr. Stephens'**

Page 63

**approval was needed to be obtained? Let's start with needed.**
A I believed that it was. Would have, and did involve relocation expenses.
**Q Okay. Did you give reasons that, you and/or Mr. Phelps, give reasons either directly to or that were communicated to Mr. Stephens in support of reassigning Mr. Beard?**
A Yes.
**Q What were those reasons? First of all, let's say, were the reasons given to you and Mr. Phelps?**
A Yes.
**Q Was there a meeting about this? Or more than one meeting?**
A There were discussions, yes.
**Q Were there any -- was it more than one?**
A I don't recall how many.
**Q Did you and Mr. Phelps have discussions that Mr. Stephens did not participate in, in which the reassignment of Mr. Beard was being discussed?**
A I don't recall.
**Q How, to your recollection, did the idea of**

Page 64

**reassigning Mr. Beard originate?**
A It originated -- we had come to the -- we had come to the conclusion that Mr. Beard was not managing region 6 the way we felt the region should be managed.
**Q When was that?**
A Concerns about the way Mr. Beard was managing the region go back a period of years through various events that occurred.
**Q How many years?**
A Probably back to 2000, 2002, I'm sorry.
**Q Hang on for one second.**
**(Pause in proceedings).**
**BY MR. SELDON:**
**Q Was there any written documentation of the decision to reassign Mr. Beard?**
A Yes.
**Q Other than the memo issuing his directive, ordering his direct reassignment?**
A Yes.
**Q What was the documentation?**
A I prepared a set of talking points.
**Q Anything else?**

Page 65

A No.
**Q And the talking points codified your reasons for reassigning or codified the reasons of the three of you for reassigning Mr. Beard?**
A What do you mean by codifying?
**Q Reduced to writing.**
A Yes.
**Q Were there any other there, to your recollection, that you didn't list?**
A Not that I can recall.
**Q Okay. Now, when, if at all, do you recall it being decided what position Mr. Beard would be reassigned into?**
A Would have been in December of 2004.
**Q What were the considerations or possible positions that he would be reassigned to?**
A There was just one, in our judgment, there was just one position available that we could reassign him to.
**Q What was that?**
A That was a special assistant position.
**Q To Mr. Phelps?**

A Right. I'm speaking of the position description that was available.
**Q So that is a special assistant position; could have been to you or Mr. Phelps?**
A Yeah. Could have been.
**Q I just want to make sure we're talking about the position description that could have been used, regardless of whether Mr. Beard became a special assistant to Mr. Phelps or to you; is that the idea?**
A Correct.
**Q That position, when had it previously been encumbered?**
A Individual by the name of Austin Groom, G-r-o-o-m, I believe.
**Q Right.**
A Had been in that position.
**Q My recollection is that he was in there in 2000. Do you have any different recollection?**
A It was -- he was in that -- he was placed in that position before my tenure.
**Q He vacated before your tenure?**
A To my recollection, it was shortly after my

tenure started.
**Q Mr. Groom, was he reporting to Mr. Phelps or to you or to someone else?**
A He was reporting to Mr. Phelps.
**Q Do you know what Mr. Groom was doing in that position, specifically?**
A No.
**Q What discussion, if any, went on when Mr. Beard's reassignment was being considered in December '04? What discussion, if any, was there about the specific assignments he could perform or would perform, rather?**
A I don't recall any.
**Q Was there -- let's say by the end of December '04, do you recall there being any?**
A Say that again.
**Q Yes. My previous question was, you made the decision to reassign Mr. Beard in December of '04. You meaning you, Mr. Stephens, and Mr. Phelps, as I understand it, right?**
A Yes.
**Q What I asked you a moment ago was, what**

**assignments, if any, was Mr. Beard -- was it specifically --**
**At the time that the decision was made to reassign Mr. Phelps (sic), what specific assignment -- strike it.**
**At the time the decision was made to reassign Mr. Beard, what specific assignments, if any, was he at that time slated to perform? Or projected to perform?**
A It was up to Mr. Phelps to make any assignments. I was not aware at that time of any specific, or do not recall any, better way of putting it, do not recall any specific assignments.
**Q Do you know one way or the other whether you have any records?**
A No, I don't recall.
**Q Again, Mr. Phelps was responsible for making his assignments? Leaving out whether you recall the assignments, particular assignments, do you recall Mr. Phelps saying, I have specific assignments for Mr. Beard as soon as he is reassigned to Washington, DC?**
A No, I don't recall.
**Q Now I'll ask you as of the date that you issued**

**the memorandum reassigning Mr. Phelps -- Mr. Beard, that would be January 5th, 2005, what specific assignments, if any, at that point in time had Mr. Phelps said he would have Mr. Beard working on?**
A I don't recall.
**Q Did he say to you, that you recall, that I have assignments for Mr. Phelps -- Mr. Beard to work on?**
A No, I don't recall.
**Q So let's get this marked.**
**(Thereafter Exhibit 8 was marked for identification).**
**BY MR. SELDON:**
**Q Can you identify this document, sir?**
A It's a memorandum I prepared for Mr. Beard, notifying him of his directed reassignment.
**Q And it's dated January 5th, 2005?**
A Yes.
**Q Is that when you gave to it Mr. Beard?**
A To my recollection, it was dated the same day.
**Q This has a permanent report date for Mr. Beard of Monday, March 7th, 2005, in his new position, right?**
A That's correct.

**Q Was Mr. Beard to report to Washington, DC, prior to that?**

A My recollection was that he was detailed to Washington prior to that date.

**Q January 10th, 2005, sound correct?**

A I don't remember the exact date.

**Q Why did you make -- I assume you made the decision -- strike that.**

**Who made the decision that Mr. Beard would be detailed prior to the effective date when he would be getting his new job permanently?**

A I can't recall who specifically, no.

**Q Were you involved in the decision?**

A Yes.

**Q Mr. Phelps?**

A Yes.

**Q Mr. Stephens?**

A I can't recall.

**Q Do you recall what assignments, if any, Mr. Phelps said he would be having Mr. Beard work on between January 10th, 2005 and March 7th, 2005?**

A No, not at that time.

**Q Did you know of any?**

A I can't recall.

**Q When did Mr. Phelps first inform you that Mr. Beard, if ever, that Mr. Beard would have specific assignments to perform between January 10th, 2005, and March 7th, 2005?**

A I don't recall.

**Q Do you recall one way or another that Mr. Beard actually performed any specific assignments between those days?**

A No.

**Q The decision to reassign Mr. Beard, you stated, was made sometime in December of '04; is that right?**

A Correct.

**Q Prior to that time -- strike that.**

**I take it there is one or more units, either within Office of Inspector General or with which the Office Inspector General contracts to provide services in connection with personnel action; is that right?**

A That's correct.

**Q Which would those be, public debt one?**

A And we have an HR group within OMAP.

**Q The bureau of public debt provides services in connection with specific personnel decisions, I take it?**

A Provide our personnel services, yes.

**Q And do they or do they not provide advice on personnel? If you don't know, that's okay.**

A They do.

**Q Does the HR group within OMAP OIG also provide services with respect to individual personnel actions?**

A Yes.

**Q Which, if either of these groups, provided advice to you prior to the decision to reassign Mr. Beard concerning his reassignment?**

A None that I recall concerning his specific reassignment.

**Q And do you know whether any -- either or both, of these groups was consulted regarding any other action involving Mr. Beard prior to December of 2004?**

A None that I recall.

**Q After December of 2004, do you know whether either of these groups was contacted concerning Mr. Beard's potential -- Mr. Beard's then decided reassignment?**

A I don't recall specifically.

**Q In December of 2004, when the decision was made to reassign Mr. Beard, was the decision made at that time where Mr. Beard would be reassigned to?**

A Would have been around December 2004.

**Q December is a long month. I guess what I'm asking you is, at the time the decision was made to take Mr. Beard out of his position heading the audit function in region 6, was there then a decision made where Mr. Beard's duty station would be?**

A Yes.

**Q What was that decision?**

A That it would be in Washington, DC.

**Q Why was that?**

A Because that's where the special assistant position was located geographically. The position is a special assistant to the deputy assistant inspector general for audit, and Mr. Phelps was located in Washington, DC.

**Q Correct. Do you recall with whom the idea of reassigning Mr. Beard to Washington, duty station in Washington, DC, originated?**

Page 74

A No.
**Q Do you recall briefing Mr. Stephens on the fact that Mr. Beard would be reassigned to a duty station in Washington, DC?**
A To the best of my recollection, there were conversations with Mr. Stephens about reassigning him.
**Q I guess I was asking about a duty station in Washington, DC.**
A Yes.
**Q When did those take place?**
A I don't recall specific dates. It would have been before, again in December.
**Q Did they take place contemporaneously with the decision to reassign Mr. Beard?**
A To the best of my recollection, yes.
**Q What communication -- I'm not sure I asked you this already or not. What communication, if any, did you and Mr. Phelps or Mr. Stephens have with either the EPD or OIG HR group about reassigning Mr. Beard after making the decision to reassign him?**
A I don't recall any specific discussions.
**Q This notice -- I'm sorry, this memorandum dated January 5th, 2005, reassigned -- gave Mr. Beard the directive to reassign, did you draft it?**

Page 75

A Yes, I did. I used a prior directive reassignment memo that we had developed when Mimi Lee was reassigned from San Francisco to Los Angeles.
**Q Did anyone else assist you in drafting this memorandum?**
A When you say this memorandum?
**Q I'm sorry. The one reassigning Mr. Beard dated January 5th, 2005.**
A No. Not directly.
**Q How about indirectly?**
A Indirectly I was, I had sought the advice of our HR group in drafting the memorandum to Mimi Lee, which mostly lays out rights, should she decide to decline the directive reassignment. We had developed a similar letter for Mimi Lee, i.e, that I had sought advice from the HR group and OMAP, I believe, was Beverly Polan at the time, and used that in drafting the memorandum to Mr. Beard. So indirectly I sought advice for a prior case that I applied to this situation.
**Q As the model. I appreciate that.**

Page 76

**Was there anyone else who participated in the drafting or preparation of this memorandum directing Mr. Beard's reassignment on January 5th, 2005?**
A None that I recall.
**Q Mimi Lee, I take it, had been heading the OIG audit function in San Francisco, California, at the time she was reassigned?**
A She was the regional inspector general for region 9, which at the time was duty stationed in San Francisco.
**Q And then that headquarters was moved to Los Angeles, I take it, region 9?**
A Yes, the headquarters, that's correct.
**Q And Mimi Lee then, I take it, had to be given a choice under federal personnel law, and if you don't know, that's okay, had been given a choice to either report to Los Angeles or be separated from the service; is that correct?**
A I don't know the specific rules.
**Q That's okay. What did Ms. Lee do?**
A I'm sorry?
**Q What did Ms. Lee do in response to being notified that her reassignment would be directed to another city?**

Page 77

A I can't recall.
**Q What can you recall?**
A That we had reached an agreement with her that in lieu of accepting the directive reassignment, she would agree to be in a temporary position. At the expiration of that tenure, she retired from the service.
**Q How long was she in that limited term position?**
A I don't recall.
**Q Months, years, do you recall?**
A Months.
**Q Before being placed in that position, do you know one way or the other whether Ms. Lee was retirement eligible?**
A I can't recall her specific retirement status.
(Whereupon a discussion was held off the record).
(Whereupon at 12:36 p.m. a luncheon recess was taken).

AFTERNOON SESSION
(1:35 p.m.)

whereupon,

JAMES ALAN HEIST,

was called for continued examination, and having been previously duly sworn was examined and testified further as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFF CONTINUED

BY MR. SELDON:

**Q We were talking, and we have a few more questions, oddly enough, about Mimi Lee.**

**Question number one is, with Ms. Lee having -- Ms. Lee's office having closed, and I take it it was the entire office that had been in San Francisco; is that right?**

A Yes, but her office didn't close.

**Q It closed in San Francisco, in other words?**

A No.

**Q It was relocated from San Francisco?**

A No.

**Q Let's go back then.**

**What happened?**

A The headquarters for region 9 was moved.

**Q I see.**

A From San Francisco to Los Angeles.

**Q And she had been employed as a regional headquarters audit head, I gather?**

A Yes.

**Q And that position, then, was being moved to Los Angeles when the headquarters of region 9 moved from San Francisco to Los Angeles?**

A Correct.

**Q So what choice, if any, did you have in terms of giving Ms. Lee a permanent duty station anywhere other than in Los Angeles?**

A For permanent duty station there were no other choices.

**Q Other than Ms. Lee and Mr. Beard, were there any other regional inspectors general for audit that you have reassigned outside of the area that they had been working?**

A Yes.

**Q Who would that have been?**

A Roger Niesen, and Robert Gwin, G-w-i-n.

**Q And Niesen went from what position to what position?**

A To the assistant director of TOP, technical oversight and planning.

**Q Okay. And what about Mr. Gwin?**

A Kansas, the regional director, regional inspector general for audit in Denver to the director of TOP.

**Q The Denver office is no longer a headquarters office, is it?**

A That's correct.

**Q Was it when Mr. Gwin was reassigned from Denver?**

A Yes.

**Q Did it remain that after his reassignment?**

A Not as a regional headquarters.

**Q The office remained as part of region 9?**

A It was combined with region 7.

**Q Where, once it was combined, was the regional inspector general for audit position?**

A Kansas City.

**Q And then did Mr. -- sorry.**

**Correct me if I'm wrong, is there still a regional inspector general for audit position in Kansas City?**

A Yes.

**Q Has there been continually for the last five years, I assume?**

A Yes.

**Q Mr. Niesen, do you have any reason to believe that he objected to being reassigned?**

A No. He did not object.

**Q Did you know one way or the other whether he was interested in a position of assistant director of TOP?**

A Yes. He expressed an interest.

**Q I take it that was before being reassigned?**

A Yes.

**Q Mr. Gwin, did he express an interest in being reassigned as director of TOP?**

A Yes.

**Q Was that before he was reassigned?**

A Yes.

**Q Was there anyone else at the regional inspector general for audit or equivalent office head level that**

**you have given a directed reassignment to outside of the area in which they formerly worked?**
A No.
**Q Was there anyone else at the regional inspector general for audit or equivalent level that you gave a direct reassignment to?**
A Yes.
**Q Who would that be?**
A Saundra Elion, equivalent being -- you did say equivalent, right?
**Q Yes. Because she was an office head?**
A Yes.
**Q And she became your special assistant?**
A Yes.
**Q And Mr. Beard became Mr. Phelps' special assistant, I take it?**
A Yes.
**Q I think we can safely say that Mr. Beard has objected to this assignment or no?**
A He accepted his reassignment.
**Q Did he express any interest in being reassigned before this?**

A No.
**Q Did Ms. Elion?**
A No.
**Q Do you know Mr. Beard has filed an EEO complaint?**
A Yes.
**Q And I take it we know that Ms. Elion has filed an EEO complaint?**
A Yes.
**Q And I take it that before Ms. Elion, before she was reassigned, had also filed an EEO complaint?**
A Yes.
**Q Is there a fellow by -- you know the name, George Dado; is that right?**
A Yes.
**Q He at one point was assigned to Cherry Hill, in New Jersey?**
A That's correct.
**Q What was Mr. Dado when he was assigned to Cherry Hill?**
A He was director, I believe the name was the additional review center on federal audits, something

like that.
**Q Was he part of the Office of Inspector General Office Audits?**
A Yes.
**Q Was he a grade 15?**
A Yes.
**Q Who did he report to, chain of command?**
A I believe Michael Phelps.
**Q Mr. Dado's work, was it local? I guess Cherry Hill, New Jersey, is what, region 3?**
A It's in region 2, it's New Jersey.
**Q Right. Was Mr. Dado's work when he was in Cherry Hill, New Jersey, specific to region 2?**
A No.
**Q Was it national work?**
A Yes.
**Q Did it encompass all the regions that office of audits had offices in?**
A It was a nationwide --
**Q Let me explain why I'm asking. He would be doing some sort of work that touched on all the regions that were national, or it would have been national in**

**some other basis? It was national, or it could have been both?**
A It was nationwide.
MR. SELDON: I'm letting him explain.
THE WITNESS: It was nationwide in scope.
BY MR. SELDON:
**Q Let's just leave it there then.**
**At some point was Mr. Dado's, the office he was assigned to in Cherry Hill, New Jersey, closed?**
A Yes.
**Q Do you recall when that was, about?**
A No, I don't recall when.
**Q When was -- I'm sorry. I didn't mean to cut you off.**
A No.
**Q Mr. Dado, after his office was closed, what became his duty station?**
A Immediately after the office was closed, I don't know.
**Q What about since then? Do you know?**
A At some point in time his duty station became Philadelphia.

Page 86

**Q What region is that in?**
A Region 3.
**Q Is he still, Mr. Dado still assigned to Philadelphia as a duty station?**
A Yes, he is.
**Q Region 2, is region 2, Philadelphia's the headquarters of region 3?**
A Yes.
**Q What is the headquarters of region 2?**
A New York.
**Q Are you responsible for the closure of Mr. Dado's former office in Cherry Hill, New Jersey?**
A No.
**Q How did that come about?**
A I don't recall the specifics. I wasn't involved in -- I wasn't the individual responsible.
**Q Was the office closed as a result of something HUD OIG -- as opposed to OIG HUD main?**
A It was a HUD OIG decision.
**Q Not one you participated in?**
A Well, I didn't participate in it. Well, I mean I wasn't responsible for the decision.

Page 87

**Q You've given me enough answer.**
**Let's go on. I really just wanted to know whether it was the main part of HUD or OIG. You answered that.**
**Who decided what Mr. Dado's duty station would become after the office in Cherry Hill, New Jersey, was closed?**
A I don't know.
**Q Did you participate in that decision in any way?**
A No.
**Q Is there a telework policy that you're aware of in HUD OIG as far as auditors are concerned?**
A Yes.
**Q What is it, to your knowledge?**
A Managers can approve telework on either situational basis or recurring basis.
**Q Is there some prohibition or other limitation on how many days a week an employee can telework?**
A To the best of my knowledge, I believe the recurring is limited to four days a week.
**Q To whom does a request to telework go?**
A The supervisor.

Page 88

**Q In terms of deciding, participating in the decision to reassign Mr. Beard, did you know of any part of the office of inspector general manual that authorized reassigning him for -- let's go back.**
**Did you reassign Mr. Beard for performance or conduct or both?**
A Neither.
**Q What was it?**
A Did not -- his reassignment was not a performance-based or conduct-based, actually.
**Q Did you have a short term to synthesize that?**
A I'm sorry?
**Q Do you have any short term to synthesize what it was based on?**
A It was based on some of the factors relating to the way he was running his -- running the region.
**Q Okay. And it was neither performance related nor conduct related?**
A Correct.
**Q To your understanding, what does performance related mean?**
A An action that would be taken as a consequence

Page 89

to an unsatisfactory rating.
**Q Was Mr. Beard reassigned as a consequence of something other than -- that was performance related that was other than an unsatisfactory rating?**
A No.
**Q And I think you said -- I'm sorry.**
**What do understand conduct related to mean?**
A An action that's taken in response to conduct that's unacceptable for the --
**Q Based on behavior? Is that it?**
A I wouldn't characterize it as conduct.
**Q That's fine.**
**Are you aware of any provision of the office of inspector general manual that permits or authorizes any employees in giving a directed reassignment based upon that employee's performance?**
A No. Not that I'm aware of.
**Q Are you aware of any provision of the OIG manual that permits an employee to be reassigned involuntarily, based upon that employee's misconduct?**
A Not that I'm aware of.
**Q Are there parts of the OIG manual that talk**

**about directed reassignments?**

A Not that I'm aware of.

**Q Now, if it was not performance and not conduct, what were the reasons? First, what were the reasons for reassigning Mr. Beard?**

A There were several reasons.

**Q Let me go back for one second, if we can. I'm sorry. Go ahead. What were the reasons?**

A Mr. Beard had evidenced a pattern that goes back a couple of years of submitting draft audit reports that lacked the proper criteria to support the findings. There were circumstances where in developing draft audit reports, developing audit findings, there were legal issues associated with those findings that were not developed effectively because Mr. Beard nor his staff had sought the advice of our legal counsel in vetting those issues. There were situations where Mr. Beard had failed to discuss audit findings with the program officials, which is contrary to our policy. Situations where TOP had made comments on draft reports that were not, either not addressed or not adequately addressed by Mr. Beard or his staff.

Mr. Phelps became aware of some personnel issues with respect to one of Mr. Beard's staff that weren't dealt with in accordance with our policy; not properly approving telework, approving an employee to work part time when that was not within his authority. There were other reasons.

**Q What was first -- I copied down the second one, audit findings, what was the first one you said?**

MS. MELNIK: Can I tell you?

MR. SELDON: Yeah.

MS. MELNIK: Pattern of submitting draft audits with lack of proper criteria to support the findings.

THE WITNESS: Couldn't remember what I had said.

BY MR. SELDON:

**Q So submitting audits that -- sorry Karen, what was that again?**

MS. MELNIK: Pattern of submitting draft audits that lacked the proper criteria to support the findings.

BY MR. SELDON:

**Q Okay. Mr. Heist, I'm going to ask you, sitting here today, is it your testimony that that facet of Mr. Beard's activity is not part of his annual**

**performance appraisal?**

A I don't know the extent to which those may or may not have been incorporated.

**Q Okay. Let's mark this as Heist Exhibit 9.**

**(Thereafter Exhibit 9 was marked for identification).**

**BY MR. SELDON:**

**Q Now, do you recognize this document, seeing as how you signed it.**

A It's our performance appraisal form.

**Q For whom? For Mr. Beard for the performance year ending January 31st, 2005; is that right?**

A Yes.

**Q And his first criterion discussed, submitting audits that, was it criteria support proposed findings, is that the idea?**

A Yes.

**Q Isn't this covered -- I'm sorry. If you look on page 3, Bates stamp 2303, these are the expectations, I take it, for Mr. Beard's performance during the particular year?**

A That's right.

**Q And these then provide the things that are looked at, criteria looked at in terms of rating for this year; is that right?**

A That's correct.

**Q So now if we look at the very bottom of this page, where it says business practices, and it says, adheres to prescribed audit standards and OIG policies and directives, don't OIG policies and directives include being certain that audits as issued follow approved criteria and does support the findings in audits?**

A Yes.

**Q Next we have audit findings, and I think you said coordinating legal issues with office counsel and that Mr. Beard failed to do that repeatedly; is that right?**

A Yes.

**Q Okay. Once again, let's start with, wouldn't coordinating draft audits with office of counsel be required in part of adhering to OIG policies and directives?**

A The audit operations manual does speak to involving legal counsel when legal matters arise.

**Q And that would be in part of the procedures and directives of office of audits?**
A Yes.
**Q Now, why don't we skip to the fourth one you had. I think it was a question of didn't adequately work with the technical oversight and planning division; is that the idea?**
A He didn't -- I believe I said he didn't address comments or adequately address comments.
**Q Right. From TOP?**
A From TOP.
**Q Now let's look at 2304, Bates stamp page 2304 under element 3, says improves coordination and communication between and among the office audit staff and various other organizational elements outside OIG.**
**I think we could agree that an organizational element within OIG is TOP, right?**
A That's correct.
**Q And so this is a criterion -- I'm sorry, one of the standards in which Mr. -- strike that.**
**This standard, does it not, relates to Mr. Beard's coordination and communication with TOP, does**

**it not?**
A When you say this standard --
**Q The part of the standard, I guess, under element 3, improving coordination and communication between office of audit staff and other organizational elements within and outside OIG.**
A As it's stated, that's part of element 3.
**Q Right. And that would mean coordinating and working with TOP, right? Or that would include that, wouldn't it?**
A Would include, TOP would be an organizational element.
**Q Would it? When you were talking about -- strike that.**
**And wouldn't this also include the requirement in Mr. Beard's position to have improved coordination and communication with elements with program offices in HUD itself?**
A It could. It's very general.
**Q It does, doesn't it?**
A Within and outside OIG.
**Q It does include, when it says outside of OIG, it**

**would include HUD program office?**
A Yes.
**Q Now, on the subject of -- this is a supervisory set of standards for Mr. Beard, correct?**
A Correct.
(Whereupon a discussion was held off the record).
BY MR. SELDON:
**Q One of the things we've been talking about was Mr. Beard's telework approval for an employee, and approval for an employee to go to work on a part-time basis, remember that?**
A Yes.
**Q Was that two separate things or one thing?**
A I don't recall.
**Q Do you have any reason to believe that Mr. Beard did so outside of, for any reason other than a good faith mistake?**
MS. MELNIK: Objection. Calls for speculation.
MR. SELDON: I said did he have any reason to believe.
BY MR. SELDON:

**Q Go ahead, please.**
A I have no knowledge of his motivations one way or another.
**Q Did you ever conclude that it was made for any reason other than a good faith mistake?**
A I never reached any such conclusion.
**Q Did Mr. Phelps every communicate anything on that?**
A Not that I can recall.
**Q How about Mr. Stephens?**
A Not that I can recall.
**Q I think you mentioned personnel. I jotted down personnel issues, then I jotted down telework and part-time. Was that supposed to be two separate subjects, or is that part of the same?**
A They're two separate approval processes.
**Q I meant were there other personnel issues, I guess is what I meant.**
A Not that I can recall at the moment.
**Q Now, I just want to ask you, Karen will be glad to know we're coming to the side of ending this. Last time I said that, you asked so many questions, for like**

an hour.
To your view, are there management positions in your organization in which you would not be the selecting official or someone who would approve or concur on selection?
A Management officials that I would neither -- say that again.
Q A series of management officials in your office.
A Correct.
Q Your office has their equivalent and presumably the assistants and deputies, to their offices. Would there be any selection in any of those positions in which you would not either be the selecting official or an official who's approval or concurrence would be needed?
A Generally I would either be the selecting official or concur in those selections.
Q Do you have an opinion one way or the other about whether Mr. Beard is suited to return to a managerial position in your organization?
A It's my judgment that he would not be suitable.
Q Is this for the same reasons that you had for reassigning him?

A Yes.
Q Were there any others?
A Others?
Q Reasons.
A There may be. I just can't think of them at the moment.
Q You should take as much time as you like.
A Let's see, I can't remember if I mentioned some of his reports exhibited the use of, either I or TOP judged to be, inappropriate language.
Q Inappropriate in what way?
A It wasn't, for example, pornographic. It was language that, in our judgment, violated the auditing standards, not being objective, not avoiding the use of adjectives that were of a subjective nature.
Q Now let's go back the Heist Exhibit 9, the performance appraisal of Mr. Beard. Would or would not the use of language be a matter, if you look at the bottom of Bates stamp 2303, been as a matter of OIG audit standards and policies and directives?
A Yes, it would.
Q And Mr. Beard, I take it, under this performance

appraisal system was also rated on whether conclusions were based on sound data analysis?
A Where are you reading?
Q The first bullet point under element 2.
A Yes.
Q Okay. So now we were talking about other reasons why Mr. Beard -- why he would not be considered favorably to return to a management position.
A At the moment I can't think; we covered what I can recall.
Q One of the issues in this case or set of claims concerns Mr. Beard's application for a position outside of HUD OIG, and the reference or information that was given as part of that application process. Was that anything, as the process was going on, that you were involved with?
A No.
Q Did Mr. Phelps or anyone else discuss that with you afterward?
A Only that there was a call.
Q From DOD, I guess it was?
A DOD OIG, Mr. Reardon.

Q What, if anything, did Mr. Phelps tell you Mr. Reardon asked about?
A We didn't discuss specifics.
Q Did Mr. Phelps give you any information on what he did or didn't say about Mr. Beard?
A Only that he gave an honest assessment.
Q Did he say what that was?
A No.
Q Okay. I didn't think so.
I'm going to read to you and then show you, but I'm going to avoid burdening the record. I'm reading from the affidavit that Mr. Phelps gave in connection with the investigation of Mr. Beard's complaint, and on page 5 it states, and I'm quoting, issues dealing with the complainant as the regional manager date back prior to 2001. At that time I began trying to deal with these issues, a new inspector general and deputy inspector general came to the organization in 2002. The AIGA, Mr. Heist, and I had discussions with the new deputy inspector general about moving the complainant out of the position as regional inspector general when the new official came on board.

Page 102

I think we know that Mr. Stephens came on board around January of '02. If you'd like to read that, you're welcome to.

So insofar as the parts I read to you concerning discussions with the new deputy inspector general in 2002 – I'm sorry, deputy inspector general in 2002 about moving Mr. Beard out of his position, did you participate in such discussions?

A I don't recall.

Q Okay. That's fair.

There's been some discussion in this record about a community planning and development audit that region 6 completed or prepared in the latter part of 2003. Do you recall that or recall that audit?

A Can you be more specific.

Q CPD capacity audit.

A Yes. I recall the assignment that is being referred to.

Q Okay. And may I ask you, I take it at some point you approved that audit for – you approved that audit for release, and then it was released in 2004?

A In 2004, yes.

Page 103

Q I'm sure at that time you believed that the audit report, as released, that all requirements were specified in OIG policies and directives?

A At the time it was released and final, yes.

Q Did you have any – did you ever come to a different belief prior to that? I'm sorry, after it was released?

A After it was released?

Q Yes.

A No.

Q Did you ever come to that conclusion with respect to any audit that Mr. -- region 6 was responsible for after it was released?

A Yes.

Q Which one?

A It was the audit of the San Antonio Hope 6 project.

Q When was that issued?

A I can't recall specifically; 2004, sometime.

Q And did you later come to the opinion that that audit had not been properly supported?

A Yes.

Page 104

Q When was that?

A At some point during the audit resolution process.

Q Which would have been?

A September through December of 2004.

Q And that would have fallen within – that would have been fiscal year 2005; is that right?

A December 2004 would have been fiscal year 2005, yes.

Q Now, if we look back at Heist Exhibit 9, this would have been Mr. Beard's performance appraisal covering that period of time, would it not?

A Yes.

Q And so whether or not the audit report complied with OIG standard, policies, and directives within standard, it would have showed up on his performance rating, would it not?

A Yes.

Q Did you ever document the fact that in writing to Mr. Beard, for example, that the audit report was not properly supported? When you say that, you said, "didn't comply with"?

Page 105

A What I communicated to Mr. Beard was that, as a consequence of issues raised subsequent to the report, I did not, in my judgment, believe we could support taking the disagreement up to higher level of the organization and that -- and pursuing the matter of recovering ineligible costs any further.

Q When did you come to that conclusion that you couldn't take it forward?

A During the audit resolution process.

Q Which was when?

A Roughly September '04 through December '04.

Q Were there other audits issued by region 6 when Mr. Beard was in charge of it that you came to the conclusion after they were issued were not properly supported or not properly issued in accordance with OIG procedures?

A You said came to the conclusion after it was issued.

Q My assumption is you wouldn't have issued it if you believed it at the time.

A There was an issue that came up with the Jazz land report.

Page 106

**Q When was that issued?**

A That I don't recall, but subsequent to the issuance of the report. The program office raised an issue with respect to one of the findings, and misapplication of criteria that the audit report asserted applied to some recipients but in fact the organization that received the funds, a guaranteed loan, was a for-profit entity, and therefore, did not meet the definition of a recipient, and as a consequence, there was no basis for recovering, I think, if memory serves, this approximately 7 million ineligible costs.

**Q The audit resolution -- I'm sorry, the audit resolution process, does that include a standard practice, discussions and exchanges with the subjects of the audit report about whether or not audit findings are correct and properly supported?**

A OIG normally does not have interaction with the subject. OIG's interactions are with the program, the HUD program office.

**Q As part of the audit resolution process, is it fair to say that the program office has discussions with the subject of an audit about whether or not audit**

Page 107

**findings are supported consistent with program guidelines?**

A I don't know. I can't speak to what the program office would do.

MR. SELDON: Let's take a few minutes. I'll organize my notes and see if there's anything else.

(Pause in proceedings).

(Thereafter Exhibit 10 was marked for identification).

BY MR. SELDON:

**Q Mr. Heist, let's go on the record.**

**You mentioned before that you had talking points prepared for -- in connection, or that you prepared in connection with Mr. Beard's reassignment?**

A That's correct.

**Q Is this the document you were talking about?**

A Yes.

**Q Under what circumstance -- did you prepare this?**

A Yes.

**Q How did you do that?**

A I went through reasons that we were reassigning Mr. Beard, discussed it with Mr. Phelps, Mr. Stephens,

Page 108

and it was intended to be the points that I wanted to mention when we sat down with Mr. Beard and advised him of his reassignment, these were the reasons.

**Q And did you, to your recollection, go through them all?**

A Yes.

**Q Let's go through the ones that came up sort of after break, advisement of reassignment, HQ special assistant position and employee letter.**

**See that one?**

A Yes.

**Q At the time, do you recall telling Mr. Beard whether it was a special assistant to you or special assistant to Mr. Phelps?**

A I believe we did. I don't want to say I'm absolutely certain. I mean, I don't know whether we made that clear at that time or not. I just don't remember.

**Q Next one effective date March 7th, and he has 15 days to accept or decline. If he accepts, I will entertain a request for reasonable extension.**

**The reassignment meeting was January 5th, 2005, and the effective date of the reassignment was March 7,**

Page 109

**right?**

A That's what this says, right.

**Q Is that your recollection? You can look -- it's Exhibit -- if you want to refresh your recollection, it's fine. Exhibit 8.**

A Technically it's effective March 6th, because that's Sunday, Monday is the first workday, that was March 7th.

**Q That was to be his report day?**

A Yes.

**Q He, meaning Mr. Beard, has 15 days to accept or decline, meaning 15 days from January 5th?**

A From January 5th, correct.

**Q If he accepts or declines, I will accept request for reasonable extension.**

**Do you recall saying that to Mr. Beard?**

A Yes.

**Q Now, that was an extension of the permanent report date, is that the idea? Permanent effective date?**

A Yes. The extension of the March 7th date.

**Q That's what you told him, he could request an extension; is that right?**

A That's correct.

**Q Now, go on down to, between now and the effective date, he meaning Mr. Beard, would be detailed to work at HQ for Mike.**

**See that part? That's what you told Mr. Beard?**

A Yes.

**Q Next thing on the report was that Mr. Beard should plan to report at HQ by lunch time January 10th? Is that what you told Mr. Beard?**

A I recall going through these talking points.

**Q Okay.**

A And as to whether or not I articulated that, as you know, this is a firm, etched in stone, date and time, I don't recall, or if it was flexible. That's what I don't recall.

**Q Do you recall telling him it wasn't -- do you recall telling him it was flexible?**

A I don't recall one way or the other. What I recall is just generally discussing that we were going to detail it at headquarters.

**Q Following down these talking points and so advising Mr. Beard, correct?**

A Yes.

MR. SELDON: Okay, Karen.

EXAMINATION BY COUNSEL FOR DEFENDANT

BY MS. MELNIK:

**Q Mr. Heist, do you recall Mr. Seldon asking you questions -- strike that.**

**Do you recall your testimony where you said that Mr. Beard's reassignment from Fort Worth to Washington was not performance -- was not based on performance, and was not based on conduct?**

MR. SELDON: Objection. Leading and asked and answered at least three times.

MS. MELNIK: Just giving him a point to reference in your questioning, then I'll ask a full on, Mr. Seldon.

BY MS. MELNIK:

**Q Do you recall him asking you questions about that and you answering thusly?**

A Yes.

**Q Okay. And do you recall Mr. Seldon pointed out with each one of the reasons that you provided for the directed reassignment, you agreed that the performance**

**evaluation, whether it be specific or in a general way, covered the reasons that you stated as the reasons for Mr. Beard's directed reassignment?**

A Yes.

MR. SELDON: Objection. Leading. Asked and answered six times.

BY MS. MELNIK:

**Q Now, Mr. Heist, in your mind, why in light of the foregoing, your foregoing responses to Mr. Seldon, why were those reasons, in your mind, not performance or conduct related? Or based on performance and conduct?**

MR. SELDON: Objection. Leading.

But go ahead.

THE WITNESS: In my mind, it was a matter of degree, and --

BY MS. MELNIK:

**Q What do you mean by degree?**

A Well, at the time our rating system was a pass/fail system, so you either passed or you failed, and if you failed a rating, that meant that you were either removed from service or downgraded.

**Q In pay? You mean downgraded in pay?**

A Downgraded in GS level.

**Q Okay.**

A The issues that we had with Mr. Beard and the way he was managing the region spanned a number of years. I think in the final, we made a judgment that, if you looked at the totality of what the region did, that we felt that a better way to handle it was to reassign Mr. Beard, rather than pursue a performance-based action. I wasn't interested in seeing Mr. Beard fired and downgraded. I thought, in my judgment, he could continue to make a contribution to the organization in the capacity of a special assistant. He could do so without losing any grade or pay.

**Q With respect to Mr. Beard's communications with headquarters, why was that a -- why, if at all, why was that a concern to management?**

A Again, it was a matter of degree. I felt that headquarters staff, TOP in particular, had to spend an inordinate amount of time in dealing with region 6's work products as compared with the other regions. It would take a -- oftentimes or a number of times either myself or TOP had to go to legal counsel to obtain legal

Page 114

opinions that, again, in my judgment, should have been obtained when the audit was ongoing and should have been resolved before we got to the draft report stage and couldn't avoid any unnecessary interaction and arguments between headquarters staff and the region staff.

**Q What, if any, impact that you either observed for -- either observed or heard for yourself, did Mr. Beard's relationship with headquarters have on his subordinates?**

A I think, in my judgment, Mr. Beard's attitude towards headquarters in essence adversely affected the way they interacted, the way the staff interacted with headquarters. He was setting the tone, that it was acceptable, even encouraged, to question headquarters, argue with headquarters, and to the extent that individuals were voicing their opinions, that's fine. I've always encouraged voicing opinions and those opinions, both sides of the story are vetted, and ultimately it's my job to make a decision and then move on. Oftentimes that's what wasn't happening. Instead of moving on, either Mr. Beard or his staff would raise issues again, argue the same points over again, and it

Page 115

was counter productive.

**Q Mr. Heist, what was your attitude with respect to Mr. Beard when Mr. Stephens started in his position? What was your approach? What was management's approach in terms of managing Mr. Beard?**

A I think it initially when back to 2002 when Mr. Stephens and Mr. Donahue assumed charge of IG, our approach was one of trying to work with Mr. Beard, and recognizing the overall context of what had happened with the organization.

**Q What do you mean by that last statement?**

A Under the previous administration, prior to 2001, under the leadership of Inspector General Gaffney, her management philosophy was one of decentralization.

**Q What does that mean for a RIGA? If you're saying Susan Gaffney's philosophy was decentralization, what's the implication for a RIGA?**

A It meant that each region, not just Mr. Beard's, all, all the regions and headquarters directors had responsibility to perform audits, issue audit reports with little or no headquarters oversight.

**Q Did that change?**

Page 116

A I changed that. I started to change that. Mr. Williams, when he was acting IG, changed that, and Mr. Stephens and Mr. Donahue continued that change in philosophy for a centralized focus with more of a degree of headquarters oversight.

**Q With respect to that management view or management decision in terms of dealing with Mr. Beard in respect to that change, overall change, was what?**

A It was my experience that Mr. Beard and his staff were resistant to that change. He questioned the level of headquarters oversights, and it was in that context that we dealt with or tried to get Mr. Beard to adjust to that change.

**Q And for how long did management try to do that, approximately how long a period of time?**

A From 2002 through the end of 2004.

**Q And ultimately, in your opinion or your assessment, did Mr. Beard adjust to the change?**

A No.

**Q Did the other, in your assessment, management assessment, did the other RIGA's adjust to the change in management from decentralization to centralization?**

Page 117

A Yes.

**Q What's your birth date, Mr. Heist?**

A June 8th, 1954.

**Q Makes you how old?**

A 52.

**Q Who replaced Mr. Beard out in region 6?**

A Frank Baca.

**Q Do you know approximately or how old he is?**

A No. I don't know how old he is. I only know that he's older than me, because I've heard him talk about being a Veteran of Vietnam. So since I narrowly missed that, must be older than me.

**Q The problems that you've described that you had coming out of region 6 when Mr. Beard was RIGA, have those problems continued or not under Mr. Baca?**

A No. Have not continued.

**Q The decision to take Mr. Beard from his supervisory position out of region 6, was that based on Mr. Beard's or affected by Mr. Beard's age?**

A No.

**Q Was the decision to implement the directed reassignment of Mr. Beard influenced or affected in any**

Page 118

**way by his prior EEO activity, or the settlement in '02?**
A No.
**Q Or the testimony that he gave in the Robert Tighe EEO complaint?**
A No.
**Q Mr. Heist, what, if any, role, did you have in the selection of Mr. Baca as the RIGA for region 6?**
A I was the selecting official.
**Q You mentioned that you discontinued the region ranking system that Mr. Phelps had implemented. Do you recall that?**
A Yes.
**Q Did you discuss that before or after he retired?**
A It was before he retired.
**Q Why did you discontinue region ranking system that Mr. Phelps had implemented?**
A I just came to the conclusion that the ranking process attempted to -- was carried out in such a way that it was too subjective. It required too many arbitrary assumptions to be made to get to the bottom line ranking. Any way of evaluating purchase performance has subjective elements, and that has to be recognized.

Page 119

We made an attempt for FY '05 to refine that. We made the rankings, we set them on it, we had a lot of concerns expressed to us by the RIG's that really pointed to the fact that it was just too impractical to try to make judgments about which goal is more important than another goal, because that had an effect on how the numbers worked out.
MS. MELNIK: Okay.
MR. SELDON: I just have a few follow-up questions.

EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. SELDON:
**Q Mr. Heist, if I understood your testimony, you said that if Mr. Beard failed a rating, you could have removed or demoted him, and instead of doing that, if I misunderstood you, say, that you reassigned him so he could continue to make contributions to the organization?**
A I said that.
**Q Isn't it correct, if Mr. Beard failed a rating, he would have to be placed in a period to demonstrate satisfactory performance before he could be removed or demoted?**

Page 120

A Yes, that's correct.
**Q So the other statement's not correct?**
A Yeah. Would be a possible outcome.
**Q Correct. But you can't take -- you can't remove or demote a GS-15 career civil servant like Mr. Beard without the basis of a performance rating without first giving him the opportunity to demonstrate he can perform satisfactorily; is that right or wrong?**
A That's correct.
**Q When you gave Mr. Beard, instead of that, the opportunity to make a contribution to the organization, what specific contributions to the organization did you have in mind for Mr. Beard to make beginning January 10th, when you were waiting for him to show up?**
A There was a continual need for someone with experience to carry out projects.
**Q Would it be safe to say you don't know of any specific assignment you anticipated Mr. Beard to be performing on January 10th?**
A Not on January 10th, no.
**Q What about a month into it?**
A I know of projects that Mr. Phelps assigned him

Page 121

to, generally.
**Q As of when?**
A As I indicated, Mr. Phelps was responsible for making his assignments.
**Q Just so we're clear, you could have given Mr. Beard assignments directly, right?**
A I could.
**Q And you did not, I take it?**
A No, I did not.
**Q Could you have given the assignments to Mr. Phelps to give to Mr. Beard?**
MS. MELNIK: Objection.
BY MR. SELDON:
**Q Keeping in the standard practice.**
A I could have.
**Q Did you?**
A I don't recall any specific.
**Q And then let's say what specific advisements do you know of, let's say in the first three months after Mr. Beard's reassignment to Washington, DC, do you know for certain that Mr. Phelps gave him?**
A I know Mr. Phelps assigned him to develop a

Page 122

competency-based rating system.
Q Anything else?
A For GS employees. That's what comes to mind.
Q Anything else?
A Don't recall, other in that time frame.
Q Had Mr. Beard been working on that before his reassignment?
A I don't recall.
Q Do you recall giving Mr. Beard an award based in part on the competency-based appraisal system?
A No, I don't.
Q Let's mark this as Heist Exhibit 11.
(Thereafter Exhibit 11 was marked for identification).
BY MR. SELDON:
Q Do you recognize this document, sir?
A It's an award recommendation for performance and incentive award, yes.
Q For Mr. Beard, correct?
A Yes.
Q That you provided, right?
A (Nods head).

Page 123

Q You need to say yes or no, painful though it may be.
A Yes.
Q You did approve on May 28th, 2004, right?
A Yes.
Q That Mr. Phelps recommended for Mr. Beard on May 27th, '04, right?
A Yes.
Q All of which was before his reassignment, correct?
A Correct.
Q And part of this award is based on Mr. Beard's work in the competency-based performance appraisal system, right?
A Yes.
Q This was the system that it was talking about, I take it?
A Yes.
Q In other words, Mr. Beard was working on this before he was reassigned. Which is not to say that he didn't work on it after, but he worked on it before?
A Right.

Page 124

Q Anything else come to mind that Mr. Beard was assigned to do 90 days after reassignment?
A No.
Q Anything at any time after that that comes to mind?
A Did an assessment of -- did a review of our audit reports and looked as those audit reports for consistency of reporting monetary benefits.
Q Okay. What else?
A He was assigned to work on the peer review.
Q Okay.
A That was performed.
Q Okay. Anything else?
A That's all that comes to mind.
Q This award, Exhibit 11, was it based on things other than Mr. Beard's performance in the core competency-based performance task force?
A Yes.
Q Such as?
A Would you like me to read it?
Q In your own words, explain it for us.
A Serving on task force representing OIG, outreach

Page 125

to outside organizations.
Q Is that -- go ahead.
A Issuing audit reports, submitting four referrals to the office of investigations, providing staff assistance, office of investigation attorney's office and financial audit.
Q Did this have to do with Mr. Beard's management of his office in region 6?
A In part.
Q I mean, those things that you just mentioned?
A Yes.
Q Okay. Now, the regional rankings that were discontinued, I just want to ask you, were you or were you not present at a meeting when Mr. Donahue, the inspector general, stated that awards would be given out based on regional rankings at least in the office of audits, if not other offices as well?
A I do recall a meeting when such an award was considered.
Q And do you recall Mr. Donahue talking about that?
A I recall the talk. I don't remember

Page 126

specifically what he said.

MR. SELDON: I have nothing more.

(Whereupon the deposition concluded at 3:18 p.m., the witness having not waived signature).

-o0o-

Page 127

CERTIFICATE OF COURT REPORTER

I, TRACY E. BARKSDALE, the court reporter before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the foregoing testimony is a complete, true, and correct transcription of the stenographic notes as taken by me in said manner on said date; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

DATED_______________

_______________________________
TRACY E. BARKSDALE, RPR
Notary Public for the
District of Columbia
My commission expires
November 14, 2011

Page 128

AFFIDAVIT OF DEPONENT

I have read the foregoing deposition, which contains a correct transcription of the answers given by me to the questions therein recorded, except as to errors which may be indicated on any attached errata sheet.

_______________________________
JAMES ALAN HEIST

Subscribed and sworn to before me this _____ day of ____________, 2007, in ______________

_______________________________
Notary Public

My Commission Expires:

________________, 20___

Page 129

ERRATA SHEET

Case Name: Beard v. Jackson

Witness Name: JAMES ALAN HEIST

Deposition Date: February 14, 2007

Page No. Line No. Change