

EXHIBIT 8

# AFFIDAVIT

WASHINGTON, DC

I, Michael R. Phelps (DOB: 11/4/45; with previous EEO complaint activity), Deputy Assistant Inspector General for Audit, Office of Audit, OIG, make the following statement freely and voluntarily to Charlester Williams, who has identified himself to me as a Contract EEO Investigator for the following federal agency: HUD, investigating a complaint of discrimination filed by D. Michael Beard, knowing that this statement may be used in evidence. I understand that this statement is not confidential and may be shown to the interested parties (those with a legal right to know). I solemnly swear or affirm the following:

I was asked a number of questions of the investigator. Those questions and my responses are set forth below.

Q. Were you the management official who made the decision to reassign the Complainant from his position of Regional Inspector General of Audit. If not, who made the decision? What role if any did you play in the reassignment decision?

A. I was not the management official who made the decision to reassign the Complainant from his position of Regional Inspector General of Audit. That decision was made by my boss, Mr. Heist, the AIGA. In making his decision, Mr. Heist did consult with me regarding the Complainant's unwillingness to adhere to HUD OIG policies or Headquarter's guidance. Given that during the time in question I served as the Complainant's immediate supervisor, I was and am in a position to speak to the Complainant's failings in this regard.

Q. Mr. Heist, the AIGA, stated he lost confidence in the complainant's ability to manage the regional audit office in compliance with outstanding office policies and auditing requirements. He states many of the Complainant's work products lacked credibility and either had to be significantly revised or the assignments were closed with no issued audit report. He states it is for this reason the Complainant was reassigned out of his Regional Inspector position. As the Complainant's immediate supervisor can you speak to the points raised by Mr. Heist in the memorandum he provided the Complainant outlining his reasons for the reasignment decision? In discussing the points, please provide relevant examples to illustrate the points made.

A. As the Complainant's immediate supervisor I can speak to the issues of the Complainant not applying laws and regulations properly, not seeking OIG counsel's advice in interpreting these laws and regulations, not communicating issues with HUD Program officials in a timely manner, not adequately addressing concerns raised by the AIGA, Mr. Heist, and the OIG Counsel, the Complainant's failure to adhere to OIG policy, and the Complainant's failure to follow

established personnel policy in a number of areas, including the failure to bring matters to my attention as his supervisor in a timely manner as required. Although I can raise numerous examples that illustrate these failings, I will cover a couple of pertinent examples from the last audit the Complainant performed that best illustrate the shortcomings.

As an example of the Complainant's failure to properly apply laws and regulations, the Complainant sent in a draft audit report to Headquarters on CVR Associates, a contractor to the Housing Authority of New Orleans. He inappropriately cited his criteria for his audit finding as being OMB Circular A-87. After reviewing the draft report, the Office of Counsel to the IG informed the Complainant that this was an inappropriate criteria because A-87 applies to non-profits and CVR Associates is a "for profit" company. IG Counsel told the Complainant that he should use federal acquisition regulations as the criteria for his audit finding. The Complainant sent in a revised draft of his audit report still containing references to A-87 while not appropriately demonstrating that the applicable federal acquisition regulations were violated. In a memorandum, dated December 17, 2004, from the AIGA to the Complainant, the Complainant is given the reasons why his recommendations in the audit report were not being accepted. The memorandum cited specific reasons why his recommendation was wrong. Specifically, on page 3 of the memo, recommendation 3(d) states that A-87 does not apply to CVR because it is a "for profit" entity and CVR costs must be analyzed under the federal acquisition regulations. Not only does this instance illustrate the Complainant's failure to properly apply rules and regulations, but it also demonstrates his failure to seek guidance from IG Counsel early on in the audit process. When the Complainant was initially faced with the question of what is the proper criterion to use for this particular company, he should have known A-87 applied to non-profits and he should have consulted with IG Counsel before applying A-87 to a for profit organization. Had he done this, this issue would not have arisen at the end of the audit when he was putting forth his audit findings. The Audit Operations Manual calls for consultation with IG Counsel throughout the process when issues arise in audits. This instance is just one example of the Complainant's failure to adhere to OIG policy or Headquarters guidance. It is expected that a manager such as the Complainant in the position of Regional Inspector General of Audit would appropriately apply the correct laws and regulations as criteria in audit reports and would seek guidance from OIG Counsel, as required by the Audit Operations Manual, when an issue arose regarding the proper criteria, and would apply that guidance appropriately.

The CVR Associate audit serves to also demonstrate the Complainant's failure to adhere to OIG policy with regard to submitting a survey report. The Audit Operations Manual requires the submission of a survey report during an audit. First, you are to conduct a survey and issue a survey report. This is to precede the audit phase and the final audit report. For the CVR Associate audit, the Complainant failed to submit a survey report. In fact, the first time Headquarters became aware of the specific issues in the audit was when it received the Complainant's draft audit report. Had he provided a survey report, Headquarters

would have been put on notice of the issues involved, including the inappropriate criteria that the Complainant was entertaining, and could have addressed such matters much earlier. Again, this failure illustrates another instance of not adhering to OIG policy. It is expected that a manager in the position of Regional Inspector General of Audit would submit a survey report as required by the Audit Operations Manual.

The Complainant also had the habit of using judgmental, opinionated, and biased language in audit reports contrary to government auditing standards. The standards require balanced reporting, not using a tone that implies criticism or unsupported conclusions. The Complainant's reports frequently included such unacceptable language. A specific example can be seen in the draft CVR Associates Report. For example, on page 13, first paragraph, he uses the term "conjured up," on page 24, last paragraph he uses the term "sloppy" and "inept." On page 26, second paragraph he uses the phrase "indulgences and abusive." These sorts of criticisms and opinionated terms are found throughout the audit report contrary to government auditing standards. In our December 17, 2004 memo to the Complainant where we laid out the reasons why his audit recommendation was not being accepted, provided the Complainant with an extensive listing of his use of inappropriate language throughout the report. It should be noted that the Complainant's audit report contained this opinionated language after he had been earlier advised that his earlier draft contained opinionated language and needed to be removed. In an e-mail to the Complainant from the AIGA, dated September 15, 2004, the Complainant was advised that his draft report was reviewed by the Assistant Director of Technical Oversight and Planning, Roger Neisen, who determined that there were dozens of expressions and words that needed to be removed because to a cold reader the audit appears to be biased against the auditee. I would not expect an auditor at any level in the organization, let alone a manager in the position of Regional Inspector General of Audit, to use inappropriate language in audit reports contrary to government auditing standards.

I expect that a manager at the Complainant's level to be able to express his views to senior management, but once we make a decision we expect him to accept it and move on in the direction we are telling him. Too frequently, the Complainant and his staff did not adhere to this philosophy and they were often argumentative and resistant to our directions. The Complainant, as manager of the region, should lead by example and set a positive tone for his staff to follow in working with Headquarters. But to the contrary, the tone he set for his staff to deal with Headquarters was negative. In my opinion, there was a need to change the management of the Complainant's region to put a leader in place who was able to work closely with Headquarters in a professional manner and not one that continually created antagonistic situations.

Our Audit Operations Manual requires that I be notified of any personnel conduct or performance issues as soon as they become an issue. On May 20, 2004, I received an e-mail from William Nixon, a supervisor on the Complainant's staff,

which outlined performance and conduct issues by a member of the Complainant's staff that had been festering for an extended period of time and had reached the stage where the person was contemplating filing an EEO complaint. In fact, she had been in touch with our OIG EEO coordinator. Failure to notify me in a timely manner is contrary to our Audit Operations Manual. As I began to look into the matter I found a number of violations of OIG policies by the Complainant. For instance, the Complainant was allowing this individual to work on a part time basis without the required approval of the AIGA. Only the AIGA can approve part time employment in the Office of Audit. The Complainant had approved this individual to work part time for maternity reasons but that approval had expired. The Complainant allowed the individual to continue the part time employment without authorization. After I brought the part time issue up to the Complainant he began taking steps to terminate the part time employment. Further, I found that the employee was being allowed to tele-work without the approved tele-work documentation. I also found that the Complainant had advanced the employee sick leave contrary to OIG policy, given that only the AIGA has authority to advance sick leave. After I brought this matter to his attention, the Complainant sent me an e-mail acknowledging that I had raised the issue with him and showing that he had approved advance sick leave for yet another employee and was now asking to have it approved by the AIGA. These are all very basic policies and I would expect that a manager in our organization would understand and comply fully with the requirements. This is another example of why I lacked trust in the Complainant's ability to manage the regional office in compliance with OIG policy.

The above examples for the most part focused on the Complainant's last audit report, but the failings with that report are just the most recent examples of the deficiencies in the Complainant's management of the work performed by his region and the reports that region submits to Headquarters.

Q. The Complainant asserts that he believes the reasons provided by Mr. Heist---the Complainant was not managing his region the way senior management wanted the region run---was nothing more than a subterfuge for discrimination because at no time had he (the Complainant) ever been given indication in any way that management was dissatisfied with how he was managing his region. To the contrary, the Complainant argues, he received positive assurances and comments in the performance rating that he received the year of his reassignment. He states he also received a performance award for that same rating year. He states these matters make clear that senior management did not have a problem with how he performed his Regional Manager duties and Mr. Heist's assertions to that affect were nothing more than pretext for illegal discrimination. Please respond to this pretext argument asserted by the Complainant.

Page 4 of 7                                                                       Initials _____

A. Issues dealing with the Complainant as the regional manager date back prior to 2001. At that time, I began trying to deal with these issues. A new Inspector General and Deputy Inspector General came to the organization in 2002. The AIGA, Mr. Heist, and I had discussions with the new Deputy Inspector General about moving the Complainant out of the position as Regional Inspector General when the new official came on board. Subsequently, I issued the Complainant a formal reprimand in February 2002 for his failure to follow established policies, indeed for the very same failings that he was reassigned from his position in 2005. He thereafter filed an EEO complaint based on the letter of reprimand. As part of the EEO process he requested ADR, which he conducted with the Deputy Inspector General. The Deputy Inspector General resolved the EEO complaint by allowing the Complainant another chance to see if he could become a team player. From that point on, we tried to work with the Complainant. We continued to counsel him about the way HUDOIG wants things done as well as on his need to follow standard rules and procedures. I took this approach as opposed to writing negative comments in his performance appraisal. Evidencing the ongoing management issues that I had with the Complainant functioning as regional manager and, matters that were addressed in several counseling sessions, attached are written communications I had with the Complainant on such matters beginning as far back as March 4, 2002.

The problems we were having with the Complainant's management of his region were not reflected with negative or failing performance evaluations. He received a passing overall rating for each of his ratings because if you measured his performance against each of the standards, it would not equate to a failing grade in our pass/fail system. Notwithstanding the passing grade he received on his annual ratings, many issues continued to arise that were not in accordance with how we expected the region to be managed.

The Complainant did receive a Special Achievement Award for 2004. This award recognized him for an administrative process of developing a core competencies rating system for auditors. This had nothing to do with the ongoing management issues within his region. I was the manager who gave the Complainant a Special Achievement Award.

Q. The Complainant charges you with discrimination when you denied him a rental car during his TDY assignment to Washington, DC beginning in January 2005. Did the Complainant request a rental car? What action was taken on the request and was the action based on the Complainant's age or any other impermissible factor?

Page __5__ of __7__                                      Initials __MH__

A.  Mr. Heist made the decision to reassign the Complainant as discussed above. Accordingly, we called the Complainant to Headquarters and gave him the reassignment letter on January 5, 2005 telling him that he had to report to Headquarters on a TDY assignment on January 10, 2005. The TDY assignment was to last until he reported to his new position by way of the directed reassignment, which was effective March 2005. We agreed to pay for his expenses during the TDY. However, the Complainant wanted a rental car provided to him during the TDY assignment. I told him that I did not think a rental car was justified because there was sufficient lodging and amenities off of the metro line, lodging that would provide him everything that he needed during the TDY. I have a budget that I have to administer for our entire organization and I did not believe it was fiscally responsible to pay for a rental car when there is satisfactory alternative transportation available. During the past 2 years two of our regional managers accepted voluntary reassignment to headquarters and neither of them were provided with a rental car. This was unlike our typical TDY assignments that are short in duration. Providing rental cars for short TDY assignments do not have the same impact on our budget as a rental car for an extended TDY such as in the Complainant's case. This was a budgetary decision I made that had nothing to do with age or any other discriminatory motive.

Q.  The Complainant charges you with retaliating against him for his prior EEO complaint against him when you gave him negative job recommendation for a position he was being considered for with the Department of Defense. Please respond to the charge.

A.  I was called upon to provide the Complainant a job recommendation. I received a telephone call from Robert Reardon from the Department of Defense who asked me to provide him my views of the Complainant as an employee as he was considering the Complainant for a position with his agency. I told Mr. Reardon a lot of positive things about the Complainant. I also shared with Mr. Reardon that we had a previous administration where the previous IG did things one way and the new IG took us in a different direction. I told him that the Complainant could not get in step with that new direction, which is why it was necessary to bring the Complainant to Headquarters as opposed to allowing him to continue to run a region. I recognize that in informing Mr. Reardon about the circumstances surrounding the Complainant's directed reassignment I was providing some negative information about the Complainant's employment along with the positive information that I had related. But, I had to be honest in my assessment, especially in dealing with the matter relating to the Complainant's directed reassignment back to Headquarters. This issue could not be avoided or skirted over and to attempt to do so would have been less than candid. My relating this information had nothing to do with reprisal or discrimination of any kind. I related the information with the same mindset that I related the Complainant's positive

Page 6 of 7 .                                         Initials _MRP_

traits and abilities. At the time of my providing the recommendation, I was aware of the Complainant's past EEO complaint activity, as I earlier explained the complaint concerned a letter of reprimand I had issued the Complainant. As stated, the recommendation I gave in 2005, had nothing to do with the Complainant's 2002 EEO complaint filing.

I have read this statement, consisting of ___9___ pages, and it is true, complete, and correct to the best of my knowledge and belief.

X _____
Signature of Affiant

Date 11/23/05

Signed and sworn to before me

on this 23 day of 11, 2005,

at ___DC___.

_____
Neutral witness, notary, or Investigator

Page 8 of 9   Initials _____