## DECLARATION OF WILLIAM NIXON

I, William Nixon, being first duly sworn, do hereby depose and state as follows:

1)      I began my career with the Department of Housing and Urban Development Office of the Inspector General (HUD OIG) in 1992 as an auditor in the New Orleans field office, which is in Region VI.  In 1997, I was selected as a Senior Auditor in Miami.  In approximately 1999, I was promoted to the position of Assistant Regional Inspector General for Audit (ARIGA) in Region VI.  At that time, Mr. Beard was the Regional Inspector General for Audit (RIGA), and my first-level supervisor.

2)      I am a Certified Public Accountant and Certified Internal Auditor.

3)      While I was an ARIGA under Mr. Beard's supervision, I was responsible for the New Orleans field office as well as some staff out of the Fort Worth office.  I had approximately 8 auditors under my supervision.  I am currently responsible for the audit staff in the Oklahoma and Fort Worth offices.  My job as an ARIGA, in part, is to ensure that the audits conducted under my supervision are complete and that they comport with the Generally Accepted Auditing Standards (GAAS) and Generally Accepted Government Auditing Standards (GAGAS), also known as the "yellow book."

### Initiation of the CVR Audit

4)      I was the ARIGA in charge of the audit of the Housing Authority of New Orleans (HANO) and CVR Associates, which is referred to as the CVR audit.  This audit came about after HANO had been put into receivership by HUD.

5)      During 2003, at the request of Deputy Inspector General Stephens, two auditors under my supervision were assigned to work with the investigative side of Region VI to look into suspicions that CVR Associates and other contractors had been inappropriately using HUD "low

1

Attachment

C

rent" grant money that they received from HANO. During this initial stage, the investigators and auditors served subpoenas on HANO, CVR, and other contractors in order to obtain contracts between the organizations, invoices, receipts, and other documents. They also conducted interviews with knowledgeable HANO staff.

6)    After the investigators and auditors had gathered a sufficient amount of evidence indicating potential wrongdoing, the audit side of Region VI was asked by Carmen Valente, who was serving as the Administrative Receiver for HANO, to perform an audit to confirm whether the contractors had received money for unsupported or ineligible expenses. This request was made at a meeting that Mr. Beard and I attended in New Orleans at which Mr. Valente; Mr. Heist, the Assistant Inspector General for Audit (AIGA); Mr. Haban, the Assistant Inspector General for Investigations; and Mr. Tighe, the Assistant Special Agent in Charge (of investigations) in Region VI were present. We discussed some of the problems that HANO was having, and Mr. Valente explained what HUD wanted us to do for the audit. Accordingly, Headquarters audit management was well aware of the scope of the audit right from the start. In fact, the audit was considered a "top priority" in the OIG and was included in the weekly priority report prepared for Inspector General Donohue.

### Headquarters' Knowledge of the CVR Audit

7)    As an initial step in the audit process, we developed an audit program which involved identifying the audit objectives and the steps that we would take to accomplish them. Because the audit had been requested by HUD, we did not need the approval of the Technical Oversight and Planning division (TOP) before undertaking the audit. However, on February 17, 2004, Region VI did inform TOP of the decision to open an assignment for CVR Associates and explain the audit objectives, which were to determine whether CVR Associates complied with

the provisions in its contract with HANO; whether costs that CVR Associates billed to HANO were for eligible expenses; whether make-up charges that CVR Associates added to sub-contract expenses were eligible charges; and whether conflicts of interest existed.

8)     This audit program and all of the working papers were stored in Auto Audit, an electronic program we used to manage audits and keep Headquarters abreast of our actions.  The working papers included many of the documents that we gathered and used to support the findings and conclusions of the audit.

9)     We also communicated with Headquarters and TOP about the status and progress of the audit through the bi-weekly briefing papers that we submitted.  These briefing papers, submitted electronically through Auto Audit, contained a table showing the progress of the audit and what phase of the audit we were in.  The briefing papers also contained a "current status" section in which we provided a narrative description of what we had accomplished, where we were planning to go next, and a timeline for completing each task.  In the "summary" section we provided information about the findings that we had made.  TOP was responsible fore reviewing the briefing papers.  Additionally, we had monthly teleconferences with Deputy Assistant Inspector General for Audit (DAIGA) Phelps; Mr. McLeod, who was the director of TOP; and the TOP desk officer assigned to our region.  Therefore, Headquarters management and TOP were kept fully informed about the CVR audit throughout the audit process.

## The CVR Survey Report

10)     I am aware that the agency has claimed in its Motion for Summary Judgment that region VI failed to submit an audit survey for CVR, thereby breaching OIG policy.  Def. Mem. at 9.  That is not accurate.  TOP did not make the revisions to the Operations Manual that required TOP's approval of survey reports until after we had begun working on the CVR audit.

My recollection is that the CVR audit began in approximately February of 2004.  TOP sent out draft revisions to the Operations Manual, which included language about the survey reports, in April of 2004.  See Attachment XX (April 8, 2004 email).  The revisions were finalized some time after that.

11)     Moreover, I do not believe that Region VI received training on the changes to the audit process, including survey reports, until our 2004 regional conference, which occurred towards the end of September that year.  At that time, we received a two day training course on report writing.  Mr. Heist did not require Regions to implement or retroactively apply the new survey report policy until after they had undergone the report writing training.  By the time Region VI received training, we were well beyond the survey report stage in the CVR audit – in fact, we had submitted our draft audit report on CVR on September 7, 2004.   It would not have made any sense for us to back-track and submit an audit survey when the CVR audit was complete.  Furthermore, neither Mr. Heist nor TOP ever asked us to do so.

### TOP's Comments Regarding the Draft CVR Audit Report

12)     As stated above, we submitted the draft audit report for CVR to TOP on approximately September 7, 2004.  TOP's initial comments, which we received on or about September 15, 2004, were transmitted to us via email.  Attachment XX (Def. Ex. 10 at pp. 8-10).

13)     The draft audit contained six findings, three that implicated HANO and three that implicated CVR.  One of TOP's suggested changes was for the report to be reorganized from six findings into two.  Id.  Based on TOP's comments, it appeared that they wanted us to place more blame on HANO rather than CVR.  For example, the first finding TOP requested was a finding on HANO not being properly managed.  However, TOP did not provide any criteria or reasoning

regarding why this new finding was appropriate. Nor did TOP take into account that HUD and

OIG already agreed that HANO was poorly managed.

14)    TOP also made vague references to "flagrant expressions and words" that it

claimed were included in the audit report. Id

15)    On September 20, 2004, Region VI requested clarification from TOP on several

of their comments, and provided explanation about why we had structured the audit the way we

did, and why we had included information that TOP considered to be "tangential." See

Attachment XX (Def. Ex. 10 at pp. 8-10). We objected to the suggested structure change as

being contrary to our understanding of the purpose of the audit. Id. Additionally, we asked for

TOP to identify the words that it felt were problematic. Id.

16)    At our regional conference on September 21, 2004, DAIGA Phelps stated that

Region VI would be given specific and detailed critiques from TOP to our draft report, rather

than the vague statements we received on September 20.

17)    Yet, on October 5, 2004, Mr. McLeod, the Director of TOP, informed us that he

would not respond to our inquiries until he heard from the Office of General Counsel on a legal

opinion that TOP had requested.

18)    We received the legal opinion on October 22, 2004. Attachment XX. After

making changes to the draft audit report conform with the opinion, we submitted a revised draft

on October 26. The following day, AIGA Heist sent an email to Region VI suspending the

processing of the draft report and directing TOP to perform a detailed review of the assignment

for compliance with the Audit Operations Manual and Government Audit Standards.

19)    On December 17, 2004, we received a memorandum from Mr. Heist advising us

that based on TOP's review of the draft CVR audit report, the audit report could not be issued.

Attachment XX (Def. Ex. 10). He also said that there was no need for a formal audit report to be issued at all. Id. Mr. Heist attached TOP's "report" on the draft audit to his memo. Id.

20)    I take issue with the "report" from TOP, and with Mr. Heist's determination that the audit report should not be issued. First of all, the attachment to Mr. Heist's memo does not conform to the standard report format used by the OIG, and does not appear to have been written in accordance with the OIG manual. It is not on HUD OIG letterhead, it was not signed, and it did not contain an explanation of TOP's methodology. Furthermore, TOP had not spoken with any of the auditors who conducted the audit, nor had it reviewed the thousands of hard copy documents Region VI had subpoenaed from CVR, which supported our findings. Most importantly, Mr. Heist had not given Region VI an opportunity to review and respond to the criticisms contained in TOP's "report" before making his determination not to issue the audit report. Attachment XX (Def. Ex. 10 at Heist memo).

21)    For this reason, Region VI prepared a rebuttal to the December 17, 2004 memo explaining point-by-point our response to TOP's review. Attachment XX (Def. Ex. 18). We felt that it was important for Mr. Heist to have a full understanding of the reasoning and evidence that supported our findings and conclusions in the draft report; ultimately, Region VI was not given an opportunity to present these explanations to TOP or to Mr. Heist.

### HUD OIG's Legal Opinion About the Criteria for the CVR Audit

22)    In October of 2004, TOP requested a legal opinion on the draft CVR audit report because it had questions about whether we had applied the correct criteria in our analysis. In the initial draft of the report, we used the Office of Management and Budget (OMB) Circular A-87, the cost principles of which govern "allowable costs incurred by State, local, and federally-recognized tribal governments under federal awards." Attachment XX at XX (legal memo). The

A-87 also applies to sub-awards made to entities other than "commercial organizations." Id. We used the A-87 as our criteria because it applied to HANO and because it would be familiar to those who would be reading the audit.

23)    The Federal Acquisition Regulations (FAR) contain similar cost principles that govern cost allowability under federal awards to for-profit organizations. 48 C.F.R. Part 31 (XX check citation). There are no material differences in the cost principles of the A-87 and the FAR.

24)    After the legal opinion was requested, we invited Brian Baker, an attorney from the Office of General Counsel, to come down to Fort Worth to review the documents that supported our findings in the draft audit report. We walked Mr. Baker through our reasoning for applying the criteria we used. We also explained our findings to Mr. Baker and provided him with the evidentiary support underlying them.

25)    After meeting with Mr. Baker, we revised our draft audit report to incorporate more references to the FAR; however, Mr. Baker told us that he had been instructed to limit his legal opinion to the original draft report. Therefore, he did not review the revised report.

26)    Approximately one month after Mr. Baker's visit, we received a legal opinion on the draft audit report. Attachment XX (legal opinion memo). The opinion concluded that OMB Circular A-87 "may probably be used to judge HANO's ... spending" (id. at 3), but in order for the OIG to act against CVR, the audit needed to be revised to analyze CVR's spending under the FAR. Id.

27)    HUD OIG's claim on summary judgment that we did not revise the audit report in conformance with the opinion from the Office of General Counsel is not true. See Def. Mem. at 8 (other cite??). Region VI submitted a revised draft report on October 26, 2007. Rather than removing the references to the A-87 in the revised draft, we simply added citations to the FAR.

In that way, we covered both HANO and CVR. Because the cost principles are the same under both criteria, the addition of the FAR did not change the findings of the audit.

### "Inappropriate Language" in the CVR Draft Report

28)    I am aware that HUD OIG claims in its Motion for Summary judgment that Region VI used "inappropriate language" in the CVR report, which supposedly "violated standards by using language that was not objective and by using adjectives that were of a subjective nature." Def. Mem. at 9. I disagree with this statement.

29)    As an initial matter, Region VI was never provided with the list of words that appears in the attachment to Mr. Heist's memorandum of December 17, 2004. Attachment XX at 6 (Def. Ex. 10). As I explained above, in response to TOP's initial comment that the report contained "flagrant expressions and words" (Attachment XX Def. Ex. 10 at 8-10), Region VI requested a list of the supposedly inappropriate language. We were never given the list. The first time we were told which words TOP found to be problematic was when Mr. Heist issued the memorandum effectively killing the audit report. Attachment XX (Dec. 17 memo).

30)    While I admit that there may have been one or two words on TOP's list that could have been toned down, I disagree that the vast majority of them were inappropriate, inflammatory, or showed bias. In fact, some of the words that TOP cited were part of the "internal control" section of the audit, which contains boilerplate language that is used in every audit report and is based on the Audit Report Template. For example the "may" TOP cites in the first paragraph on page 49 of the draft report, is from the following sentence: "Individuals charged with protecting the Authority's interests had familiar relationships with CVR and its principals. These relationships may have encroached upon the Authority administrators' objectivity and appear to be the root cause of many of the conditions cited throughout this

report." **(this is from boilerplate internal control language?)** <u>See</u> Attachment XX at 6 (Def. Ex. 10). Additionally, we used some words, like "boyfriend," because they were the words used by the witnesses interviewed during the audit.

31)    Overall, the strength of the evidence we have informed the tone of the audit report. If there was strong language in the CVR report, it was because we had the proof to back it up.

32)    The use of the words "may," "may have," or "appears" is not at all uncommon in an audit, and cannot reasonably be construed as inflammatory or inappropriate.

33)    I have always endeavored to be respectful in my communications with TOP and Headquarters management. When Region VI received directives from either of those sources, we never failed to implement them. The back-and forth exchanges that Region VI had with TOP were not a show of disrespect towards Headquarters or TOP; rather, they were part of the normal deliberative process that went along with getting the draft audit reports in final form.

34)    Region VI was not given an opportunity to engage in that process with respect to the CVR audit. Had we been allowed to respond to TOP's specific criticisms, and had TOP reviewed our evidence, I feel sure we could have resolved the issue and issued the report.

I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.


_____

William Nixon


Executed this _____ day of _____, 2007.