## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **D. MICHAEL BEARD,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) **C.A. No. 06-0756 (GK)** |
| **v.** | ) |
| | ) |
| **ALPHONSO R. JACKSON,** | ) |
|   **Secretary Of Housing And** | ) |
|   **Urban Development,** | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

## PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### PRELIMINARY STATEMENT

Plaintiff, D. Michael Beard, has had an exceptionally successful career as an audit manager with the federal government, including 18 years with the Department of Housing and Urban Development (HUD) Office of Inspector General (OIG). Beard Decl. ¶¶ 2-5, 18-25. In his 13 years as the Regional Inspector General for Audit (RIGA) for HUD OIG's Region VI, based in Fort Worth, Texas, Mr. Beard and his staff authored over 70 significant audit reports identifying over $200 million in questioned costs. Beard Decl. ¶ 24. He also served as a primary witness at five Congressional hearings regarding HUD OIG audits and activities. Id. His accomplishments have been recognized through multiple performance awards, including an Award for Excellence from the President's Council on Integrity and Efficiency (PCIE), and the HUD OIG Audit Manager of the Year Award, which he received in 2000. Id. ¶¶ 18-20.

In Fiscal Year 2005, Mr. Beard led his region to becoming the top performing Region in the agency in performance measures identified by the Inspector General, such as number of audit

reports issued; dollars recovered; audits conducted within specified time frames; and numbers of findings upheld by HUD management.  Id. ¶ 25; Pl. Ex. 5.  For Fiscal Year 2004, he received a $2,000 performance award, which, in addition to other positive feedback, complimented his management of the Region.  Pl. Ex. 4; Heist Dep. at 125.  Despite these accomplishments, the agency forcibly reassigned Mr. Beard in January of 2005 from his position as RIGA to a non-supervisory, make-work position as Special Assistant to Assistant Inspector General for Audit (AIGA) James Heist in the Headquarters office in Washington, D.C.  Pl. Ex. 1; Beard Decl. ¶¶ 45-48.

When pressed in his deposition, Mr. Heist admitted that Mr. Beard's removal and reassignment were unrelated to his performance or conduct.  Heist Dep. at 88.  Heist also admitted that Mr. Beard's performance appraisal for the year leading up to his reassignment, which Heist approved, reflected favorably upon Mr. Beard's submission of audit reports that complied with all OIG audit requirements and policies; that were properly coordinated with OIG's Office of Legal Counsel; and that he coordinated activities and communicated appropriately with OIG's Office of Technical Oversight and Planning (TOP).  Heist Dep. at 92-96; Pl. Ex. 6; see also Phelps Dep. at 40-43.  Furthermore, in deposition, the head of TOP could not identify any instances in which an audit report was issued by Region VI that was not in accordance with OIG audit procedures and standards. McLeod Dep. at 17, 19, 22, 28, 31, 33.

However, in moving for summary judgment, defendant now contends that Mr. Beard supposedly had been deficient in the very same period in any number of respects, including failing to produce audits that conform to OIG standards, failing to coordinate his Region's activities with the Office of Legal Counsel, and failing to communicate professionally with the Office of Technical Oversight and Planning (TOP).  Def. Mem. at 7-12, 23-30.  The very fact

that defendant has contradicted its own sworn testimony and contemporaneous accounts of Mr. Beard's performance is grounds for denying summary judgment.  Aka v. Washington Hospital Center, 156 F.3d 1284, 1294 (D.C. Cir. 1998) (en banc); accord Holcomb v. Powell, 433 F.3d 889, 897 (D.C. Cir. 2006).

The Special Assistant position to which Mr. Beard was reassigned had no position description, no defined job duties and responsibilities, and Mr. Beard was given virtually nothing to do apart from an assignment he had already been working on in the field.  Beard Decl. ¶¶ 48; Phelps Dep. at 15-17; see also Elion Decl. ¶ 6.  The agency apparently was counting on Mr. Beard retiring rather than accepting the directed reassignment – he was not even placed in an office for the first year he was in Headquarters because Deputy Assistant Inspector General for Audit (DAIGA), Michael Phelps, said he wanted to wait until he knew Mr. Beard would remain with the agency.  Beard Decl. ¶ 48.  However, when Mr. Beard had an opportunity to leave the agency for a position in the Senior Executive Service with the Department of Defense (DOD) Office of the Inspector General (OIG), DAIGA Phelps provided a pretextual, negative job reference, ensuring that Mr. Beard would not get the job.  Beard Decl. ¶¶ 59-61.

The agency's true motives for removing and reassigning Mr. Beard, and for costing him the job with DOD OIG, are clear – HUD OIG senior management sought to punish Mr. Beard for the unfavorable testimony he provided in connection with the EEO complaint of another employee, and for his own actions in pursuing an EEO complaint against AIGI Heist and DAIGI Phelps.  See Beard Decl. ¶¶ 32-39.  HUD OIG's similarly punitive treatment of other audit managers who participated in protected EEO activity confirms its retaliatory motives in this case: of the two managers who were similarly situated to Mr. Beard, and who filed EEO complaints against AIGA Heist and/or DAIGA Phelps, one was stripped of her supervisory duties and given

a directed reassignment to the same Special Assistant position Mr. Beard was placed in; the other was terminated. Elion Decl. ¶¶ 2-7; Groom Dep. at 33-34. Other RIGAs, even those who had disagreements with Headquarters management over the agency's shift to a centralized management style were not subjected to adverse action. See generally, Cooper Decl.; Elion Decl. ¶¶ 7-17; Beard Decl. ¶¶ 17, 62-65. It is also evident from the record that the agency wanted to drive Mr. Beard out of the federal government due to his age. See Beard Decl. ¶¶ 1, 62-65; Elion Decl. ¶¶ 5-17.

The reasons that the agency has put forward for its actions are not only contradicted by the record, including the agency's own contemporaneous records of Mr. Beard's performance, in some cases, the evidence exposes them as blatant misrepresentations. Compare Pl. Ex. 7; Lear Decl. ¶¶ 7-10 with Heist Dep. at 106. In any event, Mr. Beard has refuted each and every one of them. See Sections I and II, below. In addition to its factual assertions, the agency's legal basis for moving for summary judgment is also unsound, particularly its contention that Mr. Beard's retaliation claims are doomed by a lack of temporal proximity. Def. Mem. at 20-22. This Circuit and others have made it clear that the element of causation on a retaliation claim does not turn on temporal proximity, but may be proven by the same types of evidence that support a claim of discrimination. E.g., Lathram v. Snow, 336 F.3d 1085, 1094 (D.C. Cir. 2003); Mitchell v. Baldridge, 759 F.2d 80, 86 (D.C. Cir. 1985); Kachmar v. SunGard Data Systems, Inc., 109 F.3d 173, 177-78 (3rd Cir. 1997); Shirley v. Chrysler First, Inc., 970 F.2d 39, 44 (5th Cir. 1992); Gipson v. Wells Fargo, N.A., 460 F.Supp.2d 15, 25 (D.D.C. 2006) (JMF). For these reasons, and those discussed further below, plaintiff respectfully submits that Defendant's Motion for Summary Judgment must be denied.

## STATEMENT OF FACTS

Mr. Beard began his career with the Department of Housing and Urban Development (HUD), Office of Inspector General (OIG) in 1988 when he joined the agency as the Assistant Regional Inspector General for Audit for Region IV in Atlanta.  Beard Dep. at 9.  In 1992, Mr. Beard was promoted to Regional Inspector General for Audit (RIGA) in HUD OIG's Region VI, which is based in Fort Worth, Texas.  Id. at 8-9.  In that position, he supervised approximately 30 subordinates spread over five field offices.  Beard Decl. ¶ 4; http://www.hud.gov/offices/oig/locations/index.cfm.  His duties and responsibilities included all aspects of managing the Region including approving hiring, promotion, and training decisions for the audit and support staff; serving as a liaison with HUD Headquarters and field management; supervising and approving all audits within the Region; providing support to the OIG's Office of Investigation for criminal investigations; and assisting the government in pursuing civil lawsuits against persons or organizations that misused HUD money.  Id.  While Mr. Beard was RIGA, Region VI authored over 70 significant audit reports identifying over $200 million in questioned costs, and Mr. Beard himself served as a primary witness at five Congressional Hearings.  Id. at ¶ 24.

Throughout the time Mr. Beard served as the RIGA for Region VI, he received praise and recognition for his work.  Beard Decl. ¶¶ 18-25.  He received the OIG Audit Manager of the Year award in 2000 after being nominated by the Assistant Inspector General for Audit.  Id. at ¶ 18.  In 1998, he received an Award for Excellence from the President's Council on Integrity and Efficiency (PCIE), an organization made up of all of the presidentially appointed Inspectors General.  Id.  Mr. Beard also received a $1,000 Superior Accomplishment Award in 2001 for providing testimony to the U.S. House of Representatives on HUD activities in New Orleans,

and a $2,000 Superior Accomplishment Award in 2004, in part, for his management of Region VI. Id. at ¶¶ 20, 23; Heist Dep. at 125. In addition to those awards, during the 13 years he served as the RIGA for Region VI, Mr. Beard's performance was recognized through two Spot Awards; four Association of Government Accountants Awards; 11 Superior Accomplishment Awards; and one OIG Special Team Award. Beard Decl. ¶ 24.

Equally as impressive as Mr. Beard's individual accomplishments are the results he achieved in helping Region VI meet the Inspector General's stated performance goals. In 2003, IG Donohue instituted specific performance goals for the Regions and began ranking them according to their results. Beard Decl. ¶ 25. The goals included dollars identified for recovery; number of audits published; percentage of monetary recommendations sustained by HUD; and length of time to complete audits. Id.; Pl. Ex. 5 The Inspector General made the performance goals, particularly monetary recovery, a top priority and included them in the organizational Strategic Goals. Beard Decl. at ¶ 44. Mr. Beard reacted positively to this change by channeling Region VI's efforts into meeting the goals. Under Mr. Beard's leadership, Region VI was ranked first in the nation in 2005. Id. at ¶ 25; Pl. Ex. 5.

## The Directed Reassignment

The same year that Region VI was ranked first in meeting performance goals, Mr. Beard was given a directed reassignment, supposedly for performance reasons.[1] See Def. Mem. at 7-9. On Friday, January 5, 2005, Mr. Beard reported to the HUD OIG Headquarters office in Washington, D.C. for a meeting with Assistant Inspector General for Audit (AIGA) James Heist. Beard Decl. ¶ 45. During the meeting, Mr. Heist presented Mr. Beard with a memorandum

---

[1]     Defendant has used shifting rationalizations to explain its decision to reassign Mr. Beard, alternately claiming that the action was taken for performance reasons (see Def. Mem. at 7-9) and was not performance related (Heist Dep. at 88).

transferring him to a generic Special Assistant position in Headquarters, effective March 6, 2005. Pl. Ex. 1. Mr. Beard was ordered to report to the new position on a temporary basis beginning the following week. Beard Decl. ¶ 46. If he declined the transfer, Mr. Beard was told that the agency would initiate action to terminate him, or he could resign in lieu of involuntary separation. Id.; Pl. Ex. 1.

Mr. Beard was apparently not expected to report to his new Special Assistant position in Headquarters. The position was non-supervisory, had no position description, and no defined job duties or responsibilities. Beard Decl. at ¶ 46. Mr. Beard was given virtually nothing to do apart from low-level, menial work, and there were no assignments that were awaiting him in Headquarters except for one that he was already working on in the field. Id. at ¶ 48; Phelps Dep. at 15-17. He was not even given a permanent office for the first year he was in the job. Beard Decl. at ¶ 48.

Nonetheless, under federal personnel law, in order to remain employed by HUD, Mr. Beard had no choice but to accept the directed reassignment. Beard Decl. ¶ 47. As a result, he was separated from his spouse for approximately two months due to the agency's immediate temporary duty assignment of him to Washington, D.C. Id. Mr. Beard was forced to uproot his life in Arlington, Texas, where he and his spouse were very involved and respected members of the community, and move to Washington, D.C., where they faced a steep increase in the cost of living and a decreased quality of life. Id.

### Mr. Beard's Participation in *Tighe v. Cuomo*

The agency's actions in forcibly reassigning Mr. Beard to the position in Washington, D.C. were taken in reprisal for his prior protected activity, which included providing testimony that was harmful to the OIG in the case of Tighe v. Cuomo. In approximately 1999, Mr. Beard

participated in the selection process for the position of Assistant Special Agent in Charge for the Housing Fraud Initiative (GS-14 ).  Beard Decl. ¶ 32.  Larry Chapman, the Special Agent in Charge of the investigative side of Region VI, was the Selecting Official for the position.  Id. Mr. Chapman structured the selection so that only GS-14 applicants would be considered for lateral transfer into the ASAC position.  This led to all GS-13 applicants – including Special Agent Robert Tighe – being passed over for the position.  Id.

Mr. Tighe filed an EEO complaint over his non-selection, alleging that he had been discriminated against.  Beard Decl. ¶ 32.  In August of 1999, during the administrative investigation of that complaint, Mr. Beard provided an affidavit in which he expressed his belief that Mr. Chapman's conduct during the selection process had not complied with Equal Employment Opportunity regulations or OIG policy, thereby lending support to Mr. Tighe's claims.  Id. at ¶ 33.  That affidavit became part of the Report of Investigation, which was shared with HUD OIG management.  Id.  Subsequently, Mr. Beard was told by his first-line supervisor, the then-AIGA Kathy Kuhl-Inclan, that the affidavit had been discussed at a meeting of senior management in HUD OIG Headquarters.  Id. at ¶ 34.  Ms. Kuhl-Inclan stated that management was upset with Mr. Beard, and that he should remember that he, too, was a member of management.  Id.  Mr. Beard's understanding from the conversation was that senior OIG management viewed his participation in the Tighe case as a betrayal.  Id. at ¶ 36.

On July 16, 2001, Mr. Beard was deposed by Mr. Tighe's attorney in connection with the case of Tighe v. Cuomo, which was before the EEOC.  Beard Decl. ¶ 35.  During the deposition, Mr. Beard expressed his belief that senior HUD OIG management officials including the Inspector General had disregarded EEO regulations in various selections, including the one in which Mr. Tighe was non-selected.  Id.  Mr. Chapman was present at the deposition.  Id.

During that same time frame, James Heist was appointed as Acting Deputy Inspector General, and Michael Phelps was named Deputy Assistant Inspector General for Audit and made the first-line supervisor for all RIGAs, including Mr. Beard.[2]  Beard Dep. at 22-24.  Both Mr. Heist and Mr. Phelps were aware of Mr. Beard's deposition in the Tighe case.  Beard Decl. ¶¶ 35-66; Heist Dep. at 53-54.  As senior management in OIG Headquarters, Mr. Beard's deposition in the Tighe case directly implicated their compliance with Title VII.

### Reprisal by Heist and Phelps and Subsequent Protected Activity

After Mr. Beard participated in the Tighe deposition, he was subjected to a number of harassing and intimidating acts by Mr. Heist and Mr. Phelps, which culminated in a letter of reprimand being issued to him in February of 2002.  Beard Decl. ¶¶ 26-27; Pl. Ex. 17.  Shortly thereafter, Mr. Phelps attached a sheet onto Mr. Beard's performance appraisal – after Mr. Beard had signed off on the appraisal – that unfavorably mischaracterized Mr. Beard's performance review meeting.  Beard Dep. at 38-39.  Mr. Beard filed a formal EEO complaint over the letter of reprimand (complaint number FW 02-19) and an informal administrative grievance over the attachment to the performance appraisal.  Id.; Beard Decl. ¶ 37.  Both Mr. Heist and Mr. Phelps participated in the EEO investigation.  Id. ¶ 37.

In November of 2002, Mr. Beard engaged in Alternative Dispute Resolution (ADR) with Deputy Inspector General Michael Stephens.  Beard Dep. at 72.  The ADR resulted in a settlement agreement that resolved Mr. Beard's EEO complaint and all of his pending claims against the agency.  Beard Decl. ¶ 27; Beard Dep. at 72; Pl. Ex. 3.  Pursuant to the settlement, the

---

[2]      Eventually, Michael Stephens took over as Deputy Inspector General and Mr. Heist became the Assistant Inspector General for Audit.

agency agreed to vitiate the February, 2002 Letter of Reprimand.[3]  Id.  Mr. Stephens told Mr.

Beard that he would be given a fresh start by Mr. Heist and Mr. Phelps.  Beard Dep. at 72.

### Reprisal Between 2003 and 2005

Despite Mr. Stephens's assurances, Mr. Phelps and Mr. Heist continued to harass Mr.

Beard after the settlement of his initial EEO complaint.  Beard Decl. ¶¶ 40-44.  This harassment

included undermining Mr. Beard's supervisory authority; preventing Region VI from conducting

audits; interfering in the audit process; and interfering with the Region's ability to meet its

performance goals.  Id. at ¶ 40(a)-(j).  By 2003, the harassment had escalated to the point that the

staff in Region VI feared that Mr. Phelps and Mr. Heist were going to take retaliatory action

against Mr. Beard.  Thompson Decl. ¶ 26; Beard Decl. ¶¶ 41-42.  The staff expressed this

concern to Deputy Inspector General Stephens during the Region's Management Assessment

Review that took place that year.  Id.  Mr. Stephens assured Region VI and Mr. Beard that Mr.

Beard was doing a good job as RIGA, and could remain in the position as long as he wanted to.

Beard Decl. ¶ 41; Thompson Decl. ¶ 26; Nixon Dep. at 103.

Mr. Beard continued to receive positive feedback about his performance and the

performance of Region VI, which also helped to assure him that Phelps and Heist would not take

action against him.  Pl. Exs. 4-6.  In fact, approximately six months before his reassignment, Mr.

Beard received a $2,000 superior accomplishment award that praised his management of the

Region.  Pl. Ex. 4; Heist Dep. at 124-25.  Because Mr. Beard had no reason to believe his job

was in jeopardy, he did not pursue an EEO complaint over Mr. Phelps's and Mr. Heist's

harassment.  Beard Decl. ¶¶ 42-44.  That sense of security changed dramatically in January of

2005, when Mr. Beard was given the directed reassignment.  Pl. Ex. 1.

---

[3]      The attachment to Mr. Beard's 2002 performance appraisal was vitiated through the
grievance process.  Beard Decl. ¶ 28.

### The Centralized Audit Process Created By IG Donohue

The agency claims that one of the reasons Mr. Beard was removed from his position as RIGA was because he could not adapt to the centralized audit process that was put in place by Inspector General (IG) Donohue in 2002 (Def. Mem. at 9-12); however, the evidence shows that Mr. Beard and Region VI worked exceptionally well within the new system (Pl. Exs. 4-6), and that any disagreements Mr. Beard may have had with it were the same as those expressed by other RIGAs around the country.  See Cooper Decl. ¶¶ 6-16; Beard Dep. pp. 99-100.

Prior to 2002, under then-IG Susan Gaffney, Regional Inspectors General for Audit were given a great deal of autonomy to determine which audits to conduct and which audit reports to issue.  Beard Decl. ¶ 15; Cooper Decl. ¶ 3.  When IG Kenneth Donohue took over in 2002, he began centralizing the audit process.  Beard Decl. ¶ 16.  One way he did so was by creating the Technical Oversight and Planning (TOP) division, which was responsible for reviewing and approving all audit reports prior to their issuance.  Id. ¶ 13; Cooper Decl. ¶¶ 4-5.  Other mechanisms were put in place to keep Headquarters abreast of the status of all audits being conducted by the Regions, including bi-weekly briefing papers and monthly conference calls between TOP, Heist, Phelps, and each of the RIGAs.  Beard Decl. ¶ 12; Cooper Decl. ¶ 5.  TOP and Headquarters also implemented a series of changes to the audit policies and procedures.  Cooper Decl. ¶ 7.  By the agency's own performance standards, Region VI not only did well under the centralized approach, by 2005, it was performing better than any other Region in the country.  Pl. Ex. 5.

### Office-Wide Difficulties With the Centralized Audit Review Process

While it is true that many of the RIGAs, including Mr. Beard, felt that the centralized audit report system was less efficient, Mr. Beard and the Region VI management team were

committed to working within the new system.[4]  Beard Dep. at 24-25; Beard Decl. ¶ 17; Thompson Decl. ¶ 10.  Despite Region VI's success, morale among the staff suffered as a result of TOP's prickly interactions with the Region, as well as Headquarters' failure to follow through on promised performance awards.  Thompson Decl. ¶¶ 11-14.  Other Regions experienced similar frustrations with TOP's difficult style.  Cooper Decl. ¶¶ 6-9, 10-16; Thompson Decl. ¶ 7-9, 12; Beard Dep. at 99-102.  RIGAs in those Regions, unlike Mr. Beard, were never penalized.

The audit report review process between TOP and the Regions was supposed to work as follows:  a Region would submit a draft audit report for TOP's review; TOP would provide feedback to the Region; if the Region disagreed with TOP's comments, the parties would engage in a deliberative process to reach a consensus on how to handle the situation.  Beard Decl. ¶ 13-14; Cooper Decl. ¶ 5; Beard Dep. at 101-102; Thompson Decl. ¶¶ 6-10.  In the event of an impasse, Mr. Heist was to serve as the final decision maker.  Thompson Decl. ¶ 10.  In practice, TOP frequently picked apart draft audit reports over minor details and sometimes made substantive changes to the reports that had the effect of watering down the audit findings.  Thompson Decl. ¶ 12; Cooper Decl. ¶¶ 6-16; Beard Dep. at 99-100.  This caused considerable friction with the audit staff in the entire field, not just Mr. Beard's Region.  Cooper Decl. ¶¶ 6-9.

Former RIGA for Region IV, Nancy Cooper, described her Region's interactions with TOP in overwhelmingly negative terms:

> My managers and I found the process of working with TOP to be oppressive, and their attitude hostile.  Not only did the additional layer of oversight make our jobs much harder and decrease efficiency, TOP's mean-spirited, condescending attitude toward Region IV had a devastating impact on the employees' morale. TOP seemed to enjoy criticizing our work, often focusing on petty issues and regularly focusing on policy conformance over audit report substance.

---

[4]     Mr. Beard had successfully worked under a centralized system under former HUD IG Paul Adams, and in previous positions with the Environmental Protection Agency and the Air Force, and was familiar with that management style.  Beard Dep. at 24-25; Beard Decl. ¶ 16.

Cooper Decl. ¶ 6. Mr. Beard heard similar feedback from many other RIGAs. Beard Dep. at 99-100. Some of them – including Ms. Cooper – took their concerns to DAIGA Phelps. Cooper Decl. ¶ 8. However, unlike Mr. Beard, none were subjected to a directed reassignment for advocating their Region's positions under the new centralized process system. Id. ¶¶ 26-27; Beard Decl. ¶ 62. Notwithstanding Region VI's occasional disagreements with TOP's comments, the Region always followed the direction that it received from TOP and Headquarters and never issued an audit report without TOP's approval. Thompson Decl. ¶ 10; Beard Decl. ¶ 17.

### Region VI's Work Product

Defendant claims that Region VI's work product was poor in the years after centralization of the audit process and before Mr. Beard's directed reassignment. Def. Mem. at 7. This claim is thoroughly refuted by the agency's own admission that the reassignment was not performance related (Heist Dep. at 88), and by Region VI's first-place ranking among all Regions for Fiscal Year 2005 in meeting performance goals and objectives. Pl. Ex. 5; Heist Dep. at 27-28, 47-48. In its Motion, defendant singles out three audits that it claims are indicative of Mr. Beard's alleged performance problems: the Community Planning and Development Audit (CPD Audit); the Jazzland Audit; and the audit of the City of New Orleans/CVR Associates (CVR Audit). Def. Mem. at 7-9, 25-26. The evidence shows that in attempting to discredit Mr. Beard's performance with respect to these audits, the agency – and Mr. Heist in particular – has made serious misrepresentations. Furthermore, in deposition, the head of TOP could not identify any instances in which an audit report was issued by Region VI that was not in accordance with OIG audit procedures and standards. McLeod Dep. at 17, 19, 22, 28, 31, 33

<u>The Community Planning and Development Audit</u>

The Community Planning and Development (CPD) Audit came about in response to a Congressional inquiry.  Beard Decl. ¶ 50.  Mr. Heist assigned Region VI to perform an audit to see if CPD had appropriate financial controls over the faith-based initiatives that were under its purview, and whether the faith-based organizations receiving the grants had appropriate controls and resources to carry out the programs for which they had received funding.  <u>Id.</u>

Defendant claims that Region VI performed poorly on the CPD Audit.  Def. Mem. at 7.  According to the agency, the draft audit report contained "significant inaccuracies," which required Deputy Inspector General Stephens to assign outside auditors to resolve the issues.  <u>Id.</u>  In fact, Mr. Heist and TOP had approved for final release the draft audit report that the agency now claims was unsuitable.  Beard Decl. ¶¶ 51-52; Pl. Ex. 9.  After reviewing the draft audit report, Mr. Heist wrote to Mr. Beard, "<u>This is a well-written report.  Your staff did a nice job in tackling difficult subject matter.</u>"  Pl. Ex. 9.

After Mr. Heist approved the CPD report, on or about February 23, 2004, Inspector General Donohue made a decision to hold off issuing it.  Beard Decl. ¶ 51.  Mr. Heist subsequently directed Mr. Beard to issue a diluted report which, despite his concerns, Mr. Beard did.  <u>Id.</u> at ¶¶ 51-52.

<u>The Jazzland Audit</u>

The objective of the Jazzland Audit was to determine whether the City of New Orleans had complied with applicant eligibility and loan requirements for Section 108 grant loans.  Lear Decl. ¶ 3; Pl. Ex. 8.  The audit concluded that the city had not complied and had distributed over 7 million dollars in grant funds that were potentially ineligible.  <u>Id.</u>  The audit report recommended that HUD's Director of Community Planning and Development (CPD) for New

Orleans require the City of New Orleans to repay $1.3 million of ineligible funds; and provide support for or repay $6.3 million of unsupported funds. Id.

The City of New Orleans had given the money in question, which had come from a HUD block grant, to a private entity that was developing a theme park called Jazzland. Lear Decl. ¶ 4. CPD determined that because the City of New Orleans was the recipient of the funds, it was the party that was ultimately responsible for repaying the money. HUD could not legally hold the private developers of Jazzland responsible because they had not received the funds directly from HUD. Id. at ¶ 5. CPD gave the City of New Orleans an opportunity to provide documentation to support the costs that were determined to be unsupported. The City was not able to provide the requested information; accordingly, HUD sustained the findings and recommendations of the audit report. Id. at ¶ 6.

CPD had begun moving forward with collecting the money from the City of New Orleans when the city was hit by Hurricane Katrina in 2005. Lear Decl. ¶ 8. Subsequently, the city asked HUD to forgive the entire $7.6 million debt due to its financial devastation. Id. HUD agreed to forgive the debt as memorialized in a memorandum dated February 9, 2007, which was signed by Mr. Heist. Id. at ¶ 9; Pl. Ex. 7.

Despite Mr. Heist's signature on the February 9 debt forgiveness memorandum (Pl. Ex. 7), he testified at deposition on February 14, 2007, that Region VI had used improper criteria on the Jazzland Audit, thereby causing HUD to forego recovering $7 million in ineligible costs. Heist Dep. at 106; see also Def. Mem. at 8. Mr. Heist knew full well that HUD had forgiven the debt, that he himself had formally approved the action, and that that was the reason the money would not be recovered. Pl. Ex. 7. Furthermore, it is axiomatic that if HUD had not sustained the findings of the audit, there would have been no need for the agency to go through the process

of writing off the debt. Lear Decl. ¶ 10; Cooper Decl. ¶¶ 23-25. Accordingly, Mr. Heist's

deposition testimony about the Jazzland Audit was patently false. This fact alone warrants

denial of summary judgment. Aka v. Washington Hospital Center, 156 F.3d 1284, 1294 (D.C.

Cir. 1998) (en banc).

The CVR Associates Audit

In early 2004, Region VI was asked by Carmen Valenti, the HUD Administrative

Receiver for the Housing Authority of New Orleans (HANO), to perform an audit to confirm

whether HANO contractors, including CVR Associates, had received money for unsupported or

ineligible expenses. Beard Decl. ¶ 55; Pl. Ex. 10 at 1. This request was made by Mr. Valenti in

conjunction with HUD OIG Headquarters management after an initial investigation had been

conducted by investigators and auditors from Region VI. Id. Pursuant to that investigation, Mr.

Valenti identified the specific subjects that Region VI auditors were to focus on. Id. Region VI

conducted the audit and submitted the draft audit report for review by TOP on or about

September 7, 2004. Pl. Ex. 10 at 2.

On summary judgment, HUD OIG claims that Region VI did not adhere to OIG policy

when it failed to submit an audit survey report for the CVR Audit and keep it apprised of the

commencement of and progress in the CVR Audit. Def. Mem. at 9, 27. According to Mr.

Phelps, "the first time Headquarters became aware of the specific issues in the audit was when it

received the draft audit report." Id. (citing Phelps Aff. at 2-3). This assertion is ridiculous. Not

only had Headquarters been involved in assigning the CVR audit to Region VI (Pl. Ex. 10;

Nixon Dep. at 36), throughout the audit, TOP and Headquarters received bi-weekly briefings on

the status of the audit and its findings and conducted monthly teleconferences regarding the

same. Nixon Dep. at 45; Beard Decl. ¶ 55. The potential findings of the audit had been included

in the briefing papers submitted to TOP as early as February 28, 2004. Pl. Ex. 10 at 2. Furthermore, because the CVR Audit was considered a "priority" audit, it was included in the weekly priority report prepared for IG Donohue. Nixon Dep. at 39-40.

HUD also ignores the fact that at the time that the CVR Audit got underway, the audit survey reporting process had not yet been implemented. Nixon Dep. at 48-51. Accordingly, both Headquarters and TOP were fully informed about the progress of the audit throughout the process.

The agency next claims that Region VI failed to properly vet certain legal issues prior to issuing the draft CVR Audit report, and as a result, used inappropriate criteria in it. Def. Mem. at 8-9, 26-27. As an initial matter, the Regions do not normally request legal opinions unless the audit deals with novel issues. Thompson Decl. ¶ 16. The CVR Audit did not present any such issues; therefore, there was no reason for Region VI to consult with the legal department prior to issuing the report. Nixon Dep at 82.

As for HUD OIG's claims that Region VI misapplied criteria, that claim, too, is greatly overstated. In the initial draft of the report, Region VI used the criteria found in Office of Management and Budget (OMB) Circular A-87, the cost principles of which govern "allowable costs incurred by State, local, and federally-recognized tribal governments under federal awards." Nixon Dep. at 94-97; Beard Decl. ¶ 54; Pl. Ex. 11. The A-87 also applies to sub-awards made to entities other than "commercial organizations." Id. The Federal Acquisition Regulations (FAR) contain similar cost principles that govern cost allowability under federal awards to for-profit organizations. Id. There are no material differences in the cost principles of

the A-87 and the FAR.  Nixon Dep. at 95-96, 104-105; Beard Decl. ¶ 54.  Region VI initially

chose to use the A-87 criteria because it applied to HANO and because it would be familiar to

those who would be reading the audit.  Nixon Dep. at 96; Beard Decl. ¶ 54.

During the audit review process for the CVR Audit, TOP requested a legal opinion

regarding the criteria used in the report.  Nixon Dep. at 62-64.  The legal opinion concluded that

OMB Circular A-87 "may ... be used to judge HANO's ... spending," but in order for the OIG to

act against CVR, the audit needed to be revised to analyze CVR's spending under the FAR.  Pl.

Ex. 11 at 3.  Accordingly, Region VI submitted a revised draft report on or about October 26,

2007 in which it added citations to the FAR, while leaving in the references to OMB A-87.

Nixon Dep. at 96-97.  In that way, HANO and CVR were both covered by the report.  Id.

Because the cost principles are the same under both criteria, the addition of the FAR did not

change the findings of the audit.  Id., accord 104-105.

### Reprisal by Mr. Phelps - Negative Job Reference

In January of 2005, the same month that he was reassigned, Mr. Beard applied for the

Senior Executive Service (SES) position of Director, Readiness and Logistics Support, in the

Department of Defense Office of Inspector General (DOD OIG).  Beard Decl. ¶¶ 59-61.   On

March 28, 2005, Mr. Beard was interviewed for the position by a selection panel at DOD OIG.

Id. ¶ 60.  On April 6, 2005, Mr. Gene Reardon, the Selecting Official, interviewed Mr. Beard.

Id.  Mr. Reardon told Mr. Beard that he was the only candidate whose name had been forwarded

by the selection panel for consideration.  Id.

Prior to the interview, Mr. Reardon had sought a recommendation of Mr. Beard from Mr.

Phelps.  Id.  Most of the interview with Mr. Beard was spent discussing this recommendation,

which Mr. Reardon characterized as negative.  Id. ¶¶ 60-61.  Mr. Phelps himself admitted to

withholding information about Mr. Beard's performance award in 2004 and to stating that Mr.

Beard "wasn't operating the way" OIG Headquarters "expected him to operate." Phelps Dep. at

18, 20.  On April 11, 2005, Mr. Reardon called Mr. Beard to say that he was not selecting him

for the position because of the negative recommendation that he had received from Mr. Phelps.

Beard Decl. ¶ 61.  DOD OIG re-advertised the position on April 20, 2005.  Id.

## LEGAL STANDARDS

With important refinements courtesy of the D.C. Circuit's recent decision in Czekalski v.

Peters, 475 F.3d 360, 364 (D.C. Cir. 2007), the framework for analyzing Mr. Beard's claims was

essentially handed down by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S.

792, 802 (1973).  Under it, Mr. Beard can establish a prima facie case of discrimination by

demonstrating that he enjoys membership in a protected class and sustained an actionable change

in his employment which "gives rise to an inference of discrimination."  Stella v. Mineta, 284

F.3d 135, 145 (D.C. Cir. 2002) (quotation omitted); accord, Teneyck v. Omni Shoreham Hotel,

365 F.3d 1139, 1150 (D.C. Cir. 2004).  Mr. Beard's prima facie case of retaliation turns on the

causal relationship between his protected activity and the subsequent action, and can be

established by timing or with the same types of evidence that support an inference of

discrimination.  See Lathram v. Snow, 336 F.3d 1085, 1094 (D.C. Cir. 2003); Gipson v. Wells

Fargo, N.A., 460 F.Supp.2d 15, 25 (D.D.C. 2006).

Once any challenges to a plaintiff's prima facie case have been surmounted, an

employer's responsive burden is to produce evidence of a "legitimate, nondiscriminatory" or

nonretaliatory reason for its actions.  Texas Dept. of Community Affairs v. Burdine, 450 U.S.

255 (1981).  Czekalski refined the McDonnell Douglas analysis once that point is reached:

> As the Supreme Court has explained, once a defendant has proffered such a
> nondiscriminatory explanation, it has "done everything that would be required of

> [it] if the plaintiff had properly made out a *prima facie* case." <u>U.S. Postal Serv.</u>
> <u>Bd. Of Governors v. Aikens</u>, 460 U.S. 711, 715, 103 S.Ct. 1478, 75 L.Ed.2d 403
> (1983).  At that point, "whether the plaintiff really did so is no longer relevant,"
> and the only question is "'whether the defendant intentionally discriminated
> against the plaintiff.'"  <u>Id.</u> (quoting <u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450
> U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)); <u>see</u> <u>Morgan v. Fed. Home</u>
> <u>Loan Mortgage Corp.</u>, 328 F.3d 647, 653-54 (D.C. Cir. 2003); <u>Waterhouse</u>, 298
> F.3d at 993 n. 6.

<u>Czekalski</u>, 475 F.3d at 363.  At that point, "the focus of proceedings … will be on whether the

jury could infer discrimination" or retaliation.  <u>Aka v. Washington Hospital Center</u>, 156 F.3d at

1289.  Mr. Beard can defeat summary judgment with a "<u>prima</u> <u>facie</u> case, combined with

sufficient evidence to" create a genuine issue of material fact that defendant's "asserted

justification[s]" for reassigning him to the make-work Special Assistant position in Washington,

DC are false.  <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 150-51 (2000);

<u>Lathram v. Snow</u>, 336 F.3d at 1089 (citing <u>Aka</u>, 156 F.3d at 1290).

   "Summary judgment is appropriate only if 'there is no genuine issue as to any material

fact and … the moving party is entitled to a judgment as a matter of law.'"  <u>Lathram</u>, 336 F.3d at

1088 (quoting Rule 56, Fed. R. Civ. P.; citing <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 244

(1986)).  A district court is "obligated" in "[v]iewing the evidence 'as favorably to'" a plaintiff

"'as reason will permit … at summary judgment.'"  <u>Aka</u>, 56 F.3d 1294-95 (quoting <u>Shager v.</u>

<u>Upjohn Co.</u>, 913 F.2d 398, 401 (7th Cir. 1990)).  The Court must draw all evidentiary inferences

in plaintiff's favor.  <u>Anderson v. Liberty Lobby</u>, 477 U.S. at 255.  Because this is an employment

case, there is another crucial rule of law which must guide the Court on summary judgment:

> Credibility determinations, the weighing of the evidence, and the drawing of
> legitimate inferences from the facts are jury functions, not those of a judge.

<u>Reeves</u>, 530 U.S. at 150-51 (citing <u>Liberty Lobby</u>, 477 U.S. at 255).

Under these principles, Mr. Beard is entitled to proceed to trial because he has adduced more than sufficient evidence to establish a prima facie case of discrimination and retaliation and to create a genuine issue of material fact that the agency's asserted justifications for its actions are false.  Reeves, 530 U.S. at 148; Lathram, 336 F.3d at 1089 (citing Aka, 156 F.3d 1284, 1290).

### I.    Mr. Beard Has Established a Prima Facie Case of Discrimination and Retaliation

### A.    Plaintiff's Prima Facie Case of Retaliation Under Title VII and the ADEA Regarding His Reassignment

Plaintiff's prima facie case of retaliation is established by demonstrating that he engaged in protected activity; that the agency took action against him that would likely dissuade a reasonable employee from making or supporting a charge of discrimination; and that a causal relationship exists between his protected activity and the subsequent adverse action.  Burlington Northern & Santa Fe R.R. Co. v. White, __ US __ , 126 S. Ct. 2405, 2407 (2006).  The same framework applies to Mr. Beard's retaliation claim under the ADEA.  Chappell Johnson v. Powell, 440 F.3d 484, 487 (D.C. Cir. 2006) (citing Carter v. George Washington Univ., 387 F.3d 872, 878 (D.C. Cir. 2004)).

Defendant conceded that plaintiff engaged in protected activity when he participated as a witness in the case of Tighe v. Cuomo and subsequently filed his own EEO complaint, and that he suffered an actionable change in employment.[6]  Def. Mem. at 20.  Despite this concession, one point bears clarifying:  after Burlington the actionable change in employment standard no longer applies in retaliation claims.  Burlington Northern, 126 S.Ct. at 2415.  All actions,

---

[6]    Mr. Beard's activity was undoubtedly protected under Title VII's participation clause when he testified as a witness in the case of Tighe v. Cuomo, and when he made a charge of discrimination and retaliation on his own behalf.  42 U.S.C. § 2000e-3(a); Singletary v. District of Columbia, 351 F.3d 519, 524 (D.C. Cir. 2003).

personnel or otherwise, constitute retaliation if they are "materially adverse," meaning that they "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. (internal quotation marks omitted).  By contrast, the adverse employment action standard that applies to claims of discrimination is higher.  Id. at 2413-14.  Discrimination is actionable when it produces material and objective adverse changes in employment.  Brown v. Brody, 199 F.3d 446, 452 (D.C. Cir. 1999).  Withdrawing an employee's supervisory duties constitutes such a change.  Stewart v. Ashcroft, 352 F.3d 422, 427 (D.C. Cir 2004); accord Burke v. Gould, 286 F.3d 513, 522 (D.C. Cir. 2002).  So does denial of consideration for promotion; reassignment with significantly different responsibilities; and impairment of future employment opportunities.  Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 761 (1998)(quoting Crady v. Liberty Nat. Bank & Trust Co. of Ind., 993 F.2d 132, 136 (7th Cir. 1993).  Therefore, defendant's actions in removing Mr. Beard's supervisory duties and reassigning him to a make-work position were actionable as discriminatory.  A fortiori, under Burlington Northern, these actions are cognizable as acts of retaliation.  126 S.Ct. at 2415.  Plaintiff's claim that he was retaliated against when DAIGI Phelps gave him a negative job reference is also actionable.  See EEOC Compliance Manual § 8-13 (citing EEOC v. L.B. Foster, 123 F.3d 746, 754 n.4 (3rd Cir. 1997)) (plaintiff need not prove that retaliatory denial of job reference caused prospective employer to reject her; such a showing is relevant only to damages, not liability).

The only element of plaintiff's prima facie case of retaliation that defendant challenges is the third:  causation.  Def. Mem. at 20-21  According to defendant, if plaintiff cannot provide

direct evidence of retaliation, he is relegated to relying on a temporal nexus between his protected activity and the adverse action to satisfy the causation element. Id. at 21. This position is untenable.

Temporal proximity is not an element of retaliation, but proof of it. E.g., Shirley v. Chrysler First, Inc., 970 F.2d 39, 44 (5th Cir. 1992). While it is true that a "causal connection … may be established" with circumstantial evidence that "adverse personnel action took place shortly after" protected activity, temporal proximity is not conclusive, in and of itself, of a causal connection. Mitchell v. Baldridge, 759 F.2d 80, 86 (D.C. Cir. 1985) (emphasis supplied); see also Shirley, 970 F.2d at 44; Gipson v. Wells Fargo, N.A., 460 F.Supp.2d at 25. In addressing this exact issue, the Third Circuit has held that temporal proximity is not the only type of evidence to show causation and it most certainly is not required:

> [i]t is important to emphasize that it is causation, not temporal proximity itself, that is an element of plaintiff's prima facie case, and temporal proximity merely provides an evidentiary basis from which an inference can be drawn. The element of causation, which necessarily involves an inquiry into the motives of an employer, is highly context-specific. When there may be valid reasons why the adverse employment action was not taken immediately, the absence of immediacy between the cause and effect does not disprove causation.

Kachmar v. SunGard Data Systems, Inc., 109 F.3d 173, 177-78 (3rd Cir. 1997).

Furthermore, circumstantial evidence that provides a basis for inferring discrimination also provides grounds for establishing a causal connection between adverse action and protected activity. E.g., Lathram v. Snow, 338 F.3d at 1094.[8] The only difference in proof relevant here is that a prima facie case of retaliation may also be established, but need not be established, with

---

[8] The Supreme Court's original decision that articulated the shifting burdens in employment cases, McDonnell Douglas, sounded in discrimination and retaliation. 411 U.S. at 796. That is why circumstantial evidence that provides a basis for inferring discrimination also provides grounds for establishing a causal connection between adverse action and protected activity. See Lathram v. Snow, 338 F.3d at 1094.

nothing more than close temporal proximity between protected activity and subsequent adverse action. E.g., Mitchell, 759 F.2d at 86. Therefore, in evaluating the issue of causation, the Court should look to the same types of circumstantial evidence that demonstrate discrimination. This includes comparative treatment of employees. Cones v. Shalala, 199 F.3d 512, 519 (D.C. Cir. 2000). In addition:

> We have stated, however, that where there is a lack of temporal proximity, circumstantial evidence of a "pattern of antagonism" following the protected conduct can also give rise to the inference. Robinson v. Southeastern Pa. Transp. Auth., 982 F.2d 892, 895 (3d Cir. 1993). These are not the exclusive ways to show causation, as the proffered evidence, looked at as a whole, may suffice to raise the inference. See, e.g., Waddell v. Small Tube Products, Inc., 799 F.2d 69, 73 (3dCir. 1986).

Kachmar, 109 F.3d at 177-78; see also Lathram, 338 F.3d at 1094; Gipson, 460 F. Supp.2d at 25. In this case, Mr. Beard suffered just such a "pattern of antagonism" that began soon after he engaged in protected activity and escalated from there.

### 1. The Agency Engaged In a Pattern of Antagonism Following Plaintiff's Protected Activity.

#### a. Phelps and Heist Retaliated Against Plaintiff After He Gave Deposition Testimony in Tighe v. Cuomo.

In 1999 and 2001, plaintiff engaged in protected activity by participating as a witness in Special Agent Robert Tighe's EEO complaint against HUD OIG. Beard Decl. ¶¶ 32-36. After he did so, plaintiff was warned by the then-Assistant Inspector General for Investigations that Headquarters management was upset with him, and that he should remember that he was a member of management. Id. at ¶ 34. In February of 2002, not long after plaintiff provided deposition testimony that was unfavorable to senior OIG management, he was issued a baseless letter of reprimand by DAIGI Phelps. Beard Decl. ¶¶ 26-27, 35. The reprimand was the

culmination of a series of hostile actions against plaintiff and his Region that began around the time of his deposition testimony.  Id. ¶ 26; Pl. Ex. 17.

The next month, in March of 2002, Mr. Phelps attached a sheet onto plaintiff's performance appraisal – without plaintiff's knowledge – that purported to recount a conversation Mr. Phelps had with plaintiff during his performance review meeting.  Beard Decl. ¶ 28.  The document was essentially an unfounded negative assessment of plaintiff's performance, the pretext of which is evident from the fact that plaintiff had been recognized as OIG Audit Manager of the Year just two years earlier (Id. at ¶ 19).  See Leffel v. Valley Financial Services, 113 F.3d 787, 794 (7th Cir. 1997).[9]

### b. Phelps and Heist Retaliated Against Plaintiff After He Filed an EEO Complaint And Engaged in Alternative Dispute Resolution.

After receiving the reprimand in February of 2002, plaintiff filed an EEO complaint (No. FW 02-19) in which he named DAIGI Phelps and AIGI Heist as responsible management officials.  Beard Decl. ¶ 37.  That complaint was eventually resolved through a settlement agreement in November of 2002 after plaintiff participated in Alternative Dispute Resolution with Deputy Inspector General Stephens.  Id. ¶ 38.  According to the agency, the settlement agreement was meant to give plaintiff a fresh start with Phelps and Heist (Def. Mem. at 5). In practice, their harassment of plaintiff only escalated. Beard Decl. ¶¶ 40-44.

Throughout 2003 and 2004, Mr. Heist and Mr. Phelps continued their harassment of plaintiff and undermined plaintiff's managerial authority in Region VI, by, among other things, blocking audits and audit reports, interfering with the audit process, unfairly manipulating the

---

[9] Although these actions are not actionable now, plaintiff may rely on them as background evidence to demonstrate the agency's history of reprisal.  See National Railroad Passenger Corp. v. Morgan,  536 U.S. 101, 113 (2002) (confirming that Title VII does not bar an employee from using prior acts as background evidence in support of a timely EEO claim, even if no complaint was filed over the prior acts); United Airlines, Inc. v. Evans, 431 U.S. 553 (1977).

Region's performance measures, intimidating the Region VI staff, and settling cases that arose in Region VI without consulting plaintiff. Beard Decl. ¶ 40. The harassment was so intense that during a Management Assessment Review of Region VI in 2003, the staff expressed concern that Phelps and Heist were planning to take retaliatory action against plaintiff. Beard Decl. ¶ 42; Thompson Decl. ¶ 26. In response, Deputy Inspector General Stephens assured the Region that plaintiff was doing a good job as RIGA and could remain in the position for as long as he wanted to – a promise that turned out to be hollow. Id.; Nixon Dep. at 103. Plaintiff did not file an EEO complaint during 2003 and 2004 because he relied on Mr. Stephens's assurances of job security, and because he continued to receive praise for his performance, including in performance awards and appraisals (see Pl. Exs. 4, 6), which he believed would protect him from adverse action. Beard Decl. ¶¶ 41-44.

Additionally, plaintiff did not wish to invite further reprisal by filing another EEO complaint over Phelps's and Heist's harassment. Beard Decl. ¶ 41. Considering his own experience at HUD OIG and the overall atmosphere of the agency, in which great emphasis is placed on "loyalty," Mr. Beard's reluctance to engage in EEO activity again was imminently reasonable. Id. ¶¶ 34, 41. That much is confirmed by the recent experience of Will Nixon, the Assistant Regional Inspector General for Audit in Region VI who was Mr. Beard's former subordinate. Nixon Dep. at 11. During the discovery period in this case, the Deputy Inspector General for Audit expressly instructed Mr. Nixon that he needed to "stay neutral" with regard to Mr. Beard's case, and that he should "give no appearance of siding with anybody." Nixon Dep. at 14-15, 20-22. Mr. Nixon was so concerned that supporting Mr. Beard's EEO complaint would "kill his career" that after initially agreeing to provide voluntary assistance in this case, he declined to do so. Nixon Dep. at 26-33; Pl. Ex. 12. In an email to plaintiff and his counsel, Mr.

Nixon stated that he not only feared retaliation "within the organization" but that HUD OIG would interfere with his attempts to get another job.  Pl. Ex. 12.  In other words, he was afraid of suffering the same fate as Mr. Beard.[10]

### 2.    Plaintiff's Additional Evidence of Retaliation

In addition to the pattern of antagonism described above, plaintiff can demonstrate that the agency treated him disparately from similarly situated employees; that defendant made material misrepresentations in moving for summary judgment; and that the agency's post-hoc criticisms of plaintiff's performance stand in stark contrast to the assessment of his former supervisor as well as the contemporaneous records of his performance.  All of this evidence supports an inference of discrimination and retaliation and establishes a causal nexus between plaintiff's protected activity and the subsequent adverse action, and must be considered on summary judgment.  See Kachmar, 109 F.3d at 177-78; Czekalski v. Peters, 475 F.3d 360, 368 (D.C. Cir. 2007) (citing Aka, 156 F.3d at 1289); accord Kalinoski v. Gutierrez, 435 F.Supp. 2d 55, 70 (D.D.C. 2006); accord, Holcomb v. Powell, 433 F.3d 889, 897 (D.C. Cir. 2006).

### a.    RIGAs Who Did Not Engage In Protected Activity Were Allowed to Remain in Their Positions, Those Who Did Were Reassigned To Non-Supervisory Positions.

"Especially relevant" in establishing a prima facie case is the comparative treatment of employees.  McDonnell Douglas, 411 U.S. at 804; accord Cones v. Shalala, 199 F.3d at 519.  In this case, plaintiff has identified a fellow RIGA – Nancy Cooper – whose Region experienced the exact same difficulties with TOP and the centralized audit process that plaintiff's Region did, but who was not forcibly reassigned for voicing her frustration to Headquarters management.

---

[10]    After it was learned by HUD OIG that Mr. Nixon had worked with counsel for plaintiff in preparing an affidavit for use in opposing summary judgment, Mr. Nixon was passed over for promotion to Mr. Beard's former job, a position for which he was exceptionally well qualified. Nixon Dep. at 8-11, 31-33, 92-94.

Ms. Cooper occupied the same position as Mr. Beard during the time period that is at issue in this action; she performed the same job duties and responsibilities (in a different geographical area); and reported to the same management chain of command. Cooper Decl. ¶ 1. The only relevant difference between Ms. Cooper and Mr. Beard is that Ms. Cooper never engaged in EEO activity. Cooper Decl. ¶¶ 26-27. There can be no doubt but that she is a proper comparator. Neuren v. Adduci, Mastriani, Meeks & Schill, 43 F.3d 1507, 1514 (D.C. Cir. 1995) (quoting Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796, 802 (6th Cir. 1994)); see Radue v. Kimberly Clark Corp., 219 F.3d 612, 617-18 (7th Cir. 2000).

In her sworn declaration, Ms. Cooper testified that she and her Region, Region IV, frequently had difficult and tense interactions with TOP in which TOP criticized the work of her auditors. Cooper Decl. ¶¶ 7, 10-11, 19. She confirmed that TOP routinely accused Region IV of using "inappropriate" or "inflammatory" language in their audit reports, just as it did with Mr. Beard's Region. Id. ¶ 11; see Def. Mem. at 9, 27. She also testified that "it was the normal course of action for the Regions to take issue with TOP's recommended changes" and that Mr. Beard was not alone in pushing back against TOP and/or Heist when the occasion warranted it. Id. ¶¶ 10,12-13.

Ms. Cooper recounted one instance in which TOP and Mr. Heist required that she remove a particular finding from an audit report, prompting strong protest from her. Id. ¶ 14. By her own description, Ms. Cooper vehemently argued with Mr. Heist against making the change, and in the end, only made it under protest. Id. ¶¶ 14-16. She averred that, based on her knowledge and experience, most other RIGAs would have done the same if they felt that the change would compromise the integrity of the audit report. Id. ¶¶ 12-13.

Ms. Cooper explained that her Region's negative experiences with TOP and Headquarters management caused "significant turmoil" among her staff, whose morale suffered severely.  Id. ¶¶ 8-9.

> Based on my experience in my own region, I can state with confidence that Headquarters itself was responsible for the poor morale among the audit staff in the regions, not Mr. Beard.  My employees certainly did not need any encouragement to have a bad attitude toward Headquarters – everyone was frustrated with their dictatorial style.  I do not believe Mr. Beard or anyone else could have done anything to *prevent* the auditors from being angry and dispirited.

Id. ¶ 9 (emphasis in original).  She expressed her Region's frustrations to Mr. Phelps, who told her that she "just need[ed] to get used to it."  Id. ¶ 8.  The ARIGAs in Region IV were similarly outspoken, and were encouraged by Ms. Cooper to voice their opinions directly to Headquarters and TOP.  Id. ¶¶ 20-22.

Despite the fact that Ms. Cooper received the same criticism of her Region's work that Mr. Beard did from TOP and Headquarters (Cooper Decl. ¶¶ 7, 10-11, 14-16, 19); that her staff suffered the same bitterness and loss of morale that Mr. Beard's staff did (Id. ¶¶ 8, 10, 12-13, 15-16, 19); that Ms. Cooper and her staff were equally as vocal about their frustrations with the new centralized system as Region VI was (Id. ¶¶ 12-14, 20-22); and that Mr. Beard's Region outperformed Ms. Cooper's (Pl. Ex. 5), Mr. Beard was singled out for involuntary reassignment while Ms. Cooper was not subjected to any adverse action (Cooper Decl. ¶ 27).

Retaliation Against Another RIGA Who Utilized the EEO Complaints Process

Evidence showing that OIG "regularly retaliate[s]" against employees who protest discrimination. is "relevant to" its "motive and intent, see Rule 404(b) . . ."  Jones v. WMATA, 946 F. Supp. 1011, 1019 (D.D.C. 1996) (citing and quoting Morris v. WMATA, 702 F.2d 1037, 1045 (D.C. Cir. 1983)).  The only RIGA, apart from Mr. Beard, who was reassigned involuntarily was Saundra Elion, a former Audit Division Director.  Elion Decl. ¶¶ 1-6; Beard

Decl. ¶¶ 62-65. After Ms. Elion engaged in protected EEO activity, the Headquarters Audit Division, which she headed, was disbanded, her staff reassigned, her supervisory duties removed, and she was forcibly reassigned to the position of Special Assistant to Mr. Heist, just like Mr. Beard. Elion Decl. ¶¶ 5-6.

Likewise, the agency's treatment of Austin Groom shows that it retaliates viciously against office heads who utilize the administrative complaints process. Mr. Groom, who formerly headed the Capital District Office, was also given a directed reassignment by the agency. Groom Dep. at 14-15. Mr. Groom was reassigned to a non-supervisory position by former Assistant Inspector General for Audit, Kathy Kuhl-Inclan because his management skills were lacking. Id. Mr. Groom subsequently received a poor performance appraisal from Mr. Phelps, over which he filed an EEO complaint. Id. at 33-34. He was thereafter terminated by Mr. Phelps and Mr. Heist. 22-23.

Ms. Elion and Mr. Groom are undeniably similarly situated to Mr. Beard. They both headed OIG Audit Divisions and both were treated adversely after filing EEO complaints: in Ms. Elion's case, with an involuntary reassignment to a non-supervisory position (Elion Decl. ¶¶ 5-6); in Mr. Groom's, by termination (Groom Dep. at 33-34). Neuren, 43 F.3d at 1514; Pierce, 40 F.3d at 802; Radue, 219 F.3d at 617-18. The agency's claims that other audit employees were similarly reassigned are utterly disingenuous. Beard Decl. ¶¶ 63-65; Elion Decl. ¶¶ 7-17. With one exception, all were non-supervisory staff auditors or administrative personnel who were reassigned when their offices were disbanded, transferred geographically at their own request, or laterally exchanged with an employee of another division. Elion Decl. ¶¶ 7-17; Beard Decl. ¶¶ 62-65. The only supervisory employee who was also reassigned involuntarily was Ms. Elion's

Deputy Director, who was stripped of her supervisory duties after filing an EEO complaint of her own.  Elion Decl. ¶ 17.

### b.    The Agency's Post-Hoc "Evidence" of Mr. Beard's Alleged Performance Problems Is False.

A jury would be well within its province to "conclude that an employer who fabricates a false explanation has something to hide; that 'something' may well be discriminatory" or retaliatory "intent."  Aka, 156 F.3d at 1294; accord, Holcomb v. Powell, 433 F.3d 889, 897 (D.C. Cir. 2006).  Such an inference would be "consistent with the general principle of evidence law that … a party's dishonesty about a material fact [is] 'affirmative evidence of guilt.'"  Reeves, 530 U.S. at 147 (citations omitted).  As the District of Columbia Circuit observed in Czekalski v. Peters, 475 F.3d at 366,

> [w]e have noted many times before that one way for a plaintiff to show that an adverse employment decision was made for a discriminatory reason is to "show[ ] that the nondiscriminatory explanation the defendant proffered for its decision was false."

(quoting Lathram, 336 F.3d at 1089).  HUG OIG's misrepresentations in this case are flagrant.

On summary judgment, defendant claimed that Region VI applied improper criteria in the Jazzland Audit, which prevented HUD from recovering more than $7 million in ineligible costs.  Def. Mem. at 8, 26.  Mr. Heist provided deposition testimony to that effect on February 14, 2007.  Heist Dep. At 106.  However, just five days before his deposition, Mr. Heist had signed off on a memorandum approving HUD's forgiveness of the $7 million, due to the economic devastation that befell New Orleans after Hurricane Katrina.  Pl. Ex. 7.  Accordingly, Heist well knew that HUD's failure to recover the money had nothing to do with any shortcoming on the part of Region VI.  Tom Lear, the senior-level HUD official who was responsible for resolving the

Jazzland Audit confirmed that "the findings and recommendations of the audit were sustained" and that the program office had been moving forward with recovering the money from New Orleans prior to the hurricane. Lear Decl. ¶¶ 7-9. If the audit's findings had not been upheld, there would have been no reason for HUD to forgive the debt. Id. ¶ 10; Cooper Decl. ¶¶ 23-25. Accordingly, Mr. Heist's deposition testimony about the Jazzland Audit was patently false.

The agency also claims on summary judgment that Region VI failed to submit a required survey report for the CVR Audit, and that as a result, "the first time Headquarters became aware of the specific issues in the audit was when it received [Plaintiff's] draft audit report." Def. Mem. at 9. That accusation is specious. Headquarters was intimately involved in the CVR Audit from its inception, and was kept abreast of the progress of the audit throughout the audit process. Nixon Dep. at 39-47 (referring to Pl. Ex. 13 at ¶¶ 4-9); Beard Decl. ¶ 54. In fact, the CVR Audit was assigned by Headquarters after an investigation had been performed and evidence of possible wrongdoing uncovered. Nixon Dep. at 36-39, 41 (referring to Pl. Ex. 13 at ¶¶ 4-6); Beard Decl. ¶ 54. Because the audit was considered to be a priority audit, Inspector General Donohue himself received weekly updates about its progress. Nixon Dep. at 41 (referring to Pl. Ex. 13 at ¶ 6); Beard Decl. ¶ 54. Additionally, Region VI submitted bi-weekly briefing papers on the audit to TOP and engaged in teleconferences with Headquarters in which the progress of the audit was discussed. Nixon Dep. at 45-47; Beard Decl. ¶ 54. Thus, HUD OIG's post-hoc claims that it was kept in the dark about the CVR Audit are entirely fictitious.

### c.    The Agency's Departure From Standard OIG Business Practices Raises An Inference of Retaliation

Retaliation can also be proven by "evidence from which a jury could find" adverse action "inconsistent with the … process that [an employer] established." Lathram v. Snow, 336 F.3d at

1093; accord Johnson v. Lehman, 679 F.2d 918, 921-22 (D.C. Cir. 1982).  OIG's official, published Performance Appraisal Program specifically provides that:

> Employees whose performance is found to be unacceptable …at any time during the appraisal period must be notified in writing and placed on a performance improvement period

Pl. Ex. 14 at 8 (OIG Manual Ch. 1430.1 §1-7.D) (emphasis supplied).  Despite OIG's claim that Mr. Beard's performance was deficient for many years, it never once placed him on a required performance improvement program.  Beard Decl. ¶ 28.  In fact, approximately six months before relieving Mr. Beard of his management position and reassigning him involuntarily, Mr. Heist and Mr. Phelps issued a performance appraisal to Mr. Beard and a cash award that reflected favorably on his audit reports, his management, his service as a representative of OIG management, his Region's adherence to all OIG audit policies, and his coordination of Region VI's activities with the OIG Office of Legal Counsel and TOP.  Pl. Ex. 4, 6; Heist Dep. at 92-96; Phelps Dep. at 40-43.

     **d.**    **The Contrast Between The Agency's Assessment of Mr. Beard's Performance Before and After He Engaged in Protected Activity Raises An Inference of Retaliation.**

One of the most telling ways of discerning whether a contested employment action is the product of prohibited animus is by comparing an employee's treatment by successive supervisors, and his treatment immediately before and after protected activity.  Discrimination and retaliation may be inferred when an employee "is praised . . . one day . . . but is confronted with a laundry list of manufactured criticisms the next . . ."  Leffel v. Valley Financial Services, 113 F.3d 787, 794 (7th Cir. 1997).  In Mr. Beard's case, his performance as RIGA for Region VI was lauded by his previous supervisor and others as evidenced by his receipt of the prestigious Award for Excellence from the President's Council on Integrity and Efficiency (PCIE) in 1998,

and the HUD OIG Audit Manager of the Year award in 2000, among many other awards. Beard Decl. ¶¶ 18-25. Mr. Beard also received a $1,000 Superior Accomplishment award for providing testimony to the U.S. House of Representatives regarding the Housing Authority of New Orleans in 2001.

One year later, after he provided deposition testimony in Tighe v. Cuomo that was unfavorable to the agency, Mr. Beard was issued a Letter of Reprimand by his new first-level supervisor, Mr. Phelps, who also inappropriately appended a document to his performance appraisal that was critical of his performance. Beard Decl. ¶¶ 26-31. Despite the fact that both of those documents were vitiated as part of the settlement of Mr. Beard's prior EEO complaint (number FW 02-19), the agency has raised them on summary judgment as evidence of Mr. Beard's supposedly poor performance. Id.; Def. Mem. at 3-4. On the contrary, they are evidence of the agency's retaliatory animus.

   e.    **The Agency Has Presented Shifting Rationalizations For Its Actions.**

The factual reasons advanced by defendant for reassigning Mr. Beard have been shifting and varied. In the affidavit Mr. Heist submitted in connection with the administrative investigation of plaintiff's EEO complaint, he stated that the reassignment was based on his and the IG's loss of confidence in Mr. Beard's "ability to manage the regional audit office requirements," Pl. Ex. 15 at 3-4. On summary judgment, the agency refined its justification by claiming that plaintiff's "overall work product" and "attitude toward headquarters" demonstrated that he could not make the adjustment from a de-centralized to a centralized audit process. Def. Mem. at 7, 12, 25, 28-30. It then provided a list of Mr. Beard's alleged performance failings (id. at 7-9, 25-27), all of which have been thoroughly refuted by plaintiff or shown to be post-hoc fabrications (see e.g., Beard Decl. ¶¶ 49-58; Nixon Dep. at 48-50, 94-97; Cooper Decl. ¶¶ 5-22).

Yet, Mr. Heist, the agency official who issued the directed reassignment, testified on deposition that <u>the decision was not made for performance or conduct reasons</u>:

| | |
|---|---|
| Question: | Did you reassign Mr. Beard for performance or conduct or both? |
| Mr. Heist: | Neither. |
| Question: | What was it? |
| Mr. Heist: | Did not – his reassignment was not [] performance-based or conduct-based actually. |

Heist Dep. at 88.  Instead, Heist testified that the way Mr. Beard was "running the region" was unacceptable.  <u>Id.</u>  Later in his deposition Mr. Heist undermined this position too when he admitted that he approved a $2,000 performance award for Mr. Beard in Fiscal Year 2004 – the year immediately preceding Mr. Beard's involuntary reassignment – in part, to recognize Mr. Beard's management of Region VI.  Heist Dep. at 125; Pl. Ex. 4.  Moreover, it is undisputed that that Region VI outperformed all other Regions during Fiscal Year 2005, an accomplishment that was completed in large part before Mr. Beard's reassignment in January of 2005.  Pl. Ex. 5; Beard Decl. ¶ 25; Heist Dep. at 47.

The agency officials involved in reassigning Mr. Beard can't even agree on how the decision was made.  Mr. Heist testified that it was a "consensus decision" between him, Phelps, and Deputy IG Stephens.  Heist Dep. at 62.  Mr. Phelps, on the other hand, testified that he heard from Heist that Heist and Stephens had reached a decision that Mr. Beard was going to be reassigned.  Phelps Dep. at 31.  For his part, Mr. Stephens testified that he merely concurred in the decision, which had been made by the Office of Audit, meaning Phelps and Heist.  Stephens Dep. at 20-22.

The agency's shifting explanations of why and how the decision to reassign Mr. Beard was made provide further evidence upon which a jury could find that the agency's actions were motivated by prohibited <u>animus</u>. Accordingly, the denial of summary judgment is warranted.

**B.    Plaintiff's <u>Prima</u> <u>Facie</u> Case of Retaliation Under Title VII and the ADEA Regarding The Negative Job Reference**

Defendant conceded the first element of plaintiff's claim – that he engaged in protected activity. Def. Mem. at 20. As for the second element, plaintiff has established that by providing a pretextual and negative job reference, the agency subjected him to an action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." <u>Burlington Northern</u>, 126 S.Ct. at 2415; EEOC Compliance Manual § 8-13 (citing <u>EEOC v. L.B. Foster</u>, 123 F.3d 746, 754 n.4 (3rd Cir. 1997); <u>see</u> <u>also</u> <u>Burlington Industries, Inc. v. Ellerth</u>, 524 U.S. at 761. The position with the Department of Defense was a Senior Executive Service (SES) position that would have carried with it many career-enhancing benefits and opportunities, including greater professional exposure, and supervisory duties. Beard Decl. ¶ 59. In addition, it was an opportunity for Mr. Beard to return to substantive work in his chosen career field, as opposed to the low-level menial tasks that he has been made to perform as Mr. Heist's "Special Assistant." Beard Dep. at 86; Beard Decl. ¶ 48. For the agency to prevent an employee from obtaining a meaningful job with a different agency provides a strong disincentive to engaging in protected activity. <u>See</u> Pl. Ex. 12 (Nixon email in which he refuses to provide an affidavit in this case for fear that the agency will malign "his abilities, character, etc." if he tries to get another job); Nixon Dep. at 14-16. Accordingly, the agency's actions were "materially adverse" to Mr. Beard, and would be to a reasonable employee. <u>Burlington Northern</u>, 126 S.Ct. at 2415. Plaintiff has also adduced an abundance of evidence linking the agency's action to his

participation in protected EEO activity.  See Section (I)(A)(1)-(2), above, and Section (II)(3), below.  Accordingly, he has met his prima facie burden with respect to this claim.

### C.    Plaintiff's Prima Facie Case of Discrimination Under the ADEA

The parties' burdens of proof on a claim of discrimination under the Age Discrimination in Employment Act (ADEA) are the same as under Title VII – "the McDonnell Douglas framework applies to both Title VII and ADEA claims."  Chappell Johnson v. Powell, 440 F.3d 484, 487 (D.C. Cir. 2006) (citing Carter v. George Washington Univ., 387 F.3d 872, 878 (D.C. Cir. 2004)); accord Johnson v. Lehman, 679 F.2d at 921-22.  In the instant case, Mr. Beard has shown that he was a member of a protected group because he was over age 40 at the time that the actions at issue took place.  Beard Decl. ¶ 1.  The agency has conceded that he suffered an actionable change in employment when he received the directed reassignment (Def. Mem. at 20), and Mr. Beard has demonstrated that the negative job reference he received is also actionable. See EEOC Compliance Manual § 8-13 (citing EEOC v. L.B. Foster, 123 F.3d 746, 754 n.4 (3rd Cir. 1997).

The agency challenges Mr. Beard's prima facie case of age discrimination on two grounds:  that he was replaced as RIGA of Region VI by an employee over the age of 40 and that there is insufficient evidence from which a jury could draw an inference of discrimination.  Def. Mem. at 17-19.  As an initial matter, Mr. Beard was not denied a job or replaced in any sense of the word.  Therefore, the Supreme Court case cited by defendant in support of its assertion that in order to make out a prima facie case of age discrimination, Mr. Beard had to be replaced by someone "substantially younger" is not applicable.  In any event, the Court did not impose any such prima facie showing:

> The fact that one person in the protected class has lost out to another person in the protected class is thus irrelevant, so long as he has lost out *because of his age.* …

> Because it lacks probative value, the fact that an ADEA plaintiff was replaced by someone outside the protected class is not a proper element of the <u>McDonnell Douglas</u> prima facie case.

<u>O'Connor v. Consolidated Coin Caterers Corp.</u>, 517 U.S. 308, 312 (1996); <u>see also</u> <u>Teneyck v. Omni Shoreham Hotel</u>, 365 F.3d 1139, 1151 (D.C. Cir. 2004) ("to require a Title VII plaintiff to show that someone outside of her protected class was hired or promoted in her stead would be to graft an additional element onto the <u>McDonnell Douglas</u> model of the prima facie case. <u>Stella</u> forecloses this possibility") (citing <u>Stella v. Mineta</u>, 284 F.3d 135 (D.C. Cir. 2002)). Instead, in <u>O'Connor</u> the Court clarified that the third element of the prima facie case on an ADEA claim is "*evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion*." <u>Id.</u> (citing <u>Teamsters v. United States</u>, 431 U.S. 324, 358 (1977)) (italics in original). The Court observed that evidence that the plaintiff was disadvantaged in favor of a "substantially younger" person would meet that requirement. <u>Id.</u>; <u>Teneyck</u>, 365 F.3d at 1155.

However, Mr. Beard's claim of age discrimination does not involve a selection between two candidates of the same age; rather it revolves around a discrete personnel action - being removed from his supervisory position and reassigned involuntarily to Washington, D.C. <u>See</u> Cplt. ¶¶ 55-72. Accordingly, the appropriate focus is on whether age was a motivating factor in that action – not on who happened to replace Mr. Beard as RIGA for Region VI. The simple fact is that Mr. Beard and his successor were not in competition which means that, for purposes of this suit, the age of his replacement is irrelevant.

As for Mr. Beard's evidence of discrimination, in Section (I)(A)(1)-(2), above, he has provided ample evidence from which a jury could infer that the agency was motivated by prohibited <u>animus</u>. Additionally, the fact that the only two RIGAs who were involuntarily

reassigned by Mr. Heist – Mr. Beard and Ms. Elion – were both retirement eligible reveals that the agency was targeting employees based on their age.[11]  Beard Decl. ¶¶ 1, 79, 86; Elion Decl. ¶ 5.  It is clear that through the directed reassignment the agency intended to force Mr. Beard to retire.  See Pl. Ex. 1.  He was ordered to report immediately to Washington, D.C., even though there were no assignments that required him to be in the Headquarters office.  Phelps Dep. at 15-17. The position was non-supervisory, had no position description, and no defined job duties or responsibilities.  Beard Decl. at ¶ 46.  For the first year, Mr. Phelps refused to assign Mr. Beard a permanent office because he said that he was waiting until he knew Mr. Beard was staying.  Id. at ¶ 48.  There can hardly be any doubt that these conditions were aimed at inducing Mr. Beard to resign.  By imposing them, the agency exposed its true intention – to force older employees out of the federal government.

## II.    There Are Genuine Issues of Material Fact About The Reasons Advanced By Defendant For Its Actions.

To satisfy its responsive burden, an employer "must clearly set forth, through the introduction of admissible evidence, the reasons for" its actions; an unadorned "articulation will not suffice."  Burdine, 450 U.S. at 255 & n.9.  When an employer carries this burden, "'the McDonnell Douglas framework – with its presumptions and burdens – disappear[s], and the sole remaining issue [is] discrimination" or retaliation "'vel non.'"  Lathram, 336 F.3d at 1088 (quoting Reeves, 530 U.S. at 142-43); Czekalski, 475 F.3d at 363.  At this stage, all of the evidence plaintiff has presented, including his prima facie evidence of discrimination and retaliation, must be considered and all of it viewed in the light most favorable to him.  Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Liberty Lobby, 477 U.S. 242; Adickes v. S.H. Kress Co.,

---

[11]    Austin Groom was reassigned by Kathy Kuhl-Inclan for performance reasons.  Groom Dep. at 14-15.  Mimi Lee was only reassigned because her office closed.  Beard Decl. ¶ 65.

398 U.S. 144 (1970); Czekalski, 475 F.3d at 365-66; Teneyck, 365 F.3d at 1151 (quoting Dunaway v. Int'l Bhd. of Teamsters, 310 F.3d at 763; Waterhouse v. Dist. of Columbia, 298 F.3d at 993). Once plaintiff has made such a showing, defendant is precluded from an award of summary judgment. Id.

### 1.     Defendant's Criticisms Of Plaintiff's Work Product Are Baseless

As explained in the preceding sections, defendant's claims that the CPD Audit, the Jazzland Audit, and the CVR Audit were deficient are thoroughly contradicted by the evidence in the record. Contrary to the agency's assertion that the CPD Audit contained "significant inaccuracies," the draft audit report had been approved for issuance by TOP and Mr. Heist who called the report, "well-written" and who complimented Mr. Beard's staff for doing "a nice job in tackling a difficult subject matter." Pl. Ex. 9; Beard Decl. ¶¶ 50-52. The fact that the CPD program office took issue with the audit and some of its findings is hardly noteworthy. Beard Decl. ¶ 52.

As for the Jazzland Audit, plaintiff has conclusively shown that Mr. Heist's testimony that HUD was unable to recover more than $7 million from the Housing Authority of New Orleans due to problems with the Jazzland audit report was a blatant misrepresentation. Pl. Ex. 7; Lear Decl. ¶¶ 7-10. The findings and conclusions of the Jazzland Audit were sustained, and the program office had been moving forward with recovering the money before Hurricane Katrina devastated the city of New Orleans. Lear Decl. ¶¶ 6-10.

The agency has raised several claims with regard to the CVR Audit, mainly that plaintiff's Region failed to complete a survey memo, thereby depriving Headquarters about any information about the audit until the draft audit report was submitted; that it applied the wrong

criteria in the audit report; and used inappropriate language in the draft audit report. Def. Mem. at 8-9, 26-27. None of these charges is accurate.

With regard to the survey memo, Will Nixon, the Assistant Regional Inspector General for Audit who was in charge of the CVR Audit, testified on deposition that the survey memo was not implemented until after the CVR audit report had been submitted.

> Mr. Nixon:   We did not even have the survey format at the time of the CVR report.
>
> Question:   So it would not be possible then to fault anyone in Region VI for not preparing a survey memo; is that right?
>
> Mr. Nixon:  Absolutely correct.

Nixon Dep. at 18-19. Even if the survey memo was in use before the CVR Audit, Region VI did not receive training on the format until September of 2004 – after the CVR Audit draft report was at or near completion. Nixon Dep. at 49-51. In any event, because the CVR Audit was assigned by Headquarters following a lengthy investigation, a survey memo would have been redundant as it occurs during the initial stage of an audit when a "go/no go decision" is made. Id. at 36-38, 51-52. As Mr. Nixon confirmed, Region VI was never instructed to submit a survey memo; otherwise, they would have done so. Id. at 49-52.

In fact, Headquarters was involved in the initiation of the CVR Audit, and had been kept abreast of the audit's progress through bi-weekly reports and regular teleconferences. Nixon Dep. at 39-41, 44-46 (referring to Pl. Ex. 13 at ¶¶ 7-9); Beard Decl. ¶ 54-55. Additionally, IG Donohue received information about the audit in weekly priority reports. Id. Accordingly, the agency's assertion that "the first time Headquarters became aware of the specific issues in the audit was when it received the [Plaintiff's] draft audit report" is flatly untrue. Def. Mem. at 9, 27.

The agency also claims that Region VI cited inappropriate criteria in the CVR Audit report when it applied the cost principles found in OMB Circular A-87 rather than those found in the Federal Acquisition Regulations (FAR). Def. Mem. at 26-27. The fact is, the cost principles found in OMB Circular A-87 and those found in the FAR are not substantively different. Nixon Dep. at 72-73, 94-97; Beard Decl. ¶ 54. Region VI had originally used the OMB Circular because it was the criteria most familiar to the target audience of the audit report. Nixon Dep. at 94-97. After OIG legal counsel reviewed the draft report and recommended including citations to the FAR, which governs "for profit" companies like CVR Associates, Region VI revised the audit report to include those citations. Id. In that way, both of the targets of the audit - the Housing Authority and CVR Associates – were covered. Id.; Beard Decl. ¶ 54.

Finally, the agency's contention that Region VI violated auditing standards by using "inappropriate language" in the CVR Audit report is meritless. Def. Mem. at 27. Several of the words cited by TOP as being inappropriate (see Pl. Ex. 16 at 10) were taken from direct quotes from witnesses interviewed during the audit. Nixon Dep. at 60-61; accord Beard Decl. at ¶ 56. One of the words – the word "believe" was from boilerplate language that is used in every audit report. Nixon Dep. at 74-75. TOP also criticized Region VI for using words like "may," "may have," or "appears." Pl. Ex. 16 at 10. According to Mr. Nixon, who is a Certified Public Accountant, a Certified Fraud Examiner, and a Certified Internal Auditor, such words are not at all uncommon in audit reports and cannot reasonably be construed as inflammatory or inappropriate. Nixon Dep. at 10, 75; accord Beard Decl. at ¶ 56. In any event, Mr. Nixon, who was responsible for the CVR Audit, and who had not engaged in protected EEO activity at the time that the draft CVR Audit report was prepared, was not subjected to any adverse personnel action as a result of that report. Nixon Dep. at 57-58. Neither was Nancy Cooper, the RIGA for

Region IV whose Region had also received criticism from TOP for audit reports that supposedly contained "inappropriate language."  Cooper Decl. ¶¶ 11, 26-27.

Undercutting all of the agency's criticisms regarding plaintiff's performance is its admission that the reassignment was not ordered for performance reasons (Heist Dep. at 88), as well as its contemporaneous performance records which reveal that Mr. Beard was never issued a performance appraisal that was less than fully successful (see Pl. Ex. 6), that he was given a performance award in 2004 in part for the management of his Region (Pl. Ex. 4; Heist Dep. at 125), and that he led his Region to become the top performing Region in the country for fiscal year 2005 (Pl. Ex. 5).  Furthermore, in 2003, Deputy IG Stephens announced to everyone in Region VI that Mr. Beard was "doing a fine job as RIGA" and "that senior management had full confidence in the management of his region."  Nixon Dep. at 103, Thompson Decl. ¶ 26; Beard Decl. ¶¶ 41-42.  In consideration of these facts, the agency's assertions, made in defense of litigation, that Mr. Beard's performance was lacking are not worthy of credence.

### 2.    Defendant's Claims About Plaintiff's Hostile Attitude Towards Headquarters Are Pretextual

According to the agency, plaintiff's supervisors had an "even greater concern about Plaintiff's attitude towards Headquarters and the impact it was having on the Region VI staff" than they did about his work product.  Def. Mem. at 9.  What is clear from the record is that Mr. Beard worked exceptionally well under the centralized audit process (see Pl. Exs. 4-5) and was not the cause of any resentment that the Region VI staff may have had towards Headquarters (Cooper Decl. ¶¶ 6-16, 19-22; Thompson Decl. ¶¶ 8-14; Beard Decl.¶¶ 57-58).

Through their harassment of Region VI and their condescending and demoralizing communications with the Region, Headquarters and TOP were responsible for fostering discontent among the staff, not Mr. Beard.  Id.; Nixon Dep. at 78-79.  As Ms. Cooper observed,

"I do not believe that Mr. Beard or anyone else could have done anything to **prevent** the auditors from being angry and dispirited."  Cooper Decl. ¶ 9 (emphasis in original).  Furthermore, Mr. Beard and his subordinates always followed the ultimate direction provided by TOP and Mr. Heist, and never issued an audit report without TOP's approval.  Thompson Decl. ¶ 10; <u>see</u> Nixon Dep. at 59.  The agency's claim that it reassigned Mr. Beard due to his attitude and/or his failure to adapt to the new centralized audit process is merely a pretext to cover its discrimination and retaliation against him.

### 3.    Defendant's Explanations Regarding the Negative Job Reference Are Contradicted By The Contemporaneous Records of Plaintiff's Performance

The agency has tried to justify its negative job reference in two ways: first, by claiming that it was not all that bad; and then by arguing that Mr. Phelps was just being truthful about Mr. Beard's problems working under a centralized management system.  Def. Mem. at 14, 31.  The first rationalization is easy enough to dispense with – Mr. Reardon, the Selecting Official from DOD, told Mr. Beard that he was not selecting him for the position because of the negative job reference he received from Phelps.  Beard Decl. ¶ 61.

Regarding the "truthfulness" of Mr. Phelps's statements to Mr. Reardon, among other things, Mr. Phelps told Reardon that Mr. Beard "wasn't operating the way" OIG Headquarters "expected him to operate" and that he "had trouble… making the transition" to the centralized management style of IG Donohue.  Phelps Dep. at 18, 20.  This characterization is belied by the fact that Mr. Beard led his Region to becoming the top-performing Region in the country for Fiscal Year 2005, and that Phelps had given Mr. Beard a $2,000 performance award in the preceding year, in part for his management of the Region.  Pl. Exs. 4-6; Heist Dep. at 125.  The conflict between Mr. Phelps's negative reference and the contemporaneous records of Mr.

Beard's performance creates a genuine issue of material fact, and mandates that this claim go to trial.

### III.    Conclusion

For all of the foregoing reasons Defendant's Motion for Summary Judgment must be denied.


Respectfully submitted,


/s/
_____
Robert C. Seldon, Esq.
  D.C. Bar No. 245100


/s/
_____
Molly E. Buie, Esq.
  D.C. Bar No. 483767


Robert C. Seldon & Associates, P.C.
1319 F Street, N.W., Suite 305
Washington, D.C.  20004
Telephone: (202) 955-6968
Facsimile:  (202) 318-2287

Counsel for Plaintiff