## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **D. MICHAEL BEARD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 06-00756 (GK)** |
| | ) | |
| **ALPHONSO R. JACKSON,** | ) | |
| **Secretary, U.S. Dept. of** | ) | |
| **Housing and** | ) | |
| **Urban Development,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## PLAINTIFF'S STATEMENT OF GENUINE ISSUES

Plaintiff to the above action respectfully submits the following Statement of Genuine Issues, in accordance with LCvR 56.1.

I.     Plaintiff hereby responds to Defendant's Statement of Material Facts, utilizing the same system of paragraph numbering, as follows:

1.     Plaintiff became an employee of HUD OIG in 1988, as an Assistant Regional Inspector General for Audit ("ARIGA") in Region IV, which is headquartered in Atlanta, Georgia.  See Exhibit 1 (Deposition of D. Michael Beard) ("Beard Dep.") at 9:8-14.

**RESPONSE:** Admit, except as to the year, which was 1989.  Beard Decl. ¶ 3.

2.     In October 1992, Plaintiff became the Regional Inspector General for Audit ("RIGA") for Region VI, which is headquartered in Fort Worth, Texas.  See id. at 9:2-5.  Region VI includes Texas, Louisiana, New Mexico, Oklahoma, and Arkansas.  See Complaint at ¶ 10.

1

**RESPONSE:** Admit.

**A.     Plaintiff's Prior Protected Activities**

3.      Robert Tighe, a Special Agent employed by the Defendant in Region VI, filed an

administrative complaint of discrimination on or about 2000, claiming that he was not

selected for a promotion because of his race.  See Complaint at ¶ 15.

> **RESPONSE:**  Deny as to the date of Mr. Tighe's complaint.  Mr. Tighe had filed his
>
> complaint by 1999, when Mr. Beard participated in the administrative
>
> investigation of it.  Beard Decl. ¶ 32.

> 4.      On July 16, 2001, Plaintiff provided deposition testimony in support of Mr.
>
> Tighe's administrative complaint, a case eventually denominated <u>Tighe v. Cuomo</u>.
>
>  See Complaint at ¶¶ 17-18.

**RESPONSE:**  Admit.

> 5.      On or about June 2001, James A. Heist (born 1954) replaced Ms. Gaffney as the
>
> senior official at HUD OIG, becoming the Acting Deputy Inspector General for
>
> approximately two months.  See Exhibit 1 (Beard Dep.) at 16:20 - 17:2; Exhibit 6
>
> (Deposition of James Alan Heist) ("Heist Dep.") at 54:4-7; 117:2-3.

**RESPONSE:**  Admit.

> 6.      While Mr. Heist was the Acting Deputy Inspector General, he "learned that there
>
> was an EEO complaint and that [Plaintiff] gave a deposition."  See Exhibit 6
>
> (Heist Dep.) at 11-12.

**RESPONSE:**  Admit that when he was Acting Deputy Inspector General – during June

and July of 2001 – Mr. Heist learned that Mr. Beard provided deposition

2

testimony in the EEOC case of <u>Tighe v. Cuomo</u>.  Heist Dep. at 53-57.

7.     Mr. Heist was not a party in <u>Tighe v. Cuomo</u>.  <u>See</u> Exhibit 7 (Heist Affidavit) at

1.

**RESPONSE:**  Admit, and by way of further answer state that under 42 U.S.C. § 2000e-

16, the only possible parties were Mr. Tighe and Secretary Cuomo.  Mr. Beard's

testimony in <u>Tighe v. Cuomo</u> implicated HUD OIG senior management's

compliance with Title VII.  Beard Decl. ¶ 35.  As the Acting Deputy Inspector

General, Mr. Heist was a part of HUD OIG senior management.  Heist Dep. at 54.

8.     "Sometime in 2001 [Mr. Heist] made Mr. [Michael] Phelps (born 1945) the first-

line supervisor for all of the regional inspectors general" for Audit, including

Plaintiff.  <u>See</u> Exhibit 1 (Beard Dep.) at 22:2-24; Exhibit 2 (Deposition of

Michael R. Phelps) ("Phelps Dep.") at 53:5-6; Exhibit 4 (Hierarchy Chart).

**RESPONSE:**  Admit.

9.     In February 2002, Mr. Phelps gave Plaintiff a reprimand.  <u>See</u> Exhibit 1 (Beard

Dep.) at 37:20-22.

**RESPONSE:**  Admit that Mr. Phelps gave plaintiff a written reprimand.  Deny that the

action was warranted.  Beard Decl. ¶¶ 26-27.  By way of further response, the

reprimand was vitiated by the agency.  <u>Id.</u> at ¶ 30.

10.    In February 2002, Mr. Phelps gave Plaintiff an attachment to his performance

evaluation which was critical of his performance.  <u>See</u> Exhibit 1 (Beard Dep.) at

38:22 - 39:3; Exhibit 11 (Performance Rating attachment).  At the same time, Mr.

Phelps verbally told Plaintiff that he was difficult to manage.  <u>See</u> Exhibit 1

(Beard Dep.) at 39:19-24; 41:1-8; Exhibit 19 (Informal EEO Complaint) at 3 ¶ 5.

**RESPONSE:** Deny that Phelps gave plaintiff an attachment to his performance

evaluation in February of 2002. Beard Decl. ¶ 28. Mr. Phelps appended an

inappropriate attachment to plaintiff's performance appraisal in March of 2002,

30 days after Mr. Beard's performance review meeting. Id. By way of further

response, the attachment was removed in April of 2002 after Mr. Beard filed an

informal grievance over it. Id.

11.    Mr. Phelps also told Plaintiff that he frequently failed to follow HUD policy and

gave Plaintiff three examples. See id.

**RESPONSE:** Admit that Mr. Phelps told plaintiff that he had failed to follow HUD

policy by hiring an Administrative Officer without Phelps's permission, writing a

letter to Senator Nichols to close out a constituent complaint without first

obtaining Headquarters' approval, and failing to get a management decision on

Harmony House within the 120 day deadline. Pl. Ex. 17 at 3-4. Deny that

plaintiff "frequently failed to follow HUD policy." E.g., Thompson Decl. ¶¶ 10-

14; Beard Decl. ¶ 17; Heist Dep. at 92-96; Phelps Dep. at 40-43; Pl. Exs. 4-6.

12.    A March 28, 2002, memoranda informs Plaintiff of management's concern about

Plaintiff espousing negative views of headquarters to his staff and "poisoning

their views of the organization." See Exhibit 1 (Beard Dep.) at 46:13-25; Exhibit

20 at 5.

**RESPONSE:** Admit that Mr. Phelps issued Def. Ex. 20 to plaintiff on or about March

28, 2002. Deny that it was warranted or that plaintiff espoused negative views of

headquarters to his staff or poisoned their views of the organization. Cooper

4

Decl. ¶¶ 6-9; Thompson Decl. ¶¶ 11-14.

13.    Plaintiff filed an administrative complaint of discrimination and retaliation in

May 2002. <u>See</u> Exhibit 1 (Beard Dep.) at 38:4-8; Complaint at ¶ 25.

**RESPONSE:**  Admit.  By way of further response, plaintiff's informal complaint was

filed in March of 2002.  Pl. Ex. 17.

14.    Plaintiff named "Assistant Inspector General for Audit James Heist, Deputy

Assistant Inspector General for Audit Michael Phelps, and General Counsel

Bryan Saddler," as the alleged discriminating officials. <u>See</u> Complaint at ¶ 26.

**RESPONSE:**  Admit, except to clarify that plaintiff charged those persons with

discrimination and retaliation.  Pl. Ex. 17.

15.    On December 4, 2002, a Mediation Settlement Agreement resolving Plaintiff's

administrative complaint was formally approved. <u>See</u> Exhibit 12 (Mediation

Settlement Agreement).

**RESPONSE:**  Admit that the settlement agreement was meant to resolve plaintiff's first

administrative complaint (No. FW-02-19).  Beard Decl. ¶ 30, 38; Pl. Ex. 3.

16.    Mr. Michael P. Stephens (born 1947), the Deputy Inspector General, was the

management representative for the agreement. <u>See</u> Exhibit 12; Complaint at ¶ 29;

Exhibit 5 (Deposition of Michael P. Stephens) ("Stephens Dep.") at 36:1-2.

**RESPONSE:**  Admit that Mr. Stephens signed the Settlement Agreement.  Pl. Ex. 3.

17.    Plaintiff admits that Mr. Stephens communicated to him at the time, that the

motivation for settling the administrative complaint was to start anew. <u>See</u>

Exhibit 1 (Beard Dep.) at 72:18-25; 116:13-17.

**RESPONSE:**  Admit.  By way of further response, that did not happen.  Beard Decl. ¶

5

40.

18.     Plaintiff did not file any administrative complaints or otherwise engage in any

        protected activity during 2003 or 2004.  See Exhibit 1 (Beard Dep.) at 51:19-23;

        54:4-16; 72:2-7.

**RESPONSE:**  Admit that plaintiff did not engage in protected activity during 2003 and

        2004.  Deny that he was not subjected to reprisal during that time period.  Beard

        Decl. ¶¶ 40-44.

19.     Plaintiff did not engage in protected activity until January 21, 2005, when he

        initiated the informal administrative EEO complaints process underlying this

        lawsuit.  See id. at 48:51:17-18; Complaint at ¶ 52.

**RESPONSE:**  Admit that after plaintiff's first EEO complaint was resolved through the

        Settlement Agreement in 2002 (Pl. Ex. 3), plaintiff's next protected activity

        occurred in January of 2005 when he initiated the EEO complaint that forms the

        basis of the instant action.

**B.     Plaintiff's Reassignment To Washington, D.C.**

20.     Under Inspector General Susan Gaffney, Plaintiff had a significant amount of

        autonomy to manage Region VI.  See Exhibit 1 (Beard Dep.) at 17:16-18:3.

**RESPONSE:**  Admit.  By way of further response, plaintiff had successfully worked

        under centralized management systems before Ms. Gaffney became the Inspector

        General.  Beard Decl. ¶ 16; Beard Dep. at 24-25.

21.     Plaintiff preferred the decentralized system because he believed that "[i]t's easier

        to motivate people when they have more input into the products they are working

        with.  And it's more efficient."  See id. at 25:12-15.

6

**RESPONSE:**  Admit.  By way of further response, many other RIGAs preferred the decentralized approach as well.  Cooper Decl. ¶ 3.

22.     The management style changed significantly in March 2002, when Kenneth Donahue became the new Inspector General at HUD OIG.  <u>See</u> Exhibit 1 (Beard Dep.) at 16:20 - 17:6; Exhibit 2 (Deposition of Michael R. Phelps) ("Phelps Dep.") at 26:11-20.

**RESPONSE:**  Admit that Mr. Donohue's management style was different than Ms. Gaffney's.  Deny that it was the first time a centralized management style had been in place at HUD OIG.  Beard Decl. ¶ 16; Beard Dep. at 24-25.

23.     Mr. Donahue insisted upon adherence "to the chain of command, and he announced that empowerment was over."  <u>See</u> Exhibit 1 (Beard Dep.) at 23:17-23.  The phrase "empowerment was over" meant "[t]hat the regional inspectors general and the special agents in charge were going to have more of their actions approved in headquarters."  <u>See</u> <u>id.</u> at 24:2-6.

**RESPONSE:**  Admit.

24.      "[A] new directorate was created called Technical Oversight and Planning.  And all audit decisions were sent to TOP . . ."  <u>See</u> <u>id.</u> at 18:23-25.

**RESPONSE:**  Admit.

25.     Specifically, TOP was "responsible for overseeing the work of ten regional offices, reviewing drafts, reports, providing comments on those reports, those comments were provided to the inspector, Assistant Inspector General for Audit Jim Heist, who passed the comments on to the" regional offices.  <u>See</u> Exhibit 3 (Deposition of Stanley J. McLeod) ("McLeod Dep.") at 12:7-12.

7

**RESPONSE:**  Admit, except that TOP did not only pass its comments on to Mr. Heist.

In reviewing draft audit reports, it engaged in a deliberative process directly with

the regions in which TOP's proposed changes were discussed.  Cooper Decl. ¶¶ 5,

10-16; Thompson Decl. ¶¶ 6-10.

26.     Plaintiff's region submitted the Community Planning & Development draft audit

to HUD Headquarters.  See Exhibit 5 (Stephens Dep.) at 33:2-12.

**RESPONSE:**  Admit.

27.     "[T]here was great concerns by the auditee [CPD] and others that there were

significant inaccuracies in that [draft audit] report.."  See id. at 33:16-18.

**RESPONSE:**  Admit that, as happens in the normal audit review process, the program

office that was the subject of the CPD audit identified items that it did not agree

with in the draft audit report.  Beard Decl. ¶ 52.  Deny the report contained

significant inaccuracies.  Pl. Ex. 9.

28.     Mr. Donahue, the Inspector General, asked Mr. Stephens, the Deputy Inspector

General, "to get involved and resolve" the problems with the CPD draft audit.

See id. at 34:1-2; 36:1-2; Exhibit 4.

**RESPONSE:**  Admit that IG Donohue interfered with the normal audit review process

regarding the CPD audit after the audit had been approved for issuance by

Assistant Inspector General for Audit Heist and TOP.  Beard Decl. ¶¶ 51-52; Pl.

Ex. 9.

29.     To complete the CPD audit, Mr. Stephens (Deputy Inspector General), Mr. Heist

(Assistant Inspector General for Audit), and Mr. Phelps, (Deputy Assistant

Inspector General for Audit), "decided collectively to bring in other auditors from

8

other regions, and [they] did so at considerable cost and time . . ." <u>See</u> Exhibit 5

(Stephens Dep.) at 34:8-15.

**RESPONSE:**  Admit that Mr. Stephens unnecessarily assigned auditors from other

regions to review the CPD audit, thereby delaying its issuance, despite the fact

that the draft audit had been approved for issuance by Assistant Inspector General

for Audit Heist and TOP.  Beard Decl. ¶¶ 51-52; Pl. Ex. 9.

30.    A problem with Region VI's work product involved draft audit reports that lacked

proper criteria to support the findings.  <u>See</u> Exhibit 6 (Deposition of James Alan

Heist) ("Heist Dep.") at 90:9-11; Exhibit 8 (Affidavit of Michael R. Phelps)

("Phelps Affidavit") at 2.

**RESPONSE:**  Deny.  <u>E.g.</u> Nixon Dep. at 53-55, 94-97, 104-105; Beard Decl. ¶ 54; Lear

Decl. ¶¶ 7-10.

31.    Plaintiff admits that he reviewed the CVR audit before it was sent to

Headquarters, and that using A-87 was incorrect.  <u>See</u> Exhibit 1 (Beard Dep.) at

68:19 - 69:13.

**RESPONSE:**  Admit that plaintiff reviewed the CVR audit, the conduct of which was

supervised in the first instance by Assistant Regional Inspector General, Will

Nixon (Nixon Dep. at 53-55).  Deny that plaintiff admitted that using the A-87

criteria in the CVR audit was incorrect.  Beard Dep. at 69.  He stated that the A-

87 criteria did not apply to one of the targets of the CVR audit – the private

contractor – but that it did apply to the Housing Authority of New Orleans.  <u>Id.</u> at

114-115; Beard Decl. ¶ 54.

32.    When legal issues were not fully vetted, "TOP had to take [their] staff and go and

deal with the legal staff in trying to determine what was the right criteria to use."
See Exhibit 3 (McLeod Dep.) at 65:12-16.

**RESPONSE:**  Plaintiff objects to this statement on the grounds that it is overbroad and vague.  Notwithstanding and without waiving this objection, plaintiff denies that he or his Region failed to fully vet legal issues.  Thompson Decl. ¶¶ 15-19.

33.    The CVR audit demonstrates Plaintiff's failure to adhere to OIG policy with respect to submitting a survey report.  See Exhibit 8 (Phelps Affidavit) at 2.

**RESPONSE:**  Deny.  Mr. Nixon, who was in charge of the CVR Audit, testified on deposition that the survey memo was not implemented until after the CVR audit report had been submitted.  Nixon Dep. at 18-19.  Even if the survey memo was in use before the CVR Audit, Region VI did not receive training on the format until September of 2004 – after the CVR Audit draft report was at or near completion.  Id. at 49-51.  In any event, because the CVR Audit was assigned by Headquarters following a lengthy investigation, a survey memo would have been redundant as it occurs during the initial stage of an audit when a "go/no go decision" is made.  Id. at 36-38, 51-52.  Region VI was never instructed to submit a survey memo; otherwise, it would have done so.  Id. at 49-52.

34.    The CVR audit demonstrates Region VI's use of inappropriate language.  See Exhibit 6 (Heist Dep.) at 99:11-15; Exhibit 18 (Heist Memorandum) at 10.

**RESPONSE:**  Deny.  Several of the words cited by TOP as being inappropriate (see Pl. Ex. 16 at 10) were taken from direct quotes from witnesses interviewed during the audit.  Nixon Dep. at 60-61; accord Beard Decl. at ¶ 56.  One of the words – the word "believe" was from boilerplate language that is used in every audit report.

10

Nixon Dep. at 74-75.  TOP also criticized Region VI for using words like "may," "may have," or "appears."  Pl. Ex. 16 at 10.  According to Mr. Nixon, who is a Certified Public Accountant, a Certified Fraud Examiner, and a Certified Internal Auditor, such words are not at all uncommon in audit reports and cannot reasonably be construed as inflammatory or inappropriate.  Nixon Dep. at 10, 75; <u>accord</u> Beard Decl. at ¶ 56.

35.    Plaintiff's supervisors were concerned about Plaintiff's attitude towards Headquarters and the impact it was having on the Region VI staff.  <u>See</u> Exhibit 6 (Heist Dep.) at 114:10-115:1; 116:9-13; Exhibit 5 (Stephens Dep.) at 31:17 - 32:2; 32:8 - 33:1; Exhibit 2 (Phelps Dep.) at 63:10-17; 64:2-13.

**RESPONSE:**  Deny.  Less than six months before relieving Mr. Beard of his management position and reassigning him involuntarily, Mr. Heist and Mr. Phelps issued a performance appraisal to Mr. Beard and a cash award that reflected favorably on his audit reports, his management, his service as a representative of OIG management, his Region's adherence to all OIG audit policies, and his coordination of Region VI's activities with the OIG Office of Legal Counsel and TOP.  Pl. Exs. 4, 6; Heist Dep. at 92-96; Phelps Dep. at 40-43.  By way of further response, plaintiff did not display a hostile attitude towards Headquarters.  Thompson Decl. ¶¶ 6-14.

36.    Mr. McLeod and his TOP staff experienced the argumentative attitude emanating from Region VI.  <u>See</u> Exhibit 3 (McLeod Dep.) at 73:18 - 74:6.

**RESPONSE:**  Deny.  Region VI did not display an argumentative attitude towards TOP or Headquarters.  Thompson Decl. ¶¶ 6-14.  The back-and-forth discourse

11

between Region VI and TOP was a normal part of the deliberative audit review process.  Id.; Cooper Decl. ¶¶ 5, 10-15.

37.    Management concluded that Plaintiff could not adjust to the centralized management style.  See Exhibit 6 (Heist Dep.) at 116:2-19.

**RESPONSE:**  Deny.  Less than six months before relieving Mr. Beard of his management position and reassigning him involuntarily, Mr. Heist and Mr. Phelps issued a performance appraisal to Mr. Beard and a cash award that reflected favorably on his audit reports, his management, his service as a representative of OIG management, his Region's adherence to all OIG audit policies, and his coordination of Region VI's activities with the OIG Office of Legal Counsel and TOP.  Pl. Exs. 4, 6; Heist Dep. at 92-96; Phelps Dep. at 40-43.  By way of further response, plaintiff had successfully worked under centralized management styles before.  Beard Decl. ¶ 16; Beard Dep. at 24-25.

38.    Management decided "some time in December 2004," to reassign Plaintiff to the position of Special Assistant to the Deputy Assistant Inspector General for Audit, which is located in Washington, D.C.  See id. at 62:8-21; 73:12-19; Exhibit 9 (January 5, 2005 Memorandum).

**RESPONSE:**  Admit.

39.    On January 5, 2005, Plaintiff reported to Headquarters for the meeting with management, wherein they informed him of his reassignment to Headquarters and the reasons for that decision.  See Complaint at ¶ 34; Exhibit 6 (Heist Dep.) at 108:4 - 110:10.

**RESPONSE:**  Admit that plaintiff was ordered to report to Headquarters on January 5,

2005 for a meeting with Assistant Inspector General for Audit, James Heist, ostensibly to discuss a specific draft audit report.  Beard Decl. ¶ 45.  Instead, he was given the directed reassignment.  Id. ¶ 46; Pl. Ex. 1.

40.     The person chosen to replace Plaintiff as RIGA in Region VI was Frank Baca. See Exhibit 6 (Heist Dep.) at 117:6-7.

**RESPONSE:**  Admit that Mr. Baca took over as RIGA for Region VI after Mr. Beard's directed reassignment to Headquarters.  Heist Dep. at 117.

41.     Mr. Heist was the selecting official in hiring Frank Baca.  See id. at 118:6-8.

**RESPONSE:**  Admit that Mr. Heist selected Mr. Baca to be RIGA for Region VI.  Heist Dep. at 118.

42.     Mr. Baca, like Plaintiff, was born in 1949.  See Exhibit 1 (Beard Dep.) at 79:1-3.

**RESPONSE:**  Admit.

## C.     Mr. Phelps's Employment Reference In January 2005

43.     In January 2005, Plaintiff applied for the position of Deputy Assistant Inspector General for Audit with the Office of Inspector General for the Department of Defense.  See Complaint at ¶ 47.

**RESPONSE:**  Deny.  Mr. Beard applied for the Senior Executive Service position of Director, Readiness and Logistics Support, in the Department of Defense Office of Inspector General (DOD OIG).  Beard Decl. ¶ 59.

44.     Mr. Robert Reardon from the Department of Defense, called Mr. Phelps and asked him "to provide [his] views of the [Plaintiff] as an employee as he was considering the [Plaintiff] for a position with his agency."  See Exhibit 8 (Phelps Affidavit) at 6; Exhibit 2 (Phelps Dep.) at 18:5-11.

**RESPONSE:**  Admit.

45.    Mr. Phelps "told Mr. Reardon a lot of positive things about the [Plaintiff]."  <u>See</u>
       Exhibit 8 (Phelps Affidavit) at 6; Exhibit 2 (Phelps Dep.) at 19:2-6.

**RESPONSE:**  Deny.  Mr. Reardon characterized his conversation with Mr. Phelps as
       negative.  Beard Decl. ¶ 61.

46. Mr. Phelps told Mr. Reardon that Plaintiff "could not get in step with that new
    direction [toward centralized management], which is why it was necessary to bring
    [Plaintiff] to Headquarters as opposed to allowing him to continue to run a region."
    <u>See</u> Exhibit 8 (Phelps Affidavit) at 6.

**RESPONSE:**  Admit that Mr. Phelps contradicted the contemporaneous records of Mr.

Beard's performance (Pl. Exs. 4-6) by telling Mr. Reardon that Mr. Beard "wasn't

operating the way" OIG Headquarters "expected him to operate" and that he "had

trouble… making the transition" to the centralized management style of IG Donohue.

Phelps Dep. at 18, 20.

## II.    PLAINTIFF'S AFFIRMATIVE STATEMENT OF MATERIALFACTS THAT WARRANT DENIAL OF SUMMARY JUDGMENT

### Mr. Beard's Job Duties As RIGA for Region VI

A.    Mr. Beard began his career with the Department of Housing and Urban Development (HUD), Office of Inspector General (OIG) in 1988 when he joined the agency as the Assistant Regional Inspector General for Audit for Region IV in Atlanta.  Beard Dep. at 9. In 1992, Mr. Beard was promoted to Regional Inspector General for Audit (RIGA) in HUD OIG's Region VI, which is based in Fort Worth, Texas.  Id. at 8-9.  In that position, he supervised approximately 30 subordinates spread over five field offices.  Beard Decl. ¶ 4; http://www.hud.gov/offices/oig/locations/index.cfm.

B.    Mr. Beard's duties and responsibilities included all aspects of managing the Region including approving hiring, promotion, and training decisions for the audit and support staff; serving as a liaison with HUD Headquarters and field management; supervising and approving all audits within the Region; providing support to the OIG's Office of Investigation for criminal investigations; and assisting the government in pursuing civil lawsuits against persons or organizations that misused HUD money.  Beard Decl. ¶ 4.

### Mr. Beard's Performance as RIGA for Region VI

C.    While Mr. Beard was RIGA, Region VI authored over 70 significant audit reports identifying over $200 million in questioned costs, and Mr. Beard himself served as a primary witness at five Congressional Hearings.  Id. at ¶ 24.

D.    Mr. Beard received the OIG Audit Manager of the Year award in 2000 after being nominated by the Assistant Inspector General for Audit.  Beard Decl. at ¶ 18.  In 1998, he received an Award for Excellence from the President's Council on Integrity and Efficiency

(PCIE), an organization made up of all of the presidentially appointed Inspectors General.  Id.

Mr. Beard also received a $1,000 Superior Accomplishment Award in 2001 for providing

testimony to the U.S. House of Representatives on HUD activities in New Orleans, and a $2,000

Superior Accomplishment Award in 2004, in part, for his management of Region VI.  Id. at ¶¶

20, 23; Heist Dep. at 125.  In addition to those awards, during the 13 years he served as the

RIGA for Region VI, Mr. Beard's performance was recognized through two Spot Awards; four

Association of Government Accountants Awards; 11 Superior Accomplishment Awards; and

one OIG Special Team Award.  Beard Decl. ¶ 24.

       E.     In 2003, IG Donohue instituted specific performance goals for the Regions and

began ranking them according to their results.  Beard Decl. ¶ 25.  The goals included dollars

identified for recovery; number of audits published; percentage of monetary recommendations

sustained by HUD; and length of time to complete audits.  Id.; Pl. Ex. 5  The Inspector General

made the performance goals, particularly monetary recovery, a top priority and included them in

the organizational Strategic Goals.  Beard Decl. at ¶ 44.  Mr. Beard reacted positively to this

change by channeling Region VI's efforts into meeting the goals.  Under Mr. Beard's leadership,

Region VI was ranked first in the nation in 2005.  Id. at ¶ 25; Pl. Ex. 5.

       F.     In 2003, Deputy IG Stephens announced to everyone in Region VI that Mr.

Beard was "doing a fine job as RIGA" and "that senior management had full confidence in the

management of his region."  Nixon Dep. at 103, Thompson Decl. ¶ 26; Beard Decl. ¶¶ 41-42.

       G.     In 2004, Mr. Heist and Mr. Phelps issued a performance appraisal to Mr. Beard

that reflected favorably on his audit reports, his management, his service as a representative of

OIG management, his Region's adherence to all OIG audit policies, and his coordination of

Region VI's activities with the OIG Office of Legal Counsel and TOP.  Pl. Ex. 4, 6; Heist Dep.

at 92-96; Phelps Dep. at 40-43.

H.    In deposition, the head of TOP could not identify any instances in which an audit report was issued by Region VI that was not in accordance with OIG audit procedures and standards. McLeod Dep. at 17, 19, 22, 28, 31, 33.

## The Directed Reassignment

I.    The same year that Region VI was ranked first in meeting performance goals, Mr. Beard was given a directed reassignment, supposedly for performance reasons.  Pl. Ex. 1.

J.    On Friday, January 5, 2005, Mr. Beard reported to the HUD OIG Headquarters office in Washington, D.C. for a meeting with Assistant Inspector General for Audit (AIGA) James Heist.  Beard Decl. ¶ 45.  During the meeting, Mr. Heist presented Mr. Beard with a memorandum transferring him to a generic Special Assistant position in Headquarters, effective March 6, 2005.  Pl. Ex. 1.  Mr. Beard was ordered to report to the new position on a temporary basis beginning the following week.  Beard Decl. ¶ 46.  If he declined the transfer, Mr. Beard was told that the agency would initiate action to terminate him, or he could resign in lieu of involuntary separation.  Id.; Pl. Ex. 1.

K.    The Special Assistant position was non-supervisory, had no position description, and no defined job duties or responsibilities.  Beard Decl. at ¶ 46.  Mr. Beard was given virtually nothing to do apart from low-level, menial work, and there were no assignments that were awaiting him in Headquarters except for one that he was already working on in the field.  Id. at ¶ 48; Phelps Dep. at 15-17.  He was not even given a permanent office for the first year he was in the job.  Beard Decl. at ¶ 48.

L.    Under federal personnel law, in order to remain employed by HUD, Mr. Beard had no choice but to accept the directed reassignment.  Beard Decl. ¶ 47.  As a result, he was

separated from his spouse for approximately two months due to the agency's immediate temporary duty assignment of him to Washington, D.C.  Id.  Mr. Beard was forced to uproot his life in Arlington, Texas, where he and his spouse were very involved and respected members of the community, and move to Washington, D.C., where they faced a steep increase in the cost of living and a decreased quality of life.  Id.

M.     Mr. Heist, the agency official who issued the directed reassignment, testified on deposition that the decision was not made for performance or conduct reasons.  Heist Dep. at 88.

N.     The agency officials involved in reassigning Mr. Beard gave conflicting testimony regarding how the reassignment decision was made.  Mr. Heist testified that it was a "consensus decision" between him, Phelps, and Deputy IG Stephens.  Heist Dep. at 62.  Mr. Phelps, on the other hand, testified that he heard from Heist that Heist and Stephens had reached a decision that Mr. Beard was going to be reassigned.  Phelps Dep. at 31.  For his part, Mr. Stephens testified that he merely concurred in the decision, which had been made by the Office of Audit, meaning Phelps and Heist.  Stephens Dep. at 20-22.

### Mr. Beard's Participation in Protected EEO Activity

O.     In August of 1999, during the administrative investigation of the EEO complaint of Special Agent Robert Tighe, Mr. Beard provided an affidavit in which he expressed his belief that Mr. Chapman's conduct during the selection process had not complied with Equal Employment Opportunity regulations or OIG policy, thereby lending support to Mr. Tighe's claims.  Beard Decl. at ¶ 33.  That affidavit became part of the Report of Investigation, which was shared with HUD OIG management.  Id.

P.     Subsequently, Mr. Beard was told by his first-line supervisor, the then-AIGA Kathy Kuhl-Inclan, that the affidavit had been discussed at a meeting of senior management in

HUD OIG Headquarters.  Beard Decl. at ¶ 34.  Ms. Kuhl-Inclan stated that management was

upset with Mr. Beard, and that he should remember that he, too, was a member of management.

<u>Id.</u>

Q.    On July 16, 2001, Mr. Beard was deposed by Mr. Tighe's attorney in

connection with the case of <u>Tighe v. Cuomo</u>, which was before the EEOC.  Beard Decl. ¶ 35.

During the deposition, Mr. Beard expressed his belief that senior HUD OIG management

officials including the Inspector General had disregarded EEO regulations in various selections,

including the one in which Mr. Tighe was non-selected.  <u>Id.</u>

R.    Assistant Inspector General for Audit, James Heist, and Deputy Assistant

Inspector General for Audit, Michael Phelps, were aware of Mr. Beard's participation in the

deposition.  Beard Decl. ¶¶ 35-66; Heist Dep. at 53-54.  As senior management in OIG

Headquarters, Mr. Beard's deposition in the <u>Tighe</u> case directly implicated their compliance with

Title VII.

### Reprisal By Heist and Phelps Following Plaintiff's Protected Activity

S.    After Mr. Beard participated in the <u>Tighe</u> deposition, he was subjected to a

number of harassing and intimidating acts by Mr. Heist and Mr. Phelps, which culminated in a

letter of reprimand being issued to him in February of 2002.  Beard Decl. ¶¶ 26-27; Pl. Ex. 17.

T.    In March of 2002, Mr. Phelps attached a sheet onto Mr. Beard's performance

appraisal – <u>after</u> Mr. Beard had signed off on the appraisal – that unfavorably mischaracterized

Mr. Beard's performance review meeting.  Beard Dep. at 38-39.

### Plaintiff's Initial EEO Complaint

U.    Mr. Beard filed a formal EEO complaint over the letter of reprimand (complaint

number FW 02-19) and an informal administrative grievance over the attachment to the performance appraisal. Id.; Beard Decl. ¶ 37. Both Mr. Heist and Mr. Phelps participated in the EEO investigation. Id. ¶ 37.

  V. In November of 2002, Mr. Beard engaged in Alternative Dispute Resolution (ADR) with Deputy Inspector General Michael Stephens. Beard Dep. at 72. The ADR resulted in a settlement agreement that resolved Mr. Beard's EEO complaint and all of his pending claims against the agency. Id.; Beard Decl. ¶ 27; Pl. Ex. 3. Pursuant to the settlement, the agency agreed to vitiate the February, 2002 Letter of Reprimand. The attachment to Mr. Beard's 2002 performance appraisal was vitiated through the grievance process. Beard Decl. ¶ 28.

## Reprisal Between 2003 and 2005

  W. After Mr. Beard's initial EEO complaint was resolved in December of 2002, Mr. Phelps and Mr. Heist continued to harass him and Region VI, by, among other things, undermining Mr. Beard's supervisory authority; preventing Region VI from conducting audits; interfering in the audit process; and interfering with the Region's ability to meet its performance goals. Beard Decl. at ¶ 40(a)-(j).

  X. By 2003, the harassment had escalated to the point that the staff in Region VI feared that Mr. Phelps and Mr. Heist were going to take retaliatory action against Mr. Beard. Thompson Decl. ¶ 26; Beard Decl. ¶¶ 41-42. The staff expressed this concern to Deputy Inspector General Stephens during the Region's Management Assessment Review that took place that year. Id.

  Y. Mr. Beard did not file an EEO complaint over the harassment because he had been assured by Deputy Inspector General Stephens that his job was safe, and because he feared further retaliation from Heist and Phelps. Beard Decl. ¶¶ 41-42; Thompson Decl. ¶ 26; Nixon

Dep. at 103.  Also, Mr. Beard continued to receive positive feedback about his performance and the performance of Region VI, which also helped to assure him that Phelps and Heist would not take action against him.  Pl. Exs. 4-6.

<u>**Office-Wide Difficulties With the Centralized Audit Review Process**</u>

Z.     When Inspector General Kenneth Donohue took over HUD OIG in 2002, he began centralizing the audit process.  Beard Decl. ¶ 16.  One way he did so was by creating the Technical Oversight and Planning (TOP) division, which was responsible for reviewing and approving all audit reports prior to their issuance.  <u>Id.</u> ¶ 13; Cooper Decl. ¶¶ 4-5.  Other mechanisms were put in place to keep Headquarters abreast of the status of all audits being conducted by the Regions, including bi-weekly briefing papers and monthly conference calls between TOP, Heist, Phelps, and each of the RIGAs.  Beard Decl. ¶ 12; Cooper Decl. ¶ 5.  TOP and Headquarters also implemented a series of changes to the audit policies and procedures.  Cooper Decl. ¶ 7.

AA.     The audit report review process between TOP and the Regions was supposed to work as follows:  a Region would submit a draft audit report for TOP's review; TOP would provide feedback to the Region; if the Region disagreed with TOP's comments, the parties would engage in a deliberative process to reach a consensus on how to handle the situation.  Beard Decl. ¶ 13-14; Cooper Decl. ¶ 5; Beard Dep. at 101-102; Thompson Decl. ¶¶ 6-10.  In the event of an impasse, Mr. Heist was to serve as the final decision maker.  Thompson Decl. ¶ 10.

BB.     In practice, TOP frequently picked apart draft audit reports over minor details and sometimes made substantive changes to the reports that had the effect of watering down the audit findings.  Thompson Decl. ¶ 12; Cooper Decl. ¶¶ 6-16; Beard Dep. at 99-100.  This caused considerable friction with the audit staff in the entire field, not just Mr. Beard's Region.  Cooper

21

Decl. ¶¶ 6-9.

CC.    Through their harassment of Region VI and their condescending and demoralizing communications with the Region, Headquarters and TOP were responsible for fostering discontent among the staff, not Mr. Beard.  Cooper Decl. ¶¶ 6-16, 19-22; Thompson Decl. ¶¶ 8-14; Beard Decl.¶¶ 57-58; Nixon Dep. at 78-79.  As Ms. Cooper observed, "I do not believe that Mr. Beard or anyone else could have done anything to **prevent** the auditors from being angry and dispirited."  Cooper Decl. ¶ 9 (emphasis in original).

DD.    In her sworn declaration, Ms. Cooper testified that she and the Region IV staff, frequently had difficult and tense  interactions with TOP in which TOP criticized the work of her auditors.  Cooper Decl. ¶¶ 7, 10-11, 19.  She confirmed that TOP routinely accused Region IV of using "inappropriate" or "inflammatory" language in their audit reports, just as it did with Mr. Beard's Region.  Id. ¶ 11; see Def. Mem. at 9, 27.  She also testified that "it was the normal course of action for the Regions to take issue with TOP's recommended changes" and that Mr. Beard was not alone in pushing back against TOP and/or Heist when the occasion warranted it. Id. ¶¶ 10,12-13.

EE.    Ms. Cooper recounted one instance in which TOP and Mr. Heist required that she remove a particular finding from an audit report, prompting strong protest from her.  Cooper Decl. ¶ 14.  By her own description, Ms. Cooper vehemently argued with Mr. Heist against making the change, and in the end, only made it under protest.  Id. ¶¶ 14-16.  She averred that, based on her knowledge and experience, most other RIGAs would have done the same if they felt that the change would compromise the integrity of the audit report.  Id. ¶¶ 12-13.

FF.    Despite the fact that Ms. Cooper received the same criticism of her Region's work that Mr. Beard did from TOP and Headquarters (Cooper Decl. ¶¶ 7, 10-11, 14-16, 19); that

her staff suffered the same bitterness and loss of morale that Mr. Beard's staff did (Id. ¶¶ 8, 10, 12-13, 15-16, 19); that Ms. Cooper and her staff were equally as vocal about their frustrations with the new centralized system as Region VI was (Id. ¶¶ 12-14, 20-22); and that Mr. Beard's Region outperformed Ms. Cooper's (Pl. Ex. 5), Mr. Beard was singled out for involuntary reassignment while Ms. Cooper was not subjected to any adverse action (Cooper Decl. ¶ 27).

GG.    Some of the RIGAs, including Nancy Cooper, took their concerns about TOP and the new centralized management style to DAIGA Phelps.  Cooper Decl. ¶ 8; Beard Dep. at 99-100.  However, unlike Mr. Beard, none were subjected to a directed reassignment for advocating their Region's positions under the new centralized process system.  Beard Decl. ¶ 62; Cooper Decl. ¶¶ 26-27.

HH.    Notwithstanding Region VI's occasional disagreements with TOP's comments, the Region always followed the direction that it received from TOP and Headquarters and never issued an audit report without TOP's approval.  Thompson Decl. ¶ 10; Beard Decl. ¶ 17.

## The CPD Audit

II.    Mr. Heist and TOP reviewed the draft Community Planning and Development (CPD) Audit and had approved it for final release.  Beard Decl. ¶¶ 51-52; Pl. Ex. 9.  After reviewing the draft audit report, Mr. Heist wrote to Mr. Beard, "This is a well-written report.  Your staff did a nice job in tackling difficult subject matter."  Pl. Ex. 9.

## The Jazzland Audit

JJ.    The findings of the Jazzland Audit had been sustained, and the program office had begun moving forward with collecting the money from the City of New Orleans when the city was hit by Hurricane Katrina in 2005.  Lear Decl. ¶¶ 7-8.

KK.    Subsequently, the city asked HUD to forgive the entire $7.6 million debt due to

23

its financial devastation.  Lear Decl. ¶¶ 7-8.  HUD agreed to forgive the debt as memorialized in

a memorandum dated February 9, 2007, which was signed by Mr. Heist.  Lear Decl. at ¶ 9; Pl.

Ex. 7.

      LL.    Despite Mr. Heist's signature on the February 9 debt forgiveness memorandum

(Pl. Ex. 7), he testified at deposition on February 14, 2007, that Region VI had used improper

criteria on the Jazzland Audit, thereby causing HUD to forego recovering $7 million in ineligible

costs.  Heist Dep. at 106; see also Def. Mem. at 8.  Mr. Heist knew full well that HUD had

forgiven the debt, that he himself had formally approved the action, and that that was the reason

the money would not be recovered.  Pl. Ex. 7.

### The CVR Audit

      MM.  In early 2004, Region VI was asked by Carmen Valenti, the HUD

Administrative Receiver for the Housing Authority of New Orleans (HANO), to perform an

audit to confirm whether HANO contractors, including CVR Associates, had received money for

unsupported or ineligible expenses.  Beard Decl. ¶ 55; Pl. Ex. 10 at 1.  This request was made by

Mr. Valenti in conjunction with HUD OIG Headquarters management after an initial

investigation had been conducted by investigators and auditors from Region VI.  Id.  Pursuant to

that investigation, Mr. Valenti identified the specific subjects that Region VI auditors were to

focus on.  Id.

      NN.    Not only was Headquarters involved in assigning the CVR audit to Region VI

(Pl. Ex. 10; Nixon Dep. at 36), throughout the audit, TOP and Headquarters received bi-weekly

briefings on the status of the audit and its findings and conducted monthly teleconferences

regarding the same.  Nixon Dep. at 45; Beard Decl. ¶ 55.  The potential findings of the audit had

been included in the briefing papers submitted to TOP as early as February 28, 2004.  Pl. Ex. 10

at 2. Furthermore, because the CVR Audit was considered a "priority" audit, it was included in the weekly priority report prepared for IG Donohue. Nixon Dep. at 39-40.

OO.   Will Nixon, the Assistant Regional Inspector General for Audit who was in charge of the CVR Audit, testified on deposition that the survey memo was not implemented until after the CVR audit report had been submitted. Nixon Dep. at 18-19.

PP.   Even if the survey memo was in use before the CVR Audit, Region VI did not receive training on the format until September of 2004 – after the CVR Audit draft report was at or near completion. Nixon Dep. at 49-51.

QQ.   In any event, because the CVR Audit was assigned by Headquarters following a lengthy investigation, a survey memo would have been redundant as it occurs during the initial stage of an audit when a "go/no go decision" is made. Nixon Dep. at 36-38, 51-52. Mr. Nixon confirmed that Region VI was never instructed to submit a survey memo; otherwise, they would have done so. Id. at 49-52.

RR.   The Regions do not normally request legal opinions unless an audit deals with novel issues. Thompson Decl. ¶ 16. The CVR Audit did not present any such issues; therefore, there was no reason for Region VI to consult with the legal department prior to issuing the report. Nixon Dep at 82.

SS.   In the initial draft of the CVR audit report, Region VI used the criteria found in Office of Management and Budget (OMB) Circular A-87, the cost principles of which govern "allowable costs incurred by State, local, and federally-recognized tribal governments under federal awards." Nixon Dep. at 94-97; Beard Decl. ¶ 54; Pl. Ex. 11. The A-87 also applies to sub-awards made to entities other than "commercial organizations." Id. The Federal Acquisition Regulations (FAR) contain similar cost principles that govern cost allowability

25

under federal awards to for-profit organizations.  Id.  There are no material differences in the cost principles of the A-87 and the FAR.  Nixon Dep. at 95-96, 104-105; Beard Decl. ¶ 54.

TT.    Region VI initially chose to use the A-87 criteria because it applied to HANO and because it would be familiar to those who would be reading the audit.  Nixon Dep. at 96; Beard Decl. ¶ 54.

UU.    During the audit review process for the CVR Audit, TOP requested a legal opinion regarding the criteria used in the report.  Nixon Dep. at 62-64.  The legal opinion concluded that OMB Circular A-87 "may ... be used to judge HANO's ... spending," but in order for the OIG to act against CVR, the audit needed to be revised to analyze CVR's spending under the FAR.  Pl. Ex. 11 at 3.

VV.    After receiving the legal opinion, Region VI submitted a revised draft report on or about October 26, 2007 in which it added citations to the FAR, while leaving in the references to OMB A-87.  Nixon Dep. at 96-97.  In that way, HANO and CVR were both covered by the report.  Id.  Because the cost principles are the same under both criteria, the addition of the FAR did not change the findings of the audit.  Id., accord 104-105.

WW.   Several of the words cited by TOP as being inappropriate for inclusion in the CVR Audit (see Pl. Ex. 16 at 10) were taken from direct quotes from witnesses interviewed during the audit.  Nixon Dep. at 60-61; accord Beard Decl. at ¶ 56.  One of the words – the word "believe" was from boilerplate language that is used in every audit report.  Nixon Dep. at 74-75.  TOP also criticized Region VI for using words like "may," "may have," or "appears."  Pl. Ex. 16 at 10.  According to Mr. Nixon, who is a Certified Public Accountant, a Certified Fraud Examiner, and a Certified Internal Auditor, such words are not at all uncommon in audit reports and cannot reasonably be construed as inflammatory or inappropriate.  Nixon Dep. at 10, 75;

accord Beard Decl. at ¶ 56.

XX.    Mr. Nixon, who was responsible for the CVR Audit, and who had not engaged in protected EEO activity at the time that the draft CVR Audit report was prepared, was not subjected to any adverse personnel action as a result of that report.  Nixon Dep. at 57-58. Neither was Nancy Cooper, the RIGA for Region IV whose Region had also received criticism from TOP for audit reports that supposedly contained "inappropriate language."  Cooper Decl. ¶¶ 11, 26-27.

### The Negative Job Reference

YY.    In January of 2005, the same month that Mr. Beard was reassigned, he applied for the Senior Executive Service (SES) position of Director, Readiness and Logistics Support, in the Department of Defense Office of Inspector General (DOD OIG).  Beard Decl. ¶¶ 59-61.  On March 28, 2005, Mr. Beard was interviewed for the position by a selection panel at DOD OIG. Id. ¶ 60.  On April 6, 2005, Mr. Gene Reardon, the Selecting Official, interviewed Mr. Beard. Id.  Mr. Reardon told Mr. Beard that he was the only candidate whose name had been forwarded by the selection panel for consideration.  Id.

ZZ.    Prior to the interview, Mr. Reardon had sought a recommendation of Mr. Beard from Mr. Phelps.  Beard Decl. ¶¶ 59-61.  Most of the interview with Mr. Beard was spent discussing this recommendation, which Mr. Reardon characterized as negative.  Id. ¶¶ 60-61.

AAA. Mr. Phelps admitted to withholding information about Mr. Beard's performance award in 2004 and to stating that Mr. Beard "wasn't operating the way" OIG Headquarters "expected him to operate." Phelps Dep. at 18, 20.

BBB.  On April 11, 2005, Mr. Reardon called Mr. Beard to say that he was not selecting him for the position because of the negative recommendation that he had received from

Mr. Phelps.  Beard Decl. ¶ 61.  DOD OIG re-advertised the position on April 20, 2005.  Id.

### Similarly Situated Comparators

CCC.  Saundra Elion, the only RIGA, apart from Mr. Beard, who engaged in protected EEO activity during the time period at issue, was reassigned involuntarily from her position as Audit Division Director.  Elion Decl. ¶¶ 1-6; Beard Decl. ¶¶ 62-65.  After Ms. Elion engaged in protected EEO activity, the Headquarters Audit Division, which she headed, was disbanded, her staff reassigned, her supervisory duties removed, and she was forcibly reassigned to the position of Special Assistant to Mr. Heist, just like Mr. Beard.  Elion Decl. ¶¶ 5-6.

DDD.  Austin Groom, who formerly headed the Capital District Office, was also given a directed reassignment by the agency.  Groom Dep. at 14-15.  Mr. Groom was reassigned to a non-supervisory position by former Assistant Inspector General for Audit, Kathy Kuhl-Inclan because his management skills were lacking.  Id.  Mr. Groom subsequently received a poor performance appraisal from Mr. Phelps, over which he filed an EEO complaint.  Id. at 33-34.  He was thereafter terminated by Mr. Phelps and Mr. Heist.  22-23.

EEE.  The only other RIGA who was reassigned involuntarily was Mimi Lee, who received a directed reassignment when her office closed.  Beard Decl. ¶ 63.  The other audit employees whom the agency has identified as being given directed reassignments were all non-supervisory staff auditors or administrative personnel who were reassigned when their offices were disbanded, transferred geographically at their own request, or laterally exchanged with an employee of another division.  Elion Decl. ¶¶ 7-17; Beard Decl. ¶¶ 62-65.

FFF.  The only other supervisory employee who was reassigned involuntarily was Donna Hawkins, who was stripped of her supervisory duties after filing an EEO complaint of her own.  Elion Decl. ¶ 17.

## <u>The Agency's Intimidation of Other HUD OIG Employees</u>

GGG. During the discovery period in this case, the current Deputy Inspector General for Audit expressly instructed Will Nixon, the Assistant Regional Inspector General for Audit in Region VI who was Mr. Beard's former subordinate, that he needed to "stay neutral" with regard to Mr. Beard's case, and that he should "give no appearance of siding with anybody." Nixon Dep. at 14-15, 20-22.

HHH. Mr. Nixon was so concerned that supporting Mr. Beard's EEO complaint would "kill his career" that after initially agreeing to provide voluntary assistance in this case, he declined to do so. Nixon Dep. at 26-33; Pl. Ex. 12. In an email to plaintiff and his counsel, Mr. Nixon stated that he not only feared retaliation "within the organization" but that HUD OIG would interfere with his attempts to get another job. Pl. Ex. 12.

III. After it was learned by HUD OIG that Mr. Nixon had worked with counsel for plaintiff in preparing an affidavit for use in opposing summary judgment, Mr. Nixon was passed over for promotion to Mr. Beard's former job, a position for which he was exceptionally well qualified. Nixon Dep. at 8-11, 31-33, 92-94.

Respectfully submitted,

/s/
_____
Robert C. Seldon, Esq.
 D.C. Bar No. 245100

/s/
_____
Molly E. Buie, Esq.
 D.C. Bar No. 483767

29

Robert C. Seldon & Associates, P.C.
1319 F Street, N.W., Suite 305
Washington, D.C.  20004
Telephone: (202) 955-6968
Facsimile:  (202) 318-2287

Counsel for Plaintiff