**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **D. MICHAEL BEARD,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) **C.A. No. 06-0756 (GK)** |
| **v.** | ) |
| | ) |
| **ALPHONSO R. JACKSON,** | ) |
| **Secretary Of Housing And** | ) |
| **Urban Development,** | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

**DECLARATION OF D. MICHAEL BEARD**

I, D. Michael Beard, being first duly sworn do hereby depose and state as follows:

1.) My name is Dana Michael Beard. My birth date is November 28, 1949. I became eligible for early retirement from HUD OIG in November of 2002. I am the plaintiff in this action and I make this Declaration in support of my opposition to Defendant's Motion for Summary Judgment.

**Background**

2.) I am a Certified Public Accountant and Certified Fraud Examiner with a Masters Degree in Accounting. I taught accounting at the college level for a period of 4 years. After working with the national accounting firm of Coopers & Lybrand for five years, I took my first job with the federal government in 1979 when I joined the US Air Force Audit Agency. I remained with that agency until 1987, when I joined the Inspector General's Office of the Environmental Protection Agency as an Audit Manager.

1

3.)    I performed that job until 1989, when I left to join the Department of Housing and Urban Development's Office of Inspector General (HUD OIG) as the Assistant Regional Inspector General for Audit for Region IV, based in Atlanta, Georgia.

4.)    In 1992, I was promoted to Regional Inspector General for Audit (RIGA) in Region VI, which is based in Fort Worth, Texas.  In that position, I supervised approximately 30 subordinates spread over five field offices.  My duties and responsibilities included all aspects of managing the region including approving hiring, promotion, and training decisions for all the audit and support staff; serving as a liaison with HUD Headquarters and field management; supervising and approving all audits within the region; providing support to the OIG's Office of Investigation for criminal investigations; and assisting the government in pursuing civil lawsuits against persons or organizations that misused HUD money.

5.)    On January 5, 2005, Assistant Inspector General for Audit James A. Heist gave me a directed reassignment to a generic Special Assistant position in the Washington, DC Headquarters office of HUD OIG.  Pl. Ex. 1.  In that position, which I continue to occupy today, I have no supervisory duties or responsibilities and few if any substantive job duties.

**HUD's Audit Function**

6.)    The audit portion of HUD OIG performs audits of HUD housing programs to insure compliance by the agency and by the recipients of HUD funds with the rules and regulations of those programs.  HUD OIG is divided into ten geographical regions, not including headquarters.

7.)    Each Region is headed by a Regional Inspector General for Audit (RIGA), with two or more subordinate Assistant Regional Inspectors General for Audit (ARIGAs).  Each ARIGA has a team of auditors assigned to him or her.

8.)    The Regional Inspectors General for Audit for each region report to the Deputy

Assistant Inspector General for Audit at the first level and the Assistant Inspector General for

Audit at the second level.  Both of these managers are located in Headquarters.  During the time

period that is at issue in this case, Michael Phelps was the Deputy Assistant Inspector General

for Audit (DAIGA) and James Heist was the Assistant Inspector General for Audit (AIGA).

### The Audit Process

9.)    Audits may come about in several different ways.  Some are routinely conducted

as part of the agency's Annual Audit Plan.  Others are requested by members of Congress or

HUD management, or result from complaints received by the OIG.  Audits may be assigned to

the regions pursuant the Annual Audit Plan or according to the geographical location of the audit

target or the originating complaint.

10.)    Once a region is assigned an audit, the Assistant Regional Inspectors General for

Audit for the region develop an audit objective and an audit plan.  The plan includes an audit

program with specific steps to confirm compliance with the stated audit objective.

11.)    After the audit plan is developed, it must be submitted to the Technical Oversight

and Planning division (TOP), located in Headquarters, for review and approval.  If the audit is

approved, the Region may conduct the audit.

12.)    Twice a month each region must submit a briefing paper to TOP giving the

progress of each audit and listing the findings.  Monthly, TOP, along with the Assistant Inspector

General for Audit and the Deputy Assistant Inspector General for Audit, conducts a conference

call with the RIGAs to discuss the progress of their audits.

13.)    Once an audit is completed, the responsible region submits the draft audit report

to TOP.  If TOP approves the draft, it is submitted to the Assistant Inspector General for Audit

for his final approval.  TOP may also make suggested changes to the draft audit report, and return it to the region for revision.  Any disagreements between the region and TOP are resolved by the Assistant Inspector General for Audit.

14.)    Once an audit report is approved, it is issued to the auditee for their comments. The report may be revised in accordance with these comments.  It must be approved again by TOP and the Assistant Inspector General for Audit before final release.

### IG Donohue's Shift To A Centralized Audit Process

15.)    Prior to 2002, under then-IG Susan Gaffney, external audit reports could be issued by the Regional Inspectors General for Audit.  Only internal HUD audits were sent to Headquarters for review and approval prior to issuance.

16.)    In 2002, newly appointed IG Kenneth Donohue created the Technical Oversight and Planning (TOP) division and mandated more Headquarters control over the audit process. However, this was not the first time that the HUD OIG had followed a centralized model.  Paul Adams was the IG prior to Susan Gaffney.  The audit process under his tenure was also centralized.  That was the model that was in effect when I first joined the HUD OIG, and I had no problem working within that system.

17.)    While it is true that many of my RIGA colleagues and I preferred the de-centralized system due to its increased efficiency, I was committed to working within the system created by IG Donohue.  Although the agency has tried to paint my back-and-forth exchanges with TOP as evidence of my failure to adapt to the new system, that was not the case.  It was a normal and regular occurrence for RIGAs to engage in a deliberative process with TOP in order to ensure the most accurate audit report possible.

**Performance as RIGA for Region VI**

18.)     Throughout the time I served as the RIGA for Region VI, I received praise and recognition for my work.  For example, in approximately 1998, I received an Award for Excellence from the President's Council on Integrity and Efficiency (PCIE), an organization made up of all of the presidentially appointed Inspectors General and headed by the Chairman of the Office of Management and Budget.  The award resulted from my efforts in coordinating HUD auditors, investigators, and the state police of Louisiana during a criminal case involving HUD's Homeless Initiative in Louisiana.  The audit and investigation culminated in the conviction of the individual who ran the Housing Initiative.  Additionally, after Congressional hearings, Congress asked HUD to stop the Initiative.  I participated as a witness in the Congressional hearings.  Two of the auditors under my supervision participated in the criminal trial.  The audit report was used as evidence both in the hearings and in the criminal trial.

19.)     In 1999, I was nominated by then-Assistant Inspector General for Audit Kathy Kuhl-Inclan for the OIG Audit Manager of the Year Award, which I received in 2000.  The basis of the award was a nationwide audit of HUD's Community Builders Hiring Initiative that was conducted by Region VI at the request of the Senate.  That audit and its findings became the subject of hearings in the House of Representatives and in the Senate.  Congress subsequently passed legislation directing HUD to stop the Community Builders Initiative.

20.)     In 2001, I received a $1,000 Superior Accomplishment Award for providing testimony to the U.S. House of Representatives regarding the Housing Authority of New Orleans (HANO).  My region, which included New Orleans, had issued an audit report exposing the misuse of government funds by HANO and the deplorable housing conditions at facilities run by

HANO.  The audit report recommended that HUD take over the Housing Authority.  As a result of the Congressional hearings, HUD did so.

21.)     Congressman Richard Baker was so impressed with the HANO audit report that he posted it on his website and recommended that the White House appoint me as Inspector General.

22.)     Twice in 2004, I participated in creating and presenting multifamily fraud material for the White Collar Crime course at the Federal Law Enforcement Training Center in Glynco, Georgia.

23.)     That same year, I received a $2,000 Superior Accomplishment Award, in part, for helping to update HUD's Employee Appraisal System.  The award justification noted several successful audits that had been conducted by my region that year.  Pl. Ex. 4.  It also noted my representation of HUD OIG on the Executive Board of the Southwest Intergovernmental Audit Forum.  That body, run by the Government Accountability Office, includes federal and state Inspectors General, state auditors, and city auditors for a designated geographical area.  I was elected as the Federal Representative in 2004.

24.)     During the 13 years that I served as the Regional Inspector General for Audit in Forth Worth, I received two Spot Awards; four Association of Government Accountants Awards; 11 Superior Accomplishment Awards; and one OIG Special Team Award in addition to the awards described above.  I authored over 70 significant reports identifying over $200 million in questioned costs.  Several auditees were jailed and/or pursued in civil court as a result of these audits.  I served as the government's witness in several such trials.  I also served as a primary witness at five Congressional hearings and, at the request of Congressman Baker, created a 10-minute film for Congress on public housing conditions.

25.)    My leadership of Region VI can also been seen from the performance of the region in meeting the Inspector General's performance goals.  The goals included performance measures for the number of audit reports issued; dollars recovered; audits conducted within specified time frames; and numbers of findings upheld by HUD management, and were introduced in 2003 by Inspector General Donohue.  Initially, Region VI was ranked **12th** out of the 13 regions (including the Headquarters regions) – a ranking that was not justified.  By 2005, Region VI was ranked first among all the regions.  Pl Ex. 5.  Region VI had achieved most of those performance measures prior to my reassignment in January of 2005.

### The Agency's Claims About My Performance

26.)    The agency claims that Mr. Phelps gave me a reprimand in February of 2002 for supposedly not referring potential criminal matters to the office of investigation.  Def. Mem. at 3-4.  In actuality, Mr. Phelps, with Mr. Heist and IG Counsel Bryan Saddler, had created a hostile work environment retaliating against me because I gave a deposition in an EEO case that was critical of HUD OIG senior managers.  Mr. Phelps's attempt to reprimand me was the culmination of their retaliatory activity, prompting me to file a grievance and a retaliation claim (number EEO-05-046).

27.)    In the February 2002 written reprimand, Mr. Phelps gave two examples to support his claim that I "repeatedly" violated OIG policy.  The grievance examiner assigned to investigate my grievance removed one of the examples of my supposed violation, noting that I could not be held responsible for activity that occurred in my office when I was hospitalized and undergoing treatment for bilateral renal carcinoma.  The examiner upheld the second example but directed Mr. Phelps to delete the word "repeated" because Mr. Phelps could not offer any further examples.  The OIG eventually removed the reprimand in its entirety from my official

personnel file as part of an Alternative Dispute Settlement I reached with Deputy Inspector

General Michael Stephens in December 2002.

28.)    The agency also claims that I received an attachment to my performance

appraisal in February of 2002 that was critical of my performance.  Def. Mem. at 4.  This is not

true.  In February 2002, on the same day Mr. Phelps gave me the written reprimand, he met with

me to discuss my performance appraisal.  Mr. Phelps had me sign the appraisal, and gave me a

copy with no attachments.   Thirty days later, Mr. Phelps's administrative assistant mailed me

another copy of the appraisal with a document attached that purported to describe the oral

conversation Mr. Phelps and I had during my performance review.  Def. Ex. 11.  I filed an

informal grievance on March 28, 2002 over the attachment because I disagreed with Mr.

Phelps's summary of our performance discussion, and because I believed that it was improper

for him to attach the document to my appraisal after-the-fact.  In response to the informal

grievance, Mr. Phelps removed the attachment on April 5, 2002 from the appraisal.

Accordingly, my official performance appraisal from 2002 does not include the attachment.  I

was never given a performance appraisal in which my performance was rated less than fully

satisfactory, nor was I ever placed on a performance improvement plan.

29.)    The agency claims that I was "counseled" in March and April of 2002 about the

supposedly "negative and derogatory tone" in Region VI's audits, which were issued when Ms.

Gaffney was the Inspector General, and about how the audits were not well received by the new

HUD political appointees of the Bush Administration.  I disagree that the tone of the audits was

negative; however, it is true that Mr. Phelps told me that the new administration had a different

attitude than the previous administration of IG Gaffney, and that I had to be cautious not to "piss

off the politicals."  I questioned whether this advice by Mr. Phelps adversely affected our

independence, which is required by Government Audit Standards. Nonetheless, I attempted to avoid audits after 2002 that would result in findings critical of political appointees.

30.) The settlement agreement I reached with the agency regarding my initial EEO complaint, number FW 02-19, was supposed to vitiate the 2002 reprimand and the various documents created prior to December 2002 and give me a "clean slate" with my first and second level managers. See e.g. Def. Mem. at 5. However, as is apparent from the agency's use of these documents in its motion for summary judgment, that did not happen.

31.) At no time since 2002 was I ever counseled – formally or informally – about my performance or management of Region VI. In fact, my performance appraisals from 2003, 2004 and 2005 are complimentary of Region VI's achievements as well as the camaraderie of the region. Pl. Ex. 6.

### Participation in Protected Activity

32.) In August of 1999, I provided an affidavit in connection with an EEO investigation into allegations of discrimination that had been lodged by Special Agent Robert Tighe against Special Agent in Charge (SAC) Larry Chapman, who headed the investigation side of Region VI. Mr. Tighe's complaint centered around his non-selection for promotion to the Assistant Special Agent in Charge (ASAC) position for the Housing Fraud Initiative. I participated in that selection process, but did not consider Mr. Tighe's application because his name appeared on a list of GS-13s seeking promotion to GS-14 and Mr. Chapman only wanted to consider GS-14 seeking a lateral to the position. As such, I did not review Mr. Tighe's application during the selection process.

33.) In my affidavit, I expressed my belief that Mr. Chapman's conduct during the selection process for several Housing Fraud Initiative positions did not comply with the Equal

Employment Opportunity regulations or OIG policy, thereby lending support to Mr. Tighe's claim. This affidavit became part of the Report of Investigation into Mr. Tighe's EEO complaint, which was shared with HUD OIG management.

34.)    My first-line supervisor at the time, Assistant Inspector General for Audit Kathy Kuhl-Inclan, called me sometime after I gave the affidavit and informed me that the affidavit had been discussed at a senior management meeting attended by her, Inspector General Susan Gaffney, Deputy Inspector General John Connors, Assistant Inspector General for Investigations Phil Kesaris, and IG Counsel Bryan Saddler. Ms. Kuhl-Inclan stated that those managers were upset with me and that I should remember that I was a member of management.

35.)    On July 16, 2001, I was deposed by Mr. Tighe's attorney in connection with the same EEO complaint. At that point, Mr. Tighe had requested a hearing before the EEOC and was in the discovery process. During the deposition, I provided testimony that senior HUD OIG management had disregarded EEO regulations in various selections, including the one in which Mr. Tighe was non-selected. Larry Chapman was present at the deposition. HUD senior management would have been made aware of my deposition testimony. At a minimum, Mr. Phelps, who had replaced Ms. Kuhl Inclan as my first level supervisor, became aware of my activity when I advised him of my need to attend the deposition.

36.)    Although the information I provided in connection with the Tighe case did not directly implicate Mr. Phleps, he was a senior manager in the Headquarters office of the OIG at the time of my testimony. My understanding from my conversation with Ms. Kuhl-Inclan in 1999 was that the senior management in OIG Headquarters was unhappy with my participation in the Tighe case because they viewed it as a betrayal of my role as a manager.

37.)    On May 7, 2002, I filed EEO Case No. FW 02-19 against Messrs. Phelps, Heist, and Saddler claiming reprisal for participating in Mr. Tighe's EEO case.  At issue were continuing acts of retaliation and discrimination culminating in a letter of reprimand that was issued to me in February of 2002 by Mr. Phelps.  Mr. Phelps and Mr. Heist would have learned of my complaint through the formal complaints process.  Both gave affidavits in connection with the investigation into the complaint.

38.)    In November of 2002, I participated in ADR to resolve complaint number FW 02-19.  Around that time, my case was resolved through a settlement agreement.  Mr. Stephens, the direct supervisor of both Mr. Heist and Mr. Phelps, was the agency representative who signed the agreement.

39.)    On February 25, 2005, I filed EEO Case No. 05-046, which is the complaint that forms the basis of this action.  Mr. Phelps and Mr. Heist would have learned of my EEO activity through the formal complaints process.  Both gave affidavits in connection with the investigation into the complaint.

## **Retaliation In 2003 and 2005**

40.)    I am aware that in its Motion, defendant implies that I did not suffer any acts of retaliation during the time period between the resolution of my first EEO complaint in December 2002, and my receipt of the directed reassignment in January of 2005.  This is not true.  The following actions all took place during that timeframe:

a.)    In early 2003, Mr. Phelps ordered my desk officers to find irregularities in Region VI including a secret review of the audit of Hargest College.  I was never made aware of the review or its outcome.

b.)     Region VI was unfairly ranked 12th out of 13 regions for the 2003 fiscal year.  Mr. Heist and Mr. Phelps introduced several ranking goals in mid-year.  At year-end they manipulated the goals, introducing weighting factors not known to the regions during the year.  Further, in weighing the dollar goals, they devised a means to rank regions not on how much money the region questioned in its audits, but on how much the region missed its goals.  As a result, Region VI, with $3.8 million in questioned costs, was ranked lower than a directorate reporting $0 in questioned costs.  Region VI was not allowed to count all monies it had questioned.  This negatively impacted the morale of every auditor in the region.

c.)     Around May of 2003, TOP attempted to block Region VI's audit of the Corpus Christi Housing Authority by claiming that the audit survey was deficient, despite the fact that the survey identified over $1 million in potential questioned costs.  TOP personnel attempted to intimidate region personnel and affect the region's ability to develop successful audits.

d.)     In late 2003 and early 2004, Mr. Heist blocked the Region VI's attempt to audit the HUD's Secretary's apparent misuse of charter aircraft as reported by HUD personnel.  This had a negative impact on the region auditors as their work was dismissed.  Further, the region's reputation as independent auditors was significantly damaged within the region's accounting personnel.

e.)     In early 2004, Headquarters settled a law suit Region VI had been working on for several years with the Region Counsel's office and the United States Attorney.  The case was in the federal appeals court.  Headquarters, without the knowledge of Region VI auditors or Region Counsel, abandoned the case.  This negatively

impacted on the auditors' morale and Region VI's relationship with Region Counsel.

f.)     In early 2004, Mr. Heist directed Region VI to stop auditing the Community Planning and Development programs in New Orleans. These planned audits would have contributed greatly to the region's monetary goals. The region had planned on these audits and had a significant investment in preparing for them.

g.)     In February of 2004, Mr. Heist ordered me not to issue the Community Planning and Development ("CPD") Capacity Report that he and TOP had approved. Due to this instruction, Region VI did not receive credit for issuing the report timely, and an auditor was prevented from doing any other work for an additional 4 months while Mr. Heist delayed the issuance of the report. This action directly affected the morale of the auditor performing the work at Mr. Heist's request and she complained directly to him. Defendant is now using her complaint as an example of how I supposedly poisoned relationships between Region VI auditors and headquarters.

h.)     From February to June of 2004, Messrs. Heist, Phelps and Stephens held secret meetings and possessed documents they would not share with me or the auditors involved in the CPD capacity audit. Instead, they appointed an auditor junior to me from another region to conduct a review of the audit.

i.)     Throughout 2003 and 2004, Mr. Heist took action to delay Region VI from publishing a report on Pension Plan allocations and to decrease the amount of funds put to better use the region could claim. This had a negative impact on the auditor involved, and on the region's ability to meet its performance goals.

j.)     On or about December 17, 2004, Mr. Heist directed me to draft a letter to the

Louisiana State Ethics Board and send it to TOP within two weeks.  At the time

the memorandum was emailed to me, I was out of the office on work-related

travel (with Mr. Heist) and therefore I did not receive the message until December

22.  Further, I was scheduled to be out of the office on leave until December 29,

which was known to my supervisors.  Due to Mr. Heist's inexplicable delay in

giving me the assignment, my staff was required to work on the assignment

during Christmas week in order to complete the letter.

41.)     I did not file an EEO complaint over these actions, in part, because I relied on the

assurance of Deputy Inspector General Michael Stephens who had given me his word that my

job was safe.  Additionally, I did not want to invite further reprisal from Heist and Phelps, who

had continued to harass me despite the settlement agreement in my previous complaint.

42.)     This conversation with Mr. Stephens occurred at some point in 2003 after my

initial EEO complaint was resolved through settlement.  Region VI had undergone a

Management Assessment Review ("MAR") that year.  At the exit conference for the MAR, one

of the auditors who conducted the review reported to Mr. Stephens that the auditors in Region VI

were concerned that Mr. Heist and Mr. Phelps were going to fire me.  Mr. Stephens made a

statement to the entire Fort Worth office that he liked the way I was running the region, and that

I could stay as long as I wanted to.

43.)     Furthermore, neither Mr. Phelps nor Mr. Heist included any derogatory

comments in my performance appraisals during 2003 and 2004.  The attachment to my 2002

performance appraisal that the agency cited in its brief (Def. Ex. 11) was vitiated as a result of

my 2002 informal grievance.  Mr. Phelps and Mr. Heist did not place me on a Performance

Improvement Plan, or give me oral or written counseling to indicate that they were dissatisfied with my performance during 2003 and 2004.  Accordingly, I had no reason to believe that they would take action to remove me from my position.

44.)     Inspector General Donohue had also told all HUD OIG managers that "return on investment" was his most important goal.  By 2005, Region VI was surpassing its "return on investment" goals.  Since my region was exceeding all performance measures, I believed that my job was safe.  Therefore, I did not pursue an EEO complaint over the retaliatory harassment I and my region had received from Mr. Phelps and Mr. Heist.

### The Directed Reassignment

45.)     I was ordered to report to the Headquarters office on January 5, 2005 for a meeting with Assistant Inspector General for Audit, James Heist, ostensibly to discuss a specific draft audit report.

46.)     Instead, Mr. Heist gave me a directed reassignment which required me to report to duty in Washington, DC to a Special Assistant position that did not exist prior to that time.  Pl. Ex. 1.  The position was non-supervisory and had no position description or set duties.  If I declined the directed reassignment, I was told that the agency would initiate action to terminate me, or I could elect to resign in lieu of an involuntary separation.  If I accepted the directed reassignment, I was required to report to the new position on a temporary basis beginning January 10, 2005, and on a permanent basis by March 7, 2005.

47.)     I felt I had no choice but to accept the directed reassignment.  As a result, I was separated from my wife for approximately two months due to the agency's immediate TDY assignment of me to Washington, D.C.  Additionally, I had to uproot my family from Arlington, Texas, where we were very involved and respected members of the community, and undergo the

unplanned sale of our house in Arlington. My wife and I were forced to move to the Washington, D.C. area, where we have faced a steep increase in the cost of living and a decreased quality of life.

48.)     When I arrived in Washington, I was told by Mr. Phelps that he would not place me in an office or order one to be built until he knew I was staying. I was given virtually nothing to do apart from low-level, menial work.

**Audit Reports Identified by the Agency as Problematic**

49.)     In its Motion, the agency points to some audit reports that were supposedly problematic, including the CPD audit; the Jazzland audit, and the CVR audit.

CPD Audit

50.)     The Community Planning and Development (CPD) audit came about in response to a Congressional inquiry. Mr. Heist assigned Region VI to perform an audit to see if CPD had appropriate financial controls over the faith-based initiatives that were under its purview, and whether the faith-based organizations receiving the grants had appropriate controls and resources to carry out the programs for which they had received funding. The agency claims that there were "significant inaccuracies" in the draft audit report for CPD which caused IG Donohue to get involved in the audit. Def. Mem. at 7.

51.)     On or about February 23, 2004, as Region VI was in the process of issuing the final CPD report, Mr. Heist passed on an email from the Inspector General to Deputy Inspector General Stephens ordering the Office of Audit not issue the report. Apparently, CPD Deputy Assistant Secretary Roy Bernardi, who was facing confirmation hearings and who was implicated by the audit report, had complained to the Inspector General about the content of the report. The agency states that other auditors from other regions had to be brought in to review

and correct the audit. This statement is highly inaccurate. Both TOP and Mr. Heist had approved the draft report for release as a final audit and I was on the verge of issuing the report. After Mr. Bernardi's conversations with IG Donohue, the audit report was placed on hold and sent for review by auditors outside of Region VI. Mr. Donohue's involvement in the process – which was highly unusual – had the effect of delaying the issuance of the report until after Mr. Bernardi's confirmation hearing.

52.)     Normally when a draft audit report is prepared, it is sent to the program office for review and comment. After we get the comments back, they are incorporated into the final report. If the auditee points out something in the audit report that is inaccurate, we go back and correct it in the draft report before issuing the final version. The purpose of this review process is to make the audit report as accurate and fair as possible. It is not unusual for the office of audit to receive complaints from the program offices that are being audited – they tend to be defensive about criticism contained in the audit reports. However, the CPD audit is the first instance that I know of in which an Inspector General halted the an audit report from being issued based on the comments of the auditee. The obvious appearance of a lack of independence prompted me to request in writing to Mr. Heist and TOP that the OIG not issue the report. Mr. Heist directed me to issue report over my concerns, which I did.

Jazzland Audit

53.)     The agency claims that on the Jazzland audit, my region failed to seek the advice of legal counsel regarding the appropriate criteria to apply. Def. Mem. at 8. Again, this is untrue. Mr. Heist, in his deposition, claimed that a legal opinion he requested after Region VI issued the report removed any basis for HUD to recover $7 million in ineligible costs. In fact, HUD told TOP that the legal opinion did not change the report's finding and that HUD would

demand the City of New Orleans repay the $7 million. The only reason the money was not ultimately recovered was because HUD decided to forgive the disallowed costs after Hurricane Katrina. Pl. Ex. 7.

### CVR Audit

54.)    The agency claims that on the CVR audit, my region failed to apply the appropriate criteria, thereby disregarding the advice we received from the legal department. Def. Mem. at 8. As I have stated several times before, the opinion we received from the legal department was that we needed to use Federal Acquisition Regulations (FAR) as the criteria for one of the auditees – CVR – because they were a for-profit corporation. I agreed and made the appropriate changes to the audit. However, the A-87 circular was the appropriate criteria for another target of the audit, the Housing Authority, because they are part of a government entity. For that reason we included both criteria in the audit report.

55.)    The agency claims that the CVR audit demonstrated my refusal to adhere to OIG policy because I supposedly did not submit a survey report. Def. Mem. at 9. This claim is completely inaccurate. Mr. Phelps, Mr. Heist, and TOP were well aware of the status of the CVR audit. At Deputy Inspector General Stephens's request, Region VI had worked for more than a year supporting the Office of Investigation to identify contractor fraud at the Housing Authority of New Orleans. In a February 2004 meeting with Mr. Stephens, Mr. Heist, and Mr. Phelps, Region VI was directed to use the work gained to commence an audit of the CVR contract. Mr. Phelps and Mr. Heist were kept informed about the progress of the CVR audit through the bi-monthly briefing papers submitted by Region VI. They also included the CVR report on the IG's weekly priority report. Accordingly, the agency's claim that my supervisors

did not find out about the specific issues in the audit until they received the draft audit report is completely false.

56.)     The agency claims the CVR audit demonstrated Region VI's use of inappropriate language in the audit report.  Def. Mem. at 9.  The series of events is as follows:  after reviewing the draft report, TOP responded by advising Region VI to remove certain words that they considered to be inappropriate.  In response, Region VI asked TOP to identify the words and TOP prepared a list.  However, Mr. Heist instructed TOP not to send the list to Region VI.  Thus we were never privy as to which words TOP considered flagrant.  After reviewing the list during the discovery process in this case, however, I can defend Region VI's use of a great many of the words because they were taken from quotes from individuals who were interviewed during the audit process.  For example, TOP said that our use of the term "double dipping" created a bias; however, the report is quoting what an individual said after reviewing CVR's contract bid.  The report included as an exhibit the document where the witness had used the term.  TOP also said our characterization of an individual as a woman's "boyfriend" was biased; however, a principal of CVR used that term to describe her relationship to an individual to whom the corporation was paying rent.  Unfortunately, I was never able to engage in discussions with TOP about the specific words that were in question while the CVR audit report was pending.

### The Supposedly Negative Attitude of Region VI Toward Headquarters and TOP

57.)     The agency argues that I allowed and encouraged the audit staff in Region VI to question and argue with Headquarters over decisions related to the audits.  Def. Mem. at 11-12. That was not the case.  The auditors and management in Region VI were severely demoralized because of Mr. Heist's and Mr. Phelps's retaliatory harassment of me and the region.  It was

apparent to everyone in the region that we were being singled out for poor treatment by Headquarters management.

58.)     For example, in 2004, IG Donohue instituted a special program to reward the best performing region for fiscal year 2005 with a $5,000 cash award for the RIGA and a $2,000 cash award for each ARIGA.  Region 6 was the best performing region for that year; however, the region did not receive the promised award.  When Region 6 personnel, through the Employee Advisory Council, asked why the awards had not been given, Mr. Stephens said that management had "dropped the ball."  I have listed the other ways in which Region VI was harassed by Mr. Phelps and Mr. Heist above in paragraph 40.

### The Negative Job Reference

59.)     On January 25, 2005, Mr. Stephens assured me that no one at HUD OIG would interfere with my attempts to apply for positions in other organizations and offered to assist me in finding another position.  That same month, I applied for the Senior Executive Service (SES) position of Director, Readiness and Logistics Support, in the Department of Defense Office of Inspector General (DOD OIG).  This position would have carried with it many career-enhancing benefits and opportunities, including greater professional exposure, and supervisory duties. Furthermore, because it was an SES position, it would have made me eligible for SES bonus and other benefits such as final relocation benefits and unlimited accrual of annual leave.

60.)      On March 28, 2005, Mr. Keith West led a selection panel at the DOD OIG who interviewed me for the position at the headquarters of the DOD OIG in Arlington, VA.  On April 6, 2005, Mr. Gene Reardon, the Selecting Official, interviewed me.  He told me that I was the only candidate whose name had been forwarded to him by the selection panel.  Prior to the

interview, Mr. Reardon had sought a recommendation of me from Mr. Phelps. Most of the interview was spent discussing this recommendation.

61.)     Mr. Reardon characterized his conversation with Mr. Phelps as negative. On April 11, 2005, Mr. Reardon called me to say that he was not selecting me for the position because of the negative recommendation that he had received from Mr. Phelps. Mr. Reardon re-advertised the position on April 20, 2005. I do not know who was eventually selected for the position.

## Similarly Situated Comparators

62.)     The only other audit supervisor who, like me, was removed from her position was Saundra Elion. Ms. Elion was the Division Director for the Headquarters Audit Division, which is an equivalent position to a Regional Inspector General for Audit. Ms. Elion initially filed an EEO complaint in 2002, and later engaged in mediation with then-Deputy IG Stephens. Approximately a year later, the Headquarters Audit Division was abolished, and, like me, Ms. Elion was forcibly reassigned to the non-supervisory position of Special Assistant to Mr. Heist.

63.)     During discovery, the agency claimed that it gave directed reassignments to two other RIGAs – Austin Groom and Mimi Lee.

64.)     Austin Groom was Ms. Elion's predecessor as the Director of the Capital District Office, which is a comparable position to a Regional Inspector General for Audit. I understand that Mr. Groom was removed from his supervisory position by former Assistant Inspector General for Audit Kathy Kuhl-Inclan and put into a non-supervisory position in the same office. After filing an EEO complaint against Mr. Phelps, Mr. Groom was terminated.

65.)    Ms. Lee was the RIGA in San Francisco.  She was given a directed reassignment from San Francisco to Los Angeles because the agency closed her office in San Francisco. Accordingly, the job in San Francisco no longer existed.

## Documents

66.)    During the disclosure and discovery processes in this action, the investigation of my formal administrative complaint at the agency level, and my work as a senior manager in HUD OIG, I had or gained access to the documents, which accompany this Declaration and my Opposition to defendant's Motion for Summary Judgment.  These documents, each of which is a true and correct copy of what it purports to be, are as follows:

a.)    Pl Ex. 1 is a true and correct copy of the January 5, 2005 memorandum by which Mr. Heist reassigned me from my position as RIGA for Region VI to the Special Assistant position in Headquarers.

b.)    Pl. Ex. 3 is a true and correct copy of the Settlement Agreement I entered into with HUD OIG to resolve my initial EEO complaint, No. FW 02-19.

c.)    Pl. Ex. 4 is a true and correct copy of the $2,000 performance award I was issued in May of 2004.

d.)    Pl. Ex. 5 is a true and correct copy of the HUD OIG Regional performance rankings for the Office of Audit for Fiscal Year 2005.

e.)    Pl. Ex. 6 contains true and correct copies of my performance appraisals from February of 2001 through January of 2005.

f.)    Pl. Ex. 7 is a true and correct copy of the February 9, 2007 memorandum regarding the forgiveness of disallowed costs in connection with the Jazzland Audit.

g.)    Pl. Ex. 8 is a true and correct copy of the Jazzland audit report.

h.)     Pl. Ex. 9 is a true and correct copy of an E-mail dated October 10, 2003 from Mr. Heist to me regarding the draft CPD audit report.

i.)     Pl. Ex. 10 is a true and correct copy of a memorandum prepared by Region VI for Deputy Inspector General Stephens regarding the CVR Associates Audit.

j.)     Pl. Ex. 11 is a true and correct copy of the legal opinion prepared by the HUD OIG Office of Legal Counsel regarding the CVR Associates Audit.

k.)     Pl. Ex. 12 contains true and correct copies of emails between my legal counsel and Mr. Will Nixon regarding his decision not to voluntarily provide a declaration in connection with this case.

l.)     Pl Ex. 13 contains a true and correct copy of a draft declaration for Mr. Nixon prepared by my legal counsel, to which he made hand-written revisions during his deposition.

m.)     Pl. Ex. 14 contains a true and correct copy of HUD OIG Manual Chapter 1430.1, entitled, GS Performance Appraisal Program.

n.)     Pl. Ex. 15 contains a true and correct copy of the EEO affidavit of James Heist, submitted in connection with the administrative investigation of the EEO complaint underlying this action.

o.)     Pl. Ex. 16 contains a true and correct copy of Region VI's response to TOP's comments regarding the CVR audit.  Region VI's response appears in blue.

p.)     Pl. Ex. 17 is a true and correct copy of my informal EEO complaint of reprisal, dated March 20, 2002.  This eventually became formal complaint number FW 02-19.

I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

D. Michael Beard

Executed this _6_ day of _August_ , 2007.