UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| D. MICHAEL BEARD, | ) |
| | ) |
|    Plaintiff, | ) |
| | ) C.A. No. 06-0756 (GK) |
|    v. | ) |
| | ) |
| ALPHONSO R. JACKSON, | ) |
|   Secretary Of Housing And | ) |
|   Urban Development, | ) |
| | ) |
|    Defendant. | ) |
| | ) |

### DECLARATION OF NANCY H. COOPER

I, Nancy H. Cooper, being first duly sworn do hereby depose and state as follows:

1.) I was the Regional Inspector General for Audit (RIGA) for the Department of Housing and Urban Development, Office of the Inspector General (HUD OIG) in Region IV from September of 1996 until my retirement in January of 2004. Mike Beard and I were RIGAs during the same time frame – he in Fort Worth (Region VI) and I in Atlanta (Region IV). Mr. Beard and I both reported to the Deputy Assistant Inspector General for Audit at the first level and the Assistant Inspector General for Audit at the second level.

2.) From 1993, when I joined HUD, until 1996 I was the Assistant Regional Inspector General for Audit (ARIGA) in Region IV.

**Region IV's Experience with IG Donohue's Centralized Audit System**

3.) At the time I joined HUD, or soon after, Susan Gaffney became the Inspector General. Under her leadership, the regions were "empowered" to issue their own audits with minimal involvement from Headquarters management. Like most of my RIGA colleagues, I

1

found this de-centralized system to be highly efficient. Ms. Gaffney trusted the RIGAs and encouraged us to be independent. She allowed us to use our discretion about what we thought needed to be audited and how we went about approaching the audits and audit reports. I found Ms. Gaffney's approach to be a breath of fresh air.

     4.)     After Inspector General Donohue became the Inspector General in 2002, he changed the audit system so that all audits had to go through the newly-created Technical Oversight and Planning Division (TOP), which was located in Headquarters. TOP and the Assistant Inspector General for Audit (AIGA), James Heist, had to review and approve all audit plans and audit reports from each of the regions.

     5.)     In Region IV, the process for submitting draft audit reports to TOP worked as follows: we would submit the draft audit report to TOP; my ARIGAs and I would then have a teleconference with the official from TOP who was responsible for our region; that official would give us her list of "failures" in the audit report and/or the work papers; the management team in Region IV would review TOP's list of proposed changes; if none of the changes was substantive, we would normally make them and re-submit the draft report to TOP; if a suggested change adversely impacted the audit in a way that we believed was significant, we would express our disagreement with TOP. We would then engage in a back-and-forth deliberative process with TOP to work out our differences.

     6.)     My managers and I found the process of working with TOP to be oppressive, and their attitude hostile. Not only did the additional layer of oversight make our jobs much harder and decrease efficiency, TOP's mean-spirited, condescending attitude toward Region IV had a devastating impact on the employees' morale. TOP seemed to enjoy criticizing our work, often focusing on petty issues and regularly focusing on policy conformance over audit report

substance. TOP kept statistical worksheets on all of the regions' "failures" to give to IG Donohue. The regions were not given the opportunity to view these worksheets, make comments on them, or defend ourselves.

7.) Not only did TOP assume an adversarial stance in reviewing the draft audit reports, but it, along with the Headquarters management team of AIGA Heist and Deputy Assistant Inspector General for Audit (DAIGA) Michael Phelps, issued a constant stream of new policy and procedure guidelines faster than the regions could absorb them. TOP and Headquarters would issue a policy change one day and expect the regions to implement it the next. My staff routinely came into my office to complain about the abundance of new procedures and monitored deadlines on every phase of our work, which were interfering with their ability to do their jobs.

8.) I expressed to DAIGA Phelps that the new policies and the new level of control by Headquarters were overwhelming to my staff and causing significant turmoil. His response was something to the effect of, "that is the way it is going to be" and "you just need to get used to it."

9.) I have read HUD OIG's Motion for Summary Judgment in the case of Beard v. Jackson, Civil Action No. 06-0756 (D.D.C.), and I am aware that the agency has claimed that Mr. Beard espoused negative views of Headquarters to his staff and "poison[ed] their views of the organization." Def Mem. at 4; see also p. 12. Based on my experience in my own region, I can state with confidence that Headquarters itself was responsible for the poor morale among the audit staff in the regions, not Mr. Beard. My employees certainly did not need any encouragement to have a bad attitude toward Headquarters – everyone was frustrated with their

dictatorial style. I do not believe that Mr. Beard or anyone else could have done anything to *prevent* the auditors from being angry and dispirited.

### The Deliberative Process with TOP

10.) In addition to HUD OIG's Motion for Summary Judgment, I have read the EEO affidavit of Stanley McLeod, the former Director of TOP. I understand that the agency and Mr. McLeod claim that the "argumentative attitude" they supposedly experienced from Mr. Beard's region was somehow unique. See Def. Mem. at 11. This is not the case. As I explained above, it was the normal course of action for the regions to take issue with TOP's recommended changes, particularly if they impacted something that was significant to the audit report.

11.) TOP routinely gave my region the criticism that we had included "inappropriate" or "inflammatory" language in our audit reports, similar to the language cited in Attachment A at p. 10. It was routine for us to argue against the changes or, at a minimum, suggest alternative words. To our view, TOP was trying to water down the reports by removing any words that would peak the reader's interest and, more importantly, spur corrective action by HUD.

12.) The agency also claims that "'most Regional Inspector Generals would accept the word of Jim Heist, who was their boss ... But often in Region 6 it was not the case. Even if Jim Heist said it was wrong it would still be argued.'" Def. Mem. at 11 (quoting McLeod Dep. at 73-74). I know from experience that that statement is not true.

13.) As a rule, I do not know of any RIGA who would simply go along with TOP and/or AIGA Heist if they believed that they were being asked to make a change that compromised the audit report in some way. If we felt strongly enough about the issue, we would argue for what we thought was right. After all, we were the ones who ultimately had to put our

4

signatures on the audit reports.  We had to defend and support the audits; accordingly, we were very invested in their content.

14.) In one particular instance, TOP mandated that my region remove a statement in an audit report that referenced the fact that a Housing Authority Executive Director was living with his female Deputy Director.  Our audit made the point that this sort of inappropriate relationship – which was prevalent in this particular office – was creating serious internal control problems for the Housing Authority and HUD.  I felt strongly that the statement about the behavior of the highest level official was critical to the audit, so I elevated the issue to AIGA Heist.  Against my vehement protests, Mr. Heist directed me to remove the reference to the Executive Director's inappropriate relationship, but to leave in references to all others.  At that point, I had two choices, I could either be insubordinate and risk my career or I could face criticism for issuing a report that did not contain all the facts.

15.) I removed the reference and issued the audit report.  When it was released, I got blasted from the complainants (who had requested that the audit be performed) for failing to include the information in the report.  They accused me of lacking independence, being biased, and protecting the official in question.  They were right to be disturbed by the omission.

16.) I felt that this situation exemplified IG Donohue's efforts to dilute audit reports by removing controversy so that he could stay on good terms with HUD senior management.  That is likely why Region VI's audit reports were not "well received" by senior HUD OIG management.  See Def. Mem. at 4.

### Inclusion of ARIGAs in Meetings with TOP

17.) I have read Mr. McLeod's statement in his EEO affidavit in which he claims that Mr. Beard supposedly was not knowledgeable of the facts of the audits coming out of his region

because he "appeared to rely primarily on the opinions and positions of his audit managers." McLeod Aff. at 2. This statement is baseless.

18.) Mr. McLeod states that Mr. Beard had "to bring all of his staff into discussions" with TOP. McLeod Aff. at 2. That was a normal occurrence. I included my ARIGAs in most meetings I had with TOP because they were the supervisors who were responsible for the audits in the first instance, and because they were the ones who would be responsible for implementing TOP's changes.

19.) In fact, after a while, I asked my ARIGAs participate in the phone calls with TOP without me – the task had become too time consuming and I simply could not take any more of the negativity coming from TOP, so I let the ARIGAs handle it. I intervened when my staff and TOP could not agree on the resolution on TOP's concerns.

### Subordinates' Communication with Headquarters

20.) I am aware that the agency argues that Mr. Beard allowed his subordinates to "talk out of turn," so to speak, by communicating their frustration with TOP and the centralized audit process to AIGA Heist, DAIGI Phelps, and/or TOP. See e.g. Def. Mem. at 29.

21.) I routinely asked my ARIGAs to provide feedback when Headquarters would ask for it. I considered the ARIGAs part of the audit management team, and I thought that their points of view were important. If they found something about the new policies that were objectionable, I felt it was my responsibility to let Headquarters know.

22.) Two of the four ARIGAs under my supervision were very outspoken, and I feel sure they directly communicated their thoughts, opinions, and displeasure to Headquarters by phone and email.

### **Debt Write-Off for Jazzland Audit**

23.) I am aware of the agency's argument in its Motion for Summary Judgment that Region VI supposedly misapplied criteria in an audit report (City of New Orleans/Jazzland), and that this error prevented HUD from recovering $7 million dollars in questioned costs. Def. Mem. at 8 (quoting Heist Dep. at 106).

24.) I have reviewed the attached memorandum (Att. B), dated February 9, 2007, reflecting HUD's forgiveness of disallowed costs of $7,685,703 from the City of New Orleans. It is evident from that memorandum that the agency wrote off the debt due to the destruction of New Orleans caused by Hurricane Katrina. I note that the memorandum was signed by AIGA Heist.

25.) This sort of debt forgiveness would not have been necessary if there had not been a management decision validating the findings and recommendations of the audit. The memorandum itself reflects that the money was "due program participants," references the audit's "findings and recommendations," and states that CPD did not condone the city's actions that led to the disallowance. Therefore, Mr. Heist is incorrect in claiming that "there was no basis for recovering" the funds. Def. Mem. at 8 (quoting Heist Dep. at 106).

### **EEO Status**

26.) During the time I was employed by the HUD OIG, I did not engage in protected EEO activity.

27.) I was not given a directed reassignment or any other personnel action that I consider to be adverse.

I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

*Nancy A. Cooper*
Nancy Cooper

Executed this 15th day of May, 2007.