## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **D. MICHAEL BEARD,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) **C.A. No. 06-0756 (GK)** |
| **v.** | ) |
| | ) |
| **ALPHONSO R. JACKSON,** | ) |
|   **Secretary Of Housing And** | ) |
|   **Urban Development,** | ) |
| | ) |
| **Defendant.** | ) |
| ———————————————————— | ) |


## DECLARATION OF JERRY THOMPSON

I, Jerry Thompson, being first duly sworn, do hereby depose and state as follows:

1)      From 1989 until my retirement in January of 2007, I served as the Assistant Regional Inspector General for Audit (ARIGA) for Region VI of the Office of the Inspector General for the Department of Housing and Urban Development (HUD OIG).  I was one of three ARIGAs who worked under the direct supervision of Mike Beard from approximately 1992 until 2005, during which time Mr. Beard served as the Regional Inspector General for Audit (RIGA) for Region VI.  The other two ARIGAs, who served from 1999 to the present time, were Will Nixon and Theresa Carroll.

2)      As an ARIGA for Region VI, at various times I was assigned responsibility for the Oklahoma City and San Antonio field offices as well as for some of the staff in the Fort Worth office.  In total, I usually had between seven and eight auditors under my direct supervision.

3)      Throughout the time Mr. Beard was the RIGA, I interacted with him on a daily basis.  I also interacted to lesser degree with HUD OIG management, who were located at the Headquarters office in Washington, D.C.

4)      From approximately 2002 forward, the management team for audit in the Headquarters office consisted of Assistant Inspector General for Audit (AIGA) James Heist and Deputy AIGA, Michael Phelps.  Additionally, around that time, Headquarters began to use the Technical Oversight and Planning (TOP) division, also located in Headquarters, in the audit process.

5)      My main communication with the Headquarters management team was through the bi-weekly briefing papers that Region VI submitted to Mr. Heist, Mr. Phelps, and TOP.  I also participated in the telephone conferences Region VI management periodically held with Headquarters to discuss the briefing papers.  Through the briefing papers and the teleconferences, Region VI kept Headquarters informed about the status of the audits that were being conducted, and addressed any concerns that Headquarters management had about them.

**Region VI's Interactions with TOP**

6)      Beginning in about 2002, the regions were required to submit all audit plans to TOP for review and approval.  Additionally, the regions had to submit all draft audit reports to TOP.

7)      TOP would review the draft audit report and forward their comments to AIGA Heist, who would forward them to the region.  This additional layer of review created some frustration for those of us in the field because it greatly slowed down the process of getting audit reports issued.  We felt that if TOP would do a faster review or would be more accurate in providing their comments, we could get the reports issued faster.

8)      Since we in the region were the ones performing the audits, we naturally knew more about the details of the audits than the people at TOP.  Additionally, our region had a strong base of institutional knowledge from which to draw.  I had been an auditor with HUD for 28 years and had audited just about every program HUD had.  I was the probably the most senior ARIGA in the organization and Mr. Beard was one of the more senior RIGAs.

9)      As a result of our experience and familiarity with the facts of the audit, we sometimes felt that TOP's suggested changes were incorrect or premised on a misunderstanding of the facts.  In those circumstances, we would explain to TOP why we did not agree with their suggested changes.  More often than not, TOP would end up agreeing with us.

10)      This back-and-forth process with TOP was not an attempt by Region VI to challenge TOP's authority; rather, it was an exchange of views meant to produce the most accurate audit report possible.  If Region VI and TOP could not come to an agreement on a particular issue, we always followed the ultimate direction provided by TOP or in some cases by Mr. Heist.  Region VI never issued an audit report without TOP's approval.

### Mr. Beard's Leadership of Region VI

11)      I have read HUD OIG's Motion for Summary Judgment in the case of Beard v. Jackson, Civil Action No. 06-0756 (D.D.C.), and I saw the agency's claim therein that Mr. Beard espoused negative views of Headquarters to his staff and "poison[ed] [our] views of the organization."  Def Mem. at 4.  This statement is inaccurate.

12)      Mr. Beard did not set any sort of negative tone among Region VI staff.  Our frustration with Headquarters mainly came from the fact that TOP and the HQ management team were dismissive of our input on proposed changes to the audit process, and generally treated us

3

with condescension and disrespect.  Any negativity that Region VI staff felt toward Headquarters was a direct result of Headquarters' actions, not anything Mr. Beard said or did.

13)     One example of a way that Headquarters hurt morale in Region VI occurred when our region was not awarded for coming in first place nationwide in meeting performance goals for fiscal year 2005.  The previous year, Inspector General Donohue had announced that the region that finished in first place would receive monetary awards, but after we won, the awards never materialized.  When we asked what had happened, we were told that the agency had failed to budget for the awards.

14)     Based on my experience in working with him for a number of years, I can say that Mr. Beard was a very good Regional Inspector General for Audit.  He was fair and encouraging; he listened to the auditors; and he motivated the staff.  He helped, rather than hurt, Region VI's morale.  Additionally, Mr. Beard always followed the audit standards and required those under his supervision to do the same.

### Region VI's Interactions with the HUD OIG Legal Department

15)     I saw in HUD OIG's Motion for Summary Judgment its claim that the management of Region VI failed to properly vet legal issues, thereby causing problems with some audits.  See e.g. Def. Mem. at 28.  This claim is inaccurate.

16)     Normally, Region VI auditors did not have the need to consult the legal department in conducting an audit.  We used criteria that were clearly defined, and with which the auditors were very familiar.  In the event that a question did arise, for example if there was a gray area in a statute or in the case law surrounding an issue, we would request a legal opinion. At other times, after reviewing a draft audit report, TOP might request a legal opinion.

17)     Region VI never failed to follow a legal opinion that we received.  There were a couple of times when we disagreed with an opinion, and we engaged in a discussion with the legal department to make sure that they were aware of all the pertinent facts.  We did this in the interest of making sure that the opinion was accurate.  In some instances, these discussions resulted in the legal department changing their opinions and agreeing with us.

18)     One such instance occurred in the Reallocation of Forfeited Pension Contributions audit, which dealt with whether Housing Authority employees' forfeited contributions to the pension fund could be returned to the government-funded program or had to be distributed to the other members of the pension fund.  (HUD had been allowing forfeited pension funds to be distributed to other members of the fund.)

19)     Our audit concluded that the forfeited contributions could be returned to the government-funded program.  When a legal opinion was obtained from HUD OIG, however, they reached a different conclusion.  Mr. Beard and I ended up going to Washington, D.C. to meet with agency counsel Rick Johnson to discuss the opinion.  In the end, Mr. Johnson was convinced that the Housing Authorities did control the pension fund, and therefore could claim the forfeited contributions.  Accordingly, Mr. Johnson changed his opinion and commended Mr. Beard and me for our work.  In response to our audit, HUD revised its guidelines for pension forfeitures resulting in approximately $5 million dollars in funds put to better use annually.

### The San Antonio Hope 6 Audit

20)     I am aware that Mr. Heist has claimed that Region VI did not meet audit standards on the San Antonio Hope 6 Audit.  Heist Dep. at 103-04.  That statement is not correct. I was the ARIGA responsible for that audit, and I am familiar with the facts of it.

21)     The audit dealt, in part, with over $1 million dollars in expenditures made by the San Antonio Housing Authority <u>after</u> the Authority found out that there was a landfill on property where it wanted to construct some buildings.  In Texas, it is illegal to build on the site of a landfill without proper study and state approval; however, the Housing Authority had gone forward with its construction plans in spite of knowing about the landfill.

22)     The audit report found that the expenditures by the Housing Authority were negligent, and that it should repay the funds to HUD.  The report was issued with the approval of TOP and Mr. Heist.

23)     After the report was issued, the audit went through the Audit Resolution Process in which the HUD program office can either agree or disagree with the findings and recommendations of the audit.  In this case, the program office disagreed with the audit's findings and recommendations.  The audit was then sent to the HUD OIG legal department for an opinion.

24)     The HUD OIG attorney who reviewed the issue initially sided with the program office and found that the expenditures of the San Antonio Housing Authority had been justified; however, his opinion seemed to ignore some of the crucial facts of the audit.  Region VI then provided the attorney with additional information.  In the end, the attorney agreed with the findings of the audit – that the Housing Authority was negligent in going forward and incurring costs – but he concluded that the costs were unavoidable, even though they were incurred years after the Housing Authority's management was aware of the problems with the landfill.

25)     There was no violation of audit standards in this audit.

### DIG Stephens's Assurances that Mr. Beard's Job was Safe

26)     During 2003, the Fort Worth audit division underwent a Management Assessment Review (MAR).  After the review was complete, we held an "exit conference" which was attended by Deputy Inspector General (DIG) Michael Stephens.  At the meeting, one of the auditors who had conducted the MAR reported to Mr. Stephens that the auditors in Region VI were concerned that AIGA Heist and DAIGA Phelps were going to retaliate against Mr. Beard.  In response to that comment, Mr. Stephens assured the Fort Worth office and Mr. Beard that his job was safe and that Region VI should not be concerned.

I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Jerry Thompson

Executed this _17th_ day of _May_____, 2007.