```
                       UNITED STATES DISTRICT COURT

 1                   FOR THE DISTRICT OF COLUMBIA


 2   - - - - - - - - - - - - - - x

     D. MICHAEL BEARD,                :

 3              Plaintiff,            :

     vs.                              : Case No. 1:06CV00756

 4   ALPHONSO R. JACKSON,             :

     SECRETARY OF HOUSING AND         :

 5   URBAN DEVELOPMENT,               :

                Defendant.            :

 6   - - - - - - - - - - - - - - x

                                       Washington, D.C.

 7                                     Friday, January 19, 2007


 8


 9   Deposition of:

                            MICHAEL BEARD,

10   the Plaintiff, called for examination by counsel for

     Defendant, pursuant to notice and agreement as to time and

11   place, at 501 Third Street, N.W., Washington, D.C., before

     Deborah Rinaldo, a Notary Public in and for the District of

12
                       FREE STATE REPORTING, INC.

13                    Court Reporting   Depositions

                        D.C. Area (301) 261-1902

14                    Balt. & Annap. (410) 974-0947


15
```

8

Q.    How long have you been married?

1    A.    35 years.

Q.    What is your date of birth?

2    A.    November 28, 1949.

Q.    And that makes you how old?

3    A.    57.

Q.    Do you have any children?

4    A.    Yes.

Q.    How many?

5    A.    One.

Q.    What's his or her name?

6    A.    Jennifer.

Q.    Jennifer Beard?

7    A.    Wells, W-E-L-L-S.

Q.    And how old is she?

8    A.    34.

Q.    For whom do you currently work?

9    A.    Office of Inspector General, United States
Department of Housing and Urban Development.

10    Q.    And the acronym we often say HUD OIG?

A.    Yes.

11    Q.    And I'll refer to the Office of Inspector General
for Housing and Urban Development as HUD OIG, for the record.

12
                        FREE STATE REPORTING, INC.

13                    Court Reporting   Depositions

                        D.C. Area (301) 261-1902

14                    Balt. & Annap. (410) 974-0947

15

A.    OIG.

1    Q.    How long have you worked for HUD OIG?

A.    I believe I started with the HUD OIG in 1988.

2    Q.    What's the position you currently hold?

A.    Special assistant to the deputy assistant inspector

3 general for audit.

Q.    When did you start in that position as special

4 assistant?

A.    March of 2005.

5    Q.    What was your position prior to becoming a special

assistant?

6    A.    I was the regional inspector general for Region VI

in Fort Worth, Texas.

7    Q.    Is that regional inspector general for audit?

A.    Yes, regional inspector general for audit.

8    Q.    Again, in terms of an acronym, is that often

referred to as RIGA, R-I-G-A?

9    A.    Yes.

Q.    For how long did you hold the position of regional

10 inspector general for audit, or RIGA, in Fort Worth?

A.    I was appointed to that position in October of 1992.

11 So 13 years.

Q.    Prior to being RIGA in Fort Worth, what position did

12

FREE STATE REPORTING, INC.

13            Court Reporting    Depositions

D.C. Area (301) 261-1902

14            Balt. & Annap. (410) 974-0947

15

A.    Generally speaking, yes.  But at these planning

1   meetings we were told the subject areas that were of interest.
    So we were steered into certain subject areas.

2       Q.    But with respect to bringing specific audits against
    specific entities, you got to make that call, correct?

3       A.    Yes, we did.

        Q.    And then once the creation of TOP, that changed?

4       A.    Yes.

        Q.    Prior to Mr. Heist -- I'm sorry, what's the position

5   he holds now?  Mr. Heist?

        A.    Assistant inspector general for audit.

6           MR. JOHNSON:  We generally say AIGA.

            BY MS. MELNIK:

7       Q.    Who was the AIGA before Mr. Heist?

        A.    Kathy Kuhl-Inclan.

8           MS. BUIE:  I don't think we've spelled that one.

            THE WITNESS:  K-U-H-L, hyphen, I-N-C-L-A-N.

9           BY MS. MELNIK:

        Q.    How was your working relationship with

10  Ms. Kuhl-Inclan?  How was your relationship with her?

        A.    Professional and cordial.

11      Q.    How would you describe your professional
    relationship with Mr. Heist?

12
                        FREE STATE REPORTING, INC.

13                    Court Reporting   Depositions

                        D.C. Area (301) 261-1902

14                    Balt. & Annap. (410) 974-0947

15

23

A.    The same, professional and cordial.

1        Q.    Now, the tension that you describe between yourself

and Mr. Larry Chapman, were you ever spoken to or counseled by

2   headquarters regarding your professional interaction and/or

even personal interaction with Mr. Chapman?

3        A.    Counseled?  I think that there was a meeting in

sometime in 2002 where Mr. Haban, the assistant inspector

4   general for investigations, met with myself and Mr. Chapman

and Mr. Heist, and at that time counseled us to get along.

5            And in, I think, May of 2002, there was a conference

in Tampa, Florida, where Mr. Michael Stephens, the deputy

6   inspector general, asked Mr. Chapman and I to get along.

Q.    So the tension or stress of which you referred to

7   between yourself and Mr. Chapman was such that it was known by

headquarters?

8        A.    Someone had told Mr. --

Q.    First answer that.  Is that yes or no?

9        A.    Someone had told Mr. Stephens there was a problem.

Q.    And Mr. Stephens, at that time, and still is not

10  your first-line supervisor, correct?

A.    Correct.

11       Q.    At that time Mr. Phelps was your first-line

supervisor?

12

FREE STATE REPORTING, INC.

13                     Court Reporting   Depositions

D.C. Area (301) 261-1902

14                     Balt. & Annap. (410) 974-0947

15

A.    At the time of the counseling, yes.

1    Q.    And Mr. Heist is Mr. Phelps' supervisor?

A.    Yes.

2    Q.    And Mr. Stephens is above Mr. Heist and Mr. Phelps
and yourself?

3    A.    Yes.

Q.    Just in terms of chain of command, was there a point

4    in time when Mr. Heist changed the chain of command as to who
reported to whom?

5    A.    Yes.

Q.    Can you describe that for me?

6    A.    Sometime in 2001 he made Mr. Phelps the first-line
supervisor for the regional inspectors general.

7    Q.    Mr. Heist made Mr. Phelps; is that correct?

A.    Yes.

8    Q.    Mr. Phelps made him -- Mr. Heist made Mr. Phelps,
what?

9    A.    First-line supervisor for the regional inspectors
general.

10    Q.    And you were a regional inspector general?

A.    Yes.

11    Q.    How many regions are there?

A.    Ten.

12

FREE STATE REPORTING, INC.

13                    Court Reporting   Depositions

D.C. Area (301) 261-1902

14                    Balt. & Annap. (410) 974-0947

15

(Beard Deposition Exhibit Number 2 was marked for

1   identification.)

BY MS. MELNIK:

2       Q.   Mr. Beard, do you recognize what Exhibit 2 shows?

A.   Yes.

3       Q.   And what does it show?

A.   Relationship of Affiants Chart.  It shows a chain of

4   command type relationship.

Q.   And prior to Mr. Phelps retiring -- do you know when

5   he retired, by the way?

A.   January 2006.  Somewhere in that neighborhood.

6       Q.   So prior to his retirement, does Exhibit 2

accurately demonstrate the chain of command -- or your chain

7   of command?

A.   Yes.

8       Q.   In terms of comparison between Ms. Gaffney and

Mr. Donohue, the newer inspector general, in addition to

9   creating -- or TOP being created, what other management

differences were there between the two, if any, that you

10  recall?

A.   He instructed us to adhere to the chain of command,

11  and he announced that empowerment was over.

Q.   And when you say -- I'm sorry, what was the last

12

FREE STATE REPORTING, INC.

13                  Court Reporting   Depositions

D.C. Area (301) 261-1902

14                  Balt. & Annap. (410) 974-0947

15

Q.    You yourself were angry about some aspects of the

1    bulletin, correct?

A.    Mr. Heist --

2    Q.    Is that a yes or no, Mr. Beard?  Were you upset?

A.    I thought they were insulting and condescending.

3    Q.    In fact, you say -- and this is on the last

sentence, "The bulletins, taken as a whole, are degrading and

4    cause field staff to be resentful."

Correct, you wrote that?

5    A.    Yes.

Q.    And these bulletins to which you refer, they would

6    be applicable to all the regions.  Not just yours, correct?

A.    That's correct.

7    Q.    The line before that last line you state, "The

bulletins are overkill, indicating headquarters personnel do

8    not trust us to perform audits in accordance with GAGAS."

And just for clarification, what is GAGAS?

9    A.    Generally accepted government audit standards.

Q.    So essentially, you are telling your boss that you

10    feel like headquarters doesn't trust you to perform your job?

MS. BUIE:  Object to the form.

11    THE WITNESS:  He had asked that I give him specific

examples where I thought the bulletins were insulting and

12

FREE STATE REPORTING, INC.

13    Court Reporting   Depositions

D.C. Area (301) 261-1902

14    Balt. & Annap. (410) 974-0947

15

39

condescending.  And I responded to his inquiry.

1           BY MS. MELNIK:

    Q.   And in doing so, it was your belief that

2   headquarters did not trust you or your staff to perform audits

    in accordance with GAGAS, correct?

3       A.   That's the tone in the bulletins.  That's the

    inference being drawn by the auditors.

4       Q.   That's the inference that you drew, correct?

        A.   No.  Mr. Nixon and the other people who responded to

5   those were drawing.

        Q.   So are you saying that all your staff felt this way

6   in terms of being insulting and that they don't trust you,

    that only related to your staff?  You didn't feel that way

7   personally at all?

        A.   This was the way the bulletins were coming across.

8       Q.   I'm not asking how the bulletins were coming across.

     I'm asking about the reaction.  And you've said that

9   Mr. Nixon and the auditors felt this way.  Are you saying you

    did not feel that way as well?

10      A.   I thought that message was being inferred correctly

    from the bulletins.

11      Q.   By whom?

        A.   By those that were being asked to comment on them.

12

                    FREE STATE REPORTING, INC.

13              Court Reporting   Depositions

                  D.C. Area (301) 261-1902

14              Balt. & Annap. (410) 974-0947

15

this?

1      A.   We never knew what the problem was with Finding 3.

       Q.   To this day do you not know what the --

2      A.   To this day we do not know what the problem was with

Finding 3.

3      Q.   Mr. Beard, are you saying as you sit here today,

2007, you don't know what headquarters wanted to do with

4  respect to Finding 3 in the CPD audit?

       A.   They asked us -- well, actually, they deleted it

5  from the report and we were never involved in the discussions

of why it was deleted.  So we issued the report without it.

6  We were told they were going to do a separate audit in that

area later.

7      Q.   Did you agree with their position?

       A.   No.  But we did what we were told.

8      Q.   I understand.  Who is Laura Nixon?

       A.   Laura Nixon is a senior auditor in the Fort Worth

9  office.  She was the in-charge auditor on this CPD audit.

       Q.   And she is subordinate to you at that time?

10     A.   Yes.

            (Beard Deposition Exhibit Number 8 was marked for

11  identification.)

            BY MS. MELNIK:

12

                    FREE STATE REPORTING, INC.

13                  Court Reporting   Depositions

                    D.C. Area (301) 261-1902

14                  Balt. & Annap. (410) 974-0947

15

A.    September of 2004.

1    Q.    And that's considered an outside audit, correct?

A.    Yes.  Well, that has taints of both because at the

2    time HANO was being run by HUD?

Q.    HANO, H-A-N-O?

3    A.    Yes.

Q.    When you say HANO, what are you talking about?

4    A.    Housing Authority of New Orleans.

Q.    What was headquarters' reaction to the CVR audit?

5    A.    They sent us an e-mail accusing the auditors of

being biased and basing their findings on opinion or

6    subjective or some such words.

Q.    When you say "the auditors," are you referring to

7    your auditors in Region VI?

A.    Yes.

8    Q.    In addition to that, what about with respect to the

criteria that was being used?  Did they have a problem with

9    that?

A.    I don't recall that they had a problem with that.

10    Q.    Was there a request for a legal opinion regarding

the criteria that was used?

11    A.    I recall that Mr. Heist and/or Mr. McLeod sent the

report or the draft report to legal with some questions.

12

86

discriminated against you because of your age?

1    A.    What they did on January 5th to an individual that's
being screened annually to see if a cancer is going to recur

2    is order him on a Wednesday to report on a Monday, take away
his life --

3            (A recess was taken.)

            THE WITNESS:  Their obvious intent was to get me to

4    retire, to leave a career that I had built.

            BY MS. MELNIK:

5    Q.    What's your basis for believing that that directed
reassignment was based on your age?

6    A.    I was eligible to retire.

    Q.    Anything else?

7    A.    Yes.  Their desire to get rid of me.

    Q.    If you can turn to page 16, count III, and this is

8    now Retaliation Under the Age Discrimination and Employment
Act, ADEA.

9    A.    Okay.

    Q.    And I guess my only question here is, are you

10   alleging any different facts from those that you've explained
with respect to count I, Retaliation, and count II, ADEA?  Is

11   there any different set of facts upon which you are relying on
to make that claim, count III?

12

                        FREE STATE REPORTING, INC.

13                      Court Reporting   Depositions

                        D.C. Area (301) 261-1902

14                      Balt. & Annap. (410) 974-0947

15

          Q.   How was your relationship with your -- was it

1   daughter?

          A.   Yes, daughter.

2         Q.   Where does she live?

          A.   Roswell, Georgia.

3         Q.   Was that a good relationship prior to your move to

    Washington, D.C.?

4         A.   Yes.

          Q.   Is it still a good relationship?

5         A.   Yes.

               (A recess was taken.)

6              BY MS. MELNIK:

          Q.   Mr. Beard, I think I covered this going through each

7   of the damages inquiry that I just did, but just so I'm clear,

    with respect to the things we've talked about, emotional pain,

8   mental anguish, inconvenience, anxiety, depression, loss of

    enjoyment of life, have you seen a health professional as a

9   result of those things?

          A.   I've seen a doctor, but not a -- you were asking

10  earlier about a mental health professional.  And the answer to

    that is no, I have not seen a mental health professional.  I

11  have seen a doctor.

          Q.   What doctor have you seen for that?

12
                        FREE STATE REPORTING, INC.

13                   Court Reporting   Depositions

                       D.C. Area (301) 261-1902

14                   Balt. & Annap. (410) 974-0947

15

100

         A.    Let me cheat --

1             MS. BUIE:  You have to ask.

              THE WITNESS:  Can I look in my wallet and see if

2    I've got his card?

              BY MS. MELNIK:

3        Q.    Sure.

         A.    It's the Springfield Family Practice.  That much I

4    remember.

              MS. BUIE:  I think we probably listed it in the --

5             BY MS. MELNIK:

         Q.    Springfield Family Medicine?

6        A.    Dr. Brideau.

         Q.    And do you recall seeing him on February 15, 2006?

7        A.    I would have seen him in 2006.  The specific date,

     that's okay with me.

8             (Beard Deposition Exhibit Number 9 was marked for

     identification.)

9             BY MS. MELNIK:

         Q.    Did you have a chance to review it?

10       A.    Um-hum.

         Q.    Is that a yes?

11       A.    Yes.

         Q.    Exhibit 9 is a report from Springfield Family

12

                         FREE STATE REPORTING, INC.

13                     Court Reporting   Depositions

                         D.C. Area (301) 261-1902

14                     Balt. & Annap. (410) 974-0947


15

Medicine from a Donald Brideau, B-R-I-D-E-A-U, M.D.?

1    A.   Yes.

Q.   And is that the doctor that you saw?

2    A.   Yes, it is.

Q.   Is there anything that you are claiming was a

3 medical problem as a result of your move from Fort Worth to

Washington?

4    A.   In the sessions that I had with Mr. Brideau, the

blood pressure and the references to diabetes were new.  I

5 hadn't had those problems before.

Q.   Did you see a doctor routinely when you were in

6 Texas?

A.   Yes.

7    Q.   Do you recall who that was?

A.   No, I can't think of his name.

8    Q.   Or the practice or the location?

A.   I'm about to say Dr. Patel, but I may be confusing

9 him with somebody else.  But I did have that in the -- because

I looked it up.

10    Q.   How often were you seen by the doctor in Texas, if

you can recall?

11    A.   After -- I had been seeing Dr. Sagalowski

(phonetic).  He was my doctor in charge of my cancer case.

12

FREE STATE REPORTING, INC.

13                   Court Reporting   Depositions

D.C. Area (301) 261-1902

14                 Balt. & Annap. (410) 974-0947

15

And then he referred me back to my family practitioner, who

1    was that doctor, and I had been referred back to him late in
2004, I think.

2        Q.    You are saying the diabetes type II and --

         A.    And the blood pressure.

3        Q.    The blood pressure, that was new -- a new diagnosis?

         A.    Yes.

4        Q.    What, if any, course of treatment were you given
with respect to the diabetes, if any?

5        A.    Diet and exercise.

         Q.    Are you complying with that directive from the

6    doctor?

         A.    Exercise, yes.  Diet, no.

7        Q.    And with respect to the high blood pressure, what,
if any, course of treatment was prescribed?

8        A.    He did not prescribe a treatment for that.

         Q.    So you are not taking any -- no prescription

9    medication was prescribed with respect to the high blood
pressure?

10       A.    That's correct.

         Q.    Do you know or did the doctor say that the diet and

11   exercise would also be beneficial with respect to your blood
pressure issue?

12
                             FREE STATE REPORTING, INC.

13                       Court Reporting   Depositions

                          D.C. Area (301) 261-1902

14                       Balt. & Annap. (410) 974-0947

15

Explain for me what this ASB thing is that is included in the

1    e-mail starting at page 2 of Exhibit 3.  What is this ASB

about?

2         A.   (Reviewing document.)

          Q.   I'm not looking for specifics.  Just in general.

3         A.   Just in general they were rewriting the audit

operations manual, and they do that through the ASBs.

4              The ASB is issued by the office of audit under

Mr. Heist's signature, and it makes changes to the audit

5    operations manual.  Over time those ASBs get incorporated into

the audit operations manual.  The practice had been to send

6    the suggested changes out to the field and ask for comment.

          Q.   When you say "the field," to whom are you referring?

7         A.   To regional inspectors general.

          Q.   What about the people under the regional inspectors

8    general, the auditors themselves?

          A.   The auditors themselves, that would depend upon the

9    region and the practice of the regional inspector general.  I

would say that the majority were at least read by all of the

10   assistant regional inspectors general.

          Q.   That's what Mr. Nixon was at this time?

11        A.   Yes, that's correct.

          Q.   So what was your understanding about your role in

12

15

terms of responding or not responding to this ASB?

1  A. When they sent these requests out, I took them
seriously, that they wanted to know what we thought about

2 them, they wanted us to review it for accuracy or how it was
going to work in the field, and that they were looking for our

3 input.  And these particular ones that were coming out were
causing consternation.  This particular e-mail said it well.

4  Q. What type of consternation?

  A. The auditors felt as though they were not being

5 trusted by headquarters to do simple tasks that they had been
doing for years.  They were being asked to certify documents

6 or submit things for approval that were routine in nature and
that minutia was being elevated to vast areas of importance.

7  Q. So why did you end up forwarding Mr. Nixon's e-mail
back to Mr. McLeod?

8  A. Up until this particular incident, that was my
normal practice, was to take e-mails from my ARIGAs and

9 forward them on to Mr. McLeod.

  Q. Okay.  And did that practice change at some point?

10  A. After this particular incident, I no longer did
that.  If we were going to have a comment on anything that

11 came out, I sent it personally from me to Mr. McLeod and it
was just what I said in the e-mail.

12

FREE STATE REPORTING, INC.

13
    Court Reporting   Depositions

    D.C. Area (301) 261-1902

14    Balt. & Annap. (410) 974-0947

15