MGB Reporting, Inc.

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

D. MICHAEL BEARD,                    :
17 Rubins Walk                       :
Fredericksburg, VA  22405,           :
                                     :
                Plaintiff            : C.A. No. 06-0756 (GK)
                                     :
          v.                         :
                                     :
ALPHONSO R. JACKSON,                 :
Secretary of Housing and             :
Urban Development,                   :
451 Seventh Street, S.W.             :
Washington, D.C.  20410,             :
                                     :
                Defendant            :

          Thursday, July 19, 2007

The discovery deposition of WILLIAM W. NIXON, CPA, CIA,

CFE, a witness called for examination by counsel for the

plaintiff, at the Offices of Robert C. Seldon &

Associates, 1319 F Street, NW, Washington, DC, before

Tracy E. Barksdale, Certified Shorthand Reporter and

Notary Public in and for the District of Columbia,

commencing at 12:41 p.m., when were present on behalf of

the respective parties:

MGB Reporting, Inc.

Page 8

1        If you don't have any -- if you do have an issue in

2    the deposition with something I've said or something to

3    do, do you understand you can ask me a question about it?

4        A    Yes, sir.

5        Q    Okay.  And you do understand that that doesn't

6    make me your attorney or any advice that you can rely on,

7    right?

8        A    Yes, sir.

9        Q    Good.  We need to be clear about that.

10       Your name, sir, is William Nixon?

11       A    Yes, sir.

12       Q    And you're currently employed by the Department

13   of Housing & Urban Development; is that right?

14       A    Yes, sir.

15       Q    In the Office of Inspector General?

16       A    Yes, sir.

17       Q    Where are you currently employed, your duty

18   station, please?

19       A    My duty station is Fort Worth, Texas.  And just

20   for the record, my name is William Wainwright Nixon.

21       Q    Very good, sir.  How long have you been

22   stationed in Texas?

MGB Reporting, Inc.

Page 9

1    A    I have been stationed in Fort Worth, Texas,

2    since May-ish of 1999.

3    Q    What position do you hold there?

4    A    Assistant Regional Inspector General for Audit.

5    Q    What does that mean?

6    A    That means I supervise the audits out of --

7    well, I supervise audits and auditors, and I ensure

8    compliance with Yellow Book, applicable audit operations

9    manual, and of course, generally accepted auditing

10   standards.

11   Q    Are those the standards, to your knowledge, that

12   apply to all auditors employed in the Office of Audit of

13   the Office of Inspector General of HUD?

14   A    There's a lot of literature on it, yes, but

15   Yellow Book is the norm with the audit operations manual,

16   and then both of them refer to generally accepted

17   auditing standards.  There's also certified internal

18   auditor requirements, and they all basically go together.

19   Q    Would it be fair to say, sir, that everyone

20   employed in an audit function at any level in the Office

21   of Audit observes those same standards?

22   A    They should, yes, sir.

MGB Reporting, Inc.

Page 10

1      Q      Is everyone, to your knowledge, held to the same
2   standards of conduct, if you know?

3      A      I don't know.

4      Q      What standards of conduct are you held to, sir?

5      A      I'm held to the standards of professional
6   conduct not only by my CPA license but by my certified
7   internal auditor certificate, my certified fraud
8   examiner, and then the professional conducts of being a
9   government employee.

10     Q      Were you formally supervised by the plaintiff in
11  this action, Mr. D. Michael Beard?

12     A      Yes, sir.  I've been supervised by Mr. Beard on
13  two occasions.

14     Q      Okay.  When were those, by date?

15     A      By date, it would be when Mr. Beard came to the
16  Fort Worth region in September of '92-ish, and then I
17  went to the Miami office in May-ish of 1997, and then
18  again when I came back to Region VI in '99.

19     Q      Region VI being the region in Texas that you
20  referred to?

21     A      Yes, sir.

22     Q      As I understand it, in 1997, you were selected

MGB Reporting, Inc.

Page 11

1    as a senior auditor in Miami; is that right?

2        A    Yes, sir.

3        Q    '99 is when you were promoted to the position of

4    Assistant Regional Inspector General for Audit in

5    Region VI?

6        A    Yes, sir.

7        Q    Was that under Mr. Beard?

8        A    Yes, sir.

9        Q    Did Mr. Beard remain your first-line supervisor

10   until his reassignment in January of 2005?

11       A    Basically, yes, sir.

12       Q    Was there anyone else that was your first-line

13   supervisor?

14       A    For a brief period of time, Mr. Phelps was my

15   immediate supervisor.  Mr. Beard had a leave of absence

16   in which I served as the Regional Inspector General for

17   Audit for a couple of months.

18       Q    This is when Mr. Beard was out on medical leave;

19   is that right?

20       A    Yes, sir.

21       Q    Mr. Phelps, for the record, was the former

22   Deputy Assistant Attorney General for -- I'm sorry,

MGB Reporting, Inc.

Page 14

1    presiding in the case?

2        A    No, sir.

3        Q    Did they tell you anything about why your

4    deposition was being taken now?

5        A    A little bit.

6        Q    Is it your preference to have your deposition

7    taken, if you have one or not?

8        A    I don't understand the question.

9        Q    Would you have preferred, if it was up to you,

10    to have your deposition taken or not?

11        A    As a preference over not being taken?

12        Q    Yes, sir.

13        A    To be perfectly honest, I would prefer not for

14    it to have been taken.

15        Q    Why is that, sir?

16        A    The simplest reason is that it's been going on

17    for a long time.  This matter has been going on for two

18    years now.  I anticipate that my involvement on this will

19    affect me career-wise for about another three years.

20        Q    How do you believe that to be true?

21        A    Just the nature of the beast.

22        Q    What beast would that be?

MGB Reporting, Inc.

Page 15

1      A      Government employment, et cetera.

2      Q      Any particular people involved you're concerned

3  about?  I'm sorry, any particular people that you're

4  concerned about having an adverse affect on your career?

5      A      Not anybody by name.  Just the nature of it that

6  will always play in the back of my mind.  Obviously,

7  people whisper.  Obviously, there's rumors, gossip.  Even

8  in a labor relations/supervisory course I went to, I was

9  thinking about it last night, they even told me that

10 testifying against the organization is not something that

11 you really want on your résumé.

12     Q      How would that be on your résumé?

13     A      Everybody knows about it.

14     Q      Everybody who?

15     A      Well, people that make decisions.

16     Q      In HUD OIG?

17     A      In HUD OIG or even around the other agencies.

18 All it's gonna take is one person to whisper it if I'm

19 applying for another job.

20     Q      Do you have a reason to believe that might come

21 true?

22     A      It plays in my mind, yes, sir.

MGB Reporting, Inc.

Page 16

1     Q     Who are you concerned about, if you came to

2   apply for another job?

3     A     Nobody by name.

4     Q     Were you afraid that by giving evidence in this

5   case, you would have to show or give testimony that would

6   show that someone in senior management in HUD OIG had not

7   been accurate or truthful in statements they made?

8     A     No, sir.

9     Q     All right.  We'll get to that in a minute.

10        Mr. Nixon, I take it you do recall being in touch

11  with my associate attorney Molly Buie about possibly

12  giving an affidavit for use in this case?

13    A     Yes, sir.

14    Q     Okay.  What I'm going to do is ask to have

15  marked an exhibit as Nixon Exhibit A, and the way this

16  works is as follows:  I have the reporter mark an

17  exhibit.  Okay.  I give AUSA Melnik a copy, and the

18  reporter gives the one to you.  I give AUSA Melnik a

19  courtesy copy of the exhibit, and I keep one.

20            So I'll ask for this to be marked as Exhibit A.

21  AUSA Melnik, if you'll give me a second, I will give you

22  a copy of what I've asked to be marked as Exhibit A and

MGB Reporting, Inc.

Page 18

1     Q    Do you recall that these e-mails were exchanged

2    when Ms. Buie was asking you to give an affidavit in this

3    case?

4     A    Yes, sir.

5     Q    Did you understand that an affidavit would be

6    written testimony or evidence that would be used by

7    Mr. Beard in this case?

8     A    Basically, yes, sir.

9     Q    Did you understand that one of the purposes was

10   to find out whether or not Mr. Beard was correctly

11   faulted for not preparing a survey memo in connection

12   with the CVR audit?

13    A    Basically, yes.

14    Q    And if we look, one, two, three, four lines down

15   in your e-mail to Ms. Buie, you talk about an issue, the

16   issue pertains to the survey memo, right?

17    A    Yes, sir.

18    Q    And the statement there says, we were not asked

19   to do it.  Meaning the survey memo, right?

20    A    Yes, sir.

21    Q    That -- was that truthful and accurate when you

22   wrote it?

MGB Reporting, Inc.

Page 19

1    A    Yes, sir.

2    Q    And does it remain truthful and accurate, sir?

3    A    We did not even have the survey format at the

4    time of the CVR report.

5    Q    So it would not be possible then to fault anyone

6    in Region VI for not preparing a survey memo; is that

7    right?

8    A    That's absolutely correct.

9    Q    Okay.  You then go up two lines, and it is

10   written in this e-mail, I take it you recognize it in the

11   format that makes it your e-mail?

12   A    Yeah.  This is definitely my e-mail.

13   Q    It says, I do want to help, but don't want to

14   kill my career unnecessarily.

15       That's what you wrote, sir?

16   A    Correct.

17   Q    Was it truthful and accurate at the time?

18   A    Yes.

19   Q    What did you mean by that?

20   A    I mean, basically, that everyone in this

21   process, everyone I know that's been deposed, everybody

22   that is suing everybody, including Mr. Beard, including

MGB Reporting, Inc.

Page 20

1    Mr. Phelps, including Mr. Stephens, all the way down, can

2    retire tomorrow.  I just got my 15-year pin.

3        Q    Yes.  It's not the question I put to you, sir.

4        Why did you believe that preparing and signing an

5    affidavit on Mr. Beard's behalf would, quote, kill your

6    career unnecessarily, end quote?

7        A    Just think it does.

8        Q    By whom?

9        A    The powers that be.

10       Q    In HUD OIG?

11       A    In government wide.

12       Q    Let's stick with HUD OIG.  Were there people

13   there you believed would kill your career unnecessarily

14   if you gave an affidavit for court?

15       A    I don't know.

16       Q    Can you identify Mr. Robert Gwin, sir, by title?

17       A    He is the current Deputy Inspector General for

18   Audit.

19       Q    Did Mr. Gwin ever come to Region VI to discuss

20   the possibility of anyone's participating on Mr. Beard's

21   behalf in this case?

22       A    Gwin did mention that, basically, within this

MGB Reporting, Inc.

Page 21

1    matter, that we need to make sure that we stay neutral.

2        Q    What did that mean to you?

3        A    It meant walk a very fine line.

4        Q    Well, I take it from this, at this point on June

5    4th, you were preparing to give evidence on behalf of

6    Mr. Beard, right, in the form of an affidavit?

7        A    I would say I was entertaining it, yes, sir.

8        Q    You were?  You weren't sure?

9        A    I was not sure.

10       Q    In other words, when the affidavits were sent

11   back and forth between you and Ms. Buie, you weren't

12   sure?

13       A    I wasn't sure whether or not I wanted to give an

14   affidavit.  I was vacillating on it, to begin with.  In

15   discussing the matter with family, I vacillated even

16   more.

17       Q    What did you understand Mr. Gwin to be saying or

18   you termed as you had to walk a fine line?

19       A    Basically, like I said, walk a fine line.  Make

20   sure that you give no appearance of siding with anybody

21   or --

22       Q    Did you -- I'm sorry, sir.

MGB Reporting, Inc.

Page 22

1      A      Well, siding with anybody.

2      Q      Did you understand that giving an affidavit on

3   behalf of Mr. Beard would be siding with him?

4      A      I have no idea how anybody would view giving the

5   affidavit.

6      Q      How would you view it?

7      A      It wouldn't -- how I view it if I was Mr. Gwin

8   or how would I --

9      Q      No.  How did you view it?

10     A      I did not believe that I was in the proper spot

11  to give an affidavit voluntarily.

12     Q      I see.

13     A      Meaning that I had -- I had some concerns

14  regarding that at the time of this it had been known that

15  my boss Frank Baca was retiring July 3rd.  The position

16  was out.  I felt like I, experience wise, as far as

17  everything and the intangibles, that I had a better than

18  average shot of getting it.

19     Q      Is it fair to say, sir, that you believe that

20  better than average shot would be hurt were you to give

21  an affidavit on behalf of Mr. Beard in this case?

22     A      It was a concern.

MGB Reporting, Inc.

Page 26

1    A    No.

2    Q    Whatever affidavit you were last shown, you said

3    in here --

4         MS. MELNIK:  Can I interrupt?  I think we have a

5    different.

6         MR. SELDON:  I'm sorry, Karen.  You should have

7    Exhibit F.  If you could give that back.  Thank you.

8         Just for the record, because AUSA Melnik and I

9    are off camera, I want to make it clear that we

10   substituted exhibits, so she will have the correct copy

11   of Nixon Exhibit B.

12   BY MR. SELDON:

13   Q    Now, sir, let's return to the exhibit.  You were

14   talking about the preparation of an affidavit for use for

15   execution by you for use on behalf of Mr. Beard.  You

16   wrote in this e-mail, did you not, I don't have any major

17   disagreement with the affidavit, parentheses, just a

18   couple corrections.  Correct?

19   A    Correct.

20   Q    You said there, I was fine with putting forth my

21   opinion, contradicting opinions, and letting my life be a

22   little miserable for a while as a result of that?

MGB Reporting, Inc.

Page 27

1    A    Right.

2    Q    This was referring to how you would explain what

3    went on in connection with the CVR audit, correct?

4    A    Correct.

5    Q    Why don't you read the next sentence.

6    A    But it reads, and I understand the reason why,

7    and I'm calling Heist a liar.  I can't volunteer to do

8    that.  I do believe they would retaliate not only within

9    the organization but also maligning my abilities,

10   character, et cetera, if I try to get another job.

11   Q    So you understood, then, that by giving your

12   account of the CVR audit, that you would be calling

13   Mr. Heist, the Assistant Attorney General for Audit,

14   quote, unquote, a liar?  Sorry, Assistant Inspector

15   General Mr. Heist.  You'd be calling him, quote, unquote,

16   a liar, right?

17   A    As the affidavit read, that's how I read it when

18   I read it.

19   Q    We will get to that affidavit in a moment, sir,

20   but as it was given to you, you would be calling

21   Mr. Heist a liar, correct?

22   A    That's how it would seem.

MGB Reporting, Inc.

Page 28

1     Q     This affidavit in one form or another went back

2    and forth between at least once or twice between you and

3    Ms. Buie?

4     A     No, sir.

5     Q     You said, I can't volunteer to do that.  I do

6    believe they would retaliate.

7     First question.  Who did you believe the "they"

8    would be, the "they" who would retaliate?

9     A     The "they" is an ambiguous HUD OIG management.

10     Q     Senior management?

11     A     It would probably include everybody in HUD OIG

12    management.

13     Q     Well, nobody below you had the ability to

14    retaliate against you, did they?

15     A     That's not necessarily true.

16     Q     What people above you did you believe would have

17    the power to retaliate against you?

18     A     I think it was a menagerie of people.

19     Q     Name them.

20     A     I can't put a name on it.

21     Q     How about Mr. Heist?

22     A     I don't know that.

MGB Reporting, Inc.

Page 29

1      Q      How about the Deputy Inspector General?

2      A      I don't know that.

3      Q      So in other words, sir, if I understand you, you

4   were worried about your subordinates retaliating against

5   you?

6      A      No, sir.

7      Q      Who were you worried about?  I think we've

8   eliminated just about everybody.

9      A      I don't have any direct evidence that Mr. Heist

10   or Mr. Stephens would retaliate specifically.  I do have

11   a very big concern that they, among other people in HUD

12   OIG management, would stigmatize me.

13      Q      For doing what?

14      A      For participating voluntarily.

15      Q      Calling Mr. Heist a liar?

16      A      Definitely calling Mr. Heist a liar.

17      Q      So now I'm going to ask to be marked as Nixon

18   deposition Exhibit C.  Copy is being given to AUSA

19   Melnik.

20             (Thereafter Exhibit C was marked for

21             identification.)

22   BY MR. SELDON:

MGB Reporting, Inc.

Page 30

1    Q    This is Nixon deposition Exhibit C, sir.  Take

2    your time.

3    A    Okay.

4    Q    Now, this says, I will read through -- I'm

5    sorry.  This is an e-mail from you to Mr. Beard, copied

6    to Ms. Buie on the top, right?

7    A    Correct.

8    Q    So the text of this is an e-mail you sent to

9    Mr. Beard?

10   A    Correct.

11   Q    It said here, I will read through the affidavit

12   soon.

13        Did you ever do that?

14   A    I read through the affidavit once.

15   Q    But did you read through it?

16   A    Correct.

17   Q    Right?  And so was it correct, sir, that this

18   e-mail went to Mr. Beard on June 4th at 11:26 p.m.,

19   correct?

20   A    Correct.

21   Q    Now, let's look back on Nixon Exhibit B, this is

22   an e-mail to Ms. Buie which went on the 6th in the

MGB Reporting, Inc.

Page 31

1    morning, basically a day and a half later, right?

2        A    Correct.

3        Q    And in between that time you read the affidavit,

4    right?

5        A    Correct.

6        Q    And you said --

7        A    No, no.  I take that back.

8        Q    You mean you weren't being truthful when you

9    said, I don't have any major disagreement with the

10   affidavit, as it says in your e-mail?

11       A    It says, I will read through the affidavit soon.

12       Q    No.  Nixon Exhibit B.

13       A    Correct.

14       Q    A day and a half later, I don't have any major

15   disagreement with the affidavit; right?

16       A    That's correct.

17       Q    And that is where you were concerned that you

18   would be calling Mr. Heist a liar, right?

19       A    Correct.

20       Q    After reading the affidavit?

21       A    Correct.

22       Q    And you said, after reading the affidavit, I

MGB Reporting, Inc.

Page 32

1    would believe they would retaliate, right?

2        A    Correct.

3        Q    And that was even though, quote, unquote, you

4    don't have any major disagreement with the affidavit,

5    right?

6        A    Correct.

7        Q    So after looking at the affidavit, you were

8    concerned about retaliation, right?

9        A    Even before the affidavit, I was concerned about

10   retaliation.

11       Q    Good, sir.

12       A    Like I said, we've known that Frank Baca was

13   leaving for almost three months.

14       Q    You were concerned that this would be held

15   against you if you applied to be his replacement, right?

16       A    I did apply to be his replacement.

17       Q    Did you get the job?

18       A    No, I did not.

19       Q    Who got the job?

20       A    Jerry Kirkland.

21       Q    Who is that?

22       A    He is an Assistant Regional Inspector General in

MGB Reporting, Inc.

Page 33

1    Knoxville.  I worked with him when I was in Miami.

2        Q    More qualified than you, in your opinion?

3        A    In my opinion, absolutely not.

4        Q    Yeah.  So in other words, you did not get the

5    job after -- sorry, strike that.

6        Make certain I get the right ones.  I'm going to

7    give you a copy of a declaration, and AUSA Melnik, I will

8    give you the courtesy -- I accidentally wrote, there's a

9    little four letters I just hand scribbled on there.  Just

10   ignore them.  This will make Nixon deposition Exhibit D.

11            (Thereafter Exhibit D was marked for

12            identification.)

13   BY MR. SELDON:

14       Q    Take a look at this, Mr. Nixon.

15       A    I've read it sir.

16            THE VIDEOGRAPHER:  Mr. Nixon, can you raise the

17   microphone.

18            THE WITNESS:  Okay.

19   BY MR. SELDON:

20       Q    Mr. Nixon, the first thing I'd like to do is

21   refer you again to Nixon Exhibit B.

22       A    Okay.

MGB Reporting, Inc.

Page 36

1    disagree with?

2        A      The addition of audit operations manual.

3        Q      In paragraph 3?

4        A      Yes, in paragraph 3.

5        Q      As a standard for conducting audits, right?

6        A      Correct.

7        Q      Audit operations manual.

8        Now we'll go to the part, initiation of the CVR

9    audit.  Let's stick to page 1.  Is there anything there

10   that you disagree with?

11       A      I cannot perfectly tell you whether or not the

12   requests came, Mr. Stephens' request or even higher.

13       Q      Would it be fair to say that it was at the --

14       A      It was above Mr. Beard.

15       Q      And so that would be either Mr. Heist or

16   Mr. Stephens or Mr. Donahue?

17       A      Correct.  But the person that probably convinced

18   me the most to undertake it would have been Mr. Haven.

19       Q      Mr. Haven, who was another -- who at the time

20   was an another Assistant Inspector General, correct?

21       A      Correct.  In charge of investigation.

22       Q      Correct.  Anything else to change -- and this is

MGB Reporting, Inc.

Page 37

1    a part where auditors under your supervision were

2    assigned at the request of the investigative side of

3    Region VI, right?

4        A    Correct.

5        Q    Anything else to change on page 1?

6        A    We weren't specifically to look at the

7    suspicions of CVR Associates or other contractors.  We

8    were looking more at what HANO had provided as far as

9    contractors.

10       Q    Why don't you change that in hand the way you

11   need to change it to make it accurate and change the last

12   one in hand to make it accurate too.

13       A    (Marks on exhibit.)

14       Q    Now we're done with page 1, correct?

15       A    Correct.

16       Q    Now let's look at page 2.  Is there anything on

17   page 2 that's inaccurate?

18       A    To my recollection, the investigators did not

19   serve any of the subpoenas.

20       Q    Do you recall who did?

21       A    I believe it was auditors.  There was only one

22   investigator that was working with us, Robby Tighe.

1    Q    Let's cross a couple of those words out.  First

2    line, right?

3    A    (Marks on exhibit.)  No.  Because Robby did

4    serve the --

5         (Thereafter a discussion was held off

6         the record.)

7         MR. SELDON:  For the record, in the event

8    there's any noise heard in the back, it's because I'm

9    removing my suit jacket, as to which I assume there's no

10   objection?

11        MS. MELNIK:  No objection.

12        THE WITNESS:  Instead of wrong doings, it was

13   findings are issues.

14   BY MR. SELDON:

15   Q    Where are we looking now?

16   A    6.

17        MS. MELNIK:  Paragraph 6?

18   BY MR. SELDON:

19   Q    Oh, second sentence?

20   A    Yes.

21   Q    The word there should be findings?

22   A    There were findings/issues.

MGB Reporting, Inc.

Page 39

1    Q    Understood.

2    A    And it should be three contractors.

3    Q    Whether three contractors had received --

4    A    Received money for either support or ineligible

5    expenses.

6    Q    Okay.  Anything else on page 2?

7    A    I believe the next sentence, this is where some

8    of this stuff comes into play.  I don't know for a fact

9    of who all was at some of these meetings, and there were

10   several meetings, and there was a smorgasbord of people

11   that were in and out of them.  I think Mr. Heist came

12   down for one of those meetings on one occasion where

13   Mr. Haven did not, and I recall Mr. Haven and

14   Mr. Stephens being at another one of the meetings where I

15   don't believe Mr. Heist was at.

16   Q    All right.  Well, then, let's go to a couple

17   sentences down, and I'll read you something that's here,

18   and you'll tell me if it's correct or not.

19   A    Okay.

20   Q    This concerns the CVR audit?

21   A    Correct.

22   Q    Quote, accordingly, headquarters audit

MGB Reporting, Inc.

Page 40

1    management was well aware of the scope of the audit right

2    from the start.

3        Is that correct, to your knowledge and belief?

4        A    It is correct, to my belief.

5        Q    Okay.  In fact, the audit was considered a top

6    priority, quote, unquote, in the OIG, and was included in

7    the weekly priority report prepared for Inspector General

8    Donahue.

9        To your understanding, is that correct?

10       A    I believe, yes.  We do -- there used to be

11   somebody called, and I have no idea whether it's still

12   called that, it's called the IG hot list, and there was

13   another one that was, oh, I get it every two weeks, but

14   that's a more general run.  And then, supposedly, there's

15   four or five jobs that Mr. Donahue wants to be aware of

16   on a weekly basis.

17       Q    Okay.  So let's skip down to paragraph 7, now

18   that we know what that one is.  It says here, as an

19   initial step in the audit process, meaning the CVR audit,

20   we developed an audit program which involved identifying

21   audit objectives and the steps that we would take to

22   accomplish them.

MGB Reporting, Inc.

Page 41

1      Was that true?

2      A     Yes.

3      Q     Because the audit had been requested by HUD, we

4   did not need the approval of the Technical Oversight and

5   Planning Division, TOP, before undertaking the audit.

6      Is that also true?

7      A     That is one of the corrections I don't know.  I

8   don't honestly know whether or not that's a true

9   statement.  What I do know is that HUD was -- I mean, TOP

10  management was aware that we were going to do this and

11  that we set up a completion table.  The moment we set up

12  a completion table, it goes out, and pretty much everyone

13  on the TOP management has access to it.

14     Q     Including Mr. Heist?

15     A     Correct.

16     Q     Mr. Heist, was he one of the people, to your

17  knowledge and belief, who knew of the CVR audit?

18     A     Yes, sir.

19     Q     It says here, however, meaning let's leave that

20  out, on February 17th, 2004, Region VI did inform the

21  Technical Oversight and Planning Division of the decision

22  to open an assignment for CVR Associates and explain the

MGB Reporting, Inc.

Page 42

1   audit objectives.

2       Is that part true?

3       A    All but the date.

4       Q    What's the right date?

5       A    I have no idea.

6       Q    Was it early in 2004, do you recall?

7       A    It would have been when we started the

8   assignment.

9       Q    And it would have been when Mr. Beard was still

10  in Region VI, right?

11      A    Correct.  There should have been something

12  there, and it should have been an e-mail from me that

13  stated, hey, we're opening up the assignment, and these

14  are the objectives.  In the conclusion table and both in

15  the briefing paper, it's mentioned.

16      Q    Okay.  I'm going to give you a document to refer

17  to, but I'm not going to introduce it into evidence at

18  the moment or into the -- into the record.  We may do it

19  later.  I'll give you a copy of a document.  It's a

20  memorandum, just identifying for the record, from Michael

21  Stephens, and what I'm going to do is draw your attention

22  to the second full paragraph on page 2, after I show it

MGB Reporting, Inc.

Page 43

1    to AUSA Melnik, second full paragraph on page 2.

2        I'm going to ask, sir, if this document, which you

3    can look at as much or as little as you want, page 26,

4    second full paragraph, if this refreshes your

5    recollection whether on or about February 17th, 2004,

6    that's the date that Region VI informed TOP of the

7    decision to open an assignment for CVR Associates and

8    explain the audit objectives.

9        A    Okay.

10       Q    Does that refresh your recollection in that

11   regard?

12       A    I'll say this.  I assisted in the preparation of

13   this, and I know, based upon I know me, and I know my

14   staff, we referenced it.  So if it says it, there's a

15   document out there that we referenced it to.

16       Q    From that date?

17       A    Oh, I'm sure.  Like I say, we reference

18   everything.

19       Q    Okay.  Good, sir.

20       Now let's go to paragraph 8 in the declaration.

21   Page 3.  This says, the audit program and all of the

22   working papers were stored, meaning of the CVR audit, in

MGB Reporting, Inc.

Page 44

1    AutoAudit, an electronic program we use to manage audits

2    and keep headquarters abreast of our actions.

3        Is that right?

4        A    No.

5        Q    How would that be different?

6        A    The audit program and the electronic work papers

7    are included in AutoAudit.  AutoAudit is a program to

8    manage audits.  It's not necessarily there to keep

9    headquarters abreast, and it does not include hard copy

10   work papers.  Hard copy work papers, the only thing

11   that's mentioned in AutoAudit would be, this is a hard

12   copy work paper, and any sort of analysis or annotation

13   that we performed, like, say, an invoice, checks, bank

14   statements.  We used to not scan in contracts and stuff

15   like that because they were too -- it would destroy the

16   system.  It would just be too much.

17       So even though AutoAudit has a ton of information in

18   it and helps us manage the audits, it does not include

19   all working papers.

20       Q    All right.  So let's look at the first sentence

21   in paragraph 9.  Okay?  We, I assume, means Region VI,

22   right?

MGB Reporting, Inc.

Page 45

1       A     Yes, sir.

2       Q     So we say, Region VI communicated with

3  headquarters and Technical --

4       A     Oversight and Planning.

5       Q     -- Planning Division about the status and

6  progress of the CVR audit through biweekly briefing

7  papers that we submitted.

8       Is that right or wrong?

9       A     That would be something I would change to make

10  clear.

11       Q     Very good, sir.  Please go ahead and do it.

12       A     We submitted biweekly briefing papers, as

13  required.

14       Q     And did you submit them on the CVR audit?

15       A     Yes, sir.

16       Q     You didn't keep headquarters and TOP in the dark

17  about it, did you?

18       A     That was never my intention nor the intention of

19  my staff.

20       Q     And, to your knowledge, did anyone keep them in

21  the dark?

22       A     No, sir.

MGB Reporting, Inc.

Page 46

1       Q      Now, it says --

2       A      But whether or not they reviewed them, whether

3    or not they did anything with the briefing papers, I

4    don't know.

5       Q      Didn't they make a practice of keeping track of

6    significant audits in your region?

7               MS. MELNIK:   I'll object.   That calls for

8    speculation.

9               MR. SELDON:   I said standard business practice.

10   BY MR. SELDON:

11      Q      If you know.   Oh, do you know?

12      A      I don't know at the time.   Currently

13   headquarters does review the briefing papers on a

14   consistent basis.

15      Q      Okay.   When did that practice go into effect, if

16   you know?

17      A      I couldn't tell you.   We used to have briefing

18   paper meetings.   I just know that now briefing paper

19   meetings are pretty much standard once a month or so, but

20   we would go maybe a month, two months without briefing

21   paper meetings.

22      Q      Not a year, though, would you?

MGB Reporting, Inc.

Page 47

1     A     To my knowledge, no.  Never a year.

2     Q     So we go down to paragraph 9.  It says, TOP was

3     responsible for reviewing the briefing papers.

4           Is that right?

5     A     I don't know what TOP was responsible for.

6     Q     It then says, additionally, we had monthly

7     telephone -- teleconferences with Deputy Assistant

8     Inspector General for Audit Phelps.  Mr. McLeod was

9     director of TOP and the TOP desk officer assigned to our

10    region.

11          Right?

12    A     I recall one or two of those during the February

13    through December.  I could not attest to the fact that we

14    had them monthly.

15    Q     Okay.  And did they review, or did you go over

16    with them in these teleconferences significant audits

17    being performed in your region?

18    A     My recollection is that we went through every

19    audit that went on through the region.

20    Q     And that would have included --

21    A     CVR, yes, sir.

22    Q     This would have been in this year 2004, correct?

MGB Reporting, Inc.

Page 48

1    A    Correct.

2    Q    In that way were headquarters, management, and

3    TOP kept informed with the CVR audit during the audit

4    process?

5    A    We did our best to keep them informed.

6    Q    Any reason -- I'm sorry, sir.  Go ahead.

7    A    We -- we did not -- well, me personally,

8    professionally, I have no problem with transparency.

9    Whatever work papers I have out there is out there for

10   review.  I do my best to tell everybody fully every

11   information I can provide them, and I had no knowledge

12   whatsoever that they were not being kept informed.

13   Q    About the CVR audit?

14   A    About any of my audits.

15   Q    Including CVR?

16   A    Including CVR.

17   Q    Now I'll represent to you that there's an issue

18   that is raised in HUD's motion for summary judgment about

19   whether or not Region VI failed to submit an audit survey

20   for CVR, thereby violating a OIG policy that was in

21   effect when the CVR audit was reported.

22        Is that accurate or inaccurate?

MGB Reporting, Inc.

Page 49

1    A    I would say that that's an inaccurate

2    statement.

3    Q    Why is that?

4    A    Because if we were asked to submit a survey

5    memorandum, we would have done it.

6    Q    Correct.  Were they not required to be submitted

7    as a matter of course without being asked when the CVR

8    audit was going on?

9    A    No, sir.  The start of the CVR audit, as was

10   indicated, was February 2004.  The writing course/report

11   format/course that we had at the region was not until

12   September of 2004.  That was the introduction of not only

13   the survey memo but also the message meeting as a

14   standard of operation, if you will.

15   Q    Great.  So let's look at page 4, paragraph 11.

16   Is it correct, sir, to say that in sum and substance,

17   parts of this paragraph means -- you would agree, rather,

18   that Region VI did not have to prepare a survey report

19   about the CVR audit?

20   A    Could you repeat the question.

21   Q    Yes.  This sentence or two of a draft affidavit

22   makes a statement.  In summary I'm going to give it to

MGB Reporting, Inc.

Page 50

1    you, and I'm going to ask if you agree with it.

2         It says, Mr. Heist did not require regions to

3    implement or retroactively apply the new survey report

4    until after they'd undergone report training.

5         Is that right?

6    A    Honestly, I could not tell you.

7    Q    It says here, by the time Region VI received

8    training, we were well beyond the survey report in the

9    CVR stage.

10   A    That statement's correct.

11   Q    Okay.  It then goes on to say, would not have

12   made any sense for us to backtrack and submit an audit

13   survey when the CVR audit was complete.

14        Is that true?

15   A    Well, would have made no sense to submit a

16   survey memo after we already submitted the audit report.

17   I mean, we submitted the audit report in early

18   September.  So to come back in October and say, well, we

19   plan on submitting a survey report.

20        Furthermore, we had our draft findings as early as

21   July that were in the briefing papers.

22   Q    Is it also correct to say that Mr. Heist never

MGB Reporting, Inc.

Page 51

1    asked you or Region VI to prepare a survey report?

2         A     If Mr. Heist would have asked us to do anything,

3    we would have done it.

4         Q     Is that also true of the Technical Operations

5    and -- Oversight and Planning Division?

6         A     More yes than no.  We did do a lot of things.  I

7    recall Mr. Heist asking us specifically to prepare a memo

8    on why one of the contractors we weren't going to do work

9    on, but I never remember any time in which we did not

10   comply with any headquarters' requests.

11        Q     Just for the record, why don't you tell us what

12   the purpose of a survey, an audit survey is.

13        A     The purpose of the survey memo, as I understand

14   it, is to provide a written document to indicate on which

15   audit objectives do we want to move forward on and which

16   audit objectives that we want to basically kill, for lack

17   of a better phrase.  Usually our surveys have very

18   general rules.  So it's a -- it used to be referred to as

19   a go/no go decision, if that makes any sort of sense.  So

20   that you don't spend -- what we used to do in some

21   regions, spend 2,000 hours or a year on a job and have no

22   idea or direction on where we want to go.

MGB Reporting, Inc.

Page 52

1    Q    Okay.  So it's on that basis that you said --

2    testified that it wouldn't have made any sense to go back

3    and submit an audit survey for the CVR audit; is that

4    right?

5    A    Correct.  Not with an audit report out there.

6    Q    Right.

7    A    Typically, a survey memo's an internal document,

8    and it allows Mr. Heist and TOP to look through what

9    we've come to pass and to see whether or not we need

10   to pursue anything further or whether or not we have

11   sufficient evidence just to report out now.

12   Q    Heist never asked you to do the survey report,

13   did he?

14   A    On CVR, no.

15   Q    Do you have a recollection of TOP ever doing it?

16   A    No.

17   Q    Okay.  Let's go to paragraph 12.  It says here,

18   you submitted the draft audit report for CVR to TOP on

19   approximately August -- I'm sorry, September 7th, 2004.

20   Does that conform to --

21   A    That agrees with my recollection, with exception

22   of maybe the date, but it's pretty -- early September.

MGB Reporting, Inc.

Page 53

1      Q     It says TOP's comments were received on or about

2    September 15th, 2004.  Is that right, to the best of your

3    recollection?

4      A     Yes.

5      Q     And I take it you received TOP's comments,

6    right?

7      A     Mr. Beard would have forwarded them to me.

8      Q     What exactly was your role in the CVR audit?

9      A     Sorry.  Just caught me a little off guard.  I

10   was a supervisor.  I was the first-line supervisor.

11        My job on CVR, as on any other job, is to make sure

12   that I have the general standards of Yellow Book, proper

13   supervision, due professional care, independence, and

14   then make sure that the auditors that I have on there

15   express those attributes.  And then we go into the field

16   work standards.  It's my job to make sure that the field

17   standards are complied with, that we are not

18   unnecessarily berating somebody, that we're not -- not

19   messing around with, lack of a better phrase, silly

20   little issues.  That we're not going up to a million

21   dollar organization and saying, well, you don't have

22   stickers on your car or something.  That the evidence is

MGB Reporting, Inc.

Page 54

1    material and that everything is in there.  Make sure that

2    the field work standards of competent, sufficient,

3    reliable information is there.  Make sure that the audit

4    program has adequate procedures to ensure that the

5    objectives are met and that the objectives that we have

6    all agreed upon are in fact met.  Make sure that the

7    report is balanced.  Make sure that the report is an

8    accurate reflection of what we found and can be supported

9    by the documentation.  And then a lot of other admin

10   stuff.

11       Q    To your understanding, were these standards,

12   procedures, rules, and guidelines observed in the CVR

13   audit that was prepared under your supervision?

14       A    Yes.

15       Q    Did you check that all these things were

16   prepared?

17       A    Yes.

18       Q    Informed, rather?

19       A    Yes.  In my opinion, I had two of the better

20   auditors assigned to this.  One of them was a former

21   auditor of the year.  The other one is probably at least

22   in the top five organizationally-wise as far as computer

MGB Reporting, Inc.

Page 55

1   assisted audit technicians.  Both of them are CPA's.  I

2   had a lot of confidence in them, and I saw the struggle

3   and the strife that they had in this process.  Working at

4   HANO is not an easy assignment.

5        Q    Because it was in New Orleans, a little

6   disorganized?

7        A    That's an understatement.  That's an

8   understatement.

9        Q    So you were the hands-on first-line manager for

10  the CVR audit; is that right?

11       A    Yes, sir.

12       Q    And did you perform part of the audit yourself?

13  And by that --

14       A    Yes, sir.

15       Q    You did?  And they went up the chain of command,

16  but you were in the chain of command as a manager also, I

17  take it?

18       A    In audit speak, I assume the responsibility of

19  the work papers.

20       Q    Did anyone -- were ever disciplined for the work

21  that was done in the CVR audit?  Formally.

22       A    Not -- not at the time, no.

MGB Reporting, Inc.

Page 57

1       A       No, sir.

2       Q       Any of your supervisors ever downgraded over it?

3       A       Depends on what you'd want to say.

4       Q       Any of them ever downgraded in a level?

5       A       Nobody went to -- from a GS-15 to a 14, but

6    Mr. Beard did go from my first-line supervisor to

7    Washington, DC.

8       Q       Reassigned out of supervision; is that your

9    knowledge?

10      A       My knowledge is that he was reassigned.

11      Q       Okay.  To Washington, DC?

12      A       Correct.

13      Q       You never had anything done like that to you as

14   a consequence of the CVR audit, did you?

15      A       As of today, no.

16      Q       And you never filed an EEO complaint of

17   discrimination or retaliation, did you?

18      A       No, sir.

19      Q       Do you know if that distinguishes you from

20   Mr. Beard?

21      A       I know that he has filed a complaint.

22      Q       Where you have not?

MGB Reporting, Inc.

Page 58

1       A       Correct.

2       Q       And you were never reassigned over the CVR

3   audit?

4       A       Correct.

5       Q       Never formally disciplined?

6       A       Correct.

7       Q       Never had your performance appraised or

8   downgraded?

9       A       No.

10      Q       Do you think, to your knowledge, can you give us

11  an opinion one way or the other about whether Mr. Beard's

12  actions in connection with the CVR audit and performance

13  were correct and according to standards?

14      A       Rephrase the question a little bit.

15      Q       Let's change it a little bit.

16      Do you know of any way in which Mr. Beard in his

17  role in the CVR audit didn't adhere to OIG standards?

18      A       No, sir.

19      Q       Do you know of any way in which he didn't adhere

20  to HUD OIG practices?  You're struggling with that; maybe

21  we should go on.

22      A       Well, there's a lot of HUD OIG practices, and

MGB Reporting, Inc.

Page 59

1    I'm going through the list.

2        Q    Okay.  Sorry.  I thought I'd stumped you with

3    the question.

4        A    I would say no material ones.

5        Q    Okay.  So we go through in paragraph 13, the

6    draft CVR audit contains six findings, three that

7    implicated HANO, three CVR.

8             Was that right?

9        A    Best of recollection.

10       Q    You say, one of TOP's suggested changes is for

11   the report to be reorganized from six findings into two.

12            Is that the best of your recollection?

13       A    Correct.

14       Q    If we skip down, it said, TOP did not provide

15   any criteria or reasoning regarding -- sorry.

16            Did they give you reasoning?

17       A    No.

18       Q    On why that should be done?

19       A    No.  No, sir.

20       Q    Were you given any reasoning on why the CVR

21   audit was not done according to accounting guidelines?

22       A    We were given a letter that had an attachment on

MGB Reporting, Inc.

Page 60

1    it that said it was TOP's report.

2        Q    And when was that, sir?

3        A    That would have been in December.

4        Q    I think, just for the record, we've been talking

5    about paragraph 13 of the draft declaration?

6        A    Correct.  TOP's comments that came back the

7    first time were basically, we think it would be better if

8    you have two findings rather than three -- I mean,

9    instead of six, and that there were -- it was extremely

10   vague.

11       Q    Paragraph 14, TOP also made vague references to

12   flagrant expressions and words that it claimed were in

13   the audit report.

14       Do you see that?

15       A    Yes.

16       Q    And was that true that they made those

17   references?

18       A    Correct.

19       Q    Did they ever give, or to your knowledge, anyone

20   involved in the CVR audit a list of what they were?

21       A    At that time, no.

22       Q    Did they later give you a list that objected to

MGB Reporting, Inc.

Page 61

1    calling someone or another someone's boyfriend?

2        A    Correct.

3        Q    To your knowledge, as you went through the

4    audit, wasn't that person the woman's boyfriend?

5        A    That's how everybody referred to it.  That

6    was -- I don't know -- I mean, it seems difficult in

7    today's terminology, but life was so much simpler as

8    auditors when people were married, and everybody had the

9    same last name.  Everybody referred to this person as the

10   boyfriend/girlfriend.  To my knowledge, if I remember

11   correctly, even in the interview that we had with them,

12   they referred to each other as boyfriend/girlfriend.  I

13   didn't view that as a pejorative or a slanderous, biased

14   statement.

15       Q    Okay.  Did they ever give you -- I think you

16   answered that already.

17       Let's look at paragraph 16.  At a regional

18   conference on September 21, 2004, Deputy Assistant

19   Inspector General Phelps stated, the region would be

20   given specific detail and critiques from TOP to the draft

21   report rather than the vague statements we received on

22   September 20th.

MGB Reporting, Inc.

Page 62

1       Is that correct, to the best of your recollection?

2       A     That's a -- what Mr. Phelps said is -- was more

3  general than specific to CVR.   We had several people

4  raise many issues at that conference, and I don't know if

5  it pertained specifically to CVR, but Mr. Phelps said

6  that any time TOP gave critique, that it would be

7  specific.

8       Q     Okay.  And then were you given a specific

9  critique -- I'm sorry, did Mr. McLeod ever disagree with

10  it?

11      A     Mr. McLeod wasn't present.

12      Q     On October 5th, it says here in paragraph 17,

13  Mr. McLeod, the direct of TOP, informed us that he would

14  not respond to our inquiries until he heard from the

15  Office of General Counsel on a legal opinion that TOP

16  requested.

17      A     I believe Mr. McLeod spoke to Mr. Beard.

18  Mr. McLeod, to my recollection never spoke to me.

19      Q     Did Mr. Beard then convey this to you?

20      A     Yes.

21      Q     Was there then --

22      A     Well, he conveyed that to me, yes.

MGB Reporting, Inc.

Page 63

1    Q    And was there a legal opinion given by the

2    Office of Legal Counsel in connection with the CVR audit?

3    A    Yes, sir.

4    Q    And it had to do with whether or not the Federal

5    Acquisition Regulation Standards or Office of Management

6    and Budget Circular Standards would be used for part of

7    the audit?

8    A    That would be correct.

9    Q    Did it change the audit conclusions as you

10   understood they should be?

11   A    I thought that the legal opinion in our

12   discussions with OLC were very positive.  I felt at that

13   time that it was extremely important that legal counsel

14   came down, saw the evidential matter.  Like I said, there

15   was significant boxes.  And I felt like after legal

16   counsel left, that we had tightened it up a little bit.

17   Q    Didn't make a substantive change, did it?

18   A    Nothing substantively changed.  We tweaked it a

19   little bit, but we tightened up the criteria a little bit

20   further.  The criteria wasn't wrong, but I think after

21   legal counsel came and after their opinion, it was

22   better.

MGB Reporting, Inc.

Page 64

1    Q    Okay.  Did you think that this happened in --
2    this change for the better and this opinion came about
3    for a positive collegial change?
4    A    I've never had any problems with Office of Legal
5    Counsel.  I've never had any -- any uncivility or
6    unprofessional.
7    Q    This being no exception?
8    A    This being no exception.
9    Q    Did you ever hear from anyone in the Office of
10   Legal Counsel that they had a problem with Region VI's
11   following its opinion in the CVR audit?
12   A    No, sir.  All my discussions with Office of
13   Legal Counsel has been positive and --
14   Q    For the record, that would be the Office of
15   Legal Counsel at OIG headquarters?
16   A    Correct.
17   Q    Headed up by a member of the senior executive
18   service?
19   A    That would be Mr. Saddler?
20   Q    Yes.
21   A    Mr. Saddler does handle OLC.
22   Q    Headed up.

MGB Reporting, Inc.

Page 65

1       A    Yes.

2       Q    You said handled, I thought.

3       Now, paragraph 18 says, we received a legal opinion

4  on October 22nd, '04.

5       Does that about conform to your recollection?

6       A    Yes.

7       Q    Okay.  And then it says, after making changes to

8  the draft audit report to conform with the opinion, we --

9  meaning Region VI -- submitted a revised draft on October

10 26?

11      A    Once we had our discussion with, OLC -- I assume

12 I'm not supposed to mention anybody by name, but once we

13 had --

14      Q    No.  You should mention them by name.

15      A    Okay.  Once we had our discussion with

16 Mr. Baker, we already started making the changes.  We

17 already started looking at the work papers and revising a

18 couple of the work papers.  So we were not waiting for

19 the opinion.  We had made what we thought were going to

20 be the changes, and then when we got the opinion, we made

21 some of the other ones, because we didn't know how it was

22 going to turn on some of the issues, say, like the IRS,

MGB Reporting, Inc.

Page 72

1    A    No.

2    Q    Were they right or wrong when they said, quote,

3    unquote, kill the audit?

4    A    As I said, Mr. Heist, as the head of audit

5    agency, he can kill whatever job he wants.

6    Q    Did anyone ever give you any memorandum

7    explaining why the legal counsel's opinion hadn't been

8    followed correctly?

9    A    Yes.  That would have been in the TOP

10   attachment.

11   Q    Was that right or wrong?  The one that you said

12   didn't conform to OIG manual standards.

13   A    I thought that it was factually inaccurate.

14   Q    Now, let's take a look at the top of page 8.

15   Talks about the different use of the federal acquisition

16   regulations as well as a comparison to OMB circular.

17        MS. MELNIK:  Top of page 7?

18        MR. SELDON:  No, 8.

19   BY MR. SELDON:

20   Q    Are you with me there?

21   A    Okay.

22   Q    I'll read it in, paragraph 27.

MGB Reporting, Inc.

Page 73

1            MS. MELNIK:  All right.

2    BY MR. SELDON:

3       Q    Because the cost principles are the same under

4    both criteria, the addition of the federal acquisition

5    regulations did not change the findings of the audit.

6       Is that right or wrong?

7       A    That's correct.  I think what we ended up doing

8    was there were five instances.  The travel one, if I

9    remember correctly, was verbatim, the same out of A87 as

10   it was out of the FAR.  There's a process that we went

11   down with Mr. Baker that we discussed the process of how

12   we got from point A to point B that was included in the

13   legal opinion.

14      Q    Now --

15      A    And I want to say two of them, the wording

16   changed slightly but not materially.

17      Q    That's fair.  Let's go on to the next section,

18   beginning paragraph 28, and running through this

19   declaration A, inappropriate language, quote, unquote, in

20   the CVR draft report.  This talks, does it not, about the

21   use of inappropriate language, as TOP said, in the CVR

22   report, right?

Page 74

1    A    I didn't follow the question.

2    Q    We're just on the subject of the alleged

3  inappropriate language in the CVR report.  With me there?

4    A    Yes.  They alleged that we used biased words, I

5  believe was the phrase.

6    Q    And not objective and using adjectives that were

7  of a subjective nature?  That's what I'll represent to

8  you that the defendant's motion for summary judgment

9  alleged.  It then says in this affidavit, I disagree with

10  this statement.

11    Is that right or wrong?

12    A    Yes.  That is a correct statement.  I do

13  disagree.

14    Q    Okay.  With TOP's -- I'm sorry.  With that

15  allegation.

16    Let's go to paragraph 30.  It says, in fact, some of

17  the words that TOP cited were part of the internal

18  control section of the audit which contains boiler plate

19  language that is used in every audit report and is based

20  on the audit report template.

21    Is that accurate?

22    A    That is the word believe, yes.

MGB Reporting, Inc.

Page 75

1    Q    TOP is also an OIG headquarters in Washington,

2  DC, right?  TOP is also a IG headquarters in Washington,

3  DC, right?

4    A    Right.

5    Q    Let's go down to paragraph 32.  There was

6  criticism, I take it, if you recall, by TOP in the use of

7  words "may," "may have" or "appears" in the audit report

8  for CVR.

9         Do you recall that?

10   A    Yes.

11   Q    Then says here, it is not at all uncommon in an

12  audit and cannot be reasonably construed as inflammatory

13  or inappropriate.

14        Do you agree or disagree with that?

15   A    I agree with that.

16   Q    Says here in paragraph 33, I made every effort

17  to be respectful in my communication with TOP and

18  headquarters management.

19        Is that true?

20   A    Yes.

21   Q    It says here, when Region VI received directive

22  from either of those sources, we never failed to

MGB Reporting, Inc.

Page 78

1    TOP or with OIG audit headquarters.

2        A    I don't think out of the ordinary.  I think,

3    like I said, looking back on it and reflecting on it --

4        Q    Opinions ran strong, right?

5        A    I think emotions ran strong.

6        Q    Go ahead.

7        A    There is a couple of actions I regret.

8        Q    Did Mr. Beard do any?

9        A    I think the thing got ugly, and as an auditor,

10   you realize that it takes two people to get ugly.

11       Q    Got ugly between you and TOP?

12       A    I think by the region and TOP.  You know, as I

13   learned, you never argue with an idiot.  Spectators can't

14   tell the difference.  And I think we got dragged into

15   certain arguments we shouldn't have been.

16       Q    Who was the idiot in your analogy?

17       A    I don't mean that specifically.  Substitute in

18   clown.

19       Q    Who was the clown?

20       A    I think TOP said some things that were blatantly

21   wrong and over the top and were sort of offensive.  I

22   don't think that they truly appreciated the extent of

MGB Reporting, Inc.

1    their offensiveness about it, and I think at times,

2    myself included, including Mr. Beard, took offense, and

3    took a noticeable offense that, in hindsight, we probably

4    shouldn't have taken.

5        Q    Because you took offense?

6        A    Correct.  No, we expressed it.

7        Q    But was it reasonable under the circumstances,

8    to your knowledge?

9        A    At the time it was.  I mean, in hindsight,

10   obviously, you also want to be above the fray.

11       Q    This was a heated exchange, right?

12       A    Well, when you read the TOP report, and I had

13   the opportunity to read it again last night, the only

14   thing I walk away with is offense.

15       Q    Did you think that it was fair to walk away

16   with?

17       A    No.  I should have just walked away.

18       Q    So you expressed offensive language that you now

19   regret to TOP?

20       A    Well, I regret -- I regret my role in it.

21       Q    The role being participant in these exchanges?

22       A    Whatever I had to do with fueling the flames, I

MGB Reporting, Inc.

Page 82

1    would make the organization look good and thought that

2    would do good things.  I thought it would have a

3    significant impact.  I think it still would have had a

4    significant impact.  We got a message back from TOP

5    saying change it, but we're not going to give you a

6    reason why.  Then we got, we're going to give specific

7    guidance to you.  Then we got, we need to do a legal

8    opinion.  And then we got, kill the job.  I mean, there

9    was never truly a back-and-forth exchange in a

10   deliberative manner.

11        Q    And not because of anything the region did, I

12   take it?

13        A    No.  We were -- I am always excited to tell

14   people about my job, and I am extremely proud of my

15   staff.

16        Q    And this, on this CVR audit were they a senior

17   staff?

18        A    Yes.

19        Q    They had done a lot of work on this, hadn't

20   they?

21        A    They worked --

22        Q    For a year on it, right, better part of a year?

MGB Reporting, Inc.

Page 92

1    Q    So now I'm going to give you -- I'm going to

2    have marked a copy of Exhibit G, give it to AUSA Melnik.

3              (Thereafter Exhibit G was marked for

4              identification.)

5    BY MR. SELDON:

6    Q    Okay, Mr. Nixon.  I'm going to make a

7    representation to you, and to AUSA Melnik can always

8    correct me on, this is a filing notice on the electronic

9    filing system of the United States District Court for the

10   District of Columbia.  It represents -- it represents a

11   filing we made on behalf of Mr. Beard on Friday, June 8th

12   of this year, two days after you told Ms. Buie that you

13   had wrestled with the decision and that you weren't going

14   to file an affidavit.  Okay.  Two days afterward, right?

15   With me so far?

16   A    I'm with you.

17   Q    Okay.  Now, it lists here, because this is what

18   the court system does, all the attachments or that there

19   were attachments, and one of these, I'll represent to

20   you, is this draft affidavit we've been using today,

21   which is Nixon deposition Exhibit D.  We filed it in

22   court.  With me so far?

MGB Reporting, Inc.

Page 93

1     A     Okay.

2     Q     In fact, it's attachment C.  On June 8th it was

3  filed in court, which means that a copy of HUD OIG

4  counsel was electronically served with a copy on Friday,

5  June 8, mid afternoon.  With me so far?

6     A     Okay.

7     Q     On this date the affidavit and what you'd been

8  considering saying for Mr. Beard became publicly

9  available and available to OIG counsel, right?

10    A     Okay.

11    Q     This fellow Mr. Baca who was selected as the

12  head of Region VI; is that right?

13    A     No.  He's the retired official.  He was selected

14  two years ago or three years ago.

15    Q     Who was the person --

16    A     Jerry Kirkland.

17    Q     All right.  So Mr. Kirkland.  I'll set the scene

18  again.  On Friday June 8th your affidavit's filed in

19  court and copied to OIG counsel.  This fellow Jerry --

20  what's his name again?

21    A     Kirkland.

22    Q     Jerry Kirkland is picked for the job.

MGB Reporting, Inc.

Page 94

1    A    July 5th or 6th.

2    Q    The guy you feel you're better qualified than?

3    A    I feel I'm better qualified than most, almost

4    everybody.

5    Q    What was the selection process going on up until

6    July 6, do you know?

7    A    What do you mean?

8    Q    I mean --

9    A    I want to say that the application notice was

10   closed, maybe July 1st.  Interviews were conducted the

11   week before July 6th.  So --

12   Q    Selection was made like the first week of July?

13   A    Yeah.  The selection was made July 6th or 5th, I

14   believe.

15   Q    Just about 27, 28 days after your affidavit in

16   support of Mr. Beard became publicly available?

17   A    Yes.  I had no knowledge that it would be

18   publicly available.

19   Q    I guess you didn't, but the OIG counsel should

20   have been served with copies.

21       So I want to go back for a moment to the Office of

22   Management and Budget circular, A87, "Cost Principles

MGB Reporting, Inc.

Page 95

1    Which Govern Allowable Costs Incurred By State, Locally,

2    and Federally Recognized Tribal Governments Under Federal

3    Awards."

4        You with me so far?

5        A    Yes.

6        Q    To your recollection?  And then it applies to

7    subawards made to entities other than commercial

8    organizations?

9        A    Right.

10       Q    And then the federal acquisition regulation --

11   this has to do with the CVR audit -- federal acquisition

12   regulation contains similar cost principles; is that

13   right or wrong?

14       A    Correct.

15       Q    That govern cost allowability to for-profits?

16       A    Right.  The cost principles.

17       Q    Similar cost principles.

18       A    You can't charge alcohol, you can't do this, you

19   can't do that.  You can't charge government expenditures

20   for, et cetera.

21       Q    And you can't do that under A87 circular or the

22   federal acquisition?

MGB Reporting, Inc.

Page 96

1     A     Correct.

2     Q     Would it be fair to say, at least as far as the

3  CVR audit was concerned, to your knowledge, there were no

4  material differences in the cost principles of circular

5  A87 and the federal acquisition rates?

6     A     Nobody has shown me any differences, material

7  differences.  Wording yes, but material difference, no.

8     Q     Is it fair to say Region VI initially chose to

9  use a circular A87 criteria because it applied to one of

10  the two auditees, HANO?

11     A     We used it for a variety of reasons, the number

12  one was just familiarity.  Most auditees are more

13  familiar in the HUD environment with A87 than they are

14  with the FAR and how you go about going through the HUD

15  handbook to get to the FAR, et cetera.

16     Q     So when Region VI submitted its revised draft

17  report on the CVR audit, did it have citations to the

18  federal acquisition rates and the OMB circular, both?

19     A     Yes, sir.  That was actually my decision.

20     Q     And they were both covered by the report,

21  correct?

22     A     Correct.  I believe we had five, if memory

MGB Reporting, Inc.

1   serves me correctly, five citations to the FAR.

2        Q    Okay.  And it also cited the OMB circular A87?

3        A    Yes, sir.  And in those instances where they

4   were either verbatim or one or two words off, we cited

5   both in the same sentence.

6        Q    Would it be correct to say that the addition or

7   inclusion of citations of federal acquisition regs didn't

8   change the findings of the audit?

9        A    Like I said, I think it tightened it up a little

10  bit more.

11       Q    But it didn't change the findings?

12       A    It didn't change the conclusions.

13       Q    Okay.  So let's go ahead with some documents now

14  and get them identified.  What are we up to, Exhibit G?

15       A    Next one, H.

16            MS. MELNIK:  Did we have an F?

17            MR. SELDON:  Yes, we did.

18            THE WITNESS:  Yes, ma'am.

19            MS. MELNIK:  What is F?

20            THE WITNESS:  F is the Jazzland thing.

21            MS. MELNIK:  That's right.  The one I didn't

22  have a copy of or whatever.

MGB Reporting, Inc.

Page 103

1    MAR review conducted in or around 2003?

2        A    I would be, yes, sir.

3        Q    Were you there when around that same time Deputy

4    Inspector General Stephens came to Region VI?

5        A    Yes, sir.

6        Q    Did you hear him make any comments with respect

7    to Mr. Beard's job being safe at that time?

8        A    My recollection of his response was that they

9    thought that Mr. Beard was doing a fine job, that senior

10   management had full confidence in the management of this

11   region, and that Mr. Beard had a job until he no longer

12   wanted it.

13            MR. SELDON:   Okay.   Can we go off the record for

14   a minute.

15            THE VIDEOGRAPHER:   Time is 15:18.   We are going

16   off the record.

17            (Pause in proceedings).

18            THE VIDEOGRAPHER:   Time is 15:35.   We are back

19   on the record.

20            EXAMINATION BY COUNSEL FOR DEFENDANT

21   BY MS. MELNIK:

22       Q    Good afternoon, Mr. Nixon.

MGB Reporting, Inc.

Page 104

1    A    Good afternoon.

2    Q    Earlier this afternoon you were answering

3    questions from Mr. Seldon about the cost principles as

4    between A87 and FAR.  Do you recall him asking questions

5    about that?

6    A    Yes, I do.

7    Q    And when you said that there -- that the -- that

8    it wouldn't have made a difference in terms of the

9    conclusions in the CVR audit with respect to using A87 or

10   FAR, do you recall saying that in terms of the

11   conclusions?

12   A    As far as the conclusions of whether or not a

13   violation occurred, and I said that it tightened it up in

14   the sense that OLC was correct in pointing out that the

15   FAR is more applicable to the contractor; whereas, OMB

16   circular A87 is more applicable to HANO, and that's why

17   we include both of them.  But as far as being

18   substantively different, the FAR and OMB circular, I

19   didn't see that material difference.

20   Q    And based on that, it's your opinion that it

21   would not have changed the conclusions of your -- of the

22   CVR audit?

MGB Reporting, Inc.

Page 105

1    A    Not materially.

2    Q    And that's your opinion?

3    A    Correct.

4    Q    Okay.

5    A    The only thing that changed was, like I said,

6    the criteria got a little bit stronger.  HANO would not

7    have been allowed to charge the HUD with the money, and

8    with OLC's commentary, along with the fact that both

9    Danida (phonetic) and Winnell (phonetic) both found out

10   more stringent criteria to hold CVR accountable.  The

11   conclusion that they did spend the money did not change.

12   Q    Are you familiar with audit staff bulletins,

13   ASB's?

14   A    ASB's, yes, ma'am.

15   Q    Okay.  What's your understanding of what an ASB

16   is?

17   A    An audit staff bulletin is basically interim

18   guidance between changes in the AOM.  In fact, dictates

19   changes to the AOM.

20   Q    And what's the AOM?

21   A    Audit operations manual.

22   Q    And so -- who receives ASB's?