PLAINTIFF'S EXHIBIT 8



| Issue Date |
|---|
| March 15, 2004 |

| Audit Case Number |
|---|
| 2004-FW-1003 |

TO:      Paul Webster, Director, Financial Management Division, DGBF
               Gregory Hamilton, Director, Community Planning and Development, 6HD

FROM:    D. Michael Beard
             Regional Inspector General for Audit, 6AGA

SUBJECT:  Audit of the City of New Orleans
             Section 108 Loan Program
             Jazzland Theme Park
             New Orleans, Louisiana

We are performing an audit of the City of New Orleans (City). One objective of the audit is to determine whether the City administered its Section 108 Loan Program in an economic, effective, and efficient manner and in accordance with program requirements. To accomplish this objective, we will review the award, implementation, and monitoring of the City's Section 108 projects. This memorandum provides our conclusions on the City's Section 108 loan to Jazzland Theme Park (Jazzland).

The report contains two findings requiring follow-up actions by your office. We will provide a copy of this report to the City.

In accordance with HUD Handbook 2000.06 REV-3, within 60 days, please furnish this office, for each recommendation in this report, a status on: (1) corrective action taken; (2) the proposed corrective action and the date to be completed; or (3) why action is not considered necessary. Additional status reports are required at 90 days and 120 days after report issuance for any recommendation without a management decision. Also, please furnish us copies of any correspondence or directives issued related to the audit.

I appreciate your staff's and the City's assistance and cooperation with my staff throughout the course of this audit. Please call William Nixon, Assistant Regional Inspector General for Audit, at (817) 978-9309 if you or your staff have any questions.

Management Memorandum



*THIS PAGE LEFT BLANK INTENTIONALLY*

# Executive Summary

We are performing an audit of the City of New Orleans (City). One objective of the audit is to determine whether the City administered its Section 108 Loan Program in an economic, effective, and efficient manner and in accordance with program requirements. To accomplish this objective, we will review the award, implementation, and monitoring of the City's Section 108 projects. This memorandum provides our conclusions on the City's Section 108 loan to Jazzland Theme Park (Jazzland). To accomplish our objective we audited the $25.3 million Section 108 loan to assist in the construction of Jazzland Theme Park project (Jazzland). For Jazzland, our audit objective was to determine whether the City complied with the requirements regarding applicant eligibility and requirements; loan requirements; grant administration; and performance reviews.

The City did not comply with Section 108 requirement regarding applicant eligibility, loan requirements, grant administration, and performance reviews.

**The City paid $7.6 million in ineligible and unsupported costs.**

The audit concluded the City paid $7,685,703 in ineligible and unsupported expenditures. The City distributed $1,298,943 ineligible funds because the funds did not have an underlying loan or grant agreement. Of the $6,386,760 in unsupported costs, $2,447,191 related to the last drawdown that the City had no documentation to support the release of the funds. The remaining $3,939,569 related to miscalculations of fees, payments to vendors, and possible duplication of invoices. Further, the City had inadequate controls and management over Jazzland, and did not manage the development of Jazzland.

As a result of poor management, lax oversight, and a failure to follow requirements, the City mismanaged HUD funds. Also, because Jazzland defaulted on the City's loan, the City will be required to repay HUD from rents it receives from the new owners of the amusement park and from its general fund.

**The City had inadequate controls and management over the Jazzland Section 108 loan project.**

To correct the deficiencies cited in the report, we recommend HUD require the City to immediately repay the $1,298,943 in ineligible expenditures and either support or immediately repay the $6,386,760 of unsupported expenditures. The City should also seek recovery from vendors who inappropriately gained from the disbursements. The City needs to implement policies and procedures to ensure compliance with program requirements. Also, HUD should assist the City in the development and implementation of the policies and

procedures prior to approving any additional Section 108 loans. By doing this, the City could potentially use $52 million in available Section 108 funds more effectively. Additionally, HUD should evaluate if actions by officials, contractors, and others warrant administrative sanctions.

We provided a draft discussion on January 15, 2004, and held an exit conference on January 29, 2004. We provided a formal draft on February 5, 2004, and obtained a written response from the City on March 5, 2004. We have included the City's entire response as Appendix B. Generally, the City concurred with the findings and agreed to implement the recommendations. The City explained that it inherited the conditions cited in the report from the previous administration. We considered the City's response in preparation of our final report and amended as necessary.

# Table of Contents

Management Memorandum                                                    i

Executive Summary                                                        iii

Introduction                                                             1

Findings

1  The City Paid $7.6 Million in Ineligible and Unsupported Costs        9

2  The City Did Not Effectively Manage Jazzland                          19

Management Controls                                                      29

Follow-Up on Prior Audits                                                31

Appendices

   A.  Schedule of Questioned Costs                       33

   B.  Auditee Comments                                    35

**Abbreviations**

| | |
|---|---|
| CDBG | Community Development and Block Grant |
| City | The City of New Orleans, Louisiana |
| CPD | Community Planning and Development |
| CFR | Code of Federal Regulations |
| EDC | New Orleans, Louisiana Economic Development Corporation |
| ESG | Emergency Shelter Grant |
| HOPWA | Housing Opportunities for People With AIDS |
| HUD | U.S. Department of Housing and Urban Development |
| Jazzland | Jazzland Theme Park |
| IDB | Industrial Development Board |
| NOLA EDC | New Orleans Louisiana Economic Development Corporation |
| Ogden | Ogden Corporation |
| OIG | Office of Inspector General |
| OMB | Office of Management and Budget |

# Introduction

The City of New Orleans (City) is the largest recipient of HUD's Community Development Block Grant (CDBG) funds in the State of Louisiana.  The CDBG Program provides grants to states and local governments to aid in the development of viable urban communities.[1]  The City receives approximately $19 million per year in CDBG funds from HUD's Community Development and Planning Division[2] (CPD).

Section 108 provides the City with additional funds to stimulate economic development.

The Housing and Community Development Act of 1977[3] expanded the CDBG Program to include Section 108 loan guarantees (Section 108) for entitlement cities.[4]  According to HUD, Section 108 provides entitlement cities with a source of financing for economic development, housing rehabilitation, public facilities, and large-scale physical development projects.  Under Section 108, HUD guarantees repayment of notes issued by local governments to raise capital for approved projects.  The entitlement city pledges their current and future CDBG allocations as collateral for the loan.

HUD cannot approve a guarantee if the entitlement's city's unpaid balance of Section 108 loans would exceed five times the entitlement city's most recent CDBG allocation, approximately $91 million for the City of New Orleans. The maximum loan term is 20 years.[5]  Similar to other CDBG assistance, Section 108 must be used for activities that meet one of CDBG's national objectives:

1.  Benefit low- and moderate-income families;
2.  Prevent or eliminate slums or blight; or
3.  Meet other urgent community development needs.

Eligible activities include, among other things, property acquisition; rehabilitation of publicly owned property; economic development activities; and acquisition, construction, reconstruction, or installation of public facilities.[6]

---

[1]  Program regulations located at 24 CFR Part 570.
[2]  This does not include other funds HUD provides to the City including HOME funds, Housing Opportunities with People with AIDS (HOPWA), and Emergency Shelter Grants (ESG).
[3]  Public Law 95-128.
[4]  A metropolitan city or an urban county receiving a CDBG grant, see 24 CFR 570.701 and 24 CFR 570.300.
[5]  24 CFR 570.705(a)((2)(i) & 24 CFR 570.705 (f).
[6]  24 CFR 570.703.

2004-FW-1003

Introduction

During our audit period, the City had four outstanding Section 108 loans:[7]

| Name of Project | Activity / National Objective | Loan Amount | Principal Outstanding[8] | Status |
|---|---|---|---|---|
| Jazzland | Theme park/create jobs. | $25.3 million | $22.56 million | Six Flags purchased from bankruptcy |
| American Can Factory | Convert a warehouse to apartment complex/eliminate slum & blight | $5 million | $4.83 million | Project complete and loan current. |
| Palace of the East - Grand Theater | Movie Theater/create jobs | $5 million | $5 million | Project complete and loan current. |
| Louisiana Artworks | Artist Studio &Gallery/create jobs | $7.1 million | $7.1 million | Construction phase. |
| **Totals** | | **$42.4 million** | **$39.49 million** | |

HUD has no requirements that the City award Section 108 funds competitively. It appears developers initiated and affected the City's Section 108 process. Consequently, the funding process of a Section 108 loan differs from an entitlement grant, competitively awarded contract, or applied-for assistance.

Loan process.

*Application:*

In general, a potential developer submits an unsolicited preliminary proposal to the City's Economic Development department. After determining the project's eligibility, the Economic Development department presents the proposal to the Mayor. If the Mayor decides to undertake the project, then the Mayor obtains an ordinance from the City Council authorizing the City to apply for Section 108 funds. After obtaining the ordinance, the Economic Development department assists the developer in writing the Section 108 application. The City submits the application to both Headquarters[9] and New Orleans CPD offices. The New Orleans' office performs a cursory review of the application and recommends approval or

---

[7]   As of November 28, 2003.
[8]   As of February 26, 2004.
[9]   Financial Management Division, Office of Planning and Development.

disapproval of the loan to Headquarters.[10]  After a preliminary underwriting process and verification that adequate funds exist, a Headquarters' review panel performs a review of the application to determine compliance with program regulations and makes a recommendation to the General Deputy Assistant Secretary for CPD.  The General Deputy Assistant Secretary for CPD renders the final decision.

*Distribution/Repayment:*

Prior to signing the loan documents and receiving the loan, the City Council must approve the loan.  During the construction phase, the developer submits drawdown requests to obtain the Section 108 funds.  The City's construction consultant reviews the requests and provides a recommendation for payment.  Then, the City's bank wires the approved funds to the developer.

After completion of the project, the developer submits loan payments to the City on January 15th, April 15th, July 15th, and October 15th.  The Finance Department records/holds the payment in a specified account until the City's debt service payment is due to HUD.

Jazzland.

The developer applied for and used Section 108 funds to build Jazzland; a 100-acre theme park located approximately 12 miles from New Orleans' Central Business District and the French Quarter.  According to its Section 108 loan application, Jazzland would showcase the unique culture of Louisiana by offering live entertainment, regional food, a variety of music, games, and amusement rides.  The application projected that Jazzland would attract 1.4 million persons per year; create 4,665 new jobs; provide $18.47 million in City and State taxes annually; and generate $314 million in annual spending.  According to estimates in its original application, Jazzland was expected to cost $76.5 million.

The loan agreement required the developer to use the $25.3 million Section 108 loan funds for development and

---

[10]    There was some dispute with this statement.  HUD Headquarters stated the HUD field office "provides a substantive review which carries significant weight in the review process."  However, the HUD field office stated it only has a "limited review and monitoring function," and the "substantive review, negotiations, underwriting and financing decisions, project approval, contract execution, and bond issuances, are all performed by Headquarters."

construction, including: "without limitation, certain soft costs, sitework, utilities, and construction and the purchase of amusement rides and Underwriter's issuance costs, all of which shall be expended pursuant to the Budget."

According to its applications, "the proposed Jazzland Theme Park project will meet the following National Objective:  To provide at least 51 percent of the 740 full-time equivalent jobs to persons of low-moderate incomes. Additionally, most jobs will not require an education beyond high school."  The City pledged CDBG and program income to repay the Section 108 loan by August 2017.

Originally, Thomas Winingder proposed developing Jazzland and owned the proposed site.  Winingder sold all of his interests related to Jazzland on July 9, 1998. Jazzland agreed to pay Winingder 2 percent of gross revenue, quarterly, throughout the duration of the operation of the park and 1 percent of the first $7.5 million of annual gross revenues.  Ogden Corporation through various wholly owned subsidiaries owned and operated Jazzland (see table).



Jazzland Ownership
Prior to Purchase



**Submission of applications and development of Jazzland.**

On September 8, 1995, the City submitted to HUD a $15 million Section 108 loan application to assist in funding Jazzland, which HUD approved on September 29, 1995. On April 2, 1998, the City submitted a $10 million supplemental/amended application to assist in funding the Jazzland.  HUD approved an additional $10.3 million in

supplemental/amended application on June 11, 1998. The additional $300,000 was to cover issuance costs[11] imposed by HUD.

Also, the State of Louisiana issued a general obligation bond in the amount of $10 million to assist in funding the development and construction of Jazzland.[12] The State bond was administered through the City. Jazzland was not required to repay the State funds. However, as a condition of obtaining the funds, the State required that a public agency own the Jazzland site.

**Funding for Jazzland as of July 10, 1998**

| Funding Type | Amount |
|---|---|
| Private Bank loan | $30   million |
| HUD Section 108 loan | $25.3 million |
| State Bond | $10   million |
| Subordinated Debt | $ 7   million |
| Ogden Corporation | $ 5   million |
| Land Contribution[13] | $ 2   million[14] |
| **Total** | **$79.3 million** |

Overall, 45 percent of public funding was used to build Jazzland. The Section 108 loans provided 32 percent and the State bond provided 13 percent of the funding towards the project. In contrast, the investors only contributed 8.28 percent of their own funds.

Operation.

Jazzland opened May 20, 2000. One day before opening, Ogden Corporation sold Jazzland to Alfa Alfa Holdings.[15] Alfa Alfa Holdings purchased Jazzland for $79.7 million, consisting of $64.7 million of assumed debt and a $15 million letter of credit. Alfa Alfa owned Jazzland through an assortment of wholly owned subsidiaries (see table). Alfa SmartParks controlled Jazzland's operations and owned its stock. In addition, Jazzland's senior management team remained in place under its new owner.

---

[11] Costs associated with private sector financing of guaranteed loan funds.
[12] While this bond was not part of our scope, we did expand the scope when necessary and included conclusions reached on this bond when appropriate.
[13] Contributed by the Winingders.
[14] Assigned value.
[15] Headquartered in Athens, Greece.

Introduction

Jazzland Ownership
Resulting from Purchase



In February 2002, after two seasons, Alfa SmartParks filed for Chapter 11 bankruptcy protection. Between July 1999 and October 2001, Jazzland paid $5,303,510 in interest and principal to the City. When Jazzland defaulted,[16] Jazzland owed the City approximately $24.8 million in principal and accrued interest.[17] As a result of Jazzland's default, the City must pay HUD approximately $2.4 million a year to pay off the loan.[18]

**Subsequent to bankruptcy.**

In August 2002, Six Flags, Inc.[19] (Six Flags) purchased Jazzland from bankruptcy court for about $38 million. At the time of purchase, Six Flags entered into a 75-year lease with the Industrial Development Board (IDB).[20] Under the lease agreement, Six Flags agreed to pay a yearly $1.4 million lease payment to the IDB.[21] The IDB submits the lease payment to the City to use for its yearly $2.4 million payment on the loan. Six Flags began submitting regular payments to the City in January 2003. In addition, Six Flags submitted a payment of $1.4 million for the year 2002.

The City maintained its records at 1515 Poydras Street, Suite 1150, New Orleans, Louisiana. Further, Alfa

---

[16]  October 2001.
[17]  Calculation based upon the amortization schedule.
[18]  If the City defaults on the loan, HUD will deduct the payments from the City's yearly CDBG allocation.
[19]  A Texas company headquartered in New York City and Oklahoma City that owns and operates 39 parks in North America and Europe.
[20]  The City created the Industrial Development Board (IDB). The purpose of the IDB, as landowner, is to collect lease payments from Six Flags. The lease payments are submitted to the City, which use the funds toward the repayment of the 108 loans.
[21]  The lease agreement allows for a larger payment to the City if Six Flags' revenue increases.

SmartParks maintained records related to Jazzland at The Filing Source, Salisbury Road, Jacksonville, Florida.

**Audit Objective**

Overall, our audit objective was to determine if the City administered its Section 108 Loan Program in an economic, effective, and efficient manner. Specifically, whether the City complied with the requirements regarding applicant eligibility and requirements; loan requirements; grant administration; and performance reviews.[22] This report only provides facts and findings related to the City's $25.3 million Section 108 loan for Jazzland.

**Audit Scope and Methodology**

To accomplish our objectives, we performed the following related to the HUD Section 108 Loan Program and Jazzland:

- Reviewed applicable HUD and City rules, regulations, policies, and procedures, specifically as the requirements related to how HUD process, approve, and disapprove Section 108 loan applications and how the City processed and managed Section 108 loans;
- Interviewed HUD and City personnel, developers, and contractors regarding Section 108 and Jazzland;
- Reviewed and evaluated the City's organizational chart to identify the responsibilities of the staff as well as reporting positions;
- Reviewed the City's internal audit reports, management reviews, monitoring reports, and other documents to identify indications of weaknesses;
- Reviewed and evaluated the loan application and attachments and other applicable documents;
- Reviewed and obtained a log of all drawdown requisitions for the Section 108 loan project;
- Reviewed the City's system for collecting and accounting for Section 108 loan repayments;
- Reviewed and analyzed loan status; and
- Reviewed, evaluated, and analyzed files related to Jazzland maintained by Alfa SmartParks at the Filing Source, Salisbury Road, Jacksonville, Florida 32216.

We reconciled all drawdowns to the requisition log to confirm amounts, dates, and balance. To determine if the City met requirements, we reviewed 5 of Jazzland's 22

---

[22]  24 CFR 570 Subpart M.

drawdowns[23] totaling $15,131,585.[24]  We selected the five largest drawdowns because the universe was too large to review all transactions and statistical concepts were not appropriate.[25]  The City's requisition log did not represent all funds received by Jazzland.  Although the City produced financial reports, the City collected and reported the requisition amounts in the aggregate; therefore, we reviewed the paper details to form conclusions.  We did note differences between City data and other data such as the City's requisition log showed Jazzland received a total of $26,586,250; whereas, other documentation showed Jazzland received a total of $26,598,943.[26]  As a result, we did not rely upon the City's computer data related to Jazzland.

We provided a draft discussion on January 15, 2004, and held an exit conference on January 29, 2004.  We provided a formal draft on February 5, 2004, and obtained a written response from the City on March 5, 2004.  We have included the City's entire response as Appendix B.  Generally, the City concurred with the findings and agreed to implement the recommendations.  The City explained that it inherited the conditions cited in the report from the previous administration.  We considered the City's response in preparation of our final report and amended as necessary.  HUD also provided informal comments that we utilized in preparing the final report.

Our audit generally covered the project development, construction, and operational activities regarding the Section 108 funds during the period of June 1998 through December 2002.  We expanded the scope when deemed necessary.  We performed the audit from January 2003 to October 2003.  We conducted the audit in accordance with generally accepted government auditing standards.

---

[23]  Represents 22.7 percent of all drawdown requisitions submitted by Jazzland.
[24]  Approximately 57 percent of entire universe.
[25]  Since we did not perform a statistical selection, the ineligible and unsupported amounts cannot be extrapolated to the entire universe.
[26]  This is a difference of $12,693.

# The City Paid Over $7.6 Million in Ineligible and Unsupported Costs

By exceeding the loan amount of $25.3 million, the City improperly gave Jazzland $1,298,943. Further, of the $15,131,585 reviewed, the City could not support payments of $6,386,760 (42%). This occurred because the City did not: (1) adhere to requirements, including maintaining adequate documentation and (2) adequately monitor the project. Also, the City allowed the developer or its attorney's to take control of project funds. Further, as detailed in Finding 2, the City abdicated its responsibility by allowing a contractor to review payments requests, and required Jazzland to hire certain companies.

The City should repay the $1,298,943 of ineligible amounts, either support or repay the $6,386,760 of unsupported amounts, and develop and implement the necessary controls to ensure compliance with federal rules and regulations and improve its monitoring. Further, the City should seek recovery of any funds inappropriately paid to vendors and must retain sufficient documentation to account for HUD funds. In addition to assisting the City with the implementation of policies and procedures, HUD should determine if administrative actions against any individual or business is warranted.

---

> HUD required the City to ensure the proper use of Section 108 loans funds.

Federal requirements hold the City responsible for complying with CDBG program requirements. The use of contractors did not absolve the City of its responsibility. In addition, the Federal regulations required the City to determine and monitor the adequacy of Jazzland's performance related to program requirements.[27]

On July 10, 1998, the City entered into an escrow agreement with Jazzland and others. The agreement designated First National Bank of Commerce as the escrow agent.[28] First National Bank of Commerce had the responsibility of maintaining the Section 108 accounts including disbursements to Jazzland. Applicable requirements of the escrow agreement related to the disbursement of funds included:

➢ Jazzland could requisition funds only once a month;
➢ The requisitioned costs had to be in accordance with and related to the budget;

---

[27] 24 CFR 570.501 (b).
[28] In March 2001, the City removed First National Bank of Commerce and designated an associate with Smith Law Firm as Escrow Agent of the Section 108 loan funds.

> ➤ The City's consultant confirmed the accuracy of the requisition as it related to the completion and compliance of the work to the budget and plans and specifications;
> ➤ Jazzland certified that items listed on the requisition were due and payable and supported by invoices and other available documentation; and
> ➤ The City approved the requisition based upon the above.

**Jazzland Drawdowns.**

Based upon a non-statistical review of five[29] drawdowns totaling $15,131,585, the City expended $1,298,943 ineligibly and did not have support for another $6,386,760.[30] Between October 13, 1998, and March 31, 2001, Jazzland had 22 drawdown requisitions totaling $26,586,249.[31]  Each drawdown was reviewed to determine if it:  (1) was used as stipulated in the federal/statutory requirements, loan applications, and related agreements and (2) was adequately supported by documentation such as invoices and inspection reports.

---

[29]  Drawdowns selected for review highlighted in blue on table.
[30]  The City did not support or ensure eligibility of costs for 51 percent of drawdowns selected for review.
[31]  Jazzland received an additional $12,693 not included in the drawdown log.  The $12,693 represents interest that the City had not accounted for at the time of the last drawdown.

**Jazzland Drawdowns**

| Drawdown # | Drawdown Date | Amount Disbursed | Unsupported | Ineligible |
|---|---|---|---|---|
| 1 | 10/13/98 | $1,876,801 | $163,196 | |
| 2 | 11/24/98 | 1,419,444 | | |
| 3 | 12/24/98 | 77,015 | | |
| 4 | 1/20/99 | 402,047 | | |
| 5 | 2/21/99 | 229,581 | | |
| 6 | 3/25/99 | 729,125 | | |
| 7 | 4/24/99 | 136,981 | | |
| 8 | 6/7/99‡ | 337,697 | | |
| 9 | 6/25/99‡ | 254,606 | | |
| 10 | 7/22/99 | 1,480,887 | | |
| 11 | 8/21/99 | 515,741 | | |
| 12 | 9/28/99 | 3,299,598 | 245,503 | |
| 13 | 10/21/99 | 2,719,152 | 28,277 | |
| 14 | 11/30/99 | 540,460 | | |
| 15 | 12/28/99 | 297,742 | | |
| 16 | 2/2/00‡ | 1,150,659 | | |
| 17 | 2/29/00‡ | 1,526,259 | | |
| 18 | 3/27/00‡ | 1,213,713 | | |
| 19 | 3/29/00‡ | 3,502,593 | 3,502,593 | |
| 20 | 5/1/00 | 682,970 | | |
| 21 | 6/16/00 | 459,737 | | |
| 22 | 3/31/01 | 3,733,441 | 2,447,191 | 1,286,250 |
| | | 12,693 | | 12,693 |
| **TOTALS** | | **$26,598,942** | **$6,386,760**[32] | **$1,298,943** |

‡ More than one payment during the month.

Over $3.7 million in ineligible and unsupported costs in a drawdown that was 10 months after Jazzland opened.

In drawdown number 22, Jazzland received $1,298,943 in ineligible and $2,447,191 in unsupported costs. The ineligible funds related to an amount in excess of the loan amount and the unsupported related to lack of supporting documentation. The transfer occurred about 10 months after Jazzland opened.

In early 2001, Jazzland requested a total of $3,957,764. According to the submitted documentation, Jazzland

---

[32]   Represents 42 percent of $15,131,585 drawdowns reviewed.

  
wanted all funds remaining in the escrow account. Based upon news articles and other documentation during the period, Jazzland had financial difficulties including nonpayment to women-owned business enterprise and minority-owned business enterprise subcontractors, and Jazzland was behind on its bills. Further, Jazzland had eliminated jobs.[33]  Based upon the documentation, the funds were put into an escrow account.

**Jazzland received $1.2 million more than the loan amount.**

Agreeing to the request, the City released the remaining $3,746,134 in the escrow account to Jazzland.[34]  In doing so, Jazzland received $1,298,943 more from the City than the $25,300,000 loan agreement. The City did not execute a loan or grant agreement with Jazzland for these funds, as required by HUD.[35]  Therefore, the City had no basis for distributing these funds and must immediately repay program income $1,298,943.

**Jazzland did not supply sufficient support for approximately $2.5 million.**

Because Jazzland did not supply sufficient documentation to make a determination of eligibility, the remaining $2,447,191 of this drawdown was unsupported. It appears from the documentation supplied that Jazzland claimed it wanted to pay the general contractor, and subcontractors; however, it supplied no documentation of why the amounts should come from the Section 108 funds. Instead of the requisite approval, the City's construction consultant wrote the following:

> "I do not disagree with your desire to close out the Jazzland Project at this time and feel you are completely aware of and able to control any 'open issues' that may remain after you make final payment of all funds remaining to be paid from the HUD-108 funds."

According to an April 23, 2001 letter to a City Council member,[36] it appears Jazzland disbursed $551,362 to various subcontractors. However, the documentation did not explain why the City owed these funds under the loan agreement or its budget or if Jazzland had received reimbursement for the claims previously. Other

---

[33]  February 6, 2001, <u>Times Picayune</u> Article "Jazzland builder sings sour note" and a February 14, 2001 article: "Jazzland behind on bills theme park's suppliers say."
[34]  Includes $12,693, probably accrued interest that the City had not included in its accounts.
[35]  24 CFR 570.503 (a).
[36]  Signed by Graymond Martin.

documentation shows Jazzland paid Graymond Martin and the law firm of Smith Martin for legal services in connection with the release and disbursement of this drawdown.[37]

According to a January 14, 2002 letter, the escrow account, funded by a portion of this drawdown, still had funds remaining.  The City should obtain and review the account to determine if payments from it were supported and eligible under its agreement with Jazzland.  If any funds remain, the City should obtain those funds.  In addition, the City should seek repayment from vendors, contractors, and the escrow agent for any funds expended that did not relate to the City's obligation.

**Potential Conflict of Interest Surrounds the Last Drawdown.**

Graymond Martin, a former Executive Assistant to the Mayor,[38] interceded on behalf of Jazzland to obtain the release of the $3.7 million.  Also, when Mr. Martin served as the Executive Assistant to the Mayor, the City required Jazzland to use Mr. Martin's former law firm, Smith Martin.[39]  It is unknown how much Jazzland paid Smith Martin.

During the request for drawdown 22, the City agreed to replace its escrow agent with a Smith Martin attorney that had been performing work for the City.  It is unknown why the City agreed to do this.  The City required Jazzland to deposit $100,000 into an escrow account, controlled by the Smith Martin attorney, to clear liens on the Jazzland property.  Further, Jazzland compensated Graymond Martin for legal fees incurred to obtain the release of the $3,746,134.  According to a letter from the President of Alfa SmartParks, Inc., without the representation of Mr. Martin, "there would have been no resolution or release of HUD funds."  Both the City and HUD should determine if a conflict of interest existed between the parties and take appropriate action.

---

[37]   According to the contract, legal services were provided by a joint venture of "Staci A. Rosenberg, a professional law corporation and Hamilton Realty Company, L.L.C."  The address listed on the contract amendments for this joint venture was the same as Smith Martin.  Ms. Rosenberg worked for Smith Martin and used Smith Martin letterhead in much of her correspondence.

[38]   Served as Executive Assistant to the Mayor – Intergovernmental Affairs from September 1996 to September 1998.

[39]   The Smith Martin firm removed Martin from its name in 2003.

Other unsupported costs totaled $3,939,569.

As a result of relying upon the construction consultant[40] and the City not fulfilling its duties, Jazzland did not support $3,939,569 of costs in four drawdowns reviewed. The review consisted of reviewing documentation maintained by both the construction consultant and the City. If the review relied solely upon documentation maintained by the City, the unsupported costs would have been much higher. The $3,939,569 of unsupported costs included the following:[41]

- Drawdown number 1, totaled $1,876,801 of which $163,196 was unsupported. The $163,196 related to design fees, general requirement fees, and miscalculations of the contractor's and retainage fees. For example, Jazzland obtained $88,253 for contractor's fees in this drawdown. However, based upon the contract agreements and the drawdown, the City should have only paid a calculated contractor's fees of $67,627, resulting in $20,626 in unsupported costs.

- Drawdown number 12, totaled $3,299,598 of which $245,503 was unsupported. The $245,503 related to lack of documentation supporting the purpose or eligibility of vendors or costs. For example, the drawdown included a vendor request for $228,438. However, the drawdown did not include specifics about how the vendor's work related to the purchase, delivery, or installation of rides.

- Drawdown number 13, totaled $2,719,152 of which $28,277 was unsupported. The $28,277 related to a lack of documentation supporting the purpose or eligibility of vendors and miscalculations of the contractor's and retainage fees. Charges from vendors did not relate to the purchase, delivery, or installation of rides. For example, a vendor was reimbursed $150 for airline cancellation fees for a trip to Germany.

- Drawdown number 19, totaled $3,502,593 of which $3,502,593 was unsupported. The documentation included many invoices and other documentation dating back 7 months. During the 7 months, Jazzland received eight reimbursements totaling $11,263,324.

---

[40] Although the construction consultant was an advocate of the City, Jazzland paid the construction consultant.
[41] See the table for summary information.

The City did not provide any documentation as to why Jazzland did not include the invoices in previous drawdowns or if the invoices were duplicates. Based upon the review of the drawdowns 12 and 13, some invoices were duplicates including several from drawdown 13 that totaled $444,461. Because of the probability of duplicate drawdowns, the entire drawdown was considered unsupported. Because the drawdown did not identify the amounts included in its calculation, the amounts could not be conclusively determined ineligible.

The City should support or repay HUD the $3,939,569 of unsupported costs.

**The City did not maintain adequate files documenting the expenditure of the Section 108 funds.**

The City failed to "establish and maintain sufficient records" to determine whether it met program requirements.[42] Instead of reviewing and approving the requisitions, the City required Jazzland[43] to hire a construction consultant to review the drawdowns and supporting documentation. Further, the City relied upon the construction consultant and general contractor to retain and maintain documentation that HUD required the City to review and maintain. In addition, the City had no record of how Jazzland hired the construction consultant or how much Jazzland paid them. According to the construction consultant, the City was familiar with the construction consultant's work from work performed at the New Orleans airport. Nonetheless, this familiarity with the construction consultant did not exempt the City from following procurement requirements. The City not only needs to retain documentation but also should implement policies for review and follow-up of the documentation. Additionally, the City must comply with procurement requirements, including maintaining a contract log, filing system, and procurement history. The City's continuance of the practices cited, could cost it millions of dollars.

**City violated its escrow agreement.**

The City violated the terms of the escrow agreement by Jazzland requesting and receiving two payments in June 1999, February 2000, and March 2000.[44] The escrow agreement stated "each request by Borrower for disbursement of funds ...shall include: (i) a loan

---

[42] 24 CFR Part 570.506 (h) and (j)
[43] Included in the escrow agreement.
[44] See bolded dates in table.

requisition...which may be presented not more frequently than once in each calendar month." In addition, none of the 22 drawdowns included a certified statement from the bank as required by the Escrow Agreement,[45] and one drawdown requisition did not include a certified statement from Jazzland.[46] By not adequately monitoring, the City allowed the violations to go unchallenged. The City must develop and implement sufficient management controls to ensure compliance with program requirements and other agreements; and to reduce its exposure to fraud, waste, and abuse.

## Auditee Comments

The City agreed with the finding, but believed the $1.2 million ineligible funds should be repaid to its program and not HUD. Further, the City committed to pursuing all applicable legal avenues to recover the funds and, if successful, will retain and use the funds towards repayment of the Section 108 loan or towards funding for an eligible economic development activity.

With respect to the $6.3 million in questioned costs, the City stated it does not have funds available to repay the amount. The City believed that due to its consistent submission of debt service payments to HUD on the Jazzland loan, an alternative solution would allow the City to continue to make its payments as currently scheduled.

## OIG Evaluation of Auditee Comments

We appreciate the City's commitment to obtain the funds from those entities and/or individuals who may have improperly benefited from them. We will modify our recommendation to reflect the $1.2 million being repaid to the City's program. With respect to the $6.3 million unsupported costs, the City will need to work with HUD to resolve how and when the funds should be repaid.

## Recommendations

We recommend the New Orleans CPD Director require the City to:

---

[45] July 10, 1998 Escrow Agreement between the City, Southtrust Bank, and the First National Bank of Commerce
[46] Drawdown 22.

1A.  Immediately repay its program the $1,298,943 of ineligible funds disbursed in drawdown #22 related to funds disbursed in excess of the loan amount.

1B.  Support or repay the $2,447,191 of unsupported funds disbursed in drawdown #22 resulting from the lack of supporting documentation.

1C.  Obtain and review the escrow account(s) funded by drawdown #22 to determine if payments from it (them) were supported and eligible under its agreement with Jazzland.

1D.  Determine if a conflict of interest existed between the City, Graymond Martin, and the Smith Martin attorney and pursue administrative sanctions against parties involved.

1E.  Support or repay the $3,939,569 of unsupported funds disbursed in drawdowns 1, 12, 13, and 19 resulting from miscalculations of contractor's and retainage fees and the lack of supporting documentation.

1F.  Establish such management controls as necessary to ensure compliance with procurement requirements, including maintaining a contract log, filing system, and procurement history.

1G.  Develop and implement sufficient management controls to ensure compliance with program requirements and other agreements.

We further recommend HUD:

1H.  Determine if a conflict of interest existed between the City, Graymond Martin, and the Smith Martin attorney and pursue administrative sanctions against parties involved.



*THIS PAGE LEFT BLANK INTENTIONALLY*

# The City Did Not Effectively Manage Jazzland

The City did not adequately underwrite or administer the $25.3 million Jazzland Section 108 loan. Specifically, the City did not comply with HUD requirements related to: (1) underwriting; (2) procurement; and (3) expenditure accounting. Further, as discussed in Finding 1, the City lost control of the project by allowing former City employees and contractors to obtain $3.7 million without adequate accounting.

The City did not have proper underwriting, monitoring, procurement, or expenditure accounting policies and procedures to ensure it protected federal funds. Underwriting guidelines assist in selecting financially viable and effective CDBG-assisted projects. Monitoring ensures proper use of CDBG funds in accordance with applicable rules and regulations. Procurement procedures provide opportunities for the effective and economical use of CDBG funds. Expenditure accounting allow for the proper accounting of disbursements.

As discussed in Finding 1, the City delegated its monitoring responsibilities to a construction consultant. To exacerbate this, the City failed to instruct the construction consultant to follow federal or other regulations related to the expenditure of government funds. The City was responsible for ensuring it had procedures in place to measure, monitor, and report program performance. The City did not have these procedures in place prior to awarding the loan to Jazzland. Based upon the documentation retained by the City, and lack of procedures in place at the time, HUD and the City probably should not have used Section 108 funds for Jazzland. The City's poor management of the project resulted in it disbursing $7,685,703 in ineligible and unsupported funds. As a result of the default and subsequent bankruptcy of Jazzland, the City must pay HUD approximately $2.4 million a year from the lease payments by Six Flags and taxpayer funds.[47]

Prior to HUD approving another Section 108 loan to the City, the City must develop and implement written policies and procedures regarding the underwriting, administration, and monitoring of its Section 108 Loan Program. By implementing procedures, the City could better utilize $52 million in Section 108 funds.[48]

---

The City failed to establish adequate underwriting procedures.

Prior to loaning $25.3 million dollars, the City should have established adequate underwriting procedures. The City did not. While HUD did not require the City to use its underwriting guidelines, HUD expected the City to conduct basic financial underwriting prior to providing CDBG

---

[47] It appears that the City would not have the lease payments from Six Flags had the State not required the land to be owned by a public agency.

[48] The City has approximately $39 million in Section 108 loans outstanding and has the capacity to award approximately $91 million in Section 108 loans; thus leaving approximately $52 million of Section 108 loans that the City could award.

financial assistance towards the Jazzland project, specifically, ensuring:[49]

- Reasonable project costs;
- Commitment of project financing;
- Financially feasibility of the project;
- Reasonable rate of return on owner's equity, to the extent practical; and
- Disbursement of funds on a pro rata basis with other finances provided to the project, to the extent practical.

Further, HUD discouraged the City from substituting CDBG funds for non-federal financial support.

The City did not gather sufficient or consistent information from the entities associated with Jazzland.  The City required the developer to submit an assortment of information, including personal financial statements,[50] income tax forms, and a summary of the project.  The developer provided an individual profile form; environmental risk assessment checklist; corporation certificate; real estate rental schedule; a summary of the project; and a personal financial statement.  In addition, the City performed an internal credit analysis of the developer and the project that provided minimal support.  However, the City did not require the same from the other entities.  In addition, neither the developer nor the other entities possessed pertinent experience in the theme park industry or adequate resources.  After 1995, the City did not update its analysis of the entities or the Jazzland application.

The City did not ensure the costs to construct Jazzland were reasonable or that the project was financially feasible.  Consultants, at the request of the developers, performed two studies regarding the economic impact and a feasibility analysis of the proposed Jazzland.  The developers included the studies in its application.  As should be expected, both studies concluded the project was viable and would provide an economic benefit to the City.  However, the study did not include information or research regarding the reasonableness or financial feasibility of the project.  Moreover, one study appeared to be overly optimistic in its projected attendance.[51] For example, the study projected attendance of 1,388,000 for

---

[49]   24 CFR Pt. 570, App. A
[50]   Since many of the corporations were newly created, the City required individual statements for corporate owners.
[51]   'Feasibility Analysis of the Jazzland Theme Park in New Orleans, Louisiana,' May 1997 by LARC, Inc.

the first year for Jazzland. As a comparison, Sea World of Texas, a 250-acre park,[52] had attendance of 1,400,000 in its 8th year of operation.[53] This does not appear to be a realistic comparison. Based upon a review of the submitted documentation, it does not appear that the information gathered warranted investment by the City.

HUD should not have approved the $10 million amended application.

The developer could not secure private financing sufficient to complete the project. According to the 1995 application, the development and construction of Jazzland included $24.5 million in private financing. Apparently, the private financing never materialized. By 1997, the developer secured another investor and restructured the Jazzland budget. The new budget increased the cost of Jazzland by $7.5 million and decreased private financing by $17.5 million.[54] Consequently, in April 1998, the City submitted a supplemental/amended application for $10 million, which HUD approved. The amended equity contribution was less than 10 percent of the project costs, compared to over 30 percent in the original application. Moreover, the investor refused to provide the City with any type of guarantee on the Section 108 loan. Whereas, the investor provided a $15 million guarantee for a $30 million bank loan.

HUD's underwriting guidelines state: "the objectives of the underwriting guidelines are to ensure…(3) that to the extent practicable, CDBG funds are not substituted for non-federal financial support."[55] The newly structured project budget effectively decreased the private investment by 20 percent and increased the Section 108 portion by 11 percent. It seems the investors recognized the apparent risk while the City and HUD did not. Instead of withdrawing its $15 million Section 108 loan, HUD and the City unwisely approved the $10.3 million amended application on June 11, 1998.

Jazzland failed to provide the minimum level of public benefit.

Jazzland did not provide the minimum level of public benefit required under HUD regulations. HUD required Jazzland to provide one full-time equivalent job per $35,000 to low- and moderate-income persons.[56] HUD awarded the City $25.3 million to assist in funding the

---

[52]  Jazzland was a 100-acre park.
[53]  'Feasibility Analysis of the Jazzland Theme Park in New Orleans, Louisiana,' May 1997; LARC, Inc.
[54]  According to an appraisal, the value of the land was $2 million and not $5 million as included in the application.
[55]  24 CFR 570 Part 570, App. A.
[56]  24 CFR 570.209 (b)(1)(i).

development and construction of Jazzland. Therefore, Jazzland should have provided 723[57] full-time equivalent jobs for low- and moderate-income persons. The national objective noted in Jazzland's loan application stated: "to provide at least 51 percent of the 740 permanent full-time jobs to persons of low-moderate incomes" or 377[58] full-time equivalent jobs for low- and moderate-income persons. Neither the City nor HUD could provide any documents to indicate that it questioned the number of proposed jobs or why it approved a $25.3 million loan that did not provide the required public benefit in its application.

In addition, the City violated HUD and City requirements related to Jazzland's national objective. The City did not ensure Jazzland met the goal of meeting the national objective of providing at least 51 percent of the 740 full-time equivalent jobs to persons of low and moderate incomes. HUD required the City to obtain and maintain a written agreement to provide the jobs, a listing of jobs held by low- and moderate-income persons, and the size and income of the person's family.[59] The loan agreement between the City and Jazzland required Jazzland to provide the same. Jazzland submitted 'Open Access' reports to the City. However, the reports were deficient by not including information documenting the jobs initially or currently held by low- and moderate-income persons or the size and annual income of the person's family prior to the person bring hired for the job. The City must develop and implement procedures to ensure that it funds only those projects that provide a public benefit.

**The City failed to follow procurement requirements.**

The City violated federal procurement regulations. The City failed to include in contracts the applicable procurement requirements[60] and failed to obtain and maintain documentation verifying compliance with procurement regulations. The City required the developer and contractor to comply to with an "Open Access Plan" (Plan) created by the former Mayor. The Plan required the contractor to subcontract with women-owned business enterprises and minority-owned business enterprises in the areas of construction, professional services, and commodities

---

[57]   $25.3 million divided by $35,000 = 723.
[58]   51% x 740 = 377.
[59]   24 CFR 570.506 (b)(5)(ii).
[60]   Under 24 CFR Part 570.502, the City had to comply with the requirements of 24 CFR 85.36.

purchasing.[61]  The Plan also required the contractor to hire subcontractors from a geographically restricted list.[62]  Federal procurement regulations prohibit the imposition of geographical preferences.  In addition, by having a list of preferred subcontractors, the City compromised the procurement process and possibly gave an unfavorable appearance of preferential treatment.  For instance, the list included Citywide Testing, owned by a son of a then Council Member.  Citywide Testing received a $275,000 contract.  Further, by requiring the use of subcontractors on the list, the City may have given the contractor false assurances of the ability of the subcontractors or that the City guaranteed the work.  As discussed in Finding 1, the City required Jazzland to use a construction consultant and an attorney.  In another example of non-compliance, the City did not provide written selection procedures for other procurement transactions to the contractor, as required by federal procurement regulations.  The City must comply with procurement requirements.

> The City failed to adequately monitor the activities the Jazzland project.

In addition to not monitoring the activities of Jazzland, the City also failed to monitor activities related to the New Orleans, Louisiana Economic Development Corporation (EDC).  Although not part of the audit, information came to our attention to indicate similar problems with the City's monitoring of the EDC.

The City was required to ensure Jazzland's compliance with federal regulations[63] and manage the day-to-day operations of Jazzland to assure compliance with applicable requirements.[64]  Also, HUD required the City to ensure its CDBG funds were used in accordance with all program requirements, determine the adequacy of performance, and take appropriate action when performance problems arise.[65]  As detailed throughout the findings, the City did not have written procedures or files documenting the administration and monitoring of Jazzland.

In providing Jazzland with approximately $10 million in State funds, the State required that the Jazzland site be owned by a public agency, EDC.  EDC's purpose was to collect lease payments from Jazzland and alleviate

---

[61]  Overall participation goals during construction and operations of Jazzland: Construction (34.26%); Professional Services (17.33%); and Commodity Purchasing and Nonprofessional Services (13.09%).

[62]  There was no evidence to indicate that the list was an exhaustive list of minority-owned businesses or women-owned businesses capable and willing to work on City projects.

[63]  OMB Circular A-133 Subpart B .210(5)(e).

[64]  24 CFR Part 85.40(a).

[65]  Such as the actions described in Sec. 570.910.

2004-FW-1003

"economic distress," through disbursing grants, in certain areas of the City. The EDC President was Mayor Morial and a former aid to the Mayor served as the Executive Director.

| The City did not monitor $741,424 in rent payments to the Economic Development Corporation |

According to the financial statements and documentation at the City, between May 2000 and December 2001, Jazzland submitted a total of $741,424 in rent payments to the EDC.[66] The City had no record of $453,100 of funds submitted to or expended by the EDC between May 2000 and December 2000. The City should obtain an accounting of those funds.

Contrary to its purpose, the EDC did not award any grants. During 2001, the EDC sponsored the "Celebrate New Orleans East Week." The EDC paid $95,713 to a service provider to organize, manage, and advertise the event. However, the EDC did not execute a contract. In addition, the EDC expended much of its 2001 funds on program and supporting services expenses such as a pension plan ($14,560), an automobile allowance ($10,500), and accounting and auditing fees ($50,156). The EDC dissolved shortly after Jazzland filed a petition for bankruptcy in February 2002.[67]

| The City did not obtain audits. |

The City failed to include in contracts federal audit requirements and failed to obtain audit reports for the Jazzland Project.[68] Federal regulations required the City to ensure compliance by for-profit subrecipients by describing applicable compliance requirements and the for-profit subrecipient's compliance responsibility and establishing methods to ensure compliance such as pre-award audits, monitoring during the contract, and post-award audits.[69]

| The City lost control of Jazzland. |

The City did not maintain control of the Jazzland project. The City failed to obtain HUD's or the State's approval before approving the transfer of Jazzland to another company. The City pledged, as security for the HUD loan, a second lien mortgage on Jazzland. HUD relied upon the pledged security as consideration for awarding the loan. In addition, the State prohibited the transfer of Jazzland

---

[66] According to a February 26, 2001 letter, the EDC received $453,100 in 2000. According to 2001 financial statements, the EDC received $288,324 in 2001
[67] Times-Picayune August 20, 2002 article: "Jazzland Rent Does Little Good for City."
[68] OMB Circular A-133.
[69] OMB Circular A-133 Subpart B .210(5)(e).

without its prior written consent.  When the State learned of the transfer, it suspended funding and refused to release over $790,000 in grant funds.  However, as of March 2004, the City still had over $139,000 of State funds that it had not released to Jazzland.  The City approved the transfer of Jazzland without HUD's or the State's consent and failed to inform either agency.

On May 19, 2000, 1 day before the park opened, Jazzland transferred all of its stock to another company.  Jazzland did not seek the City's approval for the transfer.  In a letter to the City, a Jazzland official expressed disagreement with the need for the City's approval.  However, Jazzland provided information related to the transfer and the City approved it, 1 day before the transfer.  These circumstances casts doubt as to whether the City evaluated the transfer or just rubber stamped Jazzland's request.

Subsequent to the transfer, Jazzland experienced serious operational and financial problems.  In February 2002, after two seasons, Jazzland filed for bankruptcy protection and Six Flags, Inc. purchased the park for approximately $38 million.

Since 2002, the City has operated under a new administration.  Consequently, we were unable to solicit comments or explanation from some City officials involved in the Jazzland decision-making.  Based upon our work, it appears the current administration has taken steps towards implementing new procedures that should improve its systems and controls.

## Auditee Comments

The City acknowledged inadequate management controls contributed to the issues highlighted in the report.  The City evaluated its internal administrative processes as it relates to the Section 108 loan program and has implemented several changes to increase compliance and minimize future deficiencies.  The City pledged to operate the Section 108 loan program based upon four core principles including implementing new policies and procedures, ensuring fairness and accuracy in reporting, creating an internal "Transaction Team" within the law department, and seeking technical assistance from HUD.  The City projected that its policies related to the Section 108 Loan

Program would be finalized by April 9, 2004, and released online by April 30, 2004. The policies will also be available in print.

## OIG Evaluation of Auditee Comments

We commend the City for its proposed actions and believe the administration's willingness to correct the issues identified.

## Recommendations

We recommend the HUD's New Orleans CPD Director require the City to:

2A.   Develop and implement written policies and procedures to ensure the proper selection and funding of potential Section 108 loan projects.

2B.   Establish such management controls as necessary to ensure compliance with procurement requirements, including maintaining a contract log, filing system, and procurement history.

2C.   Determine and repay to its program any excessive costs on contracts.

2D.   Establish a filing system that will allow a proper accounting of all events related to the Section 108 loan project.

We further recommend the New Orleans' CPD Director:

2E.   Assist the City in developing and implementing written policies and procedures related to its Section 108 Loan Program.

2F.   Determine if any actions by City or Jazzland officials warrant administrative sanctions.

2G.   Not approve any Section 108 loans for the City until it has:

- Adequate accounting systems and procedures;
- Adequate procurement procedures and controls;

- Controls to monitor compliance with federal funding requirements; and
- Adequate City oversight of Section 108 loan recipients.

By implementing these management controls, the City can then more effectively use its remaining potential of $52 million in Section 108 loans.



*THIS PAGE LEFT BLANK INTENTIONALLY*

# Management Controls

In planning and performing our audit, we obtained an understanding of the management controls that were relevant to our audit. Management is responsible for establishing effective management controls. Management controls, in the broadest sense, include the plan of organization, methods, and procedures adopted by management to ensure that its goals are met. Management controls include the processes for planning, organizing, directing, and controlling program operations. Management controls include the systems for measuring, reporting, and monitoring program performance.

**Relevant Management Controls**

We determined the following management controls were relevant to our audit objectives:

- Adequacy of controls over project operations;
- Compliance with program requirements and procedures;
- Assurance of supported and eligible expenditures;
- Ensuring validity and reliability of relevant data;
- Ensuring safeguarding of resources;
- Monitoring progress and performance to ensure program goals and objectives are met;
- Management philosophy and operating style; and
- Documentation of compliance with program requirements and procedures including compliance with national objectives.

**Significant Weaknesses**

A significant weakness exists if management controls do not give reasonable assurance that the entity's goals and objectives are met; resource use is consistent with laws, regulations and policies; that resources are safeguarded against fraud, waste and abuse; and that reliable data is obtained, maintained and fairly disclosed in reports. Based on our review, we believe significant weaknesses existed in the following areas:

- Ensuring validity and reliability of relevant data;
- Support and eligibility of expenditures;
- Controls over project operations;
- Compliance with program requirements and procedures including underwriting, procurement, program income, and administration requirements;
- Safeguarding of resources;
- Ensuring program goals and objectives are met;
- Management philosophy and operating style; and

Management Controls

- Documentation of compliance with program requirements and procedures including compliance with national objectives.

# Follow-Up on Prior Audits

This is our first audit of the City of New Orleans' Section 108 Loan Program for Jazzland Theme Park, New Orleans, Louisiana.



THIS PAGE LEFT
BLANK
INTENTIONALLY

# Schedule of Questioned Costs

| Recommendation | Ineligible[1] | Unsupported[2] | Funds Put to Better Use[3] |
|---|---|---|---|
| 1A | $1,298,943 | | |
| 1B | | $2,447,191 | |
| 1E | | 3,939,569 | |
| 2G | | | $52,000,000 |
| **Totals** | **$1,298,943** | **$6,386,760** | **$52,000,000** |

---

1  Ineligible costs are costs charged to a HUD-financed or HUD-insured program or activity that the auditor believes are not allowable by law, contract or Federal, State or local policies or regulations.

2  Unsupported costs are costs charged to a HUD-financed or HUD-insured program or activity and eligibility cannot be determined at the time of audit.  The costs are not supported by adequate documentation or there is a need for a legal or administrative determination on the eligibility of the costs.  Unsupported costs require a future decision by HUD program officials.  This decision, in addition to obtaining supporting documentation, might involve a legal interpretation or clarification of Departmental policies and procedures.

3  Funds to be put to better use are quantifiable savings that are anticipated to occur if the OIG recommendation is implemented, resulting in a reduced expenditure in subsequent periods for the activity in question.  Specifically, this includes an implemented OIG recommendation that causes a non-HUD entity not to expend Federal funds for a specific purpose.  These funds could be reprogrammed by the entity and not returned to HUD.

Appendix A



*THIS PAGE LEFT
BLANK
INTENTIONALLY*

# Auditee Comments

DIVISION OF HOUSING AND
NEIGHBORHOOD DEVELOPMENT

## CITY OF NEW ORLEANS

C. RAY NAGIN, MAYOR

ALBERTA S. PATE
Executive Assistant
to the Mayor

Mr. D. Michael Beard
Regional Inspector General for Audit
U. S. Department of Housing and Urban Development
Region 6, Office of Inspector General
819 Taylor Street, Room 13A09
Fort Worth, Texas 76102

Re: Section 108 loan for Jazzland

Dear Mr. Beard:

Mayor C. Ray Nagin has committed to operating government openly, fairly, and
efficiently. During his tenure, every department has been charged with examining their
programs in order to weed out inefficiency or any hint of impropriety. For this reason,
the City of New Orleans welcomes this audit, conducted by the Inspector General, and
will deal with its findings accordingly. This administration began simultaneously with
Jazzland's bankruptcy proceedings. Therefore, the administration's introduction to the
Section 108 program was tenuous at best. The administration realizes, however, that the
Section 108 program is one of the best investment tools for urban communities offered to
cities by HUD. The City fully acknowledges that in order to utilize this program to the
best of its potential, changes need to be made at all levels of the loan process. The City
began revising the program prior to the completion of this audit and is confident that the
deficiencies identified by OIG in the City's administration of the Section 108 program
will be remedied.

### Finding #1: The City Paid Over $7.6 Million in Ineligible and Unsupported Costs

With respect to the Jazzland Section 108 loan, the City of New Orleans agrees the
findings that (1) $6,386,760 of costs are unsupported and (2) $1,298,943 of costs are
ineligible. However, the City disagrees with the finding that the $1,298,943 should be
repaid to HUD. The last draw request authorized by the City allowed Jazzland to receive
the remaining funds in the escrow account. Because the source of these funds resulted
from interest paid to the escrow account, the City feels that they should be treated as
program income as defined in CFR Sec. 570.504. The regulation states in Sections
570.503(b)(3) and 570.504(b)(2)(iii) that the recipient does not have to return "cash or
investments held for Section 108 loan guaranty security needs." Section 570.504(b)
states that the income may be retained by the recipient if it is "treated as additional
CDBG funds subject to all applicable regulations." In lieu of repayment of the
$1,298,943, the City commits to pursuing all applicable legal avenues to recover these

"An Equal Opportunity Employer"
1340 POYDRAS STREET | SUITE 1000 | NEW ORLEANS, LOUISIANA | 70112
PHONE 504.299.4800 | FAX 504.299.4951

Page 35                                                    2004-FW-1003

2

funds and, if successful, will retain and use them to either retire an equivalent amount of Jazzland Section 108 debt or to fund an eligible economic development activity.

Regarding the recommended repayment of the $6.3 million, the City does not have funds available to make immediate repayment at this time or, for that matter, at any time in the foreseeable future.  However, because the City has made all of its debt service payments to HUD for this loan and will continue to do so, the City proposes that an alternative solution would allow the City to make its payments as currently scheduled until the loan is paid in full in 2017.

**Finding #2:  The City Did Not Effectively Manage Jazzland**

The City of New Orleans acknowledges that inadequate management controls resulted in many of the issues highlighted in this audit report.  Prior to the completion of this audit, the City initiated an evaluation of its internal administrative processes relative to the Section 108 program and implemented several changes as a result of the evaluation designed to increase compliance and minimize future deficiencies.  The City is confident that its revised operating procedures will significantly reduce the likelihood of similar occurrences.  The City's management plans rests on four core principles:

1.   The City pledges to operate the Section 108 program in strict adherence to all regulations outlined in 24 CFR Part 570, Subpart M and all other applicable federal statutes governing the CDBG program.  To this end, the City has developed preliminary Policy and Procedural Guidelines for the operation of the Section 108 program;

2.   The City pledges to standardize, to the greatest extent possible, the selection, application, and management processes to ensure fairness and accuracy in reporting;

3.   The City has created an internal "Transaction Team" within the Law Department, comprised of experienced transactional attorneys, which will significantly reduce the City's reliance on private, outside attorneys. Utilizing the expertise of staff attorneys should eliminate conflict of interest issues highlighted in this report; and

4.   The City pledges to seek technical assistance from HUD in order to ensure that (a) all pertinent staffers are properly trained in HUD regulations and processes and (b) the City's reporting instruments accurately reflect the information needed to document public benefit and adherence to national objectives.

Regarding the potential conflicts of interest involving Graymond Martin and/or the Smith Martin law firm, the City stands ready to pursue all remedial and/or legal actions that are deemed advisable by the OIG.  The City respectfully requests, however, that the OIG specify the recommended actions in the final report – i.e., filing of a civil lawsuit, filing a complaint with the Louisiana Bar Association's Disciplinary Board, etc.

3

As stated previously, the Nagin administration is committed to the principles of an open and fair government. Therefore, once finalized, all of the City's policies regarding this program will be available to the public online and in print. The City projects that the policy document will be complete by April 9, 2004 and released online by April 30, 2004.

If you have any questions, please contact me.

Sincerely,

*Alberta S. Pate*

Alberta S. Pate