# PLAINTIFF'S EXHIBIT 10

Case 1:06-cv-00756-GK   Document 20-23   Filed 08/06/2007   Page 1 of 8



U.S. Department of Housing and Urban Development
**Office of Inspector General, Region VI**
819 Taylor Street, Suite 13A09
Fort Worth, Texas 76102

(817) 978-9309  **FAX** (817) 978-9316
http://www.hud.gov/offices/oig/

January 3, 2005

MEMORANDUM FOR:  Michael P. Stephens, Deputy Inspector General, G

FROM:           D. Michael Beard, Regional Inspector General for Audit, 6AGA

SUBJECT:        Housing Authority of New Orleans Contracts With CVR Associates, Inc.

In accordance with your desire to discuss and resolve matters early, I prepared this memorandum to bring to your attention a situation that negatively impacts my ability to meet the goals and mission of the OIG. This situation has also adversely affected the morale in this Region. I have come to believe Mr. Heist has opted to create a hostile work environment for personal reasons. Although this is not the first time Mr. Heist and TOP have attempted to discredit and demoralize staff in this Region, their behavior on the CVR Associates, Inc., assignment is unacceptable. I do not believe Mr. Heist and TOP have conducted themselves in a professional manner or that their behavior reflects positively on the OIG.

**Background**

At your and Mr. Haban's request, my office has provided assistance over the last year to the Office of Investigation on the Housing Authority of New Orleans (HANO). I assigned two top auditors[1] to this assignment supervised by an Assistant Regional Inspector General. I undertook this request realizing the extraordinary amount of work the request entailed would adversely affect the overall performance of this Region as measured in reports issued and return on investment.

HUD (Messrs. Liu and Valenti) asked us specifically to review HANO's contracts with three entities: (1) UniDev, LLC (2) Tulane University, and (3) CVR Associates, Inc. Because the HUD Administrative Receiver terminated HANO's contract with UniDev and hired an outside attorney to negotiate a settlement, we did not audit the UniDev contract. The Administrative Receiver used a previous OIG audit report to negotiate down Tulane University's settlement request, so we did not audit the Tulane University contracts.[2]

Our review of CVR Associates did not reveal any material appropriate for a criminal investigation. In a January 2004 teleconference that included you, we decided to limit the assistance to the Office of Investigation assist to an audit of CVR Associates contracts. We had accumulated the majority of evidential matter needed to audit the contracts through two subpoenas dated October 1, 2003, and with information obtained at HANO.

---

[1] Both Senior Auditors with Certified Public Accountant certificates. One auditor was an auditor of the year.
[2] The Assistant Regional Inspector General worked with HUD official including attending meetings to help resolve this situation.

The paper documentation reviewed easily exceeded 15,000 pages with over 10,000 pages being included in the workpapers as hardcopy workpapers.[3]  Most of the 10,000 pages included CVR Associates invoices and receipts supporting the invoices.  Further, we held interviews, some with the Office of Investigation taking the lead, with knowledgeable HANO staff.  As such, when I requested to perform the audit, my staff had accumulated most of the competent and relevant evidential matter needed to develop and support audit conclusions.

*CVR Associates findings and draft report*

On February 17, 2004, I informed the TOP division of the decision to open an assignment for CVR Associates, Inc., and defined the audit objectives.  As early as the February 28, 2004 briefing paper, we included potential findings.  As of the July 31, 2004 briefing paper, we detailed five findings with potential monetary benefits of $1.3 million.  On September 7, 2004, I sent the draft CVR Associates report to TOP and SAC Davis for their review.  (SAC Davis approved the report on October 15, 2004.)

On September 15, 2004, I received a message from Mr. Heist conveying TOP's comments on the draft.  Mr. Heist asked us to restructure the report and revise as suggested by TOP.  I responded on September 20, 2004, that I disagreed with TOP's request that we rewrite the report from six findings to two for better structure.  The first finding they requested would be a finding on HANO not being properly managed.  TOP did not provide any criteria or reasoning regarding why this new finding was appropriate, nor did they take into account that HUD and OIG already agreed that HANO was poorly managed.  In my September 20th response, I also asked Mr. Heist and TOP to provide specific examples of the "dozens of flagrant expressions and words that need to be removed" and to clarify their assertion the two senior auditors were biased, had not stuck to the facts, and only had conjecture to support their findings.

Also, in their September 15, 2004 message, TOP stated: "we are asking some additional questions of [legal counsel] which may have further impact."  I never received a response to my questions and I was not included in the correspondence or discussions between the TOP and legal.  The comments and criticism of the draft came as a surprise to me since we had fully communicated both the objectives and results to Mr. Heist and TOP during the assignment, and Mr. Nixon provided direct responses to Mr. Heist's and TOP's questions throughout this assignment.

When asked directly at our regional conference on September 21, 2004, the Deputy Assistant Inspector General for Audit stated unequivocally that we would get specific and detailed critiques from TOP of our draft report and not vague statements of changes.  We did not.

---

[3]  The 10,000-page estimate is based upon an average of 2,000 pages in a normal box.

2

*Legal counsel assistance*

On October 5, 2004, Mr. Heist, after legal counsel had visited my staff, provided the questions TOP had asked of legal counsel. Neither my staff nor I were consulted in the development of the questions. I would not think that interdivisional discussions on audit work would be withheld from staff performing the audit.

Between September 20, 2004 and October 26, 2004, legal counsel and my staff discussed the draft report and my staff responded promptly to all legal counsel's requests for information. Through their communications, they were able to work out their schedules to meet in Fort Worth on September 29, 2004 to discuss and review documentation and criteria. Staff was pleased with the opportunity to discuss the issues and demonstrate their grasp of the issues. Legal counsel also had the opportunity to observe the volumes of documents auditors reviewed during the assignment. Legal counsel provided specific recommendations to improve the report, which my staff quickly made. These changes included adding references to the Federal Acquisition Regulations when discussing cost principals, modifying the structure of finding 6, and including additional methodology for finding 4. We also removed and changed several sentences based on our discussions. Legal counsel provided valuable insight on the criteria and made suggestions to improve the presentation of the material.

After the departure of legal counsel, staff believed that they answered and addressed the concerns of legal counsel. Further, we had agreed that we would make the changes and resubmit the draft. At the time, legal counsel thought that was a good idea and stated he would wait for our revised draft before rendering his opinion. On October 4, 2004, I submitted a revised draft incorporating changes suggested by legal counsel. I could not incorporate any changes directed by Mr. Heist or TOP since they never responded to my questions or offered to discuss disagreements.

The same day I resubmitted the draft, we were informed that legal counsel would review and provide an opinion only on the original September 7th draft. We received that legal opinion on October 22, 2004. We made additional revisions to the October 4, 2004 revised draft and resubmitted a third draft on October 26, 2004. On October 27, 2004, Mr. Heist sent an email to me suspending the processing of the draft report and directing TOP to perform a detailed review of the assignment for compliance with the Audit Operations Manual and Government Audit Standards.

*Mr. Heist's and TOP response*

On December 10, 2004, Mr. Phelps summoned me to headquarters for a December 17, 2004 meeting related to this assignment. On December 16, 2004, Mr. Phelps canceled the meeting. On December 22, 2004, Mr. Nixon, monitoring my email while I was on scheduled leave, saw a message from Mr. Phelps stating that they had sent out TOP's review of our CVR Associates draft report along with another summons to meet with Mr. Heist and Mr. Phelps on January 5, 2005. This came as a surprise to me since Mr. Heist and I were together in San Antonio on December 21, 2004 and he did not mention either his memorandum (dated December 17th) or the scheduled meeting. I did not see the message until I returned from scheduled leave on December

3

29, 2004. In the message, Mr. Heist directed me to draft a letter to the Louisiana State Ethics Board and send it to TOP within two weeks, which ended on December 31, 2004. As previously stated, I was on leave until December 29, 2004. Fortunately, my staff worked on this during the Christmas week and I provided the requested draft letter on December 30, 2004.

*TOP's Report*

Attached to Mr. Heist's December 17, 2004, memorandum was TOP's "Report on Review of Draft Audit Report." This six-page document concludes:

> "The revised discussion draft did not contain sufficient evidence to justify the six findings and associated recommendations…"

After reading TOP's report, I felt obliged to raise this matter to your attention. I have attached a rebuttal of TOP's report. I question the motivation in preparing and developing the report. It seems Mr. Heist and TOP created their report to confirm their original opinions and personal preferences expressed in their September 15, 2004 email.

I accept Mr. Heist's position and authority to direct the audit work; however, Mr. Heist should not attempt to direct the audit results. The evidence must direct the audit results and dictate how we report. Further, it is not in the best interest of OIG for Mr. Heist to demand a TOP review of a report when a disagreement arises in an attempt to discredit field staff. An effective audit team is one that recognizes that concerns and disagreements can be aired and resolved in a professional and responsible manner. Often, our staff's willingness to raise audit issues is based not so much on procedures as on their comfort in the organization. Mr. Heist's response to our disagreement sends a clear message that if you disagree with him or TOP that he will use TOP to discredit you. Mr. Heist's actions jeopardize OIG's professionalism, independence, and objectivity. Further, headquarters audit management, with the approval and participation of Mr. Heist, has hindered this Region's ability to meet the goals and mission of the OIG.

As shown in the rebuttal of the report and highlighted here, TOP's report lacked professionalism and communication and was poorly prepared. Further, TOP's report creates an atmosphere that is hostile to auditing.

TOP Report Lacks Professionalism

As shown in the rebuttal, TOP based its conclusions on inaccurate statements (e.g. no reference to the Federal Acquisition Regulations), inaccurate hypothesis, and misleading statements. Many of TOP's inaccurate statements and hypothesis could have been resolved if TOP would have discussed its concerns with my staff or reviewed the evidential matter. As stated above, Region 6 staff reviewed and compiled approximately 10,000 pages of workpapers in developing the findings. These work papers provide the support for the conclusions reached. To our knowledge, no member of TOP visited Fort Worth and reviewed these workpapers before developing its report. The following picture shows the workpapers and other supporting documentation compiled and evaluated to meet the audit objectives and in preparing the report.

4



Quite frankly, I cannot see how a person "carefully examined the support" for each recommendation without reviewing the documents shown in the picture.

TOP's report misses the issues

TOP's report fails to recognize the problems cited in the findings or OIG's responsibility to report those findings to HUD. TOP's report as presented justifies and condones the actions of CVR Associates and former HANO executives. The report does not provide any recommendations for improvements but attempts to discredit the report and the auditors who prepared it.

In September 2004 after I submitted the draft, TOP could have processed this assignment consistent with other reports and drawn their conclusion. Given TOP's suggestions and my response, one would have expected some dialog. Mr. Heist could have informed me that he had concluded: "that there is no need for a formal audit report." Although this would not have pleased me, it would have saved a tremendous amount of time. Staff could have moved to new assignments and working towards meeting the Region's goals. Because of the uncertainty and lack of professionalism by TOP, two of my top auditors have been effectively benched for over 3 months.

TOP creates prohibited words

In its report, TOP cites both the Audit Operations Manual and Government Auditing Standards to support their opinion that the CVR Associates draft report contained "biased words." Audit standards require us to put the audit evidence and conclusions in a perspective to provide the reader with the extent and significance of the conditions, causes, and effects while providing HUD with persuasive motivation to take action. The words used in the reports are measured based upon the evidential matter. A balanced report neither overstates conditions, causes, or effects; nor should it understate them.

5

TOP's report did not define the criteria used to classify words as biased.  As written, TOP's report indicates the words would always be biased, and therefore, would be inappropriate in any audit report, correspondence, or workpaper.  If this is the case, then TOP needs to list all the prohibited words in the Audit Operations Manual.  However, some of the words TOP identified are part of the "boiler plate" language in the Report Template.  Field staff should not have to guess what TOP thinks will be biased on a particular day.  Further, I think this puts OIG in a precarious position if it was ever disclosed that the OIG was prohibited from using such words as "abusive" or "wasteful spending" since our mission as stated in the Inspector General Act is to prevent and detect fraud, waste, and abuse.

Report poorly prepared

TOP's report is undated, unaddressed, unsigned, lacked a letterhead, used unidentified acronyms, and used an unusual format to convey results of a review.  The report did not cite the standards used to evaluate the CVR Associates draft report.  The Audit Operations Manual provides no insight to this type of report or review.  As written, the standard used seems to be an anonymous personal standard unlikely to be met no matter what evidence was provided.  To my knowledge, TOP did not document its work including all discussions and information reviewed or the time it spent in reviewing and preparing this report.  This would not be acceptable for other divisions and regions of OIG.

**Summary**

TOP's report was based upon inaccurate information and hypotheses.  TOP did not:

- Communicate specific concerns directly
- Develop its report with consultation of staff, or
- Review a significant amount of the workpapers.

Considering the emails sent by TOP officials and Mr. Heist, TOP's report gives the appearance of predetermined conclusions.  Regardless of TOP's conclusions, the Region staff involved in reviewing and summarizing CVR Associates and developing the findings conducted themselves professionally and produced an objective, quality, and accurate report.  The use of pictures, invoices, correspondence, and tables aided in the presentation of the facts and persuasiveness of the audit conclusions.  I believed the report would be a model for future reports.  The staff did not deserve this unwarranted assault on their integrity, objectivity, or professionalism.  Mr. Heist and TOP's report negatively affected the morale of the staff.  Professionals will not choose to work for an OIG where their best efforts to develop quality, accurate, and objective reports are subverted by another division of the organization using inaccurate information and working clandestinely to discredit them.

**Recommendations**

I would recommend that due to the problems cited with Mr. Heist and TOP's conclusions and report that it would be rescinded with prejudice.  Despite the delays caused by Mr. Heist and

TOP, the CVR Associates draft report is salvageable.  I would recommend that the report go through standard editing and issued in draft form so that HUD can be made aware of the findings cited in the report.  It will be up to HUD on how to proceed on the findings and recommendations.

Lastly, this has taken a toll on my life and the lives of staff members in this Region so I would ask that you mediate a discussion between Mr. Heist and myself in order to establish some civility and professionalism between us.  Headquarters and field staffs need to respect and trust each other to effectively and efficiently meet the goals of OIG.  This respect and trust will not be cultivated if field staff believe that headquarters is out to get them.

I appreciate this opportunity to address my concerns to you and pray that you realize how difficult a decision this was for me.  In the end, I could not let Mr. Heist and TOP through unprofessional behavior and personal reasons harm the careers and creditability of my staff.