# PLAINTIFF'S EXHIBIT 11

U.S. Department of Housing and Urban Development
# Office of Inspector General
451 7th St., S.W.
Washington, D.C. 20410-4500
October 20, 2004

MEMORANDUM FOR:   James Heist, Assistant Inspector General for Audit, GA

FROM:   Bryan Saddler, Counsel to the Inspector General, GC

SUBJECT:   Draft Audit Re: Housing Authority of New Orleans and CVR Associates, Inc.[1]

This responds to your request for a legal opinion of September 19, 2004, which poses questions regarding a draft audit[2] of CVR Associates, Inc. (CVR), a contractor for the Housing Authority of New Orleans (HANO). We have reviewed various materials in providing this opinion, including HANO-CVR contracts, the draft audit, a HUD-HANO cooperative endeavor agreement, a request for proposals and CVR's response thereto, applicable regulations, and other relevant documents. Assistant Counsel Brian Baker also traveled to Fort Worth and conferred with audit staff on September 29, 2004 regarding this matter. Our conclusions are set forth below.

## I.   Background

In 1996, HUD and the City of New Orleans entered into a cooperative endeavor agreement (CEA) to improve HANO.[3] Under the CEA, Kevin E. Marchman ("Marchman"), then HUD's Acting Assistant Secretary for Public and Indian Housing, joined HANO's Board of Commissioners.[4]

The next year, Marchman approved HANO's hiring of CVR, a for-profit company, as a real estate asset management consultant.[5] CVR's proposal listed personnel who would perform

---

[1] This is an opinion of the Counsel to the Inspector General and does not represent the official legal position of the Department of Housing and Urban Development (HUD). The Office of General Counsel (OGC) is responsible for issuing opinions that set forth HUD's official legal position. If you desire HUD's official legal position, then you may request the same from OGC.

[2] This Opinion does not address a revised audit dated October 4, 2004.

[3] See generally CEA.

[4] CEA § A(5).

[5] Draft Audit at 49.

the work, and suggested a fee structure.[6] The contract does not mention the proposal's list of personnel, but bars CVR from unilaterally reassigning "key personnel" identified in "Schedule I" to the contract.[7] The contract also does not mention the proposal's suggested fee structure, but states that "Schedule II" sets hourly rates by which, and allowable costs for which, CVR would be compensated.[8] No parties possess a copy of either schedule, and there is no evidence that they ever existed. The contract was amended on August 7, 1998 to reflect that "Exhibit C" provides hourly rate and expense information,[9] but no document has been identified conclusively as Exhibit C.

CVR used subcontractors for most contract work, and billed HANO for amounts greater than what it paid them.[10] CVR did not provide HANO with third-party invoices.[11]

Marchman resigned from HUD and HANO in 1998.[12] CVR paid Marchman $54,510 for various services performed in 1999, including $20,000 on July 12, 1999 for "application preparation services" rendered on a HANO transaction.[13]

## II.    The OIG Cannot Act Against CVR for Failing to Adhere to Cost Principles Cited in Finding 2,[14] But Action May Be Possible Under Other Cost Principles.

Federal cost principles govern cost allowability under federal awards. For-profit organizations may recoup costs from award funds if the costs are allowable under cost principles found in the Federal Acquisition Regulation (FAR), 48 C.F.R. Part 31.[15] CVR is a for-profit corporation, and thus CVR's costs are subject to the FAR in pertinent part. If CVR's costs are unallowed under the FAR, the OIG may act against CVR on this basis.

Unfortunately, the draft audit does not analyze CVR's spending using the FAR. The draft audit indicates at Finding 2 that CVR's billings for personnel compensation may violate

---

[6] CVR Proposal § V; p.28.

[7] Contract ¶ 1.4.

[8] Id. ¶ 3.1.

[9] 8/7/98 Amendment at 2.

[10] Draft Audit at 15-16.

[11] Id. at 18.

[12] Id. at 49.

[13] Id. at 49-50.

[14] Finding 2 cites cost principles found in OMB Circular A-87. While HANO claims for reimbursement under federal grants would be analyzed appropriately under A-87, we do not believe CVR's claims may be analyzed under A-87 for the reasons discussed herein.

[15] 24 C.F.R. § 85.22(b). These cost principles are reproduced in HUD Handbook 2210.18 at Appendix I.

"federal cost principles," but cites OMB Circular A-87 instead.[16] A-87's cost principles govern "allowable costs incurred by State, local and federally-recognized tribal governments" under federal awards.[17] These cost principles also apply to subawards unless awarded to "commercial organizations."[18] A-87 does not define the term "commercial organization," but presumably a for-profit corporation qualifies. A-87 probably may be used to judge HANO's personnel spending, because it is a governmental organization, but it cannot be used to judge CVR's personnel spending because CVR is a commercial – i.e., for-profit, non-governmental – organization. We recommend therefore that the draft audit be revised to analyze CVR's personnel spending (and all other costs) under the FAR. We would be glad to examine a revised draft to assess whether a basis for action against CVR exists under the FAR. Until then, analysis of whether Finding 2 correctly interprets "federal cost principles" would be premature.

### III. Public Housing Authority Contractors Are Not Subject to Travel Regulations in OMB Circular A-87.

Finding 3 mistakenly analyzes CVR's travel costs using A-87.[19] As discussed above, A-87 does not apply to CVR. CVR's costs must be analyzed under the FAR because CVR is a for-profit organization. The FAR sets rules for determining allowable travel costs incurred by for-profit organizations.[20] We recommend therefore that the draft audit be revised to analyze CVR's travel costs under the FAR.

### IV. HUD-OIG Probably Cannot Prevail Against CVR For Substituting Personnel.

Even if Schedule I incorporated the proposal's personnel list – which cannot be confirmed – CVR is not bound by it. HANO consistently paid CVR for work performed by persons other than those listed in the proposal. A court hearing this matter would likely conclude either that HANO waived its right to object to CVR's unilateral personnel substitutions long ago, or that HANO has an absolute right to waive that right now. We recommend therefore that this issue not be pursued further.

### V. The IRS Need Not Be Consulted Regarding Worker Classification.

We have no position on whether the OIG should consult the IRS regarding CVR's possible misclassifications of subcontractors. Finding 2 offers no evidence that CVR actually violated the purported worker classification standards alluded to therein.[21] Even if CVR

---

[16] Draft Audit at 16 n.22.

[17] OMB Circ. A-87, Attach. A § A(1).

[18] Id. Attach. A §§ A(3)(a), (b).

[19] Draft Audit at 28 n.35, citing OMB Circ. A-87, Attach. B § 41.

[20] See HUD Handbook 2210.18 Attach. 1 § 31.205-46, "Travel Costs."

[21] Draft Audit at 19. The draft audit asserts criteria the IRS reportedly uses to classify workers, but cites no source for the criteria.

misclassified subcontractors, it is unclear how this bears on HANO or HUD. Unless evidence not presented in the draft audit demonstrates that such misclassification falls within the OIG's authority, we find no pressing reason to consult the IRS on this issue other than to foster comity between agencies.

### VI. While Finding 4 Offers No Strong Basis for Action Regarding Inappropriate Charges, An Alternate Theory Should Be Explored in Subsequent Drafts.

Finding 4 does not present a solid basis for action against CVR for inappropriate charges. Finding 4 implies that CVR breached the contract by claiming unallowable costs. Finding 4 states that the "Expenses by Task" spreadsheet attached to the contract "is the only basis for determining the intent of the contract with regard to price or cost."[22] Because the spreadsheet does not mention various CVR charges,[23] Finding 4 indicates that they were unallowable.[24] This position is flawed. Not only does Finding 4 disregard the FAR, which governs cost allowability, no one knows who prepared the spreadsheet, the contract does not mention the spreadsheet, and it lacks detail to suggest that the parties created it to reflect agreement on allowable costs. We do not recommend proceeding with a breach claim based on the spreadsheet.[25]

Although Finding 4 does not present a strong breach theory, this does not mean that no other theory could succeed on these facts. Fort Worth audit staff has volunteered an alternate theory to avoid difficulties presented by Schedule II's absence.[26] The contract provides that

> [f]or purposes hereof, 'allowable costs' shall include reimbursement by HANO to [CVR] based upon third-party invoices provided by [CVR] to HANO, of the *reasonable costs and expenses incurred in performing its services* pursuant to this Agreement[.][27]

They argue that many of CVR's expenses are unrelated to its contractual duties, and are therefore unreasonable under the contract. If an expense is wholly unrelated to CVR's consulting work – for example, billing HANO for a manicure – this argument might have merit. Such merit may be weakened if HANO regularly paid CVR for expenses unrelated to work, because CVR could

---

[22] Draft Audit at 33.

[23] Contract at attachment.

[24] Draft Audit at 33-34.

[25] Finding 4 also maintains that CVR's spending violated its fee proposal, which states that CVR is "very conscious of keeping overhead cost low and maximizing the resources in technical assistance." Draft Audit at 34. The contract does not appear to incorporate CVR's fee proposal expressly or impliedly. Its mention in the draft audit arguably does little more than cast CVR in a bad light. We therefore do not recommend asserting it in support of a breach claim.

[26] Fort Worth audit staff relayed this theory to Assistant Counsel Baker during his September 29 visit.

[27] Contract ¶ 3.2 (emphasis added; edits for clarity).

credibly argue that HANO waived its right to object. We recommend that subsequent drafts explore this theory in detail. We would be glad to evaluate its legal sufficiency at that time.

**VII.    Finding 6's Marchman Discussion Should Be Pared Down Significantly.**

Much of Finding 6's discussion of whether Marchman violated Louisiana law is extraneous and should be purged. The law is simple: former public board members cannot work for pay on transactions involving their old agency for 2 years, even if they had not been involved in that transaction while with the agency.[28] CVR paid Marchman for "application preparation services" on a HANO matter within the 2-year window.[29] If true, these allegations are sufficient to establish that Marchman violated Louisiana law, and further action may be warranted.

Finding 6 nevertheless explores points that do not bear upon whether Marchman worked for pay on a HANO transaction within the 2-year window. These include, but are not limited to, whether CVR enjoyed a "decade long relationship with Marchman,"[30] whether HANO's counsel advised Marchman of its ban on contracting with former employees,[31] and whether HUD exonerated Marchman of federal ethics violations.[32] These points are irrelevant to whether Marchman violated the Louisiana law at issue. We recommend therefore that the Marchman discussion focus only on facts relevant to the Louisiana law, regardless of whether those facts support or weaken a potential case against him under that statute.

**VIII.    Conclusions**

For the reasons discussed above, the draft audit should be revised as follows: (1) to reflect proper application of the FAR; (2) to explore the alternate breach theory described above; and (3) to pare down Finding 6's Marchman discussion. We do not recommend further action concerning personnel changes or subcontractor classifications. If you have any questions concerning this Opinion, or if you require additional assistance, please call Assistant Counsel Baker or myself at 202-708-1613.

---

[28] La. R.S. 42:1102(3), 1121(A)(1).

[29] Draft Audit at 49-50, and Table 7.

[30] Id. at 49.

[31] Id. at 51.

[32] Id. at 51, n.54. We recommend that Footnote 54 be deleted. HUD has never ruled upon whether Marchman's activities violate federal law. At most, counsel in a regional HUD office offered an informal, unwritten opinion on the issue. This does not constitute HUD's considered judgment on the matter. Even if it did, whether Marchman violated federal law is irrelevant to whether he violated state law. For these reasons, the footnote should be deleted.