# PLAINTIFF'S EXHIBIT 15

EXHIBIT F3

AFFIDAVIT

WASHINGTON, DC

I, James A. Heist (DOB: June 8, 1954), Assistant Inspector General for Audit (ES-511), Office of Audit, Office of Inspector General, HUD, make the following statement freely and voluntarily to Charlester Williams, who has identified himself to me as a Contract EEO Investigator for the following federal agency: HUD, investigating a complaint of discrimination filed by D. Michael Beard, knowing that this statement may be used in evidence. I understand that this statement is not confidential and may be shown to the interested parties (those with a legal right to know). I solemnly swear or affirm the following, to the best of my knowledge or belief, my responses to the following questions:

Q. Please explain your organizational relationship to the Complainant as of January 1, 2005, that is when he still served as the Regional Inspector General for Fort Worth, Texas. Were you in his supervisory chain, please explain?

A. I was the complainant's second level supervisor.

Q. At the time the Complainant was reassigned out of his aforementioned position were you aware of his involvement in the EEO hearing regarding Tighe vs. Cuomo. What did you understand his involvement in that matter to be. How did you come to know the Complainant was involved in the case. Was the Complainant's deposition testimony in the above-stated case made the subject of discussions by the Inspector General and senior members of her staff, including yourself. What was the substance of those discussions?

A. I was aware that the complainant was involved in an EEO hearing regarding Tighe vs. Cuomo. My only knowledge of the complainant's involvement was that he gave a deposition in that case. I do not know any of the substance of that deposition. I was not a party in that matter and was made aware of the complainant's involvement in that matter by the complainant himself. I never discussed the Complainant's deposition testimony in the above-referenced case with the Inspector General or senior members of his staff, nor was I ever at a meeting with the Inspector General or senior members of his staff where the

Initials 





complainant's deposition testimony in the above stated case was made the subject of discussions.

Q. Was the Complainant given a directed reassignment from the position of Regional Inspector General for Fort Worth, Texas. Who directed his reassignment. What was your involvement in such matter. What role did Mike Phelps play in this matter?

A. The complainant was given a directed reassignment to a special assistant position in Headquarters. I signed the order informing the complainant of this reassignment via a memorandum dated January 5, 2005 (See Attachment 1). Mr. Phelps was present when I presented the January 5, 2005 memorandum to the complainant in person on that same date. Mr. Phelps consulted with me on the matter. Mr. Phelps was the complainant's immediate supervisor prior to the reassignment and continues to be the complainant's immediate supervisor.

Q. Did your knowledge about the Complainant's protected EEO activity play any part in the decisions you reached and actions you took regarding the Complainant's directed reassignment?

A. No.

Q. The Complainant argues that you reassigned him to a position in Washington DC that did not exist prior to his arrival, that did not have a position description and did not have any duties for him to perform. He stated he did not even have an office upon his arrival. Please address with specificity the Complainant's assertions?

A. The complainant was reassigned to a Special Assistant position that had a previously established position description (See Attachment 2). The complainant was assigned a workstation upon his arrival, as there were no vacant private offices available in the Office of Audit's Headquarters space. Upon the complainant's acceptance of the directed reassignment, Mr. Phelps initiated the normal process with the Department to have a private office facility constructed for the complainant. The actual construction is pending as of this date, and the construction schedule and completion of the private office is the responsibility of the Department (not OIG).

Initials 

Q. Why was the Complainant reassigned out of his position of the Regional Inspector General for Fort Worth, Texas? Please explain in detail the reasons for the reassignment, while providing witnesses and documents that support the need for the reassignment. Please explain how the supplied documents support the reason for the reassignment?

A. The Inspector General and I lost confidence in the complainant's ability to manage the regional audit office in compliance with outstanding office policies and auditing requirements. In that regard, many of his work products lacked credibility and either had to be significantly revised or the assignments were closed with no issued audit report. I informed the complainant that he was being reassigned for the efficiency of the Federal service and verbally communicated the reasons that he was being reassigned, including the matters discussed below. All of the issues had been previously raised from time to time with the complainant:

- The complainant had a history of applying laws and regulations incorrectly in draft findings and not seeking advice from OIG's Legal Counsel in interpreting complex legal issues. Consistent with the requirements of the Government Accountability Office's *Government Auditing Standards*, my Headquarters staff or I had to seek advice on legal issues from OIG's Legal Counsel when the complainant should have done so to resolve those issues. In some cases, had those issues been timely addressed by the complainant, OIG could have avoided spending months of unproductive audit staff work.

- The complainant did not communicate issues with HUD program officials including proposed findings in a timely manner and in accordance with our audit policy manual. The complainant or his staff should have resolved issues long before draft reports were submitted for Headquarters review. Obtaining the views of responsible HUD officials is not only set forth in our audit policy manual, but is required by *Government Auditing Standards*.

- Even after receiving the Headquarters staff, HUD-OIG Legal Counsel's or my comments on draft reports, the complainant did not adequately address those comments in revised work products.

Initials [signature]

- The complainant's draft audit reports included unsupported conclusions and/or inappropriate language such as unwarranted adverbs/adjectives that injected biased criticisms. Use of such language has no place in an audit report and is contrary to *Government Auditing Standards.*

- The complainant did not timely or adequately address a personnel problem nor bring that matter to the attention of Mr. Phelps, his supervisor, in a timely manner. An auditor in the New Orleans Office had performance and conduct problems for several months before Mr. Phelps and I were made aware of them. When we were finally told of the problems, they had escalated to the point that her supervisor was proposing an adverse action and the employee ultimately resigned. An OIG Staff Bulletin was issued in October 2003 directing that such problems must be immediately reported to Headquarters. This policy was not adhered to. Further, the complainant also advanced sick leave to the employee without my approval as required by OIG policy. The employee was allowed to telework in an uncontrolled manner for 6 months without a signed pre-approved agreement, contrary to OIG policy.

- The Technical Oversight and Planning Division, its predecessor organization, and my experience with the complainant since my tenure as Assistant Inspector General for Audit has been that we needed to spend an inordinate amount of time dealing with the complainant's work products, compared to other regions. Also, the complainant's staff sometimes displayed an antagonistic attitude toward and frequently argued with Technical Oversight and Planning staff, Mr. Phelps and me.

A separate document was not prepared with regard to the rationale behind the decision to reassign the complainant. The underlying "support" relating the above stated reasons are reflected in numerous pieces of correspondence, legal opinions, Emails and meetings with the complainant and his staff spanning a 3-year period. Compiling, reproducing and explaining the context of these documents would take several weeks and could not be accomplished in time to include in this statement. However,

Some of the matters where I had disagreements with the complainant were raised by the complainant himself in a letter dated April 25, 2005, to the Chairman and Ranking Member of the U.S. House of Representatives, Committee on Government Reform. (See Attachment 3). That letter was transmitted by the Chairman to the Inspector General on July 20, 2005 (See Attachment 4) and received by the OIG on August 1, 2005. The Inspector General's response dated August 15, 2005 explains in great detail the specifics behind many of the concerns the Inspector General and I had with the complainant (See Attachment 5).

Q. The Complainant represented that he was advised by you that he was being reassigned because management did not like how he was running his region. He argues that this representation made no sense given that his performance appraisal for that year showed that his region had ranked fifth out of the thirteen regions and had reported 109 million in questioned costs. The appraisal also noted that his office was well known for its camaraderie and ability to produce, that he created an atmosphere where people like to work. Also, for the current rating period, he was given a Special Achievement for updating the Auditor Appraisals for the entire Office of Audit nationwide. The Complainant argued that all of the above made clear that his region was being well run and made specious management's asserted reason for the reassignment. Was the Complainant being reassigned because of management's dissatisfaction in how he was running his region. If so, please address the Complainant's argument that the above appraisal matters and accolades do not speak to his failure to properly run his region. In addressing this argument, please speak to:

1. Complainant's region had ranked fifth out of the thirteen regions and had reported 109 million in questioned costs for the performance year involving his reassignment.

2. Complainant's office was well known for its camaraderie and ability to produce as noted in the appraisal

3. Appraisal noted the Complainant created an atmosphere where people like to work.

4. For the rating period in question, the Complainant was given a Special Achievement for

Initials 

updating the Auditor Appraisals for the entire Office of Audit nationwide.

A. The reasons for the complainant's reassignment are noted in my answer to the previous question. The action was unrelated to the complainant's performance rating, which was "successful" for the rating period of February 1, 2004 to January 31, 2005. When I informed the complainant on January 5, 2005 of his directed reassignment, I informed him that the reassignment action was unrelated to his performance rating.

Q. Please address with specificity the Complainant's following argument? "There is no history of management ever telling me that there was anything wrong with my region. My mid-year evaluation that was due in August 2004 was never given to me. Mr. Heist at the January 2005 meeting informed me that my performance was satisfactory?

A. See my response to the preceding question. At the January 5, 2005 meeting referenced in my answer to the preceding question, I informed the complainant that his performance rating for the rating period of February 1, 2004 to January 31, 2005 would be "successful." I also explained that Mr. Phelps had been deferring the complainant's midterm progress review until completion of a review by my headquarters staff of the CVR Associates audit assignment, but that was overcome by events and the progress review would not be completed.

Q. Speaking to why the Complainant believes his directed reassignment was retaliation for his prior EEO activity, the Complainant makes the following argument?

"I feel that this is retaliation because Mr. Stephens also removed a GS-15 from her position after having brokered a settlement for the employee's EEO complaint against Mr. Heist and Mr. Phelps. The employee Saundra Elion had her complaint settled by Mr. Stephens. She was later removed from her supervisory position and placed in a previously non-existent nonsupervisory position. Mr. Stephens took the same action against Ms. Elion's deputy, Donna Hawkins. He reassigned her from a supervisory position to a nonsupervisory position after she filed an EEO complaint against Mr. Heist and Phelps. Mr. Stephens also removed Mr. Dan Salas from his supervisory position to a previously nonexistent nonsupervisory position after he filed an

Initials 

> EEO complaint against Mr. Stephens. So, a pattern exists of Mr. Stephens taking retaliatory action against high ranking auditors who file EEO complaints against Mr. Heist and Mr. Phelps. It is because of this pattern and because there is no evidence of my inability to run the region that leads me to believe retaliation played a part in my directed reassignment from a supervisory position where I supervised 27 employees throughout a five state region retaliation to a previously non-existing non-supervisory position that was not commensurate with my experience and background."

Please address this argument with specificity. In doing so, please explain whether you ever served in the supervisory chain of Saundra Elion, Donna Hawkins, and Dan Salas. Did any of these individuals file EEO complaints against you or Mr. Phelps. Were any of these individuals involuntarily reassigned. Did their reassignments have anything to do with their EEO complaint activity against yourself or Mr. Phelps. Why were these individuals reassigned and please provide documentation supporting the need for their reassignments.

A. Mr. Salas is not an Office of Audit employee and not in my chain of command. I, therefore, have had no involvement and therefore cannot speak to any personnel action involving Mr. Salas. To my knowledge, Mr. Salas has not filed an EEO complaint against Mr. Phelps or me.

I am currently Ms. Elion's immediate supervisor and have been her immediate supervisor since May 2004. From March 2001 to May 2004, I was her second level supervisor.

Ms. Hawkins has been in my supervisory chain since March 2001. Ms. Elion was her first or second level supervisor until April or May 2004, when Ms. Hawkins was transferred to the Technical Oversight and Planning Division.

I was named in EEO complaints filed by Ms. Elion and Ms. Hawkins against HUD.

Ms. Hawkins and Ms. Elion were part of the former Capital District Office within the Office of Audit. The Capital District was originally established, prior to my tenure as Assistant Inspector General for Audit, to perform audit work in the Washington, DC metropolitan area,

Initials 

including audits of HUD program participants and HUD offices in HUD headquarters. The Department of Housing and Urban Development (HUD or "the Department") divided the United States into ten regions[1]. The Department did not have a separate Capital District (or regional) office; rather, the Department's Washington, DC field office reported to the HUD Region 3 office in Philadelphia. PA. Prior to the creation of HUD-OIG's Capital District, audits of HUD program participants in the Washington, DC metropolitan area had been under the primary jurisdiction of the HUD-OIG Region 3 office in Philadelphia, PA. The Office of Investigations also had a Capital District office. The two OIG offices (Audit and Investigations) were HUD-OIG's eleventh district office, and HUD-OIG's structure failed to align with the organizational structure of the Department, which had ten regions. In late 2001, I recommended to then Acting Inspector General David Williams that the Office of Audit's Capital District office be disbanded. The majority of the Capital District's workload had been in HUD Headquarters, and it therefore was logical to have that office located in the HUD Headquarters building. This also allowed our Region 3 office in Philadelphia, PA to assume primary responsibility for non-HUD Headquarters audits in the Washington, DC Metropolitan area and align our field organizational structure with the Department. Mr. Williams approved my recommendation and the reorganization was completed around May 2002. My communications with Mr. Williams relating to this reorganization were verbal and there was no written document prepared. None was deemed necessary. Ms. Elion and Ms. Hawkins were reassigned to positions in the Headquarters Audits Division that were similar to those in the Capital District Office with essentially the same position descriptions.

In April 2004, I recommended, and Deputy IG Stephens approved disbanding the Headquarters Audits Division. Ms Elion was the Director of the Headquarters Audits Division and was reassigned to a Special Assistant position reporting to me. Ms. Hawkins was Assistant Director of the Headquarters Audits Division and was reassigned to the Technical Oversight and Planning Division. My reasons for

---

[1] There was a period of time when HUD did not refer to its 10 major geographic jurisdictions as "regions." During this time HUD-OIG referred to its major geographic jurisdictions as "districts." For purposes of this statement, the meaning of "region" and "district" are the same, that is, a major geographic jurisdiction, which for OIG's Office of Audit, was headed by a GS-15 Supervisory Auditor.

recommending disbanding the Headquarters Audits Division and the resulting reassignments were set forth in my memorandum dated April 20, 2004 (See Attachment 6).

None of the above referenced actions or resulting reassignments were in any way related to or resulting from any EEO complaint activity against Mr. Phelps or myself.

Q. Please detail all of the employees under your supervisory umbrella that you have involuntarily reassigned. For each employee, please provide their date of birth and whether the employee ever filed an EEO complaint against you or Mr. Phelps?

A. In addition to the complainant, Saundra Elion and Donna Hawkins, below is a list of employees within the Office of Audit who have been involuntarily reassigned since March 2001, when my tenure as Assistant Inspector General for Audit began. I do not know the birth dates of the complainant, Saundra Elion, Donna Hawkins, or any of the individuals listed below. In addition to the complainant, as noted previously, Saundra Elion and Donna Hawkins have named Mr. Phelps and me in EEO complaints filed against HUD. Edward Bowles has filed an EEO complaint against HUD and named Michael Phelps in that complaint. To my knowledge, none of the other individuals listed below have filed an EEO complaint against Mr. Phelps or me:

Latesha Walters
Jacqueline Jimmerson
Sharon Brown
Seanna McGee
Karmel Smith
Kilah White
Pamela Collins
Mimi Lee
Edward Bowles
Herman Stewart

Q. Speaking to why the Complainant believes his age was a factor in the reassignment, the Complainant makes the following argument? "I am led to believe my age was a factor in the directed reassignment because I am eligible for retirement, a point emphasized in the involuntary reassignment memo given to me by Mr. Heist on January 5, 2005. Also, Mr. Heist had a problem with the fact that he is younger than me and he knows that the other Regional

Initials [signature]

Inspector Generals look to me for leadership in our organization because I am more experienced in operational auditing and participating in civil and criminal cases and congressional hearings." Please address this argument with specificity by indicating whether the Complainant's age factored into any of your decisions and actions.

A. There was no analysis of the complainant's age or retirement status performed in drafting the January 5, 2005 memorandum (see Attachment 1) nor was this at all considered as a factor in the decision. The language in the memorandum merely serves to advise the complainant of options that were available to him if he declined the reassignment. The memorandum did not make any statement about the complainant's retirement eligibility status. Rather, the memorandum stated in pertinent part, "...if you choose to decline reassignment and resign, or if you are involuntarily separated by the OIG for failure to accept this directed reassignment, you **may** (emphasis added) be eligible for retirement under the discontinued service annuity option upon approval by the Office of Personnel Management...." The memorandum went on to provide a point of contact for information on discontinued service retirement.

I have no "problem" with the complainant being older than I am. As to his statement that I know "...that the other Regional Inspector Generals look to me for leadership in our organization...." I am unable to make a judgment as to whether that is a true statement. As to our relative experience, I am unaware of any independent, objective comparison of our respective work experiences. What I can state factually in that regard is that the complainant indicated on a recent job application that he was promoted to the grade 15 level in the 511 job series (Supervisory Auditor) in October 1992. I was promoted to the grade 15 level in the 511 job series (Supervisory Auditor) in July 1990. I, therefore, have more than two more years of federal audit experience at the Grade 15 or higher level than does the complainant.

Q. The Complainant stated he applied for an SES position with the Department of Defense, Office of the Inspector General. According to the Selecting Official, Robert Reardon, the Complainant was the sole candidate referred to him by the selection panel. Mr. Reardon advised the Complainant that he was not selecting him because of a negative recommendation that he had received from Mr.

Initials 

Phelps. Were any assurances given by yourself, Mr. Stephens, or other managements officials that Mr. Phelps would not interfere with the Complainant's attempt to get a job elsewhere?

A. I do not believe such an assurance would be necessary.

Q. Were you aware of the negative job reference given by Mr. Phelps? Was the recommendation fair and accurate? Should it have been given? Did it have anything to do with the Complainant's EEO activity and age? Please explain.

A. Mr. Phelps informed me that he had received a telephone call from Mr. Reardon concerning a job that the complainant applied for. Mr. Phelps and I did not discuss any specific information about his conversation with Mr. Reardon.

I have read this statement, consisting of 11 pages, and it is true, complete, and correct to the best of my knowledge and belief.

x James A. Hunt
**Signature of Affiant**

8/19/05
**Date**

Signed and sworn to before me

on this 19 day of F, 2005,

at 'DC.

**Neutral witness, notary, or Investigator**

*PRIVACY ACT NOTICE TO EEO COMPLAINT INTERVIEW WITNESSES*

*FOR DISCRIMINATION COMPLAINT INVESTIGATION INTERVIEW*

## GENERAL

This information is provided pursuant to Public Law 93-579 (Privacy Act of 1974), December 31, 1974, for individuals supplying information for inclusion in a system of records.

## AUTHORITY

The authority to collect the information requested by affidavit, statement or other type of testimony is derived from one or more of the following: Title 5, Code of Federal Regulations, Sections 5.2 and 5.3; Title 29, Code of Federal Regulations, Section 1613/1614; Title 5, United States Code, Sections 1303 and 1304; Title 42, United States Code, Section 2000e-16; and Executive Order 11478, as amended.

## PURPOSES AND USES

The information you supply will be used along with data you supplied previously and information developed by investigation to resolve your equal employment opportunity discrimination complaint. This information may be furnished to designated officers and employees of agencies and departments of the Federal Government in order to resolve your equal employment opportunity discrimination complaint. The information may also be disclosed to any agency of the Federal Government having a working relationship with regard to Equal Employment Opportunity Commission activities, or to others for uses as published in the Federal Register.

## EFFECTS OF NON-DISCLOSURE

Disclosure of the information sought is voluntary; however, failure to furnish the information will result in a direction by the head of the agency, or his/her designated representative, to produce or provide such information as is available. Failure to provide the information at that time may result in the initiation of disciplinary proceedings against you up to and including removal. Applicants in such cases may be refused employment. Disclosure of information by present or prospective Government contractors is also voluntary, although failure to furnish the above requested information where the contract so provides may result in administrative sanctions, including disqualification to enter into a contract or termination of an existing contract.

Signature of Interviewer

8/19/05

Date

X James G. Hunt

Signature of Affiant

8/19/05

Date