**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| D. MICHAEL BEARD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-0756 (GK) |
| | ) | |
| ALPHONSO R. JACKSON, | ) | |
| Secretary, U.S. Dept. of Housing | ) | |
| and Urban Development, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**REPLY MEMORANDUM IN SUPPORT OF**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**I.    INTRODUCTION**

This Reply Brief, together with Defendant's Motion for Summary Judgment ("Def. MSJ" or "Opening Brief"), demonstrate that Defendant is entitled to summary judgment on all of Plaintiff's discrimination and retaliation claims.

Regarding Plaintiff's age discrimination claim, Plaintiff offers nothing other than his belief that he was discriminated against on the basis of age. He provides neither direct nor circumstantial evidence to establish a prima facie case that his age played a role in management's decision to reassign him to Washington, D.C. With respect to Plaintiff's retaliation claims, he concedes that he did not file any administrative complaints or otherwise engage in protected activity during 2003 or 2004. To overcome that two-year gap and create a causal connection between his 2002 protected activity and his reassignment, Plaintiff argues that there was ongoing reprisal during that time, and he failed to report it out of fear of further retaliation. Plaintiff's argument is unavailing because it is inconsistent with the Morgan case, and circumvents Title VII's reporting requirements in an attempt to mask an obvious deficiency

in his prima facie case. Plaintiff's other purported evidence is either immaterial or inadmissible; therefore, both of Plaintiff's attempts to establish causation fail. However, even if the Court finds that Plaintiff established a prima facie case of discrimination or retaliation, he cannot show that Defendant's reasons for the reassignment and the employment reference were pretextual. Lastly, although Plaintiff attempts to create genuine issues of material fact, Defendant's Reply to Plaintiff's Statement of Purported Genuine Issues demonstrates that the disputes Plaintiff manufactures are either immaterial, irrelevant, or inadmissible.

In sum, even interpreting the facts favorably for Plaintiff, his opposition is insufficient to establish either a prima facie case or pretext; therefore, summary judgment is appropriate in Defendant's favor.

## II.    STANDARD OF REVIEW

"To avoid summary judgment, the plaintiff [is] required to produce some ***objective evidence*** showing defendant's proffered reasons are mere pretext." Batson v. Powell, 912 F. Supp. 565, 578 (D.D.C. 1996), aff'd, 203 F.3d 51 (D.C. Cir. 1999) (emphasis added); Banks v. District of Columbia, 377 F. Supp. 2d 85, 89 (D.D.C. 2005) ("[W]holly conclusory statements for which no supporting evidence is offered need not be taken as true for summary judgment purposes.") (internal quotations omitted). Thus, "the issue [currently before this Court] is not 'the correctness or desirability of [the] reasons offered . . . [but] whether the employer honestly believes in the reasons it offers.'" Fischbach v. District of Columbia Dept. of Corr., 86 F.3d 1180, 1183 (D.C. Cir. 1996) (citing McCoy v. WGN Cont'l Broad. Co., 957 F.2d 368, 373 (7th Cir.1992); Pignato v. American Trans Air, Inc., 14 F.3d 342, 349 (7th Cir. 1994) ("It is not enough for the plaintiff to show that a reason given for a job action is not just, or fair, or sensible. He must show that the explanation given is a phony reason.")). "At this stage, if

[plaintiff] is unable to adduce evidence that could allow a reasonable trier of fact to conclude

that [defendant's] proffered reason was a pretext for discrimination [or retaliation], summary

judgment *must* be entered against [plaintiff]." Paquin v. Fed. Nat'l Mortgage Ass'n, 119 F.3d 23,

27-28 (D.C. Cir. 1997) (emphasis added).

Though Plaintiff might wish it otherwise, the employment discrimination statutes did not

transform federal courts into review boards for local employment decisions. "Title VII, it bears

repeating, does not authorize a federal court to become 'a super-personnel department that

reexamines an entity's business decisions.'" Barbour v. Browner, 181 F.3d 1342, 1346 (D.C.

Cir. 1999) (quoting Dale v. Chicago Tribune Co., 797 F.2d 458, 464 (7th Cir. 1986)). To the

contrary, a court "may not 'second-guess an employer's personnel decision absent demonstrably

discriminatory motive.'" Fischbach v. District of Columbia Dep't of Corrections, 86 F.3d 1180,

1183 (D.C. Cir. 1996) (quoting Milton v. Weinberger, 696 F.2d 94, 100 (D.C. Cir. 1982)).

## III.    ARGUMENT

### A.    Plaintiff Fails To Establish a Prima Facie Case Of Age Discrimination

As shown in Defendant's Opening Brief, the person selected to replace Plaintiff as the

RIGA of Region VI is the same age as Plaintiff. See Exhibit 6 (Heist Dep.) at 117:6-7; Exhibit 1

(Beard Dep.) at 79:1-3. This is undisputed. See Plaintiff's Statement of Genuine Issues

("Plaintiff's Statement") at 40-42. Since the person who replaced Plaintiff was the same age as

Plaintiff, he fails to show how he was disadvantaged in favor of a "substantially younger"

person. See O'Connor v. Consolidated Coin Caterers Corp. 517 U.S. 308, 313 (1996). Without

this requisite showing, the Court should find that Plaintiff has failed to establish a prima facie

case of age discrimination.

In a weak attempt to establish age-related animus, Plaintiff cites to the January 5, 2005

Memorandum, regarding the directed reassignment, in which he is notified of his options if he

chooses to decline it.  See Pl. Ex. 1 at 1.  The memorandum states in pertinent part the following:

> If you decline this reassignment, the OIG would have no choice
> but to initiate action to separate you for failure to accept directed
> reassignment.  However, if you choose to decline the
> reassignment, you may elect to resign in lieu of an involuntary
> separation.  Certain involuntary separations qualify an employee
> for a discontinued service retirement, including separations due to
> reassignments outside the commuting area when no mobility
> agreement exists such as in this case.  Therefore, if you choose to
> decline reassignment and resign, or if you are involuntarily
> separated by the OIG for failure to accept this directed
> reassignment, you may be eligible  for retirement under the
> discontinued service annuity option upon approval by the Office of
> Personnel Management.  If you would like further information
> regarding discontinued service retirement, you may contact . . .

See id.  Pl. Ex. 1 at 1.  From the foregoing, Plaintiff boldly asserts that "[i]t is clear that through

the directed reassignment the agency intended to force Mr. Beard to retire."  See Plaintiff's

Opposition at 39.[1]  Providing accurate information to Plaintiff regarding his options, including

but not limited to, retirement options, does not create intentional age discrimination.  In fact, the

substance of the memorandum was fully vetted, if not wholly drafted, by Human Resources and

the Bureau of Public Debt, which services HUD OIG personnel.  See Exhibit 2 (Phelps Dep.) at

48-49.  Mr. Phelps testified regarding the memorandum as follows:

> Q:      Mr. Phelps, with respect to Mr. Beard's reassignment to
>
>         Washington, did you consult - - with whom did you consult
>
>         in terms of HR, if at all, Human Resources?

---

[1] Plaintiff also provides that Ms. Elion was retirement eligible, however, as Defendant explains
in its Reply to Plaintiff's Statement of Purported Genuine Issues ("Reply to Plaintiff's
Statement") at Statement CCC, Ms. Elion's situation is different from Plaintiff's.  Ms. Elion and
all of her co-workers lost their positions when her division was disbanded.  Thus, she is not
similarly situated to Plaintiff and her allegations concerning alleged retaliation are irrelevant.

A:    I talked with our in-house people, which would have been

the Director of HR, and probably somebody else on her

staff.  I don't recall exactly.

Q:    Why did you do that?

A:    Because I would never make such a move without vetting it

with HR.  I also talked to HR in the Bureau of Public Debt,

who was our servicer [sic], for the same reason.  To put this

into place, you want to make sure that things are being

done officially.

See id. at 48:13 - 49:4.  In response to Plaintiff's question regarding the memorandum, Mr.

Phelps testified as follows:

Q:    So you got the form of the memo, I take it, and what was

required in there, from HR, BPD?

A:    You know, I can't recall exactly how that happened,

whether I talked to them and *they* drafted it, or whether Jim

[Heist] talked to them and *they* drafted it, subsequent to me

having discussions with him and getting back to him and

telling him what we talked about.

See id. at 56:8-19 (emphasis added).  Clearly, the January 5, 2005 Memorandum fails to

establish, directly or circumstantially, discriminatory animus on behalf of management.

Plaintiff's only other attempt to create the appearance of animus concerns the nature of

his new position.  Plaintiff provides that the new position (1) was non-supervisory, (2) had no

position description,[2] (3) had no defined duties or responsibilities,[3] and (4) had no permanent office upon his arrival. See Plaintiff's Opposition at 39. From these alleged circumstances, Plaintiff wants the Court to conclude that "[t]here can hardly be any doubt that these conditions were aimed at inducing Mr. Beard to resign. By imposing them, the agency exposed its true intention - - to force older employees out of the federal government." See id.

The conclusion about "inducing Mr. Beard to resign" seems to be confusing this case with one of constructive discharge, which it is not since Plaintiff still works for HUD OIG. The second conclusion, regarding the "true intentions" of the agency, rings of disparate impact, which is equally inapplicable to this disparate treatment case. Making conclusory allegations regarding the agency's intentions does not defeat summary judgment. See Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994). As Defendant explained in detail in its Opening Brief, HUD OIG management had numerous legitimate, non-discriminatory reasons for reassigning Plaintiff. See Def. MSJ at 7-13. Lastly, the conditions about which Plaintiff complains affected him *after* management decided to reassign him. Plaintiff's dissatisfaction with the condition of his new job is not evidence of intentional discrimination in the decision-making process and is, therefore, irrelevant.

In sum, Plaintiff offers no evidence of discriminatory animus in management's decision to reassign him to Washington, D.C.; therefore, Defendant's motion for summary judgment on this claim should be granted.

---

[2] But see Exhibit 6 (Heist Dep.) at 65:15 - 66:16 (Special Assistant position had a position description).

[3] But see Exhibit 2 (Phelps Dep.) at 15:21 - 16:7 (Plaintiff worked on core competencies).

**B.      Plaintiff Fails To Establish A <u>Prima</u> <u>Facie</u> Case of Retaliation**

Not surprisingly, Plaintiff devotes a large portion of his opposition creatively attempting

to establish a causal connection between his 2002 protected activity and the 2005 directed

reassignment.  <u>See</u> Plaintiff's Opposition at 21-27.  He must be creative because courts have

found far shorter time periods than the present case to be insufficient to establish an inference of

causation.  <u>Mayers v. Laborers' Health & Safety Fund of North America</u>, 478 F.3d 364, 369

(D.C. Cir. 2007) ("the eight- or nine-month gap between the final protected activity" and the

adverse action "is far too long"); <u>Buggs v. Powell</u>, 293 F. Supp. 2d 135, 149 (D.D.C. 2003)

(Seven months was too long to demonstrate a "causal connection"); <u>Garrett v. Lujan</u>, 799 F.

Supp. 198, 202 (D.D.C. 1992) (just under one year was too long to support an inference of

reprisal, also citing list of cases on causation); <u>see</u> <u>also</u> <u>Harley v. McCoach</u>, 928 F. Supp. 533,

542 (E.D. Pa. 1996) (nine months between the protected activity and the adverse action was too

great to support an inference of retaliation); <u>Woods v. Bensten</u>, 889 F. Supp. 179, 187 (E.D.Pa.

1995) ("courts generally hold that if at least 4 months pass after the protected activity without

employer reprisal, no inference of causation is created").

> [I]t is well established that the greater the time that elapses
> between the protected activity and the alleged acts of retaliation,
> the more difficult it is to justify an inference of causal connection
> between the two.  <u>See</u> <u>Saunders v. DiMario</u>, 1998 WL 525798 *4,
> *5 (D.D.C.1998) (plaintiff failed to establish a causal nexus
> necessary for retaliation claim where the allegedly retaliatory non-
> hiring occurred eight to ten years after his filing of an EEO
> complaint); <u>accord</u> <u>Dowe v. Total Action Against Poverty</u>, 145 F.
> 3d 653, 677 (4th Cir. 1998) (a seven-month time lapse "negates
> any inference that a causal connection exists between the filing of
> an EEO complaint and plaintiff's termination"); <u>Harris v. Rector</u>
> <u>Bd. of Visitors of UVA</u>, 1996 WL 199551, *2 (4th Cir. 1996)
> (district court properly dismissed retaliation claim where
> complaints occurred thirty-five months prior to employee's
> declined appointment of a new position); <u>Clark v. Chrysler Corp.</u>,

> 673 F. 2d 921, 930 (7th Cir. 1982), <u>cert</u>. <u>den</u>., 459 U.S. 873 (1983)
> (absent other evidence of causation, a sufficiently great lapse of
> time warrants judgment for the defendant as a matter of law on
> retaliation claim). This Court has held that a lapse of even eight
> months between the filing of an EEO charge and the alleged
> retaliatory action can negate an inference of retaliatory motive.
> <u>See</u> <u>Townsend v. Washington Metropolitan Airport Authority</u>, 746
> F. Supp. 178, 187 (D.D.C. 1990); <u>see</u> <u>also</u> <u>Devera v. Adams</u>, 874
> F. Supp. 17, 21 (D.D.C. 1995) (eight-month lapse between
> plaintiff's discrimination charge and employer's letter of
> insubordination is not strongly suggestive of a causal link); <u>Dhuria
> v. Trustees of UDC</u>, 827 F. Supp. 818 (D.D.C. 1993) (granting
> judgment as matter of law to defendant on a retaliation claim
> because of the time lapses between filing EEO complaint and
> receiving poor classroom teaching evaluations).

<u>Kilpatrick v. Riley</u>, 98 F. Supp. 2d 9, 16 (D.D.C. 2000).

Clearly, the two-year gap between Plaintiff's protected activity and the directed reassignment is too long to establish a causal connection. To get around this insurmountable hurdle, Plaintiff cobbles together a totality-of- the-circumstances argument, alleging ongoing, ***unreported***, retaliation supposedly occurring in 2003 and 2004. <u>See</u> Plaintiff's Opposition at 25-26. This tactic of mixing the reporting requirements of a hostile work environment claim (which Plaintiff is not asserting), with a retaliation claim, is inconsistent with <u>National Railroad Passenger Corporation v. Morgan</u>, 536 U.S. 101 (2002). <u>Morgan</u> explained that each "incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'" <u>Id</u>. at 114. Hostile environment claims, on the other hand, are "different in kind from discrete acts." <u>Id</u>. at 115. "Their very nature involves repeated conduct." <u>Id</u>. <u>Morgan</u> recognized two types of disparate treatment claims: claims of discrete acts, which are assessed and analyzed separately and individually, and claims of "repeated conduct," in the form of hostile environment claims. Hostile environment claims are the claims which may be "based on the cumulative effect of individual acts." <u>Id</u>. at 115.

Morgan did *not* recognize Plaintiff's convoluted hybrid form of claim, alleging repeated

instances of retaliation which do not rise to the level of a hostile environment, but which in the

aggregate, purportedly constitute a material adverse employment action.  Indeed, such a theory is

simply inconsistent with Morgan's rejection of the "continuing violations doctrine" or a "serial

violations" claim.  Id. at 114.  See also Mayers v. Laborers' Health & Safety Fund of North

America, 478 F.3d 364,368 (D.C. Cir. 2007) (failure to accommodate claim time-barred due to

Morgan's requirement for timely exhaustion of discrete acts of discrimination).

Accordingly, since Plaintiff's claimed wrongs occurring in 2003 and 2004 are *not* the

basis for the instant complaint, they cannot be aggregated here to fill in for a causal connection

in Plaintiff's prima facie case.  Because Plaintiff has not pled a hostile work environment claim,

he cannot rely on the elements of that cause of action, in which repeated conduct (of which

Plaintiff never complained) is a part of the prima facie case.  See Morgan, 536 U.S. at 115.

Equally unavailing is Plaintiff's argument that he failed to report retaliation during 2003

and 2004 because he feared further retaliation.  See Plaintiff's Opposition at 26.  Here again,

Plaintiff is trying to explain away the absence of a causal connection between his 2002 protected

activity and his directed reassignment.  To accept Plaintiff's argument would mean that he, and

all future plaintiffs, could simply ignore Title VII's reporting requirements by claiming that they

feared future retaliation.  See 42 U.S.C. § 2000e-5(f)(1) (A plaintiff who claims a Title VII

violation must file an administrative claim with the EEOC to allow the agency time to act on the

alleged violation).  Plaintiff was silent for two years; he cannot now fill in that gap ex post facto

by claiming that he failed to report retaliation because he feared retaliation.

Plaintiff not only fails to connect his EEO activity with his reassignment using his own

experience, but also fails to establish causation by relying upon the experience of others.  For

example, Plaintiff attempts to bolster his deficient prima facie case by relying on the experience

of Nancy H. Cooper, Saundra Elion, and Austin Groom.[4]  See Plaintiff's Opposition at 27-31.

Regarding Ms. Cooper, Plaintiff essentially alleges that her Region behaved similarly with

respect to Headquarters as did Region VI, yet she did not suffer an adverse employment action.

See id. at 27-29.  Plaintiff can proffer no evidence that Ms. Cooper had first-hand knowledge of

all the work product and the communication that flowed between Region VI and Headquarters.

Therefore, Ms. Cooper is speculating that she and Region IV behaved similarly to Plaintiff and

Region VI.  Certainly, there is nothing in Ms. Cooper's declaration, as there is in Mr. Nixon's

deposition and elsewhere, to suggest that she or her Region's audit staff used offensive language

towards TOP, or continued to argue changes once ordered to make them by Mr. Heist.  See

Cooper Decl. at ¶ 14; Nixon Dep. at 78:4- 79:6; 79:18-20; Exhibit 14 (June 14, 2004 email);

Exhibit 1 (Beard Dep.) at 62:21 - 63:4; Exhibit 15 (June 16, 2004 email).

    In addition, Plaintiff interprets Ms. Cooper's views and argues that similarly situated

RIGAs would behave as she did "if they felt the change would compromise the integrity of the

audit report."  This purported "fact" concerning what other RIGAs might do is simply Ms.

Cooper's speculation; therefore, it has no evidentiary value with respect to Plaintiff's burden of

establishing a prima facie case.  Moreover, Ms. Cooper does not state that the changes directed

by management compromised the "integrity" of the report.  Cooper Decl. at ¶¶ 12-13.  The term

"integrity" does not appear in the paragraphs Plaintiff cites.  He is attempting to imply that

management intervened to make Ms. Cooper's audit report dishonest or deceitful.  However, Ms.

---

[4]  Mr. Groom's statements do not advance Plaintiff's prima facie argument because his reassignment was directed by former Assistant General for Audit, Kathy Kuhl-Inclan, who is not an alleged discriminating official in this case.  See Groom Dep. at 14-15.

Cooper concedes that management intervened only to mitigate language it viewed as inappropriate or inflammatory.  See id. at ¶ 11.  In sum, Ms. Cooper is not a proper comparator.

Regarding Ms. Elion, Plaintiff claims that she is an appropriate comparator because "[a]fter she engaged in protected EEO activity, the Headquarters Audit Division, which she headed, was disbanded, her staff reassigned, her supervisory duties removed, and she was forcibly reassigned to the position of Special Assistant to Mr. Heist, just like Mr. Beard."  See Plaintiff's Opposition at 30.  Ms. Elion is not similarly situated to Plaintiff.  When Headquarters Audit Division was disbanded, her entire staff lost their positions, not just Ms. Elion, because the positions no longer existed.  Ms. Elion is simply making a conclusory allegation that her EEO activity played a role, just as Plaintiff does in this case.  See Greene v. Dalton, 164 F.3d 671, 675 (D.C. Cir. 1999) (accepting plaintiff's "conclusory allegations . . . would defeat the central purpose of the summary judgment device, which is to weed out those cases insufficiently meritorious to warrant the expense of a jury trial."); Harding v. Gray, 9 F.3d 150, 154 (D.C. Cir.1993).

In any event, Plaintiff's declarations from other HUD OIG employees containing personal anecdotes and/or observations of alleged retaliation are not magically transformed into admissible evidence simply because they are under oath.   The Federal Rules of Evidence call for the admission only of "relevant evidence."  See Fed. R. Evid. 402.  "Relevant evidence" is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  See Fed. R. Evid. 401; United States v. Carter, 522 F.2d 666, 685 (D.C. Cir. 1975).  Equally important, the Federal Rules also provide for the exclusion of evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the

issues, or [the likelihood of] misleading the jury, or by considerations of undue delay, waste of

time, or needless presentation of cumulative evidence." Fed. R. Evid. 403.

Testimony from the witnesses listed above has no nexus to the disputed facts at issue in

this case.  To Defendant's knowledge, none of the three witnesses was involved in or is

personally knowledgeable about the decision to reassign Plaintiff.  It appears instead that

Plaintiff anticipates offering testimony from these witnesses primarily, if not exclusively, as

other alleged victims of retaliation, under the theory that if HUD OIG, writ large, retaliated

against these individuals, it is more likely that the alleged retaliating officials in this case did so

against him personally.

As a general matter, courts have excluded such "me too" evidence, recognizing in many

different contexts that it has no probative value.  "Trial courts regularly prohibit 'me too'

evidence from or about other employees who claim [retaliatory] treatment because it is highly

prejudicial, but only slightly relevant."  Reid v. National Linen Service, 182 F.3d 918

(unpublished table decision), 1999 WL 407463 at **7 (6th Cir. Jun. 2, 1999); see Schrand v.

Federal Pacific Electric Co., 851 F.2d 152, 156 (6th Cir. 1988).  More particularly, courts have

closely scrutinized the connection of the proposed witness's testimony to the case at hand --

excluding the evidence, for example, where the alleged [retaliating] official was not the same for

the plaintiff and the proffered witness, where the alleged [retaliation] took place during a

different time period, where the alleged [retaliation] took place in a different office, where the

type of adverse employment action was not the same, where the alleged victims of [retaliation]

had different grades, titles or qualifications, or where the type of alleged discrimination (i.e., sex,

race, handicap, etc.) was different for the plaintiff and the proffered witness.  See Haskell v.

Kamen Corp., 743 F.2d 113, 121 (2d Cir. 1984) (other employee testimony "definitely should

have been excluded by the district court in accord with Fed. R. Evid. 403" and "even the

strongest jury instructions could not have dulled the impact of a parade of witnesses, each

recounting his contention that defendant had laid him off because of his age"); Goff v.

Continental Oil Corp., 678 F.2d 593, 596-97 (5th Cir. 1982); Rauh v. Coyne, 744 F. Supp. 1181,

1183 (D.D.C. 1990).

Judged against these standards, there is no possible relevance to any testimony from

these individuals concerning their own perceptions that they were the victims of retaliation.  For

example, Ms. Elion worked in an entirely different office than Plaintiff (Headquarters Audit

Division, **not** Region VI, see Elion Decl. ¶ 2), and the type of alleged adverse action was not the

same (her reassignment was due to the complete disbanding of her division, id. ¶ 5, whereas

Plaintiff was transferred from a still-existing office).  Either of these factors would be sufficient

to exclude her testimony under the case law discussed above.  According to Plaintiff's own

Affirmative Statement of Material Fact DDD, Groom also worked in an entirely different office

than the Plaintiff (Capital District Office, **not** Region VI, see Pl. Opp. At 28, Statement DDD),

the alleged retaliating official was not the same (former AIGA Kathy Kuhl-Inclan, id., who is

**not** complained of by Plaintiff), and the type of alleged adverse action was not the same (Groom

was terminated subsequent to EEO activity, id. **not** reassigned).  Under the "me-too" case law,

these factors demonstrate that his testimony is irrelevant to Plaintiff's own claims and should be

excluded.  The most flagrant "me-too" example comes from Plaintiff's reliance on Cooper, who

not only worked in an entirely different office than Plaintiff (Region IV, **not** Region VI, see

Cooper Decl. ¶ 1), but also has **not** complained of discrimination or retaliation, much less of the

kinds alleged by Plaintiff ("I was not given a directed reassignment or any other personnel action

that I consider to be adverse," id. ¶ 27).  In light of the foregoing, the testimony of all three

witnesses are irrelevant.

Moreover, there can be no serious doubt that Plaintiff wants to parade these witnesses in order to generally show a retaliatory atmosphere at HUD OIG and provide anecdotal evidence concerning other employees. No other conclusion can be drawn. Such testimony also should be barred under Fed. R. Evid. 701. That rule provides that witness testimony in the form of an opinion:

> is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.

Under this rule, "the opinion of a lay witness on a matter is admissible only if it is based on first-hand knowledge or observation – for example, a witness's opinion that a person with whom he spoke was drunk, or that a car he observed was traveling in excess of a certain speed." United States v. Marshall, 173 F.3d 1312, 1315 (11th Cir. 1999); see also Rule 701 Advisory Committee Notes, 2000 Amendments. It is well settled that a plaintiff cannot create a factual issue of pretext based merely on personal speculation of discriminatory intent. See Brown v. Brody, 199 F.3d 446, 458 (D.C. Cir. 1999); Goldberg v. B. Green & Co., Inc., 836 F.2d 845, 848 (4th Cir. 1988). The speculation of others is equally inconsequential. Additionally, testimony which amounts to little more than "choosing up sides" can be excluded for lack of helpfulness. Perkins v. Marriott International Inc., 945 F. Supp. 282, 287 (D.D.C. 1996) (citing Rule 701).

Permitting the testimony of these me-too witnesses would also contravene Rule 404(b), which proscribes the admission of other "bad acts" in order to show action in conformity therewith. See Fed. R. Evid. 404(b). Plaintiff's rationale for calling these witnesses is to suggest to the jury that if the agency may have retaliated in other instances, they should conclude that

there was retaliation in this case. Rule 404(b) specifically proscribes this kind of evidence.

Plaintiff should not be permitted to turn this case into a general referendum on whether HUD

OIG is a good employer, or simply sully the Defendant by putting on witnesses who will

complain about real or perceived mistreatment in their employment. The proof at trial should

address whether Plaintiff's directed reassignment was the result of retaliation by Mr. Stephens,

Mr. Heist, and/or Mr. Phelps. The proposed "me-too" witnesses are entirely irrelevant to this

inquiry, would confuse the fact-finder, and devolve the presentation of this cases into a number

of mini-trials concerning each witnesses' claims.

> **C.     Defendant Had Legitimate, Non-Discriminatory Reasons To Reassign
> Plaintiff, And Plaintiff Failed To Establish That Those Reasons Were
> Pretextual.**

Even assuming, arguendo, that Plaintiff has established a prima facie case of

discrimination and retaliation, Defendant offers well-supported, legitimate, non-discriminatory

and non-retaliatory reasons for its decision to reassign Plaintiff. See Def. MSJ at 23-30.

Plaintiff is required to refute *all* of these explanations to preserve his discrimination and

retaliation claims for trial. See Barnette v. Chertoff, 453 F.3d 513 (D.C. Cir. 2006) (although

record evidence did not support agency's first explanation, that it had a policy giving preference

to internal applicants seeking promotions over applicants seeking lateral transfers, the agency,

nevertheless, was entitled to summary judgment because plaintiff could not demonstrate that the

agency's second explanation - - that the selectee was more qualified - - was pretextual).[5]

---

[5] See also Jaramillo v. Colorado Judicial Dept., 427 F.3d 1303, 1309 (10th Cir. 2005) (en banc)
("The fact that one of the [employer]'s explanations turned out to be incorrect does not
necessarily create a genuine issue of fact concerning pretext."; plaintiff could only refute one of
two reasons proffered by employer); Tyler v. RE/MAX Mt. States, Inc., 232 F.3d 808, 814 (10th
Cir.2000) ("[A]s a general rule, an employee must proffer evidence that shows each of the
employer's justifications are pretextual."); Russell v. Acme-Evans Co., 51 F.3d 64, 69 (7th

To establish pretext, Plaintiff argues that "Mr. Heist's deposition testimony about the Jazzland Audit was patently false," because he "had just signed off on a memorandum approving HUD's <u>forgiveness</u> of the $7 million, due to the economic devastation that befell New Orleans after Hurricane Katrina." <u>See</u> Plaintiff's Opposition at 32 (emphasis in original). Plaintiff is attempting to create a contradiction were none exists. During deposition, Plaintiff asked Mr. Heist if there were any audits issued by Region VI, that HUG OIG discovered afterwards were not properly supported or issued in accordance with OIG procedures. <u>See</u> Exhibit 6 (Heist Dep.) at 105:12-18. Mr. Heist responded that regarding the Jazzland report

> [t]he program office raised an issue with respect to one of the findings, and misapplication of criteria that the audit report asserted applied to some recipients but in fact the organization that received the funds, a guaranteed loan, was a for-profit entity, and therefore, did not meet the definition of a recipient, and as a consequence, there was no basis for recovering, I think, if memory serves, this approximately 7 million ineligible costs.

<u>See</u> <u>id.</u> at 105:21 - 106:11. The fact that "[t]he findings and recommendations of the audit were sustained," <u>see</u> Lear Decl. at ¶ 8, does not necessarily mean that Region VI had not misapplied criteria, discovered afterwards as described by Mr. Heist. Thus, even if Mr. Heist "well knew that HUD's failure to recover the money had nothing to do with any shortcoming on the part of Region VI," <u>see</u> Plaintiff's Opposition at 31, his answer to Plaintiff's actual question was not deceitful.

---

Cir.1995) (debunking one explanation defeats summary judgment only if the company has offered no other reason that, standing alone, would have caused the company to take the action at issue); <u>Combs v. Plantation Patterns</u>, 106 F.3d 1519, 1539 (11th Cir.1997) (plaintiff must discredit "each" proffered explanation; employer entitled to judgment because plaintiff could discredit only two of three explanations);<u>see also</u> <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 148 (judgment for employer mandatory if "the record conclusively reveal[s] some other, nondiscriminatory reason for the employer's decision").

Plaintiff also alleges that Mr. Phelps's statement regarding when Headquarters became aware of the specific issues in the CVR audit "is specious." See Plaintiff's Opposition at 32. Even if there is a dispute as to when Headquarters learned about specific issues in the CVR audit, it is irrelevant because the statement of material fact upon which Defendant relies is that Plaintiff failed to adhere to OIG policy by not submitting a survey report. See Defendant's Statement at ¶ 33. In response, Mr. Nixon states only that Region VI had not been *asked* to produce a survey memo, and that Region VI lacked a standard format for such memos when it worked on the CVR audit. See Nixon Dep. 18:9-19:8. He does not state that survey memos did not exist at that time. Mr. Nixon then opines that Region VI should not be held accountable for not producing a survey memo, but he never addresses whether Region VI was otherwise required to submit a survey memo without being asked to do so. Id.

Plaintiff, citing OIG's official Performance Appraisal Program ("PAP"), asserts that Defendant departed from standard OIG business practices, raising an inference of retaliation. See Plaintiff's Opposition at 32-33. Plaintiff's argument is flawed. Because Defendant never found Plaintiff's overall performance in any one year to be unacceptable, it was unnecessary to place him on a performance improvement period as required by the PAP. See id. at 33. Regarding this issue, Mr. Heist testified as follows:

> Q:    Now, Mr. Heist, in your mind, why in light of . . . your
>        foregoing responses to Mr. Seldon, why were those reasons
>        . . . not performance or conduct related?  Or based on
>        performance and conduct?
>
> A:    In my mind, it was a matter of degree, and - -
>
> Q:    What do you mean by degree?
>
> A:    Well, at the time our rating system was a pass/fail system,
>        so you either passed or you failed, and if you failed a

> rating, that meant that you were either removed from
> service or downgraded.
>
> Q:    In pay?  You mean downgraded in pay?
>
> A:    Downgraded in GS level.
>
> Q:    Okay.
>
> A:    The issues that we had with Mr. Beard and the way he was
> managing the region spanned a number of years.  I think in
> the final, we made a judgment that, if you looked at the
> totality of what the region did, that we felt that a better way
> to handle it was to reassign Mr. Beard, rather than pursue a
> performance-based action.  I wasn't interested in seeing
> Mr. Beard fired or downgraded.  I thought, in my
> judgment, he could continue to make contribution to the
> organization in the capacity of a special assistant.  He could
> do so without losing any grade or pay.

See Exhibit 6 (Heist Dep.) at 112:8 - 113:13.  Similarly, Mr. Phelps testified as follows:

> Q:    Why didn't Mr. Beard receive a failing grade in one or
> more of the rating categories or elements that are part of his
> performance appraisal?
>
> A:    Because, from the time that the ADR was done, in the
> original EEO Complaint, and a decision was made that we
> were going to try to work together and get things done, I
> was never in the mode of operation of documenting a
> performance case.  I was not building a file for
> performance purposes, to show how each of the elements
> and sub-elements was being violated, continually hoping
> that things were going to work themselves out, but
> ultimately reaching the point where the reality was that it
> wasn't going to work itself out and something needed to be
> done.

See Exhibit 2 (Phelps Dep.) at 50:18 - 51:11.  Defendant never violated the PAP, accordingly, no

inference of retaliation can be made.

Plaintiff next argues that the contrast between how the Defendant assessed his work

before and after he engaged in protected activity raises an inference of retaliation.  See Plaintiff's

Opposition at 33-34.  Plaintiff notes awards he received in 1998, 2000, and 2001.  See id. What

Plaintiff conveniently fails to mention is that he filed his EEO complaint in 2002, the same year

Kenneth Donahue became the new Inspector General at HUD OIG and changed the management

style significantly.  See Exhibit 1 (Beard Dep.) at 16:20 - 17:6; 23:17-23; 24:2-6.  Moreover,

management continued to recognize Plaintiff for specific achievements after 2002.  See Pl. Ex.

4; Exhibit 6 (Heist Dep.) at 125.

     Lastly, Plaintiff claims that Defendant has presented "shifting rationalizations for its

actions."  See Plaintiff's' Opposition at 34-35.  A review of the citations Plaintiff provides does

not demonstrate "shifting rationalizations," but rather the way three different people describe

Plaintiff's problems.  Plaintiff refers the Court back to numerous pages from Defendant's

Memorandum to account for this alleged shift, however, those pages include citations from Mr.

Stephens, Mr. Heist, and Mr. Phelps.  When read together and in context, they are wholly

consistent.

     In sum, Plaintiff fails to show that Defendant's legitimate, non-discriminatory and non-

retaliatory reasons for reassigning are pretextual.  See Woodruff v. Peters, 482 F.3d 521, 531

(D.C. Cir. 2007) (summary judgment granted against plaintiff because plaintiff  provided "no

basis for rejecting the presumptive validity" of his supervisor's decision).[6]

## IV.    CONCLUSION

     For the foregoing reasons, Defendant respectfully requests that the Court grant summary

judgment in their favor on all of Plaintiff's claims.

                    Respectfully submitted,

---

[6]  Regarding Plaintiff's claims of retaliation in connection with Mr. Phelps's job reference,
Defendant incorporates the arguments submitted in its Opening Brief and supra at 3-6.

_____/s/_____
JEFFREY A. TAYLOR, DC Bar #498610
United States Attorney


_____/s/_____
RUDOLPH CONTRERAS, DC Bar #434122
Assistant United States Attorney


_____/s/_____
KAREN L. MELNIK, DC Bar #436452
Assistant United States Attorney
555 4th Street, N.W.
Washington, D.C. 20530
(202) 307-0338