MGB Reporting, Inc.

Page 1

```
 1              UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLUMBIA
 2

 3    D. MICHAEL BEARD,           :
      17 Rubins Walk              :
 4    Fredericksburg, VA  22405,  :
                                  :
 5              Plaintiff         : C.A. No. 06-0756 (GK)
                                  :
 6        v.                      :
                                  :
 7    ALPHONSO R. JACKSON,        :
      Secretary of Housing and    :
 8    Urban Development,          :
      451 Seventh Street, S.W.    :
 9    Washington, D.C.  20410,    :
                                  :
10              Defendant         :

11              Thursday, July 19, 2007

12    The discovery deposition of WILLIAM W. NIXON, CPA, CIA,

13    CFE, a witness called for examination by counsel for the

14    plaintiff, at the Offices of Robert C. Seldon &

15    Associates, 1319 F Street, NW, Washington, DC, before

16    Tracy E. Barksdale, Certified Shorthand Reporter and

17    Notary Public in and for the District of Columbia,

18    commencing at 12:41 p.m., when were present on behalf of

19    the respective parties:

20

21

22
```

COPY

MGB Reporting, Inc.

Page 15

1   A   Government employment, et cetera.

2   Q   Any particular people involved you're concerned

3   about? I'm sorry, any particular people that you're

4   concerned about having an adverse affect on your career?

5   A   Not anybody by name. Just the nature of it that

6   will always play in the back of my mind. Obviously,

7   people whisper. Obviously, there's rumors, gossip. Even

8   in a labor relations/supervisory course I went to, I was

9   thinking about it last night, they even told me that

10  testifying against the organization is not something that

11  you really want on your résumé.

12  Q   How would that be on your résumé?

13  A   Everybody knows about it.

14  Q   Everybody who?

15  A   Well, people that make decisions.

16  Q   In HUD OIG?

17  A   In HUD OIG or even around the other agencies.

18  All it's gonna take is one person to whisper it if I'm

19  applying for another job.

20  Q   Do you have a reason to believe that might come

21  true?

22  A   It plays in my mind, yes, sir.

MGB Reporting, Inc.

Page 16

1   Q   Who are you concerned about, if you came to
2   apply for another job?
3   A   Nobody by name.
4   Q   Were you afraid that by giving evidence in this
5   case, you would have to show or give testimony that would
6   show that someone in senior management in HUD OIG had not
7   been accurate or truthful in statements they made?
8   A   No, sir.
9   Q   All right. We'll get to that in a minute.
10       Mr. Nixon, I take it you do recall being in touch
11  with my associate attorney Molly Buie about possibly
12  giving an affidavit for use in this case?
13  A   Yes, sir.
14  Q   Okay. What I'm going to do is ask to have
15  marked an exhibit as Nixon Exhibit A, and the way this
16  works is as follows: I have the reporter mark an
17  exhibit. Okay. I give AUSA Melnik a copy, and the
18  reporter gives the one to you. I give AUSA Melnik a
19  courtesy copy of the exhibit, and I keep one.
20       So I'll ask for this to be marked as Exhibit A.
21  AUSA Melnik, if you'll give me a second, I will give you
22  a copy of what I've asked to be marked as Exhibit A and

9805 Korman Court, Potomac, MD 20854
301-983-9315 ~ www.mgbreporting.com

Page 78

1    TOP or with OIG audit headquarters.

2    A    I don't think out of the ordinary. I think,
3    like I said, looking back on it and reflecting on it --

4    Q    **Opinions ran strong, right?**

5    A    I think emotions ran strong.

6    Q    **Go ahead.**

7    A    There is a couple of actions I regret.

8    Q    **Did Mr. Beard do any?**

9    A    I think the thing got ugly, and as an auditor,
10   you realize that it takes two people to get ugly.

11   Q    **Got ugly between you and TOP?**

12   A    I think by the region and TOP. You know, as I
13   learned, you never argue with an idiot. Spectators can't
14   tell the difference. And I think we got dragged into
15   certain arguments we shouldn't have been.

16   Q    **Who was the idiot in your analogy?**

17   A    I don't mean that specifically. Substitute in
18   clown.

19   Q    **Who was the clown?**

20   A    I think TOP said some things that were blatantly
21   wrong and over the top and were sort of offensive. I
22   don't think that they truly appreciated the extent of

MGB Reporting, Inc.

Page 79

their offensiveness about it, and I think at times, myself included, including Mr. Beard, took offense, and took a noticeable offense that, in hindsight, we probably shouldn't have taken.

Q   Because you took offense?

A   Correct. No, we expressed it.

Q   But was it reasonable under the circumstances, to your knowledge?

A   At the time it was. I mean, in hindsight, obviously, you also want to be above the fray.

Q   This was a heated exchange, right?

A   Well, when you read the TOP report, and I had the opportunity to read it again last night, the only thing I walk away with is offense.

Q   Did you think that it was fair to walk away with?

A   No. I should have just walked away.

Q   So you expressed offensive language that you now regret to TOP?

A   Well, I regret -- I regret my role in it.

Q   The role being participant in these exchanges?

A   Whatever I had to do with fueling the flames, I

9805 Korman Court, Potomac, MD 20854
301-983-9315 ~ www.mgbreporting.com

MGB Reporting, Inc.

Page 107

1           the record.)

2    BY MS. MELNIK:

3        Q    Mr. Nixon, I'm handing you what's been marked as Nixon Exhibit K, and do you recognize it to be an audit staff bulletin and ASB from June of 2002?

6        A    It appears correct, yes.

7        Q    Okay. And is that something that auditors in your region, including yourself and Mr. Beard, would have received?

10       A    We should have, yes, sir. Excuse me, yes, ma'am.

12           (Thereafter a discussion was held off
13           the record.)

14   BY MS. MELNIK:

15       Q    Mr. Nixon, are you familiar with what the -- in a general way, I don't need you to recite them -- what the significant criteria are for external audits?

18       A    There's like five or six of them. Over 500,000, possible, media attention, et cetera, et cetera.

20       Q    And do you have an opinion as to whether the CVR audit --

22       A    The CVR audit would have been -- would have been

9805 Korman Court, Potomac, MD 20854
301-983-9315 ~ www.mgbreporting.com

MGB Reporting, Inc.

Page 111

1  if a survey would be performed before the formal audit
2  start, right?
3         MS. BUIE:  Page number?
4         MR. SELDON:  1, page 1.
5  BY MR. SELDON:
6     Q    You can read as much as you like, but toward the
7  fifth line up from the bottom, if a survey will be
8  performed.  It doesn't say perform a survey, does it?
9     A    Correct.
10    Q    And when surveys were required, was after there
11 was training in surveys, right?
12    A    I know that the survey memo as we have now, I
13 don't recall doing one before the training.
14    Q    That was in --
15    A    But this June 2002 thing is troubling my little
16 mind at this point.  Because I do know that we had some
17 discussions about internal versus external, when it was
18 appropriate for external, but I don't believe that we
19 formalized any sort of the results or the format or how
20 it was indicated out, whether or not the briefing paper
21 itself where we would have that we were going into the
22 audit phase would suffice.  What was the format of the