**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

```
                                   :
D. MICHAEL BEARD,                  :
                                   :
          Plaintiff,               :
                                   :
     v.                            :   Civil Action No. 06-756 (GK)
                                   :
STEVE PRESTON, Secretary           :
of Housing & Urban Development:
                                   :
          Defendant.               :
                                   :
```

<u>MEMORANDUM OPINION</u>

Plaintiff, D. Michael Beard, a 56-year-old male, brings this action against Defendant Steve Preston,[1] Secretary of Housing and Urban Development.  He alleges employment discrimination based on age and retaliation against him for a protected activity, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e <u>et</u> <u>seq.</u>, and the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 633a.  This matter is before the Court on Defendant's Motion for Summary Judgment [Dkt. No. 13].  Upon consideration of the Motion, Opposition, Reply, Surreply, and the entire record herein, and for the reasons stated below, Defendant's Motion for Summary Judgment is **denied in part and granted in part.**

---

[1] Defendant Preston is sued in his official capacity.  When Plaintiff initially brought this action, Alphonso R. Jackson was Secretary of the Department of Housing and Urban Development, and the case was titled <u>Beard v. Jackson</u>.  In the months since this case was filed, there has been turnover in the executive branch.  On June 15, 2008, Steve Preston succeeded Jackson.  Pursuant to Federal Rule of Civil Procedure 25(d)(1), the Court has automatically substituted Preston for his predecessor in office.

## I. BACKGROUND

### A. Facts[2]

Plaintiff D. Michael Beard, a 56-year-old man, has been employed by the United States Department of Housing and Urban Development's ("HUD") Office of Inspector General ("OIG") since 1989, and has worked in a supervisory capacity for the federal government since 1982. He has held various positions with HUD, most recently serving as Special Assistant to the Deputy Assistant Inspector General in OIG Headquarters in Washington, D.C. He served as Regional Inspector General for Audit ("RIGA") in OIG Region VI, based in Fort Worth, Texas,[3] for thirteen years prior to his transfer to the Special Assistant position in Washington, D.C. Plaintiff characterizes the Special Assistant position as "nonsupervisory," "superfluous," and not "commensurate with his GS-15 grade level." Plaintiff's claims arise out of his transfer and out of HUD's alleged interference with his selection for a Senior Executive Service position in the Department of Defense's Office of Inspector General.

Plaintiff alleges that his January 2005 transfer to HUD OIG's Washington, D.C. office was a retaliatory act by his superiors for unfavorable deposition testimony he had provided in 2001 in

---

[2] Unless otherwise noted, the facts set forth herein are undisputed and drawn from the parties' Statements of Material Facts submitted pursuant to Local Civil Rule 7(h).

[3] Region VI includes Texas, Louisiana, New Mexico, Oklahoma, and Arkansas.

connection with a discrimination complaint brought against OIG by a Region VI employee.  That employee, Robert Tighe, had brought suit against HUD OIG claiming that he was not selected for a promotion because of his race.  In his July 2001 deposition, Plaintiff testified that OIG senior management was hiring minorities and females in violation of Equal Employment Opportunity ("EEO") policies.  He specifically identified Susan Gaffney, the former Inspector General, and Kathy Kuh-Inclan, the former Assistant Inspector General for Audit, as the responsible management officials.

In June 2001, Ms. Gaffney was replaced by James A. Heist (born 1954), who became the Acting Deputy Inspector General for HUD for approximately two months.  During this time, Mr. Heist  learned of the existence of Mr. Tighe's EEO complaint and learned that Plaintiff had given a deposition in the case.  According to Defendant, Mr. Heist "had no knowledge . . . one way or another" if Plaintiff's testimony was favorable or unfavorable to Mr. Tighe.  Def.'s Mot. for Summ. J. at 3 ("Mot.").  The parties agree that Mr. Heist was not a party to Mr. Tighe's administrative action and never discussed Plaintiff's testimony with the Inspector General or senior members of his staff.

In 2001, Mr. Heist made Michael Phelps (born 1945) the first-line supervisor for all of the RIGAs, including Plaintiff.  In February 2002, Mr. Phelps gave Plaintiff a reprimand "[f]or not referring potential criminal matters to the office of

-3-

investigation" in Region VI, and appended an attachment to his performance evaluation[4] which was critical of his performance. Mot. at 3-4.  At the same time, Mr. Phelps verbally told Plaintiff that he was difficult to manage and chastised him for failing to follow HUD policy, providing Plaintiff three specific instances of such failure.  In March 2002, Defendant provided Plaintiff with a memorandum detailing management's concern that Plaintiff was espousing negative views of headquarters to his staff and "poisoning their views of the organization."  Def.'s Statement of Facts ¶ 12.

In March 2002, Kenneth Donahue became the new Inspector General at HUD OIG.  Both parties agree that, as a result, the management style of the organization changed dramatically.  While Ms. Gaffney was Inspector General, Plaintiff had a significant amount of autonomy to manage Region VI, whereas Inspector General Donohue insisted upon adherence "to the chain of command, and he announced that empowerment was over."  Def.'s Statement of Facts ¶ 23.

In other words, RIGAs would need to have more of their actions approved by HUD headquarters, and all audit decisions would need to

---

[4] Defendant contends that the attachment was given to Plaintiff in February 2002, contemporaneous with his performance evaluation.  Plaintiff disputes this fact, arguing instead that Mr. Phelps appended the attachment to Plaintiff's performance appraisal in March 2002, 30 days after his performance review meeting, and removed it in April 2002, after Plaintiff filed an informal grievance over it.

be routed through a new directorate called Technical Oversight and Planning ("TOP").  TOP was responsible for overseeing the work of the ten regional offices, reviewing drafts and reports, and providing comments on those reports to the Assistant Inspector General for Audit, Mr. Heist.  Mr. Heist then would pass TOP's comments on to the regional offices.  According to Plaintiff, in addition to passing comments on to Mr. Heist, TOP also engaged in a deliberative process directly with the regions in which TOP's proposed changes were discussed.  Plaintiff and, he alleges, many other RIGAs, preferred the decentralized system that had been in place under Inspector General Gaffney.

Defendant asserts that due to the implementation of this decentralized system, Plaintiff developed a negative attitude towards Headquarters, and that this attitude negatively impacted the Region VI staff.  See Def.'s Statement of Facts ¶¶ 35-37. According to Defendant, Region VI displayed an argumentative attitude toward both OIG management and TOP staff, ultimately leading management to conclude that Plaintiff "could not adjust to the centralized management style."  Id.

In May 2002, Plaintiff filed an administrative complaint of discrimination and retaliation against Mr. Heist, Mr. Phelps, and General Counsel Bryan Saddler.  On December 4, 2002, the parties reached a Mediation Settlement Agreement resolving Plaintiff's administrative complaint.  Mr. Michael Stephens, the management representative for the Agreement, indicated to Plaintiff that the

motivation in settling the complaint was to "start anew."  Def.'s
Statement of Facts ¶ 17.

From 2003 to 2004, Plaintiff did not file any administrative
complaints or otherwise engage in any protected activity.  However,
Plaintiff contends that he continued to be subjected to reprisals
during that time period, including an unfairly low ranking of his
region  and  interference  with  several  of  his  region's  audits.
Plaintiff represents that he refrained from filing an EEO complaint
over these actions in part because of assurances from Mr. Stephens
that Plaintiff's job "was safe," and in part out of fear of further
reprisals.  Beard Decl. ¶¶ 40-41.  Both sides agree that after the
resolution of Plaintiff's 2002 complaint, he did not engage in any
additional  protected  activity  until  January  21,  2005,  when  he
initiated  the  informal  administrative  EEO  complaint  process
underlying this lawsuit.

In  January  2005,  Plaintiff  was  instructed  to  report  to
Headquarters in Washington, D.C. for a meeting with management.  At
that meeting, management informed him, for the first time, of his
reassignment to Headquarters and the reasons for that decision.
According  to  Defendant,  Plaintiff's  inability  to  adjust  to  a
centralized management style, as well as material deficiencies in
his work product (including problems with a Community Planning &
Development  ("CPD")  draft  audit,  the  Jazzland  audit,  and  a  CVR

-6-

Associates audit)[5], ultimately caused management to involuntarily reassign him to a non-supervisory position at Headquarters, namely Special Assistant to the Deputy Assistant Inspector General for Audit. Id. ¶¶ 37-38. Plaintiff alleges that Mr. Heist conceded in his deposition that the reassignment and relocation were not performance-based. Pl.'s Opp. at 2. Plaintiff also asserts that in his last appraisal (for the period ending January 31, 2004), he received a successful rating on a pass/fail scale. Plaintiff was replaced as RIGA of Region VI by Frank Baca, who, like Plaintiff, was born in 1949. According to Defendant, the problems concerning that Region's work product and attitude toward headquarters did not persist under Mr. Baca's leadership.

In January 2005, Plaintiff applied for the position of Director, Readiness and Logistics Support,[6] for the Department of Defense ("DOD") OIG. The DOD contacted Mr. Phelps and asked his views of Plaintiff as an employee. According to Defendant, Mr.

_____

[5] Plaintiff disputes the existence of the material deficiencies alleged by Defendant in Region VI's auditing process and reports. Pl.'s Statement of Facts ¶¶ 27-34.

[6] The precise title of the position for which Plaintiff applied at the DOD OIG is unclear from the record. Plaintiff's Complaint identifies the position as "Deputy Assistant Inspector General for Audit." However, when Defendant referenced this title in its Statement of Facts, Plaintiff denied that he had applied for such a position, and instead identified the position for which he applied as "Director, Readiness and Logistics Support," as listed in the text here. Pl.'s Statement of Facts ¶ 43.

Phelps told the DOD many positive things about Plaintiff,[7] but also stated that Plaintiff "could not get in step with that new direction [toward centralized management], which is why it was necessary to bring [Plaintiff] to Headquarters as opposed to allowing him to continue to run a region." Id. ¶¶ 45-46.  On April 11, 2005, a DOD representative contacted Plaintiff to say that Plaintiff was not selected for the DOD OIG position because of the negative recommendation he had received from Mr. Phelps.  Beard Decl. ¶ 61.

### B.   Procedural History

On January 21, 2005, Plaintiff initiated the informal administrative EEO complaint process.  On February 2, 2005, Plaintiff filed a formal administrative complaint of discrimination and retaliation, which he amended on April 21, 2005.  Plaintiff has exhausted his available administrative remedies, as more than 180 days have elapsed since he last amended his formal administrative complaint of discrimination, and a Final Agency Decision still has not been issued.

The Complaint contains five counts alleging age discrimination and retaliation for prior protected activity in violation of Title VII of the Civil Rights Act of 1964, as amended by the Equal Opportunity Act of 1972, 42 U.S.C. §§ 2000e et seq., and as further

---

[7] Plaintiff disputes this assertion, noting that Mr. Reardon, the DOD representative who made the call, characterized his conversation with Mr. Phelps as "negative."  Pl.'s Statement of Facts ¶ 45.

-8-

amended by Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981a, and the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 <u>et seq</u>.[8]  Plaintiff seeks an order declaring that Defendant violated his civil rights; an order restraining and enjoining Defendant from further violations; reinstatement to his position as RIGA of Region VI; compensatory damages in an amount to be determined at trial; back pay in the amount Plaintiff would have received had he been selected for the position of Director, Readiness and Logistics Support,[9] with the DOD and liquidated damages in a like amount; amendment of his personnel records; and attorneys' fees and costs.

After completion of discovery, Defendant filed the instant Motion for Summary Judgment on April 23, 2007 [Dkt. No. 13], which Plaintiff opposed on August 6, 2007 [Dkt. No. 20].  Defendant filed

---

[8]  Counts I through III are brought in connection with Plaintiff's allegation that he was impermissibly involuntarily removed from his position as RIGA for HUD OIG Region VI.  Count I alleges retaliation in violation of Title VII.  Count II alleges age discrimination in violation of the ADEA  Count III alleges retaliation in violation of the ADEA.

Counts IV and V are brought in connection with the allegedly unjustified negative reference Defendant provided to the Department of Defense.  Count IV alleges retaliation in violation of Title VII.  Count V alleges retaliation in violation of the ADEA.

[9] As discussed <u>supra</u> note 6, the precise title of the position for which Plaintiff applied at the DOD OIG is unclear from the record.  Although Plaintiff's Complaint identifies the position as "Deputy Assistant Inspector General for Audit," for consistency's sake, the Court will refer to the position as it is described in Plaintiff's most recent filing, as "Director, Readiness and Logistics Support."  Pl.'s Statement of Facts ¶ 43.

a Reply on September 20, 2007 [Dkt. No. 23].

## II. STANDARD OF REVIEW

Summary judgment may be granted "only if" the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. <u>See</u> Fed. R. Civ. P. 56(c), as amended December 1, 2007; <u>Arrington v. United States</u>, 473 F.3d 329, 333 (D.C. Cir. 2006). In other words, the moving party must satisfy two requirements: first, demonstrate that there is no "genuine" factual dispute and, second, that if there is it is "material" to the case. "A dispute over a material fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" <u>Arrington</u>, 473 F.3d at 333, <u>quoting</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A fact is "material" if it might affect the outcome of the case under the substantive governing law. <u>Liberty Lobby</u>, 477 U.S. at 248.

In its most recent discussion of summary judgment, in <u>Scott v. Harris</u>, __ U.S. __, 127 S.Ct. 1769, 1776 (2007), the Supreme Court said,

> [a]s we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" <u>Matsushita Elec. Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 . . . (1986)

> (footnote omitted).   "[T]he mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact."

<u>Liberty Lobby</u>, 477 U.S. at 247-48 (emphasis in original).

However, the Supreme Court has also consistently emphasized that "at the summary judgment stage, the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." <u>Liberty Lobby</u>, 477 U.S. at 248, 249.   In both <u>Liberty Lobby</u> and <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 150 (2000), the Supreme Court cautioned that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts, are jury functions, not those of a judge" deciding a motion for summary judgment.   <u>Liberty Lobby</u>, 477 U.S. at 255.

In assessing a motion for summary judgment and reviewing the evidence the parties claim they will present, "[t]he non-moving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'"   <u>Hunt v. Cromartie</u>, 526 U.S. 541, 552 (1999) (quoting <u>Liberty Lobby</u>, 477 U.S. at 255). "To survive a motion for summary judgment, the party bearing the burden of proof at trial . . . must provide evidence showing that there is a triable issue as to an element essential to that party's

claim." <u>Arrington</u>, 473 F.3d at 335[10]; <u>see</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324 (1986).   "[I]f the evidence presented on a dispositive issue is subject to conflicting interpretations, or reasonable persons might differ as to its significance, summary judgment is improper."   <u>United States v. Philip Morris</u>, 316 F. Supp. 2d 13, 16 (D.D.C. 2004) (quoting <u>Greenberg v. FDA</u>, 803 F.2d 1213, 1216 (D.C. Cir. 1986)).

## III. ANALYSIS

### A.   The Governing Standards

Traditionally, discrimination and retaliation claims under Title VII are analyzed using the burden-shifting framework set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). <u>See</u> <u>Teneyck v. Omni Shoreham Hotel</u>, 365 F.3d 1139, 1149 (D.C. Cir. 2004); <u>Broderick v. Donaldson</u>, 437 F.3d 1226, 1231 (D.C. Cir. 2006); <u>Lathram v. Snow</u>, 336 F.3d 1085, 1088 (D.C. Cir. 2003).   The parties' burden of proof on a claim of discrimination or retaliation under the ADEA is the same as under Title VII – "the <u>McDonnell Douglas</u> framework applies to both Title VII and ADEA claims."   <u>Chappell Johnson v. Powell</u>, 440 F.3d 484, 487 (D.C. Cir. 2006) (citation omitted).

Under the <u>McDonnell Douglas</u> framework, the plaintiff must first establish, by a preponderance of the evidence, a <u>prima facie</u>

---

[10] It should be noted that a non-movant's affidavit may suffice to defeat a summary judgment motion if the parties' sworn statements are materially different.   <u>Greene v. Dalton</u>, 164 F.3d 671, 674-75 (D.C. Cir. 1999); <u>Arrington</u>, 473 F.3d at 337.

case of discrimination or retaliation.[11]  See McDonnell Douglas, 411 U.S. at 802.  Once the plaintiff establishes a prima facie case, the defendant must "produc[e] evidence that the adverse employment actions were taken for a legitimate, non-discriminatory reason." Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1289 (D.C. Cir. 1998) (quotations and citations omitted).  Once the defendant has done so, "the presumption . . . raised by the prima facie case is rebutted" and "drops from the case."  Id. (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993)).

Our Court of Appeals recently held that, when considering a motion for summary judgment in the employment discrimination context, a district court "need not – and should not – decide whether the plaintiff actually made out a prima facie case" if the defendant has offered a legitimate, non-discriminatory reason for its actions.  Brady v. Office of the Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008) (emphasis in original).  Instead, "the

_____

[11]  In firing, demotion, or other adverse-action cases, a plaintiff makes out a prima facie case of discrimination by establishing that:  (1) he is a member of a protected class; (2) he suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination.  George v. Leavitt, 407 F.3d 405, 412 (D.C. Cir. 2005) (internal quotations and citations omitted).  In retaliation cases, a prima facie case is established when the plaintiff demonstrates that:  (1) he engaged in protected behavior; (2) the employer took action against the employee that would dissuade a reasonable employee from making or supporting a charge of discrimination; and (3) a causal relationship exists between the protected activity and the subsequent adverse action.  See Weber v. Battista, 494 F.3d 179, 184 (D.C. Cir. 2007); Burlington Northern & Santa Fe R.R. Co. v. White, 548 U.S. 53, 67-70 (2006); Holmes-Martin v. Leavitt, 2008 WL 3090273, at *13 (D.D.C. Aug. 7, 2008).

district court must resolve one central question:  Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason" for the adverse employment actions, and that the employer's actions were discriminatory.[12]   Id.

**B.    Defendant's Motion for Summary Judgment on Plaintiff's ADEA Claims Is Granted Because a Reasonable Jury Could Not Infer Intentional Age Discrimination from the Evidence Presented.**

Defendant has moved for summary judgment on Plaintiff's ADEA age discrimination claim on the ground that Plaintiff has failed to establish a prima facie case of age discrimination.[13]  Specifically, Defendant contends that Plaintiff has provided no evidence giving rise to an inference of age discrimination.

As outlined above, the Court of Appeals has indicated that "once the employer asserts a legitimate, non-discriminatory reason [for its adverse employment decision], the question whether the employee actually made out a prima face case is no longer relevant and thus disappears and drops out of the picture." Brady, 520 F.3d

_____

[12] Although the Court set forth this standard in the disparate treatment context, it also indicated that in other contexts "the McDonnell Douglas prima facie factors have led to a plethora of problems; as we underscore today, however, the factors are usually irrelevant." Brady, 520 F.3d at 493 n.1.  But see Laurent v. Bureau of Rehabilitation, Inc., 544 F. Supp. 2d 17, 22 n.3 (D.D.C. 2008) (J. Leon)("The Circuit Court's decision in Brady appears to be limited to disparate treatment discrimination cases.").

[13] It must be noted that Defendants' Motion was briefed prior to the decision in Brady, and therefore does not incorporate its analysis.

at 493 (quotations and citations omitted).  HUD OIG has asserted a legitimate, non-discriminatory reason for Plaintiff's transfer: performance-related issues involving his leadership of Region VI and various audits he supervised.  Therefore, the question at this point is whether there is sufficient evidence for a reasonable jury to find that Defendant's asserted reason was not the actual reason for Plaintiff's involuntary reassignment, and that Defendant intentionally discriminated against him on the basis of age.

In determining whether a reasonable jury could infer intentional discrimination, our Court of Appeals has instructed district courts to look at "all the evidence," including the "plaintiff's prima facie case" and "any further evidence of discrimination that may be available to the plaintiff." Carter v. George Washington Univ., 387 F.3d 872, 878 (D.C. Cir. 2004) (quotations and citation omitted).

Construing all evidence in the light most favorable to Plaintiff, the Court concludes that he has failed to produce sufficient evidence from which a reasonable jury could find intentional age discrimination.  A review of the record indicates only two pieces of evidence which even arguably support Plaintiff's ADEA claim: (1) that he was presented with the option of retiring or accepting the involuntary reassignment;[14] and (2) that "the only

---

[14] Plaintiff also has alleged that he was subjected to conditions aimed at inducing retirement following his transfer to Washington, D.C., but has failed to present any specific direct or comparative evidence to indicate that these working conditions were

two RIGAs who were involuntarily reassigned . . . – Mr. Beard and
Ms. Elion – were both retirement eligible," Opp. at 38-39.

As to the first piece of evidence, the mere mention that an
employee has the option of retirement is not enough, without other
evidence, to demonstrate age discrimination, and thereby survive
summary judgment.  Indeed, an employer would be derelict in its
duties if it did not adequately advise its employees of their
legitimate options.  That is particularly true in the federal
government, which has an exceedingly complex statutory and
regulatory civil service scheme.  Even where a plaintiff has
interpreted such a reference as pressure, "[m]ere personal belief,
conjecture and speculation are insufficient to support an inference
of age discrimination." Woythal v. Tex-Tenn Corp., 112 F.3d 243,
246-48 (6th Cir. 1997) (quotation and citations omitted) (holding
that multiple inquiries from supervisor regarding plans for
retirement did not raise an inference of discriminatory intent).

In this case, the only time Plaintiff alleges retirement was
mentioned was at the time he received his involuntary reassignment,
and never thereafter.  See Pl.'s Opp. at 4 (citing Pl.'s Ex. 1,
Jan. 5, 2005 Mem. from James Heist to D. Michael Beard).  Even
then, retirement does not appear to have been part of the actual
conversation, and certainly not the focus of it.  Rather, the basis
for Plaintiff's assertion that HUD OIG "wanted to drive [him] out

---

in any way tied to his age or retirement eligibility.

of the federal government due to his age" is a memorandum provided to Plaintiff at the meeting regarding his reassignment.  See id. This memorandum, dated January 5, 2005, formally notified Plaintiff of his transfer to Washington, D.C., and informed him of his options if he declined the reassignment:  namely, termination or retirement.  Pl.'s Ex. 1 at 1 ("if you are involuntarily separated by the OIG for failure to accept this directed reassignment, you may be eligible for retirement under the discontinued service annuity option . . . .").

As Defendant notes, "[p]roviding accurate information to Plaintiff regarding his options, including[,] but not limited to, retirement options, does not create intentional age discrimination."[15]  Def.'s Reply at 4.  Given the dearth of any evidence of animus or coercion at the time of the presentation of the retirement option in this case, the Court agrees.

As to the second piece of evidence, Plaintiff's assertion that the only two RIGAs who were involuntarily reassigned were both retirement eligible is also insufficient to demonstrate discriminatory animus.  Ex. 5 to Pl.'s Opp. ¶ 5.  Ms. Elion and Plaintiff are not sufficiently similarly situated to support a

_____

[15] Plaintiff also has failed to adduce any evidence indicating that information regarding the retirement option was conveyed in a coercive way.  Rather, much of the substance of the memorandum was taken from an earlier memorandum, which was the product of a collaboration between HUD OIG and the agency's human resources department.  Def.'s Reply at 4; Pl.'s Surreply at 2-3.

conclusion of age discrimination.[16]   Unlike Plaintiff, Ms. Elion's division was disbanded, causing her and all her coworkers to lose their jobs.  Def.'s Reply at 4.  Given the substantial differences in the circumstances surrounding their respective reassignments, it is plain that Ms. Elion's retirement eligibility is irrelevant to support claims of age discrimination.

While this Court is very mindful that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts, are jury functions," <u>Liberty Lobby</u>, 477 U.S. at 255, there is simply no credible evidence from which a jury could reasonably conclude that the agency's reasons for involuntarily transferring Plaintiff were based on age discrimination.  It may well be that a jury could conclude that the agency acted unfairly, or unwisely, or that it was punishing Plaintiff for his open disagreement with HUD OIG management policies.  However, none of those conclusions would constitute age discrimination.

**C.    Defendant's Motion for Summary Judgment on Plaintiff's Retaliation Claims Is Denied Because a Reasonable Jury Could Infer Intentional Retaliation for Protected Activity from the Evidence Presented.**

---

[16] Ms. Elion later filed a complaint alleging retaliation and discrimination against HUD OIG.  Civ. Action No. 1:05-cv-00992-PLF.  On April 10, 2008, a jury awarded her a verdict of $488,500, finding that she had been the victim of race and gender discrimination, and retaliation.  Notably, Ms. Elion voluntarily dismissed her age discrimination claim shortly before her case was scheduled to go to trial.  <u>See</u> <u>id.</u>, Mar. 4, 2008 Minute Order.

Defendant has also moved for summary judgment on Plaintiff's Title VII and ADEA claims alleging that retaliation for his 2001 testimony motivated his involuntary transfer to Washington, D.C. and negative employment reference.   Defendant concedes that Plaintiff has established the first two elements of a prima facie case of retaliation under both Title VII and the ADEA, but disputes that he has shown the required causal link between the adverse employment action and the protected activity.[17]  Burlington Northern & Santa Fe R.R. Co., 548 U.S. at 67-70.

Defendant contends that Plaintiff has not made his prima facie case because the temporal gap between Plaintiff's protected activity, which occurred in 2001 and was resolved by mediation in December 2002, and the adverse employment actions taken in 2004 and 2005, is too great.   Mot. at 22-24.   Defendant argues that the passage of two years, between the December 2002 settlement and the allegedly retaliatory actions in December 2004 deciding to reassign Plaintiff, and in early 2005 giving of a negative reference, bars a finding of a causal connection between the two events.   Mot. at 21.   In other words, this is "too long a period of time to provide

---

[17]While it is true that our Court of Appeals held in Brady, 520 F.3d at 493, that inquiry into whether a prima facie case has been established is no longer relevant, in the context of this case, the argument is so central to Defendant's position that the Court must address it.  Moreover, in determining what conclusions a reasonable jury could reach, district courts are to look at "all the evidence," including the "plaintiff's prima facie case" and "any further evidence of discrimination that may be available to the plaintiff."  See Carter, 387 F.3d at 878.

an inference of a causal connection between Plaintiff's protected activity and the reassignment." Id. (citations omitted).

Defendant misinterprets the applicable case law in making this argument.  The Supreme Court and our Court of Appeals have held that a close temporal relationship may, without other evidence, be sufficient to establish the required causal connection.  See Clark County School Dist. v. Breeden, 523 U.S. 268, 273-74 (2001) ("cases that accept mere temporal proximity . . . to establish a prima facie case uniformly hold that the temporal proximity must be 'very close'"); Mayers v. Laborers' Health & Safety Fund of N. America, 478 F.3d 364, 369 (D.C. Cir. 2007) ("causation can sometimes be inferred by temporal proximity").  However, Defendant has cited to no case law supporting its far broader argument that a temporal gap alone would require a grant of summary judgment.[18]

Indeed, Plaintiff accurately observes that temporal proximity is not a required element of retaliation; rather, it may be used as evidence of retaliatory intent.  Opp. at 23.  While, the lack of temporal proximity between Plaintiff's protected activity and an adverse employment action may be used by Defendant as evidence that causation does not exist,[19] it does not mandate the grant of summary

_____

[18] Nor has Defendant alleged that Plaintiff is relying upon temporal proximity alone in making his claim, and that this principle is relevant on that basis.

[19] Saunders v. DiMario, 1998 WL 525798, at *5 (D.D.C. Aug. 14, 1998), aff'd 194 F.3d 175 (D.C. Cir. 1999) ("The greater the time that elapses between the protected activity and the alleged acts of retaliation . . . .  the more difficult it is to demonstrate any

judgment.   Given the other evidence presented by Plaintiff of allegedly retaliatory treatment by HUD OIG,[20] a reasonable jury could conclude that causation has been shown, notwithstanding the temporal gap.

Defendant also argues that summary judgment should be granted because Plaintiff has failed to adduce evidence showing that Defendant's legitimate, non-discriminatory reasons for reassigning him are pretextual.   However, the evidence presented by Plaintiff makes clear that a genuine dispute of material fact does exist as to what motivated Plaintiff's involuntary reassignment and his

---

causal connection.").

[20] Not only has Plaintiff introduced evidence indicating certain negative, allegedly retaliatory, treatment in the intervening years between the adverse employment action alleged and his protected activity, he has also proffered comparative evidence from which a reasonable jury could infer causation.

For instance, Plaintiff has proffered comparative treatment evidence indicating that because of his protected activity, he was treated dissimilarly from other RIGAs similarly situated.  Opp. at 27-31.  For example, Plaintiff also alleges that certain RIGAs who did not engage in protected activity were allowed to remain in their positions, even though their regions encountered "the exact same difficulties" with the centralized audit process that Plaintiff's Region did.  Id. at 27-29.

Nor is this evidence negated by the fact that Plaintiff's superiors at the time of his protected activity were different from those who ordered the allegedly adverse employment actions.  Such a change in management does not necessarily destroy the causal link between the occurrence of protected activity and any resultant retaliatory treatment.

Finally, a jury may reasonably infer from all this evidence, taken together with the negative employment reference given shortly after his involuntary reassignment, that retaliation was Defendant's motivation.

negative job reference.

Among such genuine disputes of material fact are the accuracy of Defendant's criticism of Plaintiff's work product and the real reason for both his reassignment and negative reference.  Plaintiff has pointed to occasions when his excellent performance was officially recognized in the same time frame that his work was alleged by Defendant to be unacceptable, including evidence that he led his Region to become the top-performing Region in the country for Fiscal Year 2005, and that he was awarded a $2,000 performance award in the preceding year.  Pl.'s Exs. 4-6; Heist Dep. at 125. This evidence not only raises a dispute with respect to Defendant's proffered reason for Plaintiff's reassignment, but also with respect to the reason a negative reference was provided to the DOD.

Plaintiff has also introduced evidence that Defendant's claims about his allegedly hostile attitude towards Headquarters were pretextual.  For instance, Plaintiff has presented evidence that it was Defendant's own conduct, not his, that fostered the dissension within Region VI, and that neither Plaintiff nor anyone else "could have done anything to prevent the [Region VI] auditors from being angry and dispirited."  Cooper Decl. ¶ 9 (emphasis omitted). Construing all evidence in the light most favorable to Plaintiff, there is more than sufficient evidence to convince a reasonable jury that Defendant's proffered non-discriminatory reason was not the actual reason for the adverse employment actions.

**IV. CONCLUSION**

For the foregoing reasons, Defendant's Motion for Summary Judgment [Dkt. No. 13] is **denied in part and granted in part.**  An Order will issue with this Memorandum Opinion.


September 18, 2008                    /s/_____
                                     Gladys Kessler
                                     United States District Judge



**Copies to: attorneys on record via ECF**